**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Cr. Nos.: 05-0359-01, 02 & 03 (RMU)** |
| | : | |
| **DOUGLAS JEMAL, et al.** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM IN SUPPORT OF MOTION TO QUASH**

**A. INTRODUCTION**

Defendants, Douglas Jemal and Norman D. Jemal, respectfully submit this memorandum in support of their Motion to Quash the February 22, 2005 search warrant authorizing the search of Douglas Development Corp. corporate offices (the Douglas warrant) and any evidence or fruits thereof seized pursuant to such warrant. Usually, the government utilizes search warrants in situations where exigent circumstances exist, *i.e.*, the imminent destruction or loss of potential evidence but, in this case, no such issue existed. To the contrary, there was absolutely no threat regarding the destruction of documents or the availability of potential witnesses. In fact, from the commencement of this grand jury investigation, Douglas Corp has cooperated with the government including producing a voluminous amount of documentation to the grand jury and arranging for the government to interview a plethora of Douglas Corp. employees. Indeed, beginning in late 2004, in response to seven grand jury subpoenas, Douglas Corp. furnished the grand jury with approximately 45,000 pages of material, and was willing to continue to provide the grand jury any additional documentary material necessary to the criminal investigation. In other words, Douglas Corp. was in a complete cooperative mode and would produce any

information to the government that the government believed necessary to complete its criminal investigation.

Despite the total cooperation received from Douglas Corp. and the utter lack of any exigent circumstances, the government decided to search the Douglas Corp. offices.  To accomplish this objective, Special Agent Andrew Sekala (SA Sekala), prepared an affidavit to induce the magistrate to issue the warrant.  *See* Exhibit A, attached hereto.  The affidavit asserted that the Douglas Corp offices contained evidence of bribery of a public official (18 U.S.C. § 201), conspiracy to commit bribery of a public official (18 USC § 371), and tax evasion (26 USC § 7201) and, to establish these allegations, the affidavit identified three disparate transactions: (1) an alleged bribery scheme involving Douglas Corp.and Michael Lorusso (Lorusso), the former deputy director of the District of Columbia Office of Property Management; (2) Douglas Jemal's purported illegal receipt of a $430,039.38 leasing commission through MTD Real Estate Services (MTD), a Jemal-owned entity; and (3) a tax evasion scheme whereby Douglas Corp. provided Mr. Esherick, Mr. Brownell, and Mr. Millstein, two other Douglas Corp. employees, with a variety of benefits, which supposedly constituted taxable income for those individuals, but the individuals failed to report such benefits as taxable income.  Exhibit A, pp. 1-14.

With respect to the bribery scheme, SA Sekala relied solely upon the criminal information to which Lorusso pled whereby, from November 2000-January 2003, he admitted causing the District of Columbia to engage in a variety of activities benefiting Douglas Corp. and receiving several gifts from Douglas Corp.  Exhibit A, pp. 2-5.  The affidavit was utterly silent, however, as to any *quid pro quo* between Lorusso and Douglas Corp.  The affidavit did not even attempt to link the benefits Lorusso supposedly conferred upon Douglas Corp. and the gifts Douglas Corp. provided to Lorusso.  In addition, the affidavit failed to identify specifically any

leases, contracts, or properties involved in the alleged bribery scheme, instead relying on generic language such as "vehicle impoundment lot," "impoundment lot lease," and "Addison Road lease." Exhibit A., pp. 2-4. Finally, SA Sekala attempted to corroborate Lorusso's version of events by confirming that Douglas Corp had, in fact, furnished certain benefits to Lorusso. Exhibit A, ¶¶13-17, pp. 4-5. SA Sekala, however, did not present any evidence linking Lorusso's official acts with Douglas Corp.'s gifts to him.

Regarding the alleged criminality of Douglas Jemal's 2002 receipt of the MTD leasing commission, the affidavit detailed an unnamed DC government official's statements that the DC government used only two agents for leasing purposes, Cushman & Wakefield and Staubach & Co., that the official had never heard of MTD, and that MTD did not represent any city agencies in connection with leases at 77 P. Street, the building from which MTD earned its leasing commission. Exhibit A, ¶ 24, p.6. In addition, the affidavit detailed an interview of MR, a Douglas Jemal acquaintance, who signed the lien release thereby allowing the leasing commission to be distributed. MR denied knowing what he signed or the reason for the signing, claimed to have no knowledge of the bank account to which the money was wired, and did not grant permission to anyone to use his name on the wiring instructions. Exhibit A, ¶ 26, p.6. Furthermore, the affidavit also recounted portions of an interview of Douglas Corp.'s controller, who indicated that Paul Millstein informed him that the purpose of creating MTD to receive the leasing commission was to allow Douglas Jemal to receive such funds without his partner in the property being aware. Exhibit A, ¶ 29, p.7. Finally, the affidavit contained an excerpt of a law enforcement interview with Douglas Jemal's partner in the property, who indicated he did not know if he would have objected to Mr. Jemal's receiving a leasing commission. Exhibit A, ¶ 33 p.8.

The probable cause to believe that, from 2000-2003, a tax evasion scheme occurred consisted of a recitation of the various benefits and compensation that Douglas Corp. allegedly bestowed upon Mr. Esherick, Brownell, and Millstein and their failure to report such benefits as taxable income. According to the affidavit, Douglas Corp. paid Mr. Esherick's child support payment, provided direct payments of cash to him, furnished him rent-free housing, and paid for his personal vehicles, and Mr. Esherick failed to report these benefits as taxable income. Exhibit A., ¶¶ 36-45, pp. 8-10. Regarding Mr. Brownell, the affidavit detailed Douglas Corp.'s payments to Mr. Brownell's line of credit, and Mr. Brownell's failing to report such payments as taxable income. Exhibit A, ¶¶ 52-61, pp.11-14. With respect to Mr. Millstein, the affidavit identified the fact that Douglas Corp.'s books and records revealed that Douglas Corp. paid many expenses for the benefit of Mr. Millstein, such as credit card payments and house construction payments, and that the company's records reflected such payments as loans and advances. The affidavit also outlined an interview with Douglas Corp.'s controller from 2001-2003, who informed the government agents that he advised Mr. Millstein that such payments should be memorialized in an agreement, and the controller was unaware of any loan repayments or agreements. Exhibit A, ¶ 62, p.14. The affidavit, however, failed to acknowledge that Mr. Millstein underreported any potential income.

Finally, regarding the probable cause to believe that any corporate records evidencing the three purportedly illegal transactions would be located at Douglas Corp.'s corporate offices, the affidavit described the exterior of the offices and stated that a Douglas Corp. truck was parked in front of the office. Exhibit A, ¶ 66, pp. 14-15. In addition, the affidavit averred that it was "reasonable to conclude" that law enforcement agents would find the personal financial

information of Mr. Esherick, Brownell, and Millstein at Douglas Corp.'s the corporate offices.

The affidavit failed to contain any facts to buttress this speculation.

Based upon this affidavit containing three discrete alleged criminal schemes occurring

between 2000-2003, the government presented the magistrate with the warrant.  The Douglas

warrant contained eleven categories of items to be seized, nine categories failed to contain any

time limit and none of the categories were restricted to the alleged criminal transactions outlined

in the indictment:

(1)     All documents relating to Michael Lorusso and high-level officials in the DC
        Government;

(2)     All documents and records related to all financial affairs of Blake C. Esherick, including
        but not limited to all records related to his financial relationship with Douglas
        Development;

(3)     All documents and records related to all financial affairs of John E. Brownell, including
        but not limited to all records related to his financial relationship with Douglas
        development;

(4)     All documents and records related to all financial affairs of Paul Millstein, including but
        not limited to all records related to his financial relationship with Douglas development;

(5)     All documents and records relating to MTD Real Estate Services;

(6)     All documents and records relating to 4800 Addison Road;

(7)     All documents and records relating to 77 P. Street;

(8)     All documents and records related to all items of value provided by Douglas
        Development to persons and entities, not including routine payments for services or
        materials in the normal course of business;

(9)     All documents and records relating to Rolex watches, trips to Las Vegas in 2001 and
        2002, cash withdrawals or third party checks cashes, and limousine records;

(10)    All documents and records in the nature of day planners, calendars, phone directories,
        address books, receipts, travel related documents and such records which account for the
        activities of Douglas Jemal, Norman Jemal, and Blake Esherick, including entertainment
        and travel, from January 1, 2001 to the present; and

(11)    Any collections of photographs which include Lorusso and/or other DC Government public officials.

In addition, the Douglas warrant allowed the government agents to seize documents that the warrant did not specifically enumerate:

> [i[f the above said documents and records are found in a file/folder with other documents and records, the entire file may be seized.

*See* Exhibit B, attached hereto.

Finally, "to effectuate the search and to the extent necessary to retrieve documents and records identified in the affidavit," the Douglas warrant allowed the government agents to seize all of Douglas Corp.'s computer hardware and software."  Exhibit B, ¶¶ A-E, p. 18. The Douglas warrant also failed to contain any reference to any criminal offenses or to identify specifically any criminal statutes.  In addition, the warrant did not incorporate the affidavit.

The warrant and the underlying affidavit, however, fail to comply with Fourth Amendment jurisprudence.  The affidavit lacks the requisite probable cause that a crime has been committed and that the documents will be found at Douglas Corp.'s offices.  Since the affidavit was utterly devoid of any specific link between Lorusso's actions and the gifts Douglas Corp. provided him, there can be no probable cause to believe that bribery has occurred.  The affidavit simply lacked the fundamental element of a bribery offense, the *quid pro quo*.  The affidavit also failed to establish that the MTD leasing commission transaction was a crime.  There is nothing illegal about Douglas Jemal legitimately earning a real estate commission, and creating a third-party entity to collect that commission.  Finally, the probable cause for the tax counts was tenuous at best, considering that a host of legitimate reasons exist to consider the benefits provided to the three individuals as nontaxable items.

Regarding the probable cause that government agents would find the enumerated documents at Douglas Corp.'s offices, the affidavit contains none.  Other than a conclusory statement that a Douglas Corp. truck was seen in front of the corporate offices, the affidavit was entirely devoid of any probable cause that the government would locate any of the records in Douglas Corp.'s offices.  Indeed, the affidavit's only attempt to establish the nexus between the items to be seized and the locations to be searched was regarding the personal financial information of Mr. Esherick, Brownell, and Millstein, and the affidavit failed miserably in this attempt.  SA Sekala declared that probable cause existed to establish that this material was located at Douglas Corp.'s offices because it was "reasonable to conclude" that the personal financial information of the three individuals would be found at the corporate offices.  Yet, besides being pure speculation, such a statement was nonsensical considering that most people, if they preserve such information at all, maintain it in places other than their work place.

The affidavit's lack of probable cause is also vividly illustrated by the staleness of the time between the transactions and the issuance of the warrant.  The three transactions occurred between 2000-2003 but the magistrate did not issue the warrant until February 22, 2005.  Thus, a two-year delay existed between the date of the transactions and the issuance of the warrant, and such a lengthy delay significantly contributed to the affidavit's lack of probable cause.

The vice of lack of probable cause also voids the warrant.  As this Court is well aware, the scope of a search warrant must be limited to the affidavit's probable cause, *i.e.*, the Fourth Amendment precludes the use of facially overbroad warrants.  In this case, the warrant bears little - if any - relationship to any alleged probable cause contained in the underlying affidavit. The categories in the warrant far exceed any purported probable cause in the affidavit, and the warrant even permitted the government to seize and review documents that the warrant did not

specifically enumerate and all of the computer hardware and software found in the corporate offices. Simply put, even if the affidavit contained probable cause, the command sections of the warrant far exceeded any such probable cause, and therefore, the warrant is facially overbroad and thus invalid.

The warrant also lacks the requisite particularity.[1] The Fourth Amendment requires that all warrants "particularly describe[e] . . . the persons or things to be seized" but, in this case, the warrant permitted the government to conduct a fishing expedition into the personal financial affairs of Mr. Esherick, Mr. Brownell, and Mr. Millstein, and the business affairs of Douglas Corp, irrespective of time or transaction. Despite the fact that the affidavit was limited in time and scope, the warrant's command section used generic language and blatantly ignored the affidavit's restrictions. A vast majority of the categories in the warrant failed to contain a time limitation. In fact, of eleven total categories, nine failed to contain any time restriction, despite the fact that the alleged criminal conduct identified in the affidavit occurred over only a three-year period. Furthermore, the warrant was not even limited to any specific criminal activity because the warrant neither identified any criminal statutes nor referred to any criminal offenses. In other words, the Douglas warrant was a general warrant in direct violation of the Fourth Amendment and therefore, based upon the affidavit's lack of probable cause and the warrant's invalidity, this Court must quash it and suppress all evidence and fruits seized therefrom.

## II. LEGAL ANALYSIS

### A. THE AFFIDAVIT LACKS PROBABLE CAUSE[2]

---

[1]     A warrant's lack of particularity also is encompassed within the Fourth Amendment's prohibition against overbroad warrants. *See United States v. Leary*, 846 F.2d 592, 600-605 (10th Cir.1988)

[2]     "[T[he capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of

"A search by Government agents is presumptively unreasonable under the Fourth Amendment unless conducted pursuant to a warrant issued by a judicial officer upon a finding of probable cause." *United States v. Warren*, 42 F.3d 647, 652 (D.C.Cir.1994) (citing *Katz v. United States,* 389 U.S. 347, 357 (1967)). "To demonstrate probable cause, an affidavit must set forth facts sufficient to induce a reasonable prudent person to believe that a search thereof will uncover evidence of a crime." *United States v. Huggins*, 733 F.Supp. 445, 447 (D.D.C.1990). Moreover, the affidavit must establish probable cause not only that criminal conduct occurred but also that the evidence of such illegal activity will be found in a particular place. "There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Kemper*, 375 F.Supp. 2d 551, 553 (E.D.Ky.2005) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir.1998)). Indeed, probable cause does not exist to justify a search of a particular location if the affidavit underlying the search warrant fails to identify specific facts that the

---

(continued)

privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)). Thus, prior to determining the validity of the affidavit and the warrant, this Court must ascertain whether the Jemals possessed a reasonable expectation of privacy in their corporate offices. An employee has a reasonable expectation of privacy in his or her work office. *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). Consequently, the Jemals and Mr. Esherick possess standing to challenge the search of their corporate offices. In addition, the Jemals have standing to contest the search of the remaining parts of the Douglas Corp.'s offices because: (1) Douglas Jemal owned the company; (2) both Jemals possessed the power to exclude anyone from any part of the offices; (3) they ensured the privacy of the items within the offices by placing electronic keys on the entrance to the building, the elevator, and the file room contained in the offices; (4) the file room, containing a multitude of files, also was secured by a door lock; (5) the Jemals were legitimately on the premises during the search; and (6) they worked in all areas of the suite, not just their offices. *See United States v. Brien*, 617 F.2d 299, 306 (1st Cir.1980); *United States v. Lefkowitz*, 464 F.Supp. 227, 230-31 (C.D. Ca.1979); *see also United States v. Duran*, 884 F.Supp. 548, 550 (D.D.C.1995). Thus, the Jemals possessed a reasonable expectation of privacy in their secured office suite.

Memorandum in Support of Motion to Quash
Page 9

evidence of criminal activity will be located at the place to be searched. *Carpenter*, 360 F.3d at 594.

The probable cause analysis is a "practical, commonsense" inquiry based upon the totality of the circumstances contained in the affidavit. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).    A search, however, may not be based upon a "hunch" or unparticularized suspicion." *Brinegar v. United States*, 338 U.S. 160, 175 (1949).  Indeed, common rumor or report, suspicion, conclusory allegations or even "strong reasons to suspect" have failed to satisfy the Fourth Amendment's probable cause standard. *Gates*, 462 U.S. at 238; *Henry v. United States*, 361 U.S. 98, 191 (1959).  Thus, the bottom line is that this Court must look at the four corners of the affidavit to determine whether the magistrate had a substantial factual basis for issuing the warrant. *United States* v. *Warren*, 42 F.3d 647, 652 (D.C.Cir. 1994).

In this case, the affidavit fails to satisfy the Fourth Amendment's probable cause standard.  According to the affidavit, the Douglas Corp offices contained evidence of bribery of a public official (18 U.S.C. § 201), conspiracy to commit bribery of a public official (18 USC § 371), and tax evasion (26 USC § 7201).  To support this claim, the affidavit then identified three disparate transactions: (1) an alleged bribery scheme involving Douglas Corp. and Michael Lorusso (Lorusso), the former deputy director of the District of Columbia Office of Property Management; (2) Douglas Jemal's purported illegal receipt of a $430,039.38 leasing commission through MTD Real Estate Services (MTD), a Jemal-owned entity; and (3) a tax evasion scheme whereby Douglas Corp. provided Mr. Esherick, Mr. Brownell, and Mr. Millstein, two other Douglas Corp. employees, with a variety of benefits, which supposedly constituted taxable income for those individuals, but the individuals failed to report such benefits as taxable income. Exhibit A, pp. 1-14.

Yet, there is no substantial basis to conclude that the Jemals or anyone else was involved in a bribery scheme with Lorusso. The affidavit relied solely upon Lorusso's criminal information in which he pled guilty to conspiring to pay and to receive bribes from the Douglas Corp. Lorusso admitted to causing the District of Columbia to engage in a variety of activities benefiting Douglas Corp. and to receiving several gifts from Douglas Corp. Exhibit A, pp. 2-5. Yet, receiving gifts from the Douglas Corp. and causing the DC government to take actions that benefited the Douglas Corp does not equate to probable cause that Douglas Corp. bribed Lorusso. As this Circuit has stated:

> [t]he bribery section makes necessary an explicit *quid pro quo* which need not exist if only an illegal gratuity is involved; the briber is the mover or producer of the official act, but the official act for which the gratuity is given might have been done without the gratuity, although the gratuity was produced because of the official act.

*United States v. Brewster*, 506 F.2d 62, 72 (D.C.Cir. 1974); *see also United States v. Schaffer*, 183 F.3d 833, 841 (D.C.Cir. 1999) ("bribery requires a *quid pro quo*"). Without a *quid pro quo*, there can be no bribery and, in this case, the affidavit fails to establish, pursuant to any evidentiary standard, any *quid pro quo* between Lorusso and Douglas Corp. Indeed, the affidavit does not even attempt to link the benefits Lorusso supposedly conferred upon Douglas Corp. and the gifts Douglas Corp. provided to Lorusso.[3]

Moreover, the affidavit's attempt to corroborate Lorusso does not alter the equation. While SA Sekala might have confirmed that Douglas Corp had, in fact, furnished certain items of value to Lorusso, that fact alone does not create sufficient probable cause to believe that Douglas Corp. bribed Lorusso. Exhibit A, ¶¶13-17, pp. 4-5. The affidavit needed to contain

---

[3]    In the section of Lorusso's criminal information contained in the affidavit, he admits dealing with Douglas Corp. regarding an impoundment lot lease around the time Douglas Corp. paid for his hotel room in Las Vegas. Exhibit A, p.3. Yet, such an assertion does not create the requisite *quid pro quo*.

facts establishing a substantial basis that a *quid pro quo* existed, but it did not do so.  Such a failure prevents any conclusion that probable cause existed to establish a bribery scheme between Lorusso and Douglas Corp.[4]

Regarding the alleged criminality of of the MTD leasing commission, the affidavit details statements by an unnamed DC government official that the DC government used only two agents for leasing purposes, Cushman & Wakefield and Staubach & Co., that the official had never heard of MTD, and that MTD did not represent any city agencies in connection with leases at 77 P. Street, the building from which MTD earned its leasing commission.  Exhibit A, ¶ 24, p.6.  Yet, these assertions fail to establish probable cause that a crime had been committed with respect to the Douglas Jemal's receipt of the leasing commission.   MTD did not have to officially "represent" a DC agency to collect the commission.  Rather, to earn legitimately the commission, MTD was required to assist in persuading a city agency to sign a lease for office space in the building.  Whether MTD officially "represented" the city or whether the city utilized only two real estate brokers for its office space needs is simply irrelevant to the legitimate earning of the commission.[5]  Moreover, this Court must view with great skepticism the information received from this DC official because the affidavit failed to specifically identify him or his precise employment with the DC government.  Instead, the affidavit refers to him as an "official with the DC Government familiar with the real estate operations of the city[.]" Exhibit A, ¶ 24, p.6.

---

[4]     The affidavit fails to contain the fact that, after he pled guilty in November 2004, Lorusso became a cooperating government witness.  Therefore, any judicial officer should have questioned Lorusso's reliability when he inculpated anyone in his criminality considering his obvious and logical desire to please the government thereby minimizing any potential incarceration period.

[5]     The fact that that this unnamed DC official had never heard of MTD does not mean that MTD did not legitimately earn the leasing commission.

Moreover, the affidavit's recitation of the government's interview with MR is similarly unavailing to establish probable cause.[6]  According to the affidavit, MR, a Douglas Jemal acquaintance, signed the lien release thereby allowing the leasing commission to be distributed. MR denied knowing what he signed or the reason for the signing, claimed to have no knowledge of the bank account to which the money was wired, and did not grant permission to anyone to use his name on the wiring instructions.  Exhibit A, ¶ 26, p.6.  Again, MR's comments have no effect on the determination of whether MTD legitimately earned the leasing commission.

Likewise, the fact that Paul Millstein informed Douglas Corp.'s controller that the purpose of creating MTD to receive the leasing commission was to allow Douglas Jemal to receive such funds without his partner in the property being aware does not assist the probable cause determination.  Exhibit A, ¶ 29, p.7.  Douglas Jemal was entitled to create any entity to receive this commission, and he was under no obligation whatsoever to inform his partner of the entity's creation[7].  It is not criminal to earn legitimately a commission and create a third-party entity to receive the commission without a partner being aware.  Such a transaction might warrant civil litigation but certainly fails to violate any criminal laws.[8]

---

[6]     The fact that the affidavit fails to connect this transaction to the criminal statutes identified in the affidavit, *i.e.*, conspiracy to bribe, bribery, and tax evasion further illustrates the affidavit's lack of probable cause regarding this transaction.  The affidavit is devoid of any rationale explaining how Douglas Jemal's receipt of the leasing commission violates any of those three statues.  Furthermore, the government appears to be confused as to precise the criminal conduct in this transaction.  In the overview section, the affidavit describes it as wire fraud and in another place, the affidavit identifies the vice of the transaction as a false invoice. Exhibit A, ¶ 11, p.2, ¶ 32, p.7.

[7]     Noticeably absent from the affidavit are any facts remotely suggesting that Douglas Jemal had a legal obligation to inform his partner that MTD was an entity that the Jemals created to receive a leasing commission that they legitimately earned.

[8]     The fact that Douglas Jemal's partner in the property indicated that he did not know if he would have objected to Mr. Jemal's receiving a leasing commission further amplifies the non-criminal nature of this transaction.  Exhibit A, ¶ 33 p.8.  Essentially, with respect to this

Finally, the affidavit's recitation of the MTD transaction vividly illustrates the conclusory, nonfactual assertions permeating the affidavit. According to SA Sakela:

> [t]hat Brownell's use of the phrase "outside brokers" was intended to suggest brokers other than Douglas Development (or related Douglas Jemal entities). The evidence supports the conclusion that this statement was a deliberate lulling comment and that even prior to settlement Brownell was a participant in a scheme to submit the false invoice to the lender in order to divert loan proceeds to Jemal.

Exhibit A, ¶ 32, p.7. Unfortunately for SA Sekala, the affidavit fails to contain any facts supporting this conclusion, and consequently, no judicial officer could rely upon this speculation to conclude that probable cause existed to establish that Douglas Jemal's receipt of the leasing commission constituted a crime.

The affidavit's attempt to create probable cause with respect to the alleged tax evasion scheme also fails. With respect to Mr. Esherick, the affidavit details the payments that Douglas Corp. made on behalf of Mr. Esherick including child support, utilities, personal vehicles, and various housing-related expenses. Exhibit A., ¶¶ 36-45, pp. 8-10. Then, the affidavit proceeds to identify the various deductions that Mr. Esherick claimed and concludes, based upon an unnamed Internal Revenue Service's (IRS) Special Agent's review of Mr. Esherick and Douglas Corp.'s books and records, that Mr. Esherick failed to report over $100,000 in taxable income. Exhibit A, ¶¶42-43, pp.9-10. According to the affidavit, an IRS analysis of 2002 also revealed that Mr. Esherick continued to receive income that was not reported, and he did not file a tax return in 2003. Exhibit A, ¶44, p.10.

The problem with this analysis, however, is that it is premised upon conjecture that the benefits Douglas Corp. provided to Mr. Esherick constituted income Mr. Esherick was required

---

(continued)
transaction, the government has attempted to create probable cause that a crime has been committed when the transaction itself is not a crime.

to report.  Again, like with the MTD transaction where SA Sekala relied upon an unnamed

source, the affidavit fails to identify specifically the IRS agent, who concluded that the benefits

constituted income, or to contain any portion of the IRS agent's review whereby he arrived at his

finding that these benefits were reportable income.  In addition, regarding 2002, the affidavit is

completely void of any facts.  Rather, it simply states that the IRS analysis established that Mr.

Esherick received income that he failed to report.  Yet, such a conclusory statement cannot,

under any evidentiary standard, constitute probable cause to believe that a crime has been

committed, especially regarding an alleged tax evasion scheme.

Furthermore, while the affidavit concedes that the Douglas Corp. books recorded the

benefits provided to Mr. Esherick as "loan receivables," the affidavit then concludes that such

benefits cannot be loans because there has been no repayment of them and Douglas Corp. did not

charge any interest on the loans.  Exhibit A, ¶ 45, p.10.  Of course, the fact that Mr. Esherick has

not yet repaid the money and Douglas Corp. did not charge any interest does not mean that the

benefits were not loans, especially considering that Douglas Jemal runs the company as a small

family business.  Finally, the fact that witnesses familiar with the Douglas Corp. books and

records were unaware of any such loans to Mr. Esherick is irrelevant.  Once again, the affidavit

does not identify these individuals and, more importantly, the fact that these individuals were

unaware of the loans does not mean that such loans did not occur.

The affidavit's facts related to Mr. Brownell's tax issues also fail to establish the requisite

probable cause.  According to the affidavit, from 1999-2003, Douglas Corp would make

payments to Mr. Brownell's personal equity line of credit at Potomac Valley Bank (PVB) and

Mr. Brownell would draw on the credit line, thereby creating unreported income for Mr.

Brownell.  Exhibit A, ¶¶ 46-53, pp. 10-13,  Then, the affidavit reveals that Douglas Corp

recorded these payments to PVB as loan repayments and that Brownell loaned Douglas Corp. $70,000. Exhibit A, ¶¶ 55-56, p.13. The affidavit, however, proceeds to conclude that the Douglas Corp. payments to PVB could not be loan repayments because: (1) Mr. Brownell used the loan repayment account to pay other personal expenses; (2) the Douglas Corp. payments to PVB exceeded any loans from Mr. Brownell to Douglas Corp and the loan payable account failed to identify any other loans from Mr. Brownell to Douglas Corp.; and (3) in 1999 and 2000, Mr. Brownell received two additional $20,000 Douglas Corp. checks, classified as loans to Mr. Brownell, thereby suggesting that the loans from Mr. Brownell to Douglas Corp. had already been paid off. Exhibit A, ¶¶ 56-60, p.13. According to SA Sekala:

> "it is reasonable to conclude that Douglas development and Brownell have used the existence of loans as a pretext to conceal and obscure the payments of funds to Brownell in excess of any loans he may have made

Exhibit A, ¶ 61, pp. 13-14.

Yet, it is unreasonable to assume, based upon the affidavit, that the loans were used to conceal income. Indeed, there was no concealment. Douglas Corp. did not hide its checks to PVB, and Mr. Brownell did not conceal his use of his equity line of credit. In fact, the money trail was open and notorious, thereby directly contradicting SA Sekala's conclusion. In addition, the fact that Mr. Brownell utilized the loan repayment account to pay other expenses does not negate the conclusion that the Douglas Corp. checks to PVB constituted loan repayments. Moreover, while the affidavit relies upon the fact that the loan payable account did not identify any additional loans from Mr. Brownell to Douglas Corp., the fact remains that a reasonable possibility existed that such loans occurred. Douglas Corp. could have loaned Mr. Brownell additional money based solely upon Douglas Jemal's oral representations. Also, the fact that Douglas Corp. loaned Mr. Brownell additional funds in 1999 and 2000 also does not equate to a

finding that Douglas Corp. repaid in full its obligation to Mr. Brownell. Douglas Jemal could have loaned Mr. Brownell the funds even though he still owed Mr. Brownell on another loan. Simply put, SA Sekala's attempt to create a tax evasion scheme based on Mr. Brownell's equity line of credit simply does not hold water. It is based upon pure conjecture.[9]

Finally, this Court can make short shrift of the allegations relating to Mr. Millstein's tax situation. While the affidavit generally declares that Douglas Corp. paid for substantial expenses of Mr. Millstein, it fails to specify that Mr. Millstein failed to file his tax returns or underreported any income. Thus, there can be no probable cause that Mr. Millstein was part of a tax evasion scheme considering that the affidavit fails to contain any information indicating he underreported his income. Moreover, the fact that Douglas Corp.'s controller from 2001-2003 indicated that the payments to Millstein should be memorialized in some type of agreement does not alter the result. Exhibit A, ¶ 62, p.14. Oral agreements are as valid as written ones. Moreover, the affidavit's recitation of a conversation between Mr. Brownell and an outside accountant in which Mr. Brownell was instructed to "clean up' the tax situations of Mr. Esherick or Mr. Millstein is nice atmospherics but fails to establish probable cause of any tax evasion scheme. In sum, the affidavit fails to establish any probable cause that a tax evasion scheme occurred and, as this Court is well aware, without probable cause, there can be no search warrant.

## B. THERE WAS NO NEXUS BETWEENS THE PLACE TO BE SEARCHED AND THE EVIDENCE SOUGHT

"The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific things to be searched for and

---

[9]    The affidavit also details the fact that the Douglas Corp. general ledger would reflect only a check to PVB, not that Mr. Brownell was enriched. The general ledger should reflect only the check to PVB. The fact that Mr. Brownell used his credit line is irrelevant to Douglas Corp.'s books and records.

seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *see also United States v. Thomas*, 989 F.2d 1252, 1254 (D.C.Cir.1993). In this case, no such probable cause exists. The affidavit identifies the location of the corporate offices and describes the exterior of the office building but fails to establish any factual basis for a reasonable conclusion that the items sought in the Douglas warrant would be located at the corporate offices. Exhibit A, ¶ 66, pp.14-15. Again, SA Sekala's unsupported conclusion that Douglas Corp's documents would be found at the corporate offices is simply insufficient to establish the requisite probable cause. Moreover, no reasonable basis exists to conclude that the personal financial information of Mr. Esherick, Brownell, and Millstein would be at the Douglas Corp. offices and, regarding the corporate documents, such documents could be located in another building or even an off-site storage area, especially considering that that the transactions identified in the affidavit were over two years old. Thus, the affidavit does not establish the nexus between the items to be seized contained in the Douglas warrant and the location to be searched. As a result, the affidavit fails to pass muster.[10]

## C. THE AFFIDAVIT'S INFORMATION WAS STALE

"While there is no bright line for staleness, the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search so that probable cause can be said to exist at the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir.1993); *see also Schoeneman v. United States*, 317 F.2d 173, 177 (D.C.Cir.1977). "If the information is too old, it is considered stale and probably no longer exists." *United States v. Huggins*, 733 F.Supp. 445,

---

[10]    The lack of a nexus is further illustrated by the fact that Douglas Corp. had already produced a multitude of documents to the government. Thus, it was very likely that no further documents remained at the corporate site.

447 (D.D.C.1990) (quoting *United States v. Rakowski*, 714 F.Supp. 1324, 1329 (D.Vt.1979) (citing *Sgro v. United States*, 287 U.S. 206, 210-12 (1932)). Yet, in this case, the affidavit identifies three areas of purported criminal activity, all of which occurred from approximately 1999-2003. The government, however, waited until February 22, 2005 to induce the magistrate to issue the search warrant, well over two years after the transactions at issue and then, in the affidavit, omitted to include any facts proving that the documents relating to these transactions were still located at Douglas Corp.'s offices. Furthermore, despite interviewing Douglas Corp.'s controller from 2001-2003, the government still failed to include, within the four corners of the affidavit, Douglas Corp's retention policies with respect to documents or even whether the documents enumerated in the warrant still existed. In sum, if the affidavit contained probable cause, such probable cause was stale. It did not establish, under any evidentiary standard, that the documents enumerated in the command sections of the warrant would be found at the Douglas Corp. offices.

### D. THE WARRANT IS FACIALLY OVERBROAD BECAUSE ITS COMMAND SECTIONS EXCEEDED ANY PROBABLE CAUSE CONTAINED IN THE UNDERLYING AFFIDAVIT

"The Fourth Amendment requires . . . that the scope of the warrant be limited to the specific areas and things for which there is probable cause to search. *United States v. Leary*, 846 F.2d 592, 605 (10th Cir.1988) (citing *Maryland v. Garrison*, 480 U.S. 79 (1987)). "The breadth of a warrant must be justified by the breadth of the probable cause." *Voss v. Bergsgaard*, 774 F.2d 402, 408 (10th Cir.1985) (Logan, J., concurring). As the Ninth Circuit aptly stated," the command to search can never include more than is covered by the showing of probable cause to search." *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir.1980) (quoting *United States v. Hinton*, 219 F.2d 324, 325 (7th Cir.1955). Thus, even if an affidavit establishes probable cause

justifying the issuance of a search warrant, the command sections of that warrant can never, as a matter of law, exceed the probable cause identified in the affidavit.

Yet, that is the precise scenario that occurred in this case. Assuming that probable cause exited with respect to the bribery scheme, the MTD leasing commission, and the tax evasion allegations, the command section of the Douglas warrant exceeded such probable cause. Three of the categories (2-4) allowed the government to seize all records relating to the financial affairs of Mr. Esherick, Brownell, and Millstein. In other words, this provision permitted the government to conduct a fishing expedition into these three individuals' financial dealings with any individual or entity, including reviewing any records of financial transactions between them and family members. Yet, if any probable cause existed in the affidavit, such probable cause related to a tax evasion scheme between the individuals and one entity, Douglas Corp. The affidavit's purported probable cause allowed the government to seize the records of those three individuals related only to their financial relationship with Douglas Corp, nothing more and nothing less.[11]

Likewise, the category that allowed the government to seize all material related to Michael Lorusso and other high-level officials in the DC government (category 1) exceeds any probable cause found in the affidavit. The affidavit's bribery allegations pertain only to Lorusso,

---

[11]    The bribery and MTD transactions also fail to provide sufficient probable cause to allow the general rummaging into these three individuals' financial dealings. First, the affidavit's bribery allegations do not inculpate Mr. Brownell or Mr. Millstein, so this transaction cannot, as a matter of law, support a wholesale search into those two individuals' financial dealings. Second, although the affidavit inculpated Mr. Esherick in the bribery scheme, such evidence certainly did not allow the government to seize all of Mr. Esherick's financial information. It permitted the seizure of his financial material relating only to Lorusso. Third, if the affidavit established probable cause regarding the leasing commission, such probable cause permitted the government to obtain the financial records of these three individuals relating only to the receipt of the leasing commission. Of course, the warrant sought much more.

and therefore, Fourth Amendment jurisprudence mandates that this category be similarly limited to Lorusso.  It was not, and therefore, is overbroad.[12]

Similarly, the three categories permitting the government to obtain all the records relating to MTD, 4800 Addison Road, and 77 P. Street (categories 5-7) are also facially overbroad.  The affidavit details one transaction involving MTD, *i.e.*, the leasing commission, but the warrant demands the seizure all MTD records, regardless of transaction.  The affidavit patently lacks any probable cause to justify the seizure of all of the transactions in which MTD was involved.  Likewise, the affidavit does not even specifically identify 4800 Addison Road, but the warrant mandates the seizure of all records of that property.  Such a command is invalid.  There can be no probable cause to seize all of the records relating to 4800 Addison Road when the affidavit fails to identify specifically the property.[13]  The same rationale applies to the seizure of all records pertaining to 77 P. Street.  There is no specific mention of  77 P. Street in the bribery or the tax evasions sections of the affidavit.  The affidavit refers to 77 P. Street only in the MTD leasing commission transaction but the warrant commands the seizure of all 77 P. Street documents.  If the affidavit limits 77 P. Street to the leasing commission transaction, the corresponding command section of the warrant must similarly restrict the seizure of documents relating to only that particular aspect of the property.

---

[12]    The affidavit indicates that Douglas Corp. provided  a $105.74 cellphone power adapter to Eric Price, the former District of Columbia Deputy Mayor.  Exhibit A, ¶ 18, p.5.  This statement fails to provide the requisite probable cause allowing the government to seize all of Douglas Corp.'s records relating to any high-level DC official.  In fact, this statement does not even establish that a crime has been committed.

[13]    Throughout the affidavit's bribery allegations, properties are described generically, such as "the Addison Road lease," "vehicle impoundment lot," and a "building owned by Douglas Development."  Exhibit A, pp.3-4.  These general descriptions fail to establish sufficient probable cause to allow the government to seize all records relating to 4800 Addison Road, 77 P. St., or MTD Real Services Inc.

The final four categories of the Douglas warrant contain the same vice. Category 7 directs the seizure of all of Douglas Corp.'s records relating to any items of value provided to any person or entity, excluding routine vendor payments. Yet, the affidavit lacks any probable cause to justify such a seizure. If the affidavit contains probable cause with respect to the bribery allegations, such probable cause is limited to Douglas Corp.'s dealings with Lorusso, and category 7 should have adhered to this limitation. It did not, instead allowing the government to rummage through all of Douglas Corp.'s records pertaining to gifts given to anyone or any entity, including family and friends. Such a command provision blatantly exceeds the affidavit's probable cause and consequently, is fatally deficient. The warrant also allowed the government to obtain all records relating to Rolex watches, trips to Las Vegas in 2001-2002, cash withdrawals or third party checks cashed, and limousine records (category 8). Thus, this category allowed the government to seize the records of any Douglas Corp. employee who used a limousine at any time, traveled to Las Vegas in 2001 or 2002, withdrew money at any time, or cashed a check for a friend at any time. Yet, if the affidavit establishes probable cause, such probable cause is limited to the giving of items of value to Lorusso, and consequently, this category should been qualified by a connection to Lorusso. It was not, and therefore, was facially overbroad. Category 9 also is deficient. It allowed the seizure of all records accounting for the activities of Douglas Jemal, Norman Jemal and Mr. Esherick from January 2001 to the present. Yet, the affidavit does not contain probable cause allowing the government to obtain such documents. To the contrary, the affidavit is limited to three discrete transactions, and category 9 should have been restricted to those three transactions. Moreover, there is no probable cause allowing to government to obtain records from 2003 to the present. The affidavit fails to establish a course of criminal conduct continuing to the present. The alleged criminal

activity identified in the affidavit terminated by 2003, and therefore, there simply is no basis to allow the government to obtain records past that date.  In simple terms, category 9 exceeds any purported probable cause found in the affidavit and, like the other categories, is patently overbroad. The category allowing the government to seize photographs of Lorusso and other high-level DC government officials is similarly invalid.  Again, the affidavit limits any supposed probable cause to alleged bribes to Lorusso, and consequently, the seizure of any photographs must be limited to Lorusso.

Finally, the Douglas warrant contains two provisions that blatantly allowed the government to seize essentially any document found in the corporate offices.  Specifically, the warrant declares:

> [i]f the above said documents and records are found in a file/folder with other documents, the entire folder may be seized

In addition, the warrant permits the government, in order "to effectuate the search and to the extent necessary to retrieve documents identified in the affidavit which may be stored electronically/digitally," to seize any and all computer hardware, software and computer-related documentation.  *See* Exhibit B, p. 18.  In other words, based upon these two provisions, any probable cause finding in the affidavit is irrelevant.  The government can seize any document it wants, including all of Douglas Corp.'s business records contained within its computers. Indeed, the warrant's command allowing government agents to seize all computer-related items essentially permits the government to rummage through Douglas Corp.'s business affairs regardless of transactions despite any showing that the company was permeated with fraud.  *See United States v. Singh*, 973 F.Supp. 7, 8-10 (D.D.C. 1997) (cannot seize all of a company's business records unless affidavit establishes business permeated with fraud).  Moreover, these two facially-overbroad provisions also permitted the government agents to seize a variety of

attorney-client privileged material, including a forensic accountant's memorandum marked

"privileged" and addressed to Akin Gump Strauss Hauer and Feld (the attorneys for Douglas

Corp and Douglas Jemal).    This document constitutes a direct roadmap of the tax charges

contained in the indictment because attached to it was a spreadsheet detailing Douglas Corp.'s

ledgers' entries that needed to be adjusted relating to the compensation Douglas Corp. paid Mr.

Esherick, Mr. Brownell, and Mr. Millstein.[14]   The day after the search was executed, the

government returned that privileged memorandum and eleven other attorney-client privileged

documents but, of course, the government would not know which documents to return unless the

agents reviewed the documents.[15]   In simple terms, the government utilized the warrant's

overbreadth to examine the most privileged and confidential documents that the Douglas Corp.

possessed, and this improper intrusion into the attorney-client privilege vividly illustrates the

warrant's patently facial overbreadth.[16]

### E. THE WARRANT IS ALSO FACIALLY OVERBROAD BECAUSE IT LACKS THE REQUISITE PARTICULARITY

"The fourth amendment states that a search warrant must 'particularly describe the place

to be searched, and the persons or things to be seized."  *United States v. Singh*, 973 F.Supp. 7,

10 (D.D.C.1997) (quoting U.S. Const. amend IV).   In other words, the Fourth Amendment bars

---

[14]    Counsel for Douglas Corp. and Douglas Jemal immediately lodged with this Court an objection to the seizure of such privileged material.

[15]    Also, the government agents would not have known which document to seize unless, prior to seizing it, they reviewed it.

[16]    Several days after the raid, an Akin Gump attorney reviewed the remaining seized items to ascertain whether the government continued to possess additional privileged material.  The attorney discovered an additional sixteen attorney-client privileged items.  By seizing and maintaining Douglas Corp's privileged material, the government must now rebut the presumption that tainted material was furnished to the prosecution team.  *United States v. Neill*, 952 F.Supp. 834, 841 (D.D.C.1997) (citing *Briggs v. Goodwin*, 698 F.2d 486, 495 n.29 (D.C.Cir.1983).  The government will have an arduous task in doing so because of the significance of the forensic accountant's memorandum to the pending tax charges.

"the general, exploratory rummaging [of] a person's belongings." *United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C.Cir.1990) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)) . By restricting searches "to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas*, 379 U.S. 476, 485 (1965) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).

In this case, however, the Douglas warrant left a great deal of discretion to the executing officers. The warrant failed to specify the type of documents to be seized, instead relying upon generic language such as "all documents and records whatsoever" and "all documents relating to." In addition, it did not restrict the seizure of documents to the allegedly criminal conduct identified in the affidavit. Furthermore, despite the fact that the three transactions specified in the affidavit occurred over a specified time period, the warrant was not limited to such time periods. Indeed, in the Douglas warrant, nine of the eleven categories failed to contain any time limitation whatsoever. In addition, of the two remaining categories that contained a time limitation, one of them allowed the seizure of records from 2001 to the present despite the fact that the affidavit failed to contain any probable cause establishing, pursuant to any evidentiary standard, that any of the alleged criminal conduct was continuing in nature.

The warrant's lack of particularity is further confirmed by its complete failure to identify any criminal statutes or to refer to any criminal offenses. This lack of specificity combined with the warrant's generic language, lack of a time frame, and a lack of connection to the  specific transactions identified in the affidavit  "effectively authorized the inspector to cart away anything

that they could find on the premises." *Roberts v. United States*, 656 F.Supp. 929, 931

(S.D.N.Y.1987).[17]   Indeed, the best evidence that the inspectors were allowed to seize any items

they wanted were the provisions contained in the warrant allowing for the seizure of all computer

hardware and software regardless of the material contained within and all folders, as long as one

document within the folder was enumerated in the warrant.  Thus, based upon these provisions

and the other command sections of the warrant, the agents were permitted *carte blanche* to seize

documents exceeding any probable cause found in the affidavit.  In other words, the warrant

permitted a general, exploratory search of Douglas Corp.'s offices and the Fourth Amendment

bars such searches.[18]

## F.  THE GOOD FAITH EXCEPTION IS INAPPLICABLE

In 1984, in *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the

exclusionary rule should not be applied when the officer conducting the search acted in

"objectively reasonably reliance" on a warrant issued by a impartial and detached magistrate that

subsequently is determined to be invalid.  *Id*. at 920.  *See United States v. Nader*, 621 F.Supp.

1076, 1082 (D.D.C.1985).  The *Leon*  Court, however, proceeded to identify four situations

where courts should not apply the "good faith exception" to the exclusionary rule: (1) where the

magistrate issued the warrant based on a deliberately or recklessly false affidavit; (2) where the

---

[17]     The Fourth Amendment also requires the government to describe the items to be seized
with as much specificity as the circumstances allow.  *See United States v. Leary*, 846 F.2d 592,
600 (19th Cir.1988).  Moreover, "warrants are conclusively invalidated by their substantial failure
to specify as nearly as possible the distinguishing characteristics of the goods to be seized."
*United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir.1987).  In this case, the government made no
attempt to specify the items to be seized.  Considering that it had access to the former Douglas
Corp. controller and Lorusso, it could have specified in great detail the documents it needed to
pursue its investigation.  Instead, it proceeded to draft a warrant essentially allowing the agents
to seize any documents maintained in either location.

[18]     Also, the government cannot rely upon the affidavit to cure this invalid warrant.  The
affidavit was neither attached to nor incorporated into the warrant.  Consequently, the warrant
stands alone.  *See United States v. Maxwell*, 920 F.2d 1028, 1031-33 (D.C.Cir.1990).

issuing magistrate failed to act in a neutral and detached manner; (3) where a warrant is based on an affidavit "so lacking in indicial of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where a warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *see also United States v. Johnson*, 332 F.Supp. 2d 35, 39 (D.D.C.2004).

In this case, exceptions three and four remove any possibility that the "good faith" exception preserves the validity of the Douglas warrant. Regarding any probable cause that the transactions identified in the affidavit constitute crimes, the affidavit contains none. There is absolutely no attempt to link the gifts Douglas Corp. provided Lorusso to any official actions that Lorusso took on behalf of Douglas Corp. Thus, no law enforcement officer could reasonable conclude, under any circumstances, that the affidavit's factual recitation constitutes probable cause to believe that Douglas Corp. bribed Lorusso. With respect to the MTD leasing commission transaction, the affidavit is utterly devoid of any facts establishing that Douglas Jemal did not earn the commission. Rather, the affidavit focuses upon unnamed DC government official declaring that he had not heard of MTD and that MTD did not represent the District of Columbia, but such averments fail to establish probable cause that crime was committed. The fact remains that Douglas Jemal was entitled to receive a leasing commission in any entity he so desired as long as he earned it, *i.e.*, assisted in persuading a District of Columbia tenant to move into 77 P. St.. The affidavit is silent as to this critical fact, and consequently, no reasonable government agent could rely upon that portion of the affidavit to establish probable cause.

Finally, with respect to the alleged tax evasion scheme, no law enforcement officer conclude reasonably conclude that probable cause exists to believe that Mr. Millstein was part of

any tax evasion scheme because the affidavit omitted any specific facts and failed to allege that he underreported any income. *See* Exhibit A.,¶62,p.14.  With respect to Mr. Esherick, the affidavit details the payments that Douglas Corp. made on behalf of Mr. Esherick including child support, utilities, personal vehicles, and various housing-related expenses, proceeds to identify the various deductions that Mr. Esherick claimed and concludes, based upon an unnamed Internal Revenue Service's (IRS) Special Agent's review of Mr. Esherick and Douglas Corp.'s books and records, that Mr. Esherick failed to report over $100,000 in taxable income.  Exhibit A., ¶¶ 36-45, pp. 8-10.  According to the affidavit, an IRS analysis of 2002 also revealed that Mr. Esherick continued to receive income that was not reported, and he did not file a tax return in 2003.  Exhibit A, ¶44, p.10.

No law enforcement officer, however, could reasonable conclude that such allegations constitute probable cause that Mr. Esherick engaged in a tax evasion scheme.  Again, like with the MTD transaction, the affidavit fails to identify specifically the IRS agent who concluded that the benefits constituted income or to contain any portion of the IRS agent's review whereby he concluded that such benefits were reportable income.  Regarding 2002, the affidavit is void of any facts.  Rather, it simply states that the IRS analysis established that Mr. Esherick received income that he failed to report.  Yet, such a conclusory statement cannot, under any evidentiary standard, constitute probable cause to believe that a crime has been committed.

Furthermore, while the affidavit concedes that the Douglas Corp. books recorded the benefits provided to Mr. Esherick as "loan receivables," the affidavit then speculates that such benefits cannot be loans because there has been no repayment of them and Douglas Corp. did not charge any interest on the loans.  Exhibit A, ¶ 45, p.10.  Of course, the fact that Mr. Esherick has not yet repaid the money and Douglas Corp. did not charge any interest does not mean that the

benefits were not loans, and simply constitutes pure conjecture that cannot, as a matter of law, be relied upon by any law enforcement agent. Finally, the fact that witnesses familiar with the Douglas Corp. books and records were unaware of any such loans to Mr. Esherick is irrelevant. Once again, the affidavit does not identify these individuals and, more importantly, the fact that these individuals were unaware of the loans does not mean that such loans did not occur.

No government agent could also reasonably rely upon the affidavit's purported facts inculpating Mr. Brownell in the tax evasion scheme. According to the affidavit, from 1999-2003, Douglas Corp would make payments to Mr. Brownell's personal equity line of credit at Potomac Valley Bank (PVB) and Mr. Brownell would draw on the credit line, thereby creating unreported income for Mr. Brownell. Exhibit A, ¶¶ 46-53, pp. 10-13, Then, the affidavit reveals that Douglas Corp recorded these payments to PVB as loan repayments and that Brownell loaned Douglas Corp. $70,000. Exhibit A, ¶¶ 55-56, p.13. Thus, although the affidavit reveals a nontaxable, legitimate reason for Douglas Corp.'s payments to Mr. Brownell's line of credit, the affidavit, however, proceeds to conjecture that the payments to PVB could not be loan repayments because: (1) Mr. Brownell used the loan repayment account to pay other personal expenses; (2) the Douglas Corp. payments to PVB exceeded any loans from Mr. Brownell to Douglas Corp and the loan payable account failed to identify any other loans from Mr. Brownell to Douglas Corp.; and (3) in 1999 and 2000, Mr. Brownell received two additional $20,000 Douglas Corp. checks, which were classified as loans to Mr. Brownell, thereby suggesting that the loans from Mr. Brownell to Douglas Corp. had already been paid off. Exhibit A, ¶¶ 56-60, p.13. According to SA Sekala:

   "it is reasonable to conclude that Douglas development and Brownell have used the existence of loans as a pretext to conceal and obscure the payments of funds to Brownell in excess of any loans he may have made

Exhibit A, ¶ 61, pp. 13-14.

Yet, it is specious to assume, based upon the affidavit, that the loans were used to conceal income. Indeed, there was no concealment. Douglas Corp. did not hide its checks to PVB, and Mr. Brownell did not conceal his use of his equity line of credit. The paper trail was open and notorious, thereby vitiating any notion that concealment existed in this transaction. In addition, no reasonable law enforcement agent could conclude that the fact that Mr. Brownell utilized the loan repayment account to pay other expenses negates a finding that the Douglas Corp. checks to PVB constituted loan repayments. Moreover, while the affidavit relies upon the fact that the loan payable account did not identify any additional loans from Mr. Brownell to Douglas Corp., the fact remains that a reasonable possibility existed that such loans occurred. Douglas Corp. could have loaned Mr. Brownell additional money based solely upon Douglas Jemal's oral representations. Also, the fact that Douglas Corp. loaned Mr. Brownell additional funds in 1999 and 2000 also does not equate to a finding that Douglas Corp. repaid in full its obligation to Mr. Brownell. Douglas Jemal could have loaned Mr. Brownell the funds even though he still owed Mr. Brownell on another loan. Simply put, no law enforcement officer could reasonably conclude that the affidavit's alleged facts pertaining to the alleged tax evasion scheme constituted probable cause.

Likewise, there is absolutely no probable cause establishing a nexus between the alleged illegal activity and the places to be searched.[19] *See United States v. Johnson*, 332 F.Supp.2d 35, 39 (D.D.C.2004)("good faith" exception inapplicable because no nexus between illegal activity and place to be searched"). While the affidavit identifies the location of the corporate offices

_____

[19]    In determining whether the "good faith" exception applies, courts are restricted to the four corners of the affidavit and may not, under any circumstances, rely upon subsequent testimony with respect to the agents' intentions, knowledge, or belief. *See Johnson*, 332 F.Supp. at 39-40.

and describes the exterior of the office building, the affidavit fails to establish any factual basis

whatsoever for a reasonable conclusion that the items sought in the Douglas warrant would be

located at the corporate offices.  Exhibit A, ¶ 66, pp.14-15.  Again, SA Sekala's unsupported

conclusion that Douglas Corp's documents would be found at the corporate offices is simply

insufficient to establish the requisite probable cause.  Moreover, no reasonable basis exists to

conclude that the personal financial information of Mr. Esherick, Brownell, and Millstein would

be at the Douglas Corp. offices and, regarding the corporate documents, such documents could

be located in another building or even an off-site storage area, especially considering that that the

transactions identified in the affidavit were over two years old.  Thus, the affidavit does not

establish the nexus between the items to be seized contained in the Douglas warrant and the

location to be searched. [20]

        The staleness of the information contained in the affidavit confirms that the affidavit

lacked the requisite indicia of probable cause.  The affidavit identifies purported criminal

conduct occurring between late 2000 and early 2003, but the government did not seek to induce a

magistrate to issue the warrant until February, 2005, over two years later.  By the time the

magistrate issued the warrant, so much time had elapsed that there was no possible probable

cause that any of the documents that the government sought were located at Douglas Corp.

offices.  This staleness eviscerated any possible probable cause, and consequently, precludes any

application of the "good faith" exception to this case.  No law enforcement agent could rely upon

---

[20]        The utter lack of probable cause regarding the nexus between the criminal activity and
the places to be searched is further exemplified by the fact that, according to the affidavit, the
government had access to a former controller of Douglas Corp.  Exhibit A, ¶29, p. 7.  Thus, the
government, based upon this individual's cooperation, should have been able to learn the precise
location of any documents it needed.  Yet, the government made no effort to do so, thereby
confirming that the search was, in fact, a fishing expedition, and also that the agents involved in
the search engaged in willful or, at least, negligent conduct.

such a stale affidavit.  *See Zimmerman*, 277 F.3d, 426, 437 (3d Cir. 2002)(staleness of affidavit barred applicability of "good faith" exception).[21]

Moreover, in this case, the warrant was so facially overbroad that no reasonable law enforcement officer could presume them to be valid.  *See Kemper*, 375 F.Supp. at 553. Specifically, the warrant permitted the government agents to seize all the computer hardware and software contained at the corporate offices, regardless of time, transaction, or party.  In addition, the warrant allowed the government agents to obtain entire files of documents from the location as long as one document within each file was enumerated by the warrant.  In other words, based upon these two provisions alone, government agents were entitled to rummage through all of Douglas Corp.'s business affairs and the personal lives of Mr.  Esherick, Mr. Brownell, and Mr. Millstein, regardless of time or transaction.

The lack of meaningful restriction of the items to be seized also extended to the categories contained within the warrant.  As discussed *supra*, a majority of the categories failed to contain any time limitation, several categories lacked any restrictions as to transaction, and none of the categories were limited to the transactions contained in the affidavit.  Moreover, the warrant did not identify any criminal statutes, refer to any criminal offenses, or even incorporate the underlying affidavit.  Finally, each category within the warrant utilized generic language, such as "all documents and records whatsoever "and "all documents and records related to all financial affairs," thereby allowing the agents to use their own judgment in determining which

---

[21]    The government possessed complete control over the timing of the searches.  It had access to Lorusso and a former Douglas Corp. employee but waited until February, 2005 to initiate the search process.  Its intentional delay caused the staleness contained within the affidavit.

documents to seize.[22]  In sum, based upon the facial overbreadth of the warrant, the government agents were allowed to rummage throughout Douglas Corp.'s affairs looking for documents. The Fourth Amendment prohibits such a general, exploratory search, and the "good faith" exception does not apply to such a situation.

### III. <u>CONCLUSION</u>

The Fourth Amendment stands as a bar to unreasonable searches and searches.  It compels government official to hesitate before seeking warrants of any kind.  In this case, however, the government was not careful.  Despite receiving full cooperation from the targets in its criminal investigation, the government embarked on a course of conduct that resulted in an affidavit lacking probable cause and a warrant that was facially overbroad.  Therefore, this Court has no choice but to quash the warrant and to suppress all evidence seized there from.

---

[22]      The fact that the warrant permitted the government agents to use their judgment to determine which records to seize is amply illustrated by the category allowing the government to seize all records related to Lorusso and other "high-level" officials in the DC government.  This provision allowed each agent to ascertain whether a DC official was "high-level" and , if so, to seize all documents related to the official, regardless of time or transaction.  Such a category establishes, beyond any doubt, that the warrant is facially overbroad.

Memorandum in Support of Motion to Quash
Page 33

Respectfully submitted this _____ day of December, 2005.

_____
Stanley M. Brand
Ross Nabatoff
The Brand Law Group
923 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 662-9700
Counsel for Norman Jemal

Reid Weingarten
Erik L. Kitchen
Brian M. Heberlig
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
 (202) 429-3000
Counsel for Douglas Jemal

Michele Roberts
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306
Counsel for Douglas Jemal

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334
Counsel for Douglas Jemal

Paul Kemp
Carol Elder Bruce
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4400
Counsel for Blake Esherick