**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ | |
| | ) |
| **UNITED STATES,** | ) |
| | ) |
| v. | )  **Cr. Nos. 05-0359-01, 02, 03 (RMU)** |
| | ) |
| **DOUGLAS JEMAL, et al.** | ) |
| | ) |
| **Defendants.** | ) |
| _____) | |

**DOUGLAS JEMAL AND NORMAN D. JEMAL'S REPLY TO**
**THE GOVERNMENT'S OPPOSITION TO THEIR MOTION TO QUASH**

**I. INTRODUCTION**

Defendants, Douglas Jemal and Norman D. Jemal, respectfully submit this reply to the government's opposition to their motion to quash. In their motion, the Jemals requested that this Court quash the search warrant directed at the corporate offices of Douglas Development Corp. (Douglas Corp) and suppress the fruits and instrumentalities seized therefrom because: (1) the affidavit underlying the search warrant lacked probable cause to establish any criminality; failed to establish a nexus between the place to be searched and the evidence sought; and contained stale information; (2) the warrant's command sections exceeded any probable cause contained within the affidavit, thereby creating a facially overbroad warrant; (3) the warrant lacked the requisite particularity; and (4) the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984) was inapplicable.

In its opposition, the government argues that: 1) the affidavit contains sufficient probable cause to establish criminality; 2) the warrant is not facially overbroad and does not lack the requisite particularity, and 3) the good faith exception to the exclusionary rule applies. The

government's principal claim, however, is that the magistrate's probable cause determination is entitled to great deference, and this Court should simply adhere to that deference. Government Opposition, pp. 2-3, 20-24. Throughout its brief, the government repeats the same mantra: this Court's analysis "must instead start with a deferential review of Magistrate Judge Kay's findings solely to determine whether there was a 'substantial basis' for his decision to sign the warrant." Government Opposition, p. 23. In effect, the government urges this Court to disregard any defects contained in the affidavit and warrant, and to "rubber-stamp" the magistrate's decision, even if it was wrongly decided.

The caselaw fails to support the government's position. While a magistrate's determination regarding the issuance of a search warrant is entitled to deference and the reviewing court must examine the magistrate's decision only to ascertain whether a substantial basis exists to support the ruling, the reviewing court does not simply rubber-stamp the magistrate's decision. To the contrary, in analyzing a magistrate's decision to approve a search warrant, a court must inquire into all aspects regarding a search warrant including, but not limited to, whether the affidavit contains probable cause, the breadth and specificity of the warrant, and the applicability of the good faith exception. In simple terms, contrary to the government's assertions that a reviewing court should not be drawn "into a legally and factually intensive analysis of every aspect associated with search warrants," the substantial basis analysis requires exactly that: an inquiry into all aspects of the affidavit and the warrant. Government Opposition, p. 22.

That is the precise inquiry required in this case. This Court must scrutinize the magistrate's decision to determine whether a substantial basis exists to support the decision to approve the warrant, *i.e.*, does the affidavit contain probable cause and is the warrant facially

overbroad or lack particularity.  When it conducts this inquiry, this Court will arrive at only one

conclusion: no substantial basis exists to support the magistrate's conclusion that probable cause

exists and that the warrant is free from defects.  Rather, the affidavit is conspicuously devoid of

probable cause, the warrant is facially overbroad and lacks the requisite particularity, and the

good faith exception to the exclusionary rule is inapplicable.  Simply put, this Court must quash

the Douglas Corp. search warrant and suppress the fruits and instrumentalities seized therefrom.

## II. <u>ANALYSIS</u>

### A.  THIS COURT DOES NOT RUBBER-STAMP<br><u>THE MAGISTRATE'S DECISION</u>

In reviewing a magistrate's decision that probable cause exists to justify the issuance of a

search warrant, "the duty of a reviewing court is simply to ensure that the magistrate had a

'substantial basis for . . . concluding' that probable cause existed."  *Illinois v. Gates*, 462 U.S.

213, 238-39 (citations omitted); *see also United States v. Warren*, 42 F.3d 647, 652

(D.C.Cir.1994).  However, "[t]his does not man that reviewing courts should rubber stamp a

magistrate's conclusions; it does require the application of a common sense standard."  *United*

*States v. Tehfe*, 722 F. 2d 1114, 1117 (3rd Cir.1983); *see also United States v. Zimmerman*, 277

F.3d 426, 432 (3rd Cir.2002) ("This, however, 'does not mean that reviewing courts should

simply rubber stamp a magistrate's conclusions.'") (quoting *Tehfe*, 722 F.2d at 1117).  Indeed, "a

court is not relieved from making its own judgment as to whether the affidavits provide a

'substantial basis . . . to conclude that [the evidence was] probably present in the [home].'"

*Schoeneman v. United States*, 317 F.2d 173, 176 (D.C.Cir.1963) (quoting *Jones v. United States*,

362 U.S. 257, 271 (1960)).

While the government, for obvious reasons, prefers that this Court simply rubber stamp

the magistrate's conclusion with respect to the Douglas Corp. warrant, the law requires that this

Reply to Opposition to Motion to Quash
Page 3

Court do otherwise and, when it complies with the law by examining the affidavit and the warrant, it will quash the warrant and suppress the fruits and instrumentalities seized therefrom.

### B. THE AFFIDAVIT PATENTLY LACKS PROBABLE CAUSE

The government's argument that the affidavit provides probable cause to believe that the Jemals committed bribery lacks merit.  According to the government:

> The affidavit prescribes evidence that the defendants, personally and through DDC, provided Michael Lorusso, a former DC government official, numerous items of value at about the same time that Lorusso was taking official acts to benefit the defendants.  The affidavit provided substantial corroborating detail to support the contentions related to the items of value provided by DDC to Lorusso, and discussed the numerous acts that Lorusso undertook of value to DDC.  This sets forth probable cause to believe the offense of bribery has been committed.

Government's Opposition, pp. 4-5 (footnote omitted).  The government conveniently fails to refute or even to mention the Jemal's chief argument that the affidavit lacks probable cause regarding any alleged bribery, *i.e.*, the affidavit lacked any factual basis to conclude that a *quid pro quo* existed between the Jemals and Lorusso, and therefore, without a *quid pro quo*, there can be no bribery.  The government disregards this argument, and concocts a new theory of bribery; that is, if a public official receives benefits in temporal proximity to the offiical's act that is sufficient to establish bribery.  Of course, the law does not support such a theory, and the affidavit's failing to allege any probable cause that a *quid pro quo* existed between the Jemals and Lorusso militates against any probable cause finding regarding bribery.  *United States v. Brewster*, 506 F.2d 62, 72 (D.C.Cir. 1974); *see also United States v. Schaffer*, 183 F.3d 833, 841 (D.C.Cir. 1999).

Furthermore, the government also ignores precedent holding that benefits provided to public officials to cultivate business or political friendship would not violate the bribery statute, as well as other federal statutes such as mail and wire fraud.  As the First Circuit stated:

> [t]he practice of using hospitality, to cultivate business or political relationships is longstanding and pervasive. The government does not argue, and we do not believe, that payments for entertainment, lodging, golf, sports events, and the like would constitute violations of the Travel Act (or the mail and wire fraud statutes) if the aim of the lobbyists were simply to cultivate a business or political "friendship" with the legislator. It may well be that all such hospitality should be flatly prohibited by law, but if Sawyer had this limited intent—to cultivate friendship rather than to influence an official act—the federal statutes here involved would not be violated.

*United States v. Sawyer*, 85 F.3d 713, 741 (3rd Cir.1996); *see also United States v. Sun-Diamond*, 526 U.S. 398, 406-07 (1999); *Brewster*, 506 F.2d at 78-79, 83.[1] Without some extra element, the federal criminal code does not currently criminalize the cultivating of business or political friendships. In the bribery context, that extra element consists of the *quid pro quo* and, without that element, bribery is not present. In this case, the affidavit fails to establish, pursuant to any evidentiary standard, a *quid pro quo*, and consequently, probable cause does not exist to believe that the Jemals committed bribery.[2]

Moreover, the government's claim that the affidavit establishes probable cause to believe that the Jemals committed a crime regarding the MTD transaction is similarly unavailing. To prove its point, the government simply reiterates the affidavit's contentions, and then declares that "[t]his portion of the affidavit provides probable cause to believe offenses, including wire fraud were committed related to the defendants' use of 'MTD' to obtain funds from Morgan Stanley." Government Opposition, pp. 5-6. Nothing could be further from the truth. The fact that the DC government used only two agents for leasing purposes and that MTD did not officially represent any city agencies in connection with leases at 77 P. Street, the building from

---

[1]     *Sawyer* involved bribery within the context of the Travel Act. *Sawyer*, 85 F.3d at 741.

[2]     The corroboration of the gifts that the Jemals provided to Lorusso adds nothing to the analysis. The question remains whether a *quid pro* quo existed between the Jemals and Lorusso, and the affidavit is patently silent on that issue.

which MTD earned its leasing commission, fail to establish probable cause that a crime had been committed with respect to Douglas Jemal's receipt of the leasing commission.

MTD did not have to officially "represent" a DC agency in order to collect the commission. Whether MTD officially "represented" the city or whether the city utilized only two real estate brokers for its office space needs is irrelevant to whether a crime has been committed. Also, this Court must view with great skepticism the information received from this DC official because the affidavit fails to identify him specifically or his precise employment with the DC government. Instead, the affidavit refers to him as an "official with the DC Government familiar with the real estate operations of the city[.]" *See* Affidavit, ¶ 24, p.6. The testimony of this unnamed official, who lacked any personal knowledge of the MTD transaction, constitutes pure unadulterated, uncorroborated hearsay and adds nothing to the probable cause determination.

Additionally, the government's interview with MR does not create the requisite probable cause.[3] MR's comments denying that he knew what he signed or the reason for the signing, claiming to have no knowledge of the bank account to which the money was wired, and not granting permission to anyone to use his name on the wiring instructions have no effect on the determination of whether MTD's receipt of the commission was criminal. Douglas Jemal was entitled to create any entity to receive this commission, and he was under no obligation

---

[3]    The government obfuscates the precise alleged criminal conduct in this transaction. On the one hand, it declares that the defendants provided a false invoice and, on the other hand, it states that the affidavit "provides probable cause to believe offenses, including wire fraud, were committed[.]" Government's Opposition, pp. 5-6.

Reply to Opposition to Motion to Quash
Page 6

whatsoever to inform his partner of the entity's creation[4]. Such a transaction might warrant civil litigation but certainly fails to violate any criminal laws.[5]

Finally, with respect to the alleged tax evasion scheme, the government argues that the affidavit "set forth an abundance of evidence to support the conclusion that Esherick and two other DDC employees received substantial compensation in forms that were not reported to the Internal Revenue Service". Government Opposition, p. 6. The government, however, ignores its own affidavit. Regarding Paul Millstein, the affidavit generally declares that Douglas Corp. paid for substantial expenses of Mr. Millstein, but is utterly silent as to whether Mr. Millstein failed to file his tax returns or underreported any income. Before any judicial officer issues a search warrant regarding alleged tax evasion, the underlying affidavit must contain some evidence that the defendant, at a minimum, underreported his income. In this case, regarding Mr. Millstein, the affidavit did not even attempt to do so, and therefore, the government's claim that an "abundance of evidence" exists to establish a tax evasion scheme fails to pass muster.

With respect to Mr. Esherick, the affidavit details the payments that Douglas Corp. made on behalf of Mr. Esherick including child support, utilities, personal vehicles, and various housing-related expenses. Affidavit, ¶¶ 36-45, pp. 8-10. Then, the affidavit proceeds to identify the various deductions that Mr. Esherick claimed and concludes, based upon an unnamed Internal Revenue Service's (IRS) Special Agent's review of Mr. Esherick and Douglas Corp.'s books and records, that Mr. Esherick failed to report over $100,000 in taxable income. Affidavit,

---

[4]    Noticeably absent from the affidavit are any facts remotely suggesting that Douglas Jemal had a legal obligation to inform his partner that MTD was an entity that the Jemals created to receive a leasing commission that they legitimately earned.

[5]    The fact that Douglas Jemal's partner in the property indicated that he did not know if he would have objected to Mr. Jemal's receiving a leasing commission further amplifies the non-criminal nature of this transaction. Affidavit ¶ 33 p. 8. Essentially, with respect to this transaction, the government has attempted to create probable cause that a crime has been committed when the transaction itself is not a crime.

¶¶ 42-43, pp. 9-10.  According to the affidavit, an IRS analysis of 2002 also revealed that Mr. Esherick continued to receive income that was not reported, and he did not file a tax return in 2003.  Affidavit, ¶ 44, p. 10.

This analysis, however, is faulty.   It is premised upon conjecture that the benefits Douglas Corp. provided to Mr. Esherick constituted income that Mr. Esherick was required to report.  Again, like the MTD transaction where the Special Agent relied upon an unnamed source, the affidavit fails to identify specifically the IRS agent who concluded that the benefits constituted income, or to contain any portion of the IRS agent's review whereby he arrived at his finding that these benefits were reportable income.  In addition, regarding 2002, the affidavit is completely void of any facts.  It simply states that the IRS analysis established that Mr. Esherick received income that he failed to report.  Such a conclusory statement cannot, under any evidentiary standard, constitute probable cause to believe that a crime has been committed, especially regarding an alleged tax evasion scheme.

Furthermore, while the affidavit concedes that the Douglas Corp. books recorded the benefits provided to Mr. Esherick as "loan receivables," the affidavit then concludes that such benefits cannot be loans because there has been no repayment of them and Douglas Corp. did not charge any interest on the loans.  Affidavit, ¶ 45, p. 10.  The fact that Mr. Esherick had not repaid the money and Douglas Corp. did not charge any interest does not equate to a finding that the benefits were not loans.  Finally, the fact that witnesses familiar with the Douglas Corp. books and records were unaware of any such loans to Mr. Esherick does not buttress the probable cause finding.  Once again, the affidavit does not identify these individuals, and the fact that these individuals were unaware of the loans does not mean that such loans did not occur.

The affidavit's facts related to Mr. Brownell's tax issues also fail to establish the requisite probable cause. According to the affidavit, from 1999-2003, Douglas Corp would make payments to Mr. Brownell's personal equity line of credit at Potomac Valley Bank (PVB) and Mr. Brownell would draw on the credit line, thereby creating unreported income for Mr. Brownell. Affidavit, ¶¶ 46-53, pp. 10-13, Then, the affidavit reveals that Douglas Corp recorded these payments to PVB as loan repayments and that Brownell loaned Douglas Corp. $70,000. Affidavit, ¶¶ 55-56, p. 13. The affidavit, however, proceeds to conclude that the Douglas Corp. payments to PVB could not be loan repayments because: (1) Mr. Brownell used the loan repayment account to pay other personal expenses; (2) the Douglas Corp. payments to PVB exceeded any loans from Mr. Brownell to Douglas Corp and the loan payable account failed to identify any other loans from Mr. Brownell to Douglas Corp.; and (3) in 1999 and 2000, Mr. Brownell received two additional $20,000 Douglas Corp. checks, classified as loans to Mr. Brownell, thereby suggesting that the loans from Mr. Brownell to Douglas Corp. had already been paid off. Affidavit, ¶¶ 56-60, p. 13. According to the Special Agent:

> "it is reasonable to conclude that Douglas development and Brownell have used the existence of loans as a pretext to conceal and obscure the payments of funds to Brownell in excess of any loans he may have made

Affidavit, ¶ 61, pp. 13-14.

Yet, there was no concealment. Douglas Corp. did not hide its checks to PVB, and Mr. Brownell did not conceal his use of his equity line of credit. In fact, the money trail was open and notorious, thereby contradicting the Special Agent's purported conclusion. In addition, the fact that Mr. Brownell utilized the loan repayment account to pay other expenses does not negate the conclusion that the Douglas Corp. checks to PVB constituted loan repayments. Moreover, while the affidavit relies upon the fact that the loan payable account did not identify any

additional loans from Mr. Brownell to Douglas Corp., the fact remains that a reasonable

possibility existed that such loans occurred.  Douglas Corp. could have loaned Mr. Brownell

additional money based solely upon Douglas Jemal's oral representations.  Also, the fact that

Douglas Corp. loaned Mr. Brownell additional funds in 1999 and 2000 does not equate to a

finding that Douglas Corp. repaid in full its obligation to Mr. Brownell.  Douglas Jemal could

have loaned Mr. Brownell the funds even though he still owed Mr. Brownell on another loan.

The affidavit's attempt to create a tax evasion scheme based upon Mr. Brownell's equity line of

credit simply does not hold water.  It is based upon pure conjecture.[6]

## C. THE AFFIDAVIT FAILS TO ESTABLISH THE REQUISITE NEXUS

In its attempt to portray the affidavit as successfully establishing the nexus between the

items sought and the place to be searched, the government misconstrues the law.  According to

the government:

> "[t]he crimes were committed in the name of and through the facilities of DDC.  It was
> reasonable to conclude that evidence related to those crimes, consisting in large part of
> typical business records, would be found in DDC's offices.  Government Opposition, p.
> 7.

Wwhether it was reasonable to conclude that the documents would be found at Douglas Corp.'s

offices is irrelevant.  The critical question is whether the affidavit identifies specific facts that the

items sought "would be found [at Douglas Corp.], rather than in some other place." *United States*

*v. Kemper*, 375 F.Supp. 2d 551, 553 (E.D.Ky.2005) (citing *United States v. Carpenter*, 360 F.3d

591, 594 (6th Cir.2004); *see also United States v. Thomas*, 989 F.2d 1252, 1254 (D.C.Cir.1993).

The affidavit does not contain this critical element.  While the affidavit identifies the location of

---

[6]     The affidavit also details the fact that the Douglas Corp. general ledger would reflect only
a check to PVB, not that Mr. Brownell was enriched.  The Douglas Corp. general ledger should
reflect only the check to PVB.  Mr. Brownell's utilization of his credit line is irrelevant to
Douglas Corp.'s books and records.

the corporate offices and describes the exterior of the office building, it fails to aver any specific facts that the items sought in the warrant would be located at the corporate offices.

Moreover, the Special Agent's conclusion that the financial records of Douglas Corp and the various LLCs are maintained at the corporate offices is similarly unavailing. The nexus requirement compels some level of specificity regarding the location of the documents identified in the warrant and, in this affidavit, specificity does not exist. This omission is even more glaring considering that the government, prior to seeking the search warrant, interviewed Douglas Corp.'s controller, who surely possessed intimate information regarding the location of specific documents. Affidavit, ¶ 29, p. 7. Yet, the affidavit is conspicuously silent as to the locations of any of the documents, instead relying upon the general allegation that Douglas Corp. documents are located at Douglas Corp. offices.

Of course, of the warrant's eleven categories, only three tangentially relate to Douglas Corp. corporate records (categories 4-6), and those three pertain to LLC's, not official Douglas Corp. records. In addition, contrary to the government's argument, it is unreasonable to assume that the financial records of the three employees, including their personal material, would be located at the corporate offices. To the contrary, such records would probably be located at their private residences. Simply put, the affidavit fails to specify sufficient facts establishing a nexus between the items sought and the location to be searched. Consequently, there was no substantial basis for Magistrate Judge Kay to conclude that evidence of the crimes described in the affidavit would be found at the business offices of DDC. Government Opposition, p. 8.

### D. THE AFFIDAVIT CONTAINS STALE INFORMATION

Regarding the staleness issue, the government contends that the "warrant for the DDC offices specified the seizure of the sorts of records which would be retained or found in the

offices of an on-going business, months or even years after the conduct at issue." Government

Opposition, p. 11. The fact that Douglas Corp. was – and still is—an on-going business is

irrelevant to a determination of whether the affidavit's information was stale. The staleness issue

revolves around whether the alleged criminal activity, not the business, is ongoing in nature. If it

is, staleness of the information contained in an affidavit is usually not in dispute. *See United*

*States v. Pless*, 982 F.2d 1118, 1126 (7th Cir.1992) (passage of time is less critical when the

affidavit refers to ongoing criminal activity).

Of course, in this case, the affidavit fails to contain any allegation of continuing criminal

activity. The alleged bribery scheme terminated in January, 2003, when Lorusso resigned his

position within the District of Columbia government. The MTD transaction occurred in 2002,

and the purported tax evasion scheme occurred between 2000-2003. Thus, by its explicit terms,

the affidavit fails to establish, pursuant to any evidentiary standard, ongoing criminal conduct,

and therefore, this Court cannot, as a matter of law, condone the government's delay, **well over**

**two years** after the transactions at issue, to seek a search warrant. Indeed, the government's

neglect with respect to the timing of the search warrant is further illustrated by the affidavit's

lack of any specific facts establishing that the documents sought by the warrant were actually in

existence and located at the Douglas Corp. corporate offices.[7]

Finally, the government cites several cases supposedly supporting its contention, but an

analysis of these cases reveals them to be inapposite and, in fact, buttressing the Jemal's claim of

---

[7]    The government had access to Douglas Corp. employees but failed to utilize these
employees to garner specific facts regarding the location of the documents. Furthermore, the
government's position that "there is every reason to conclude" that the three employees'
compensation information would be located at the corporate offices is nonsensical. The warrant
permits the seizure of all their financial information, not just their employment compensation,
and there is "no reason to conclude" that such personal information would be located at the
corporate offices, especially considering the affidavit fails to contain an iota of factual evidence
supporting this speculation.

staleness.  For example, in *United States v. Singh*, 390 F.3d 168 (2d Cir.2004), on July 22, 1999,
the magistrate issued the search warrant, and the affidavit contained specific facts relating to the
alleged health care fraud dated January 7, 1999. Thus, the *Singh* affidavit portrayed ongoing
criminal conduct.  *Id.* 179-182.  Of course, in the present case, the affidavit fails to contain any
such evidence of ongoing criminal activity by the Jemals.  Therefore, *Singh* fails to support the
government.[8]

      Likewise, *United States v. Cherna*, 184 F.3d 403 (5th Cir.1999) does not support the
government's theory.  In *Cherna*, like in *Singh*, the affidavit contained specific facts indicating
the existence of ongoing criminal activity.  *Id*. at 410.  In the present case, the affidavit contains
no such factual predicate.  Furthermore, *United States v. Shomo*, 786 F.2d 981 (10th Cir. 1986)
adds little to the analysis.  *Shomo* involved a ten-day period between the time the defendant was
observed carrying a firearm and the warrant's issuance.  *Id. at* 984.  In this case, the interval
between the alleged criminal conduct and the warrant's issuance was **well over two years**.
*United States v. Schaefer*, 87 F.3d 562 (1st Cir.1996) adds even less to the government's position.
In *Schaefer*, while the affidavit included some remote information, it also contained recent facts
corroborating the ancient information.  Based upon these recent details, the First Circuit held that
the affidavit was "temporally adequate."  *Id.* at 568-69.  The present case involves no such
corroboration of remote facts.  In fact, the affidavit underlying the Douglas warrant does not
even attempt to be "temporally adequate."  Finally, like the other cases the government relies

---

[8]     *Singh* also exemplifies the appropriate standard of review for a reviewing court in the
search warrant context.  While the Second Circuit afforded deference to the magistrate's
conclusion regarding the search warrant, the appellate court did not rubber stamp the
magistrate's decision.   Rather, it engaged in a detailed analysis of the issues that the defendant
raised regarding the warrant, including a thorough scrutiny of the affidavit's facts related to the
staleness issue, and concluded that the affidavit and warrant were valid.  *Singh*, 390 F.3d at 179-
184.

Reply to Opposition to Motion to Quash
Page 13

upon, *United States v. Williams*, 897 F.2d 1034 (10th Cir. 1990) offers little solace to the government.  In *Williams*, the affidavit was not entirely premised upon remote information, and the affidavit connected the defendant to a continuing drug conspiracy.  *Id.*, at 1039.  The affidavit underlying the Douglas warrant fails to contain any recent information, and certainly does not link the Jemals to an ongoing criminal conspiracy.  As such, the information contained within the affidavit is stale.

### E.  THE WARRANT'S COMMAND SECTIONS ARE OVERBROAD

The government's argument that that the scope of the warrant "is limited by the probable cause set forth in the affidavit" is simply not supported by even a cursory comparison of the two documents.[9]  Government Opposition, p. 13.  According to the government, category one of the warrant commands the seizure of "records related to the relationship between DDC and Lorusso and the DC government."  Government Opposition, p. 13.  Contrary to the government's interpretation, category one is not restricted to documents related to the relationship between DDC and Lorusso and the DC government.  This category allowed the government to seize all material related to Michael Lorusso or other high-level officials in the DC government.  Moreover, because of its breadth, this command far exceeded any probable cause found in the affidavit.  The affidavit's bribery allegations pertain only to Lorusso, and therefore, Fourth Amendment jurisprudence mandates that this category be similarly limited to Lorusso.  It was not, and therefore, is overbroad.[10]

---

[9]     The government does not engage in any analysis whatsoever of the affidavit's probable cause compared to the warrant's command section, instead simply concluding that the "scope of the warrant is limited by the probable cause set forth in the affidavit."  Government Opposition, p. 13.

[10]    The affidavit indicates that Douglas Corp. provided a $105.74 cell phone power adapter to Eric Price, the former District of Columbia Deputy Mayor.  Affidavit, ¶ 18, p. 5.  This

Likewise, categories 2-4 are not directly linked to the affidavit's probable cause. These three categories allowed the government to seize all records relating to the financial affairs of Mr. Esherick, Brownell, and Millstein. In other words, this provision permitted the government to conduct a fishing expedition into these individuals' entire financial dealings with any individual or entity. If any probable cause existed in the affidavit, however, such probable cause related to a tax evasion scheme between the individuals and one entity, Douglas Corp, and this probable cause allowed the government to seize the records of those three individuals related only to their financial relationship with Douglas Corp.[11]

The command provision regarding MTD is similarly overbroad. Category five permitted the government to seize all the business records of MTD despite the fact that the affidavit details only one transaction involving MTD, *i.e.*, the leasing commission. Thus, the affidavit patently lacks any probable justifying the seizure of all of the transactions in which MTD was involved. Indeed, this category allowed the government to seize all the business records of an entity when the affidavit failed to establish that the entity was permeated with fraud. Such a command contravenes controlling precedent. *United States v. Singh*, 973 F.Supp. 7, 9-10 (D.D.C. 1997) (affidavit insufficient because failed to establish business permeated with fraud).

_____

(continued)
statement fails to provide the requisite probable cause allowing the government to seize all of Douglas Corp.'s records relating to any high-level DC official.

[11]    The bribery and MTD transactions also fail to provide sufficient probable cause to allow the general rummaging into these three individuals' financial dealings. First, the affidavit's bribery allegations do not inculpate Mr. Brownell or Mr. Millstein, so this transaction cannot, as a matter of law, support a wholesale search into those two individuals' financial dealings. Second, although the affidavit inculpated Mr. Esherick in the bribery scheme, such evidence certainly did not allow the government to seize all of Mr. Esherick's financial information. It permitted the seizure of his financial material relating only to Lorusso. Third, if the affidavit established probable cause regarding the leasing commission, such probable cause permitted the government to obtain the financial records of these three individuals relating only to the receipt of the leasing commission. Of course, the warrant sought much more.

The government's claim that the warrant is not overbroad is nonsensical when analyzing categories six and seven. These two categories permitted the government to seize all documents related to 4800 Addison Road and 77 P. Street. The affidavit, however, does not even identify 4800 Addison Road, but the warrant mandates the seizure of all records of that property.[12] Such a command is invalid. There can be no probable cause to seize all of the records relating to 4800 Addison Road when the affidavit fails to identify specifically the property. The same rationale applies to the seizure of all records pertaining to 77 P. Street. There is no specific mention of 77 P. Street in the bribery or the tax evasions sections of the affidavit. The affidavit refers to 77 P. Street only in the MTD leasing commission transaction but the warrant commands the seizure of all 77 P. Street documents. If the affidavit limits 77 P. Street to the leasing commission transaction, the corresponding command section of the warrant must similarly restrict the seizure of documents relating to only that particular aspect of the property.

The final four categories of the Douglas warrant contain the same vice. Category eight directs the seizure of all of Douglas Corp.'s records relating to any items of value provided to any person or entity, excluding routine vendor payments. But the affidavit lacks any probable cause to justify such a seizure. Any seizure should have been limited to Douglas Corp.'s dealings with Lorusso. The warrant also allowed the government to obtain all records relating to Rolex watches, trips to Las Vegas in 2001-2002, cash withdrawals or third party checks cashed, and limousine records (category nine). This category allowed the government to seize the records of any Douglas Corp. employee who used a limousine at any time, traveled to Las Vegas

---

[12]     The government claims the omission of 4800 Addison Road in the affidavit is "hypertechnical" and does not vitiate the good faith exception. Government Opposition, p. 13, n. 10. Since the affidavit failed to refer to 4800 Addison Road, then no probable cause existed to support the seizure of any records pertaining to that property, and the affidavit was so lacking in probable cause that the good faith exception is inapplicable.

in 2001 or 2002, withdrew money at any time, or cashed a check for a friend at any time.  Yet, if the affidavit establishes probable cause, such probable cause is limited to the giving of items of value to Lorusso, and consequently, this category should been qualified by a connection to Lorusso.

Category ten also is deficient.  It allowed the seizure of all records accounting for the activities of Douglas Jemal, Norman Jemal and Mr. Esherick from January 2001 to the present.  The affidavit does not contain probable cause allowing such a broad seizure.  It is limited to three discrete transactions, and category ten should have been restricted to those three transactions.  Also, no probable cause exists allowing the  government to obtain records from 2003 to the present.  The affidavit failed to establish a course of criminal conduct continuing to the present.  The alleged criminal activity identified in the affidavit terminated by 2003, and therefore, the government was barred from obtaining records subsequent that date. The category allowing the government to seize photographs of Lorusso and other high-level DC government officials are similarly invalid (category eleven).  The affidavit limited any supposed probable cause to alleged bribes to Lorusso, and consequently, the seizure of any photographs must be limited to Lorusso.

Finally, in its opposition, the government completely ignores the warrant's two provisions exposing its overbreadth.  The warrant declares:

> [i]f the above said documents and records are found in a file/folder with other documents, the entire folder may be seized.

Also, the warrant permits the government, in order "to effectuate the search and to the extent necessary to retrieve documents identified in the affidavit which may be stored electronically/digitally," to seize any and all computer hardware, software and computer-related documentation. Based upon these two provisions, any probable cause finding in the affidavit is irrelevant.  The government can seize any document it wants, including all of Douglas Corp.'s

business records contained within its computers.   The warrant's command allowing government

agents to seize all computer-related items essentially permits the government to rummage

through Douglas Corp.'s business affairs regardless of transactions despite any showing that the

company was permeated with fraud.  *See Singh*, 973 F.Supp. at 8-10.  In other words, the

warrant's command sections bear no relationship to the any probable cause contained within the

affidavit, and therefore, the warrant is facially overbroad.  *United States v. Whitney*, 633 F.2d

902, 907 (9th Cir.1980) ("the command to search can never include more than is covered by the

showing of probable cause to search") (quoting *United States v. Hinton*, 219 F.2d 324, 325 (7th

Cir.1955)).

## F. <u>THE WARRANT LACKS THE REQUISITE PARTICULARITY</u>

In attempting to refute the argument that the warrant lacked the requisite particularity,

the government disregards the Jemals' claims.  The Jemals asserted that the warrant failed to

specify the documents to be seized, instead relying upon generic language such as "all

documents and records whatsoever" and "all documents relating to."  Memorandum in Support

of Motion to Quash, p. 24.  The government, however, does not refute the Jemal's contention.  It

generally claims that the "warrant in this case provides straight-forward commands as to the

objects to be seized by relation to the matters under investigation."  Government Opposition, p.

16.  In addition, while the Jemals claimed that the lack of any time limitations with respect to

nine of the warrant's eleven categories evinced the lack of particularity permeating the warrant,

in its opposition, the government fails to address the warrant's lack of time limitations.  The

Jemals also argued that the warrant's lack of particularity is further illustrated by its failing to

identify any criminal statutes or to refer to any criminal offenses.  Again, the government is

silent on that issue.  Finally, the government omits any discussion regarding the Jemal's claim

that the warrant's provisions allowing for the seizure of all computer hardware and software

regardless of the material contained within and all folders, as long as one document within the

folder was enumerated in the warrant, proves that the warrant lacked the requisite particularity.

Based upon these provisions and the other command sections of the warrant, the agents were

permitted *carte blanche* to seize documents exceeding any probable cause found in the affidavit.

The government however, just refuses to address this issue.

      The government does attempt to justify the command provision relating to the seizure of

all of Mr. Esherick's financial information.  According to the government:

> in order to fully investigate the potential tax crimes of Esherick, it was reasonable to seize
> all his financial records, for such records were reasonably likely to detail his income,
> sources of income, his spending and spending patterns . . . and even changes in spending
> patterns over time.

Government Opposition, p. 16.  Courts do not review the reasonableness of a seizure in

determining whether a warrant contains the requisite particularity.  Instead, they examine the

language of the command sections of the warrant to ascertain whether the warrant "particulary

describe[s] the place to be searched, and the persons or things to be seized."  U.S.Const. amend

IV.  Moreover, it was only reasonable to seize all of Mr. Esherick's financial information if the

affidavit contained probable cause justifying such a seizure.  It did not.

## G.  THE GOOD FAITH EXCEPTION IS INAPPLICABLE

      In support of its claim that the good faith exception to the exclusionary rule applies, the

government argues: (1) "that a fair reading of the affidavit supports a finding of probable cause,

and a fair reading of the seized language suggests that it is fully supported by the affidavit; and

(2) "the affidavit provided magistrate Judge Kay an abundance of detail, thus allowing him . . . to

exercise his independent judgment in determining the existence of probable cause."  Government

Opposition, pp. 19-20.  Any fair reading of the affidavit reveals a fundamental lack of probable

cause.  For example, the government argues that Mr. Millstein engaged in a tax evasion scheme based solely upon the affidavit's contents indicating he received certain income.  Any reasonable person, including any reasonable law enforcement agent, would realize that there is no probable cause establishing that Mr. Millstein evaded his taxes unless the affidavit indicated that he underreported the income.

Furthermore, no law enforcement officer could reasonably conclude that the Jemals engaged in a bribery scheme based solely upon the fact that Lorusso received gifts from the Jemals around the same time he was officially acting on their behalf.  Such evidence simply fails to establish probable cause that the Jemals engaged in a bribery scheme.  Additional proof of a *quid pro quo* is needed, but which the affidavit failed to provide.  Similarly, no law enforcement personnel could reasonably believe that the Jemals committed fraud regarding the leasing commission when the affidavit is utterly silent as to the critical element: whether the Jemals legitimately earned the commission.  If they did, there is no crime.  Of course, the affidavit fails to contain any evidence regarding this point.

Any reading of the warrant's command provisions reveals an utter lack of probable cause to justify them.  The warrant permits the seizure of all records relating to 4800 Addison Road and 77 P. Street, but 4800 Addison Road is not mentioned in the affidavit and 77 P. Street is referred to only with respect to the leasing commission issue.  The warrant's command provisions allow the seizure of all documents relating to any high-level DC government official, but the affidavit is utterly devoid of any probable cause establishing that any DC government official, other than Lorusso, was involved in any alleged criminality.  Reduced to essentials, the warrant's command provisions fail to contain one category restricted to the purported probable cause contained in the affidavit, and therefore, the good faith exception is inapplicable.  The utter

lack of probable cause regarding the warrant's command provisions combined with the affidavit's lack of probable cause creates a situation where no law enforcement official could reasonably rely upon the affidavit or the warrant. [13]

The warrant was so facially overbroad that no reasonable law enforcement officer could presume it to be valid. *See Kemper*, 375 F.Supp. at 553. The warrant permitted the government agents to seize all the computer hardware and software contained at the corporate offices, regardless of time, transaction, or party. In addition, the warrant allowed the government agents to obtain entire files of documents from the location as long as one document within each file was enumerated by the warrant. In other words, based upon these two provisions alone, government agents were entitled to rummage through all of Douglas Corp.'s business affairs and the personal lives of Mr. Esherick, Mr. Brownell, and Mr. Millstein, regardless of time or transaction.

The lack of meaningful restriction on the items to be seized also extended to the categories contained within the warrant. A majority of the categories failed to contain any time limitation, several categories lacked any restrictions as to transaction, and none of the categories were limited to the transactions contained in the affidavit. Moreover, the warrant did not identify any criminal statutes, refer to any criminal offenses, or even incorporate the underlying affidavit. Finally, each category within the warrant utilized generic language, such as "all documents and records whatsoever "and "all documents and records related to all financial affairs," thereby

---

[13]     The affidavit's complete lack of probable cause extends to its failing to establish a nexus between the items to be sought and the place to be searched. It is disingenuous for the government to argue that it acted in good faith when it made no attempt to establish the requisite nexus.

allowing the agents to use their own judgment in determining which documents to seize.[14]  In sum, based upon the facial overbreadth of the warrant, the government agents were allowed to rummage throughout Douglas Corp.'s affairs looking for documents.  The Fourth Amendment prohibits such a general, exploratory search, and the "good faith" exception does not apply to such a situation

## III. <u>CONCLUSION</u>

Wherefore, for the foregoing reasons, defendants, Douglas D. Jemal and Norman Jemal, respectfully request this Court to quash the Douglas warrant and to suppress the fruits and instrumentalities seized therefrom.  Such a ruling would be in accord with the facts and the law.

Respectfully submitted this _____ day of January, 2006.

_____
Stanley M. Brand
Ross A. Nabatoff
The Brand Law Group
923 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 662-9700
Counsel for Norman Jemal

Reid Weingarten
Erik L. Kitchen
Brian M. Heberlig
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
 (202) 429-3000
Counsel for Douglas Jemal

---

[14]      The fact that the warrant permitted the government agents to use their judgment to determine which records to seize is amply illustrated by the category allowing the government to seize all records related to Lorusso and other "high-level" officials in the DC government.  This provision allowed each agent to ascertain whether a DC official was "high-level" and , if so, to seize all documents related to the official, regardless of time or transaction.  Such a category establishes, beyond any doubt, that the warrant is facially overbroad.

Michele Roberts
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306
Counsel for Douglas Jemal

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334
Counsel for Douglas Jemal

Paul Kemp
Carol Elder Bruce
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4400
Counsel for Blake Esherick