IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DOUGLAS JEMAL, et al., )<br>)<br>Defendants. ) | Criminal Nos. 05-0359-01, 02 & 03<br>(RMU) |

**EXPERT DISCLOSURE**

Pursuant to Fed.R.Crim.P.16(b)(1)(C), Defendants submit the following disclosure regarding the expert testimony of Richard Watkins.

**I.   QUALIFICATIONS**

Richard Watkins is a founding senior member of Watkins, Meegan, Drury & Company, L.L.C., a certified public accounting firm headquartered in Bethesda, Maryland, with additional offices in Annapolis, Maryland, Washington, D.C., and Fairfax, Virginia. He is a Certified Public Accountant, licensed in Maryland and practicing in Maryland, Washington, D.C., and Virginia with the firm of Watkins, Meegan, Drury & Company, L.L.C. ("WMD"). He has been licensed to practice since 1962, and is a member of the American Institute of Certified Public Accountants and the Maryland Association of Certified Public Accountants. WMD is a member of Moore Stephens, a network of CPA firms nationally and worldwide.

Mr. Watkins has a Master of Commercial Science from Benjamin Franklin University and is accredited in Business Valuation by the American Institute of Certified

1

Public Accountants. Over the course of his career, he has assisted served as a consultant to hundreds of small, medium, and larger businesses and employers on a wide range of business issues including employee compensation.

Mr. Watkins has been qualified as an expert and has testified in state and federal courts, as well as in AAA arbitrations, in Washington, D.C., Maryland, Virginia, and Pennsylvania.

Mr. Watkins was assisted in his work by Jeffrey D. Walsh, CPA/ABV, CVA. Mr. Walsh is also a member of Watkins, Meagan, Drury & Company. He has over 20 years of experience as a Certified Public Accountant with local and national CPA firms, and has also testified as an expert witness.

## II.    STATEMENT OF OPINIONS

Mr. Watkins will testify as to the following opinions:

**Opinion 1:** Douglas Development Corporation's ("DDC's") accounting department was woefully understaffed and overworked throughout the period from 1999 through 2004. As a result, routine accounting work was not being done or was being done late. In such an environment, mistakes are common. The mistakes that occurred as a result of DDC's understaffed accounting department often hurt DDC financially.

**Reasons and Bases:** Mr. Watkins reviewed general ledgers for DDC and for many of its properties, tax documents prepared by DDC's outside accountants, selected work papers from its outside accountants, selected payroll records, and a number of DDC Property Summaries for the years 1994 through 2001 and 2006. He also interviewed Jan Peterson, the outside accountant who has worked part-time at DDC since 2001. Mr. Watkins' associate, Jeff Walsh, interviewed a number of DDC employees for Mr.

Watkins. Based on his review of these materials, Mr. Watkins determined that DDC grew rapidly from a company with 37 properties in 1994 to one with 124 properties in 2001. Each one of these properties was a separate entity. All checks came in and went out through DDC, but they had to be recorded at the individual company level. Based on Mr. Watkins' experience, accurate accounting for all of these entities is extremely challenging and would require numerous full-time in-house accountants. The accounts of all of the separate entities should be reconciled every month by an in-house accountant who has access to DDC employees so that he/she can raise questions and obtain the answers regarding specific transactions.

Mr. Watkins determined that from 1999 to 2000, DDC's accounts were being reconciled by DDC's outside accountants at Grossberg & Company. Beginning in November 2000 and through the present, this work is done by Jan Peterson on a part-time basis. For most of that time period, DDC had limited in-house accounting staff. It was apparent from Mr. Watkins' review of the documents and discussions with Mr. Peterson that Mr. Brownell, DDC's Chief Financial Officer, was heavily involved with property acquisition, financing, refinancing, and creditor issues, greatly diminishing his capacity to monitor the accounting function.

Based on his review of the accounting documents, Mr. Watkins determined that all of DDC's inter-company accounts were only reconciled at year-end until well after Mr. Peterson began work in late 2000. Reconciling all of these accounts at year end was a huge undertaking, and it took months. At the end of 1999, for example, there were over 100 year end journal entries for DDC. Mr. Watkins would expect to see five or six entries in a company with a good accounting system. It took months to reconcile all of

these accounts at the end of the year. After Mr. Peterson got fully acclimated, he began to reconcile some accounts on a quarterly basis. Even then, there were delays. Tax returns for DDC and its properties were generally filed substantially later than the due dates because the accounts for all of the entities were not being reconciled on time. Under such circumstances, it would be virtually impossible to catch every mistake in coding specific transactions or payments. Further discussions with Jan Peterson, and a review of the Grossberg work papers, revealed that very little effort was put into analyzing expense accounts other than a cursory review.

Based on his discussions with Mr. Peterson and his own review of the accounting documents, Mr. Watkins determined that DDC was hurt financially by its inadequate accounting staff. For example, DDC was not able to bill tenants on a timely basis for common area maintenance ("CAM") charges, rent escalations, and tenant improvements, and they still have difficulty with these issues today. Settlements were not being booked until the end of the year. Up until 2003, DDC was not booking management fees or finance and construction fees until year end as well. All of these problems were due to the extreme shortage of accounting staff and they caused a significant delay and risk of loss to DDC.

**Opinion 2:** In many companies and businesses, salaries are not set purely a function of job title, but often depend on the specific circumstances and personalities of the individual employees.

**Reasons and Bases:** In his over 40 years of practice, Mr. Watkins has worked closely with numerous businesses and has specifically consulted on compensation issues. He has observed that some employees will work for less than their apparent market value.

4

Based on his many years of practice, Mr. Watkins will testify that salaries vary widely even within the same business and are based on many factors other than simply job title or position. Factors that induce employees to accept lower salaries include how much they enjoy their jobs, the excitement or responsibility of a given job, a close relationship with their employer, or their hopes for a big reward or payoff in the future.

**Opinion 3:** It is common for small businesses to make loans to their employees. The DDC loans to employees alleged in the indictment very likely enhanced loyalty and employee retention. Because of the understaffing in the DDC accounting department, it is not surprising that mistakes would happen in accounting for the employee loans and other compensation.

**Reasons and Bases:** The Indictment in this case alleges that DDC provided substantial amounts of loans or advances to Defendant Blake Esherick and recorded them as loans due from Mr. Esherick. The government has sought permission to introduce similar evidence of loans to other employees under Rule 404(b). The government contends that these were not *bona fide* loans, but rather should have been treated as compensation to the employees. In the course of Mr. Watkins' 40 years of experience, he has found that small companies or employers commonly make loans to their employees. Such loans generate goodwill among employees. In this case, the loans also discouraged employees from leaving DDC's employ because they faced the potential of owing the company substantial amounts on the unresolved loans. To the extent that any loan payments were not recorded as loans or advances on DDC's books, such a mistake is not surprising based on the minimal accounting staff at DDC. In his discussions with Jan Peterson, Mr. Watkins learned that Peterson had recategorized some of the erroneous

postings, but had also missed some that should have been recategorized. This is not surprising in light of the tremendous strain on DDC's accounting resources.

**Opinion 4:** The property at 77 P Street, N.E. was not a cash drain on DDC in 2001 and 2002 because of the structure of the loan in place with Fremont Investment and Loan ("Fremont"). Similarly, it was not a cash drain after November 19, 2002, because of the structure of the Morgan Stanley loan.

**Reasons and Bases:** Mr. Watkins reviewed the loan documents relating to the $39 million loan from Fremont to Cayre Jemal's Gateway dated October 26, 2000, the amended Fremont loan for $50 million dated May 1, 2002, workpapers relating to Fremont loan activity including interest reserve draws, and tax returns. In addition, he reviewed the loan documents relating to the $67 million loan from Morgan Stanley to Cayre Jemal Gateway Holdings, LLC. Based on this review, Mr. Watkins concluded that the Fremont loan was not a cash drain on DDC in 2001 and 2002. The loan documents relating to the Fremont loan, including the Secured Promissory Note, included provisions for several holdbacks which would be used to fund the costs of the developing the P Street property. These included an interest reserve holdback which was to be used for interest costs, an environmental remediation holdback, a holdback for leasing which was to be used for tenant improvements and leasing commissions, and a holdback for construction. Based on Mr. Watkins' review of the documents, the funds in these accounts were sufficient to cover the development and carrying costs of the property. In essence, the loan paid for itself. At the time that DDC repaid the Fremont loan, there was approximately $10 million left in the loan of unborrowed money.

Similarly, the Morgan Stanley loan provided for a "Rollover Account" of approximately $6.7 million to cover tenant improvement and leasing commissions. As detailed below, the Morgan Stanley loan also included a "Completion Holdback" of $19 million to protect Morgan Stanley until the building was fully leased. Morgan Stanley could have used these funds to cover DDC's payments had DDC ever been unable to make the payments of interest and principal.

**Opinion 5:** Morgan Stanley did not lose any money as a result of the $430,039.08 commission that was paid to MTD out of the "Rollover Account" for tenant improvements, nor would it have from the borrower's point of view.

**Reasons and Bases:** Mr. Watkins reviewed all of the loan documents related to Morgan Stanley's $67 million loan to Cayre Jemal's Gateway Holdings, LLC and correspondence and offering documents relating to Morgan Stanley's sale of the loan. The documents revealed that the loan was disbursed on November 19, 2002, and Cayre Jemal's Gateway Holdings, LLC began paying interest on the full $67 million. Pursuant to the Loan Agreement and the Cash Management Agreement, approximately $6.7 million of the loan amount was disbursed into a "Rollover Account" at Wells Fargo Bank, N.A. to pay for leasing commissions and tenant improvements. After these expenses were paid, the funds remaining in the account (if any) were to be disbursed to the Borrower, not returned to Morgan Stanley.

At the time of the closing, Morgan Stanley retained $19 million as a "Completion Holdback." The bank was entitled to retain this $19 million for its protection to ensure that the P Street property was fully leased, and it had a great deal of discretion as to how and when to use these funds. This $19 million alone essentially guaranteed that Morgan

7

Stanley would not lose money on this loan. In addition, however, the loan was secured by the P Street property itself and personally guaranteed by Douglas Jemal and Joseph Cayre. Mr. Watkins reviewed Mr. Cayre's statement of net worth, dated December 31, 2001, which showed that Mr. Cayre had a net worth of $349,795,337. The documents indicate that Morgan Stanley successfully sold the loan as part of a large securitization in December 2002.

Based on Mr. Watkins' review, it is apparent that Morgan Stanley did not lose any money as a result of its paying the $430,039.08 invoice from MTD. Moreover, from the borrower's perspective, the payment of the MTD invoice out of the Rollover Account would not have appeared to cost Morgan Stanley money or increase the bank's risk of non-payment in any way.