UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :  Crim. No. 05-359-01,-02, 0-3 (RMU) |
| | : |
| DOUGLAS JEMAL, et al. | : |

**GOVERNMENT'S OMNIBUS OPPOSITION TO (1) DEFENDANTS' MOTION <u>IN LIMINE</u> TO PRECLUDE THE GOVERNMENT FROM INTRODUCING EVIDENCE REGARDING DOUGLAS JEMAL'S PERSONAL FINANCES AND (2) NORMAN D. JEMAL'S MOTION <u>IN LIMINE</u> TO EXCLUDE EVIDENCE OF HIS FINANCIAL AFFAIRS INCLUDING EVIDENCE RELATING TO HIS CASH WITHDRAWALS.**

The United States, through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendants' motions <u>in limine</u>. The evidence sought to be admitted by the government—which shows defendants' access to cash to pay cash bribes to Michael Lorusso—is indisputably relevant and (given the way in which it is being offered) not unduly prejudicial.

**DISCUSSION**

The Indictment charges the defendants with, among other things, bribery, conspiracy to pay bribes, and honest services fraud. The defendants are charges as principals, aiders and abetters, and conspirators with respect to paying bribes to Michael Lorusso. The bribes consist of numerous items of value, including cash in August and September of 2001, a Rolex watch, trips to Las Vegas, automobile repairs, tickets at the MCI Center, cowboy boots, meals, and similar items.

A significant aspect of the government's factual theory is that Douglas Development–the alter ego of Douglas Jemal–found itself in highly trying financial circumstances in 2001. Thus, the defendants, personally and as agents for each other, sought to obtain tenants for certain

Douglas Jemal-owned properties and corruptly courted Michael Lorusso to do so. The government has also made it clear that it will prove that Blake Esherick and Norman Jemal undertook corrupt acts for the benefit of Douglas Jemal personally and themselves, and that each of the three defendants are vicariously liable–as aiders and abetters and coconspirators–for the conduct of each other.

In this regard, three issues have been raised about the proposed testimony of Darlene Brown.

1) Esherick's access to cash. The government's proof will be that Esherick provided Lorusso cash on two occasions in approximately early August and mid to late September 2001. Esherick had no personal sources of ready cash, and the funds to pay the bribes necessarily came from others sources. Indeed, the evidence at trial establishes that the Douglas Jemal funded nearly all the financial activities of Blake Esherick.[1]

In this regard, the government cannot show there is a single cash withdrawal from a company account corresponding to the dates of the alleged bribe (just as it cannot show a withdrawal from a company account related to the $2900 furniture purchase). Nonetheless, the government can and should be able to establish that Douglas Jemal and Norman Jemal cashed numerous checks in the $2000 to $4000 range in the summer of 2001. These total an amount more than sufficient to fund the alleged bribes.

In particular, Norman Jemal's cash withdrawals in the July-September time-frame include the following:

---

[1] In a similar vein, the evidence has already proved that Esherick purchased furniture in the amount of close to $3000 in October 2001 with no corresponding withdrawal from his account.

| Date | Check No. | Amount |
|------|-----------|--------|
| 7/11 | 349 | 4000 |
| 7/27 | 350 | 4000 |
| 8/7  | 351 | 4000[2] |
| 8/28 | 352 | 3000 |
| 9/6  | 354 | 3000 |
| 9/21 | 355 | 1000 |

The government has not located <u>any</u> other cash withdrawals for Norman Jemal in excess of $2000 for all of 2001, so this sequence of cashed checks is consistent with an unusual attempt to amass cash. As far as Douglas Jemal is concerned, he cashed checks in the amount of about $2000 per week. Thus, in the eight weeks from mid July through mid-September, the two men cashed checks drawn on their personal accounts amounting to approximately over $34,000. Moreover, these relatively routine transactions off their personal accounts would not draw anywhere near the scrutiny of large withdrawals of cash from company accounts.

"Relevant evidence, Rule 401 tells us, is 'evidence having any tendency to make the existence of <u>any fact</u> that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" <u>United States v. Foster</u>, 986 F.2d 541, (D.C. Cir. 1993) (emphasis supplied). "The standard is not stringent; it is aimed at each 'brick' of evidence potentially making a wall and not every witness 'mak[ing] a home run.'" <u>United States v. Yazzie</u>, 188 F.3d 1178, 1189 (10th Cir. 1999) (citing Fed.R.Evid. 401 advisory committee's note (citation omitted)).

---

[2] Norman Jemal in a relatively short time frame withdrew close to $19,000 in cash, with some presumably used for a vacation to Europe.

Applying Rule 401, therefore, the determination as to 1) whether and 2) from what source(s) Esherick had access to cash to pay Lorusso are both "fact(s) that [are] of consequence" to this case. Indeed, they are facts of utmost consequence. The determination as to the existence of these facts is "more probable" <u>with</u> the evidence that Douglas Jemal and Norman Jemal obtained substantial amounts of cash in the time frame surrounding the bribes than it would be <u>without</u> such evidence:

> "Assume that a defendant is charged with armed robbery committed by someone carrying a handgun. The prosecution wants to offer into evidence testimony that the defendeant owned a handgun prior to the time the robbery was committed. Defendant claims the evidence is irrelevant. Certainly this evidence, standing alone, does not make it more probable than not that the defendant committed the crime. Furthermore, it is <u>a fortiori</u> not sufficient to prove beyond a reasonable doubt that the defendant committed the crime. The evidence is clearly insufficient on its own to prove the defendant's guilt. But it is a piece of evidence, the existence of which makes it somewhat more likely that the defendant committed the crime than if there were no such evidence. Therefore it is relevant."

Saltzburg <u>et al.</u>, 1 Federal Rules of Evidence Manual ¶ 401.02[1] (2006). See also McGlaughlin <u>et al.</u>, 2 Weinstein's Federal Evidence § 401.06 (2006) (footnote ommitted) ("In general, in determining whether evidence is relevant, the district court may not consider the weight or sufficiency of the evidence. Its consideration should be limited to whether the evidence has any tendency to support a consequential fact. It is no objection to admissibility that 'X does not prove Y, your Honor.' X is admissible if X <u>tends</u> to prove Y.").

In short, there can be no real doubt but that this evidence would tend to <u>make it more likely than not</u> that Esherick had access to cash to pay bribes and the opportunity to commit the crime. It is relevant that, immediately preceding the charged bribe payments, the conspirators obtained cash, from their personal accounts, of an amount sufficient to pay the alleged bribes.

There is no prejudice or other any other issues associated with jury confusion. The jury is highly intelligent and attentive and well knows the defendants have substantial means—in part because of cross examination questions that have brought out the vast real estate holdings of Mr. Jemal. The mere fact that the defendants cashed checks in the amounts of about $2,000 to $4,000 is not the sort of evidence that would tend to inflame any jury. Indeed, Mr. Jemal is free to argue that his withdrawals are to support his family—provided such evidence is admitted at trial—but that just means that this is a legitimate question for the jury. Finally, the government will be exceptionally careful, and the Court may so instruct the jury, that the defendants' lifestyles are not at issue.

2) Douglas Jemal's annual spending. The evidence will show that Douglas Jemal received distributions from Douglas Development of about $1.3 million in 2001. These distributions are relevant in that they are yet an additional source of financial pressure on Douglas Development and upon the defendants to find tenants for Douglas Jemal's non-performing properties. Evidence of yet another $100,000 a month obligation (that is, the approximate amount of monthly distributions to Douglas Jemal) is yet another piece of evidence that is relevant to establishing the overall collection of financial pressures on the company and felt by Douglas Jemal. In other words, it is another "brick" on the "wall." Moreover, the checks to Douglas Jemal are already in evidence. The government would ask Ms. Brown to identify some of them and explain how they were created.

Again, the existence (or lack) of financial pressures on Douglas Development (hence on Douglas Jemal and the other two men) is a "fact that is of consequence" to this case. Evidence of the financial demands placed by Douglas Jemal and Norman Jemal on the income stream of

Douglas Development makes the existence of these financial pressures "more probable" than it would be without such evidence.

Finally, the amounts at issue are far from prejudicial. There are probably some jurors who would assume that Douglas Jemal received amounts far in excess of the approximately $1.3 million that can be totaled for 2001. Moreover, the government is not showing how this money was spent or suggesting an outrageous, offensive or inflammatory lifestyle.

3) The payment procedures. Nearly all the things of value provided by the defendants were charged to one of three American Express credit cards: that of Ms. Quinn, Norman Jemal and Douglas Jemal. The government has already introduced evidence as to how Ms. Quinn's credit card expenses (for the Audi repairs, the MCI Center, and the Rolex watch repair) were approved by defendant Esherick, with the check signed by Douglas Jemal. The procedures were easy to understand and not prejudicial. The evidence that described these procedures permitted the jury to understand the charged conduct associated with the use of her credit card.

The government likewise seeks to have the jury understand the procedures associated with the payments of Norman Jemal's and Douglas Jemal's credit cards. To pay these bills using personal funds, Ms. Brown would prepare the checks and transfer Douglas Development funds into the respective personal accounts to cover the amounts of the checks. These procedures were used not only for the American Express payments but for other payments (such as personal mortgage payments) out of the respective personal accounts as well

As noted, the alleged bribes were charged to the credit cards, and the precise handling of the credit card expenditures is critical to understanding the charges in this case. Indeed the overt

acts in the conspiracy count directly discuss the credit card payments. The government is entitled to have the jury to understand this charged conduct, from start to finish. Moreover, the government seeks simply to have the evidence answer a question the jurors are likely to ask, that is, how did the money get into the personal accounts to pay the credit card bills? At the most basic level, the submission of the American Express bill to Ms. Brown, and the steps she took to pay that bill, are a core aspect of the conduct that constitutes the charged overt acts in this case. The evidence of these procedures is, to some extent, part and parcel of the charged conduct.

\* \* \*

For reasons set forth above, the evidence at issue is highly relevant–it goes to core issues in this case as to the charged conduct. More to the point, it is far from "prejudicial" apart from its probative value. We stress there has been no incident in this trial, to this point, that should give the Court the slightest concern that the government is trying to inflame the jury by proof of an extravagant life-style, and the evidence discussed above poses no such threat in any event.

In that the evidence is relevant and non-prejudicial, it should be admitted.

## CONCLUSION

Defendants' motions should be denied.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

By: /s/ Mark H. Dubester

Mark H. Dubester, D.C. Bar No. 339655
Timothy G. Lynch, D.C. Bar No. 456506
Assistant United States Attorneys
555 4th Street, NW
Room 5233
Washington, D.C. 20530
(202) 353-4862

CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of September, 2006, I caused to be served by electronic filing a copy of the foregoing motion to:

Michele A. Roberts, Esquire
Jeffery M. King, Esquire
Counsel for Douglas Jemal
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036

Paul F. Kemp, Esquire
Counsel for Blake C. Esherick
Venable LLP
One Church Street, Fifth Floor
Rockville, MD 20850

Reid H. Weingarten, Esquire
Erik L. Kitchen, Esquire
Brian M. Heberlig, Esquire
Counsel for Douglas Jemal
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Carol Elder Bruce, Esquire
Lawrence B. Bernard, Esquire
Counsel for Blake C. Esherick
Venable LLP
575 Seventh Street, NW
Washington, D.C. 20004

Christopher B. Mead, Esquire
Counsel for Douglas Jemal
London & Mead
1225 19th Street, NW, Suite 320
Washington, D.C. 20036

Stanley McK. Brand, Esquire
Ross A. Nabatoff, Esquire
Counsel for Norman D. Jemal
Brand Law Group
923 15th Street, NW
Washington, D.C. 20005

Mark H. Dubester
Assistant United States Attorney