UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA   :
             :
    v.       :   **Criminal Action No. 05-359 (RMU)**
             :
DOUGLAS JEMAL ET AL.    :

GOVERNMENT'S OPPOSITION TO
DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL
AND MOTION TO DISMISS

The United States of America, through its attorney, the United States Attorney for the

District of Columbia, respectfully opposes defendants' motions for judgement of acquittal and

motion .to dismiss.  In opposition thereto, the government submits:

I.  THE GOVERNMENT HAS PROVED ITS CASE

A.  Introduction.

The Indictment in this case sets forth a series of allegations and the government has

proved each and every one with but minor exceptions.[1]

The defendants' various motions for judgement of acquittal are flawed from top to

bottom.  Most significantly, the motions fail to fairly portray the evidence in the light most

favorable to the government.  They routinely pick out phrases or sentences out of a 4,000 page

record that helps their clients or fails to support the government's case, but utterly fail to address

the obvious power of the government's evidence.  They make credibility determinations that only

a jury can make; they fail to make credibility determinations that are within the jury's power to

---

[1]   The Indictment alleged that Douglas Development purchased $600,000 of
furniture from Fernando Villegas, where Lorusso stood to financially benefit.  In connection with
the testimony of Mr. Villegas, the government and defense agreed that the government would not
pursue this allegation, the allegation would be deleted from the Indictment, and the defense
would not argue in closing that the government had not introduced evidence on this topic.

make. They fail to acknowledge the inferences that a jury is capable of making; they fail to acknowledge motive evidence at all; they fail to marshal the circumstantial evidence and they repeatedly misstate the law.

Moreover, the defendants' motions in many respects have little to do with the factual record. Rather, the defendants have taken the opportunity at this particular juncture in the proceedings to re-litigate purely <u>legal</u> issues already decided pre-trial, legal issues that were the subject of litigation in connection with jury instructions, or legal issues they raised or should have raised months ago. These legal issues include such issues as the meaning of "honest services fraud," the propriety of the bribery theory, and, incredibly, for the first time, a challenge to certain charging language in the indictment. The length (93 pages of dense arguments) and complexity of the defendants's motions is not due to the defendants' arguing the facts–this could have been done in a few pages (the government had suggested 20). Instead, the defendants persist in raising long-settled legal issues. The government is obligated to respond–and it does so reluctantly and with but roughly 24 hours to do so–because it cannot let the defendants' legal assertions go unchallenged.

### B. Legal Standard for Reviewing the Rule 29 Motions

The Government cannot improve on the following statement of the law set forth by Judge Kollar-Kotelly:

> The Court must deny a motion for judgment of acquittal when, considering the evidence in the light most favorable to the Government, the evidence "is sufficient to permit a rational trier of fact to find all the essential elements of the crime beyond a reasonable doubt." <u>United States v. Kayode</u>, 254 F.3d 204, 212 (D.C.Cir.2001); see also <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "In ruling on a motion for a judgment of acquittal, 'the trial court must view the evidence in the light most favorable to the Government

giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." ' United States v. Treadwell, 760 F.2d 327, 333 (D.C.Cir.1985) (quoting United States v. Davis, 562 F.2d 681, 683 (D.C.Cir.1977)); United States v. Sutton, 801 F.2d 1346, 1358 (D.C.Cir.1986). This stringent standard contemplates that the ultimate decision of guilt or innocence should be left to the jury, and that it is the province of the jury to credit certain testimony and reject other testimony. United States v. Davis, 763 F.Supp. 645, 648 (D.D.C.1991) ("Sentencing courts should therefore by wary of rejecting a jury's assessment of witness credibility."). "When a reasonable mind might fairly have a reasonable doubt of guilt or might fairly have none, the decision is for the jury to make." United States v. Herron, 567 F.2d 510, 514 (D.C.Cir.1977) (citation omitted); see also United States v. Bethea, 442 F.2d 790, 792 (D.C.Cir.1971)

* * *

The evidence in question "need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." United States v. Maxwell, 920 F.2d 1028, 1035 (D.C.Cir.1990) [citation omitted]. Moreover, "[t]here is no requirement of any direct evidence against the defendant; the evidence may be entirely circumstantial." United States v. Poston, 902 F.2d 90, 94 n. 4 (D.C.Cir.1990) [citation omitted]; United States v. Simmons, 663 F.2d 107, 108 (D.C.Cir.1979)). "No distinction is made between direct and circumstantial evidence in evaluating the sufficiency of evidence supporting a guilty verdict," Maxwell, 920 F.2d at 1035, "since it is 'the traditional province of the jury to assess the significance of circumstantial evidence, and to determine whether it eliminates all reasonable doubt." ' Treadwell, 760 F.2d at 333 (quoting United States v. Staten, 581 F.2d 878, 883 (D.C.Cir.1978)). "Similarly, the government, when using circumstantial evidence, need not negate all possible inferences of innocence that may flow therefrom." Id. (citation omitted). As such, "[i]t is only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the judge may properly take the case from the jury." Davis, 562 F.2d at 683 (citations omitted); see also United States v. Durant, 648 F.2d 747, 750 (D.C.Cir.1981) (same). "If the evidence is such that a reasonable man may have reasonable doubt as to the defendant's guilt, the case should go to the jury." Bethea, 442 F.2d at 792.

United States v. Morrow, 2005 WL 1389256 (D.D.C. June 13, 2005) (J. Kollar-Kotelly) at **3-4.

## II. GOVERNMENT'S SUMMARY OF THE EVIDENCE

### A. The Evidence Related to Counts One through Four
### (Corruption and Fraud Related to the D.C. Government)

As to Counts One through Four, the jury would be entitled to conclude:

Michael Lorusso was a public official, that is, the Deputy Director of the Office of Property Management. He had substantial discretion in finding space for D.C. Government agencies, and substantial discretion in negotiating lease terms. His work was not micro-managed. His judgement was relied on by supervisors and other agency officials. Though he dealt with attorneys, their role was to review leases for legal sufficiency only.

The defendants has particular financial needs in 2001: one was to put tenants in a vacant building at 77 P Street, the other to put tenants in a vacant property at 4800 Addison Road.

As to 77 P Street, Douglas Jemal had a difficult partner, Joe Cayre, to whom he owed $19 million related to the purchase and development of that property. Cayre was continually pressing Jemal for the performance of that property, and was concerned about repayment. They fought constantly. The defendants wanted tenants for 77 P Street, not only for the rental income, but because once the property was filled with tenants, it was possible to refinance the property, obtain cash, and pay off Cayre. Furthermore, the value of the property was determined by the income the property would yield; that income, in turn, was a function of the value of the leases.

The defendants also sought to lease the parking lot space surrounding the warehouse at 4800 Addison Road. The basic rental value of storage yard space in Prince George's County Maryland was, per Ralph Haught of CB Richard Ellis, at this time about $2500 to $3000 per acre per month. They had previously rented a fraction of this space (14,400 square feet at $800 a

-4-

month) at rental terms consistent with the typical rates for storage yard space. Thus, they made an offer to a tour bus operator (Marie C. Thomas) of 3 acres at $10,000 per month, or at a total of $120,000 per year ($.92 per square foot). They had received an offer from a automobile auction entrepreneur for 3 acres at $3,500 per month ($42,00 per year). Moreover, in 2005, long after Lorusso left the government, when the storage yard land had increased in value, the defendants offered four acres to Connex, again for bus storage, at $12,500 per month, or about $150,000 per year ($.92 per square foot). This was about a third of the per square foot rate that had been charged to the D.C. Government, notwithstanding Douglas Jemal's insistence in his testimony before the city council that the land was worth $.2.75 per square foot, or about a third of what they had previously leased the property to the D.C. Government.

Finally, Douglas Jemal and his company Douglas Development were in a difficult cash position, characterized by hundreds of bounced checks and checks paid over insufficient funds. Vendors were being paid late, and vendors were being forced to accept less than the true amount to which they were entitled by virtue of the leverage which arose from their concerns of not being paid at all. Even personal friends (like George Cois and George Myers) of Douglas Jemal had to wait for payment and sometimes accept less than what they were entitled to under their contracts with Douglas Development.

Starting in 2001, almost immediately after they met Lorusso in connection with leasing the two floors at 77 P Street, the defendants began to shower upon Michael Lorusso a constant series of things of value – large and small. Though they barely knew Mr. Lorusso, having only met him in late April 2001, by mid May 2001, only about two weeks later (and not later than May 11, 2001), Esherick and Douglas Jemal invited Lorusso to Las Vegas to be their guest at the

-5-

Bellagio Hotel.[2] Lorusso joined them, and his trip was paid for at the time by Norman Jemal's credit card. Throughout the summer, and thereafter, the defendants, in one or more combinations, provided Lorusso meals, cash, a Rolex Watch, repairs to his automobile (which they picked up and returned to him), numerous sets of tickets to the MCI Center (including what may have been tickets to Michael Jordan's first game as a Wizard), an invitation to Florida (for which tickets were purchased), another trip including transportation and lodging in Las Vegas, cowboy boots, and a custom-tailored suit. Lorusso was treated at Douglas Development as if he was part of the Douglas Jemal team. Indeed, just as Douglas Development employee Kelly McIlwrath received a birthday bonus ($100), repairs to her car, and tickets at the MCI Center, so did DC OPM official Lorusso receive birthday presents, car repairs and tickets to MCI Center events. Just as Sabra Gould received MCI Center tickets, so did DC OPM official Michael Lorusso.

Notwithstanding the defendants' contentions as to the relative openness of the relationship, many of these activities were kept secret. For example, neither Sabra Gould nor Susan Jordan (Esherick's assistants), knew that the watch that was sent back to have the link added had been purchased for and given to Lorusso. Other personnel at Douglas Development, such as Dave Medding and Darlene Brown, were unaware that things of value had been given to Lorusso. No documents of Douglas Development reference Lorusso as a guest at the Bellagio Hotel. Norman Jemal's credit cards, which did reference certain travel by Lorusso, were discretely shared, if at all, and only with Darlene Brown who would attach no significance to the

---

[2]    Mr. Lorusso met the defendants April 26, 2001. The invitation had to have been extended on or before May 11, 2001, because that was when Lorusso purchased his airline ticket to travel with his brother to Las Vegas.

-6-

Lorusso charges (she did not even know who he was).   Similarly, Douglas Jemal's American Express provide no information as to the identify of the persons for whom he purchased boots and meals.  Indeed, Douglas Jemal, while under oath, described their relationship in terms that obscured the financial relationship.

Douglas Jemal benefitted from every act of Lorusso, and, moreover, he ultimately paid for nearly every item of value that was given to Lorusso.  Some of the items were paid for by Douglas Jemal on Douglas Development checks, such as the items charged to Sabra Gould's credit card or the MCI Center invoices.  As to these items, the evidence showed that Douglas Jemal scrutinized the bills and would have seen the support for these payments. (The evidence also demonstrated that Douglas Jemal was a strong presence in the company and certainly would have known of these various expenditures).  The cowboy boots and the meals were charged directly to Douglas Jemal's credit card.  Others expenditures, such as most of the travel, were paid for with Norman Jemal's credit card.  Some of these charges were paid for by Douglas Development; some by Norman Jemal.  However, as to the charges paid by Norman Jemal personally, these were in truth paid for by Douglas Jemal by means of the payment procedures described by Darlene Brown, where Douglas Development funds were transferred from Douglas Development accounts to Norman Jemal's personal accounts, after which the bills, such as American Express bills or the mortgage payments on 7804 Radnor Road, would be paid.

Even though Douglas Jemal paid for these things– directly or indirectly–he was not a friend of Lorusso.  Lorusso describes their relationship as "friendly," and Douglas Jemal, in his sworn testimony in front of the City Council, under oath used terms that clearly implied he was not "friends" with Lorusso and knew Lorusso just as he knew Councilmember Graham.

-7-

The jury was entitled to conclude that these things of value were intended to influence, and had the effect of influencing, Lorusso in the performance of his official duties.

At the same time that these things were given to Lorusso, Lorusso took a series of official acts for the benefit of the defendants.

The relationship between the things of value given and the official acts performed is summarized on the following chart:

| Date | Thing of value given | Involvement of Particular Defendants | Official Acts of Lorusso |
|------|----------------------|--------------------------------------|--------------------------|
| May 2001 | Accommodations in Las Vegas (Bellagio Hotel) | Trip offered by Esherick and Douglas Jemal; paid for on Norman Jemal's credit card; payment funded by Douglas Jemal. | Signing Letter of Intent for 4800 Addison Road and taking related steps to lease space for DC Government at that location. |
| July 2001 | | | Approved $38,000 move damage invoice. |
| August 2001 | $10,000 Cash<br><br>$3,200 Rolex | Esherick; jury entitled to infer source of cash was Douglas Jemal, since cash did not come from Esherick's account;<br><br>Esherick gave the watch; Norman Jemal's credit card used to purchase the watch; Norman Jemal's credit card statement paid for by Douglas Jemal;<br><br>Esherick caused watch repair to be charged to Sabra Gould's credit card; expense approved by Esherick, paid by check signed by Douglas Jemal to American Express, expense account report would have been provided to Douglas Jemal with check. | Signing Addison Road lease;<br><br>Signing $1.8 million lease at 77 P Street for Department of Mental Health (DMH);<br><br>Causing $99,000 to be paid pursuant to a false "Construction management" invoice;<br><br>Commencement of negotiations on the "New Economy Act" space. |

| Date | Thing of value given | Involvement of Particular Defendants | Official Acts of Lorusso |
|---|---|---|---|
| Late September-early October 2001 | Cash | Esherick | Continued negotiations on the New Economy Act space |
| October 2001 | Auto repairs | Esherick directed George Cois; charged to Sabra's credit card; credit card bill paid by Douglas Jemal. | Lorusso approved three invoices that benefitted Douglas Jemal:<br><br>1) $100,000 invoice (unitemized) for Addison Road construction;<br><br>2) $66,000 invoice for "Telco Room Buildout;"<br><br>3) $863,000 for "Reimbursement for Tenant Construction." |
| November 2001 | MCI Center Ticket (Michael Jordan's first game) | Esherick, charges placed on Sabra's credit card, credit card bill paid by Douglas Jemal. | Lorusso commenced steps to purchase 4800 Addison Road;<br><br>Lorusso added 15,000 square feet to DMH. lease at 77 P Street;<br><br>Lorusso back-dated letter, appears to be for zoning hearing, at Esherick's request. |
| December 2001 | MCI Center events | Esherick; Douglas Jemal signed checks to MCI Center with supporting documentation indicating that Lorusso was guest | Lorusso took steps to inflate Addison Road appraisal;<br><br>Lorusso used DC Government "commission pool" funds to pay two $97,000 invoices for 77 P Street |

| Date | Thing of value given | Involvement of Particular Defendants | Official Acts of Lorusso |
|------|----------------------|--------------------------------------|--------------------------|
| February 2002 | Offer of trip to Florida and purchase of tickets;<br><br>Offer and purchase of reservations for trip to Las Vegas | Eshericks offered, paid for by Norman Jemal; Norman Jemal's credit card use reimbursed directly by Douglas Jemal<br><br>Put on Norman Jemal's credit card; | Lorusso used DC Government "commission pool" funds to pay DDC debts, including Branlik. |
| May 2002 | meals, lodging and entertainment in Las Vegas;<br><br>Cowboy boots in excess of $1000 | All three in attendance, paid for with Norman Jemal's credit card.<br><br>Douglas Jemal | |
| June 2002 | | | Lorusso paid additional DDC debt from "commission pool" funds. |
| July 2002 | | | Lorusso signed two more leases for 77 P Street. |

| Date | Thing of value given | Involvement of Particular Defendants | Official Acts of Lorusso |
|------|---------------------|--------------------------------------|--------------------------|
| August 2002 | offer of custom made suit | Esherick | Lorusso signed another leases for 77 P Street; Lorusso spoke to Morgan Stanley bankers to assure them DC government would fill up 77 P Street. |
| THROUGHOUT | | | |
| 2001 - 2002 | meals<br><br>limousine | Douglas Jemal (on credit card) and paid for as company expense; all defendants aware and present;<br><br>Blake Esherick (directing limousine to be made available). | Expediting payments from DC Government to DDC;<br><br>Failing to monitor status of $863,000 transferred to Lorusso in October 2001;<br><br>Failing to monitor status of payment obligation of approximately $377,000 by DDC to the commission pool account;<br><br>Failing to monitor status of $100,000 paid by DC Government to DDC for tenant improvements at Addison Road.. |

The above recitation of the evidence is a truly conservative one. The evidence, in the light most favorable to the government, supports that finding that Lorusso and Esherick had specific discussions about one or more of the invoices being affirmatively fraudulent. Moreover, Lorusso's sworn statement that he himself perceived he was in a conspiratorial relationship with the defendants, where he would do things for them in exchange for the things of value, is entitled to credit.

Moreover, as further evidence of intent, the jury would be entitled to conclude, having seen Lorusso for days on the stand, that he was hardly a true friend of any of the defendants – even Esherick. He barely knew Norman Jemal and was only "friendly" with Douglas Jemal, who actually complained about Lorusso hanging around in Las Vegas. Indeed, the jury would be permitted to find that once Lorusso was of no more use to the defendants, Douglas Jemal pretty much washed his hands of him and stopped contact with Lorusso altogether (hardly the behavior of a true friend, who only the year before had given Lorusso a Rolex watch). The jury would be entitled to conclude that the only reason that Douglas Jemal paid for things given to Lorusso was because he knew that such things were important to induce Lorusso to continue to take steps as a city official of value to Douglas Jemal. Having seen Lorusso for days on end, the jury would be entitled to conclude that the defendants' reaction to Lorusso was essentially the same as Villegas's, namely, if Lorusso were not the Deputy Direct of OPM, they would have had nothing to do with him, let alone give him a Rolex and nurtured a relationship in which Douglas Development on a daily basis embraced him by showering him with things of value. The jurors, who themselves may wish little to do with Lorusso, are entitled to reject the contention that Lorusso was such a truly beloved friend of the defendants that after they had known him for but two weeks, they simply had to have him join them in Las Vegas, and who was such a valued friend that after knowing him only four months they felt it appropriate to give him a Rolex wristwatch.

The jury would be entitled to conclude that any "friendship" Lorusso may have believed they had was, in fact, a truly one-sided one, more perceived than real. The jury would be entitled to conclude that though Lorusso may have genuinely believed the defendants–all or some–liked

him and enjoyed his company, the true facts suggest they tolerated his presence (as in Las Vegas), flattered him (by saying nice things about him in front of others), and–critically in this case–coupled flattery with bribes to ensure Lorusso would behave toward them with partiality and favor. Indeed, the jury could reasonably conclude that what Lorusso may have believed to be, in part, gifts were nothing more than pure, unadulterated bribes, Lorusso's perception of the defendants' motives notwithstanding. Indeed, the jury, upon hearing and seeing Lorusso for over five days, would be justified to find it completely implausible that such shrewd businessmen and judges of character as the defendants would be genuine "friends" with Lorusso, Lorusso's beliefs notwithstanding; the jury would be justified in concluding instead that the defendants well understood they could easily buy Lorusso to enrich themselves.

Finally, Lorusso kept this relationship secret, and thereby deprived the D.C. Government of his honest services, free of the undisclosed relationship involving the receipt of things of value from the defendants. The materiality of this concealed relationship was obvious through the testimony of John Koskinen. Koskinen– at all times Lorusso's supervisor in the chain of command--testified that had he known that Lorusso had received things of value from the defendants, he would not have permitted Lorusso to continue dealing with the defendants and would have scrutinized every transaction. He specifically disavowed and repudiated any inference from the emails that he approved or ratified the conduct of Lorusso, be it in connection with the Addison Road dealings or the 77 P Street dealings.

The evidence shows that the defendants submitted and caused to be paid five false invoices, each through the Office of Property Management:

1.      $38,000 moving damage. This invoice was unsigned, undated, unnumbered, and

-13-

unitemized.   It represents there were "80 hours of move supervision" when in fact, the only person present was Bruce Frazier, who received 16 hours overtime at $18 per hour.   By its terms it suggests that there was move damage that caused Douglas Development to be entitled to $38,000 when, in fact:

a.     When subpoenaed, DDC provided supporting invoices for certain painting that in fact was not charged to the DC Government, and certain "clean-up," only a portion – between $2500 and about $7,500– could possibly have come from the move;

b.     Certain of the claims were otherwise demonstrably false, for example, there was a claim for sprinkler damage, when, by all accounts, it appears it was repaired for free, and the elevator company who had a service warranty on any elevator repair did not bill or charge DDC for elevators;

c.     Despite vigorous cross-examination suggesting such theories as to the bases for expenses, there is no evidence whatsoever that supports any other damage for which the $38,000 invoice could be proper;

d.     The evidence demonstrates that Esherick prepared it.   In particular, a copy of the invoice was found on Esherick's folder in the network server.   Even though Sabra Quinn, who worked for Esherick, stated that she occasionally prepared documents for Millstein, a contemporaneous email seeking support for this $38,000 invoice clearly identified it as having been prepared by Esherick.   In addition, Esherick – not Millstein – had the close relationship with Lorusso, the individual to whom this invoice was

-14-

submitted. Furthermore, it is known that Esherick prepared false claim after false claim. The proof of the falsity of the document supports the conclusion that Esherick was its author.

e.    The "move damage" claim could have been paid out of the tenant improvement allowance; the jury was entitled to conclude that it was prepared and submitted directly to Lorusso to avoid scrutiny by Kauffman of Staubach.

2.    The $99,000 invoice for "additional construction management"

a.    The phrase "construction management" is clearly false. Though Douglas Development was entitled to $1 per square foot for "construction management" associated with the initial DOES lease, this was in fact paid to DDC out of the tenant improvement allowance, and there was no provision for "additional construction management." Kenneth Kauffman, who administered the "construction management" under the contract, was unaware of this invoice and disavowed any basis for "additional construction management."

b.    The defense has suggested that this was really for use of another floor to store and assemble furniture. If indeed intended for this purpose, the invoice remains false. Moreover, the furniture assembly took up a small portion of the floor, and if this were a side-deal, as the defendants suggest, it is a side-deal that is consistent with the conspiracy and bribery alleged in the indictment, namely a deal with Lorusso to generate funds for the

-15-

defendants pursuant to false and fraudulent documents.

3.    $863,000 invoice for "reimbursement"

    a.    This was a fraudulent invoice was prepared by Esherick. The term "reimbursement" has a common meaning – it means a payment after expenses have been incurred, not prior thereto.

    b.    Even though the circumstances suggest that the transfer of funds from the D.C. Government to Douglas Development was known by others in addition to Lorusso, once having been transferred, Lorusso made no attempt to keep track of this money or ensure it was spent for the benefit of the D.C. Government. In addition, these funds were treated simply as income by Douglas Jemal– no attempt was made to keep them separate or available for use for the D.C. Government. Indeed, the $863,000 was immediately split 50-50 between Douglas Jemal and his partner.

4.    $66,000 invoice for Telco Room Buildout

    a.    This invoice was fraudulent, and resulted in $66,000 going to the defendants;

    b.    The defendants are not helped by their claim, if true, that some of this money was used to pay a furniture expense on behalf of the D.C. Government. Even on the defendants' theory, they charged the city $66,000 by way of a false invoice to pay a city bill in the amount of $44,000 – a $22,000 "profit" to write a check. If this were the case, it would again only cement the evidence demonstrating a fraudulent and

-16-

corrupt relationship between the defendants and Lorusso.

c.        Moreover, it is noteworthy that Douglas Development was subpoenaed for all supporting documentation for the $66,000 payment, in response to which they represented they had "no responsive documents." If the $44,000 furniture documents are truly the explanation, their failure to produce these documents earlier in response to the grand jury subpoena is evidence of concealment and consciousness of guilt; for these documents are evidence that the invoice itself was fraudulent, but, if true, simply suggest that the nature of the "loss" to the D.C. Government was $22,000 (assuming the furniture purchase was legitimate) and not $66,000.

5.        February 2002 $261,000 invoice for Addison Road construction.

a.        In September 2001, Esherick submitted a claim for $100,000 for reimbursement for Addison Road construction. The $261,000 invoice failed to credit the $100,000 already paid, and resulted at a minimum in a $100,000 overpayment.

b.        Esherick specifically stated to Medding that he had doubled the cost of this bill

c.        The cover sheet for this bill makes no sense, and clearly makes up labor costs;

d.        It includes over $25,000 for fencing, an item DDC was required to provide under the lease;

e.        Finally, various invoices for expenses having nothing to do with the

impound lot – such as fencing and paving in non-impound portions of Addison Road--were simply thrown into the invoice, undoubtedly because the defendants had no doubt that Lorusso would approve them or cause them to be approved;

f.      Although Lorusso may not have personally reviewed this invoice, the evidence supports the finding that the defendants knowingly and willfully submitted it to the Office of Property Management, well aware that with Lorusso on their payroll, the chances of this invoice being scrutinized, let alone rejected, were nil.

### B.  The Elements of the Public Corruption Counts

Taking the evidence in the light most favorable to the government, the jury would be permitted to find that the government has proved the three corruption counts beyond a reasonable doubt.

### 1.  The Elements of Count Two (Bribery)

The above evidence, taken in the light most favorable to the government, satisfies the elements of the bribery statute, namely:

**First**, that the defendant, on or about the dates charged, offered, promised or gave money or something else of value to Michael Lorusso.

The jury can find that the defendants gave numerous things of value to Michael Lorusso as charged in the Indictment;

**Second**, that Michael Lorusso was then a public official as a District of Columbia employee of the Office of Property Management.

-18-

The evidence demonstrates that Lorusso was a public official as defined.

**Third**, that the defendant did so with the corrupt intent[3] to influence an official act or officials acts of Michael Lorusso or to induce Lorusso to do or omit to do an act or acts in violation of his lawful duty.

The evidence is sufficient for the jury to conclude the defendants had corrupt intent.

## 2. Elements of Count One (Conspiracy)

**First**, that between January 2001 and April 15, 2004, an agreement existed between two or more people, to commit the crime of Bribery. * * * It is enough that the government proves beyond a reasonable doubt that there was a common understanding among those who were involved to commit the crime of Bribery.[4] So, the first thing that must be shown

---

[3]      "Corrupt intent means simply having an improper motive or purpose. The defendant must have promised, offered, or given money or a thing of value to the public official with the deliberate purpose of influencing an official act or official acts of that person. This involves conscious wrongdoing, or as it has sometimes been expressed, a bad state of mind." 1 L. Sand, et al., Modern Federal Jury Instructions (2004), Inst. 16-6, at p. 16-13.

[4]      To prove such an agreement existed, the evidence need show only that conspirators agreed on "the essential nature of the plan," and does not have to demonstrate that the "conspirators agreed on the details of their criminal scheme." United States v. Treadwell, 760 F.2d 327, 336 (D.C. Cir. 1985). The evidence does not need to show an explicit agreement; a conspiracy can be demonstrated by showing that the parties had a "tacit understanding to carry out the prohibited conduct." United States v. Samaria, 239 F.3d 228, 234 (2d Cir. 2001). "It is well established that an agreement sufficient to support a conspiracy conviction can be inferred from circumstantial evidence." United States v. Gatling, 96 F.3d 1511, 1518 (D. C. Cir. 1996); see also Glasser v. United States, 315 U. S.60, 80 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'"); United States v. Dean, 55 F.3d 640, 646-47 (D.C. Cir. 1995). Finally, when using circumstantial evidence to prove a conspiracy, the government "need not negate all possible inferences of innocence that may flow therefrom." Treadwell, 760 F.2d at 333.

is the existence of an agreement.

> The evidence is sufficient to show that the three defendants reached a "common understanding to commit the offense of bribery. In this regard, all three men took numerous steps to provide things of value to Lorusso. Moreover, the evidence is clear that neither Douglas Jemal nor Norman Jemal were really friends with Lorusso, underscoring the inference that their intent was for corrupt business purposes.

**Second**, the government must prove that the specific defendant intentionally joined in that agreement.[5] It is not necessary to find he agreed to all the details of the crime, or that he knew the identity of all the other people the government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins in it with the intent to advance or further the unlawful object of the conspiracy.

> Again, the evidence is sufficient for a jury to determine that all three men played active roles in the provision of things of value to Lorusso and were knowing participants in a scheme to bribe him.

Third, the government must show that one of the people involved in the conspiracy did

---

[5]     Once a conspiracy has been shown, "evidence sufficient to link another defendant to it need not be overwhelming." Samaria, 239 F.3d at 234. In fact, "[t]he evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." United States v. Whittington, 26 F.3d 456, 464 (4th Cir. 1994); see also United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994) ("[o]nce a conspiracy is established, as well as [a] defendant's intent to further it, any connection between the defendant and the conspiracy, even a slight one, will be sufficient to establish knowing participation").

something for the purpose of carrying out the conspiracy.

The numerous overt acts have associated with providing Lorusso things of value have been proved.

### 3. The Elements of Count Three, as applied to the Honest Services Allegations

**First**, the defendant knowingly devised or participated in a scheme or plan to fraudulently deprive the District of Columbia and its citizens of their intangible right to the honest services of Michael A. Lorusso;

The evidence, taken in the light most favorable to the government, supports the conclusion that the defendant knowingly bought the honest services of Lorusso, by providing him a continuous stream of financial benefits;

**Second**, the scheme involved a failure to disclose a material fact;

The evidence is that the relationship depended on the failure to disclose material facts, namely, the defendants' giving and Lorusso's receiving things of value. Even Douglas Jemal, at the City Council hearing, well understood the need to keep the financial aspects of their relationship secret.

**Third**, the defendants had an intent to defraud;

A jury would be entitled to conclude that the defendants' giving to Lorusso of a series of things of value was done to cheat the District of Columbia and its citizens of their right to Lorusso's honest services;

**Fourth**, in advancing, furthering, or carrying out this scheme to deprive the government of the honest services of Michael Lorusso, the defendant used the mails or caused the mails to be used.

Nearly every item of value was paid for by mail, either by check or by credit card.

### C. The Evidence Related to Count Five (Wire Fraud)

In fall 2002, Douglas Jemal needed $400,000 to complete the purchase of 111 Massachusetts Avenue (the "Darth Vader building)." The money was not available in DDC's operating accounts, and there was not a ready source of funds.

At about that time, Douglas Jemal, on behalf of himself and his partner, Joe Cayre, refinanced the 77 P Street property. The purpose of this refinancing was to turn a construction loan (at higher interest rate) into "permanent financing" at a lower interest and to get "cash out" of the transaction.

77 P Street was appraised by Don Morris at $96 million. As a result, Morgan Stanley agreed to make a $67 million loan. Of the $67 million, about $41 million was going to be used to pay off the former construction loan, $19 million was to be "held back" pending full occupancy, and $7 million was to be used for "tenant improvements." Morgan Stanley, to protect its interests, insisted on its right to approve the invoices to be paid to contractors from the $7 million tenant improvement fund and to direct the payments by wire to the contractors' accounts. Morgan Stanley demanded signed lien releases from all such contractors, that is, a document indicating that if payment was made, the recipient would not attach a lien on the property.

In addition, Douglas Jemal had a demanding partner, Joseph Cayre, who was constantly haranguing Douglas Jemal to repay the outstanding loans. Cayre's concern for his investment with Jemal is obvious not only by the coarse tone of the emails between them, but by his testimony about their arguments. Cayre, in particular, was concerned about the amounts being paid from the partnership to Douglas Jemal (DDC) in the form of fees and commissions. Cayre

-22-

was a demanding partner who wanted to have his loans repaid as soon as possible

The defendants hit upon the following scheme. Esherick prepared an invoice purportedly from "MTD Real Estate Services" that was false and fraudulent in the following ways:

- The invoice represented that MTD was the broker for the DC Department of Transportation; this was false;

- It represented that there was a 10-year lease; this was false;

- It represented lease terms (square feet and price per square feet) that were false:

- It represented that MTD's address was on Eastern Avenue (so as to conceal the true recipient of the funds); this was false;

- It used as MTD's phone number a DDC fax line (again so as to conceal the true recipient of the funds);

- The invoice was designed to look as legitimate as possible; it had an invoice number, suggesting prior invoices and was "approved" for payment by Esherick, though in fact he created the document.

To keep Cayre from knowing what they were doing, a memorandum was prepared and faxed to Cayre that described the "tenant improvement" funds held by Morgan Stanley. In this memorandum, signed by Brownell, explaining the structure of the loan, the following representation was made: "Note that $7 million is being held back to fund the remaining tenant improvement and leasing commissions (all of these are to outside brokers). [emphasis supplied]. Cayre testified that he understood this phrase to "outside brokers" as being entities or brokers other than Douglas Development/Douglas Jemal.

Shortly thereafter, on December 10, 2002, the defendants opened an account in the name

of MTD at Adams Bank. Douglas Jemal was the only signor on this account. Despite using an

Eastern Avenue address on the invoice, the address on the MTD Adams Bank account was

Douglas Development's address at 702 H Street, N.W.

Morgan Stanley wanted more than just the invoice, it wanted the lien release and bank

wire information. Thereafter, either Esherick or Douglas Jemal obtained the signature on a "lien

release" document from Michael Rowe, a kick-boxer/athletic trainer. In addition, Medding, at

either Millstein's or Esherick's request, prepared a memorandum, purportedly from Rowe to

Medding, that contained the MTD Adams account information. Rowe disavowed the contents of

the lien release; he disavowed knowledge of the bank account or the bank wire information. This

wire information and lien release was faxed to Morgan Stanley.

Thereafter, on December 12, 2002, in reliance on the invoice and lien release, Morgan

Stanley wired $430,000 to Adams Bank. The day after, at a time when DDC's operating balance

was approximately negative $180,000, Norman Jemal directed the wiring of $400,000 from the

account of MTD to the settlement company handling the purchase of 111 Massachusetts Avenue.

The balance in the account, approximately $30,000, was moved from Adams to Douglas

Development, almost immediately the following week.

### D. The Elements of the Offense (Wire Fraud)

**First**, that the defendants knowingly devised or knowingly participated in a scheme to

obtain money or property by means of false or fraudulent pretenses, representations, or

promises.

The evidence is sufficient to permit the jury to conclude that the defendants did

participate in such a scheme, involving the false pretenses associated with the

-24-

MTD invoice, the lien release, and the misrepresentation to Joseph Cayre;

**Second**, that the defendant did so with the intent to defraud[6];

> The jury could conclude that the defendants knew or reasonably knew that if they had sought to obtain monies honestly and above board, they would have been thwarted, either by Morgan Stanley or by Jemal's partner; accordingly, they intentionally sought dishonest means with the intent to deceive.

**Third**, in advancing, furthering, or carrying out the scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representation, or promises, the defendants [used the wires].

> The jury could reasonably conclude the wires were used: 1) to fax a memorandum to Joe Cayre, 2) to wire a lien release to Morgan Stanley, and 3) to cause the wiring of funds from Morgan Stanley's escrow agent (GMAC in Utah) to the MTD account at Adams National Bank.

### E.  Counts Six, Seven and Eight - Tax Evasion

The evidence shows that the defendant Douglas Jemal, for years, compensated Esherick in ways not reported to the IRS.  The defendants have filed a motion only with regard to Count Eight (2003).  Nonetheless, the evidence involving Count Eight is nearly the same as the evidence for the other counts (2001 and 2002).  The evidence shows:

---

[6]    "To act with an "intent to defraud" means to act knowingly and with the intention or purpose to deceive or to cheat."

An intent to defraud is accompanied, ordinarily, by a desire or purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person or entity.

1.    Esherick's reported compensation from 1999 through 2003, never increased; the
      jury is entitled to conclude this is unreasonable, inconsistent with experience (or
      why wouldn't Esherick simply leave for another job) where even Galen
      Galentine's salary increased over time at DDC, and that his compensation did
      increase as per the unreported elements described below:

2.    Though Esherick was a senior executive, one of the top employees in the company,
      his reported salary was less than half of Medding's, who Esherick clearly out-
      ranked. It was also less than that of Galen Galentine (who made over $100,000),
      Robin Sippel (who made $75,000, who worked in the accounting department for
      Medding) and Tim Roberts (who handled service contracts). It was barely more
      than that of George Cois (who made $65,000 doing odd jobs and taking care of the
      DDC cars), and only $10,000 more than from Darlene Brown, who handled payroll
      and Douglas and Norman Jemal's personal accounts. The jury would be entitled
      to conclude that the reported compensation of $66,000 per year is not credible, and
      that his compensation included the unreported elements described below;

3.    As far as Esherick is concerned, the evidence is overwhelming and not even
      disputed that he took false deductions for mortgage interest and real estate taxes for
      2001 and 2002–evidence of his fraudulent intent vis-a-vis the IRS and his tax
      obligations;

4.    The jury would be entitled to conclude there were other aspects of compensation,
      including:

      a.    Free housing. For years, Douglas Jemal, through Douglas Development,

provided Esherick free housing; first at Radnor Road, then at 6001 Nevada Avenue. These were nice properties. These properties were each ultimately funded by Douglas Development. The Radnor Road mortgage payments of over $1700 per month were made by Norman Jemal (who took the mortgage interest deduction on his personal returns). Moreover, Douglas Jemal and Norman Jemal gave up the rental income they would have received if they had chosen to rent that property. However, on a monthly basis, Norman would submit the bill to Darlene Brown; she would transfer Douglas Development funds into Norman's account sufficient to cover the check (plus some additional to cover tax withholding), and Norman would write the check. The source of all payments was Douglas Development and Douglas Jemal – Eshericks's employer.

Especially since: 1) there was no salary increase during this time, 2) true out of pocket costs to Douglas Jemal associated with providing housing to Esherick (the mortgage payments, the foregoing of rent and the payment of utilities) were significant, and 3) jurors may rely on personal experience to appreciate that housing and living accommodations are typically the most significant expense an individual routinely incurs, the jury would be entitled to conclude the provision of housing functioned as compensation, was intended by Douglas Jemal to be compensation, and was seen as compensation by Esherick.

b.     Payments to Barbara Gill. Esherick in 2000 was making payment to Gill

-27-

out of his personal account. These were indeed crushing payments – about $2000 per month ($1356 child support, a housing allowance, and pay for outstanding consumer debt) out of a take-home pay of $4000 per month ($1000 per week). Starting in late 2000, Douglas Development (that is, the alter ego of Douglas Jemal) started making these payments. Even though they had obvious economic value to Esherick – they were the equivalent of $2100 per month income (nearly a 50% increase in salary) — they were falsely recorded in DDC books as a "miscellaneous general and administrative" expense. (They were also falsely labeled as "daycare.") These payments continued, unabated, through 2001, 2002 and well into 2003. Sometime in late 2003, an outside accountant reclassified the 2002 payments and moved them into the "loan receivable" account. But calling them loans did not make them loans. Moreover, no effort was made to reclassify the 20001 or 2001 payments, and even the recording of the 2003 payments continued to be in the "Miscellaneous G&A" account. The jury would be entitled to conclude the payments to Barbara Gill functioned as compensation, was intended by Douglas Jemal to be compensation, and was seen as compensation by Esherick.

c.    Payment for Esherick's vehicles. Eshericks had two vehicles in his name during this time period–a Jeep and a Tahoe. Although Douglas Development could have simply increased Esherick's salary by the amount of the car payments, Douglas Development instead paid for both these cars.

Esherick has embraced these cars as personal vehicles –going so far as to claim the deduction on his personal returns for 25,000 miles on his personal vehicle(s) in 2000 and 2001 (almost certainly an inflated figure), and nearly 50,000 business miles (a truly absurd figure–consistent with Esherick's other false statements on the return) for 2002. (In effect, both Esherick and Douglas Development claimed deductions for the same vehicles.)

d.      Checks directly to Esherick recorded in the loan accounts.   The jury can find that there was never an intent to repay the checks recorded in the loan accounts for the following reasons, among others:

I.      Only low-level employees had to repay their loans;

ii.     There was never an attempt for three years to review the loan account;

iii.    Esherick and Douglas Jemal never acted as if the loans were bona fide; they never sought a list or an accounting of the loans, conduct inconsistent with persons who actually had a debtor-creditor relationship;

iv.     Two of the payments were on the Christmas eve – one of these (in 2001) was a $10,000 check requested by Douglas Jemal; the other, in 2000, was a $5000 check.  These were not loans.

vi.     In 2000, Esherick took steps to keep these payments from being traced to his account: a $1500 check was signed over to Sabra Gould who, in turn, gave him a check for $1,5000; the December

$5000 check was cashed.

v.      The amount of the so-called loans increased year after year –

consistent with an increase in salary;

vi.     The payments were made without regard to an ability to repay; in

2003, Douglas Jemal signed payments in excess of $50,000 for

Esherick's benefit – against a salary of $66,000.

vii.    The monies were not handled by Eshericks as if they were loans –

that is, they were used simply to support life-style expenses.

5.    Esherick certainly perceived his salary to be in excess of $66,000: he reported a

salary of $115,000 in 2000, $150,000 in 2001 and $150,0000 in 2003 where he

wanted a credit card or more time with his children from his first marriage.

6.    Finally, there is no reason why all these payments – fair market value of housing,

payments recorded in the loan account, payments for cars, payments to Gill, could

not have been handled by making payments directly to Eshericks sufficient to

cover these expenses.  The jury could reasonably infer that the only reason that

these expenses were handled in this fashion was to avoid taxes.

Taking the evidence in the light most favorable to the government, the evidence is

sufficient to permit the jury to find the defendants committed the crime of tax evasion for all three

tax years, 2001, 2002 and 2003.

### F. Elements of the Offense (Tax Evasion)

**First**, for the specific calendar year, there existed a tax deficiency related to income taxes

due and owing from Blake C. Eshericks;

-30-

The evidence, including the summary testimony of Agent Jones and the tax

calculations of Jennifer Abbott, is sufficient to permit the jury to find the existence

of a tax deficiency;

**Second**, the defendants attempted to evade this tax as detailed in the Indictment; and

For the above reasons, there is ample basis for the jury to conclude the defendants

the defendants committed numerous acts of evasion.

Third, in attempting to evade such tax, the defendants acted willfully.

The numerous calculated acts support a finding of willfulness.

## G.  Conclusion

Taking the evidence in the light most favorable to the government, there is sufficient

evidence for the charges to be considered by the jury.

## III.  REPLIES TO SPECIFIC MOTIONS

### A.  Opposition to Motion to Dismiss Public Corruption Counts

For reasons set forth above, the government has presented a case that, in the light most

favorable to the government, satisfies the bribery statute.  The defendants' 20-page Motion for

Judgement of Acquittal on these Counts should be denied.

Defendants set forth five arguments.  They will be addressed in turn.

### 1.  The Determination of the Defendants' Intent is for the Jury

The issue as to the defendants' intent is for the jury.  Defendants' pleading is premised on

the unstated proposition that Lorusso and only Lorusso can testify to the defendants' intent, and

that the evaluation of the government's evidence as to the defendants' intent must rest solely on

an evaluation of Lorusso's testimony, to the exclusion of all the other evidence.  This is not the

law. As noted at the outset of the pleading, the jury is permitted to rely on all the facts and circumstances, and can make a host of credibility findings.

Lorusso's perception of the defendants' intent, and his description of his own conduct, though relevant, is but one piece of evidence. As an example, Lorusso could well have believed the Rolex wristwatch to be a gift; a jury could well conclude that Douglas Jemal–who had not even given Esherick a $100 raise--would never have given such a thing of value to someone he had only known for four months in a business setting, unless Douglas Jemal sought to influence Lorusso and sought to get value from Lorusso in return. Indeed, the jury could well conclude that Lorusso may have exaggerated in his own mind the nature of his so-called "friendship" with any of the defendants.

United States v. Jennings, 160 F.3d 1006 (4th Cir. 1998) is remarkably on point. In Jennings, the payor of the bribes was tried and convicted, and, at trial the recipient testified that he perceived the bribe payments to be gifts. The Fourth Circuit made it clear that, though the recipient's intent in receiving the things of value could conceivably constitute relevant evidence, it was ultimately for the jury, not the bribe recipient, to determine the payor's intent:

> To begin with, Jennings [the payor] is mistaken to focus on Morris's [the recipient's] testimony that he believed he accepted gifts, not bribes, from Jennings. * * * Thus, the only intent at issue was Jennings's: if he gave money to Morris with the requisite corrupt intent, Jennings violated the statute regardless of Morris's intent in accepting the money. Of course, Morris's testimony regarding his own intent in taking the payments might have some relevance to Jennings's intent in making them. Morris's testimony is not dispositive of Jennings's intent, however. So long as the other evidence was sufficient to prove beyond a reasonable doubt that Jennings paid Morris with the corrupt intent to influence or reward him, the jury could find Jennings guilty of bribery despite Morris's testimony.

-32-

The jury is entitled to consider <u>all</u> the evidence, not just Lorusso's testimony, and indeed, the jury has seen and heard evidence of which Lorusso was unaware.   The jury is entitled to see patterns that Lorusso did not perceive, or draw connections he could not make.   The jury is entitled to recognize that the stream of things of value occurred when Lorusso was doing the most for the defendants and came to an end (and Lorusso discarded as a "friend") when Lorusso was of no longer of use to them, that is, after he had filled 77 P Street, and the Addison Road deal was done.   The jury is entitled to conclude that the defendants did not truly treat Lorusso as a friend, but instead merely as a means to obtain leases and other concessions from the D.C. Government, and that he could be bought cheaply for that end.   For example, Douglas Jemal talked behind Lorusso's back and complained of Lorusso's presence in Las Vegas.   The defendants, though embracing Lorusso as part of their team, failed to inform him that the Addison Road property they were trying to sell the D.C. Government for $14 million was the subject of a bona fide zoning dispute – a fact that would have been important to Lorusso and could have made Lorusso look bad if, on his recommendation, the city bought a property for $11.5 million that could not even be used for its intended purpose.[7]   Even Douglas Jemal, in sworn testimony under oath, in front of

---

[7]      The defendants in Court have repeatedly trivialized this litigation and mischaracterized its resolution.  After Prince George's County informed Douglas Development in July of 2001 that the permit was issued in error – because Douglas Development had sought a permit for an automobile towing station, a use that was simply different than the use of the property as an "impound lot."  Douglas Development commenced litigaiton to have the permit issued, notwithstanding the error.  There were hearings in front of the zoning examiner, . Douglas Development lost, and the County Council affirmed the zoning examiner's decision in 2002.  This was appealed to two rounds and Douglas Development lost through the Maryland courts.

In the summer of 2002, Douglas Development filed suit in federal court complaining about the "spot zoning" that effected the 4800 Addison Road facility.  This "spot zoning" was held unconstitutional – though this decision had no bearing on the unrelated zoning litigation.

the City Council, denied that Lorusso was any sort of friend, stating that their relationship was entirely business, Lorusso's perception of their relationship notwithstanding.

The defendants' pleading fails to give full play to all the circumstantial evidence in this case, such as the motives the defendants had for filling 77 P Street and their need for Lorusso to complete this process; their inability to achieve any meaningful income from Addison Road and Lorusso's value to them in accepting, uncritically, above-market lease terms and above market sale terms on behalf of the D.C. Government; their inability to pay their vendors for tenant improvement work, and Lorusso's extraordinary accommodation to their financial needs by agreeing to use city funds for that purpose; their needs for cash and their knowledge that with Lorusso on the invoices– false and legitimate--would be approved and would be paid promptly. Lorusso may have had a sense what the defendants could do for them; he had no sense of the value of the 77 P Street leases to the defendants in terms of their enabling the defendants to refinance the property; he had no sense of the fair market value of the leases and proposed purchase price for Addison Road; he had no idea of the cash flow struggles of Douglas Development; he had no idea that the various things of value were paid for by Douglas and Norman Jemal–not his friends (like Esherick) (evidence that these were understood at Douglas Development more as business expenses and less as personal expenditures borne of friendship). He has no idea that Douglas Jemal did not really even consider Lorusso a "friend," certainly not a close friend deserving trips and a watch, evidence by Jemal's sworn testimony. Such facts can be considered by the jury when it decides the defendants' intent.

---

Nonetheless, Prince George's County, as part of the settlement of the case with Douglas Development, permitted the ongoing use of the property as an impound lot.

2.  The Government has Established the Corrupt Intent Required by the Statute

The defendants have now, for the third time, raised essentially legal arguments as to what is required by the bribery statute.  Again, they argue, in substance, that the statute can only be violated by a specific "one bribe for one act" relationship.  They argue the law and then the facts.

First and foremost, defendants' "quid pro quo" concerns can be easily addressed by a proper unanimity instruction, whereby the jury is instructed that it must be unanimous as to the thing or things of value provided by the defendants to Lorusso that they conclude was/were made with criminal intent, and the act/acts of Lorusso that were sought to be influenced.  Such an instruction obviates all the defendants concerns.

As a factual matter, the defendants again base all their arguments on parsing Lorusso's testimony, yet, again, Lorusso's perception is just one part of the overall evidence in this case.[8] Taking the evidence in the light most favorable to the government, the jury could reasonably find, for example:

- the defendants paid for Lorusso's hotel accommodations in Las Vegas in 2001 with the intent to corruptly influence him in connection with the leasing of Addison Road;

- the defendants paid for these hotel accommodations with the corrupt intent of influencing him in what they assumed would be future lease dealings;

- the defendants gave Lorusso a Rolex wristwatch both to reward him for the acts he already committed on their behalf – which at that time included executing leases

---

[8]     The defendants' repeated reliance on Lorusso is somewhat baffling, in that they claim he is a con-man and not worthy of belief.

and approving invoices, and corruptly, to further influence him, by communicating

to him that further deeds would go rewarded as well, to perform future acts of the

same nature, including the negotiation of lower level space at 77 P Street – a

negotiation for which the defendants provided Lorusso a "letter of intent" on nearly

the same day they gave him the watch;

- and so forth, in the same vein, that the defendants paid for other items of value,

  such as automobile repairs, tickets at MCI Center events, other travel and even the

  cowboy boots, in each instance to reward Lorusso for past efforts, to communicate

  that further things of value would be bestowed, and to continue to influence

  Lorusso in the performance of official acts in the nature of executing leases and

  approving invoices.

On a month by month basis, the defendants gave Lorusso things of value both as the reward, that

is the bribe payment for the previously performed acts, as well as a further inducement in advance

of the next set of official acts they intended to influence.

The defendants' remaining legal contentions are largely a rehash of arguments already

made. This Court has already held that the Indictment properly charges bribery, and the facts

adduced fully support the charges.

Nonetheless, in response to the defendants' legal contentions, the government stresses that

there are many ways the offense of bribery may be committed. It may involve a single payment

intended to influence a single act, multiple payments intended to influence a single act or – as in

this case – a course of conduct encompassing multiple payments intended to influence multiple

acts. "[T]he intended exchange in bribery can be 'this for these' or 'these for these,' not just 'this

for that.'" <u>United States v. Jennings</u>, 160 F.3d 1006, 1014 (4th Cir. 1998).

There are a host of ways that bribe schemes can be organized, and the facts in this case, both as alleged in the Indictment and proven at trial, mirror those in <u>United States v. Jennings</u>, <u>id.</u> <u>Jennings</u>, for example, involved a bribe scheme that did not involve a specific thing of value for specific official act–the defect of which the defendants once again complain.[9] In language that fits the facts of this case like a glove, the Fourth Circuit made it clear that this is no barrier to a conviction on bribery charges where corrupt intent to influence is nonetheless present:

> [T]he government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions). Bribery requires the intent to effect an exchange of money (or gifts) for specific official action (or inaction), but each payment need not be correlated with a specific official act. * * *. Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action. * * *. In other words, the intended exchange in bribery can be "this for these" or "these for these," not just "this for that." Further, it is not necessary for the government to prove that the payor intended to induce the official to perform a set number of official acts in return for the payments. The quid pro quo requirement is satisfied so long as the evidence shows a "course of conduct of favors and gifts flowing to a public official <u>in exchange for</u> a pattern of official actions favorable to the donor." * * * . Thus, all that must be shown is that payments were made with the intent of securing a specific <u>type</u> of official action or

---

[9]      Even if the evidence did not necessarily link each of Jennings's payments to a specific official act by Morris, a reasonable juror could still conclude that Jennings paid bribes. Over a fairly short period Morris approved over $650,000 worth of contracts for Jennings's companies, and Jennings paid Morris over $7,000 in cash. Again, a reasonable juror could have concluded that there was a course of conduct involving payments flowing from Jennings to Morris in exchange for a pattern of official actions favorable to Jennings's companies, and that was sufficient to convict Jennings of bribery.

<u>United States v. Jennings</u>, 160 F.3d at 1018.

favor in return.  For example, payments may be made with the
intent to retain the official's services on an "as needed" basis, so that
whenever the opportunity presents itself the official will take
specific action on the payor's behalf. * * *  This sort of "I'll scratch
your back if you scratch mine" arrangement constitutes bribery
because the payor made payments with the intent to exchange them
for specific official action.

In this case, the same principles apply: A jury would be entitled to conclude that the defendants

initiated initiate "a course of conduct of favors and gifts" to Lorusso  to corruptly influence him in

the performance of his official duties, that is, to induce him to engage in a "pattern of official

actions," for this sort of back-scratching does constitute bribery "because the payor made

payments with the intent to exchange them for specific official action."

Accordingly, "course of conduct" corruption schemes involving multiple payments for

multiple acts have been charged under nearly all the federal corruption statutes, including § 201.

For example, the bribe scheme in  United States v. Campbell, 684 F.2d 141, 149 (D.C. Cir. 1982),

was described as an "on-going scheme that covered an extensive period of time" involving the

receipt by a District of Columbia Superior Court Judge of a series of bribes – including such

disparate items as "the move of household goods in August 1975 and five payments of cash

between January 1976 and February 1977" – from a moving/hauling company, in exchange for his

dismissal of hundreds of traffic tickets that had been issued against the bribe payor.  In such a

case, it would have been impossible to line up a single payment with a specific dismissed ticket,

and it is apparent that the bribe payor's motive was to provide a series of goods to influence a

series of acts.  Presumably this would be fatal to the prosecution under the defendants' logic.[10]

---

[10]     United States v. Leggett, 81 F.3d 220, 222-23 (D.C. Cir. 1996) (bribery scheme
between cleaning contractor and government contracting official charged in a single bribery
count:  contractor placed official's girlfriend on payroll at $750 to $800 biweekly "for doing

Even in light of <u>Sun-Diamond</u>, the Court of Appeals in <u>Quinn</u> soundly and unambiguously

reaffirmed the core principles of <u>Jennings</u>, particularly that it was not necessary to establish that

bribe payments be "tied to specific acts:"

> We have stated that the government is not required in a bribery case
> to prove "an expressed intention (or agreement) to engage in a quid
> pro quo." [<u>United States v. Jennings</u>, 160 F.3d at 1014.]. Nor must
> the government prove "that the defendant intended for his payments
> to be tied to specific official acts (or omissions).... Rather, it is
> sufficient to show that the payor intended for each payment to
> induce the official to adopt a specific course of action." <u>Id</u>. In other
> words, "[t]he quid pro quo requirement is satisfied so long as the

almost nothing" in exchange for official's ongoing lax enforcement of the terms of the contract);
<u>United States v. Kelley</u>, 36 F.3d 1118 (D.C. Cir. 1994) (numerous acts and payments by payor (a
subcontractor) and numerous acts by government contracting official); <u>United States v. Quinn</u>,
359 F.3d 666, 673 (4th Cir. 2004) (same) (quoting <u>Jennings</u>); <u>United States v. Dixon</u>, 658 F.2d
181 (3rd Cir. 1981) (series of payments and numerous acts as part of a scheme to obtain a
government contract through bribes of a legislative aide); <u>United States v. Morales</u>, 11 F.3d 915,
916-18 (9th Cir. 1993) (government official's receipt of bribes from various sources, and in
different amounts in 1989 and 1990 charged in single bribery count); <u>United States v. Arshad</u>,
239 F.3d 276, 279 (2d Cir. 2001) (affirming "more than one bribe" enhancement in sentencing
defendant, a painting contractor, on a single count alleging a violation of the bribery provisions
of 18 U.S.C. § 666: "'[T]he six payments made by [the painting contractor] to the [government]
inspector were intended for the accomplishment of more than [] one action[:] one, approval of
his deficient painting work by the painting inspector; two, authorization for more work hours by
the painting inspect[or]; three, expediting a building superintendent's approval for [the painting
contractor's] payment ....'" (quoting the district court's findings at sentencing; brackets in
opinion)), <u>cert. denied</u>, 533 U.S. 910 (2001); <u>United States v. Gubelman</u>, 571 F.2d 1252 (2d Cir.
1978) (payments to meat inspector by meat packing companies of $20 to $25 per week), <u>cert.
denied</u>, 436 U.S. 948 (1978); <u>United States v. Benedetto</u>, 571 F.2d 1246 (2d. Cir. 1978) (same);
<u>United States v. Forszt</u>, 655 F.2d 101, 104 (7th Cir. 1981) ("Hobbs Act extortion is also a
continuing offense so that no statute of limitations problem exists where, as here, there is a single
continuous plan of extortion embracing multiple payments over a period of years."); <u>United
States v. Aliperti</u>, 867 F.Supp. 142, 147 (E.D.N.Y. 1994) ("[W]here the Indictment alleges that
the defendants engaged in a single, continuous plan of extortion envisioning multiple payments
over several years from certain named companies, Congress would have intended that the offense
be treated as a continuing one.").

> evidence shows a course of conduct of favors and gifts flowing to a
> public official in exchange for a pattern of official actions favorable
> to the donor." Id.

Quinn at 673.  Accordingly, Quinn, Jennings, and the established body of federal corruption law

well support charging a "course of conduct" bribe scheme, involving a series of bribe payments to

influence a series of acts.

These principles are fully consistent with United-States v. Sun-Diamond, in which the

Supreme Court had before it a review of a gratuities conviction (and not a bribery conviction, let

alone a bribery conviction based on a "course of conduct" theory).[11]  The Court briefly discussed

the intent required for the gratuities offense, and distinguished it from the "corrupt" intent

required to commit the offense of bribery.  Nothing about Sun-Diamond suggests the Court

intended to alter well-understood interpretations of the bribery statutes.  Indeed, no issue

regarding the interpretation of the intent required for a bribery convictions was before the Court.

Moreover, even in light of Sun-Diamond, the Court of Appeals in Quinn soundly and

unambiguously reaffirmed the core principles of Jennings, particularly that it was not necessary to

establish that bribe payments be "tied to specific acts:"

> We have stated that the government is not required in a bribery case
> to prove "an expressed intention (or agreement) to engage in a quid
> pro quo." [United States v. Jennings, 160 F.3d at 1014.].  Nor must
> the government prove "that the defendant intended for his payments
> to be tied to specific official acts (or omissions).... Rather, it is
> sufficient to show that the payor intended for each payment to
> induce the official to adopt a specific course of action." Id.  In other

---

[11]    The Court did not have before it a "course of conduct" prosecution involving
multiple "gratuities" for "multiple acts."  Rather, it had before it the review of a conviction where it
was alleged that certain gifts constituted gratuities even though it was proven they were linked to
no official acts whatsoever.  The Court certainly did not hold that a bribery offense could not be
committed by such a course of conduct.

words, "[t]he quid pro quo requirement is satisfied so long as the
evidence shows a course of conduct of favors and gifts flowing to a
public official <u>in exchange for</u> a pattern of official actions favorable
to the donor." <u>Id</u>.

<u>Quinn</u> at 673. Accordingly, <u>Quinn</u>, <u>Jennings</u>, and the established body of federal corruption law

well-support charging a "course of conduct" bribe scheme, involving a series of bribe payments to

influence a series of acts.

3. There is no <u>Timing Requirement for the Actual Giving of a bribe</u>

The defendants' assertion that a bribe must be paid "up front" is particularly meritless.[12]

<u>See, e.g.</u>, <u>United States v. Gatling</u>, 96 F.3d 1511, 1522 (D.C. Cir. 1996) (quoting <u>Campbell</u>, 684

F.2d at 148 ("[I]t is only logical that in certain situations the bribe will not actually be conveyed

until the act is done."); <u>Jennings</u>, 160 F.3d at 1014 (same, quoting <u>Campbell</u>). Moreover, it would

be reasonable for the jury to infer that sequential payments, once they started flowing, were

intended to communicate that additional payments will be forthcoming if further actions are taken

on the behalf of the defendants. This understanding of human nature was well-stated in <u>United</u>

<u>States v. Shaffer</u>, 183 F.3d 833, 841 (D.C. Cir. 1999), <u>vacated as moot</u>, 240 F.3d 35 (D.C.Cir

2001): "[B]ribery typically involves an intent to affect the future actions of a public official

through giving something of value, and receipt of that thing of value then motivates the official

act." As the Court in Jennings further noted: "It is simply implausible that Jennings continued to

pay Morris with no intent to induce him to continue awarding contracts at favorable prices." <u>Id</u>. at

1023. Indeed, it is hard to imagine intelligent men in business or government not attaching such

a meaning to a series of valuable items given to a government official intertwined temporally with

---

[12]    For example, the defendants' contend that "[n]ecessarily, the Audi repairs could
not have induced Lorusso to approve the invoices that he already approved the week earlier."

-41-

acts by the official for the giver's benefit. Certainly, a jury would be permitted (even if not required) to draw such an inference.

### 4. The Evidence Supports Culpability of Douglas Jemal and Norman Jemal

The defendants' contentions that there is no evidence that Douglas and Norman Jemal participated in a conspiracy can be quickly rejected. The evidence shows myriad acts of both men, including the payment by both men of things of value for Lorusso, that demonstrates their participation in the conspiracy. Both Douglas Jemal and Norman Jemal were in Las Vegas for both trips and saw Lorusso there; Douglas Jemal in fact complain that Lorusso was hanging around too much (Joseph Cayre saw Lorusso in the Douglas Development booth). The fact that Lorusso may have perceived Esherick's interests to be divergent from Douglas Jemal's, even if true as to one issue, is hardly dispositive as to their participation in the conspiracy charged in Count One.

### 5. The Undisclosed Conflict Has Been Proven to Support Liability under the Honest Services Prong of the Mail Fraud Count

The jury has heard evidence that Lorusso's failure to disclose his obvious and continuing conflict of interest with the defendants was essential to the defendants' continuing ability to extract from the City a stream of benefits. Thus, Mr. Koskinen testified that if he had known of Lorusso's continuing receipt of things of value from the defendants, (1) he would not have allowed Mr. Lorusso to negotiate with the defendants on the City's behalf; (2) he would have assigned another City official to take over the negotiations and would have scrutinized the lease terms of leases previously negotiated by Lorusso; and (3) he would have referred the matter to the D.C. Auditor to investigate Lorusso's relationship with the defendants. Under the circumstances,

there is no doubt that the defendants' continuing ability to dip into the City's well would have dried up had they or Mr. Lorusso disclosed his obvious conflict of interest. Moreover, the government has no duty to prove that the defendants knew that their conduct in giving things of value to Lorusso was against the law; it is enough to show that the defendants had the intent to deceive—a point that has amply proved in this trial. See United States v. Paradies, 98 F.3d 1266, 1284-85 (11th Cir. 1996) (affirming honest services mail fraud convictions and holding that trial court correctly refused to instruct jury "that the defendants knew that their conduct was against the law," because the government need only prove that the defendant had the intent to deceive, and ignorance of the law is no defense").

Defendants' remaining arguments are similarly unavailing. First, contrary to defendants' brief, see Defs. Mem. at 15-16, there is no requirement for an honest services conviction that the public official's receipt of things of value violated a state or local statute. Thus, the First Circuit has made abundantly clear that "proof of a state law violation is not required for conviction of honest services fraud. Indeed, the incorporation of a state law violation in such a prosecution may cause complications." United States v. Sawyer, 85 F.3d 713, 726 (1st Cir. 1996) (citation omitted). Defendants' citation to United States v. Paranella, to support their assertion that honest services convictions can only rest on violations of a particular state law is also misplaced. In Paranella, the Third Circuit did affirm a conviction for honest services fraud where the underlying conduct violated state conflict-of-interest rules. See Paranella, 277 F.3d at 694-97. But the underlying state-law violation was not essential to the court's holding. Indeed, the Third Circuit went so far as to note that it "need not decide whether a violation of state law is always necessary for nondisclosure to amount to honest services fraud * * *." Id. at 693. Thus, the

-43-

government respectfully submits that the Court should follow the lead of the First Circuit, in Sawyer, and hold that there is no specific requirement that a conflict of interest honest services fraud conviction rest on a violation of a state or local criminal statute.

In any event, there is a statute that criminalizes Lorusso's conflict of interest, and it applies to officials in the District of Columbia government. That statute is 18 U.S.C. § 208, and it criminalizes the conduct at issue in this case.

Second, the defendants are incorrect in seeking to limit the scope of honest services fraud to bribery (and conflict of interest). See Defs. Mem. at 14. A scheme to provide a public official gratuities also qualifies as an honest services fraud. See Sawyer, 85 F.3d at 730 (holding that honest services convictions may be predicated on public official's receipt of gratuities from defendants). Here, the government has requested that the Court instruct the jury on the lesser-included offense to bribery of providing illegal gratuities.

Third, contrary to the defendants' position, see Defs. Mem. at 15, the indictment alleges in plain terms that the defendants are guilty of honest services fraud because of Lorusso's undisclosed conflict of interest:

> "DOUGLAS JEMAL, NORMAN D. JEMAL, and BLAKE ESHERICK * * * devised and intended to devise a scheme to: * * * (b) defraud and deprive the DC Government and the citizens of the District of Columbia of their right to the honest and faithful services of Michael A. Lorusso as an employee of OPM, performed free from deceit, favoritism, bias, self-enrichment, self-dealing and **conflict of interest**."

Indictment, Count Three, ¶ 2 (emphasis added). The Indictment could not be clearer that conflict of interest is a theory on which the government has been proceeding; and it is not unfair to hold

-44-

the defendants with knowledge of the plain language of the Indictment.[13]

Fourth, defendants ignore the record evidence when they contend, see Defs. Mem. at 18, that there were no efforts to conceal Lorusso's relationship with the defendants. The defendants did not reserve a room in Lorusso's name at the Bellagio. Moreover, Lorusso testified that, when he checked in at the Bellagio Hotel in May 2001, and when Norman Jemal was standing right there at the hotel desk, he had his brother, Peter Lorusso, sign the guest register to avoid creating evidence that a public official was staying on Douglas Development's dime. Moreover, the address given for Lorusso for the May 2002 trip to the Barbary Coast hotel in Las Vegas was 702 H Street, the address of Douglas Development. Finally, Dave Medding, the Comptroller at Douglas Development, and the man charged with maintaining the finances of the company, testified that he had no idea of the things of value given to Lorusso. Lorusso testified that, although he told Elchino Martin that he was traveling to Las Vegas in May 2001, he did not disclose that he was going to be staying for free in a $500 per night hotel paid for by the person with whom he was negotiating. Similarly, Sabra Gould testified that she didn't know the Rolex watch was given to Lorusso. Hence the jury could reasonably conclude that, far from these gifts being open and notorious, the defendants and Lorusso took steps to ensure that their scheme could continue by making certain that Lorusso's compromised position not be disclosed.

Finally, defendants remarkably contend that the government has not proved that the

---

[13]     Moreover, there is little doubt they have understood this point all along. The defendants have demonstrated to the Court that they know full well how to obtain more information about the Indictment. Thus, they aggressively litigated their motion for a bill of particulars, seeking to require the government to disclose greater detail than what was already provided in the thirty-nine page Indictment. See Defs. Mot. for a Bill of Particulars (Doc. 30) (Dec. 22, 2005). Yet in that motion defendants sought no clarifying information about the government's honest services theories.

District of Columbia and its citizens were not deprived of the honest services of Lorusso. See

Defs. Mem. at 17-18. The government respectfully submits that Lorusso's approval for payment

of a $66,000 "reimbursement" for a telco room build out at 77 P Street—an invoice he

acknowledged was fraudulent—is but one example of the impact the defendants' corrupt

relationship with Lorusso had on the City.

### B.  Opposition to Motion to Dismiss Counts Three and Five for Failure to Allege Materiality.

Defendants allege that Counts Three and Five fail to state the offense of fraud because

they do not specifically charge that the fraudulent representations and pretenses were "material."

This is purely a legal argument, and no excuse or reason has been provided for the defendants'

failure to raise it prior to October 14, 2006.

In any event, the argument fails for two reasons. First, no case whatsoever holds that the

indictment must use the precise term "material" in the charging language, rather, the indictment is

sufficient if the allegations set forth the concept of materiality. Second, where the defendants

have so clearly waited to bring their claim, the indictment must be liberally construed in favor of

its validity.

### 1. Legal Standard

Starting with the legal standard first: At this stage in the proceedings, the indictment must

be liberally construed to support the indictment. The defendants have been on actual notice of

what they claim to be a defect in the Indictment for over a year. Indeed, they submitted a

"materiality" jury instruction at the time of the pre-trial submission. They failed to raise this issue

timely, at the time of pre-trial motions (9 months ago) or at any time thereafter. They have instead

raised their claim for the first time at the close of the government's case after a lengthy trial.   The

facts associated with the timing of this motion are indistinguishable from those found in United

States v. Pheaster, 544 F.2d 353, 361 (9ᵗʰ Cir.1976), cert. denied, 429 U.S. 1099 (1977), where the

Ninth Circuit held that "indictments which are tardily challenged are liberally construed in favor

of validity." The Ninth Circuit stated its displeasure at this sort of late filing, and reasoned

bluntly:

> Finally, we must note that the asserted inadequacy of Count One
> was first brought to the attention of the district court only after all
> the evidence had been received in an extensive jury trial. Failure of
> an indictment to state an offense is, of course, a fundamental defect
> which can be raised at any time. * * *  However, the very limited
> resources of our judicial system require that such challenges be
> made at the earliest possible moment in order to avoid needless
> waste. Consequently, although such defects are never waived,
> indictments which are tardily challenged are liberally construed in
> favor of validity. * * * In our view, the same standard should apply
> here, where the challenge came in a motion for acquittal after all
> evidence had been received. Such a long delay in raising the issue
> suggests a purely tactical motivation of incorporating a convenient
> ground of appeal in the event the jury verdict went against the
> defendants.

United States v. Phaester, 544 F.2d at 361. The indictment in this case thus must be upheld
"unless it is so defective that by no reasonable construction can it be said to charge the offense."
United States v. White, 241 F.3d 1015 {8ᵗʰ Cir. 2001) ( citing cases). See also, United States v.
Sabbeth, 262 F.3d 207 (2d Cir. 2001) ("Where, as here, a defendant challenges the sufficiency at
the close of the Government's case, we hold that the indictment should still be construed in a
liberal manner."); United States v. Gooch, 120 F.3d 78, 80 (7ᵗʰ Cir. 1997) ("This challenge to the
sufficiency of the indictment was not made until the close of the government's case and therefore
the indictment must be upheld 'unless it is so defective that it does not, by any reasonable
construction, charge an offense for which the defendant is convicted.'" (citation omitted) (citing
cases)).

## 2.  Under any Standard, the Indictment Fairly Charges Materiality

Notwithstanding the suggestion in the defendants' motion, no case that holds that the

precise word or term, "material," must be used in an Indictment.  "[I]in determining the

sufficiency of the indictment, 'the law does not compel a ritual of words.'" <u>United States v.

Wilson</u>, 884 F.2d 174, 179 (5th Cir. 1989).  Rather, the Indictment must allege a scheme or series

of false representations that fairly encompass the concept of "materiality."

> Where the government charges a defendant with mail fraud, it must
> prove the materiality of the fraudulent statement as an element of
> the offense. * * *. The failure to employ the word "material" in the
> language of the indictment, however, is not fatal. See <u>United States
> v. Richards</u>, 204 F.3d 177, 191 (5th Cir.2000) ("In determining the
> sufficiency of the indictment, '[t]he law does not compel a ritual of
> words.' " [citation omitted].   Instead, an allegation of fraud in an
> indictment will be sufficient so long as the facts alleged in the
> indictment warrant an inference that the false statement is material."
> [citation omitted].

<u>United States v. Biegenowski</u>, 313 F.3d 264, 285 (5th Cir. 2002), <u>cert. denied</u>, 538 U.S. 1014

(2003).  See also, <u>United States v. Cooper</u>, 283 F.Supp 2d. 1215, 1233 (D. Kan 2003) ("[n]or

must the indictment actually use the term, "material" in alleging this element[]" * * *  "It is

enough if the indictment contains sufficient factual allegations to encompass the concept of

materiality." <u>Id</u>.  (citing <u>United States v. Fernandez</u>, 282 F.3d 500, 508 (7th Cir.) (bid-rigging

allegations in fraud indictment encompassed concept of materiality), <u>cert denied</u>, 537 U.S. 1028

(2002).

  Similarly, as noted by the Fifth Circuit in <u>United States v. McGough</u>, 510 F.2d 598 (5th

Cir. 598):

> The proper question to ask *** in determining whether an
> indictment sufficiently alleges materiality is whether the statement
> or representation alleged to be false *** is potentially capable of
> being proved material by the government at trial. If the facts alleged
> in the indictment warrant an inference that the false statement is

material, the indictment is not fatally insufficient for its failure to
allege materiality in haec verba.

United States v. McGough, 510 F.2d at 602.  See also, United States v. Siegleman, 2006 WL

680566 (M.D. Ala.) March 15, 2006 at *2 (affirming honest services fraud indictment: "[T]he

numerous allegations of bribery and public corruption pertaining to both Defendants are

'potentially cable of being proved material' by the United States at trial. Therefore, the indictment

sufficient alleges materiality."); United States v.White, 2004 WL 2612017 at * 12 (E.D. Pa. 2004)

(honest services fraud corruption allegations "sufficiently allege[d] facts that are material.");

United States v. Stewart, 151 F. Supp. 2d 572, 584 (E.D. Pa.)  ("[W]e conclude that by any

reasonable construction, the superseding indictment identifies misrepresentations that can only be

characterized as material even though the word "material" is not used.");[14] United States v. Fern,

155 F.3d 1318, 1325 (11th Cir. 1998) ("[I]f the facts alleged in the indictment warrant an inference

that the jury found probable cause to support all the necessary elements of the charge, the

indictment is not fatally deficient[.]" (citing McGough, supra, for the proposition that "if facts

alleged [in the Indictment] warrant inference that false statement are material, an indictment is

sufficient." (footnote omitted))).  The instant indictment fairly alleges facts that are "capable of

being proved material," that is, it contains "sufficient factual allegations to encompass the concept

of materiality."

As to Count Three, the Indictment incorporates by reference the corruption scheme set

forth in detail in paragraphs 15 and 16 of Count One.  These paragraphs allege that the defendants

---

[14]    The District Court in Stewart reasoned that the concept of fraud itself required the
misrepresentation or concealment of a material fact.  Hence, "because the word "fraudulent"
clearly encompasses the notion of materiality, the superseding indictment cannot be considered
deficient."  United States v. Stewart, 51 F. Supp. 2d at 584.

took actions to give Lorusso a series of things of value, and further, that "[s]aid actions were made with the intent of influencing Michael A. Lorusso to use his official position to benefit Douglas Development and defendant DOUGLAS JEMAL, and to obtain Lorusso's services on an "as needed" basis, so that when the opportunity presented itself Lorusso would take action on Douglas Development's and defendant DOUGLAS JEMAL'S behalf, said actions by Lorusso consisting of the following, among others * * * ." The materiality of this scheme is apparent. Moreover, the purpose of the scheme in Count Three is described thus: "The purpose of the scheme was for the defendants to provide things of value to Michael A. Lorusso and thereby induce him to take actions as a DC Government official to financially benefit and enrich, directly and indirectly, defendants DOUGLAS JEMAL, NORMAN D. JEMAL, BLAKE C. ESHERICK and companies under their control." The materiality of the allegations is manifest.

As to Count Five, again, the materiality of the false representations is set forth in the Indictment. It alleges, among other things, that the defendants used a series of fraudulent devices to obtain money from Morgan Stanley and from partnership assets: these included, for example, a an invoice that represented that "MTD" was entitled to a commission for representing the DC Government (and was fraudulent in many other respects), when it did not represent the D.C. Government, a lien release signed by an individual without knowledge of its contents, and a facially fraudulent statement to Jemal's partner. There can be no question that these representations are "capable of being material" and that the indictment sets forth "sufficient factual allegations to encompass the concept of materiality."

The government maintains the indictment is more than sufficient in setting forth a scheme and material representations and could easily survive a "pre-jeopardy" review. In any event, when

constructed under the deferential liberal standard that must apply at the present context, the

defendants certainly have not shown that it the indictment is "so defective that by no reasonable

construction can it be said to charge the offense."[15]

### C. Government's Opposition to Defendant's Motion to Dismiss the Money and Property Allegations in Count Three

Count Three charges the defendants with a Mail Fraud Scheme: "to defraud and deprive

the DC Government and to obtain money by means of false and fraudulent pretenses and

representations." The description of the scheme was described by reference to Count One: "

Paragraphs Fifteen and Sixteen of Count One of this Indictment are re-alleged as if set forth in

full." Those paragraphs describe the scheme as follows:

> 15.    [allegations that defendants provided things of value to Michael A. Lorusso].
>
> 16.    Said actions were made with the intent of influencing Michael A. Lorusso to use his official position to benefit Douglas Development and defendant DOUGLAS JEMAL, and to obtain Lorusso's services on an "as needed" basis, so that when the opportunity presented itself Lorusso would take action on Douglas Develoment's and defendant DOUGLAS JEMAL'S behalf, said actions by Lorusso consisting of the following, among others:
>
> a.    Causing the DC Government to lease 4800 Addison Road for use as a vehicle impoundment lot at a cost of approximately $998,000 per year;
>
> b.    Attempting to cause the DC Government to purchase 4800 Addison Road for approximately $12.5 million, even after an appraiser informed Lorusso that the fair market value was substantially less than that amount;
>
> c.    [To be deleted]

---

[15]    The defendants rely primarily on United States v. Omer, 395 F.3d 1087, 1089 (9th Cir. 2005). In Omer, it simply is not clear what was actually alleged in the Indictment. The Ninth Circuit opinion, if read for the proposition that automatic reversal is required if the actual term "material" is not alleged in the Indictment, is simply far outside the mainstream of the law in interpreting indictment, and, moreover, it is inconsistent with the well-established body of law that calls for looking at the substance of the allegations to determine whether the scheme or representations are "material," not whether that specific terms is used. Moreover, the defendant in Omer had raised this issue pre-trial; as noted, the posture is far different in this case, where the defendants have waited and waited until after the jury was sworn before raising their complaint.

    d.     Causing the DC Government to enter into leases of a value in excess of $100 million as a tenant in 77 P Street over the approximate ten-year term of the leases and signing lease-related documents on behalf of the DC Government and various of its agencies;

    e.     Causing the DC Government to make payments to Douglas Development in response to a variety of invoices, including invoices which were fraudulent, excessive, duplicative, irregular and otherwise unsupported, including the following:

        I.      Undated, unnumbered and unsigned invoice, submitted approximately in or about July 2001, for $38,000 for "D.O.E.S. Relocation Expenses";

        ii      August 8, 2001 invoice for $99,000 for "additional construction management services";

        iii.     September 26, 2001 invoice for $66,000 for "77 P Street, NW, New Economy, Reimbursement for Telco Room Buildout";

        iv.     September 27, 2001 invoice for $100,000 for "Build Out Reimbursement";

        v.      September 28, 2001 invoice for $863,299.28 for "Reimbursement for Tenant Construction [,] 77 P Street, NW, New Economy";

        vi.     February 2002 invoice in the amount of approximately $261,000 for construction at 4800 Addison Road;

    f.     Using DC Government funds under the control of a third party to pay over $377,000 of financial obligations of Douglas Development related to tenant improvements at 77 P Street, thereby saving Douglas Development that same amount; and,

    g.     Otherwise taking steps of benefit to Douglas Development in connection with numerous routine issues involving and relating to the DC Government's leasing of space through Douglas Development.

Starting with the very first lease, the 77 P Street lease of April 2001, every other lease, and every other dollar obtained pursuant to those leases, is suspect and tainted. The May 2001 Addison Road lease is infected by the very critical material non-disclosure, namely, that Lorusso was a guest of the defendants at Las Vegas over the weekend prior to the letter of intent being executed. This was made clear by John Koskinen. It is no defense to the charge of fraud that the same result would have occurred honestly (such as the leases for 77 P Street, or even, conceivably, the Addison Road lease), if the evidence shows the defendants took steps to procure

the results through dishonest means and through ongoing material non-disclosures. It is no defense to fraud that the city otherwise got a "good deal" or a deal at "market value" if the lease, and the monies that flowed to the defendants therefrom, were otherwise obtained by deception.

The jury has ample evidence to conclude that Douglas Jemal and Norman Jemal were most decidedly part of the scheme to obtain money. First, they participated in giving things of value to Lorusso. The jury could well conclude that Douglas Jemal in particular would never have done that unless he knew it would be in his financial interest to do so. Furthermore, it is known that Douglas Jemal had particular knowledge of some of the invoices, including the $863,000 and $66,000 invoices (a portion of the proceeds of which he gave to his partner Joe Cayre), and, it is known that Norman Jemal personally gave the directions to prepare the $99,000 invoice (a supporting email was attached to the invoice in the Douglas Development records).

The invoices for Addison Road were likewise duplicate and fraudulent. Eshericks submitted to Lorusso an unitemized $100,000 invoice in September 2001 for "Build-out reimbursement" at Addison Road. This was paid. Then, the $261,000 invoice was prepared for other Addison Road expenses. This was clearly duplicative of the $100,000 invoice that had already been submitted and paid just a few months prior. Moreover, the $261,000 is just fictional in its representations as to the labor costs, its inclusion of non-impound lot expenses, its billing for items covered by the lease (the fencing). Esherick made a specific statement to Medding that he "doubled" the price of the invoice before it was submitted to the D.C. Government.

Finally, as to the tenant commission pool– the evidence is clear that the defendants well-knew that Lorusso had used D.C. government funds to pay their expenses, and sat silently. At one point, they wrote a check or checks to reimburse the D.C. Government but they voided the checks.

One measure of the "money and property" the defendants obtained from giving things of value to Lorusso, and having his relationship with them kept secret is the following: after Lorusso left the D.C. Government, the defendants credited the D.C. Government with three sums of money:

> the $100,000 overpayment of Addison Road;
>
> the $377,000 "credit" for the tenant rep pool;
>
> the $863,0000 payment for the "build out reimbursement" for the lower level of 77

P Street.

Because of Lorusso, the defendants had received, and were now forced to repay upon Lorusso's departure, over $1.3 million that they would not have otherwise enjoyed. Had Lorusso remained in his position, there is no reason to conclude the defendants would not have kept that money forever.

### D. Opposition re Motion for Judgment of Acquittal on Count Three for Failure to Prove a Proper Mailing.

#### The Mailings Were in Furtherance of the Fraud Scheme.

As the Supreme Court has made clear, "[t]o be part of the execution of the fraud * * *, the use of the mails need not be an essential element of the scheme. * * * It is sufficient for the mailing to be 'incident to an essential part of the scheme, or a step in [the] plot.'" Schmuck v. United States, 489 U.S. 705, 710 (1989) (citations omitted). Under that very liberal standard, the mailings here more than qualify.

The mailings to and from American Express concerning bills and payments for various things of value provided to Michael Lorusso were integral to an ongoing scheme lasting between

2001 and 2003. Indeed, the specific factual circumstances in this case have been analyzed in a

First Circuit opinion that specifically rejected challenges exactly like those raised by defendants

here. In <u>United States</u> v. <u>Woodward</u>, 149 F.3d 64-65 (1st Cir. 1998), the First Circuit affirmed a

conviction for mail fraud of a state legislator (Woodward) who received things of value from a

lobbyist (Sawyer) who, in turn, paid for the things of value with a credit card; and it rejected

Woodward's challenge that the mailings to and from the credit card company were not in

furtherance of Woodward's participation in the scheme:

> "In the present case, the mailing in question was sent by Citibank Visa to
> Sawyer, billing him for charges arising from Sawyer's use of his Visa card to pay
> for illegal gratuities given to Woodward. According to Woodward, because the
> mailing took place some three to four weeks after Sawyer purchased the meals and
> entertainment for Woodward, the use of the mail was a 'result of' the fraudulent
> scheme but not 'for the purpose of executing' the scheme. We disagree.
>
> "Woodward's argument focuses too narrowly, on each gratuity
> individually. His contention assumes a new fraudulent scheme began and ended
> every time Sawyer used his credit card to pick up the tab for Woodward. On the
> contrary, the evidence supported the conclusion that the fraudulent scheme in
> which Woodward and Sawyer participated was an <u>ongoing scheme</u>, lasting for
> years and involving Sawyer's use of his credit card. <u>Every month, Visa would use
> the mails to bill Sawyer for his charges; if Sawyer did not pay those bills, his credit
> line would have been terminated and the gratuities could not have continued as
> Woodward and Sawyer expected. It was thus a necessary part of the ongoing
> scheme that Sawyer pay his bill after receiving it in the mail."</u>

<u>Woodward</u>, 149 F.3d at 64-65; see also <u>United States</u> v. <u>Wallach</u>, 935 F.2d 445, 465 (2d Cir.

1991) (holding that mailings from credit card company to defendant's company reflecting

fraudulent purchases were in furtherance of ongoing scheme to defraud).

Here, the mailings to and from American Express were similarly integral to an <u>ongoing</u>

scheme. The defendants chose to pay for things of value on an American Express card bill; they

needed to pay that bill each month; and thus the use of the mails—(1) by American Express to bill

defendants for the charges and (2) by defendants to pay those bills—was in furtherance of the scheme.

Moreover, Woodward specifically rejected the argument made by defendants' in their contention (see Defs. Mot. at 7 & n.2) that the mails were not integral because the bills and payments were received after Lorusso received things of value. See Woodward, 149 F.3d at 65 (rejecting contention that mails not integral where credit card bills mailed three to four weeks after lobbyist used credit card to pay for meals and entertainment for legislator).

Moreover, defendants fail to explain why it is relevant to a mail fraud charge that they had the economic means to pay for their bribes to Lorusso with cash rather than using their credit cards. See Defs. Mot. at 5-6. The mail fraud statute concerns itself with uses of the mails. See 18 U.S.C. § 1341. That defendants did use the mails, and thereby subjected themselves to federal indictment, when they could have paid for things in cash, is something they probably rue; but that is not a reason to grant a motion for a judgment of acquittal.

Similarly, contrary to their arguments, see Defs. Mot. at 6, it is no defense to mail fraud that the particular mailings created a paper trail that helped ensnare the defendants. That much was made clear by the Supreme Court in Schmuck, which specifically rejected the argument that a mail fraud charge "cannot be satisfied by a mailing * * * that is routine and innocent in and of itself, and that, far from furthering the execution of the fraud, occurs after the fraud has occurred, is merely tangentially related to the fraud, and is counterproductive in that it creates a 'paper trail' from which the fraud may be discovered." Schmuck v. United States, 489 U.S. 705, 711 (1989). To be clear, Schmuck held that it "disagree[d]" with the "description of the applicable law" implicit in a defense claim that counterproductive, guilt-producing mailings do not qualify as

-56-

mailings under the mail fraud statute. Id.

Finally, the mailings were in furtherance of the scheme even though American Express had a contractual duty to send billing statements to its customers. See Defs. Mot. at 9-10. As noted above, the First Circuit held that, in ongoing schemes like the one involving Mr. Jemal and his co-defendants, the mailing of credit card bills and the mailings of payments on those bills are an essential part of maintaining an ongoing scheme in which the credit card is used to pay for things of value given to a public official. See Woodward, 149 F.3d at 64-65. Moreover, the case relied on primarily by the defendants, United States v. Cross, 128 F.3d 145 (3d Cir. 1997) has been limited by the Third Circuit in a subsequent case. See United States v. Al-Ame, 434 F.3d 614, 617-18 (3d Cir. 2006). Cross involved mailings of the dispositions of corrupt court proceedings—after the court proceedings had already been influenced by bribes. The mailings were legally required and were made after the particular court proceeding had been fixed. In Al-Ame, however, the Third Circuit distinguished a legal duty of a government to mail court dispositions (such mailings being held not in furtherance of a scheme) from mailings pursuant to a contractual duty (which were in furtherance of a scheme). See Al-Ame, 4343 F.3d at 617 ("Moreover, the fact that ETS had a contractual duty to mail the scores to Al-Ame is clearly distinguishable from the legal duties at issue in Cross and Parr."). See also Woodward, 149 F.3d at 65 n.10 (distinguishing Cross and noting that "Sawyer's Visa bills were certainly not 'legally required mailings' that simply informed people of the already completed outcome of the scheme. Nor would those Visa bills have been mailed 'but for the fraudulent scheme.'") (quoting Cross).

Finally, the mail fraud statute requires a use of the mails; and a particular mailing can have many different purposes and can contain a number of pieces of paper (some related to the scheme

and some unrelated to the scheme). The mail fraud statute does not require as an element that the government prove that a particular mailing was entirely and exclusively related to the fraud scheme. It is enough that a part of the mailing furthered the scheme. Hence it is irrelevant that American Express bills mailed to the defendants contained charges for things of value provided to people other than Lorusso, or that the checks mailed to American Express to cover monthly statements included money going to things not provided to Lorusso. Defendants' attempt to require "but-for" causation between the mailings and the fraud scheme is contrary to case law. See, e.g., United States v. Pimental, 380 F.3d 575, 587 (1st Cir. 2004) (reversing trial court order granting motion for judgment of acquittal and noting that "a mail fraud conviction does not require the existence of a 'but-for' link between the mailing and the fraud, or its cover-up. Such a rule would harken back to the oft-rejected notion that the mailing needs to be connected with the essence of the fraud. It need not be so, so long as it is incident to an essential element of the fraud.'"), quoting Schmuck, 489 U.S. at 710.

### E. Government's Opposition to Defendant Esherick's Motion for Judgement of Acquittal on Count Four

Defendant Esherick argues that no reasonable juror could find him guilty of fraud in connection with the $38,000 moving repair invoice. However, in a nutshell, a reasonable juror could conclude he prepared or directed the preparation of the invoice for the following reasons:

- A contemporaneous memorandum specifically states that he prepared it;

- It was found in his computer files;

- He had a relationship with Michael Lorusso, to whom it was submitted, and it was the sort of invoice – undated, unsigned, unnumbered and

-58-

unsupported– that Esherick would conclude he could submit to Lorusso and have paid despite its obvious defects;

Second, a reasonable juror could conclude it was fraudulent at the time it was prepared:

- It represented 80 hours of moving supervision, when in fact there was a single employee, Bruce Frazier, who received exactly $2888 for 16 hours over time at $18 per hour;

- It referenced sprinkler repair, when in fact, such repair was performed for free if at all;

- It referenced elevator repair, when in fact, the best evidence is that that repair was performed for free, if at all;

- When called upon to support this claim, Douglas Development, with Esherick's personal knowledge, submitted supporting documents consisting of some cleaning bills, only a small portion of which actually related to the move damage, and some painting invoices which, in fact, were not passed on to Douglas Development at all. This occurred in 2005 – years after the event – and evidences the fraudulent intent at the time. No other invoices, despite opportunity to look and motive to produce, were found.

### E. Opposition to Defendants' Motion to Dismiss the Wire Fraud Count (Count Five)

The case relied upon by the defendants themselves establish the viability of the wire fraud count. Thus, United States v. Reid holds that "[i]t is only necessary to establish a scheme to defraud, and a mailing in furtherance thereof; it is not necessary even to show that a loss took

place." 533 F.2d 1255, 1261 (D.C. Cir. 1976) (emphasis added); see also id. at 1264 ("It is the scheme to defraud and not actual fraud that is required. Fraudulent intent may be inferred from the modus operandi of the scheme."). Here, defendants' modus operandi demonstrates their fraudulent intent: (1) the defendants created a series of different letterheads for a company that had done nothing other than the sine qua non for receiving wire transfers (obtaining a tax identification number); (2) various versions and the final version of the letterheads misrepresented the actual location and phone number of the company; (3) the defendants had Michael Rowe sign documents connected with the company, even though he knew nothing about it and only signed them because he trusted the defendants and was a person who did not ask questions; (4) the invoice itself fraudulently represented that MTD was entitled to fees for representing the District of Columbia Department of Transportation, when in fact no tenant rep. was representing DDOT other than Michael Lorusso himself; (5) the invoice represented that MTD was entitled to ten years' worth of commissions, when the actual DDOT lease was less than nine years in length; (6) the actual commissions that would have been available for representing DDOT (if there were such a representation agreement) would have been $283,626, not $430,000, see Tr. 882; and (7) if MTD—a Douglas Development-related entity—were truly representing a city agency (DDOT) in negotiations with Douglas Development, that would mean that Douglas Development was negotiating with itself—a conflict of interest that would make even Michael Lorusso blush.

It is true that the government must show that "'some actual harm or injury was contemplated by the schemer.'" Id. at 1264 n.34 (quoting United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir. 1970). But that proof is abundant at the time the invoice was submitted.

Mr. Cayre's testimony after the fact that he did not ultimately care about the MTD invoice because he made a lot of money from Douglas Jemal does not mean that, at the time Douglas Jemal and his codefendants submitted that invoice for payment they did not intend to defraud Mr. Cayre. Indeed, Mr. Cayre's statement that Douglas Jemal admitted that the invoice was false because Cayre was always "breaking [Douglas's] balls" shows that, at the time the invoice was submitted it was known to be false, and that it was submitted to avoid the scrutiny that would have come from Cayre had Douglas Jemal submitted an invoice directly in the name of Douglas Development. Put simply, Cayre and Jemal were fighting like cats and dogs about commissions. The MTD invoice was, in one sense, an attempt to avoid a fight; but that does not make it benign; to the contrary, it shows that Douglas Jemal knew he couldn't get the $400,000 he needed immediately to purchase 111 Massachusetts Avenue by simply submitting an invoice in that amount in the name of Douglas Development (not that Douglas Development was _ever_ entitled to a commission for representing DDOT); for, had he done so, (as the "break my balls" comment reveals), he knew he would have faced a tough fight from Cayre, and that he couldn't have gotten the money in time to purchase the new building.

As of the date he received the wire transfer from Morgan Stanley, and transferred that money to the settlement company handling the purchase of the new building, there was nothing remotely close to $400,000 in Douglas Development's bank account. Indeed, Dave Medding's testimony established that the DDC bank account was overdrawn $180,750.87 on the day the money was wired from the MTD account. Tr. 872. Hence the scheme to obtain the $430,000 was material.

The scheme was also material from the perspective of Morgan Stanley. Again, following

-61-

Reid, it is completely and utterly irrelevant that Morgan Stanley did not lose money on this transaction. The question is not loss but fraudulent intent. Ben Black, the Morgan Stanley investment banker, testified that he had no authority to pay fraudulent invoices and that he relied on the representations of Douglas Development in allowing funds under the loan to be released. No banker has the authority to pay a fraudulent invoice. The invoice was beyond any doubt false and fraudulent—regardless of whether Douglas Development had a theory of how it was otherwise entitled to money held back by Morgan Stanley. What defendants really are arguing is a claim of right defense—the defense the Court rejected in the motions in limine practice.

If defendants really had a right to the money and no criminal intent, why did they dummy up a false invoice and rely on the willingness of a kickboxing champion and bar bouncer to sign documents to get the money? The question answers itself. But, to remove any doubt, the real reason the defendants submitted the false MTD invoice was because they needed the money right away and were not confident that they could get it legitimately under the terms of the loan agreement with Morgan Stanley and the terms of the partnership agreement with Joe Cayre.

It is wholly immaterial that any money that was not disbursed under the set-backs to the loan agreement would ultimately go back to the borrower (the Jemal-Cayre partnership). See Defs. Mot. at 10-11. The point is that Douglas Jemal and Norman Jemal needed $430,000 to purchase 111 Massachusetts Avenue in December. They could not wait until the end of the tenant construction to get back any residual monies; they had to get the money immediately; and the only way they could be confident of getting the money immediately was to submit a fraudulent invoice that would secure the funds from Morgan Stanley.

It is for those same reasons that the false invoice and false lien waivers were in fact

material. Regardless of whether Cayre or Morgan Stanley ultimately might have signed off on

funds going to MTD for a fraudulent invoice—again, no matter how hard defendants try to talk

about everything but the invoice, an invoice seeking commissions for representing an agency that

was not in fact being represented is a false and fraudulent invoice—the risk to the defendants was

that seeking a tenant rep. commission in the name of Douglas Development would have set off a

close scrutiny of the invoice; and that scrutiny (however it would have been resolved) would have

meant that the defendants could not get the $400,000 they needed in December to purchase the

building. Thus, materiality is measured at the time the invoice and lien waivers were submitted;

not after the fact, when the bank and the partner were willing to forgive the fraud because they

made a lot of money on the 77 P Street deal and other deals with the defendants.

As to the fraud on the IRS, MTD is an entity with a taxpayer identification number that

received $430,000 from Morgan Stanley and yet, according to Ms. Moisa, never bothered to file a

tax return showing the receipt of that money.

Finally, as to Norman Jemal's separate motion on count five, the jury can reasonably infer

his criminal intent based on the circumstances surrounding the use of the $400,000 to purchase

111 Massachusetts Avenue. According to Dave Medding, the bank balance of DDC was

overdrawn $180,000 as of the date the money was being wired to purchase the new building.

Obviously, the jury can infer, the defendants were scrambling to get enough money to make the

purchase of 111 Massachusetts Avenue in time. Norman Jemal was Douglas Jemal's partner in

purchasing 111 Massachusetts Avenue, and the jury can reasonably infer that Norman Jemal

would have known about how $430,000 might fall into the hands of Douglas Development at just

the critical time. Norman Jemal's office is right next to Blake Esherick's, and the two men were

-63-

in charge of leasing at DDC. The jury can infer that, based on Norman's position in the company (both physically and in the hierarchy of the company), his position as a partner of Douglas Jemal in the purchase of 111 Massachusetts Avenue, and the company-wide scramble to find sufficient funds to purchase the new property, Norman Jemal would have known about how the funds were acquired from Morgan Stanley.

### G. Opposition to Motion for Judgement of Acquittal on Count Eight
Tax Evasion (2003)

Defendants allege that no reasonable juror could find the defendants committed tax evasion in connection with Count Eight. The essence of the argument is difficult to distill, however, it appears that the defendants are saying the government, at most, has proved a failure to file.

Despite defendants' contentions, the government has produced a wealth of evidence demonstrating a scheme to defraud the IRS in the year 2003. This includes not only the failure to file, as the defendants note, but the evidence of substantial unreported income, including DDC payments to Barbara Gill, over $50,000 in DDC payments to Esherick or for his benefit that the jury could conclude are falsely listed in the DDC "loans receivable" account, the purchase by Douglas Jemal of a $800,000 house for Esherick and the provision of housing accommodations for Esherick at that location, and the payment of certain vehicle expenses. The jury could easily determine that the same tax evasion scheme that was in place in material respects for prior years (2001 and 2002) was still in place – indeed, it had only expanded by the increased volume of checks to Eshericks recorded in the loan account.

The jury also knows that Eshericks was paid at the rate of $66,000 per year and that his

2003 W-2 reported to the IRS wages of $66,000 per year, while, at the same time, Eshericks filled out a form that he provided to the Maryland court that reported his income as $150,000 per year (the same salary he had reported in 2001– when he also reported income of $66,000 per year).

In short, this is no mere "failure to file" case; the Indictment alleges, and the jury would be permitted to find, numerous "acts of evasion," consisting of the numerous acts associated with Douglas Jemal's providing income to Esherick in ways that were not reported to the Internal Revenue Service.

## CONCLUSION

Defendants' motions should be denied.

Respectfully submitted,

UNITED STATES ATTORNEY
JEFFREY A. TAYLOR

By: _____
Mark H. Dubester, D.C. Bar No. 339655
Timothy G. Lynch, D.C. Bar No. 456506
Assistant United States Attorneys
555 4th Street, NW
Room 5233
Washington, D.C. 20530
(202) 353-4862

-65-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 15th day of October, 2006, I caused to be served by electronic filing a copy of the foregoing opposition to:

Michele A. Roberts, Esquire
Jeffery M. King, Esquire
Counsel for Douglas Jemal
Akin Gump Strauss Hauer & Feld
LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036

Paul F. Kemp, Esquire
Counsel for Blake C. Esherick
Venable LLP
One Church Street, Fifth Floor
Rockville, MD 20850


Reid H. Weingarten, Esquire
Erik L. Kitchen, Esquire
Brian M. Heberlig, Esquire
Counsel for Douglas Jemal
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Carol Elder Bruce, Esquire
Lawrence B. Bernard, Esquire
Counsel for Blake C. Esherick
Venable LLP
575 Seventh Street, NW
Washington, D.C. 20004


Christopher B. Mead, Esquire
Counsel for Douglas Jemal
London & Mead
1225 19th Street, NW, Suite 320
Washington, D.C. 20036

Stanley McK. Brand, Esquire
Ross A. Nabatoff, Esquire
Counsel for Norman D. Jemal
Brand Law Group
923 15th Street, NW
Washington, D.C. 20005

Mark H. Dubester
Assistant United States Attorney