# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 05-359 -01, -03  (RMU)** |
| | : | |
| **DOUGLAS JEMAL** | : | |
| **BLAKE ESHERICK,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S AMENDED OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT FOUR OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

The United States of America, through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendants' motion for judgement of acquittal and, in the alternative, for a new trial.

## I.  INTRODUCTION

The jury convicted Douglas Jemal and Blake Esherick of wire fraud, Count Four of the Indictment, based on their participation in a brazen and calculated scheme to use false and fraudulent invoices and representations to obtain monies under the control of and belonging to Morgan Stanley and Joseph Cayre, Jemal's partner.

The defendants have filed a Motion for Judgement of Acquittal.  Although they cite the correct standard for review – that the Court must consider the evidence in the light most favorable to the Government – they absolutely and consistently fail to apply this standard in stating the facts.  Moreover, they argue the facts based on credibility determinations that were uniquely those of the jury to make.  Finally, they misstate the law.

There is no basis to upset the jury's verdict, the defendants' motions must be denied, and the jury verdict must stand.

II. <u>THE LEGAL STANDARD</u>

      The Court must deny a motion for judgment of acquittal when, considering the evidence in the light most favorable to the Government, the evidence "is sufficient to permit a rational trier of fact to find all the essential elements of the crime beyond a reasonable doubt." <u>United States v. Kayode</u>, 254 F.3d 204, 212 (D.C. Cir.2001); <u>see also</u> <u>Jackson v. Virginia</u>, 443 U.S. 307, 319(1979). "In ruling on a motion for a judgment of acquittal, 'the trial court must view the evidence in the light most favorable to the Government giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact.' " <u>United States v. Treadwell</u>, 760 F.2d 327, 333 (D.C. Cir.1985) (quoting <u>United States v. Davis</u>, 562 F.2d 681, 683 (D.C. Cir.1977)); <u>United States v. Sutton</u>, 801 F.2d 1346, 1358 (D.C. Cir.1986). This stringent standard contemplates that the ultimate decision of guilt or innocence should be left to the jury, and that it is the province of the jury to credit certain testimony and reject other testimony. <u>United States v. Davis</u>, 763 F.Supp. 645, 648 (D.D.C.1991) ("Sentencing courts should therefore by wary of rejecting a jury's assessment of witness credibility.").

<u>United States v. Morrow</u>, 2005 WL 1389256 (D.D.C. June 13, 2005) (J. Kollar-Kotelly) at **3-4.

III.  <u>THE FACTS</u>

A.  <u>The $67 Million Morgan Stanley Loan to Cayre-Jemal's Gateway Holdings</u>

In November 2002, "Cayre-Jemal Gateway Holdings"(CJG) – the entity that owned the property at 77 P Street – entered into a loan agreement with Morgan Stanley, whereby Morgan Stanley lent CJG $67 million, secured by the 77 P Street property. At the time of the loan, substantial portions of the building were vacant and not yet built out.

Of the $67 million in loan proceeds, $41 million was distributed at settlement to pay off a pending construction loan. Of the remaining $26 million, approximately $19 million was "held back" by Morgan Stanley pending full occupancy of the building. Tr. 1212. The balance, approximately $7 million, was also held back and placed in escrow by Morgan Stanley to be used exclusively to pay for tenant improvements associated with the buildout of the unoccupied space.

Tr. 1214-15.  This $7 million was referred to in the loan agreement as the "TI [tenant improvement] construction reserve deposit." Tr. 1215.  As stated by Benjamin Black, the purpose of the TI construction reserve was "to ensure that vendors and/or contractors that furnish invoices or receipts or other similar documentation are in fact then paid."  Tr. 1216.

Morgan Stanley put in place rigorous procedures to safeguard its interest in the disposition of funds from the TI construction reserve. The procedures worked as follows:

- First, the borrower, through its agent, Douglas Development (DDC), would submit a "draw request" to Morgan Stanley containing contractor or vendor invoices that DDC sought to be paid with TI construction reserve funds.  Morgan Stanley personnel scrutinized the invoices to assure they were appropriately paid from the TI construction reserve.  Tr. 1219-20.

- The terms of the loan agreement required that the TI construction reserve funds be disbursed "directly to third-party vendors and/or contractors," Tr. 1215 (as opposed to sending the requested funds to DDC for distribution to the contractors and vendors).  Morgan Stanley thus required DDC to provide wiring information for contractors' bank accounts.  Tr. 1222.

- Morgan Stanley insisted that the contractors' invoices be accompanied by "lien waivers," whereby the contractor promised that if paid the invoiced amount, the contractor would not attach a lien on the property.  Tr. 1217-18.

The diligence with which Morgan Stanley applied these procedures was evidenced by its scrutiny of the first draw request from the TI construction reserve.  This draw request included a request for payment to DDC for "construction management."  Morgan Stanley required DDC to justify its receipt of such a payment because it was concerned with Douglas Development's relationship with the borrower [i.e., the partnership]:

> Q. [Mr. Lynch]: Why did Douglas Development's relationship to the borrower give you any concern?
>
> * * *

> A.* * *  With respect to that reserve account, or a reserve account
> of that nature, my first concern is that vendors and contractors,
> people that did work are paid, and I want to make sure that there's
> money there so that any work that is further down the road can be
> paid for out of the reserve, first and foremost.  And as you get
> closer to the borrower, I get more — I would generally be more
> concerned with respect to how that money is being released.

Tr. 1235.  Black further explained that he "would rather that an affiliate of the borrower be paid

last, and all the contractors be paid before [the affiliate]" because he "want[ed] to make sure that

if you do work on that building, that you get paid, and the probability or the likelihood that a

related entity of the borrower is going to lien against their own property is much less than a third

party unrelated entity."  Tr. 235-1236.

B. <u>Douglas Jemal's Relationship with Joseph Cayre</u>

Joseph Cayre was a partner with Jemal in many real estate ventures, including 77 P

Street.  Tr. 2114-2116, 2123.  Cayre would invest his own funds for his purchase of 50% of the

entity, and would loan Jemal money to purchase Jemal's 50% interest in the property.  Tr. 2114.

On occasion as with 77 P Street, Cayre lent funds to the partnership entity itself.  Tr. 2130.

Jemal, through DDC, managed the partnership properties, though Cayre or his representative (his

son-in-law), was required to co-sign the checks on the partnership account.  Tr. 2120-21.

Cayre had ongoing concerns with the payment of partnership funds to Jemal (through

DDC) for fees and leasing commissions.  "We always hollered about fees.  There were

management fees that he took and there were leasing commissions that he took."  Tr. 2117.

Although, ostensibly, the issue of leasing commissions was resolved in January of 2001 by an

agreement whereby no more than 6% in total commissions would be paid by partnership entities,

-4-

the two men continued to fight over leasing commissions well past that date, and into at least 2003. Tr. 2173.

At the time of the November 2002 loan, DDC personnel represented to Cayre that he would receive nearly all the cash ($19 million) generated by the Morgan Stanley loan to pay off outstanding loans from Jemal and the partnership to Cayre. Tr. 2143.[1] Cayre identified a blunt November 2002 email exchange between the two men setting forth his impatience with the pace of the 2002 loan. Tr. 2139; GX 386-0014-15 (attached as Exhibit 1).

C. The Fraud Scheme

At some time in 2002, the defendants set up a company called "MTD Real Estate."[2]

The defendants used MTD in November and December 2002 as the central vehicle in their scheme to obtain funds from the TI construction reserve, out from under the watchful eye of Morgan Stanley and Cayre, for the personal use of Jemal. As described below, the defendants undertook a series of dishonest, calculated, and deceptive acts designed to create the following false pretenses: that MTD was a legitimate going concern in which Michael Rowe was a knowledgeable principal and representative; that MTD was an "outside broker" not affiliated with Jemal; and that MTD provided real estate brokerage services to the D.C. Government for which MTD was entitled to a $430,000 commission. These representations–through documents, words and deeds of the defendants—were bald-faced lies, intended to trick and deceive Cayre and Morgan Stanley into parting with money.

_____

[1]      It was represented to Cayre that he would receive $19,296,0000 and Jemal only $49,000 of the loan proceeds.

[2]       The letters MTD stood for the respective sons of Douglas Jemal (Matthew), Paul Millstein (Tyler) and Blake Esherick (Douglas). Tr. 1145.

In the fall of 2002, Esherick directed Sabra Quinn (then Sabra Gould) and Kellian McIlwrath to prepare letterhead stationery for MTD. This letterhead went through several versions, reflecting deletions of DDC's main phone number and address, and the replacement of that information with the phone number of a DDC fax line and an Eastern Avenue address. Tr.1150-59; GX 320, GX 321, GX 341 (attached as Exhibits 2, 3, and 4).

Esherick, in November 2002, directed McIlwrath to prepare a $430,000 invoice from MTD to Cayre-Jemal's Gateway (the 77 P Street partnership). This invoice represented that MTD was billing for a leasing commission for representing the D.C. Department of Transportation (DDOT) in leasing space at 77 P Street. Tr. 1167; GX 324 (attached as Exhibit 5). This invoice bore no relationship to a "true" leasing commission for DDOT. Tr. 874-882. The text of this invoice was then added to the letterhead stationery.

This MTD invoice was submitted to Morgan Stanley on November 22, 2002 as part of the first draw request. Tr. 1226; GX 411-0002, 0031 (attached as Exhibit 6). This document had the following features:

- The invoice falsely represented that MTD was entitled to a $430,000 commission;

- It falsely represented that MTD had represented DDOT;

- It falsely represented that there was a 10-year lease;

- It set forth lease terms (annual rent) that were false and bore no relationship to the actual lease;[3]

- It falsely represented that MTD's address was on Eastern Avenue;

- It used as MTD's phone number a DDC fax line;

---

[3]     Thus, the document, by inflating the length of the lease and the amount of the rent, generated a leasing commission of $430,000, when a "real" invoice based on the actual lease terms would have generated a commission of about $275,000. Tr. 882.

- It was designed to minimize the potential that it would ever be the subject of questions from Morgan Stanley: it had an invoice number (thus suggesting prior invoices) and was "approved" for payment by Esherick.

The defendants were thereafter required by Morgan Stanley to provide the lien release and wiring information for the MTD invoice. Having been required to justify the DDC claim for payment of construction management fees from the TI construction reserve, the defendants knew they had to be exceedingly careful in providing the lien release and wiring information for the MTD invoice to conceal from Morgan Stanley that the true recipient of the funds was Jemal.

Thus, sometime prior to December 10, 2002, either Esherick or Jemal obtained from Michael Rowe his signature on the lien release. Tr. 1297. And, on December 10, 2002, Jemal opened an account in the name of MTD at Adams National Bank. Tr. 656. Thereafter, a memorandum, also dated December 10, 2002, was created, purportedly from Rowe to Medding, that contained the wiring information for the MTD Adams account. And, finally, on December 10, 2002, the lien release and the wiring memorandum were faxed from DDC to Morgan Stanley in New York. Tr. 1221-1222; GX 525-0007-08 (attached as Exhibit 7). Rowe had no knowledge of the significance of the lien release, the existence or use of the bank account, the wiring information, the wiring information memorandum, the purposes to which those documents were to be put, the "operations" of MTD, the funds collected by MTD, or any other aspects of MTD. Tr. 1298-1301.

As a result of these false and fraudulent documents, Morgan Stanley approved the wiring of $430,000 from the TI construction reserve (then held in escrow by GMAC bank in Utah) to the Adams MTD account. This money was wired on December 12, 20002, and, on the very next day, December 13, 2002, $400,000 was wired out of the MTD Adams account for Jemal's use in

the purchase of 111 Massachusetts Avenue.[4]  A few days later, the remaining $30,000 was returned to DDC, leaving a small balance.  Other than these three transactions spanning about one week, the MTD account was, for all practical purposes, never used.  Tr. 667-72.

The funds in the TI construction reserve were funds of the 77 P Street partnership, and were funds as to which Cayre had a partnership interest.  Thus, the conduct of the defendants not only worked a fraud on Morgan Stanley, but it involved the fraudulent and secret diversion of partnership assets, 50% of which belonged to Cayre, to the personal use of Jemal.  To keep Cayre from knowing what they were doing, the defendants took the following steps:

- Jemal and his agents (including Brownell) kept this diversion secret;

- The defendants used the MTD invoice and the related documents to obtain the commissions;  thus, if Cayre had sought to question the draws from the TI construction reserve, he would be unaware that the partnership monies had been paid to Jemal.  To the same end, the invoice represented that MTD was entitled to a commission for representing the DDOT, not the partnership entity, thus minimizing the potential that it would ever be questioned by Cayre.

- A DDC a memorandum to Cayre explaining the structure of the loan represented: "Note that $7 million is being held back to fund the remaining tenant improvement and leasing commissions (all of these are to outside brokers)." [emphasis supplied].  This representation was intended to deceive, and did in fact deceive, Cayre.  As Cayre testified:

    Q.    I'm just asking whether or not in your own mind you understood this phrase ["all of these are to outside brokers"] as implying that money was going to Douglas Jemal or not to Douglas Jemal.

    A.    I did not believe it was going to Douglas Jemal.

Tr. 2145 (emphasis added); GX 197-0001 (attached as Exhibit 8).

---

[4]    On the day of  this transfer, the DDC operating account was overdrawn by $180,750.97. Tr. 872.

- On December 18, 2002, just a few days after Jemal received the funds from Morgan Stanley pursuant to the MTD invoice, Brownell signed a "lulling" letter to Cayre, designed to allay any suspicions as to the good faith of Jemal in handling loan proceeds.[5] This letter stated, in pertinent part:

> We have accelerated this [buildout] process as if we were the ones receiving all of the buildout funds, when we in fact realize that all of it is going to you. We will continue to work as quickly as possible to have the space built and occupied and will keep you updated regarding the timing as we get closer to the completion date.

Tr. 2148 (emphasis supplied); GX 197-0004 (attached as Exhibit 9).

In short, the jury was entitled to conclude that, facing a need for cash, the defendants recognized a pool of monies they could tap, namely, the partnership monies held by Morgan Stanley in the TI construction reserve. This was a perfect target for them. The defendants knew that unlike the partnership bank account, on which Cayre or his representative was a required signor, Morgan Stanley—and not Cayre—had control over the TI construction reserve funds. They devised a scheme to keep Cayre at bay, uncurious, and trusting, as they used fraudulent means to cause Morgan Stanley to part with $430,000 of partnership funds for Jemal's personal purposes.[6]

---

[5]     Moreover, this letter, as well reflects DDC's (i.e., Jemal's) awareness of and sensitivity to Cayre's impatience and his concerns with being repaid promptly.

[6]     Jemal admitted he initiated the scheme with his "break my balls" comment to Cayre in 2005. Tr. 2149. It is also clear that Esherick, Brownell, and Millstein took actions for Jemal's benefit to effectuate the scheme and it is inconceivable that they would have done so, especially to the extent that their actions related to and impacted Jemal's relationship with Cayre, without Jemal's direction and approval. Similarly, either Jemal or Esherick, at Jemal's direction, procured Rowe's signature. Again, it is inconceivable that Esherick would have undertaken this action, which profoundly trafficked on Jemal's relationship with Rowe, without Jemal's approval. Defendants' contentions as to lack of evidence against Jemal, worthy of but a footnote in their pleading, are meritless.

D. The Defendants Have Failed to Give the Government the Benefit of All Inferences,
   and Have Made Unwarranted Credibility Determinations

The defendants set forth a truly benign version of events that fails to give the government

the benefit of all the inferences to which it is entitled. They pick and chose snippets of testimony

and argue their version of events as if proven. For example, the defendants assert that they

intended for the MTD invoice to constitute a bona fide leasing commission for monies ostensibly

owed by the Cayre-Jemal partnership to DDC. However, for all their attempts at creating an

alternative view of events, no amount of alchemy will transform the truth of defendants'

deliberate intent and efforts to use dishonest means into an intent to use honest means; no

amount of wand-waving can transform the fraudulent invoice, lien release and wiring instructions

into documents that reflect and evidence anything other than criminal intent. Indeed, though the

defendants argue they operated in a friendly landscape where there were funds readily available,

their dishonest conduct proves precisely the opposite and can only be explained by the significant

financial constraints–proved in the government's case–that both Cayre and Morgan Stanley

imposed on the defendants' access to partnership funds and funds in the TI construction reserve.

Indeed, there is remarkably little evidence to support their factual claims—either as to the

underlying facts or the intent those facts supposedly reflect. Cayre, for example, cannot and did

not testify as to the defendants' actual intent. Similarly, Medding cannot and did not testify to the

defendants' actual intent—all he could testify to was one statement by Millstein. There was no

testimony by Jemal, Esherick or any of the actual participants in the transaction as to their intent.

Moreover, the invoice itself is sheer fiction. It was a critical feature of the MTD invoice's design

that it depicted a financial relationship between two third parties (MTD and the DC

Government), unrelated to each other, unrelated to Douglas Jemal, and unrelated to the partnership.[7]  At the most basic factual level, the defendants' assertions at this juncture that they could have obtained the $430,000 honestly is belied by their strenuous efforts to obtain that money by fraud.

Second, the issue of the defendants' intent was particularly one for the jury.  The jury was entitled to glean the defendants' intent from the dishonesty of their conduct, and was permitted to conclude that the defendants resorted to dishonesty precisely because they sought to obtain monies they believed they could not otherwise obtain honestly.[8]  Among the evidence that the jury could consider were the numerous iterations of the MTD invoice designed to conceal the fact that MTD was Jemal's alter ego, the falsity of the actual "leasing commission" calculation, the procuring of Rowe's signature at night in a dark parking lot, the false representations in the correspondence with Cayre, and the clever design of the invoice to ward off scrutiny.

Third, defendants have relied extensively on their implicit credibility determinations as to certain aspects of the testimony of Black and Cayre.  However, it is for the jury to make decisions as to the weight to be accorded the respective testimonies of the two men, and the jury was entitled to adopt different and far more incriminating interpretations of their testimony than the

---

[7]    The jury could easily conclude that the design of the invoice representing a brokerage arrangement between two unrelated third parties – MTD and the D.C. Government – was designed to provide a layer of protection from probing by Morgan Stanley and Cayre.  Both Cayre and Morgan Stanley would be less likely to ask questions concerning a payment to the D.C. Government's broker than they would to an entity that purportedly represented the partnership.

[8]    "A variety of circumstantial evidence has been held relevant to infer fraudulent intent.  Intent may be inferred from evidence that the defendant attempted to conceal activity.  Intent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statements as well as whether the defendant profited or converted money to his own use." United States v. Welch, 327 F.3d 1081, 1105 (10th Cir. 2003) (citations omitted).

versions urged by the defendants.[9]  As to Cayre's testimony, for example, the jury knew that

Cayre had a family relationship with Jemal, and the jurors observed Cayre testifying in a manner

that they could readily observe was extremely partial to Jemal.  The jury would have been

justified in concluding that Cayre, a highly intelligent and perceptive individual, chose his words

carefully, consciously intending to portray his relationship with Jemal in almost cartoon-like

terms. ("We fought like cats and dogs.  We didn't fuss." Tr. 2163).[10]  The jury would have been

entitled to conclude from all the evidence, including the correspondence between Cayre and

Jemal and the efforts by the defendants to use MTD to divert partnership funds, that

notwithstanding certain aspects of Cayre's September 2006 testimony, in November and

December 2002 (well before he knew the Woodies and 77 P Street projects were sure money-

makers), Cayre was deadly serious about the status of his investments and loans with Jemal,

sought to be informed of every dollar that left the partnership and went to Jemal personally, and

continued to scrutinize such transactions. In light of Cayre's bias in favor of Jemal, the jury could

have treated as particularly incriminating Cayre's testimony that he was "disappointed" in Jemal,

Tr. at 2151, Cayre's refusal to testify that he would "trust" Jemal (other than to trust Jemal to

make Cayre money), Tr. at 2181, and Cayre's testimony that he understood the term "outside

brokers" in the Brownell memorandum to mean entities other than Douglas Development and

---

[9]      "In ruling on a motion for a judgment of acquittal, 'the trial court must view the evidence
in the light most favorable to the Government giving full play to the right of the jury to determine
credibility, weigh the evidence and draw justifiable inferences of fact.'" United States v.
Treadwell, 760 F.2d 327, 333 (D.C. Cir.1985) (quoting United States v. Davis, 562 F.2d 681,
683 (D.C. Cir.1977)).

[10]      The transcript indicates "Laughter" after the above comment.  Tr. 2163.  Throughout his
testimony, Cayre described his financial relationship with Jemal as if it were humorous, and the
transcript notes "laughter" on several occasions. Tr. 2148, 2160, 2161, 2162, 2163, 2181, and
2182.

Jemal. Tr. at 2145.  In short, notwithstanding Cayre's efforts to persuade the jury not to consider

him a victim of the defendants' fraud scheme, the jury was entitled to reach the exact opposite

conclusion.

The jury could likewise have understood that Black had ongoing personal and financial

interests vis-a-vis Jemal at the time of his testimony.  The jury could have concluded that Black

chose his words carefully and sought to understate any part of his testimony that could be

interpreted as an accusation of fraud.  The jury could have understood that Black's testimony that

his job was to protect Morgan Stanley's interests, that he had no authority to pay a fraudulent

invoice, and that he was reluctant approve a payment to Douglas Jemal (or DDC) constituted

powerful evidence of the fraud on Morgan Stanley, notwithstanding Black's professed

willingness to do other deals with Jemal.

Fourth, the defendants place great reliance on Cayre's testimony as to how he would have

considered the request for a leasing commission payment in 2002.  However, even if the jury

were to credit Cayre–which, as noted, the jury would not have been required to do in light of all

the evidence of Cayre's tenacious resistence to and suspicion of such payments—such testimony

is no more dispositive as to the issue of the defendants' intent than if Cayre were to have testified

as follows:  "He stole from me, that crook.  If I had known the truth, I never would have let him

have that $430,000 at that time.  Half of that $430,000 was mine.  As far as I am concerned, I

was defrauded and Jemal attempted to defraud me."  Similarly, it is hardly dispositive that Black

testified that Morgan Stanley did not lose any money, or if Black were to have testified as

follows:  "They stole from Morgan Stanley, those crooks.  If I had known the truth, I never would

-13-

have approved the payment of the $430,000 to MTD. As far as I am concerned, Morgan Stanley was defrauded and Jemal attempted to defraud us."

Fifth, the defendants place great weight on aspects of the testimony of Cayre and Black in arguing that the defendants did not have criminal intent. However, as the jury well knew, neither Cayre nor Black was present in the offices of DDC when the fraudulent scheme was being designed and implemented, when Esherick directed Gould and McIlwrath to create the false documents, or when Esherick and Jemal persuaded Rowe to become part of MTD and sign the lien release at their request. Black did not see the letters to Cayre, and Cayre did not see the documents sent to Morgan Stanley. Neither Black nor Cayre was aware of Jemal's personal motives and DDC's desperate need for cash, and neither saw Rowe testify or were present when Rowe's signature was procured on the lien release. However, this evidence was known to the jury. Thus, whatever Cayre's and Black's perceptions were at the time of the events or at the time of their testimony, the jury heard additional evidence and was entitled to draw a different conclusions.

In short, there was little in the way of evidence that would compel a jury to find that the MTD invoice and related documents constituted anything more than a brazen attempt to obtain partnership monies, under the control of Morgan Stanley, by fraud. Certainly, the jury was permitted to make finding of an intent to defraud. The defendants presented their version of the facts to the jury and the jury properly rejected it.

IV. <u>THE DEFENDANTS COMMITTED WIRE FRAUD</u>

A. <u>The Jury Properly Found The Existence of a Scheme to Defraud</u>

The jury properly found the existence of the first element, namely "a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises." Tr. 4320. These terms are not complicated and are well within the province of the jury to understand. "'The law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity.'" <u>United States v. Diggs</u>, 613 F.2d 988, 997 n. 48  (D.C. Cir. 1979) (quoting <u>Weiss v. United States</u>, 122 F.2d 675, 681 (5th Cir.  1941)).[11] Thus, as this Court properly instructed, a "scheme to defraud" means "any plan, device or course of action to obtain money or property by means of false or fraudulent pretenses, representation or promises reasonably calculated to deceive persons of average prudence." <u>Id</u>. Moreover, "[i]t is only necessary to establish a scheme to defraud, * * * ; it is not necessary even to show that a loss took place.[ ]" <u>United States v. Reid</u>, 533 F.2d 1255, 1262 (D.C. Cir. 1976) (footnote omitted).[12]  The evidence amply supports the jury's conclusion that the defendants employed a

---

[11]    <u>See also</u>, <u>e.g.</u>, <u>United States v. Van Dyke</u> 605 F.2d 220, 225 (6th Cir. 1979). ("The [scheme to defraud] standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right in the general and business life of members of society. [citations omitted.] *** [T]he scheme must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. [citations omitted.]"); <u>United States v. Lindsey</u>, 736 F.2d 433, 436 (7th Cir. 1984) ("[Fraud scheme] is not to be measured by technicalities.  Rather, the measure of fraud is its departure from moral uprightness, fundamental honesty, fair play and candid dealings in the general life of members in society.  [citation omitted].").

[12]    As to the third element, the use of wires, there is really no dispute.  The evidence demonstrated that:  1) Brownell faxed a memorandum to Cayre; 2) DDC faxed the Rowe lien release and wiring information to Morgan Stanley, and, 3) Morgan Stanley caused the wiring of funds from the escrow account for the TI construction reserve from an account in Utah to the District of Columbia.

"scheme to defraud" within this definition, that is, they employed a course of action to obtain

money by means of false and fraudulent representations.

B.  <u>The Jury Properly Found the Defendants Possessed Intent to Defraud</u>

The evidence likewise supported the jury's determination that the defendants intended to

defraud.  The Court properly instructed the jury as to intent, as follows:

> "Intent to defraud" means to act knowingly and with the specific
> intent to deceive, for the purpose of causing some financial or
> property loss to another.
> * * *
> As a practical matter, then, in order to sustain the charges against
> the defendant, the government must establish beyond a reasonable
> doubt that he knew that his conduct as a participant in the scheme
> was calculated to deceive and, nonetheless, he associated himself
> with the alleged fraudulent scheme for the purpose of causing some
> loss to another.

Tr. 4323, 4326.

This element is satisfied by proof of the defendants' participation in the scheme to

defraud, that is, in their knowing and intentional use of false documents and misrepresentations

to obtain money or  property from another.  It is no more complicated, subtle, or nuanced than

this.  "[T]he words 'to defraud' *** usually signify the deprivation of something of value by

trick, deceit, chicane or overreaching."  <u>McNally v. United States</u>, 483 U.S. 350, 358 (1987).   As

the Sixth Circuit stated:

> To convict a defendant of wire fraud the government must prove
> specific intent, which means not only that a defendant must
> knowingly make a material misrepresentation or knowingly omit a
> material fact, but also that the misrepresentation or omission must
> have the purpose of inducing the victim of the fraud to part with
> property or undertake some action that he would not otherwise do
> absent the misrepresentation or omission.

-16-

United States v. Daniel, 329 F.2d 480, 487 (6th Cir. 2003) (citation omitted).  Stated succinctly by

the Seventh Circuit,  "[t]o prove the specific intent element of a violation of the mail fraud

statute, the government must prove that the defendant has knowingly made a 'material

misrepresentation or omission.'"  United States v. Dunn, 961 F.2d 648, 651 (7th Cir. 1992).  And,

to the same end, as stated by the Tenth Circuit, "[o]nce the device, scheme or artifice to defraud

has emerged, the question is whether one has participated in the criminal transaction or

transactions shown to have been perpetrated." United States v. Dowlin, 408 F.3d 647, 658-59

(10th Cir.2005).

       This understanding of "intent to defraud" is found in case after case where white collar

defendants have unsuccessfully challenged their mail fraud and wire fraud convictions on

grounds similar to those urged by the defendants in this case, namely, that even though the

defendants used false representations to obtain money from another, the defendants nonetheless

lacked the requisite intent to defraud because they did not intend to cause actual loss (or harm or

injury) and in this way acted in "good faith."[13]

       Courts have routinely and uniformly rejected the argument that "no intended harm" and

"no intended loss" negates criminal intent.  The law is clear that the factual inquiry as to criminal

intent involves a determination as to whether the defendant knowingly participated in making the

false representations, not whether the defendant believed everything would turn out well in the

end with no loss to the intended target.  "Good faith is employed to mean a genuine belief that

the information being sent or given is true. Good faith does not mean an ultimate hope or even

faith that eventually the project will come out even." United States v. Preston, 634 F.2d 1285,

---

[13]     Though the defendants do not use the term "good faith" in their motion, that is the
substance of their position.

1294 (10th Cir. 1980).  See also, e.g., United States v. Mabrook, 301 F.3d 503, 509 (7th Cir. 2002)

("Mabrook's good-faith belief that Global Chemical would eventually be successful is not

relevant because that belief did not negate the falsity of his representations to his investors.")[14]

Thus, the defendants' claims in this case that they could have obtained those monies honestly

makes no difference in assessing their intent, for, again, their criminal intent was established by

their participation in a scheme to use false and fraudulent pretenses to obtain the funds.[15]

       The defendants have cited cases where the intent standard has been described as

encompassing an intent to "harm."  However, these cases involve facts that are easily

distinguishable from the facts here,[16] and courts have rejected attempts by white collar defendants

---

[14]     See also United States v. Curry, 461 F.3d 452, 458 (4th Cir. 2006) ("'[N]o amount of
honest belief that his corporate enterprise would eventually succeed can excuse the willful
misrepresentations by which the investors' funds were obtained. An investor may be defrauded if
his reliance is induced by deliberately false statements of fact, and the defendant's optimism as to
the future is no defense.'" (brackets in text) (quoting United States v. Painter, 314 F.2d 939, 943
(4th Cir.1963)); United States v. Janusz, 135 F.3d 1319 (10th Cir. 2006)  ("By admitting his false
pretenses, Mr. Janusz admitted, as a matter of law, that he did not act in good faith. A defendant's
honest belief that a venture will ultimately succeed does not constitute good faith if, in carrying
out the plan, he knowingly uses false representations or pretenses with intent to deceive."
(citations omitted));  United States v. Benny, 788 F.2d 1410, 1417 (9th Cir. 1986)  ("While an
honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a
good-faith belief that the victim will be repaid and will sustain no loss is no defense at all."
(citation omitted)).

[15]      See, e.g., United States v. Rodolitz, 786 F.2d 77, 80-81 (2d Cir.1986) ("[I]t was not
necessary for the government to prove that Rodolitz recovered more from the insurance company
than that to which he was entitled.  To sustain the conviction the government needed to prove
only that Rodolitz employed a deceptive scheme intending to prevent the issuer from determining
for itself a fair value of recovery. [citations omitted]"); United States v. Feinberg, 535 F.2d 1004,
1008 (7th Cir. 1976) ( "It is immaterial and of no consequence that Feinberg may have been able
to acquire a similar reduction in the amount of taxes payable [by means of fraud and deceit] on
the properties respectively through some honest means.").

[16]     For example, the defendants rely extensively on United States v. Jain, 93 F.3d 436,
441-42 (8th Cir. 1996), a case involving the prosecution of a psychiatrist for receipt of kickbacks
from a hospital for patient referrals.  The Eight Circuit held that this scheme did not work a fraud

to extend this "intent to harm" language beyond the concept of intent to obtain property by fraud; indeed, to the contrary, courts have explicitly equated the two concepts.  See, e.g., United States v. Welch, 327 F.3d 1081, 1106 (10th Cir. 2003) ("[W]e reject Defendants' argument that the intent to cause economic harm or injury is an element of [mail fraud or wire fraud].  The required intent is simply an intent to defraud which the Government may establish by various means.");

United States v. Fernandez, 282 F.3d 500, 506-07 (7th Cir. 2002) ("This Circuit has never required the government to establish a 'contemplated harm to the victim'").[17]  Notably, the

_____

on the patients because the psychiatrist did not intend to harm them and did not actually harm them– there was no showing that any of the patient referrals were inappropriate.  The Eighth Circuit analyzed this issue under 18 U.S.C. § 1346 in terms of whether the psychiatrist owed a duty of honest services to his patients.  Jain has nothing to do with the instant facts.  Moreover, the Eighth Circuit has subsequently rejected defendants' arguments that Jain established some sort of "intent to harm" requirement in connection with routine financial frauds.  See, e.g., United States v. Whitehead, 176 F.3d 1030, 1037-38 (8th Cir. 1999) (rejecting argument that Jain required "intent to harm" instruction).

    The defendants also rely heavily on United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987) a case which also used the "intent to harm" language.  In Starr, the defendants, as part of their bulk mailing services for customers, worked a fraud on the postal service.  The issue was whether their customers were likewise a victim of the fraud.  Similarly, United States v. Novak, 443 F.3d 150 (2d Cir. 2006) held that a kickback scheme between union members and a union official did not operate on a fraud against the employer who contracted for union services, i.e., there was no "intent to harm" the contractor.  The facts and legal issues of Starr and Novak are distinguishable from those of this case, which involves the presentation of false documents to deceive and obtain monies.  Moreover, the Second Circuit has subsequently elaborated that its concept of "harm" encompasses the types of frauds by the defendants in this case. See infra in text

[17]    See also United States v. Daniel, 329 F.3d at 488 (rejecting "intent to harm" requirement: "[Appellant], however, would have us take the words "harm" and "deprive" in a grand sense. That is, though he admittedly intended to deprive Century and CBIZ of money in the short-term by taking improper loans, he did so in hopes of benefitting them in the long-term by repaying the loans and retaining the stock, and consequently he intended neither to harm the businesses nor deprive them of money. But neither law nor policy supports this approach, which would have the jury look beyond his bad conduct to his overall motives."); United States v. Kenrick, 221 F.3d 19, 26-27 (1st Cir. 2000) (relying on interpretations of mail fraud and wire fraud, specifically rejecting an "intent to harm" and holding that the intent necessary for a bank fraud conviction "is

Eighth Circuit, which decided the Jain case cited by the defendants, has subsequently limited its application.  In United States v. Ervasti, 201 F.3d 1029, 1035 (8th Cir. 2000), the Eighth Circuit, in affirming the trial court's decision not to instruct on "intent to harm," characterized Jain as arising in a "context that is inapposite here" and as nothing more than "an exception to the ordinary rule that the scheme itself may provide evidence of the defendant's intent to defraud." (citation omitted))."  Finally, the Second Circuit, which decided the Starr case on which the defendants also rely, has made it clear that persons and entities have the "right to control [their] assets" and that the concept of "harm" is thus satisfied when an entity is required "to make decisions concerning the disposition of funds under its control on the basis of false information." United States v. Dimone, 86 F.3d 277, 284 (2nd Cir. 1996) (false mortgage loan application constituted mail fraud and wire fraud, notwithstanding defendant's intent to cause no loss).  See also United States v. Chandler, 98 F.3d 711, 716 (2d Cir. 1996) (prosecution for obtaining credit card by fraud; intent to defraud satisfied notwithstanding defendant's insistence she intended to pay the credit card bills:  "[T]he intent to harm is inextricably bound to the intent to deceive. *** Thus, the jury's finding of intent to deceive is the functional equivalent of the essential finding of intent to harm.").

Thus, the defendants possessed the requisite intent to defraud by their participation and complicity in the scheme to defraud and their use false documents to obtain money and property of and under the control of Cayre and Morgan Stanley.  For reasons set forth above, that is all the law requires.

---

an intent to deceive the bank in order to obtain from it money or other property").

Nonetheless, the defendants possessed the requisite specific intent even if some additional "harm" were required to have been intended. The defendants knew and intended that Morgan Stanley be deprived of accurate information that Morgan Stanley deemed important in deciding whether it would release assets under its control in the TI construction reserve; that Morgan Stanley would lose its control of a portion of its cushion to insure there were sufficient funds in the TI construction reserve to ensure that the buildout would be completed; that Morgan Stanley would subject itself to an increased risk that there would be insufficient resources to complete the buildout and that a contractor would go unpaid and place a lien on the property; that Morgan Stanley would be subject to an increased risk the building would not be fully occupied. If Morgan Stanley wanted the defendants to have administered the TI construction reserve it would have permitted them to do so; if it did not care about the invoices being paid, it would not have scrutinized them, required lien releases and required the wiring procedures. Similarly, the defendants knew and intended that Cayre would be deprived of his personal interest in the partnership asset ($430,000) and that he would be deprived of his right to control, acquiesce or have a say in the disposition of $430,000 of partnership assets. The defendants have cited no case that holds that the intentional use of a false document to deprive another of money under his or her ownership or control does not reflect an intent to "harm" or "injure" within the meaning of the statute. Indeed, it is nearly impossible to conceive of facts where a person fools another into parting with hundreds of thousands of dollars and claims that there was no injury intended.

## C. The Jury Properly Found The Misrepresentations To Be Material

There was sufficient evidence for the jury to conclude that the series of false representations satisfied the "materiality" requirement. In this regard, the Court properly

instructed the jury:  "A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision."[18]  Tr. 4321-22.  Actual reliance is not required.  "Because the issue is whether a statement has a tendency to influence or is capable of influencing a decision, and not whether the statement exerted actual influence, a false statement can be material even if the decision maker did not actually rely on the statement." United States v, Neder, 197 F.3d 1122, 1128 (11th Cir. 1999) (citation omitted).

The fraudulent representations were material to Morgan Stanley, which made the decision to approve the payment of $430,000 pursuant to the false representation that MTD had represented the DC Government in securing space at 77 P Street, coupled with the false and fraudulent Rowe lien release and wiring instructions.  Moreover, the defendants knew or reasonably expected it would be an important to Morgan Stanley whether the funds associated with the MTD invoice would be going to Jemal; they thus created and submitted the documents that concealed this important and material fact.

The documents and false representations were likewise material in connection with the fraud on Cayre.  The defendants sought to accomplish and conceal their diversion of $430,000 of partnership monies to Jemal.  The defendants had reasons to know to a certainty that Cayre—a reasonable and prudent person—would be vitally concerned with this payment and certainly did not consent to it.  (The jury certainly would have been justified in so concluding as well.)  The defendants thus created an elaborate pretense to hide this diversion, by having it appear that the

---

[18]    See Neder v. United States, 527 U.S. 1, 16 (1999).  A misrepresentation is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." (citations omitted; brackets in original).

payment from the TI construction reserve was to an "outside broker" unrelated to Jemal, and by

assuring Cayre in the lulling letter that all the monies from the loan would be going to him.

The defendants' materiality arguments are fundamentally flawed, as they focus on the

actual effect of the misrepresentations (particularly on Cayre).  However, the materiality inquiry

focuses on the inherent capacity or tendency of the representation to influence a decision.  It is

not important whether the representations under scrutiny actually influenced the victim or

decision maker; indeed it is unimportant whether the result would have been different but for the

misrepresentation (or, in some contexts, whether the misrepresentations were even seen by the

decision maker).[19]  Thus, Cayre's testimony in 2006 that he would not have cared in 2002 about

the defendants taking $430,000 from partnership assets (even if such testimony were credited, a

dubious proposition at best) has nothing to do with the test for materiality, that is, whether the

representations at issue had the inherent tendency or capacity to be important to him, and of

course they did.   In short, the representations at issue, if important to Morgan Stanley and Cayre,

are material, and the materiality of these statements is unaffected by whether the defendants

could have used other, honest, representations to obtain the same result.  The government does

not have to disprove the contention that the defendants could have obtained the money by honest

means, if it did prove they did so by fraud.

---

[19]    The defendants' assertion that materiality is to be "measured by the recipient of the
alleged misrepresentation," Defendants' Motion at 16, fn. 6, is thus flatly wrong.  The Ninth
Circuit, for example, frames the jury instruction on materiality so as to focus on the qualitites of
the representation, not the person or entity to whom the representation is to be made: "The test
for determining the materiality of the false statement, representation or promise is whether it is
made to induce action or reliance by another. In other words, does it have a natural tendency to
influence or is it capable of influencing another's decisions?" United States v. Carpenter, 95 F.3d
773, 778 (9th Cir. 1996) (citation omitted).  If the defendants were correct–which they are not--
the materiality of a representation would depend on whether the victim was smart or gullible,
savvy or naive, or attentive or inattentive.

V.  The Verdicts Were Not Against the Weight of the Evidence

Since the verdict was fully supported by the evidence, and not contrary to the weight of

the evidence, there is no grounds for a new trial.

* * *

WHEREFORE, the government respectfully requests that the defendants' motions for

judgement of acquittal and for a new trial be denied.

RESPECTFULLY SUBMITTED,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:    _____
Mark H. Dubester, D.C. Bar No. 339655
Timothy G. Lynch, D.C. Bar No. 456506
Assistant United States Attorneys
555 4th Street, NW
Room 5233
Washington, D.C. 20530
(202) 353-4862