UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES ) | |
| ) | |
| v. ) | Crim. No. 05-0359-1, -3 (RMU) |
| ) | |
| DOUGLAS JEMAL, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT
FOUR OF THE INDICTMENT OR, IN THE ALTERNATIVE, FOR A NEW
TRIAL BECAUSE THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE**

The Court should enter a judgment of acquittal on Count Four of the Indictment because the evidence is insufficient to sustain the verdict. The government focuses on the falsity of the MTD invoice and argues that intent to defraud may be inferred solely from a false statement. In so doing, the government refuses to acknowledge that it agreed to a jury instruction providing that a false statement alone is insufficient, which is now law of the case. In reality, the government was also required to establish that Defendants intended to harm the alleged victims or caused them to suffer tangible injury from which intent to defraud could be inferred. The government attempts to compensate for its failure to introduce such evidence by inviting the Court to speculate that the jury drew negative inferences contrary to the direct testimony of the government's own witnesses. The Court should reject this misguided effort and hold that there was insufficient evidence of intent to defraud to sustain the verdict.

The government's attempt to establish that the misrepresentations in the MTD invoice were material to Joe Cayre or Morgan Stanley similarly fails in light of the testimony of the government's own witnesses. Finally, the government's failure to meaningfully respond to

Defendants' argument that a new trial is warranted because the verdict is against the weight of the evidence reflects a lack of respect for the important role the Court plays in preventing a miscarriage of justice, which is what would occur if this verdict is permitted to stand.

## ARGUMENT

### I. The Government Failed To Prove Intent To Defraud

The government devotes the majority of its 24-page opposition to establishing that the MTD invoice was false and misleading -- a point over which there is no real dispute -- and arguing that intent to defraud for purposes of the wire fraud statute may be inferred solely from an intentional false statement. The government is wrong. Indeed, the government conceded as much by agreeing to a jury instruction to the contrary. The law requires a defendant to have at least contemplated harm to the property rights of the alleged victim. Here, the government proved no actual loss or harm to Joe Cayre or Morgan Stanley and consequently no tangible injury from which the jury could have inferred intent to defraud.

The government contends that proof of intent to defraud for purposes of the wire fraud statute may be established solely by the knowing participation in the making of false statements. See Government's Opposition To Defendants' Motion For Acquittal On Count Four Or, In The Alternative, For A New Trial at 17 ("Rule 29 Opp'n") ("the factual inquiry as to criminal intent involves a determination as to whether the defendant knowingly participated in making the false representations."). The government fails to acknowledge that it agreed to a jury instruction providing that "if a defendant knowingly submits an inaccurate or misleading document, honestly believing that the inaccuracies are not material, and that he did not intend to defraud, as I have used that term, he is not guilty of mail or wire fraud." Tr. 4361 (emphasis added). Thus, the government necessarily agreed that the knowing submission of a false invoice, without more, is insufficient to establish intent to defraud.

Agreed-upon instructions are law of the case.  See Defendants' Motion For Judgment Of Acquittal at 4-5.  Again, the government completely ignores this well-settled and controlling authority.  The Court should deem the government's failure to address this authority a concession that intent to defraud is not established by proof of a false statement.[1]

Even if the government had not conceded the point, the law is clear that the wire fraud statute requires the government to prove "'that some actual harm or injury was contemplated by the schemer.'"  United States v. Reid, 533 F.2d 1255, 1264 n.34 (D.C. Cir. 1976) (quoting United States v. Regent Office Supply Co., 421 F.2d 1174,1180 (2d Cir. 1970)).  The government's argument that false statements alone are sufficient to establish criminal intent rests on a series of "no ultimate harm" cases, in which defendants contended that they did not possess intent to defraud because they intended to repay their victims or make an ultimate profit for investors they were defrauding.[2]  Indeed, the government characterizes this authority as standing for the proposition that the criminal intent determination does not turn on "whether the

---

[1] See United States v. Simmons, 431 F. Supp. 2d 38, 73-74 (D.D.C. 2006) (court deemed defendant's motion to dismiss multiple counts conceded by government, pursuant to Local Criminal Rule 47(b), due to government's failure to respond to defendant's motion); United States v. Rezaq, 899 F. Supp. 697, 702 n.3, 705 (D.D.C. 1995) (court treated the issue of materiality of defendant's discovery requests as conceded because the prosecution failed to contest it); see also Hooker-Robinson v. Rice, No. 05-321, 2006 U.S. Dist. LEXIS 10788, at *10-11 (D.D.C. March 1, 2006) ("Because the plaintiff only addressed some of the defendant's challenges in her response, the Court will consider those challenges not addressed by the plaintiff in her response as conceded.") (collecting cases).

[2] See, e.g., United States v. Daniel, 329 F.3d 480, 488 (6th Cir. 2003) (Defendant contended he intended to repay fraudulently obtained loans, and that the loans allowed him to keep stock and benefit the business in the long term); United States v. Dunn, 961 F.2d 648, 651 (7th Cir. 1992) (fraudulent solicitation of investors was not excused by defendant's belief that investment would be "successful in the long-term"); United States v. Maybrook, 301 F.2d 503, 509 (7th Cir. 2002) (defendant contended that he "intended eventually to repay" his victims); United States v. Curry, 461 F.3d 542, 458 (4th Cir. 2006) ("The intend to repay eventually is irrelevant to the question of guilt for fraud.").

defendant believed everything would turn out well in the end with no loss to the intended target." Rule 29 Opp'n at 17.  These cases are wholly inapposite because Defendants did not pursue a "no ultimate harm" defense in this case.  Defendants consistently maintained that they were entitled to the commission at issue in the MTD invoice pursuant to their agreement with Joe Cayre -- not that they intended to repay him or make him a profit with stolen funds.

The government acknowledges that other courts (in cases cited by Defendants) have framed the issue as whether the defendant intended to harm or cause tangible injury to the alleged victim, but attempts to brush those cases aside in a footnote as "distinguishable." Rule 29 Opp'n at 18 n.16.  Then, inexplicably, the government claims that Defendants have failed to cite any cases holding that "the intentional use of a false document to deprive another of money under his or her ownership or control does not reflect an intent to 'harm' or 'injure' within the meaning of the statute." Rule 29 Opp'n at 21.  Yet that is precisely what the cases cited by Defendants have held.

The court in Rossomondo held that where the defendant firefighter intentionally submitted a form understating his income to his pension board, knowing that the pension board would use it to determine the amount of his pension, an honest belief by the defendant that the false statement would not cause a financial loss to the pension board was a defense to mail fraud. United States v. Rossomondo, 144 F.3d 197, 201 (2d Cir. 1998).  Similarly, in Starr, the court held that there was insufficient evidence that the defendants had intent to defraud, even though they caused false postal receipt forms to be sent to their customers and deprived their customers of postage fees.  United States v. Starr, 816 F.2d 94, 99 (2d Cir. 1987).  Likewise, in D'Amato, the court held that there was insufficient evidence of intent to defraud even though the defendant obtained consulting fees from a company through invoices that falsely described the services

- 5 -

performed and concealed that the defendant was being paid to provide "access" to his brother, a U.S. Senator. United States v. D'Amato, 39 F.3d 1249, 1258-61 (2d Cir. 1994); see also United States v. Novak, 443 F.3d 150, 156-57 (2d Cir. 2006) (insufficient evidence of intent to defraud even though the defendant failed to disclose in employee time cards or otherwise that he was receiving a portion of the union wages paid by the alleged contractor victims).

The Eighth Circuit reached the same result in United States v. Jain, 93 F.3d 346 (8th Cir. 1996). The government claims that Jain was subsequently limited by the Eighth Circuit in United States v. Ervasti, 201 F.3d 1029 (8th Cir. 200), Rule 29 Opp'n at 20, but fails to recognize that it was limited to cases involving the exact situation present here: where the alleged victims suffered no "tangible harm." Ervasti, 201 F.3d at 1035. In such a case, "where there has been no actual harm," the Eighth Circuit, like the Second Circuit, requires the government to "'produce evidence independent of the alleged scheme to show defendant's fraudulent intent.'" Id. (citing D'Amato, 39 F.3d at 1257). In determining whether such independent evidence exists, courts look to whether the alleged victims received what they bargained for. See Starr, 816 F.2d at 98-99 ("the harm contemplated must affect the very nature of the bargain itself"); Novak, 443 F.3d at 159 (no intent to defraud where the alleged victims "received all they bargained for").

Here, the only direct evidence established that Defendants submitted the MTD invoice to avoid the historic disputes that Mr. Jemal had with Mr. Cayre over leasing commissions, not to obtain money to which they were not entitled. The government criticizes Defendants for not presenting "testimony by Jemal, Esherick or any of the actual participants in the transaction as to their intent" -- as if Defendants had the burden of proof. Rule 29 Opp'n at 10. The government's criticism is particularly disingenuous given that it presented no direct

evidence of inculpatory statements of Messrs. Jemal and Esherick establishing intent to defraud, and also elicited <u>during the direct examinations of government witnesses</u> the statements of Douglas Jemal and Paul Millstein, both participants in the transaction, which directly contradict any intent to defraud.  Tr. 2150 (Mr. Jemal's statement); 864 (Mr. Millstein's statement).  There is simply no direct evidence in the case demonstrating any intent to defraud.

With respect to the circumstantial evidence in the case, the government's argument again boils down to the claim that Defendants' intent to defraud is established by use of a false invoice to obtain the funds at issue.  <u>See</u> Rule 29 Opp'n at 11 ("defendants' assertions at this juncture that they could have obtained the $430,000 honestly is belied by their strenuous efforts to obtain that money by fraud.").  The government's claim overlooks the fact that "no evidence of tangible injury was shown from which the jury could infer an intent to defraud." <u>Starr</u>, 816 F.2d at 101.  The lack of tangible injury was demonstrated conclusively by the two alleged victims, Joe Cayre and Morgan Stanley representative Ben Black.  Tr. 2180 (Cayre); 1236 (Black).  To get around the obvious import of this testimony, the government incredibly attempts to discredit its own witnesses and suggests that the jury could have drawn negative inferences directly at odds with their testimony.

For instance, the government argues that "it is hardly dispositive that Black testified that Morgan Stanley did not lose any money."  Rule 29 Opp'n at 13.  Yet <u>the government</u> asked Mr. Black, "to be absolutely clear for the record," whether Morgan Stanley lost any money and elicited Mr. Black's response that "Morgan Stanley did not lose any money on this deal."  Tr. 1236.  The government never sought to impeach this testimony in any way.  No other witness from Morgan Stanley testified.  The uncontradicted evidence in the record establishes unambiguously that Morgan Stanley lost no money as a result of the MTD

transaction. The government cannot be heard to speculate now that the jury disbelieved this testimony when it did not impeach it or offer any evidence whatsoever that Morgan Stanley lost money. Moreover, the government completely ignores the various reasons why Morgan Stanley could not possibly have lost money on the deal, including the facts that the money was already borrowed, the funds reverted to Cayre Jemal Gateway if not spent, the entire loan amount earned interest for Morgan Stanley from the moment the loan closed, Morgan Stanley was fully secured by the $30 million in equity in 77 P Street above the value of the loan, and Messrs. Jemal and Cayre executed personal guarantees. There is no evidence of harm to Morgan Stanley from which the jury could have inferred any intent to defraud by Defendants.

Similarly, the government makes the truly bizarre claim that "notwithstanding Cayre's efforts to persuade the jury not to consider him a victim of the defendants' fraud scheme, the jury was entitled to reach the exact opposite conclusion." Rule 29 Opp'n at 13. Yet <u>the government</u> elicited testimony from Mr. Cayre that the MTD commission was money that Defendants were "entitled to" because it was "within the 6 percent guideline that [Mr. Jemal] and [Mr. Cayre] worked out." Tr. 2144. The government also does not dispute that Mr. Cayre testified that he agreed to pay six percent in commissions on the 77 P Street project as a whole to any broker, that the commission at issue fell within that agreement, and that Mr. Cayre has not lost any money as a result of the transaction. Tr. 2179-80. The government did not impeach this testimony and offered no evidence that the agreement was anything other than what Mr. Cayre described. Accepting the government's claim that the jury must have disbelieved Mr. Cayre's testimony based on his demeanor and supposed family relationship with Mr. Jemal, in the

absence of evidence contradicting his testimony, is sheer speculation.[3]  Again, there is no evidence of harm to Mr. Cayre from which the jury could have inferred any intent to defraud.

The government also makes the misleading suggestion that Defendants submitted the invoice on MTD letterhead because they knew that Morgan Stanley would carefully scrutinize invoices from Douglas Development.  Rule 29 Opp'n at 3, 7, 22.  Yet the MTD invoice was included in the first draw request to Morgan Stanley, which also contained five requests for fees to be paid to Douglas Development.  See GX 411-0002 (Ex. 6 to Rule 29 Opp'n).  Any suggestion that Defendants were concerned that Douglas Development could not receive fees under the Morgan Stanley loan is belied by the inclusion of Douglas Development invoices in the first draw request containing the MTD invoice.  The government also incorrectly contends that the tenant improvements reserve at issue was "to be used exclusively to pay for tenant improvements," Rule 29 Opp'n at 2, when in fact the first draw request contained another request for a leasing commission that Morgan Stanley paid to the Staubach company, see GX 411-0002, and Mr. Black testified that nothing in the loan agreement prohibited the payment of

---

[3] In a similar context, the D.C. Circuit has reversed a conviction where the government's proof was insufficient but the government argued that the jury must have disbelieved the defendant's testimony and drawn negative inferences based on demeanor, stating:

> Because we cannot evaluate demeanor, a decision along the lines the government proposes would mean that in cases in which defendants testify, the evidence invariably would be sufficient to sustain the conviction.  We would in each such case assume the jury correctly evaluated the evidence.  In explaining how this could be so in light of the defects in the government's proof, we would reason backwards to the only explanation available -- the defendant's demeanor.  This sort of approach, beginning with the hypothesis that the jury must have gotten things right, contradicts the reason why appellate courts review convictions for sufficiency of evidence -- that juries sometimes get things wrong.

United States v. Zeigler, 994 F.2d 845, 849 (D.C. Cir. 1993).

leasing commissions. Tr. 1268. Thus, there is no merit to the suggestion that Morgan Stanley was defrauded because commissions could not be paid out of the tenant improvements reserve.[4]

In sum, the government's entire argument is premised on the claim that the falsity of the MTD invoice establishes intent to defraud. Yet as set forth above, the law (as conceded by the government in the agreed-upon instruction) requires something more demonstrating an intent to harm the alleged victims. There is no such evidence in the record from which the jury could have concluded that Defendants acted with intent to defraud.

## II. The Government Failed To Prove Any Material Misrepresentations

The government would have the Court resolve the issue of materiality in a vacuum, focusing on whether the alleged misrepresentations were capable of influencing a hypothetical reasonable decision-maker. Rule 29 Opp'n at 22. However, the relevant inquiry is whether the misrepresentation is capable of influencing "the decision of the decisionmaking body to which it was addressed." Neder v. United States, 527 U.S. 1, 16 (1999). The element is typically established, as in the case cited by the government, by testimony from the alleged victim that he would have acted differently with accurate information. See United States v. Neder, 197 F.3d 1122, 1130-31 (11th Cir. 1999). Here, of course, there was no such testimony.

The evidence simply fails to establish that the alleged misrepresentations in the MTD invoice were capable of influencing Mr. Cayre or Morgan Stanley. Mr. Cayre testified unequivocally that he did not care to whom leasing commissions were paid as long as they

---

[4] The government further suggests that Mr. Jemal caused a "'lulling'" letter to be sent Mr. Cayre on December 18, 2002 to "allay any suspicions" that DDC had received a portion of the loan proceeds. Rule 29 Opp'n at 9. However, that letter related to the $19 million occupancy holdback in the loan, see GX 197-0003, which the letter correctly noted was going almost exclusively to Mr. Cayre. This agreement regarding the $19 million holdback did not preclude DDC from obtaining commissions from the $7 million tenant improvements reserve.

remained within the six percent agreement, as these commissions did. Tr. 2180. Mr. Black testified that Douglas Development could have billed for the commission itself and been paid without violating the terms of the loan agreement. Tr. 1267, 1272. The government presented insufficient evidence that the alleged misrepresentations in the MTD invoice were capable of influencing the relevant decisionmakers given this uncontradicted testimony.

### III.   The Verdict Is Against The Weight Of The Evidence

In its role as the "thirteenth juror," the Court is required to take a hard look at the evidence, without giving the government the benefit of all inferences, to determine whether the evidence weighs so heavily against the verdict that a miscarriage of justice may have occurred. The government's one-sentence, conclusory response to Defendants' argument fails to give respect to this important role served by the trial court. Rule 29 Opp'n at 24. In opposing Defendants' motion for judgment of acquittal, the government asks the Court to conclude that the jury disbelieved the testimony of its own witnesses, elicited by the government during direct examinations and never impeached in any way, and instead drew negative inferences contrary to the actual testimony that the government vouched for at trial. Even if this strained reconstruction of the evidence could conceivably provide an evidentiary basis for the verdict, which Defendants submit it could not, the lengths the government goes to distance itself from the testimony of its own witnesses powerfully demonstrates that the verdict is against the weight of the evidence.

### CONCLUSION

For the foregoing reasons, the Court should set aside the verdict on Count Four of the Indictment and enter a judgment of acquittal or, alternatively, grant Defendants a new trial.

Respectfully submitted,

/s/ Reid H. Weingarten
_____
Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
 (202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
(202) 331-3334

Counsel for Douglas Jemal

Paul Kemp
Carol Elder Bruce
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4400

Counsel for Blake Esherick

Dated: December 6, 2006