# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 05-359-01 (RMU)** |
| | : | |
| **DOUGLAS JEMAL** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, through its attorney, respectfully submits this
Memorandum in Aid of Sentencing.

## I.  INTRODUCTION

Prior to, during, and after the trial, the defendant, Douglas Jemal, has been lionized by
supporters – including his paid attorneys and many others who did not hear the evidence.  He has
been portrayed as an individual who does not follow the ordinary rules of business, and,
implicitly, as a man for whom the "ordinary" laws – such as those that make it a crime to commit
wire fraud -- do not pertain.  In the defendant's world, therefore, a wire fraud conviction is a
great victory; being found guilty of wilfully defrauding a financial institution and his partner is
like "stepping on a splinter[;] [i]t's a little pinch" and the jury verdict finding him guilt of such
fraud a "public vindication." [1]

The constant praise heaped on the defendant – even when it comes from those who
financially benefit from him and from those who did not attend the trial – undoubtedly provide
him a constant source of reassurance; for if he is a great developer who has performed great
deeds, he can hardly be a convicted criminal, let alone one who has been convicted of
committing criminal acts involving fraud and deceit.  Yet a convicted felon he is.  This Court and

---

[1]     "Jemal Jumps Right Back In; It's Business as Ususal for Developer After Bribery Trial."
<u>Washington Post</u>, October 30, 2006.

the jury heard the evidence that the defendant, surrounded by loyal and well-compensated assistants, including Blake Esherick and John Brownell, performed dishonest acts, including the crime of conviction, as a matter of routine in pursuit of his business interests.

Indeed, the defendant's rationalizations and minimizations for his conduct take on many variations and permutations, but reduce to the following: I am too rich, too powerful, too successful, and too entitled to do things my way to be accountable and punished for this "splinter" of a crime.[2] Any individual – rich or poor, a real estate visionary or salaried office worker or hourly construction worker – who willfully and fraudulently obtained more than $400,000 in funds from a financial institution and was found guilty by a jury of that crime, would almost certainly be sentenced to jail. Any principled individuals who heard a jury of 12 citizens of this community pronounce him guilty of a felony involving dishonesty would be humbled and contrite. Not Mr. Jemal.

This Court heard the evidence at trial and can recognize that the jury verdict as a righteous one that requires real incarceration. The verdict represents the jury's profound and unambiguous rejection of the suggestions that the defendant should not be held accountable for his obvious criminal activity because of his alleged "uniqueness" and his success as a developer. In short, the evidence at trial fully exposed the defendant as an ordinary criminal who committed fraud to obtain money, and, it is for this reason the defendant comes before the Court a convicted felon deserving of meaningful punishment.

---

[2]     The defendant's after the fact letter apologizing for this statement means little. His unedited contemporaneous comments, not influenced by counsel and with little concern as to how this Court may perceive them, reveal his true view of the verdict and the events at trial.

## II.  THE CRIME OF CONVICTION

The crime of conviction is replete with dishonest act after dishonest act.  The essentials of the scheme reduce to but two facts:

- Jemal needed more than $400,000;

- Jemal – through Blake Esherick and Brownell – obtained $430,000 money by fraud.

It is no more complicated than this.  The defendant's attempt to obscure the essentials of this narrative is unavailing.

Moreover, what is stunning about the offense of conviction is the casual but determined way in which the defendant went about getting $400,000 for his own use from under of the watchful eyes of Cayre and Morgan Stanley, how he acted with the firm belief that the laws did not apply to him, and how, fueled by his desire – not need – to purchase the next big property, he concluded that the use of dishonest means was an appropriate course of action.

In short, this was a crime, like nearly all financial crimes, motivated by greed.  The defendant did not need to buy food; he did not have personal debts that threatened his home, livelihood or family.  Rather, he committed fraud merely because he wanted the money to buy a building.

## III.  THE DEFENDANT'S REAL ESTATE BUSINESS - OVERVIEW

Jemal has built his real estate empire and made himself a wealthy man, primarily by developing office buildings and retail establishments.  Jemal's business model has been simple: to purchase developed or undeveloped real estate, develop the properties and find tenants for them, and as the value of the property rises, to refinance and obtain cash from the increasing

-3-

asset, and buy new real estate. The defendant has made numerous such investments, and, as the value of real estate has continued to rise, his holdings have grown accordingly. The result has been a wealth of tens if not hundreds of millions of dollars.[3]

However, as the Court has learned, the defendant's business has been very highly leveraged, with every free dollar of cash being invested in new real estate or going to support the lifestyle of the defendant (numerous houses and, for example, a rare car collection) and his family. As the evidence at trial demonstrated, the defendant faced chronic shortages of funds to support his real estate acquisitions, development activities, routine business expenses, and his lifestyle. He faced huge demands to generate cash.

## A. Bouncing Checks and Failing to Pay Suppliers

There are two views of the business of Douglas Development. George T. Myers and Kevin Clark for example, have profited well by their association with Douglas Development and seek to continue their association with him. However, the Government brings to the Court's attention those who have had a different experience with the defendant in financial matters. These are small businesses that Douglas Jemal has harmed by his practice of bouncing checks and not paying bona fide business debts. The following is a list of law suits involving attempts

---

[3]    The defendant reported to the U.S. Probation Officer a net worth that appeared to be based on solely "personal" properties and assets. For reasons not clear, the defendant did not appear to report his interests in the numerous corporations that own properties. If this is taken into account, his net worth would be far in excess of the amounts reported in the Pre-Sentence Report.

to collect debts by aggrieved vendors.[4]

- _Stalker Brothers, Inc_. v. _Cayre Jemal Peoples, L.L.C_., Civ. Action No. 02-265 (D.C. Sup. Ct. Jan. 14, 2002) (seeking enforcement of mechanic's lien and alleging contract and unjust enrichment claims for nonpayment of $74,619 for work performed at 77 P Street from July 1999 through August 31, 2001);

- _Tri County Industries Inc_. v. _Douglas Development Co_., Civ. Action No. 01-6642 (D.C. Sup. Ct. Sept. 5, 2001) (seeking payment of $62,661.75 for removal of 500 gallon used oil tank at 400 Massachusetts Avenue, NW, between March 26 and May 7, 2001);

- _Adecco Employment Serv. Inc_. v. _Douglas Development Co_., Civ Action No. 01-5371 (D.C. Sup. Ct. July 18, 2001) (seeking payment of $8,037 for employment services billed on August 21, 2000);

- _Neary and Sons Corp_. v. _Douglas Development Corp_., Civ. Action No. 01-2789 (D.C. Sup. Ct. April 11, 2001) (seeking $31,258.41 for electrical services provided between July 2000 and December 2000);

- _The Keystone Plus Construction Corp_. v. _Douglas Development Corp_., Civ. Action No. 03-406 (D.C. Sup. Ct. Jan. 21, 2003) (seeking enforcement of settlement agreement and breach of contract damages for nonpayment of $222,348 based on labor and materials provided in 2000);[5]

- _Neco Construction & Mgmt. Corp_. v. _Douglas Development Corp_., Civ. Action No. 03-2827 (D.C. Sup. Ct. April 11, 2003) (seeking $37,500 for labor and materials provided between June 29, 2001, and August 10, 2001);

- _Neco Construction & Mgmt. Corp_. v. _Douglas Development Corp_., Civ. Action No. 03-2542 (D.C. Sup. Ct. April 2, 2003) (seeking $88,283.34 for labor and materials provided at 4800 Addison Road between March 2001 and June 2001);

- _Washington Gas Light Co_. v. _Douglas Development Corp_., Civ. Action No. 03-

---

[4]    The Government possess certified Court records for the first twenty of these cases.  The remaining were obtained from public record information, including information provided by "Westlaw."  The Westlaw case information is attached as "Exhibit 1" and "Exhibit 2."

[5]    Keystone Plus Construction and Neco Construction are related companies.  Attached to this pleading as Exhibit 3 are a series of bounced checks that reflect these companies' difficulties in receiving payment from Douglas Development.   These companies were finally paid in 2003 and 2004 – after they sued – for work done in 1999 through 2001.

5579 (D.C. Sup. Ct. July 9, 2003) (seeking payment of $13,679.64 for gas bill for February 15, 2002, through June 18, 2003);

- Pavement Design & Eng. Consultants, Inc. v. Douglas Development Corp., Civ. Action No. 01-56 (D.D.C. Jan. 11, 2001) (seeking payment of $96,561.50 for paving and sealing work performed in 2000).

- Bradco Supply Corp. v. Douglas Development Corp., Civil No: 129139-v (Cir. Ct., Mont. Co. Md., Nov. 17, 1994) (seeking payment of $47,991.92 for materials and labor);

- Shaw Contract Flooring v. Douglas Development Corp., Civil No: 199291 (Cir. Ct., Mont. Co. Md., May 3, 1999) (seeking payment of $33, 459.76 for flooring provided in 1997, invoices attached);[6]

- Creative Financial Staffing. v. Douglas Development Corp., Civil No: 268375-V (Cir. Ct., Mont. Co. Md., Jan. 13, 2006) (seeking payment of $19,125 for placement of employee);

- Landfield, Becker & Green v. Douglas Jemal, et al, Civil No: 79320-V (Cir. Ct., Mont. Co. Md., Aug. 1991 (seeking payment of over $90,000 in legal fees);

- Breed, Abbott & Morgan v. Douglas Jemal, et al, Civil No: 79321-V (Cir. Ct., Mont. Co. Md., Aug. 1991 (seeking payment of over $300,000 in legal fees);

- Capron Company v. Douglas Development Corp., Civil No: 79321-V (Cir. Ct., Mont. Co. Md., Feb. 1997 (seeking payment of over $50,000 for HVAC work);

- Rental Tools and Equipment v. Douglas Development Corp., Civil No: 169119-V (Cir. Ct., Mont. Co. Md., May 7, 1997 (seeking payment of over $37,000 plus fees for rental equipment);

- Duron v. Douglas Development Corp., Civil No: 173477-V (Cir. Ct., Mont. Co. Md., Feb. 13, 1998) (seeking payment of $5,000);

- Supplies Unlimited, Inc. v. Douglas Jemal, Civil No: 158955-V (Cir. Ct., Mont. Co. Md., Oct. 10, 1996 (seeking mechanic's lien to enforce payment of $1,391.34);

---

[6]    The Complaint, filed May 3, 1999,  sought $26,614 for the contract, the balance for interest and attorneys fees.  The Settlement Agreement, made part of the Court file, reveals that the case was settled for $25,000.  The settlement agreement was dated June 24, 1999.

- <u>Adrian L. Merton, Inc. v. Douglas Development Corp.</u>, Civil No: 141277-V (Cir. Ct., Mont. Co. Md., Aug. 28, 1995 (seeking payment of $183,163.90 for labor and material on various construction projects);

- <u>Adrian L. Merton, Inc. v. The Wiz Distributors and Douglas Development Corp.</u>, Civil No: 145329-V (Cir. Ct., Mont. Co. Md., Aug. 28, 1995 (seeking payment of $9,442.13 for labor and material on construction projects).

- <u>Stephen Jemal and Marvin Jemal v. Douglas Jemal</u>, Civ. No. 01-1286 (Dist. Ct. Md., May 1, 2001) ($1,725,000 for breach of contract);

- <u>Cassidy & Pinkard v. Jemal</u>, Civ. No. 93-2668 (JR) (Dist. Ct. D.C., Dec. 20, 1993) (suit for breach of contract alleging failure to pay real estate commission);

- <u>Baptiste v. Douglas Development Corp.</u>, Civil No. 29085 (P.G. Co. Dist. Ct., Sept. 29, 2006) (demand for $15,502.74) (Exh. 1, pp. 1-2);

- <u>Lichtman Communications v. Douglas Development Corp.</u>, Civil No. 16533 (Mont. Co. Dist. Ct., July 19, 2004) (demand for $1,000) (Exh. 1, pp. 3-4);

- <u>Basic Snow Services, Inc. v. Douglas Development Corp.</u>, Civil No. 26781 (Mont. Co. Dist. Ct., Dec. 11, 2003) (demand for $9,990) (Exh. 1, pp. 5-6);

- <u>Millstone Corp. v. Douglas Development Corp.</u>, Civil No. 36707 (P.G. Co. Dist. Ct., Oct. 27, 2003) (demand for $21,394.13) (Exh. 1, pp. 7-8);

- <u>J. P. Sewerooters, Inc. v. Douglas Development Corp</u>, Civil No. 23041 (Mont. Co. Dist. Ct., Oct. 21, 2003) (demand for $22,298.57) (Exh. 1, pp. 9-10);

- <u>Washington Gas Light v. Douglas Development Corp.</u>, Civ. 09794-02 (D.C. Super. Ct., June 14, 2002) (demand for $4,316) (Exh. 1, pp. 11-12);

- <u>DHI Construction v. Douglas Development Corp.</u>, Civ. No. 23317 (Mont. Co. Dist. Ct., Nov. 7, 2001) (demand for $17,240) (Exh. 1, pp. 13-15);

- <u>Management Recruiters of Frederick v. Douglas Development Corp.</u>, Civ. No. 15907 (Mont. Co. Dist. Ct., Jul 10, 2001) (demand for $8,000) (Exh. 1, pp. 16-17);

- <u>Fisher & Strachan, Inc. v. Douglas Development Corp.</u>, Civ. No. 03632 (Mont. Co. Dist. Ct., Feb. 22, 2001) (demand for $7,980) (Exh. 1, pp. 18-19);

- <u>Brundage-Bone & Blanchet, LLC v. Douglas Development Corp.</u>, Civ. No. 25781

(Mont. Co. Dist. Ct., Oct. 10, 2000) (demand for $9,821) (Exh. 1, pp 20-21);

- Tate Engineering Systems, Inc. v. Douglas Development Corp., Civ. No. 14722 (Mont. Co. Dist. Ct., June 30, 1999) (demand for $7,155) (Exh. 1, pp. 22-23);

- Recovar Group v. Douglas Development Corp., Civ. No. 10118 (Mont. Co. Dist. Ct., May 6, 1999) (demand for $5,000) (Exh. 1, pp. 24-25);
- Realty Information Group v. Douglas Development Corp., Civ. No. 00691 (Mont. Co. Dist. Ct., Jan. 8, 1999) (demand for $23,863) (Exh. 2, pp. 26-27);

- AA Rental Corp. v. Douglas Development Corp., Civ. No. 31189 (Mont. Co. Dist. Ct., Dec. 20, 1998) (demand for $4,904) (Exh. 1, pp. 28-29);

- Environmental Logic Corp. v. Douglas Development, DC-007169 (Monmouth Co. Special Civil, Monmouth, NJ, July 6, 1998) (demand for $9,339.64) (Exh. 2, pp. 30-31);

- Foulke Assoc., Inc. v. Douglas Development Corp., Civ. No. 16924 (Mont. Co. Dist. Ct., June 23, 1998) (demand for $8,320) (Exh. 2, pp. 32-33);

- Korth Companies, Inc. v. Douglas Development Corp., Civ. No. 10656 (Mont. Co. Dist. Ct., Apr. 29, 1998) (demand for $1,500) (Exh. 2, pp. 34-35);

- Carrier Corp. v. Douglas Development Corp., Civ. No. 30034 (Mont. Co. Dist. Ct., Oct. 31, 1997) (demand for $2,705) (Exh. 2, pp. 36-37);

- Richard Donnally Assoc. v. Douglas Development Corp., Civ. No. 13065 (Mont. Co. Dist. Ct., Apr. 30, 1997) (demand for $6,92) (Exh. 2, pp. 38-39);

- Associated Bldg Maintenance Co. v. Douglas Development Corp., Civ. No. 5504 (P. G. Co. Dist. Ct., Mar. 19, 1997) (demand for $6,327) (Exh. 2, pp. 40-41);

- Branch Group d/b/a Branch Electric v Douglas Development Corp., Civ. No. 8603 (P. G. Co.  Dist. Ct., Mar. 10, 1997) (demand for $1,769.43) (Exh. 2, pp. 42-45);

- Baltimore Door and Frame v. Douglas Development Corp., Civ. No. 12111 (Ann Arundel Co. Dist. Ct., Oct. 25, 1996) (demand for $3,983.20) (Exh. 2, pp. 46-47);

- Long Fence v. Douglas Development Corp., Civ. No. 24206 (Mont. Co. Dist. Ct., Oct. 8, 1996) (demand for $759.50) (Exh. 2, pp. 48-49);

- Pepco. v. Douglas Development Corp., Civ. No. 19676 (Mont. Co. Dist. Ct.,

Aug. 26, 1996) (demand for $1,028) (Exh. 2, pp. 50-51);

• J. T. Enterprise v. Douglas Development Corp., Civ. No. 11778 (Mont. Co. Dist. Ct., June 13, 1995) (demand for $3,435.72) (Exh. 2, pp. 52-53).

The above list includes only law suits that were actually filed, mostly in the District of Columbia and the nearby Maryland suburbs. Nearly all of these settled, and the confirmed terms reflect that the suits typically had merit and that Jemal's refusals to pay were frivolous.[7]

Although any one suit, or even any few such suits, may be easily disregarded as having no significance, the sheer number of times that vendors have had to sue the defendant for failing to pay debts cannot be so easily dismissed. It is of course possible that Douglas Jemal has gone through life unjustly accused of failing to pay debts – after all, defense counsel announced pre-trial he had defenses to all the suits (even, presumably, the ones that settled for almost the full amount of the Complaint). However, the evidence at trial and the confirmed details associated with the above law suits demonstrate that the defendant's routine practice of failing to honor business debts was a business choice that he made so as to have cash to grow his business and support his lifestyle. (The defendant took out millions of dollars a year from his company for personal purposes.) And, not to put too fine a point on it, it is not so difficult to be a unique visionary and a "risk taker" by amassing debts and not paying them.[8] Moreover, as the above list

---

[7]    These reflect the actual number of times that Jemal has actually been sued. It does not include the number of times he has prevailed upon vendors to take less than what they were owed, or simply failed to pay and where the vendor concluded that the time and expense of a lawsuits was not worth it.

[8]    Attached to this pleading at Exhibit 4 is an example where Jemal used his leverage to force a vendor to take less than they were owed. With Zimmerman, a small businessman, Jemal essentially made him discount his bills by $40,000. The leverage was obvious: Jemal (through Douglas Development) could go into a slow pay/no pay mode, and his supplier can take either less than he is due or take nothing and resort to litigation with its costs and uncertainties.

reveals, it is typically the little guy – not the large construction companies, the major lenders, or the close associates of the defendant – who go unpaid and are forced to sue.

                    B.  <u>The Defendant's Handling of Compensation</u>

The defendant also systematically compensated his senior employees in ways that were "non-traceable" and not reported to the Internal Revenue Service, thus, in Brownell's words, "eliminat[ing] tax burdens" from both Jemal (the employer) and the employee.[9]  This strategy was revealed at trial in connection with Jemal's relationship with Esherick, and has been brought into sharper focus by the facts that have emerged in the plea and sentencing associated with <u>United States v. Brownell</u>, Crim. No. 06-077 (RMU).[10]

Two sets of undisputed facts speak to the above.  First, in January of 2005, after grand jury subpoenas focusing on the compensation of Esherick and Brownell were issued in December 2004, Jemal raised the salaries of the three highest ranking employees in his company as follows: Esherick, from $70,200 to $300,000 (and later in 2005 to $350,000); Brownell, from $121,888 to $300,000, and the construction vice president, from $163,000 to $350,000.  Exh. 5, pp. 2-3. Second, after the searches were conducted (February 2005) and after Esherick was informed he

---

Similarly, as the evidence demonstrated at trial, Mark Mallus CB Richard Ellis was of the belief that Jemal also used his leverage to avoid commissions due and owing for 77 P Street, and, in Mallus's opinion, for a sale involving the "Park and Shop" on Connecticut Avenue in the mid-90s.

[9]    Various documents related to this Section are attached as "Exhibit 5."  The "non-traceable" memorandum is attached as Exh. 5, p. 1.  These "tax burdens" consisted of the federal and state tax withholding and the social security and medicare payments that would otherwise be required to be paid as part of the gross wages, withheld by Jemal, and then turned over to the IRS.

[10]    Jemal's attorneys were in the Courtroom for all plea and sentencing proceedings in that case.

was a target of tax evasion allegations (May 2005), the nonsense over the millions of dollars of

"loans" to the senior employees came to an end.  In June of 2005, Jemal paid Esherick, Brownell

and the construction vice president close to $3 million in "gross" wages as a "bonus";  they

"repaid" the company close to $1.5 million (representing repayment of purported "loans").  Jemal

paid the balance, more than **$1 million** to the IRS.  Of course, the loan "repayments" by the three

men were as fictional and meaningless as the loans in the first place.  Neither Esherick, Brownell,

nor the construction vice president actually had to part with so much as penny to "repay" their

"loans."   The money that "repaid" their loans was simply a pass-through of Douglas

Development monies.  In short, the compensation practices that Jemal had employed in years

past – supervised by Brownell (a convicted tax cheat) – had saved him more than $1 million (i.e.,

it had "eliminated" a $1 million tax "burden").  It was this amount Jemal was forced to pay when

the investigation uncovered the criminality at the core of his compensation practices.

    Moreover, in addition to the Jemal trial record,[11] this Court has since seen:  1) the

Brownell-Jemal "non-traceable income" memo which speaks bluntly to the intent of Brownell to

evade taxes for Jemal's benefit and in which Brownell also bragged about using "creative

accounting," 2) Brownell's admission at his plea proceeding of having received cash from a

Jemal refinancing that did not hit the books of the company, and, 3) the related evidence showing

that others in the company (including Esherick and the construction vice president) also received

cash from that same settlement transaction as Brownell.  These facts, taken together and with the

trial evidence, make clear that the pattern of unreported compensation was a deliberate business

---

[11]     Esherick's amended returns and 2005 "repayments" were not permitted to be brought
before the jury.

practice designed to save the defendant money.

Further, this Court heard the evidence about Jemal's financial relationship with Esherick at trial. In this regard, the evidence demonstrated the Esherick's salary – $70,200 -- was deliberately kept low and that Jemal provided Esherick was provided income in other forms. There is really no dispute about this. Esherick's amended returns acknowledged that the provision of housing and the payments by DDC to his ex-wife constituted income. The evidence demonstrates that Jemal purchased an $825,000 house in Chevy Chase, now worth more than $1 million, for Esherick. Esherick could not possibly have obtained financing to purchase an $825,000 house in Chevy Chase on a reported salary of $70,000 per year, nor made payments on a mortgage loan of that amount, so Jemal, who had previously provided Esherick free housing at the Radnor Road location, purchased it for him. Though this may seem to be a generous impulse by Jemal, the reality is quite different. It was just a way of permitting Esherick and Jemal to dodge taxes by having Jemal provide Esherick substantial compensation in the form of a house – thereby "eliminating tax burdens" for both men.

## C.  The Defendant's Relationship with the D.C. Government

A few comments about the defendant's relationship with the D.C. Government are in order, for the defendant has portrayed himself as a great friend of the city and its government. However, Jemal's dealings with the D.C. Government should be understood for what they are, the actions of a businessman attempting to maximize his profit from his investments. There is nothing wrong with this – Jemal, like anyone, may actively seek from the government regulatory and real estate actions that benefit him financially, but his actions are nothing other than the furtherance of business interests.

-12-

The importance of the actions by the city government to Jemal's financial well-being is illustrated by a memo written by Brownell in late 2000 to a lender.  See Exh. 6, pp. 1-3.[12]  At that time, Jemal was exploring the possibility of a loan. The lender sought some explanation of various non-performing "negative cash flow" properties – the two most prominent being the Woodies Building and 77 P Street – with others  including 4800 Addison Road and an office building at 450 H Street.  It was the actions of the D.C. Government, either as a regulator or as a tenant, that ultimately proved instrumental in making all four of those investments successful.

1.  77 P Street

This Court heard about 77 P Street.  The evidence demonstrated Jemal could not lease the property until 2001, then Lorusso filled up the building with D.C. Government tenants. Jemal ultimately refinanced the property for $67 million.[13]   The government does not reargue the bribery conviction facts here.  Nonetheless, the undisputed evidence is that, during this time frame, Jemal on numerous occasions gave Lorusso things of value and that Lorusso signed each of the leases that filled the building with D.C. Government tenants.  Though the jury may have concluded these items were not bribes – there is no dispute that the items were given.

2.  Woodies Building

Jemal bought the Woodies Building in 1998 for more than $28 million.  At the time, the

---

[12]    Documents related to certain aspects of this Section are attached as Exhibit 6.

[13]    One measure of the prominence of this building to Jemal is reflected in the attached list of 2002 loans and financings.  See Exh. 6, pp. 4-5   The 77 P Street financing, at $67 million, was the largest single transaction of the year.  Moreover, Jemal used over $400,000 of the loan proceeds to purchase 111 Massachusetts Avenue for $62 million (the second largest transaction). No other transactions were even close.  In 2001, the largest transaction did not exceed $10 million dollars.

building was zoned for retail. As a practical matter, Jemal could not hope to make money on the

Woodies Building if he had to fill it with retail tenants. In fact, even though he paid $28 million

for the building, Jemal actually sought for a reduction in the assessed value, actually claiming

that he had overpaid for the property by millions of dollars. Exh. 6, pp. 6-7.

Jemal ultimately obtained a zoning change in 2001 that was worth tens if not hundreds of

millions of dollars. The upshot of the zoning decision was that Jemal was permitted to turn all

but the bottom two floors of the Woodies Building into office space. Thereafter, the D.C.

Government provided millions of dollars in subsidies to the retail tenants who would move in to

the first two floors.[14]

The government again wishes to be clear: it does not allege anything improper in the

zoning process, or anything wrong with Jemal accepting taxpayer subsidies to have retail tenants

in his building. Jemal, like any businessman, is permitted to seek and reap financial rewards

through government regulatory actions, grands and subsidies. However, the relationship between

Jemal and the D.C. Government should not be understood as anything other than one stemming

from Jemal's business needs and his desire to maximize profits.

This is clear from Cayre's testimony. The defense had portrayed Jemal's interest in the

Woodies building as a reflection of his sentimental attachment to a Washington D.C., landmark,

divorced from the economic realities of the investment. Cayre dispelled that:

Q.    [H]as Mr. Jemal ever indicated to you that his goal with the Woodies

_____

[14]    Attached are press accounts, including one from the Douglas Development web cite, that
discuss the subsidies. The subsidy for "H&M" is euphemistically described as a "retroactive"
subsidy. What this means is that after H&M signed the lease – without the benefit of any
subsidies – the D.C. Government went ahead and gave a $2.9 million subsidy anyway.

building was anything other than to maximize the profit from that building?

A.    His goal's always to maximize the profit from anything we did together.

Tr. at 2185.  This was obvious.

### 3. 4800 Addison Road

In 2001, when the D.C. Government was desperate for an impound lot, Jemal, while in Las Vegas with Lorusso as his guest at the Bellagio Hotel, finalized the deal where Jemal leased 4800 Addison Road to the D.C. Government for $1 million per year, that is, about four or five times the going rate for such property.  The evidence at trial was undisputed: vacant land in Prince George's County typically leased for about $2,500 to $3,000 per acre per month – a rate consistent with offers by Jemal to other potential tenants immediately prior to the lease with the D.C. Government.  The D.C. Government, ended up paying about $10,000 per acre per month. Again, if Jemal can identify a need by a prospective tenant – in this case the D.C. Government  – with a particular need and can take advantage of an unknowledgeable negotiating official (Lorusso) to obtain an above-market lease, he is certainly entitled to do so.  But, to the same end, this relationship should not be understood as anything other than reflecting Jemal's pursuits of financial goals.

### 4. 450 H. Street

This building was originally built in violation of the zoning rules, because it lacked certain parking and failed to meet other requirements (the area was zoned for housing). Accordingly, the owners/builders were unable to use the building because they could not obtain a certificate of occupancy.  Jemal purchased the building and obtained the certificate of occupancy in a day.  He ultimately rented it to city agencies.

\* \* \*

Thus, of 14 properties that were "non-performing" in 2000 (including what were by far two of the most significant of Jemal's entire portfolio), it was the D.C. Government that proved to be the difference in turning four of the non-performing properties – including 77 P Street and the Woodies Building – into profitable ones.

## IV.   THE PURPOSE OF SENTENCING

The Sentencing Guidelines are advisory, nonetheless, they constitute an appropriate starting point for determining the sentence in this case. The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the goals of the legislation was to correct what Congress saw as a significant problem in the criminal justice system: the fact that "some major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses." U.S.C.C.A.N., 98th Congress, 2nd Sess. (1984) at 3260.

As Justice Breyer, one of the Sentencing Commission's original members, explained:

> The Commission found in its data significant discrepancies
> between pre-Guideline punishment of certain white-collar crimes,
> such as fraud, and other similar common law crimes, such as theft.
> The Commission's statistics indicated that where white-collar
> fraud was involved, courts grant probation to offenders more
> frequently than in situations involving analogous common law
> crimes; furthermore, prison terms were less severe for white-collar
> criminals who did not receive probation.  To mitigate these
> discrepancies, the Commission decided to require short but certain
> terms of confinement for many white collar offenders, including
> tax, insider trading, and antitrust offenders, who previously would
> have likely received only probation.

Breyer, "The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,"

17 Hofstra L. Rev. 1, 20 (1988) (emphasis added).

In this case, the jury found the defendant committed wire fraud, designed to obtain from Morgan Stanley $400,000 to which the defendant was not entitled.  He should be sentenced within the guideline ranges of incarceration established by the Guidelines.[15]

## V.  DETERMINATION OF THE GUIDELINES FOR THE WIRE FRAUD CONVICTION

### 1.  The Loss is Over $400,000[16]

The defendant should receive a fourteen-point increase based on the loss amount of approximately $430,000, as recognized in the Pre-Sentence Report.  That loss amount is correct under the facts elicited at trial and pursuant to the application notes to the Sentencing Guidelines.  In short, as discussed below, the concept of "intended loss" for purposes of the Guidelines explicitly includes "pecuniary harm that would have been impossible or unlikely to occur."  Morgan Stanley sought to avoid "potential pecuniary harm" to its secured loan and in the operation of the Tenant Improvement Construction Reserve by putting in place rigorous procedures associated with distributions from the Reserve, and the defendant's conduct,

---

[15]    Even if this Court finds that the $430,000 loss overstates the crime, a "no loss" finding would vastly understate it, and this Court should depart upwards.  And, if there is to be an upward departure, it is appropriate that it be a meaningful one, recognizing the defendant's proven dishonesty – not only in connection with the numerous acts comprising the crime of conviction, but vis-a-vis the D.C. Government (both dealings with Lorusso and the various invoices) and the IRS (compensation of Brownell and Esherick).  Moreover, the particular crime was one of pre-meditation and there is not a hint of remorse or reflection of the seriousness of the crime.  When the defendant – through his attorneys – stand on the steps of the Courthouse and announce that Jemal has been vindicated, and when the defendant announces that a Wire Fraud conviction is a "splinter," this Court has proof positive that meaningful incarceration is required.

[16]    The legal arguments set forth in this Section are identical in substance to the arguments in the Esherick Sentencing Memorandum, with minimal technical adjustments to refer to defendant Jemal instead of Esherick.

obtaining money by fraud, threatened the very pecuniary harm Morgan Stanley so rigorously sought to avoid.  This conclusion as to the loss arises from the plain reading of the Guidelines.

To start with, the Guidelines state that for purposes of the loss calculation, "loss is the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1, App. Note 2(A).  These terms are further defined as follows:

- the Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, App. Note 2(A)(I);

- The Guidelines define "intended loss" as "(I) the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur * * *."  Id. App. Note 2(A)(ii) (emphasis added);

- The Guidelines define "reasonably foreseeable pecuniary harm" as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id. App. Note 2(A)(iv) (emphasis added);

- Finally, if the loss cannot reasonably be determined, "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss."  Id. App. Note 2(B).

The MTD invoice was intended to obtain $430,000 from Morgan Stanley at a time when the defendant was not entitled to that amount.  Morgan Stanley had rigorous procedures for ensuring that funds drawn on the Tenant Improvement Construction Reserve would in fact be spent on tenant improvements.  Thus, they insisted on language in the contract to ensure that funds would not go directly to the borrower, which, here, was a partnership between one of the defendants, Douglas Jemal, and Joseph Cayre.  Moreover, Morgan Stanley demanded justification from Douglas Development when the company sought to obtain funds directly through the Tenant Improvement Construction Reserve.

-18-

The evidence at trial demonstrated that the defendant needed $400,000 immediately to purchase another building, at 111 Massachusetts Avenue; that, at the time of that transaction, Douglas Development was overdrawn on its bank accounts by more than $100,000; and that the MTD fraud provided defendant the keys to the new building on Massachusetts Avenue.

Thus, the defendant intended to obtain $430,000 to which he was not entitled from Morgan Stanley. His criminal intent and intended loss are evidenced by the fraudulent MTD invoice and the various iterations of the MTD letterhead; and Jemal's decision to have Michael Rowe—a simple but honest man whom defendants knew would not ask questions—sign relevant MTD-related documents to distance MTD from its true status as an entity connected with Jemal and Douglas Development.

Defendant has contended that there was no loss intended in this case. Thus, he argued over and over to the jury that he did not commit the offense of wire fraud because he did not intend to cause harm to Morgan Stanley or Joseph Cayre, in that he was entitled to the money in the first place, that he would have gotten the money in the end even without the fraud, that he didn't really need the money because there was cash available at settlement to purchase 111 Massachusetts Avenue, and that Morgan Stanley was never at risk of losing money because the loan was protected by sufficient collateral.

The jury flatly rejected each and every one of those arguments.

Nevertheless, defendant seeks to resurrect those arguments at sentencing to avoid the obvious import of submitting a fraudulent $430,000 invoice. But what each one of those arguments has in common is a variant of the following: I can't be responsible for a $430,000 loss because it was "impossible" or "unlikely" for Morgan Stanley or Joseph Cayre to suffer a loss in

that amount.  But, critically, the Court does not need to accept a  defendant's "self-serving

assertions at sentencing that he intended no loss * * *."  E.g., United States v. Anderson, 68 F.3d

1050, 1054 (8th Cir. 1995).   To the contrary, the defendant's conduct inherently put Morgan

Stanley at risk that the Tenant Improvement Construction Reserve would be short by $430,000 –

this was a "potential result" and no amount of arguments to the contrary alters this conclusion.

Moreover, defendant's argument is foreclosed by the plain, straightforward language of

the Guidelines.  As described above, the guidelines define "intended loss" to include "pecuniary

harm that would have been impossible or unlikely to occur."  U.S.S.G. § 2B1.1, App. Note

2(A)(ii) (emphasis added).  Thus, defendant is precluded from arguing that the loss was not

$430,000 because, for example, the Cayre-Jemal partnership would have obtained any unspent

Tenant Improvement funds:  even if that were true, and even if it meant that an actual loss to

Morgan Stanley was less likely under the circumstances, the Guidelines calculation of $430,000

would still apply.  Those are all just arguments to the effect that a loss to Morgan Stanley or

Cayre was unlikely or remote or even, in defendant's mind, impossible.  Under the Guidelines,

that position is irrelevant and immaterial to the loss calculation.

Indeed, arguments exactly like those raised by the defendants have been rejected outright

as being contrary to the Guidelines.  See United States v. Younes, 194 Fed. Appx. 302, 2006 WL

2567481 (6th Cir. Sept. 5, 2006), cert. denied, 127 S. Ct. 699 (2006).  In Younes, the defendants

were convicted of, among other things, wire fraud for their activities in running a for-profit

vocational school that received federal financial aid.  Thus, the defendant and his coconspirators

> "(1) supplemented student files with fake high school diplomas, GED scores, or
> [other] test scores (even when the students might have possessed proper
> documentation at home), and (2) indicated that students had enrolled in travel and

computer classes [which were eligible for federal financial aid] when in fact they had enrolled in ESL [which was not eligible]. The government also argued * * * that [one of the defendants] sent false reports to [the school's] accrediting body * * *."

Younes, 194 Fed. Appx. at 305. At sentencing, the government arrived at a loss figure of $866,000 based on spreadsheets reflecting Education Department disbursements for "(1) students with fraudulent documents in their files, (2) students enrolled in certain classes ineligible for government aid, and (3) students whose attendance had been falsified * * *." Id. at 315.[17]

Raising arguments of the same nature advanced by the defendant here, one of the defendants in Younes argued that the trial court erred in calculating the loss because

> "some of the students on the spreadsheet were actually eligible for financial aid because, for example, some students graduated from high school or had equivalent degrees, even though their files at [the defendants' school] were supplemented by false documentation. Those students' eligibility * * * makes it impossible for the government to have suffered a loss (since the students could have received the money anyway), and that impossibility means the district court erred by including those sums in the 'intended loss.'" Id. 315-16 (emphasis added).

In other words, the defendant in Younes was contending, don't calculate the loss amount to include financial aid given to students who may have been entitled to receive financial aid, even though false and fraudulent documentation was used to obtain that financial aid. The Sixth Circuit affirmed the trial court's rejection of that argument, noting that 2001 amendments to the Sentencing Guidelines "'clarified that intended loss 'includes intended pecuniary harm that would have been impossible or unlikely to occur.'" Id. at 316 (quoting United States v. Anderson, 353 F.3d 490, 505 n.13 (6th Cir. 2003)).

---

[17] Based on defense arguments, the trial court arrived at a loss figure of $793,325. Younes, 194 Fed. Appx. at 315.

Here, exactly like in <u>Younes</u>, the defendant submitted false and fraudulent paperwork to Morgan Stanley to obtain money.  Exactly like in <u>Younes</u>, the defendant here objects to including in the loss calculation the money obtained through false and fraudulent paperwork on the ground that he was entitled to the money at that time (because of an agreement with Joseph Cayre) or at a subsequent time (after construction was complete and in the event there were left over Tenant Improvement funds).  And exactly like the trial court and appeals court in <u>Younes</u>, the defendant's similar arguments <u>here</u> should be rejected as contrary to the Guideline provision including "unlikely or impossible" losses as in fact losses.

Finally, pursuant to the Guidelines, if the Court were to determine that, given any uncertainties, the loss cannot be reasonably be determined, it should use the amount of the gain to the defendants as a measure of the loss.  See U.S.S.G. § 2B1.1, App. Note 2(B).  Here, the gain to the defendant was $430,000, based on the amount he was able to obtain from Morgan Stanley through the false and fraudulent MTD invoice seeking reimbursement for "representing" the District of Columbia's Department of Transportation.

## 2. Sophisticated Means Were Used

The "sophisticated means" adjustment under §2B1.1(b)(8)(C) is required in this case. The defendant committed the following acts to accomplish the fraud and avoid detection:

- creation of a false and misleading memorandum to Cayre informing him of commissions from the TI to "outside brokers;"

- careful creation of false MTD letterhead, crafted to suggest that MTD was a legitimate firm unrelated to Douglas Development or Douglas Jemal so as to avoid questions or scrutiny from Morgan Stanley or Cayre; this letterhead went

-22-

through several drafts to accomplish maximum deceptive effect;

- creation of a false invoice from MTD to the partnership entity, purportedly for representing the DC Government in securing space at 77 P Street; this document was utterly false and was marked as "approved" by Esherick for payment;

- opening of a MTD bank account at Adams Bank;

- obtaining Michael Rowe's signature on the lien release;

- preparation of a memorandum, purportedly from Rowe to Medding, informing Medding of the Adams Bank MTD account number (when, in truth, Rowe had no idea of the existence of this account);

- preparation of a subsequent lulling letter from Brownell to Cayre, informing Cayre that: "We have accelerated this [buildout] process as if we were the ones receiving all of the buildout funds, when we in fact realize that all of it is going to you;"

- wiring funds directly from the MTD account to the account of a settlement attorney (within 24 hours), so as to further conceal the transaction and the disposition of the funds so acquired.

This course of conduct falls squarely within the contemplation of the "sophisticated means" enhancement.  As the Application Notes to the Guidelines provide:

> "'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. * * * Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

§2B1.1, App. Note 6(B) (2002 ed.) (emphasis added).  Though the examples of the Application

Note are illustrative, the example provided in the Guidelines – namely, the use of a sham or shell

corporation to accomplish the crime and avoid detection –  applies to the fraud in this case.  As

one District Court has stated:

> "The use of offshore bank accounts implies that the perpetrator
> has used a means that will protect his or her identity. Similarly,
> 'transactions through corporate shells' implies conducting business
> through corporate entities designed to shield the identity of the
> ultimate controlling person(s) or decision maker(s). In both
> instances, the examples describe 'means' that are 'sophisticated' at
> protecting against the discovery of the scheme or the identification
> of the person responsible for or benefitting from the fraudulent
> scheme.

United States v. Lewis, 907 F. Supp 683, 686 (S.D.N.Y 1995) (emphasis supplied).  In this case,

the defendants used the corporate shell of MTD precisely "to shield the identity of the ultimate

controlling person(s) or decision maker(s)" and to "protect[] against the discovery of the scheme

or the identification of the person responsible for or benefitting from the fraudulent scheme."

Moreover, the "sophisticated means" enhancement applies in that the overall fraud

scheme is intricate, even if no particular step were particularly elaborate.  See, e.g., United States

v. Halloran, 415 F.3d 940 (8th Cir. 2006) (affirming enhancement for sophisticated means even

where "certain aspects of [the] scheme were not especially complex or especially intricate,"

because scheme was "sophisticated," involved a "series of fraudulent transactions," used a

"corporate entity [and] numerous fraudulent documents" and forged signatures); United States v.

Jackson, 346 F.3d 22, 25 (2nd Cir. 2003) ("[E]ven if each step in the scheme was not elaborate,

the total scheme was sophisticated in the way all the steps were linked together so that Jackson

could perceive and exploit different vulnerabilities in different systems in a coordinated way.").

Similarly, the defendants in this case used a false corporate entity, numerous fraudulent documents, and obtained the signature of Michael Rowe – essentially a forgery in that it represented that Rowe was a principal in MTD – precisely to "exploit different vulnerabilities" of Morgan Stanley and Joseph Cayre "in a coordinated way." The sophistication of the defendants' conduct thus warrants the two-level adjustment under §2B1.1(8)(C).

### 3. The "Vulnerable Victim" Enhancement Applies.

The government urges a two-level increase for "vulnerable victim" (under §3A1.1(b)(2)). In this case, Jemal targeted Michael Rowe to facilitate the crime of conviction. He had Mr. Rowe sign the lien release and used his name on a memo purportedly providing Morgan Stanley with wiring instructions.[18] These documents were required by Morgan Stanley to release the

---

[18]    The "vulnerable victim" is not required to be the named victim of the offense of conviction. See, e.g., United States v. Bachynsky, 949 F.2d 722, 735 (5th Cir. 1991), cert. denied, 506 U.S. 850 (1992) (in prosecution of physician for submitting false diagnoses to third parties to obtain reimbursement, unknowing patients were vulnerable victims even though insurance companies and the Department of Defense were defrauded); United States v. Echevarria, 33 F.3d 175, 180 (2nd Cir. 1994) (in prosecution of defendant for falsely representing self as doctor and obtaining Medicare reimbursements, exploited patients were vulnerable victims even through economic impact was on the government (following Bachynsky)); United States v. Yount, 960 F.2d 955, 957 (11th Cir. 1992) ("vulnerable victim" enhancement applies in prosecution of bank officer for money laundering of funds stolen from elderly bank account holders even though they were not "victims" of the offense of conviction); United States v. Haggard, 41 F.3d 1320, 1325 (9th Cir. 1994) (in prosecution of prisoner for false statements for claiming to know where a body was buried, family members were vulnerable victims even though the harm caused to them was not an element of the any of the crimes of conviction: "[C]ourts may look beyond the four corners of the charge to the defendant's underlying conduct in determining whether someone is a 'vulnerable victim' under section 3A1.1."); United States v. Cruz, 106 F.3d 1134, 1136 (3rd Cir. 1997) (vulnerable victim enhancement applied with respect to twelve year old passenger in carjacking: "except for the Sixth Circuit, all of the circuits that have considered this issue have held that the vulnerable victim does not have to be the victim of the offense of conviction.").

funds it controlled in escrow.[19]

The Court and jury observed Mr. Rowe testify.  Mr. Rowe's demeanor was of a very

decent, simple, gullible, trusting individual, and, with due respect to Mr. Rowe, it was apparent

there were aspects of his personality that would have made it obvious to the defendants that they

could easily exploit him and induce him to sign documents, the contents about which Mr. Rowe

would have no idea.  In essence, the defendants, in a truly calculated, cynical and callous fashion

implicated Mr. Rowe as a participant in their fraud scheme.  It is noteworthy that even the

defense counsel described Mr. Rowe as being a "poor man" who had been "hit one too many

times" – treating him as an object of scorn if not derision, and clearly of diminished mental

stature.

> Mr. Rowe, Mike Rowe.  Mike Rowe, the victim.  I wrote it down to pull out the transcript because I didn't want to get this wrong.  It's the prosecutor's view that they, meaning Douglas Development, specifically meaning Douglas, took advantage of that poor man.  And I think this is one we should spend a couple minutes on, because I think this sort of really catches the different viewpoints here.

> Who is Rowe.  We laughed on occasion when Rowe was here.  He said some funny things.  Maybe he was hit one too many times when he was playing with the Colts or doing kickboxing, maybe not.

Trial Tr., October 19, 2006 at 4498-99.

### D.  Conclusion

The Government hereby sets forth the various Guidelines calculations consistent with the

---

[19]     Rowe had no knowledge of the significance of the lien release, the existence or use of the bank account, the wiring information, the wiring information memorandum, the purposes to which those documents were to be put, the "operations" of MTD, the funds collected by MTD, or any other aspects of MTD.  Tr. 1298-1301.

arguments set forth above.

    1.  <u>If the Court finds "Sophisticated Means" and "Vulnerable Victim"</u>

<u>Sentence for Wire Fraud</u>
    2B1.1   Fraud
          (a)(2)Base Offense Level       6
          (b)(1)(H) Loss in excess of $400,000   14
          (b)(8)(C) Sophisticated Means   2
    3A1.1 (b)(2)  Vulnerable Victim   2
    <u>3B1.1(c)  Role in the Offense[20]      2</u>
    Total          26

The sentence at level 26 would be 63 - 78 months, though the statutory maximum is five years (60 months).

    2.  <u>"Sophisticated Means" and No "Vulnerable Victim"</u>

 <u>Sentence for Wire Fraud</u>
    2B1.1  Fraud
          (a)(2)Base Offense Level       6
          (b)(1)(H) Loss in excess of $400,000   14
          <u>(b)(8)(C) Sophisticated Means   2</u>
    Total          24

The sentence at level 24 would be 51 to 63 months, though the statutory maximum is five years (60 months).

    3.  <u>Neither "Sophisticated Means" nor "Vulnerable Victim"</u>

    Finally, if the Court were to adopt the recommendation of the Probation Officer, and not find either "sophisticated means" or "vulnerable victim," then the Guidelines would be calculated as set forth by Ms. Moses-Gregory, at level **22** (41-51 months).

    Thus, the Guidelines for Wire Fraud is either level 22 – at a minimum – as found by

---

[20]   The Government does not reargue the findings in support of this adjustment.  It is clear Jemal supervised Esherick, Brownell and Millstein, and that the scheme required numerous coordinated steps.

Probation Officer Renee Moses-Gregory, or level 24 (plus sophisticated means) (51-63 months), or level 26 (plus vulnerable victim) (63 to 78 months) as urged by the Government.  As noted, the maximum sentence is five years by statute.)

IV.  FACTORS UNDER 18 U.S.C. 3553 RELATED TO THE IMPOSITION OF SENTENCE, FACTORS RELATED TO THE IMPOSITION OF TERMS OF SUPERVISED RELEASE AND CONSIDERATION OF GROUNDS FOR UPWARD DEPARTURE

A.  Term of Incarceration

The possible sentences discussed above, in the range of 41 months (at the lowest end of the lowest range found by the Probation Officer)  to 60 months (the statutory maximum) is absolutely proper in this case.

The MTD invoice reflected weeks of dishonest planning and offers a window into how Jemal operated, devising a scheme to deceive both Morgan Stanley and Jemal's partner.

Applying the factors listed in 18 U.S.C. §3553, therefore, the sentence suggested above, and derived from the guidelines, is appropriate, and, more important, it is reasonable.

Under 18 U.S.C. §3553(a)(1), such a sentence appropriately takes into consideration "the nature and circumstances of the offense," namely, the numerous calculated and dishonest efforts to perpetrate a $430,000 fraud and annual tax crimes.  The Wire Fraud scheme required numerous steps, careful coordination, and the recruitment of Michael Rowe.  It was not a crime of impulse or opportunity.

Similarly, under 18 U.S.C. §3553(a)(1), such a sentence also appropriately takes into account "the history and characteristics of the defendant."  In this regard, this Court is aware of other dishonest acts of the defendant, including those involving money, designed to enrich

-28-

himself and others.  The crimes are hardly those of a "first offender," rather, they are the crimes of an individual who has finally been prosecuted.[21]   Moreover, whether the defendant's conduct vis-a-vis the D.C. Government and Lorusso was criminal – that matter has been decided – it was certainly dishonest.

For the same reasons, under 18 U.S.C. § 3553((a)(2), such a sentence appropriately reflects "the seriousness of the offense, promote[s] respect for the law, and [] provide[s] just punishment."  It would not fairly characterize the seriousness of the defendant's conduct, and the crime of conviction to sentence him other than to a meaningful term of incarceration.  Indeed, it would invite disrespect and suggest that there is a different standard for punishing the crimes that are committed by the wealthiest in society if, having been convicted of a serious felony in the nature of obtaining over $400,000 by fraud, the defendant did not receive a meaningful term of incarceration.

Accordingly, the government maintains that a sentence of incarceration within the Guidelines ranges discussed above is reasonable and reflects an appropriate consideration of the requirements of 18 U.S.C. §3553.[22]

---

[21]    Though Jemal was not convicted of the corruption and fraud counts, the evidence demonstrated a series of dishonest encounters between Jemal and Esherick with Michael Lorusso.  These encounters also consist of Esherick's preparation of dishonest documents for submission to the D.C. Government.

[22]    Similarly, though the government insists that the guidelines as calculated are appropriate, the government further believes that a "no loss" finding on the Wire Fraud and any subsequent guideline calculation would tremendously and drastically understate the true culpability of Esherick.  If so, the Court would be just in departing "upward" into the 41 to 71 month range urged by the government

B. <u>Supervised Release</u>

The Government urges the Court to impose standard conditions of supervised release designed to sever the ties between Jemal and his confederates Esherick and Brownell.

The evidence has demonstrated that for numerous reasons, Esherick and Brownell have knowingly and intentionally placed themselves in positions of utter dependence on and abject and uncritical loyalty to the defendant.

The financial dependence of both men is obvious: Esherick left a marriage in 1998 with nothing. As of 2005, after 7 years of (purportedly) making $70,000 per year, by 2005, after the tax scheme was uncovered, Jemal commenced paying him more than $350,000 per annum. (His W-2 for 2005 was in excess of $700,000.) Jemal provided Esherick not only monies when needed, but a car (in 2004, it was a Mercedes station wagon) and a million-dollar house in Chevy Chase. Let there be no question: that house was purchased by Jemal for Esherick. In 2004, for example, Esherick made substantial payments to renovate and improve the property, and he made these payments by "borrowing" monies from Douglas Development.[23]

Similarly, Brownell, working for Jemal, has seen his salary which was in the $50,000 per year range (though deliberately and falsely kept low) throughout the 1990s, is now at or more than $300,000 per year.

In short, Jemal's relationship with both men – convicted tax evaders whose crimes stemmed from their association with the defendant – must come to an end.

In imposing terms of supervised release pursuant to 18 U. S. C. § 3583(d), this Court

---

[23]    Jemal had paid for the construction of a home of another Douglas Development official. It appears he was affording the same employee benefit to Esherick.

should consider "the nature and circumstance of the offense and the history and characteristics of the defendant," the "need for the sentence imposed *** to provide respect for the law" and to "protect the public from further crimes of the defendant."[24]   It is thus a <u>standard</u> condition of supervised release that a convicted felon (Jemal) not be permitted to associate with other known felons (Esherick and Brownell).  As set forth in the Guidelines, §5D1.3(c)(9), it is a standard condition of supervised release that "the defendant shall not associate with any person *** convicted of a felony unless granted permission to do so by the probation officer[]."  As written, this standard condition requires that there be no such contacts without approval of the Probation Officer.  We request that this condition be modified so that there be no such contact without permission of the Court.

The imposition of this standard term of supervised release, and its rigorous enforcement, is essential for the rehabilitation of Jemal.   He must be removed from association of those men who will commit crimes for his benefit; moreover, it is necessary to end the financial influences that Jemal intuitively and astutely brings to those relationships and bring to an end the power of Jemal over their respective conduct.   Moreover, such a term is essential to protect the community at large, for when Esherick and Brownell operate under the influence of Jemal, they lose judgement, perspective and the ability to distinguish right from wrong.  As noted, such terms are standard, and have particular applicability when the crime at issue stems from the unique relationship between the individuals.  <u>See</u>, <u>e.g.</u>, <u>United States v. Bortels</u>, 1993 WL 101445 (6th Cir., Apr. 6, 1993) at *1 (defendant convicted of harboring a fugitive prohibited, under the terms

---

[24]   18 U.S.C. § 3684 cross-references, in particular, the factors of 18 U.S.C. §3553(a) related to the imposition of sentence.  The factors cited include 18 U.S.C. § 3553(a)(1) and 2(A) and (C).

of supervised release, from having contact with known felons including that same fugitive).[25]

It would undermine respect for the law if Jemal were permitted to resume his relationships with Esherick and Brownell as if nothing ever happened, and it is appropriate to bring Jemal's relationship with the two men, his control over them, and their financial dependence on him to an end.[26]

Esherick will have been sentenced prior to Jemal. Accordingly, the government urges that as a condition of supervised release, Jemal cease any contact with Esherick immediately, and that there be no more financial dealings between Jemal and Esherick and Jemal (even involving the Nevada Avenue house and Esherick) within one year of the imposition of Esherick's sentence. During that period, any financial dealings between the two men must occur through counsel and be reported to the government and the Court.

Brownell will be sentenced subsequent to Jemal. Accordingly, the government urges that as a condition of supervised release, Jemal cease all contact, direct or indirect, with Brownell as of the date of Brownell's sentencing (when a similar term will be imposed on Brownell), and that any financial dealings between the two men prior to that date occur through counsel and be

---

[25]    See, e.g., United States v. Sharp, 931 F.2d 1310, 1311 (8th Cir. 1991) (approving term of supervised release subjecting defendant to warrantless searches for drugs and alcohol: "the district court may order conditions of supervised release which are 'reasonably related to *** the nature and circumstances of the offense and the history and characteristics of the defendant, and *** to protect the public from further crimes of the defendant.'" U.S.S.G. § 5D1.3(b); see also 18 U.S.C. § 3583(d)."); United States v. Phaneuf, 91 F.3d 255, 262-63 & n. 10 (affirming terms of supervised release limiting defendant's power to make purchases over $100 and obtain credit (citing cases)).

[26]    In United States v. Mills, 959 F.2d 516 (5th Cir. 1992), a defendant convicted of odometer tampering was forbidden under the terms of supervised release to go into the used car business. Here, the government is simply requiring that the defendant not work for one specific company.

-32-

reported to the Court.

C. <u>Fine</u>

Pursuant to statute, 18 U.S.C. § 3571(d),  this Court can impose a fine of up to twice the amount of the pecuniary financial gain.  This Court should impose a fine of $860,000 – twice the pecuniary gain –  and require it be paid promptly, not strung out over years

WHEREFORE, the Government requests the Court consider this Memorandum in sentencing the defendant, to wit:  1) that the Court find the sentencing guidelines at either level 22 (as suggested by the Pre-Sentence Report Writer) or level 24 (finding sophisticated means) or level 26 (finding sophisticated means and vulnerable victim);  2) that the Court impose the maximum permissible fine of $860,000; and, 3) that the Court modify the standard conditions of supervised release to require:  a) that the defendant have no contact with convicted felons, to include Blake Esherick and John E. Brownell, without permission of the Court;  b) that, as regards to Esherick, that Jemal cease any contact with Esherick immediately, and that there be no more financial dealings between Jemal and Esherick within one year of the imposition of Esherick's sentence and that during that period, any financial dealings between the two men occur through counsel and be reported to the government and the Court; and, c) that, as to Brownell, Jemal cease all contact, direct or indirect, with Brownell as of the date of Brownell's sentencing, and that any financial dealings between the two men prior to that date occur through

-33-

counsel and be reported to the government and the Court.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:    _____/s/_____
Mark H. Dubester, D.C. Bar No. 339655
Timothy G. Lynch, D.C. Bar No. 456506
Assistant United States Attorneys
555 4th Street, NW,
Washington, D.C.  20530
(202) 514-7986