**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES** | ) | |
| | ) | |
| v. | ) | **Crim. No. 05-0359-1 (RMU)** |
| | ) | |
| **DOUGLAS JEMAL,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

_____)

**SENTENCING MEMORANDUM OF DOUGLAS JEMAL**

Reid H. Weingarten
Brian M. Heberlig
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
 (202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
(202) 331-3334

Counsel for Douglas Jemal

Dated: February 21, 2007

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    THE OFFENSE ................................................................................................3

III.   PERSONAL HISTORY ...................................................................................7

IV.    SENTENCING ISSUES ..................................................................................15

    A.     Federal Sentencing After *United States v. Booker* ...............................15

    B.     Consideration Of The Sentencing Guidelines Results In A Guidelines
        Range That Renders Mr. Jemal Eligible For Probation.........................19

        1.     The "Intended Loss" Enhancement Does Not Apply ...............19

        2.     Mr. Jemal Was Not A "Supervisor" Of Criminal Activity For
            Purposes Of The Guidelines ....................................................20

        3.     Mr. Jemal's Total Offense Level Is Six...................................22

    C.     The Court Should Depart Downward On A Number Of Grounds .......23

        1.     This Case Is Outside The "Heartland" Wire Fraud Offense.....23

        2.     Imprisonment Of Mr. Jemal Would Impose Extraordinary
            Hardship On His Employees ....................................................26

        3.     Mr. Jemal Has Engaged In Extraordinary Post-Offense
            Rehabilitation..........................................................................33

    D.     Consideration Of The Additional 18 U.S.C. § 3553(a) Factors Strongly
        Supports A Lenient Non-Guidelines Sentence ....................................36

        1.     Mr. Jemal's History And Characteristics, Including Strong Family
            Ties And Substantial Charitable And Community Service, Warrant
            A Non-Guidelines Sentence ....................................................36

        2.     There Is No Need To Protect The Public Through A Lengthy
            Prison Sentence Because There Is No Chance of Recidivism...................49

        3.     The Nature And Circumstances Of The Offense Warrant Leniency.........50

V.     CONCLUSION...............................................................................................51

## I.    INTRODUCTION

The Court should sentence Douglas Jemal to a term of probation with a special condition requiring Mr. Jemal to adopt and implement a comprehensive corporate compliance program at Douglas Development Corporation ("Douglas Development" or "the Company"). Mr. Jemal has engaged KPMG at substantial expense to prepare such a compliance program designed to educate him and his employees regarding all applicable laws, regulations and ethics rules and to implement internal controls and auditing functions sufficient to ensure the integrity of the Company's billing and accounting practices. KPMG is in the process of completing its review of Douglas Development and we will present the Court with a comprehensive plan prior to sentencing.

Such a sentence is appropriate in this case for many reasons. First and foremost, as the 204 letters to the Court submitted with this memorandum demonstrate, Mr. Jemal is a compassionate and charitable family man who rose from humble beginnings to create an extremely successful real estate development business that has greatly benefited the District of Columbia.[1] Mr. Jemal is known for his integrity, entrepreneurial vision and ability to do business on a handshake. He has pioneered the redevelopment of areas of the District that other developers found undesirable, preserved historical architecture and made decisions motivated by his desire to benefit this city rather than profit, and played a central role in the transformation of downtown District of Columbia. Along the way, Mr. Jemal has given breaks to young entrepreneurs and disadvantaged tenants, and performed innumerable acts of charity and

---

[1] The 204 letters of support written to this Court on Mr. Jemal's behalf are attached to the accompanying Declaration of Brian M. Heberlig In Support of Defendant Douglas Jemal's Sentencing Memorandum And Memorandum of Law Regarding Intended Loss Enhancement ("Heberlig Decl.").

community service both large and small. The outpouring of support from the community evidenced in the attached letters reveals Mr. Jemal's true character and demonstrates convincingly that the conduct upon which the conviction was based was an aberration.

Second, a sentence of probation is fully supported by the advisory Sentencing Guidelines calculation. The Court should conclude that Mr. Jemal's total offense level is a level 6, placing him within Zone A of the Sentencing Table and rendering him eligible for probation. The Court should decline to apply the proposed 14-level enhancement for "loss." Neither Joseph Cayre nor Morgan Stanley lost any money as a result of the transaction at issue. There was also no evidence that Defendants Douglas Jemal and Blake Esherick ("Defendants") intended to cause either "victim" to lose money. Moreover, there could not possibly be an intended loss to Morgan Stanley because any intended loss would be more than fully offset by (1) the collateral that Morgan Stanley had in the form of $30 million in equity in the building and the personal guaranties of Messrs. Jemal and Cayre, and (2) the fact that Defendants essentially replenished any improperly obtained loan funds by spending more in tenant improvements on the building after the tenant improvements reserve was fully depleted than the amount of the invoice at issue. The Court should decline to impose the proposed 2-level enhancement for "supervisory" role because the government failed to prove that Mr. Jemal supervised anyone in the commission of the offense. A proper Guidelines calculation results in a level 6 and renders Mr. Jemal eligible for probation.

Third, even if the Court concludes that a higher offense level applies, the Court should depart downward from the Guidelines range on several grounds. Specifically, this "no loss" fraud involving a single private business transaction falls far outside the heartland of a typical wire fraud offense, as demonstrated by Department of Justice policy indicating that

conduct of this nature should be resolved in civil court if at all.  In addition, imprisonment of Mr. Jemal would irreparably damage his business and cause substantial collateral harm to the approximately 120 employees of Douglas Development and other independent contractors who depend on Mr. Jemal for their livelihoods.  Finally, Mr. Jemal has engaged in extraordinary post-offense rehabilitation by directing KPMG to evaluate Douglas Development and develop a comprehensive corporate compliance program to ensure the integrity of the Company going forward.  The Court would be justified in departing downward for any one of these reasons. Together, they present a compelling case for a downward departure to render Mr. Jemal eligible for probation.

Finally, even if the Court declines to grant a formal downward departure, the Court should nonetheless impose a "non-Guidelines" sentence of probation because an evaluation of the applicable 18 U.S.C. § 3553(a) factors demonstrates that probation is "just punishment" for the conduct at issue.  Mr. Jemal's history and characteristics, including his devotion to family and community, strongly support a lenient sentence.  Mr. Jemal is the dominant means of emotional and financial support for his entire family and has contributed an exceptional amount of his time and resources to the community.  There is also no realistic risk of recidivism given Mr. Jemal's age and lack of criminal history.  Moreover, the nature and circumstances of the offense -- a victimless crime involving no loss -- distinguish this case from the typical wire fraud offense and justify leniency.

In sum, Mr. Jemal respectfully submits that a sentence of probation would be fair and just under the unique circumstances of this case.

## II.     THE OFFENSE

In support of Count Four of the revised Indictment, the government contended that Defendants defrauded Joseph Cayre and Morgan Stanley by submitting an invoice on MTD

letterhead to the Cayre Jemal's Gateway partnership, which was paid out of the Morgan Stanley loan covering 77 P Street, without disclosing MTD's affiliation to Douglas Development.  The weakness of the evidence underlying this offense of conviction has been summarized in Mr. Jemal's post-trial motions and the accompanying Defendant Douglas Jemal's Memorandum of Law Regarding Intended Loss Enhancement and will not be repeated here.  Suffice it to say, however, this is far from the typical wire fraud offense.  The offense did not harm anyone in any way.

Indeed, both "victims" of the offense testified at trial that they did not lose any money and, perhaps more importantly, that they would jump at the opportunity to do business with Douglas Jemal in the future.  Mr. Cayre testified that Mr. Jemal was "entitled" to the money at issue, Tr. 2144, and confirmed that he has not "been defrauded out of one penny as a result of the MTD commission."  Tr. 2180.  Mr. Cayre further testified that despite Mr. Jemal's actions relating to the MTD transaction, he would not hesitate to do business with him in the future:  "If he brought me a deal, I'd probably jump to take it."  Tr. 2181.  Mr. Cayre further testified that he would trust Mr. Jemal to be his partner, and would personally loan money to Mr. Jemal without any documentation based solely on Mr. Jemal's word.  Tr. 2181-82.

Mr. Cayre has also written a letter asking for the Court's leniency when sentencing Mr. Jemal.  Mr. Cayre writes that he did not have an opportunity during his trial testimony "to explain to [the Court] what a warm, caring and charitable person Doug Jemal really is."  Heberlig Decl. ¶ 34 (Ex. 32).  Mr. Cayre further writes:

> Doug is a champion of the underprivileged helping them <u>DAILY</u>.
> No one, probably not even you, with all due respect, could believe
> the daily acts of kindness including feeding and giving financial
> help to those who need it with <u>DIGNITY</u>.  This is a hard to find
> very special quality which Doug Jemal has.

> As for his family, friends, and community he has single-handedly
> built religious institutions and has lent money to many, many,
> many families who came upon bad times knowing well they would
> never repay him.  This man, Doug Jemal, is a very special human
> being that we all need on the streets helping people and not behind
> bars.

Id.  It speaks volumes about the atypical nature of the government's case that the principal

alleged "victim" of the crime has asked the Court to spare Mr. Jemal from prison.

Morgan Stanley representative Ben Black also testified that Morgan Stanley lost

no money as a result of the MTD transaction.  Tr. 1237, 1268.  Mr. Black further testified that he

was eager to do more business with Mr. Jemal after the 77 P Street loan, Tr. 1248-49, and that he

initiated discussions with Douglas Development personnel about doing more business after he

left Morgan Stanley to join another investment bank.  Tr. 1269.  This testimony is utterly

inconsistent with that of a "victim" of a crime.

Moreover, if it is even possible to interpret the offense conduct as intended to

harm Morgan Stanley -- a proposition Mr. Jemal strongly disputes -- the letters of support written

by other lenders with whom Mr. Jemal does business make clear that such an intent would be

completely inconsistent with the manner in which Mr. Jemal has dealt with financial institutions

during his career.  In total, 14 executives of various lenders have written letters on Mr. Jemal's

behalf.  These lenders have uniformly found Mr. Jemal to be a man of integrity and honesty in all

of his dealings with them.  Douglas L. Davidson, Senior Vice President of the Union Bank of

California, who has managed loans in excess of $70 million to Mr. Jemal in the last seven years,

writes:

> I suppose the days have long since passed when substantial
> commercial transactions would be concluded without detailed legal
> documentation.  However, I would have no hesitation closing a
> deal with Douglas, of any size, based on his handshake.  I have
> found him to be a man of his word.  I trust him.  I know of no
> higher compliment.

- 5 -

Heberlig Decl. ¶ 56 (Ex. 54).

Kurtis J. Marx, Executive Vice President of United Bank, an institution that loaned Mr. Jemal approximately $7.825 million last year with full knowledge of his pending trial and approximately $3.1 million this year despite Mr. Jemal's conviction, writes that "United Bank's decisions to provide significant real estate financing to Douglas Jemal was based heavily on his demonstrated integrity and character, which United Bank believes will not waiver even under the worst of conditions."  Heberlig Decl. ¶ 62 (Ex. 60).

Other lenders with whom he has dealt have similarly concluded that Mr. Jemal is "a person of integrity, honesty and high character," Heberlig Decl. ¶ 58 (Ex. 56 -- Wachovia executives Timothy L. Leon and Douglas B. Cochrane), "forthright, fair and honorable," id. ¶ 57 (Ex. 55 -- Monument Bank CEO H.L. Ward), "honest, hardworking and responsible," id. ¶ 63 (Ex. 61 -- Cardinal Bank/Washington President Kate Walsh Carr), "honest and forthright in each transaction," id. ¶ 51 (Ex. 49 -- BB&T Senior Vice President Howard Dymond), "honest," id. ¶ 61 (Ex. 59 -- Washington First Bank Senior Vice President Bruce Wilmarth), and "professional," a "recognized leader," and "an asset to the city."  Id. ¶ 60 (Ex. 58 -- PNC Real Estate Finance Senior Vice President William R. Lynch, III).  The letters submitted by other lenders echo this sentiment.  See id. ¶ 65 (Ex. 63 -- Labor-Management Fund Advisors Vice President Jameson Cahill), ¶ 59 (Ex. 57 -- Industrial Bank Senior Vice President Patricia A. Mitchell); ¶ 53 (Ex. 51 -- Royal Bank America Chairman Robert R. Tabas); ¶ 52 (Ex. 50 -- Royal Bank America Chief Lending Officer Murray Stempel, III).

It is also worth highlighting the letter written by Mark T. Palmer, Vice President of The Adams National Bank.  The government devoted a substantial portion of the trial to attempting to prove that Douglas Development repeatedly bounced checks or overdrew its

accounts at Adams Bank, and argued from that evidence that Douglas Development was an

irresponsible corporate citizen and that Mr. Jemal was so "broke" that he had a motive to bribe

Michael Lorusso. The government's theory was preposterous given Mr. Jemal's net worth and

enormous success as a developer. Mr. Palmer also puts to rest any claim that Douglas

Development's practices were somehow harmful to Adams Bank, stating:

> I currently manage 8 real estate secured loans personally
> guaranteed by Mr. Jemal. Douglas Development related entities
> have nearly 20 deposit accounts at The Adams National Bank. All
> of these loan and deposit accounts have been and continue to be
> handled as agreed, in a manner that every banker would expect
> from their best customer. Despite the felony conviction, I continue
> to seek new loan and deposit business from Douglas Jemal. This is
> a relationship that I treasure, am immensely proud of and will
> strive to maintain throughout my banking career.

Heberlig Decl. ¶ 54 (Ex. 52).

This outpouring of support from the lending community strongly supports the

view that Mr. Jemal's actions in connection with the MTD transaction were not directed at the

lender, Morgan Stanley, in any way. At a minimum, however, the letters establish that any

dishonesty or intent to harm directed at the lender was an aberration in a career of dealing with

real estate lenders with absolute integrity, honesty and responsibility.

## III.    PERSONAL HISTORY

Douglas Jemal is a decent and honorable man who rose from humble beginnings

through hard work to reach a degree of extraordinary success. Along the way, Mr. Jemal has

remained at all times the same straightforward, self-made man of family, religion, humility and

extreme generosity. The overwhelming number of letters of support submitted to the Court by

Mr. Jemal's friends, colleagues and family members illuminate these features of Mr. Jemal's life

and illustrate his true nature -- a man who loves and respects those around him as well as the city

of Washington, D.C.

Mr. Jemal is a very generous man, known for dedicating his time and resources to his family, community and friends. Unfortunately, the numerous contributions Mr. Jemal has made to the city of Washington, D.C. and its citizens risk being overshadowed by a single private business transaction. In reality, Mr. Jemal has continuously benefited his community and hopes he is able to continue doing so.

Born in Brooklyn, New York in 1942, to immigrant parents of modest means, Mr. Jemal learned the value of hard work at a very young age. Mr. Jemal comes from a large family of five brothers, two sisters, one step-brother and one step-sister. The Jemal family frequently struggled financially during Mr. Jemal's childhood. Mr. Jemal's father was an entrepreneur who constantly pursued new business ventures and often over-extended himself. From growing up in this environment, Mr. Jemal gained a sense of commitment to finish what he started, which led to his successful business strategy of holding onto properties for the long term.

After attending P.S. 215 Elementary School and P.S. 228 Junior High School, Mr. Jemal completed only a few months of high school before discontinuing his studies to work and help support the family. At age 16, Mr. Jemal traveled to Puerto Rico to work with his father, who owned and operated a small retail store in San Juan. After a year or two, Mr. Jemal returned to New York and again worked with his father at a discount retail store located near the site of the former World Trade Center. Mr. Jemal was eager to work for himself and, at the age of 17, opened his own discount merchandise store in Seaside Heights, New Jersey with his father's help. Mr. Jemal barely made enough money that summer to pay his debts, but he learned invaluable lessons in retailing and running his own business and his summer venture was profitable for several years thereafter.

Mr. Jemal met his wife, Joyce, in the summer of 1963 in Seaside Heights, New Jersey. They married a year later and their first child, Sally, was born on February 22, 1965 -- George Washington's birthday. Mr. Jemal viewed the date of his daughter's birth as a sign and his impulsive nature led him to relocate his family to Washington, D.C. to start a new life.

Upon arriving in Washington, D.C., Mr. Jemal rented an empty storefront on the corner of 7th and F Streets, convinced his brother, Lawrence, to join him, and opened Bargaintown DC, a discount merchandise store. Mr. Jemal and his brother acquired their entire inventory on credit, but sold enough merchandise during the first month of operation to remain in business and ultimately developed Bargaintown into a thriving local business in the heart of the District. Bargaintown remained open until approximately 1973, when the D.C. metro was constructed and the Bargaintown site was taken under eminent domain.

Mr. Jemal then opened Douglas Stereo, a discount electronics store, at 1108 F Street, NW, and later opened a second store at 425 7th Street, NW. Shortly thereafter, Lawrence Jemal decided to return to New York, but Mr. Jemal stayed in D.C. to finish what he started.

In the early-1980's, several of Mr. Jemal's brothers opened a stereo and music store in Brooklyn, New York called "The Wiz." Mr. Jemal provided some capital for the business, and became actively involved when The Wiz expanded and became a major retail electronics chain that eventually became "Nobody Beats the Wiz." At its peak, the company had 60 to 70 stores in Washington, D.C., New York, New Jersey, Connecticut and Pennsylvania. By 1993, Mr. Jemal did not like the direction the business was headed and wanted to sell the company, but his brothers instead decided to purchase his interest. However, the chain went bankrupt shortly thereafter and Mr. Jemal received little more than the real estate that the company owned in Washington, D.C.

Mr. Jemal began investing in real estate in the 1980's when the real estate market had bottomed out and the RTC was taking over many properties. Mr. Jemal had grown frustrated with the landlords from whom he rented retail space, so he gambled that the real estate market would turn around and bought a few retail properties. Having little accumulated wealth, Mr. Jemal used credit and financing to purchase his first several properties and then used his early success to gain financing for subsequent deals. Up until very recently, Mr. Jemal typically held the properties he purchased and reinvested his profits in the acquisition of additional real estate.

In 1992, Mr. Jemal opened the first Douglas Development office in Rockville, Maryland, which he moved to 7th and H Streets, NW, in 2000. In the early years, Mr. Jemal focused on acquiring small retail storefronts in economically depressed areas where other developers refused to invest. Mr. Jemal renovated these properties and leased them to commercial tenants, which produced income and sparked economic growth in the surrounding neighborhoods. The Wonder Plaza near Howard University was Mr. Jemal's first large project that established Douglas Development as a significant area developer. Mr. Jemal has since completed many significant projects in Washington, D.C., such as the Park and Shop complex in Cleveland Park, the Woodward and Lothrop Building and Spy Museum located downtown, and the 77 P Street project in the New York Avenue corridor.

Throughout the years, Douglas Development has experienced tremendous growth, and Mr. Jemal now owns approximately 180 properties in Maryland, Virginia and Washington, D.C. One thing has remained constant throughout this remarkable growth -- Mr. Jemal's commitment to acquiring, renovating and leasing properties in a manner that most benefits the community, often times at his own expense. Mr. Jemal continues to focus his efforts on

underdeveloped areas of the District.  Mr. Jemal invests in these areas not only because it has

proven to be a successful, albeit risky, business model for Douglas Development, but because he

is committed to improving this city that has given him so much.

Mr. Jemal's unwavering commitment to certain principles and beliefs is what has

enabled Mr. Jemal to be successful in life.  Mr. Jemal values his family above all else.  Mr. Jemal

is a loving husband and a caring father to his six children:  Sally, Monette, Norman, Jennifer,

Kim and Matthew.  His daughters have in turn given him 18 wonderful grandchildren.

Mr. Jemal's family is central in his life.  In fact, he drives more than four hours to New York or

New Jersey every Friday night to have dinner with his wife, children, grandchildren and in-laws.

Mr. Jemal's daughter, Jennifer Jemal Sitt, describes the importance of this special time to the

entire family:

> Being able to spend every Friday night with my father is an
> amazing treat.  We all gather, my sisters, brothers, their spouses
> and all the grandkids.  We laugh, reminisce and keep our family
> bond strong.  These nights are irreplaceable.  They keep us close
> and united.  There is never a Friday night dinner in which we do
> not spend together as a family.  From Mondays we talk about the
> Friday night to come, which sister is going to host our traditional
> dinner or if we are going to New Jersey for the weekend to gather
> in our parents home there.  There is no other place in the world that
> I would rather be than with my parents and siblings on our Friday
> nights.  Being able to have our kids cherish these nights with their
> grandparents is something I hold dear.  I know that these special
> nights we share are sacred and unique [and] can never imagine
> what will become of my family if they are taken away from us.

Heberlig Decl. ¶ 7 (Ex. 5).

Mr. Jemal's love for his family extends far beyond his wife and children.  After

his father's death in the early-1980's, Mr. Jemal assumed the role of patriarch of his entire family

and provides both emotional and financial support to his extended family.  According to Elliot

Shalom, one of Mr. Jemal's sons-in-law, "Douglas is the patriarch and guiding light of this

wonderful family that includes his mother, wife, six children, four son in laws and eighteen

grandchildren, as well as his seven brothers and sisters and their respective families.  We are

very fortunate to have Douglas as our leader, for there is never a time his advice and counsel is

without merit."  Heberlig Decl. ¶ 29 (Ex. 27).  Mr. Jemal's sister, Francine Benun, further

explains the role Mr. Jemal has assumed to support his family:

> My father's death left my family and mom bereft.  Douglas had
> lost his best friend and mentor.  But survive he did for our sakes.
>
> Douglas is my mom's sole means of support.  My mom lives
> beautifully.  He is constantly fixing her home.  She never needs to
> ask – a new driveway because she will like it: a roof because she
> needs it; a waterfall because she will enjoy it. . . . He is the only
> one of six sons who calls her everyday!
>
> My brothers are also beneficiaries to Douglas's generosity.  He has
> helped finance their homes.  Douglas supports them as well as their
> children, so that they can continue to live with dignity, complete
> college and becomes successful individuals.

Heberlig Decl. ¶ 11 (Ex. 9).

Mr. Jemal is fortunate to enjoy the deepest and most profound love from his

family.  The warm letters of support from his family, described in greater detail below, are

testimony to this relationship.  They reflect a loving, supportive family that would be devastated

if Mr. Jemal -- the core of the family -- was taken away from them.

Mr. Jemal's compassion and generosity extend far beyond his family.  According

to Jolie Figueroa, one of Mr. Jemal's employees at Douglas Development, "[Mr. Jemal] would

give his shirt off of his back to anyone."  Heberlig Decl. ¶ 42 (Ex. 40).  Many of Mr. Jemal's

friends, colleagues and employees have experienced Mr. Jemal's compassion, honesty and

generosity first-hand.  Jerome Robinson, one of Mr. Jemal's first employees, describes the

enormous impact that Mr. Jemal had on his life:

> I have known Douglas Jemal for thirty two years.  When I first met him I was sixteen.  He gave me my first job working as a sales person at his store, Douglas Records.  When I was eighteen, he purchased my first car and charged nothing for it.  Growing up in a low income housing, Douglas was there for me.  My parents could not afford to buy me clothes and shoes but Douglas did.  There were times when Douglas took me shopping and told me to buy whatever I wanted.  On one occasion, he bought me three pairs of shoes, I kept one pair and gave the rest to my brothers.  And this is something that he knew but did not say anything about it because he cared about me and my family's happiness.  I also remember a time when my parents were behind in paying their rent which was 1600 dollars and I went to Douglas for a loan.  He told me to go to the secretary for whatever I needed.  I agreed to pay him back twenty dollars a week but he told me whatever that I could afford.  Within that same week, my father crashed my car and I came to Douglas again worried and sad.  Douglas once again came through for me.  He gave me the money and told me not to worry about the other loan.  He also stated that the incident was a part of life.  Everyone has to go through things in order to be successful.
>
> Douglas treated me like the father that I never had.  He is someone that I respect and I look up to.

Heberlig Decl. ¶ 48 (Ex. 46).  The impact that Mr. Jemal has had on people from all walks of life is discussed in greater detail below.

Numerous employees, friends, colleagues, and even competitors describe Mr. Jemal as "a man of his word" who honors his commitments.  Heberlig Decl. ¶ 162 (Ex. 160) (Letter of Leonard A. Greenberg, a competing real estate developer).  Stephen G. Gerdon, a commercial real estate broker, describes such an example involving a negotiation between the Food Lion grocery chain and Mr. Jemal that Mr. Gerdon initiated:

> I set up a meeting with Douglas and Food Lion and in that meeting they verbally agreed to a deal.  At the end of the meeting Douglas asked me what my fee was and I told him.  We never even executed a commission agreement. . . . As negotiations went on, I basically stepped out as the Broker, and Douglas said it would probably be best to work with Food Lion direct, and that he would pay me if the deal got done. . . . I moved on doing other business and the months flew by fast.  Fourteen months later, I got a call from Douglas saying that the deal had been completed and asked

> me where he should mail me my check. I had no idea that the deal
> had gotten done. I will never forget the feeling I had when I hung
> up the phone. I was blown away. I thought to myself, "my God
> we never even signed an agreement and he called me to make sure
> I got paid." I guarantee you sir that no other developer would have
> called me to make sure I got paid. . . . I called him back and
> expressed my appreciation. I was truly touched. You know what
> his response was? He said, "I am a man of my word, as you will
> learn."

Heberlig Decl. ¶ 160 (Ex. 158). The exceptional degree of respect and admiration that

Mr. Jemal's employees, colleagues and competitors have for him is set forth in greater detail

below.

Mr. Jemal's investments in Washington, D.C. are often geared towards restoring

the city's rich architectural history as well as its economic viability. It is often far more

expensive for a developer to rehabilitate an old building than to demolish an existing structure

and build a new one. Mr. Jemal, however, prides himself in spending the extra time and money

needed to bring the once beautiful buildings of downtown back to their original glory.

According to architectural historians Emily Hotaling Eig and Laura Harris Hughes:

> In the years that we have worked with Mr. Jemal, we have
> celebrated his tenacious spirit and determination in purchasing and
> developing historic buildings in parts of the city many in his field
> had rejected as 'too historic' or not financially sound investments.
> For preservationists, these projects were the ones desperately
> needed to jump start our downtown revitalization. Mr. Jemal
> sought out locations and sites with historic buildings, and based his
> development plans on research and documentation that provided an
> understanding of each historic structure. He did not approach each
> project, as so many developers do, with the intention of
> demolition; the resulting rehabilitations along 7th Street as well as
> the International Spy Museum, and the important Woodward &
> Lothrop Department Store have restored many of Washington's
> important downtown landmarks.

Heberlig Decl. ¶ 133 (Ex. 131).

The attached letters make clear that Mr. Jemal has led a life devoted to his family, friends and community.  In addition, he conducts his professional affairs in an honest, straightforward and trustworthy manner that has benefited numerous contractors, vendors, tenants, financial institutions and residents of Washington, D.C.  If given the opportunity, Mr. Jemal will continue to be a tremendous asset to his community.

## IV.     SENTENCING ISSUES

### A.     Federal Sentencing After *United States v. Booker*

The Supreme Court fundamentally altered the federal sentencing landscape in United States v. Booker, 543 U.S. 220 (2005), by holding that mandatory application of the Sentencing Guidelines violated a defendant's Sixth Amendment right to a jury trial.  With this decision, the Court freed sentencing courts from the rigid, formalistic framework that existed under the Guidelines, replacing it with a system that provides judges the discretion to consider any relevant characteristic of an offense or of the particular defendant.  As the Supreme Court recently confirmed, courts are "no longer . . . tied to the sentencing range indicated in the Guidelines."  Cunningham v. California, 127 S. Ct. 856, 867 (2007).  Instead, courts are "obliged to 'take account of' that range along with the sentencing goals Congress enumerated in the [Sentencing Reform Act] at 18 U.S.C. § 3553(a)."  Id. (quoting Booker, 543 U.S. at 259, 264); see also United States v. Pickett, -- F.3d --, 2007 WL 445937, at *4 (D.C. Cir. Feb. 13, 2007) ("The Court's remedial opinion [in Booker] required the district court to treat the Guidelines as advisory only and as simply one factor to be considered in sentencing.").

"In the post-Booker world, the court must calculate and consider the applicable Guidelines range but is not bound by it."  United States v. Dorcely, 454 F.3d 366, 375 (D.C. Cir.), cert. denied, 127 S. Ct. 691 (2006).  The sentencing judge must determine the applicable Guidelines range in the same manner as before Booker, including consideration of any policy

statements issued by the Sentencing Commission and departure authority.  Id. at 375 n.6.[2]

Thereafter, Booker "requires" the district court to consider the Guidelines range and the other

Section 3553(a) factors.  Id. at 376.

In particular, 18 U.S.C. § 3553(a) provides that in determining the sentence to be

imposed, a court shall consider:

(1)     the nature and circumstances of the offense and the history
        and characteristics of the defendant;

(2)     the need for the sentence imposed --
        (A)  to reflect the seriousness of the offense, to promote
        respect for the law, and to provide just punishment for the
        offense;
        (B)  to afford adequate deterrence to criminal conduct;
        (C)  to protect the public from further crimes of the
        defendant; and
        (D)  to provide the defendant with needed educational or
        vocational training, medical care, or other correctional
        treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established
        for --
        (A)  [in the Sentencing Guidelines] . . .

(5)     any pertinent policy statement --
        (A)  issued by the Sentencing Commission . . .

(6)     the need to avoid unwarranted sentence disparities among
        defendants with similar records who have been found guilty
        of similar conduct; and

_____

[2] Under the Guidelines, courts were discouraged from considering factors such as the defendant's age, education and vocational skills, mental and emotional conditions, physical condition, ties to family and the community, or civic, charitable and public service.  U.S.S.G. § 5H1.1-4, 6, 11.  These factors were "not ordinarily relevant" in determining an appropriate sentence and could only be considered in extraordinary situations.  Post-Booker, however, as explained below, these are precisely the types of considerations courts must now evaluate when imposing sentences.

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (2000 & Supp. IV 2004).

"One, but only one, of the factors a sentencing court must also consider is the sentencing range under the Guidelines." Pickett, 207 WL 445937, at *4. Several courts have held that the Guidelines are entitled to no greater weight than any of the other factors. See United States v. Biheiri, 356 F. Supp. 2d 589, 594 n.6 (E.D. Va. 2005) ("No individual factor is singled out as having greater weight; instead, the richness of factual diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances."); Simon v. United States, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) ("[T]he Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by § 3553(a)."); United States v. Ranum, 353 F. Supp. 2d 984, 986-987 (E.D. Wis. 2005) (giving equal weight to each factor listed in § 3553(a)).

As the D.C. Circuit recently held regarding the proper weight to be given the "advisory-only Guideline range":

> One might answer that the Guideline range should be considered presumptively reasonable. But that would be to confuse the standard this court and several others have adopted for appellate review with the standard to be applied by the sentencing court. A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence. To do so would be to take a large step in the direction of returning to the pre-Booker regime. Another approach, the correct one in our view, is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a).

Pickett, 2007 WL 445937, at *5 (footnote and citations omitted; emphasis added).[3]

---

[3] The D.C. Circuit has held that a sentence within a properly calculated Guidelines range is "entitled to a rebuttable presumption of reasonableness" on appeal. Dorcely, 454 F.3d at 376. However, the Supreme Court subsequently granted certiorari in a case to resolve the question of whether affording a presumption of reasonableness is consistent with Booker. See Rita v. United
(Continued …)

"'If <u>Booker</u>'s rendering the Guidelines discretionary means anything,' it must give district court judges greater latitude in assessing potentially mitigating factors than they had under the Sentencing Guidelines." <u>United States v. Brown</u>, 449 F.3d 154, 160 (D.C. Cir. 2006) (quoting <u>United States v. Gomez</u>, 431 F.3d 818, 825 (D.C. Cir. 2005)).  The D.C. Circuit has also recognized that mitigating evidence that is not relevant to the Guidelines calculation may well be relevant to the district court's analysis of the Section 3553(a) factors.  <u>United States v. Ayers</u>, 428 F.3d 312, 315 (D.C. Cir. 2005)  It is through the consideration of all of these relevant sentencing factors that courts ensure they reach a "just punishment" as required by 18 U.S.C. § 3553(a).

After equal consideration of the Guidelines and all of the other Section 3553(a) factors, the court has the authority (i) "to impose the sentence that would have been imposed under the Guidelines, *i.e.*, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence." <u>United States. v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005).

For the reasons set forth below, if the Court somehow concludes that the advisory Guidelines range calls for imprisonment and that no downward departures apply, the Court should impose a non-Guidelines sentence of probation to reflect the unique circumstances in this case.

---

<u>States</u>, 127 S. Ct. 551 (2006) (granting certiorari on, among other things, issue of whether it is "consistent with <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), to accord a presumption of reasonableness to within-Guidelines sentences?"); <u>see also</u> <u>Claiborne v. United States</u>, 127 S. Ct. 551 (2006) (granting certiorari on related issue of whether it is "consistent with <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005), to require that a sentence which constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances?").  We respectfully submit that affording a Guidelines sentence a presumption of reasonableness is fundamentally inconsistent with the <u>Booker</u> decision, and expect the Supreme Court to reach that conclusion in the near future.

**B.    Consideration Of The Sentencing Guidelines Results In A Guidelines Range That Renders Mr. Jemal Eligible For Probation**

The Court should adopt an advisory Guidelines offense level of six, placing Mr. Jemal in Zone A and rendering him eligible for probation.  We respectfully submit that the calculation in the Presentence Investigative Report ("PSIR") is wrong in two critical respects.  The PSIR concludes that Mr. Jemal's total offense level is 22, based on:  (1) a base offense level of 6 (§ 2B1.1(a)); (2) a 14-level specific offense characteristic enhancement for "intended loss" (§ 2B1.1(b)(1)(H)); and (3) a 2-level enhancement for a leadership role in the offense (§ 3B1.1(c)).  PSIR at 8 (¶¶ 27-35).  The Court should decline to apply the 14-level enhancement for "intended loss" and the 2-level enhancement for a leadership role in the offense because, as applicable Guidelines commentary and case law make clear, neither enhancement is supported by the evidence in this case.

**1.    The "Intended Loss" Enhancement Does Not Apply**

The evidence at trial established conclusively that neither alleged victim in this case -- Joseph Cayre and Morgan Stanley -- suffered any actual loss as a result of the MTD transaction.  Indeed, the PSIR recognizes that both victims have "indicated that they have not suffered a monetary loss as a result of the defendants' conduct."  PSIR at 7 (¶ 23); see also id. at 18 (¶ 87) (concluding that restitution is not an issue because there was no loss).  Therefore, the only issue before the Court is whether any enhancement for "intended loss" should apply.  For the reasons set forth in Defendant Douglas Jemal's Memorandum of Law Regarding Intended Loss Enhancement, submitted herewith, the Court should decline to impose any enhancement for "intended loss" pursuant to U.S.S.G. § 2B1.1(b)(1).

####    2.    Mr. Jemal Was Not A "Supervisor" Of Criminal Activity For Purposes Of The Guidelines

The Court should also decline the PSIR's suggestion to apply the two-level enhancement for aggravating role in the offense under § 3B1.1(c), see PSIR at 7 (¶¶ 19-22), because Mr. Jemal was not a "supervisor" of criminal activity as that term is contemplated by the Guidelines under the specific facts of this case.

Under U.S.S.G. § 3B1.1, a defendant's offense level may be increased by (a) four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive"; (b) three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive"; or (c) two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. § 3B1.1.  Here, the PSIR concludes that the two-level enhancement under § 3B1.1(c) applies because of Mr. Jemal's alleged "supervision of at least three participants."  PSIR at 7 (¶ 19).  On the contrary, no adjustment for role in the offense should apply because the government failed to prove that the Mr. Jemal organized, led, managed or supervised any of the activity relating to the MTD transaction and "[t]his adjustment does not apply to a defendant who merely suggests committing the offense."  U.S.S.G. § 3B1.1 (App. Note 4).

The D.C. Circuit has held that "'all persons receiving an enhancement [under § 3B1.1] must exercise some control over others.'"  United States v. Quigley, 373 F.3d 133, 139 (D.C. Cir. 2004) (citing United States v. Graham, 162 F.3d 1180, 1185 (D.C. Cir. 1998)); see also United States v. Jobe, 101 F.3d 1046, 1065 (5th Cir. 1996) (court vacated two-point enhancement under § 3B1.1(c) because lower court "incorrectly conclud[ed] that [defendant's]

position as director of two of the banks involved . . . demonstrat[ed] that he managed or supervised the criminal activity.").

Here, the evidence failed to establish that Mr. Jemal exercised any degree of control over the participants in the MTD transaction. The government proved only that Mr. Jemal signed the documents needed to open the MTD bank account at Adams Bank, see GX 54; Tr. 657 (Scott), and had a conversation with Mr. Cayre after the relevant events took place in which he explained that Douglas Development submitted the invoice on MTD letterhead to avoid the fighting that took place between them. Tr. 2150 (Cayre). The government did not prove that Mr. Jemal personally played any role in the creation of the MTD invoice or related documents.[4] The government also failed to prove that Mr. Jemal directed anyone else to prepare the MTD invoice or managed any other details relating to the alleged offense. Thus, this case bears no resemblance to those cases in which the D.C. Circuit has held that a defendant's involvement in criminal activity qualified him as an organizer, leader, manager or supervisor. See, e.g., United States v. Rhodes, 894 F. Supp. 1, 4 (D.C. Cir. 1995) (adjustment applied to defendant who "was the one that had the checks,[] was the one who was signing the checks, and [] was directing what was to be done, when and where.") (citation and quotation marks omitted), aff'd without op., 88 F.3d 1279 (D.C. Cir. 1996); United States v. Wilson, 240 F.3d 39, 46 (D.C. Cir. 2001) (defendant in bank fraud case was "'organizer or leader of a criminal activity'" because he "'solicited [participant's] involvement' in the criminal conduct, and gave him 'very explicit directions as to exactly the kind of information, and exactly the kind of profile that he wanted [the participant] to get out of the bank's records.'").

----

[4] Although the government attempted to prove that Mr. Jemal had Mike Rowe sign MTD-related documents, Mr. Rowe testified that he did not know whether the documents Mr. Jemal asked him to sign were related to MTD at all. Tr. 1316-17; 1320-21.

In its section regarding the role enhancement, the PSIR notes that Mr. Jemal "is the owner and operator of Douglas Development Corporation," and that he entered into the loan with Morgan Stanley. PSIR at 7 (¶ 19). The PSIR thus suggests that Mr. Jemal's leadership position in Douglas Development is sufficient to trigger the role enhancement under § 3B1.1.[5] However, the inference that the head of a legitimate company was also an active organizer, leader, manager or supervisor of criminal activity is insufficient to trigger the sentencing enhancement for aggravating role. See United States v. Carter, 449 F.3d 1287, 1299 (D.C. Cir. 2006) ("Absent findings by the district court on [defendant's] degree of control or authority over his associates, the district court could not enhance his sentence under § 3B1.1(a).") (citing United States v. Graham, 162 F.3d 1180, 1185 (D.C. Cir. 1998); United States v. Thomas, 114 F.3d 228, 261 (D.C. Cir. 1996)). The government was required to prove Mr. Jemal's active role in organizing, leading, managing or supervising the offense conduct and failed to do so. In sum, Mr. Jemal should receive no upward adjustment to his offense level based on his role in the offense.

### 3.    Mr. Jemal's Total Offense Level Is Six

Without the unwarranted enhancements for intended loss and role in the offense, Mr. Jemal's total offense level is six. As the PSIR correctly concludes, Mr. Jemal has no criminal history and falls in Category I. PSIR at 9 (¶ 38). Accordingly, Mr. Jemal falls within

---

[5] In response to Mr. Jemal's objection to the role enhancement, the Probation Officer contends that Mr. Jemal's leadership position in Douglas Development was "not a determinate" factor. PSIR at 23 (Addendum). Instead, the Probation Officer states, without citing any evidence upon which the conclusion was based, that Mr. Jemal "had the decision making authority and supervised the other participants." Id. For the reasons set forth herein, this conclusory assertion is not supported by the record.

Zone A of the Sentencing Table, and his range is zero to six months imprisonment. At this range, the Court is authorized to impose a sentence of probation. See U.S.S.G. § 5B1.1(a)(1).

### C.    The Court Should Depart Downward On A Number Of Grounds

Part of the Court's task in considering the applicable Guidelines range is to determine whether any grounds for departure exist in the same manner as before Booker. Crosby, 397 F.3d at 112. Mr. Jemal respectfully submits that a sentence of probation is appropriate in this case before any consideration of downward departures. However, in the event the Court interprets the Guidelines differently, there are several grounds upon which the Court should grant Mr. Jemal a downward departure, including (1) this no-loss fraud involving a single private business transaction is far outside the "heartland" wire fraud offense, (2) incarcerating Mr. Jemal would have a calamitous effect on Douglas Development, resulting in substantial collateral harm to innocent third-party employees and independent contractors, and (3) Mr. Jemal has engaged in extraordinary post-offense rehabilitation by committing to implement a comprehensive compliance program and set of internal controls designed to ensure that Douglas Development personnel understand all applicable laws, regulations and ethics provisions, and properly document and support all invoices prepared by the Company.

### 1.    This Case Is Outside The "Heartland" Wire Fraud Offense

A sentencing court may depart downward on the basis that the defendant's case falls outside the "heartland" of typical cases involving the same offense. As the introduction to the Guidelines states:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from

> the norm, the court may consider whether a departure is warranted.
> . . . With [a few] specific exceptions, . . . the Commission does not
> intend to limit the kinds of factors (whether or not mentioned
> anywhere else in the guidelines) that could constitute grounds for
> departure in an unusual case.

U.S.S.G. Ch. 1, Pt. A § 4(b) (policy statement) (2006).  Thus, a court "may consider whether

departure is warranted in any 'atypical case,' that is, one not falling within the 'heartland' of

cases the Guidelines sought to address."  United States v. Clark, 8 F.3d 839, 845 (D.C. Cir.

1993); see also Koon v. United States, 518 U.S. 81, 96 (1996) (factors not mentioned in the

guidelines may be the basis for departure where they are "sufficient to take the case out of the

[applicable] Guideline's heartland"); In re Sealed Case, 181 F.3d 128, 137 (D.C. Cir. 1999)

(citing Koon).

  Mr. Jemal respectfully submits that this case falls far outside the typical or

"heartland" wire fraud offense.  From its inception, the investigation of Douglas Jemal focused

on the public corruption allegations involving Michael Lorusso, and the public corruption

charges were the centerpiece of the Indictment.  All Defendants were acquitted of all of the

public corruption charges.  We submit that the wire fraud charge and the tax evasion charges

were afterthoughts designed to pressure Mr. Jemal into a plea, which never would have been

prosecuted in a stand-alone case.

  Any doubt as to whether this case is outside the "heartland" wire fraud offense is

put to rest by Department of Justice policy.  Section 9-43.100 of the U.S. Attorney's Manual

instructs prosecutors that "[p]rosecutions of fraud ordinarily should not be undertaken if the

scheme employed consists of some isolated transactions between individuals, involving minor

loss to the victims, in which case the parties should be left to settle their differences by civil or

criminal litigation in the state courts."  See Heberlig Decl. ¶ 205 (Ex. 203).  This case involved a

single private business transaction between Messrs. Jemal and Cayre that involved no loss

whatsoever to any "victim."  We are unaware of any other "no-loss" mail or wire fraud case

prosecuted by the U.S. Attorney's Office for the District of Columbia.  As the U.S. Attorney's

Manual instructs, this is a case that should have been pursued in the civil courts if at all.

        Any applicable provisions of the U.S. Attorney's Manual may properly be

considered by a sentencing court as part of its heartland analysis.  For example, in United States

v. Woods, 159 F.3d 1132 (8th Cir. 1998), the Eighth Circuit took into account a provision of the

U.S. Attorney's Manual outlining what types of cases should be prosecuted under the money

laundering statutes in affirming the sentencing court's determination that the defendant's case

fell outside the heartland of money laundering cases.  Id. at 1135 (noting that "the United States

Attorney's Manual provides that 'only particularly complex and sensitive cases should be

prosecuted' under the money-laundering statutes").  Similarly, in United States v. Bart, 973 F.

Supp. 691 (W.D. Tex. 1997), the sentencing court relied in part on the U.S. Attorney's Manual in

conducting its heartland analysis because it found the Manual to be "probative of how the

government views the intentions of Congress in drafting the statutes and the Commission in

drafting the guidelines and also . . . instructive as to how the government believes the statutes

should be applied."  Id. at 697.  In finding that the defendants' case was atypical and outside the

heartland, the court specifically noted that the government's decision to charge the defendants

under the money laundering statute based on the conduct at issue "appears to deviate from

prosecutorial practices and may controvert . . . the government manual. . . ."  Id. at 698.

        Here, the government's decision to prosecute this wire fraud charge contradicted

Department of Justice policy not to institute a fraud prosecution over isolated private business

transactions that result in minor loss to the victims.  Such a policy is particularly important in

cases such as this where neither "victim" complained or even sought any civil recourse against

Defendants as a result of the transaction at issue. The Court should grant a downward departure because this case falls far outside the "heartland" wire fraud offense.

### 2.    Imprisonment Of Mr. Jemal Would Impose Extraordinary Hardship On His Employees

The Court should depart downward because imprisoning Mr. Jemal would impose an extraordinary hardship on the employees of Douglas Development. Mr. Jemal is the founder, owner and clear leader of Douglas Development. His knowledge, skills, relationships and vision are what make Douglas Development run on a daily basis. If Mr. Jemal is sentenced to prison, there is a substantial possibility that Douglas Development will cease to exist as a viable operation and its approximately 120 employees will lose their livelihoods. Perhaps even more importantly, if Douglas Development ceases to exist, many small and disadvantaged contractors who Mr. Jemal has hired over the years will suffer as well.

A sentencing court may depart downward to avoid imprisoning a small business owner where imprisonment would impose extraordinary hardship on the defendant's employees. United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995). In Milikowsky, the Second Circuit affirmed a downward departure in an antitrust case in which the district court held that imprisoning the defendant would cause significant collateral harm to the defendant's employees. Among other things, the defendant was "the only individual with the knowledge, skill, experience, and relationships to run" the business, and there was a substantial possibility that the company would lose its credit if the defendant was imprisoned, which would have resulted in the company's bankruptcy and the loss of employment for the defendant's employees. Id. at 8-9. The First Circuit has also concluded that a downward departure is permissible where the defendant's incarceration will cause job losses to innocent employees. United States v. Olbres, 99 F.3d 28, 36 (1st Cir. 1996).

In <u>United States v. Somerstein</u>, 20 F. Supp. 2d 454 (E.D.N.Y. 2002), a sentencing court similarly granted a downward departure where the defendant demonstrated her "total 'indispensability to . . . the [] business[].'" <u>Id.</u> at 461 (citation omitted). Among other things, the evidence before the sentencing court established that the defendant was an "exceptional business woman" and the "public face" of her small business, whose "unique talents, flair, dedication to detail, perfectionism, and responsiveness to customers' needs . . . draws the clients." <u>Id.</u> In sum, the court concluded that incarcerating the defendant would "impose a grave hardship on the employees, and with reasonable certainty, will leave them jobless." <u>Id.</u> at 462.

Likewise, in <u>United States v. Toback</u>, No. 01 Cr. 410 (RWS), 2005 U.S. Dist. LEXIS 6778 (S.D.N.Y. Apr. 19, 2005), the sentencing court granted the defendant a post-<u>Booker</u> "non-Guidelines" sentence of probation, where the Guidelines called for 10 to 16 months incarceration, based on the hardship to the defendant's employees that would have resulted from incarceration. The court noted that the defendant was "essential to the successful operations" of his business, and his "daily guidance and input keep the business thriving." <u>Id.</u> at **14-15. According to the court, "[s]hould [the defendant] be imprisoned, a vacuum in leadership would result, significantly threatening the business's continued prosperity and endangering the future employment of its 80 plus employees." <u>Id.</u> at *16.

In this case, the Court should grant a similar downward departure to Mr. Jemal to avoid significant hardship to the innocent employees and independent contractors who rely on Douglas Development for their livelihoods. In 2006, Douglas Development employed 119 individuals and had a gross payroll of $4.62 million dollars. In that same year, Douglas Development contracted the services of more than 873 independent contractors and vendors and paid over $65 million to those individuals. In a very real sense, these employees and many of the

contractors depend on Douglas Jemal to make a living. The collateral consequences to these individuals if Mr. Jemal is incarcerated would be devastating.

Mr. Jemal is the founder, 100% owner, public face and visionary behind Douglas Development. As dozens of letters submitted to the Court reflect, the success of Douglas Development is attributable to Mr. Jemal's personality, tenacity, relationships and ability to do business, time and time again, based on his word and his handshake. Just like the business owners sentenced in <u>Milikowsky</u>, <u>Somerstein</u>, and <u>Toback</u>, Mr. Jemal is utterly indispensable to the successful operation and continued viability of Douglas Development.

Moreover, Douglas Development and the individual LLC's owned by Mr. Jemal depend heavily on financing for their continued operation. Numerous personal guaranties of Mr. Jemal securing loans on his properties have provisions that permit lenders to treat a felony conviction and/or incarceration as a default.[6] To date, Mr. Jemal's lenders have not done so. However, there is a substantial possibility that lenders will hold Mr. Jemal in default if he is incarcerated and no longer able to run Douglas Development on a day-to-day basis. All it would take is a couple of lenders to hold Mr. Jemal in default to create a calamitous "run on the banks" by Mr. Jemal's lenders. Such action would likely lead to bankruptcy and require Mr. Jemal to liquidate properties and fire his employees. Sentencing Mr. Jemal to probation would prevent such a tragic situation.

Lane Potkin, Douglas Development's real estate lawyer for 20 years and someone who has reviewed and negotiated the significant majority of the loans relating to Mr. Jemal's

---

[6] <u>See, e.g.</u>, Heberlig Decl. ¶ 206 (Ex. 204) (Douglas and Joyce Jemal Guaranty for loan from WashingtonFirst Bank to Jemal's Columbia National L.L.C.) (Section 4.1 states: "For purposes of this Guaranty, 'Event of Default' means: (l) a material adverse change in the condition or affairs (financial or otherwise) of the Borrower or the Guarantor, as determined by the Bank in its sole discretion.")).

properties, has grave concerns for the future of the business if Mr. Jemal is incarcerated, and his

letter is worth quoting at length:

> Mr. Jemal has been, and remains, the heart and soul of DDC. He always has taken a hands-on approach to the running of his business, and, for better or worse, the company's infrastructure has not grown along with the growth in the company's holdings. Lenders, brokers, sellers, purchasers and others essential to the continued viability of his company are accustomed to dealing directly with Mr. Jemal, and his absence from the company would in essence leave the ship rudderless, making it nearly impossible for the company to continue its development projects effectively. While his conviction has undoubtedly had a negative impact on the company, his continued presence has enabled it to maintain its course. Unfortunately, given human nature, I have little doubt that if Mr. Jemal is incarcerated those who have stood behind him and his company during these trying times may be inclined to jump ship, resulting in many of his planned projects being placed on hold, or scuttled completely, to the detriment of all.

> More significantly, Mr. Jemal, consistent with his continued belief in and commitment to his development work, has guaranteed personally a large percentage of loans made to his related companies. I have been involved in reviewing the loan documents for almost all of these outstanding loans (which I estimate to be in excess of 150), and many contain provisions which would permit the lenders to declare, or attempt to declare, a default upon his incarceration. To date, his conviction has not caused this result, but there is a significant likelihood that his incarceration will compel some lenders to reconsider their exposure and take pre-emptive action. This, in turn, could result in a herd mentality among lenders, with potentially calamitous consequences, not only to Mr. Jemal and his companies, but to lenders, vendors, tenants and other parties who would be impacted. The mere possibility that these events might occur, and the resulting collateral damage that would be inflicted on many innocent parties, weighs heavily in favor of considering sentencing alternatives which would permit Mr. Jemal to remain actively involved with his company's day to day operations.

Heberlig Decl. ¶ 36 (Ex. 34).

Timothy B. Roberts, one of Douglas Development's first employees who has

worked with Mr. Jemal for 16 years, confirms that:

> Douglas is the heart and soul of the entire organization.  I am in constant contact with our tenants every day and this sentiment is universal.  I honestly believe that without Douglas' commitment to customer service and the guidance he provides to the entire staff, there would not be tenants in many of our properties and our tenants are the lifeblood of this company.  Douglas' passion and energy is the reason I get up everyday and go to work.

Heberlig Decl. ¶ 108 (Ex. 106).

Robert F. Leibner, who represented Douglas Development in its real estate transactions with Lane Potkin for the past 20 years, also fears that the Company will not survive if Mr. Jemal is incarcerated:

> The reality is that Douglas Jemal *is* DDC, and despite the genuine efforts of others in his company, I fear for DDC's continued viability in his absence.  DDC provides a multitude of jobs in this region, and many, many families are dependent on DDC for their economic survival.  Lenders have extended significant loans to DDC premised upon Mr. Jemal's personal guarantee, as well as his unfettered record of performance.  It was made clear at Trial that DDC's infrastructure has struggled to keep pace with its own geometric growth in the last few years.  DDC is desperately in need of Mr. Jemal's continued presence and leadership.

Heberlig Decl. ¶ 35 (Ex. 33).

Dennis O. Kane, President and CEO of Kane Construction, who has seen firsthand how Douglas Jemal has employed contractors throughout the region, similarly describes the devastating impact a sentence of incarceration would have on people who rely upon Mr. Jemal for work:

> I honestly believe that removing Douglas from day to day control of his real estate operation is not something that would be good for our city, his family, vendors, tenants and employees.  I know that may not sound like a good reason to many to keep someone convicted of a crime out of jail.  But if it means that hundreds of good people lose their jobs as a result of the challenges his small organization will have to endure without him, then perhaps you can at least see the cause for concern.  This is not a corporate pin-stripe issue.  The big money real estate professionals will live another day no matter what happens to Douglas Development

- 30 -

> Corp.  In fact, they will probably benefit from the ultimate demise
> of his firm. The ripple effect here will most certainly
> disproportionately affect the many minority and small businesses
> Douglas employs throughout the region.  They are the one's who
> have taken his word over paper for many years.  They are the one's
> who will get the form letter from an attorney handling the certain
> bankruptcy proceeding wherein their lien rights are voided.  Many
> small trade-providing firms are owned by first generation
> Americans.  They will watch as the buildings in which they have
> labored to participate in the American dream by taking a man at his
> word are sold off to major developers -- who have no intention of
> settling up with them. . . . Please don't let this happen.

Heberlig Decl. ¶ 130 (Ex. 128).

The people who could lose their jobs if Douglas Jemal is sent to prison are not pin-striped executives who could easily land on their feet in other corporate positions.  Mr. Jemal takes pride in hiring people from disadvantaged backgrounds who sometimes face difficulty finding employment.  Douglas Development employee Darlene Brown (a government witness at trial) writes, "Douglas is a friendly casual man who treats all individuals in a fair and respectable manner, he will hire the less advantaged person or a person who has taken a wrong turn in life and give them a chance to work towards a new way of life."  Heberlig Decl. ¶ 45 (Ex. 43). Long-time Douglas Development employee Tim Roberts similarly writes that Mr. Jemal is "always willing to give anybody a chance at a job.  Douglas has even given some employees 2nd, 3rd and 4th chances.  He can never say no to somebody who wants to work and better themselves."  Id. ¶ 108 (Ex. 106).[7]

---

[7] See also Heberlig Decl. ¶ 71 (Ex. 69) (Al Hajj Mahdi Leroy J. Thorpe, Jr., an elected Advisory Neighborhood Commissioner in the District, writes:  "What you may not know is that Mr. Jemal's front office staff looks like the United Nations.  He has given employment to those who are poor, neglected by society because of human errors that they made in life or just needs an opportunity for another chance at life to make it."); id. ¶ 88 (Ex. 86) (Frances Phillips, Vocational Counselor at Hope Village, a reentry and work release program in the District, writes about Mr. Jemal's recent hiring of six residents of Hope Village:  "We are pleased that Mr. Jemal
(Continued …)

Douglas Development's many tenants will also be harmed if Mr. Jemal is incarcerated. Mr. Jemal's philosophy of giving people a chance through employment extends to giving opportunities to tenants. A perfect example is expressed in the letter of Yama Jewayni, who describes how Mr. Jemal gave him a chance as a young, 23-year old entrepreneur to open a restaurant and lounge where other District landlords had refused to do so:

> After a few meetings with an associate we managed to get in front of Mr. J for a meeting. We were happy to get that far but we knew what was coming. He asked the usual questions, what is your experience, do you have financial statements etc. . . As we presented our case that while we host a weekly party and "have some money", we have never owned a business. He thought for a second, looked hard at us and said "so you're doing it for someone else and now you want to do it for yourself, alright you can have the space." We were elated and could not believe someone would give us a shot.

> That was just the beginning of how Mr. J treated us. As the true amateurs that we were we ate up the free three months rent for construction and were now in our eighth month trying to get the place open. The bills piled on, we ran out of money twice having to bring investors. As we got close to opening our main concern was how to pay the seven months of back rent we owed. Mr. J had always periodically dropped in to see how we were doing, he saw we were working hard and struggling. When we approached about the back rent he said "Forget the back rent, and I'll give you one more months' free rent so you get on your feet, good luck." The back rent amounted to about $35,000. . . .

> Without that first shot I don't know where I would be.

Heberlig Decl. ¶ 118 (Ex. 116). That first restaurant / lounge that Mr. Jewayni opened was the now-highly successful 18th Street Lounge, and Mr. Jewayni has gone on to open other popular and successful restaurant and lounge establishments in the District, including Dragonfly and Local 16.

---

has given a second chance to individuals who are being released from the Bureau of Prisons and the Department of Corrections.").

A similar opportunity is described by Sam Lloyd, President of locally-owned Kemp Mill Music, who explains how Mr. Jemal helped save two retail Kemp Mill stores employing 18 people after a bankruptcy and liquidation, "after some discussion and little more than a handshake," because Mr. Jemal "embraced us as entrepreneurs, wanting to support our efforts to have a successful, locally owned small business." Heberlig Decl. ¶ 119 (Ex. 117). Freddie Lewis Archer, who created her minority-owned real estate company several years ago, writes of a similar experience: "Six years ago, when I decided to take a 'leap of faith' and start my own firm, Douglas was one of many well wishers; however, his kind words became a tangible deed when he leased office space to my firm and two other minority startups at less than market rate for space in Chinatown." Id. ¶ 178 (Ex. 176). These are but a few examples of the opportunities that Mr. Jemal has given people and continues to give people. Incarceration would bring such opportunities to an end.

In sum, the Court should grant a downward departure because imprisoning Mr. Jemal would have a disastrous impact on Douglas Development and impose substantial collateral harm to its innocent third-party employees, independent contractors, and tenants.

### 3. Mr. Jemal Has Engaged In Extraordinary Post-Offense Rehabilitation

Significant post-offense rehabilitation alone can be the basis of a downward departure by the sentencing judge, even in cases where the defendant puts the government to its burden at trial and does not otherwise accept responsibility. United States v. Chapman, 356 F.3d 843, 847 (8th Cir. 2004). A request for a downward departure on this basis is properly made pursuant to U.S.S.G. § 5K2.0, which provides:

> The sentencing court may depart from the applicable guideline range if . . . the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance . . . of a

> kind, or to a degree, not adequately taken into consideration by the
> Sentencing Commission in formulating the guidelines that, in order
> to advance the objectives set forth in 18 U.S.C. § 3553(a)(2),
> should result in a sentence different from that described.

U.S.S.G. § 5K2.0(a)(1).  See Chapman, 356 F.3d at 848.  In order to warrant a departure under

this section, post-offense rehabilitation must be "atypical."  Id. at 849.  However, "[a]typical

post-offense rehabilitation does not necessarily require that a defendant accept responsibility or

that a defendant begin rehabilitative efforts before arrest."  Id.  Other circuit courts have also

agreed that post-offense rehabilitation may provide a basis for a downward departure, separate

and apart from any consideration of the defendant's acceptance of responsibility.  See, e.g.,

United States v. Hairston, 127 Fed. Appx. 811, 814 (Table) (6th Cir. 2005) (holding that district

court did not err in departing downward based on defendant's post-offense rehabilitation,

without any discussion of defendant's acceptance of responsibility); United States v. Antelope,

65 Fed. Appx. 112, 113 (Table) (9th Cir. 2003) (affirming district court's grant of downward

departure based on post-offense rehabilitation, without any discussion of defendant's acceptance

of responsibility); United States v. Bryson, 163 F.3d 742, 747 (2d Cir. 1998) (noting that

sentencing judge has discretion to depart from applicable guideline range based on defendant's

post-offense rehabilitation, without any discussion of acceptance of responsibility).

        In this case, Mr. Jemal pleaded not guilty to the wire fraud charge, defended

himself at trial and continues to maintain that he did not possess any criminal intent to defraud

Joe Cayre or Morgan Stanley in connection with the MTD transaction.  In this regard, Mr. Jemal

acknowledges that he is not entitled to the "acceptance of responsibility" reduction set forth in

§ 3E1.1 of the Guidelines.  Nonetheless, as the above authority makes clear, significant post-

offense rehabilitative efforts -- even if they do not involve an acceptance of responsibility -- can

provide a basis for a downward departure under the Guidelines.  Mr. Jemal's corporate

compliance efforts after the trial in this case are precisely the sort of atypical actions that warrant a downward departure.

Mr. Jemal has directed counsel immediately to oversee the design and implementation of a sophisticated and wide-ranging corporate compliance program, in consultation with a national accounting firm having expertise in the areas of corporate governance, anti-fraud programs, and accounting internal controls. Counsel has asked Jeffrey E. McFadden, a Steptoe & Johnson partner with seventeen years of legal expertise and experience in these areas, to oversee the design and implementation of the program, and has retained the national accounting firm KPMG LLP to assist in that effort.[8]

The compliance program will be designed to address the following areas: (1) the legal and ethical rules governing contracting relationships with state and federal governments, government agencies, and government officials, including the General Services Administration, the District of Columbia, the State of Maryland, and the Commonwealth of Virginia; (2) the legal and ethical rules governing campaign contributions at both the federal and state level; and (3) anti-fraud programs and accounting internal controls reflecting Sarbanes-Oxley best practices and standards, designed to enhance the Company's risk management of potential fraud and misconduct.

Mr. McFadden and KPMG are actively preparing the compliance program. Shortly before sentencing, Mr. Jemal will present to the Court a written report that includes (1) a description of the compliance programs that have been designed by Mr. McFadden and KPMG; (2) a description of the steps Mr. Jemal has taken to implement the programs including (a) hiring

---

[8] Mr. McFadden played no role in the defense of Mr. Jemal at trial. His biography is attached at Heberlig Decl. ¶ 207 (Ex. 205).

of key professionals and (b) training of all key DDC personnel, and (3) a proposal that the Court require Mr. Jemal to implement the compliance program as a condition of Mr. Jemal's probation.

### D.  Consideration Of The Additional 18 U.S.C. § 3553(a) Factors Strongly Supports A Lenient Non-Guidelines Sentence

After evaluating the Sentencing Guidelines and calculating a potentially applicable Guidelines range, a sentencing court must consider the remaining Section 3553(a) factors in order to "'impose a sentence sufficient, but not greater than necessary,'" to comply with the purposes set forth in 18 U.S.C. § 3553(a).  United States v. Safavian, No. CR 05-0370 (PLF), 2006 U.S. Dist. LEXIS 83170, at *19 (D.D.C. Nov. 16, 2006) (quoting 18 U.S.C. § 3553(a)).  Sentencing courts now have the obligation to consider factors that were discouraged under the pre-Booker mandatory Guidelines regime, such as the history and characteristics of a defendant, the nature of the offense, the need for deterrence, the likelihood of recidivism, and the public's need for protection.  Following Booker, sentencing courts are obligated to evaluate these factors in order to determine the appropriate punishment for a particular defendant, thereby "achieving somewhat more individualized justice."  Crosby, 397 F.3d at 114.

### 1.  Mr. Jemal's History And Characteristics, Including Strong Family Ties And Substantial Charitable And Community Service, Warrant A Non-Guidelines Sentence

Under Section 3553(a), a sentencing court must consider "the history and characteristics of the defendant" when imposing a sentence.  18 U.S.C. § 3553(a)(1) (2000).  This is a wide-ranging factor, permitting sentencing courts to consider many features of the defendant's life when fashioning a fair and just sentence.

One of the most common factors relied upon by sentencing courts to justify a non-Guidelines sentence below the Guidelines range is the strength of a defendant's family ties.

Among other things, courts evaluate the level of support a defendant enjoys from his or her

spouse and children when determining whether to impose a non-Guidelines sentence.  <u>See</u>

<u>Simon</u>, 361 F. Supp. 2d at 42 (sentencing defendant convicted of conspiracy to distribute crack

and using a firearm to a lower non-Guidelines sentence in part because defendant "had been a

caring father"); <u>United States v. Nellum</u>, No. 2:04-CR-30-PS, 2005 WL 300073, at *4 (N.D. Ind.

Feb. 3, 2005) (sentencing defendant guilty of crack distribution to a lower non-Guidelines

sentence in part due to his good relationship with his children).  Letters of support written by

family members, as well as their presence in the courtroom, are indicators of the strong family

ties enjoyed by a defendant.  <u>Nellum</u>, 2005 WL 300073, at *5.

    In this case, Mr. Jemal's history and characteristics strongly favor a lenient non-

Guidelines sentence.  As discussed in greater detail above in the Personal History section,

Mr. Jemal rose to extraordinary heights from very modest means.  After his father's death,

Mr. Jemal assumed the role of patriarch of his entire extended family.  Mr. Jemal provides

emotional support and guidance as well as financial support to his family so that everyone he

loves can enjoy a life as full as his.  According to Paulette Jemal, one of Mr. Jemal's sisters-in-

law:

> After my father-in-law passed away in 1983, Douglas became
> somewhat like a second father to the family.  In today's society, it
> is almost unusual to find a man so committed to the welfare of his
> family.  But the fact is that Douglas has been there for each and
> every member of his family, through countless problems and
> difficult situations with his positive attitude, sound advice and
> financial support.  He has never neglected to help one in need in a
> most gracious and respectful manner.

Heberlig Decl. ¶ 16 (Ex. 14).

    To ensure he is there for his family, Mr. Jemal drives from the District to the New

York City area every Friday to have dinner with the family and spend time with them every

weekend.  Mr. Jemal's daughter, Monette Jemal Mishan,  describes the importance of these

visits:

> My dad is a man that works so hard each and everyday of his life.
> But, no matter what, he would never disappoint his family on a
> Friday night to come home and be with his family for dinner.
> Friday night is our favorite night of the week because we are
> always together, husbands, wives, children, and grandchildren.
> What we have is envied by most around us.  We have a love and
> togetherness that is indescribable.  We truly enjoy each other's
> company.  No matter what the weather conditions are outside or
> how much traffic my dad has to sit in to get home to his family, he
> never ever disappoints us.  He is always there no matter what.

Heberlig Decl. ¶ 5 (Ex. 3).  Each of the letters from Mr. Jemal's family members discusses the

central role that he plays in the Jemal family and the detrimental effects that would result from

losing his guidance and counsel.

    As discussed above, Mr. Jemal is his mother's sole means of support.  In addition,

Mr. Jemal has consistently shared his success with family members in need.  According to

Pamela Jemal, Mr. Jemal's sister-in-law:

> When my husband was suddenly unemployed five years ago,
> Douglas with his charitable efforts, came to our rescue.  His caring
> ways and his generous spirit make him someone very special.
> Douglas's thoughtfulness at my family's bleakest moment created
> a bit of hope to go on.  Every time he offers a helping hand,
> showing he cares and understands, he helps find beauty in this
> difficult life we live.  My life would never be the same without
> Douglas Jemal involved so.  His honesty for the past 36 years has
> proved to me that this man has a golden heart that reaches only
> outward to help those in need.  He is my hero.

Heberlig Decl. ¶ 15 (Ex. 13).

    Mr. Jemal's family members also expressed their support for Mr. Jemal by

attending trial on a regular basis.  The constant presence of his family at his side during these

difficult times reflects Mr. Jemal's role as a loving father and an important presence in the lives

of his family.  Mr. Jemal's nephew, Gregory Jemal, articulates the sentiment shared by many

family members, stating: "I must say that my life would not be the same if Douglas was not part of it. He is not only an uncle to me, but a friend, a mentor, an inspiration, a teacher, and a role model." Heberlig Decl. ¶ 26 (Ex. 24).

Mr. Jemal's caring and compassionate nature also extends to his friends, employees, and the entire community. Mr. Jemal appreciates his good fortune and has not allowed his incredible success to affect his core values and beliefs; he treats people from all walks of life with the same degree of kindness and respect. Perhaps the truest indicator of Mr. Jemal's character is how others react to him. According to Mr. John Scheurer: "If you tour a building with him, he gets hugs from janitors and engineers and the same from business leaders, restaurant owners and others. It is common to go somewhere with Douglas and have someone come up to him and thank him for something he did for them years ago." Heberlig Decl. ¶ 64 (Ex. 62).

Another factor courts consider when evaluating a defendant's history and characteristics is service to the community and charity. See, e.g., United States v. Arthur, No. 04-CR-122, 2006 U.S. Dist. LEXIS 93819, at *27-32 (E.D. Wis. Dec. 22, 2006) (In determining that sentence within the guideline range "would be greater than necessary to satisfy purposes of sentencing," the court found "the guidelines did not account for the defendant's significantly positive personal characteristics, as reflected in her good works and the many letters [the court] received" which "depicted someone who is caring, responsible and eager to help others."); United States v. Mansuetto, No. 5:06CR36, 2006 U.S. Dist. LEXIS 72518, at *15 (N.D.W.V. Oct. 3, 2006) (court found "that the substantial amount and degree of the defendant's community service, coupled with the apparent consistency and length of time over which the defendant has served merits some consideration as a positive sentencing factor in arriving at a variance

sentence" below the Guidelines range); <u>United States v. McQueen, II</u>, No. IP 05-201-CR-1 H/F,

2006 U.S. Dist. LEXIS 84548, at *22-25 (S.D. Ind. Apr. 20, 2006) (defendant's "leadership and

support for his community and his neighbors," generosity "in supporting local charities" and

generosity "with his time, as well" were among the factors weighing in favor of a sentence below

applicable Guideline range).  Throughout his many years in Washington, D.C., Mr. Jemal has

consistently given many hours of his time and significant resources to help those in need without

seeking recognition for his generosity.

   Mr. Alexander M. Padro, an Advisory Neighborhood Commissioner for the Shaw

Neighborhood in Washington, D.C., is grateful to Mr. Jemal for his generosity:  "Whether it was

funding to support commercial revitalization and historic preservation efforts, or providing

backpacks to children of needy families or influenza vaccinations to seniors, Mr. Jemal has

always been ready and willing to help improve the quality of life of the less fortunate members

of our community."  Heberlig Decl. ¶ 81 (Ex. 79).  Father Pierce Klemmt, a priest at Christ

Church in Alexandria, Virginia has also witnessed Mr. Jemal's charitable acts:

> [Mr. Jemal] has a special passion for the poor who, through no
> fault of their own, are separated from getting a good chance to
> make a living, have a family and contribute to the common good.
> Mr. Jemal has helped me, my congregation and the community be
> an asset to those we serve and to confront the obstacles that keep
> people from thriving.

<u>Id.</u> ¶ 38 (Ex. 36).  Similarly, Darlene Brown, Mr. Jemal's long-time assistant who testified at

trial as a government witness, stated:  "I have never seen or worked with anyone in Mr. Jemal's

capacity who is more compassionate about his work, his community, family, friends and

employees."  <u>Id.</u> ¶ 45 (Ex. 43).

Mr. Jemal donates significantly to various religious- and community-based institutions in Washington, D.C., as well as Maryland, Virginia and New Jersey. For instance, according to the Mayor of Deal, New Jersey, Harry I. Franco:

> Because of his keen interest in the education of our children, Mr. Jemal took it upon himself to spearhead the renovation of a facility which today houses hundreds of students and focuses on religious education. He is a fundraiser who generously contributes to many charitable and religious organizations, as well as helping the needy and under-privileged; he is an inspiring role model and mentor whose willingness to get involved sets an example for others to follow.
>
> Should Douglas be incarcerated, the negative impact will be significant. He is a highly respected and well-regarded member of our community. We will be weakened by the absence of his wise counsel and selfless energy.

Heberlig Decl. ¶ 93 (Ex. 91). Similarly, Messrs. Thomas Ponton and Bill McGregor of DeMatha Catholic High School -- to which Mr. Jemal donated $1 million and agreed to donate land for a playing field in 2006 -- stated:

> In just a very short period of time, Mr. Jemal has become the single largest donor to the school, even though he had no prior relationship to DeMatha. With his funds, we are planning to install artificial turf on two fields we presently use. . . . Mr. Jemal's contributions will also help us construct our $12 million Convocation Center, an edifice we plan to start building this spring.

Id. ¶ 39 (Ex. 37).

In addition to monetary contributions, Mr. Jemal also frequently donates use of his properties to worthy causes in the community. Karen Williams Gooden, on behalf of the Kiamsha Youth Empowerment Organization in Prince George's County, recently expressed her gratitude to Mr. Jemal for such a contribution: "Douglas Jemal's corporate decision to provide Kiamsha with office space in-kind for a year is a phenomenal blessing! This will give these young people an opportunity to raise funds towards financial independence, and move them

closer to their ultimate goal of owning property elsewhere in fee." Heberlig Decl. ¶ 214 (Ex. 212).

Many of Mr. Jemal's charitable contributions benefit entire neighborhoods within Washington, D.C. One such project involved the historic Avalon Theatre on Connecticut Avenue, N.W., near Chevy Chase Circle. After acquiring the property, Mr. Jemal agreed to lease, and later sell, the theater to the Avalon Theater Project, Inc. ("ATP"), a non-profit community theater project. According to Debra Yogodzinski, Chair of the Board of Directors of the ATP, the theater project soon experienced financial difficulties:

> Operating a two screen independent movie theater in a chain-dominated film market is a huge challenge. Mr. Jemal assisted us in a number of different ways during the first few years of ATP's operations, including most notably by simply accruing the rent in the months (of which there were more than a few) in which we operated at a deficit.
>
> As if that assistance were not enough, in July 2006, when ATP received grants from the District of Columbia and a bank loan sufficient to allow it to purchase the theater building from Mr. Jemal, he agreed not to collect any of the accrued unpaid rent and other costs owed to him by ATP and discounted the purchase price for the building by $50,000, thus facilitating even further ATP's purchase of the building. Without Mr. Jemal's support throughout the process of ATP's renovation of the theater building and its initial years of operation, this neighborhood treasure would have never been saved.

Heberlig Decl. ¶ 85 (Ex. 83). Mr. Jemal also frequently donates his resources to governmental agencies for the good of all residents of the District and the surrounding communities. A representative of the Department of Justice recently expressed his gratitude to Mr. Jemal for providing such services:

> Members of the Drug Enforcement Administration Metro Area Task Force Group 34 want to extend our sincere appreciation and gratitude for your assistance and cooperation in allowing the use of facility and storage locations. These locations, to include the property located at 9111 Edmonston Road, Greenbelt, Maryland

> and 4800 Addison Road, Capitol Heights, Maryland, played a key
> role in operations conducted by the Task Force. You are an
> example of how citizens can work together with Law Enforcement
> Agencies to successfully combat the war on crime and drug[s] in
> our community. Again accept our sincere thanks and appreciation.

Heberlig Decl. ¶ 95 (Ex. 93) (Letter of Patrick Musselman). These are but a few examples of the

many instances of Mr. Jemal's generosity expressed in the letters to the Court.

Religion is central in Mr. Jemal's life, and many of his donations to various

religious institutions and schools reflect the importance Mr. Jemal places on his beliefs and the

beliefs of others. In addition to purely monetary donations, Mr. Jemal helped save a historic

synagogue in downtown Washington, D.C. from becoming a nightclub by helping to purchase

the building and personally guaranteeing, along with two other local businessmen, the loan

needed to renovate the building. Shalom Baranes, the architect who assisted Mr. Jemal in

restoring the synagogue, describes Mr. Jemal's enthusiasm for this project:

> The most memorable and meaningful project I have worked on
> with Mr. Jemal is one about which he called me one day and told
> me to drop whatever I was doing and to meet him at the corner of
> Sixth and Eye Streets near Chinatown. When I arrived I saw a
> man that was happier than any adult I have ever seen at any
> wedding, Bar Mitzvah or childbirth. Mr. Jemal, along with two
> friends, had just acquired the First Baptist Church building and
> was going to restore it to its original use as a synagogue. We spent
> the afternoon walking the building together and discussing the
> work that would ensue, and to this day, I remember that day as one
> of the most memorable of my entire professional career. I hadn't
> known until that day that Mr. Jemal was a deeply religious man.
> He talked to me about his childhood, his family and his father in
> particular. He talked to me about the importance of providing a
> place in our modern downtown that would offer others the same
> opportunity to be introspective that he had growing up near a
> synagogue in New York. And he talked to me about the
> importance of honoring the memory of loved ones with acts of
> good deeds, or as we commonly refer to them in Judaism,
> *mitzvahs*. Not then nor at any other time did Mr. Jemal ever ask
> me to contribute my services for this project. But I felt so inspired
> and privileged to be involved in this undertaking that the project

> became the most significant pro bono commitment I had ever
> made.

Heberlig Decl. ¶ 131 (Ex. 129).

Mr. Jemal displays the same integrity, values and generosity in his professional

life as he does in his personal interactions.  Among the letters to the Court are numerous

testimonials by colleagues, contractors, vendors and competitors who have benefited from

Mr. Jemal's exceptional honesty and integrity.  According to Leonard A. Greenberg, one of

Mr. Jemal's competitors:

> I have known Douglas personally and professionally for more than
> 15 years.  During that period, he and I have worked on transactions
> and sometimes competed with one another.  No matter what the
> circumstance, however, my experience is that Doug is a man of his
> word.  We have transacted business on a handshake in many
> instances, and I have never been disappointed.  He has always
> honored his commitments, whether they were written or unwritten.
> He is honorable and trustworthy.

Heberlig Decl. ¶ 162 (Ex. 160).

Business associates not only trust Mr. Jemal to keep his word, but also know that

he will ensure that the parties on both sides of a transaction achieve a fair and beneficial result --

a trait uncommon among most businessmen.  Raymond A. Ritchey, Executive Vice President of

Boston Properties, has experienced Mr. Jemal's unique business ethic first-hand:

> [I]n every deal I have with Douglas, I know that he is attempting to
> achieve a final outcome that is beneficial for both parties, and is
> based on the principle of fairness.  Perhaps the best statement to
> his honesty and integrity is I know that, after making a deal with
> Douglas, shaking his hand and looking into his eyes, his "word"
> means much more than any of the thousands of contracts I have
> ever signed.

Heberlig Decl. ¶ 158 (Ex. 156).

Mr. Jemal's sons, Norman and Matthew, work with Mr. Jemal at Douglas

Development.  Mr. Jemal believes that teaching his sons solid professional values and ethics is as

- 44 -

important as imparting the knowledge and skills needed to successfully negotiate real estate

transactions. Norman Jemal describes an early lesson he learned from his father:

> In or about 1991, we purchased a one-story building at 4445
> Wisconsin Avenue. We were partners with a man by the name of
> Michael Johns. . . . Michael had used his retirement money that he
> had accumulated as a structural engineer; it was basically his
> whole life savings. In or about 1998, his investment was worth
> less than he had invested. He needed money, so my father agreed
> to buy him out and gave him all his money back (more than the
> market [value] at that time). At the time I was in my mid-20's and
> I asked my dad, "What are you doing, that is much more than his
> share is worth?" My dad answered me, "we have our whole lives
> to make that money back. That is that man's retirement. He
> worked his whole life for that money, we will be fine."

Heberlig Decl. ¶ 6 (Ex. 4).

In addition to conducting his business affairs with the utmost integrity, Mr. Jemal

uses his development projects as an opportunity to help the underprivileged members of society.

Fellow real estate developer M. Anthony Gould explains:

> I have not only sat on boards with Mr. Jemal and watched him
> champion programs that would benefit the city's hard core
> unemployed, I have seen him get his hands dirty by making that
> happen.
>
> His development projects go out of their way to employ Hispanic
> and African American workers. They are paid fairly and taught
> skills that lead to trade and career advancement. And many of his
> future endeavors will be ground breaking initiatives in the poorest
> parts of the District, Anacostia for example. In many respects, he
> is a pioneer. Not surprising, for he is only one generation removed
> from the same economic status.

Heberlig Decl. ¶ 97 (Ex. 95).

Mr. Jemal demonstrates a commitment to the city of Washington, D.C. that is

unmatched by other real estate developers. According to Dennis J. Cotter, Executive Vice

President of James G. Davis Construction Corporation: "Nobody loves the District more than

Douglas. . . . He cares so much and wants to be remembered in this town as someone who

worked hard to make Washington, DC a better place to live and to do business."  Heberlig Decl.

¶ 125 (Ex. 123).  Likewise, former Deputy Mayor for Planning and Economic Development Eric

Price, who was involved in many of the District's decisions relating to the 77 P Street and

Addison Road properties at issue in the trial, and his colleagues at Abdo Development, write:

> As a business leader [Mr. Jemal] has been at the fore-front of the
> District's economic revitalization.  His real estate investments,
> often in areas of the City that have suffered years of neglect, have
> been a catalyst for future economic investment and through his
> civic activities he has shown what it means to be a 'corporate
> citizen' by committing his time, and resources, to worthwhile
> projects throughout the city.

Heberlig Decl. ¶ 181 (Ex. 179) (Letter of Jim Abdo, Eric Price and Toby Millman).  Ward 2

Councilmember Jack Evans also explains how  Mr. Jemal's commitment to investing in areas

other developers shunned has rejuvenated the City:

> I have had the pleasure of knowing Doug Jemal for many years
> and my ward has benefited greatly from Doug's extensive
> downtown redevelopment.  Doug has been a key player in the
> revitalization of our city and was a pioneer -- investing in areas we
> now know to be prosperous, when no other developer would dare.
> Gallery Place and the 7th Street corridor is the 'Times Square' of
> DC and Doug was there well before the glory days.
>
> Doug has also been very focused on historic preservation and in
> making sure the retailers and others using his property are
> appropriate for our city.  His commitment to the civic good of
> Washington has greatly benefitted all of us who live and work
> here.

Heberlig Decl. ¶ 70 (Ex. 68).  Likewise, former District of Columbia Councilmember Harold

Brazil writes:

> I admire Doug because he believed in this city, he kept his head
> while all, it seemed, were losing theirs. While others were in
> retreat, Doug invested in the city, with his time, his money, his
> know-how, his family, and his livelihood. Gallery Place, F Street,
> N.W. and Woodey's, for example, would not have been what they
> are today if it were not for Doug's investment. I believe that Doug

> is a brave man and one that we all should admire and thank for
> what he did for our city.

Heberlig Decl. ¶ 204 (Ex. 202).  Numerous other letters detail how Mr. Jemal's investments in

the District have greatly improved many depressed areas of the city.

Mr. Jemal's love for Washington, D.C. is a driving force behind his efforts to

return the downtown area to its former glory by responsible development designed to preserve

and protect historical architecture.  Often at his own expense, Mr. Jemal goes to great lengths to

preserve the historical and architectural integrity of the downtown buildings he restores and

insists that they remain vacant until he locates a tenant that best suits the needs of the area.

Jameson Cahill describes the substantial measures Mr. Jemal undertook to ensure that the

development of the 7th Street corridor was "done right:"

> I was the Lender for Mr. Jemal's Chinatown project.  I was amazed
> at Douglas' attention to detail when he described how he planned
> to restore the blighted store fronts along 7th Street to their original
> condition circa the early 1900's.  He had gone through the trouble
> of digging up the original plans and old photographs.  The bank for
> which I worked at the time became concerned about the
> burgeoning budget and suggested that Douglas cut back on some
> of the esthetic aspects of the plans and focus more on the practical.
> Douglas refused stating that the project needed to be done right
> since it was across the street from the new MCI Center (now
> known as the Verizon Center) and it would help stimulate growth
> in a blighted area of the City.  The bank, still concerned about the
> final loan value, revised the budget and reduced the loan amount.
> This did not deter Douglas.  He stuck to his original plans and
> budget and paid for the additional costs not funded by the loan out
> of his own pocket, right down to the decorative urns that sit atop
> the buildings that he had hand made in England.  Today, Jemal's
> Chinatown is one of the most beautiful and successful real estate
> projects in the city.

Heberlig Decl. ¶ 65 (Ex. 63).

Mr. Jemal never seeks a "quick buck" to the detriment of the District.  In fact

Mr. Jemal often sacrifices his own profit to make sure that, once renovated, his buildings house

tenants that will most benefit the surrounding area, and completed properties sometimes sit

vacant for extended periods while Mr. Jemal searches for the right tenant.  Mr. Jemal's

construction manager on the Woodies building project, Greta Perry, explains:

> During my work at Woodies, for over a year, I worked with the
> design and construction team of *Ross Dress for Less* as they
> negotiated a lease to establish a retail store at Woodies.  After an
> enormous outlay of architectural and engineering fees by Douglas
> he killed the deal.  He did so because the quality of this retailer
> was not what was best for downtown Washington retail.  *Ross
> Dress for Less* was a financial win for the economics of the
> project, but Douglas based his decision on what was best for
> Washington and the future of the downtown retail not what the
> lender for the building might like to see.

Heberlig Decl. ¶ 123 (Ex. 121).  Mr. Jemal did not rent this space in the Woodies building for

approximately a year until he located the right tenant that would benefit the District, a West Elm

designer furniture store.  On April 12, 2006, with full knowledge of Mr. Jemal's impending trial,

then-District of Columbia Mayor Anthony Williams announced the forthcoming arrival of West

Elm's flagship store to the Woodies building, while standing side-by-side with Mr. Jemal,

stating:  "This is a big, big gain for the city."  <u>See</u> Mayor's Weekly Press Briefing, April 12,

2006.

In sum, the letters submitted to the Court make clear that Mr. Jemal is a man

devoted to his family, friends and community.  Mr. Jemal continuously donates his time and

resources to improve the lives of others, and he looks forward to the opportunity to continue

doing so.  Matthew J. Klein, one of Mr. Jemal's competitors, expressed this sentiment well:  "His

leadership and commitment to Washington has been omnipresent and his contributions to the

community are numerous and well documented.  The Washington, DC area is better off when

Douglas Jemal is an engaged and productive member of the business community."  Heberlig

Decl. ¶ 151 (Ex. 149).  The central role Mr. Jemal plays in his entire family's well-being, the

integrity and compassion with which he conducts his personal and professional life, and the extraordinary contributions Mr. Jemal has made to the community strongly favor a lenient non-Guidelines sentence of probation in this case.

>   **2.    There Is No Need To Protect The Public Through A Lengthy Prison Sentence Because There Is No Chance of Recidivism**

In determining an appropriate sentence, courts must also consider the need for the sentence to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C) (2000). Two key indicators of the likelihood of recidivism are the defendant's age at the time of sentencing and criminal history. A non-Guidelines sentence is appropriate in the case of an elderly, first time offender because the Sentencing Guidelines do not take into account the fact that defendants who are over the age of forty "exhibit markedly lower rates of recidivism in comparison to younger defendants." United States v. Carmona-Rodriguez, No. 04 CR. 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citations omitted); see also United States v. Hernandez, No. 03 CR 1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (imposing lower non-Guidelines sentence on 49-year old defendant in part because defendants over 40 "exhibit markedly lower rates of recidivism" in comparison to younger defendants); Nellum, 2005 WL 300073, at *3 (court sentenced the defendant to a lower non-Guidelines sentence in part due to the fact that even with the lower sentence, the defendant, "will be released from prison when he is roughly 65 years old. . . . The likelihood of recidivism by a 65-year old is very low."); Simon, 361 F. Supp. 2d at 48 (sentencing 43-year old defendant to lower non-Guidelines sentence because, "[t]he Guidelines' failure to account for [the correlation between increased age and decreased recidivism rates] renders it an imperfect measure of how well a sentence protects the public from further crimes of the defendant.").

In Mr. Jemal's case, the likelihood of recidivism is zero. Mr. Jemal is 64 years old. Moreover, Mr. Jemal is a first time offender, having been a caring husband and father, a hardworking businessman and a pillar of his community his entire life. In short, Mr. Jemal is not a criminal from whom the public needs protection, and there is no fear of recidivism in this case. Accordingly, this factor weighs in favor of a non-Guidelines sentence.

### 3.     The Nature And Circumstances Of The Offense Warrant Leniency

Another factor courts must evaluate in determining an appropriate sentence is "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1) (2000). Pursuant to 18 U.S.C. § 3553(a), the court now has the discretion to review all the facts surrounding an offense and apply a non-Guidelines sentence if it finds circumstances that justify lenience. See Safavian, 2006 U.S. Dist. LEXIS 83170, at *19 (18 U.S.C. § 3553(a) factors "clearly can inform the Court's discretion in considering the Guidelines, and whether the Guideline range for this individual defendant properly reflects the nature and circumstances of his offense, the seriousness of those offenses, and what sentence would constitute just punishment for those offenses.").

As discussed above, and in Defendant Douglas Jemal's Memorandum of Law Regarding Intended Loss Enhancement, the "victimless" offense in this case was a private business transaction that resulted in no loss. Indeed, the Probation Officer concluded that "[p]ursuant to 18 U.S.C. § 3553(a)(1), the Court may find the nature and circumstances of the Wire Fraud offense are such that there was no intended loss." PSIR at 19 (¶ 88). Among the circumstances the Probation Officer enumerated in support of a conclusion that there was no intended loss are: "[b]oth victims, Morgan Stanley and Joseph Cayre, testified at trial that neither suffered a loss as a result of the defendants' conduct" and the value of 77 P Street and

Mr. Jemal's personal guaranty "provided for a substantial collateral in excess of the value of the fraudulent invoice, thereby reducing the amount of intended loss to zero." Id. In addition, Mr. Jemal spent far in excess of the amount of the MTD invoice on tenant improvements construction after the tenant improvements reserve was exhausted and thereby effectively returned the amount of the MTD invoice to the lender before the offense was detected. In sum, the nature and circumstances of the offense weigh strongly in favor of a lenient non-Guidelines sentence of probation.

## V.    CONCLUSION

For the reasons set forth above, the Court should sentence Mr. Jemal to a term of probation with a special condition requiring Mr. Jemal to adopt and implement a comprehensive corporate compliance program for Douglas Development.

Respectfully submitted,

_____
Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
 (202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334

Counsel for Douglas Jemal

Dated:  February 21, 2007

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on February 21, 2007, a copy of the foregoing Sentencing Memorandum of Douglas Jemal was served on the government by the ECF filing system, and to Probation Officer Renee Moses-Gregory by email at: <u>Renee_Moses-Gregory@dcp.uscourts.gov</u>.

 

                                              _____

                                              Brian M. Heberlig