UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| v. | ) | Crim. No.  05-0359-1 (RMU) |
| | ) | |
| DOUGLAS JEMAL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____)

DEFENDANT DOUGLAS JEMAL'S MEMORANDUM
OF LAW REGARDING INTENDED LOSS ENHANCEMENT

I.    INTRODUCTION

The Court should decline to enhance the advisory Sentencing Guidelines offense level of Douglas Jemal on the basis of "intended loss."[1]  The evidence at trial demonstrated conclusively that there was no actual loss in this case.  In testimony largely elicited by the government, alleged victims Joseph Cayre and Morgan Stanley representative Benjamin Black both testified that they did not lose any money in connection with the MTD Real Estate ("MTD") transaction that forms the basis of the wire fraud charge (Count Four).  Mr. Cayre further testified that Mr. Jemal was entitled to the funds at issue under their agreement, indicating that there is also no "intended loss" with respect to Mr. Cayre.

_____

[1] Mr. Jemal is also filing a Sentencing Memorandum in which he addresses other legal issues relating to sentencing and makes a specific sentence request.  However, Mr. Jemal submits this memorandum separately because the Court is obligated to consider Mr. Jemal's advisory Guidelines range when determining an appropriate sentence under 18 U.S.C. § 3553 (2000 & Supp. IV 2004), United States v. Booker, 543 U.S. 220 (2005), and the issue of "loss" is the single largest factor determining the Guidelines range.

The only issue facing the Court with respect to the loss enhancement, therefore, is whether Defendants Douglas Jemal and Blake Esherick ("Defendants") intended a loss to Morgan Stanley in connection with the MTD transaction. Indeed, in its recent sentencing memorandum relating to Blake Esherick, the government argues only that there was an intended loss to Morgan Stanley with no mention of Mr. Cayre. The Presentence Investigation Report ("PSIR"), without any analysis, states that Defendants intended a loss of $430,039.08 -- the full amount of the MTD invoice -- and that a 14-level enhancement applies pursuant to U.S.S.G. § 2B1.1(b)(1)(H). PSIR at 8 (¶ 28). However, the PSIR further identifies several factors from which the Court could conclude that there was no intended loss, and that the base offense level should remain at a level six. Id. at 19 (¶ 88). In other words, the PSIR essentially leaves it for the Court to decide whether any enhancement for "intended loss" applies in this case.

The law and facts of this case leave no doubt that the Court should decline to apply any "intended loss" enhancement. First, the government simply failed to prove that Defendants intended to cause Morgan Stanley to lose any money in connection with the MTD transaction. On the contrary, the evidence established that the MTD invoice was focused on Mr. Cayre and submitted to avoid the historical hassling that Mr. Cayre gave Mr. Jemal over fees and commissions.

Second, in fraudulent loan cases, courts have consistently taken into account the value of any collateral provided by the defendant for the loan when determining intended loss under the Guidelines. Here, even if Defendants' conduct relating to MTD was directed at Morgan Stanley, the Morgan Stanley loan was secured by $30 million in equity in the 77 P Street building, as well as the personal guaranties of Douglas Jemal and Joe Cayre -- individuals worth hundreds of millions of dollars. This collateral renders the intended loss zero.

Finally, even if the funds paid pursuant to the MTD invoice should have been spent on tenant improvements construction instead of leasing commissions, the intended loss would still be zero because Defendants spent far in excess of the amount of the MTD invoice on tenant improvements construction after the tenant improvements reserve was exhausted and prior to the government's detection of the alleged scheme. Thus, the $430,000 was effectively returned to the lender before the offense was detected and Defendants are entitled to a credit against loss of the full amount of the MTD invoice, rendering the applicable loss zero.

In sum, the Court should decline to impose the substantial 14-level intended loss enhancement proposed in the PSIR. PSIR at 8 (¶ 28). Instead, Mr. Jemal's offense level on the wire fraud offense should remain at a level six.

## II.      BACKGROUND

Count Four charged the Defendants with violating the wire fraud statute, 18 U.S.C. § 1343, by allegedly devising a scheme to defraud relating to a commercial loan obtained from Morgan Stanley by Cayre Jemal's Gateway, the entity that owned the 77 P Street property. Count Four alleged that the scheme to defraud involved obtaining leasing commissions by way of a false MTD invoice in order to: (a) obtain partnership funds from Mr. Cayre, and (b) obtain funds from Morgan Stanley out of a tenant improvements reserve that was part of the loan.

Mr. Cayre and Mr. Jemal formed the Cayre Jemal's Gateway entity to purchase the property at 77 P Street. Mr. Jemal's agreement with Mr. Cayre was roughly as follows: Mr. Cayre provided the funds for the purchase of the property and some of the construction costs. Mr. Jemal was the hands-on manager of the project, providing construction, property management and leasing services through Douglas Development Corporation ("Douglas Development" or the "Company"). When the property made a profit, Mr. Cayre was to be repaid

his capital investment plus interest, and Messrs. Jemal and Cayre would split the remaining

profits 50-50. Mr. Cayre would also pay Douglas Development fees and commissions for the

services it provided.

Prior to this project, Mr. Cayre had always given Mr. Jemal a hard time paying

these types of fees and commissions. Although they were friends and had a family connection,

their professional relationship was frequently contentious. Especially in the early days,

Mr. Cayre repeatedly complained that he was paying too much in fees and commissions and

routinely questioned Douglas Development's entitlement to these legitimate fees. After talking

it through, Mr. Cayre would typically pay the fees and commissions that he owed Douglas

Development, but it was rarely without a hassle. Several letters reflecting these disputes were

admitted in evidence at trial. See Defense Exs. 912, 914, 920, 923 & 932 ("DX"). A review of

this correspondence indicates that Mr. Cayre appeared to enjoy pushing Mr. Jemal's buttons and

hassling him over money to which Douglas Development was entitled.

On the 77 P Street project, after some fighting over these same issues,

Messrs. Jemal and Cayre reached an agreement that Mr. Cayre would pay a standard leasing

commission on all leases obtained for the building, which was six percent in the industry.

Mr. Cayre agreed to pay a six percent commission on the entire 77 P Street project, taking into

account all of the rents on all of the leases in the building. Mr. Cayre agreed to pay these

commissions to either outside brokers or to Douglas Development. Despite this agreement,

Mr. Cayre continued to hassle Mr. Jemal over legitimate commissions that Douglas

Development was entitled to. See DX 932 (September 9, 2003 letter from Mr. Jemal to

Mr. Cayre, stating with respect to unpaid leasing commissions: "Why is it so difficult for us to

get paid for what we do?").

In late-2002, Messrs. Jemal and Cayre refinanced 77 P Street and obtained a $67 million loan from Morgan Stanley. The loan had three components: (a) approximately $41 million was to pay off the existing lender on the property, (b) approximately $19 million was held back by Morgan Stanley to be paid when the building was fully occupied and the construction completed, and (c) approximately $7 million was in a tenant improvements reserve that was to be used to pay the remaining tenant construction costs and related expenses, such as leasing commissions.

In November 2002, Douglas Development personnel submitted several invoices to Morgan Stanley to be paid out of the tenant improvements reserve. Two of the invoices were for leasing commissions related to a lease transaction with the District of Columbia's Department of Transportation and Department of Health. Douglas Development acted as the broker representing the landlord (the Cayre Jemal's Gateway partnership) on these transactions. The Department of Health was represented by The Staubach Company in the lease negotiations and one of the invoices was for Staubach's commission. Although the Department of Transportation was not represented by an outside broker, the draw request included an invoice from MTD for a commission relating to the Department of Transportation portion of the lease. Because Mr. Cayre had agreed to pay six percent in commissions on all leasing transactions, it was believed that Douglas Development was entitled to the full six percent commission. To avoid the historic hassling that Mr. Cayre had given Mr. Jemal on other legitimate Douglas Development fees and commissions, Douglas Development personnel submitted the invoice on MTD letterhead without disclosing MTD's affiliation with Douglas Development. Morgan Stanley paid the invoice out of the tenant improvements reserve of the loan.

At trial, as set forth in greater detail below, alleged "victims" Joe Cayre and Morgan Stanley representative Benjamin Black both testified that they did not lose any money as a result of the MTD transaction.

## III.    ARGUMENT

The government failed to prove that there was any actual or intended loss to either Joe Cayre or Morgan Stanley for purposes of the Guidelines.  Accordingly, the Court should not enhance Mr. Jemal's advisory Guidelines range on the basis of loss.

Under U.S.S.G. § 2B1.1(b)(1),[2] a defendant's base offense level may be increased based upon the applicable "loss" amount.  Application Note 2(A) to § 2B1.1 provides that "loss is the greater of actual loss or intended loss."  Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1 (App. Note 2(A)(i)).  Intended loss is "the pecuniary harm that was intended to result from the offense . . . ."  Id. (App. Note 2(A)(ii)).  The application notes further provide that any loss shall be reduced by:  "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not

---

[2] All citations are to the 2002 Sentencing Guidelines Manual because the offense conduct was complete as of December 2002.  The Court must apply the 2002 Guidelines because the base offense level would be higher under the 2003 Guidelines, which would violate the ex post facto clause of the United States Constitution.  See U.S.S.G. § 1.B1.11(b)(1) ("If the court determines that the use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."); United States v. Mellen, 393 F.3d 175, 180 n.1 (D.C. Cir. 2004).  Specifically, under the 2002 Guidelines Manual, the base offense level for wire fraud is 6.  U.S.S.G. § 2B1.1(a).  Under the 2003 Guidelines Manual, effective November 1, 2003, the base offense level for wire fraud is 7.  U.S.S.G. § 2B1.1(a)(1).  The Probation Office agrees that the Court must apply the 2002 Guidelines Manual to avoid an ex post facto violation.  See PSIR at 8 (¶ 26).

been disposed of by that time, the fair market value of the collateral at the time of sentencing."
Id. (App. Note 2(E)(ii)).

>    A.    **The Court Should Require The Government To Establish The Applicable Loss Beyond A Reasonable Doubt**

As an initial matter, the Court should require the government to prove the loss amount beyond a reasonable doubt in light of the enormous impact the loss calculation has on the Guidelines range in this case -- potentially increasing the applicable range by 14 offense levels. Under the reasonable doubt standard, the government cannot establish that Defendants intended any loss, let alone a loss of $430,000.

Prior to United States v. Booker, 543 U.S. 220 (2005), the standard for resolving most factual disputes under the Guidelines was a preponderance of the evidence. United States v. Long, 328 F.3d 655, 670-71 (D.C. Cir. 2003). However, the Supreme Court recognized, without deciding, that there was "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." United States v. Watts, 519 U.S. 148, 156 (1997) (per curiam); see also McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986) (holding out the possibility that a higher standard of proof would be required to satisfy Due Process where a sentencing enhancement becomes "a tail which wags the dog of the substantive offense"). The D.C. Circuit recognized that in "extraordinary circumstances a clear and convincing standard may be required," but declined to apply such a standard to a sentencing enhancement involving a six-level increase to the defendant's offense level. United States v. Kwong-Wah, 966 F.2d 682, 688 (D.C. Cir. 1992); see also Long, 328 F.3d at 671 (similarly recognizing that "'extraordinary

circumstances'" may justify a higher standard of proof but declining to apply one in a case involving an eight-level increase).[3]

Post-Booker, the D.C. Circuit reaffirmed its holding that facts triggering enhancements under the Guidelines need only be proved by a preponderance of the evidence in the typical case. United States v. Dorcely, 454 F.3d 366, 373 (D.C. Cir. 2006), cert. denied, 127 S. Ct. 691 (2006). However, the court recognized that the Supreme Court has "left open the question whether a higher standard of proof might be necessary if relevant conduct dramatically increased the sentence," an argument the defendant did not advance in Dorcely. Id. at 373 n.2.

A sentencing court that has addressed the issue of loss calculation post-Booker has required the government to prove loss beyond a reasonable doubt. According to the court, "[c]ertain facts like the amount of loss continue to assume inordinate importance in the sentencing outcome. So long as they do, they should be tested by our highest standard of proof." United States v. Pimental, 367 F. Supp. 2d 143, 153 (D. Mass. 2005). The sentencing court rejected the government's suggested loss figure of over half a million dollars, finding that no loss had been established beyond a reasonable doubt, and sentenced the defendant to a non-

---

[3] Numerous other circuits recognized that a higher standard of proof was potentially required when an enhancement or upward departure resulted in a large increase in the Guidelines range. See United States v. Gigante, 94 F.3d 53, 56 (2d Cir. 1996) ("Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond reasonable doubt where appropriate. Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly."); United States v. Trujillo, 959 F.2d 1377, 1382 (7th Cir. 1992) (holding "due process demands increased scrutiny at sentencing" in extreme cases); United States v. Townley, 929 F.2d 365, 369-70 (8th Cir. 1991) (holding that factor producing a potential 18-level increase in offense level requires higher standard of proof); United States v. Munoz, 233 F.3d 1117, 1127 (9th Cir. 2000) (holding factor producing potential 9-level enhancement requires higher standard of proof); United States v. St. Julian, 922 F.2d 563, 569 n.1 (10th Cir. 1990) (holding the standard of proof may vary when the difference between a departure sentence and a guideline range is great).

Guidelines sentence of probation rather than the Guidelines range of 27 to 33 months. <u>Id.</u> at 155-57.

One court in this District noted an alternative approach in which the sentencing court would not apply a higher standard of proof but would depart downward from the advisory Guidelines range where a sentencing enhancement dramatically increased a sentence:

> in those cases where enhancements become unreasonable in relation to the convicted offense, a sentencing court would depart from the advisory Guidelines range pursuant to the provision in 18 U.S.C. § 3553(a) requiring a court to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

<u>United States v. Edwards</u>, 427 F. Supp. 2d 17, 26 n.5 (D.D.C.), <u>appeal</u>, 198 Fed. Appx. 4 (D.C. Cir. 2006).

Here, the loss calculation is the most significant factor in determining Mr. Jemal's Guidelines range. In fact, the PSIR recommends that Mr. Jemal receive a substantial 14-level enhancement for a loss greater than $400,000, which, if applied, would increase Mr. Jemal's sentence range from probation to several years of incarceration. PSIR at 8 (¶ 28). In light of the overwhelming significance of the loss determination and resulting sentence enhancement in this case, the Court should hold the government to a reasonable doubt standard that recognizes the significance of this important issue and ensures that the resulting sentence range represents a "just punishment." 18 U.S.C. § 3553(a)(2)(A). Under such a standard, the government cannot establish beyond a reasonable doubt that Mr. Jemal intended a loss greater than $400,000.

**B.    <u>Mr. Cayre Suffered No Actual Loss As A Result Of The Offense</u>**

The testimony at trial established conclusively that Mr. Cayre suffered no actual loss for purposes of the Guidelines. Mr. Cayre testified that he fought repeatedly with Mr. Jemal

about commissions until "we finally made an agreement after some time that there would be a 6 percent commission paid, and I really didn't care who it was paid to. [Douglas Jemal] could either take it all or give it all away . . . ." Tr. 2118.  On direct examination, the government asked Mr. Cayre if the $430,000 commission at issue in the MTD invoice was a commission that Douglas Jemal would have been "entitled to" under this agreement. Tr. 2144. Mr. Cayre responded: "Yes. It would have been a leasehold commission. . . . And it was within the 6 percent guideline that he and I worked out." Id.

On cross-examination, Mr. Cayre clarified that this agreement "took into account the entire P Street project" and contemplated Mr. Cayre paying leasing commissions of six percent of the rent negotiated for all of the leases at 77 P Street. Tr. 2179. Mr. Cayre also confirmed that he "didn't care if Douglas Jemal got the money, if brokers [he] never heard of got the money, or if the money went to charity . . .," stating: "I didn't care where the money went, as long as it wasn't any more than 6 percent." Id. Mr. Cayre further testified that he did not pay more than six percent in commissions on the 77 P Street project. Tr. 2180. As a result, Mr. Cayre confirmed that he has "concluded that [he has] not been defrauded out of one penny as a result of the MTD commission." Id. The government offered no other evidence that Mr. Cayre lost money as a result of the MTD transaction, and did not impeach Mr. Cayre's testimony in any way. Moreover, in its sentencing memorandum filed recently in the Esherick case, the government does not argue that Mr. Cayre suffered any actual loss. Accordingly, there was no actual loss to Mr. Cayre from the offense.

### C.    Mr. Jemal Did Not Intend Any Loss To Mr. Cayre

There was also no intended loss to Mr. Cayre from the offense. Mr. Cayre testified that he repeatedly argued with Mr. Jemal about leasing commissions and other fees,

which eventually led to an agreement with Mr. Jemal to pay leasing commissions of six percent of the rents obtained on the entire 77 P Street project.  <u>See</u> Tr. 2117 (Mr. Cayre testified that he and Mr. Jemal "fought like cats and dogs" over fees and leasing commissions).  Despite their agreement, Mr. Cayre continued to hassle Mr. Jemal over leasing commissions and fees to which Douglas Development was entitled well into 2003.  Tr. 2173.

       The evidence at trial established that Defendants submitted the invoice on MTD letterhead to avoid the historic disputes that Mr. Jemal had with Mr. Cayre over leasing commissions; not to obtain funds to which Defendants were not entitled.  During Mr. Cayre's direct examination, the government elicited Douglas Jemal's statement regarding the purpose of MTD:  "[H]e sa[id] the reason that I did it that way is because you always break my balls and call me up and scream and holler, so we did it that way, it was within our 6 percent, so what do you care anyway."  Tr. 2150.  Similarly, the government also elicited from one of its witnesses the statement of Douglas Development construction vice president Paul Millstein that MTD was used "so that there just wouldn't be the fighting between the two of them, [and] they could collect the commission <u>that they were entitled to</u>."  Tr. 864 (emphasis added).  The evidence establishes that Defendants did not intend to cause any monetary loss to Mr. Cayre.

       In its sentencing memorandum filed recently in the Esherick case, the government does not argue that there was any intended loss relating to Mr. Cayre.  Accordingly, there is no intended loss to Mr. Cayre for purposes of the Guidelines.

### D.   <u>Morgan Stanley Suffered No Actual Loss As A Result Of The Offense</u>

       Morgan Stanley also suffered no actual loss for purposes of the Guidelines.  Benjamin Black was the only Morgan Stanley witness who testified at trial.  At the end of his

direct examination, the government established that Morgan Stanley did not lose any money as a result of the MTD transaction:

> Q.  I just have one more question, Mr. Black.  <u>Just to be absolutely clear for the record</u>, did Morgan Stanley lose any money on this deal?
>
> A.  It is my understanding that Morgan Stanley did not lose any money on this deal.

Tr. 1236 (emphasis added); <u>see also</u> Tr. 1268 (Mr. Black confirming on cross-examination that Morgan Stanley did not "lose one penny as a result of this commission payment to MTD").  The government did not attempt to impeach this testimony and introduced no other evidence that Morgan Stanley lost any money as a result of the MTD transaction.  In its sentencing memorandum filed recently in the Esherick case, the government does not argue that Morgan Stanley suffered any actual loss.

If there was any doubt on this issue, an additional reason why Morgan Stanley suffered no actual loss in connection with the MTD transaction is that Morgan Stanley sold the 77 P Street loan into a loan securitization pool shortly after the closing date.  As a result, Morgan Stanley was effectively paid off shortly after it made the loan to Cayre Jemal's Gateway.  The 77 P Street loan was the largest loan in a $835 million loan securitization pool issued by Morgan Stanley Dean Witter Capital I Trust 2002-IQ3 ("Capital Trust").  <u>See</u> Declaration of Brian M. Heberlig In Support of Defendant Douglas Jemal's Sentencing Memorandum And Memorandum of Law Regarding Intended Loss Enhancement ¶ 208 ("Heberlig Decl.") (Ex. 206) (excerpts from prospectus).  Morgan Stanley sold the 77 P Street loan to Capital Trust in a transaction that closed on December 17, 2002 -- shortly after the MTD transaction took place.  Thus, Morgan Stanley suffered no loss because it sold the loan and there was never any default.

E.     **Mr. Jemal Did Not Intend Any Loss To Morgan Stanley**

Mr. Jemal submits that the evidence at trial also failed to establish that Defendants intended to cause Morgan Stanley to suffer any loss. As set forth above, all direct evidence of intent established solely that MTD was used to avoid Mr. Jemal's historic disputes with Mr. Cayre over fees and commissions. There was no evidence that the MTD invoice was intended to cause any loss to Morgan Stanley.

1.     **There Was No Intended Loss To Morgan Stanley Because The Morgan Stanley Loan Was Secured By Collateral Worth Far More Than The $430,000 MTD Invoice**

Moreover, there is another consideration that establishes conclusively that there is no intended loss relating to Morgan Stanley for purposes of the Guidelines. The Morgan Stanley loan was fully secured by collateral that ensured that Morgan Stanley could not suffer any loss. The value of this collateral must be taken into account in determining any intended loss, which under the facts of this case necessarily means that there was no intended loss.[4]

---

[4] The PSIR notes this argument as a "factor that may warrant departure" or a non-Guidelines sentence under 18 U.S.C. § 3553(a)(1). See PSIR at 19 (¶ 88). We respectfully submit that the argument directly relates to the calculation of the advisory Guidelines offense level, although the same argument certainly would also justify a departure or a non-Guidelines sentence. In response to Mr. Jemal's objection on this ground, the Probation Officer appears to contend that (1) the arguments relating to collateral and Mr. Jemal's personal guaranty apply only to Mr. Jemal and not Mr. Esherick, (2) Mr. Jemal is responsible for the acts of his co-defendant, Mr. Esherick, as "relevant conduct," and, therefore, (3) Mr. Jemal is not entitled to a finding of no intended loss. See PSIR at 22 (Addendum). We respectfully disagree with this analysis. As set forth below, Mr. Esherick is equally entitled to a finding of no intended loss because, as Mr. Jemal's right-hand man who was intimately involved in the operations of Douglas Development, Mr. Esherick certainly knew at the time the MTD invoice was submitted that the Morgan Stanley loan was secured by approximately $30 million in equity and Mr. Jemal's guaranty. Accordingly, Mr. Esherick could not have intended a loss to Morgan Stanley. The fact that Mr. Esherick did not personally provide the collateral is irrelevant.

Several courts have held in cases involving fraud against a lender that the value of any collateral given for the loan must be deducted from intended loss when determining a defendant's sentence. For instance, in United States v. Weidner, 437 F.3d 1023 (10th Cir. 2006), the defendants, a banker and a borrower of the bank, were charged with defrauding a bank by increasing the borrower's line of credit by $1.5 million without disclosing that the borrower was lending the funds at issue to the banker for a private investment. There was no actual loss because the borrower fully repaid the entire line of credit after the transaction was discovered. Id. at 1030. The district court concluded that the intended loss was $1.5 million, the entire amount of the increased loan balance. Id. at 1047-48. On appeal, the Tenth Circuit held that the district court erred by not considering the value of the collateral that the borrower had pledged to secure the line of credit in determining the amount of intended loss. Id. at 1048. The court further noted that a district court is only justified in ignoring collateral in determining intended loss if it determines that the defendant intended to deprive the lender of the collateral. Id. In a subsequent appeal in the same case, the Tenth Circuit held that the intended loss was zero because the loan was fully secured by collateral and there was "no evidence that [the borrower] intended the Bank to lose any money on its loan to him." United States v. Wittig, No. 06-3166, 2006 WL 3378451, at *6 (10th Cir. Nov. 22, 2006).

Similarly, in United States v. Staples, 410 F.3d 484 (8th Cir. 2005), the defendant was charged with defrauding a bank by purchasing a house with a counterfeit check. The seller of the house was a participant in the fraud. The counterfeit check was approximately $250,000, the outstanding mortgage on the property was approximately $170,000, and the seller's equity was approximately $76,000. The district court concluded that the intended loss was the full amount of the $250,000 counterfeit check. Id. at 491. The Eighth Circuit reversed, holding that

the house essentially served as collateral for the purchase, which the district court should have taken into account in determining the intended loss. Id. at 490. The court stated: "If a reasonable person intends for the collateral to revert to the defrauded party (or understands that it will), then he or she does not intend to obtain the value of that collateral." Id. In other words, "the existence of collateral could indicate that the defendant intended to cause a smaller loss than would have occurred absent the collateral. Thus, sentencing courts should subtract the value of the collateral from the intended loss amount when the facts warrant it." Id. at 491. Since a reasonable person would not have believed that he would have been able to dispose of the house or otherwise keep the bank from foreclosing on it to reduce its loss on the transaction, the court held that the value of the house needed to be subtracted from the amount of the purchase price to determine intended loss. Id.

Likewise, in United States v. Calkins, 2006 FED App. 0617N (6th Cir.), 193 Fed. Appx. 417, the defendant was charged with defrauding a lender by delaying repayment of construction loans and instead diverting funds for his personal use. The full amount of the delayed repayment was approximately $4.9 million, which the district court used as the intended loss. 193 Fed. Appx. at 418. However, the lender had obtained a first security interest in the properties underlying the construction loans, and a pledge of all of the defendant's business and personal assets, which the defendant contended would reduce the loss to approximately $330,000 if liquidated. Id. The Sixth Circuit held that "[t]he district court erred in concluding that the defendant's intended loss, i.e., his intent not to pay off the construction loans, would eliminate an offset for pledged collateral. . . . [T]he banks were never in any danger of losing the underlying collateral, which was secured by the condominium units." Id. at 420-21. Accordingly, the court remanded for resentencing with instructions that the district court should reduce the intended loss

amount by the value of the collateral, including the value of the underlying condominium units and any assets of the defendant that were pledged as collateral. Id. at 422.

Many other courts have similarly concluded that the value of collateral must be taken into account when determining intended loss in a case involving fraud against a lender. See United States v. Nichols, 229 F.3d 975, 980 (10th Cir. 2000) (In reversing with instructions to reduce intended loss determination by value of collateral, court stated: "The security of the loan is a valid consideration in evaluating a defendant's realistic intent and the probability of inflicting the loss."); United States v. Quigley, 2005 FED App. 285P (6th Cir.), 382 F.3d 617, 622-23 (holding that in cases where a defendant obtains a loan under false pretenses, a district court must reduce the amount of loss by the value of any collateral used to secure the loan); United States v. Radziszewski, 474 F.3d 480, 488 (7th Cir. 2007) (approving district court's calculation of intended loss figure by deducting value of collateral from amount of fraudulently obtained loan).

At worst, Mr. Jemal's conduct in this case caused loan proceeds to be obtained by false pretenses. Mr. Jemal did not steal any money outright. The funds were borrowed from Morgan Stanley. There was no evidence that Mr. Jemal defaulted on the Morgan Stanley loan, failed to make a payment, or otherwise failed to repay Morgan Stanley.

Accordingly, as in other cases involving lenders, the value of Morgan Stanley's collateral securing the loan at 77 P Street must be taken into account in determining the intended loss. Because Morgan Stanley's collateral in the 77 P Street loan far exceeded the $430,000 MTD invoice, it could not possibly have lost money on the transaction and Defendants could not have intended any loss. Specifically, the amount of the Morgan Stanley loan was approximately $67 million. Tr. 1210. As part of the loan, Morgan Stanley obtained a perfected security interest

in the entire property at 77 P Street, as well as assignments of all leases, rents and contracts associated with the property.  See Government Ex. 113-0167 ("GX") (Section 3.1.7 of the Morgan Stanley loan); GX 248-285 (Fee and Leasehold Deed of Trust And Security Interest executed as part of the loan).  The government introduced evidence that the appraisal commissioned by Morgan Stanley in connection with this loan valued 77 P Street at $96 million. GX 356 (the appraisal); Tr. 3711 (testimony of Don Morris).  Even assuming that Defendants intended to obtain the $430,000 in loan proceeds from Morgan Stanley by fraud, which Defendants dispute, Defendants could not possibly have intended to cause Morgan Stanley to suffer a loss because they knew that Morgan Stanley had a security interest in 77 P Street -- which was valued at approximately $29 million more than the loan balance -- and that there was no way they could conceal or deprive Morgan Stanley of this collateral.

In addition to its collateral in the equity in 77 P Street, Morgan Stanley obtained a personal guaranty from Douglas Jemal to further secure the loan.  See GX 113 (pp. 332-46). Mr. Jemal has a net worth of several hundred million dollars.  Therefore, even if somehow the approximately $30 million in equity at 77 P Street was insufficient to protect Morgan Stanley from a loss associated with the $430,000 MTD invoice, Morgan Stanley had additional protection against loss from  Mr. Jemal's personal guaranty.  Accordingly, the intended loss amount in this case is zero.

### 2.    Even If There Was An Intended Loss, Mr. Jemal Is Entitled To A Credit That Reduces Any Loss To Zero

There is also yet another basis for the Court to conclude that the applicable loss amount relating to Morgan Stanley is zero.  Even if Defendants were prohibited by the loan terms from receiving the MTD leasing commission from the tenant improvements reserve (which Defendants dispute), and the $430,000 at issue should have been spent instead on tenant

improvements at 77 P Street, Defendants effectively replaced those funds by spending more than

$430,000 in additional tenant improvements at 77 P Street after the tenant improvements reserve

was exhausted.  By so doing, Defendants fully protected Morgan Stanley's interest in the

property even if the $430,000 should not have gone to pay the MTD commission.  Mr. Jemal is

therefore entitled to a full credit against any intended loss amount that reduces the loss to zero.

Application Note 2(E)(i) to U.S.S.G. § 2B1.1, entitled "Credits Against Loss,"

provides that loss shall be reduced by:

> The money returned, and the fair market value of the property
> returned and the services rendered, by the defendant or other
> persons acting jointly with the defendant, to the victim before the
> offense was detected.  The time of detection of the offense is the
> earlier of (I) the time the offense was discovered by a victim or
> government agency; or (II) the time the defendant knew or
> reasonably should have known that the offense was detected or
> about to be detected by a victim or government agency.

U.S.S.G. § 2B1.1 (App. Note 2(E)(i)).

In United States v. Rothwell, 387 F.3d 579 (6th Cir. 2004), the Sixth Circuit

applied this Guidelines policy statement in a case with strikingly similar facts to those at issue

here to conclude that the defendant was entitled to a full credit against loss that rendered the loss

enhancement inapplicable.  In Rothwell, the defendant was convicted of mail fraud based on the

submission of false draw requests for progress payments on a Small Business Administration

("SBA") loan.  The draw requests included invoices and certifications that falsely represented

that the costs for which the loan proceeds were sought had been incurred constructing a building

to which the loan related, when in fact the defendant had spent the funds constructing another

building.  Id. at 581.  In reliance upon these false draw requests, the SBA advanced

approximately $103,370 to the defendant.  Id.  However, the defendant ultimately spent more

than the total loan amount to construct the building covered by the loan, thereby effectively

replenishing the amount obtained by fraud prior to the government's discovery of the scheme.

The defendant contended that his false draw request to the SBA "'can only be seen to have

caused a portion of the total loan to be advanced prematurely.  As to those funds, he replaced

them voluntarily.'"  Id. at 582 (quoting Appellant's Br. at 7).  The defendant conceded that the

intended loss was $103,370, but argued that the district court should have reduced the loss

amount to zero because the construction costs on the project ultimately exceeded the loan

amount.  Id. at 584.

The Rothwell court, relying upon Application Note 2(E)(i) to U.S.S.G. § 2B1.1,

agreed with the defendant and concluded that "[b]ecause the expenditures on the project

exceeded the amount envisioned under the loan agreement, [the defendant] returned or replaced

the money he improperly obtained before the offense was detected and is thus entitled to a credit

equal to the amount of the replaced funds . . . ."  387 F.3d at 585.  Accordingly, the Sixth Circuit

ordered the district court to re-sentence the defendant with a loss amount of zero.

Here, even if the Court somehow concludes that the approximately $430,000

MTD invoice represents the intended loss to Morgan Stanley, Mr. Jemal is entitled to a full credit

against loss because he spent more than $430,000 on subsequent tenant improvements at 77 P

Street after the $7 million tenant improvements reserve was fully depleted.  Specifically, as

demonstrated in documentation submitted with this memorandum, more than $10 million total

was spent on tenant improvements at 77 P Street (or more than $3 million in excess of the tenant

improvements reserve in the Morgan Stanley loan).  The 2003 77 P Street Tenant Lease

Construction Costs Ledger, an accounting document maintained by Douglas Development,

identifies $5,842,319.26 in total expenditures for tenant improvements construction at 77 P

Street that were paid out of the tenant improvements reserve in the Morgan Stanley loan.  See

Heberlig Decl. ¶ 209 (Ex. 207) (relevant expenses highlighted in yellow on page one). An additional $651,815.08 was drawn from the tenant improvements reserve to pay leasing commissions related to 77 P Street, including the $430,000 MTD commission at issue. See id. ¶ 210 (Ex. 208) (77 P Street Tenant Lease Commission Costs Ledger; relevant expenses highlighted in yellow). The total of these amounts -- $6,494,134.34 -- effectively exhausted the tenant improvements reserve in the Morgan Stanley loan.[5]

Thereafter, roughly $3.7 million in additional tenant improvements construction at 77 P Street was spent in 2003. See Heberlig Decl. ¶ 209 (Ex. 207). The bulk of these additional tenant improvements construction costs -- $2,490,337.00 -- were paid to Davis Construction Corp. in April and July 2003. See id. (payments to Davis highlighted in orange on pages two and four). Backup documentation from Davis Construction Corp. confirms that these expenses related to tenant improvements construction at 77 P Street. Id. ¶ 212 (Ex. 210).

Therefore, just as in Rothwell, Defendants effectively replaced the $430,000 obtained from the tenant improvements reserve pursuant to the MTD invoice by subsequently spending an amount far in excess of the $430,000 on other tenant improvements at 77 P Street after the tenant improvements reserve was exhausted. There is no question that these expenditures took place "before the offense was detected" for purposes of Application Note 2(E)(i) to U.S.S.G. § 2B1.1. The approximately $2.5 million in Davis Construction invoices alone were paid in April and July 2003. See Heberlig Decl. ¶¶ 209 & 212 (Exs. 207 & 210). The government did not issue the first grand jury subpoena to Douglas Development until

---

[5] While the Morgan Stanley loan documentation originally included a $7 million tenant improvements reserve, the amount of the tenant improvements reserve was later reduced to $6.5 million. See GX 411-0002 (Heberlig Decl. ¶ 211 (Ex. 209)) (showing a $6,505,192.83 "Beginning Deposit Balance" in the first application for tenant improvements funds sent to Morgan Stanley).

August 2004. The government did not issue any grand jury subpoena seeking records related to MTD until December 27, 2004. Accordingly, even if the $430,000 could be deemed an intended loss to Morgan Stanley, that intended loss would be fully offset by the amount of tenant improvements that Defendants spent on the 77 P Street property after the tenant improvements reserve was depleted.[6] This credit against loss renders the applicable loss amount zero and eliminates any loss enhancement under U.S.S.G. § 2B1.1(b)(1).

### 3. The Government's Arguments For An Intended Loss To Morgan Stanley In The Esherick Sentencing Memorandum Are Without Merit

The government's argument in its sentencing memorandum related to Mr. Esherick that Defendants intended a loss to Morgan Stanley of approximately $430,000 (the amount of the MTD invoice) are wholly without merit. The government's argument is based on a mischaracterization of the facts and a misunderstanding of the applicable law.

The government's argument is premised on the factual assertion that "[t]he MTD invoice was intended to obtain $430,000 from Morgan Stanley at a time when the defendants were not entitled to that amount." Government's Memorandum In Aid Of Sentencing at 3 ("Esherick Mem."). The government bases that claim, in turn, on the assertion that Morgan Stanley "had rigorous procedures for ensuring that funds drawn on the Tenant Improvement Construction Reserve would in fact be spent on tenant improvements." Id. The government's factual assertions are incorrect.

---

[6] Moreover, although the court in Rothwell did not address this issue, there also can be no claim that Morgan Stanley lost the time value of money by paying the MTD invoice sooner than it might have paid for these other tenant improvements because Morgan Stanley earned interest on the entire loan amount -- including the tenant improvements reserve -- from the day of the loan closing. Tr. 1279.

- 21 -

Morgan Stanley did not require funds drawn on the Tenant Improvement Construction reserve to be spent solely on tenant improvements at 77 P Street. In fact, the first draw request to Morgan Stanley contained invoices for leasing commissions related to a lease transaction between Cayre Jemal's Gateway and the District of Columbia's Department of Transportation and Department of Health. One of the invoices was from The Staubach Company, reflecting the commission related to the Department of Health portion of the transaction, and the other invoice was from MTD, reflecting the commission related to the Department of Transportation portion of the transaction. See GX 411-0002. The government ignores the fact that Morgan Stanley paid the Staubach leasing commission without incident, even though it was for a commission rather than any tenant improvements at the 77 P Street property. Morgan Stanley representative Ben Black testified that nothing in the loan agreement prohibited the payment of leasing commissions out of the tenant improvement reserve. Tr. 1267-68. Therefore, contrary to the government's claim, the Morgan Stanley loan agreement undeniably *permitted* the payment of leasing commissions out of the tenant improvement reserve.

The government also ignores Mr. Cayre's testimony that Mr. Jemal was "entitled" to the leasing commission reflected in the MTD invoice pursuant to their agreement. Tr. 2144. Because the Morgan Stanley loan *permitted* the payment of leasing commissions out of the tenant improvements reserve, and Mr. Jemal was *entitled* to the leasing commission at issue pursuant to his agreement with Mr. Cayre, the government is flat wrong in its claim that Defendants intended to obtain funds "to which they were not entitled from Morgan Stanley" by way of the MTD invoice. Esherick Mem. at 3. For this reason alone, the Court should reject the government's intended loss argument.

The government's reliance on United States v. Younes, 194 Fed. Appx. 302 (6th Cir. 2006), cert. denied, 127 S. Ct. 699 (2006), an out-of-circuit opinion, is similarly misplaced. In that case, the defendants fraudulently obtained federal financial aid for their vocational school by submitting false paperwork regarding students' eligibility for financial aid. Id. at 305. The defendants contended that the loss amount should have been reduced because some of the students would have been eligible for the aid if the correct paperwork had been filed. The court rejected that argument because "to *qualify* for benefits does not *entitle* one to them, and the government was in fact defrauded when it disbursed funds to students whose applications or documentation were deficient." Id. at 316.

Here, however, Morgan Stanley had no discretion to pick and choose among the vendors and contractors providing services related to 77 P Street before paying them out of the tenant improvements reserve. As long as the invoices contained in the draw requests to Morgan Stanley were for tenant improvements or other qualified expenses -- such as the Douglas Development property management fees and the Staubach leasing commission that Morgan Stanley paid out of the tenant improvements reserve -- Morgan Stanley was obligated to pay them. In other words, a vendor or contactor who submitted a qualified expense was entitled to payment from Morgan Stanley. This distinction renders Younes inapposite.

The government also misconstrues the meaning of the Guidelines commentary providing that "intended loss" includes "pecuniary harm that would have been impossible or unlikely to occur . . . ." U.S.S.G. § 2B1.1 (App. Note 2(A)(ii)). The government contends that this commentary makes any belief that loss was "unlikely or remote or even, in defendants' minds, impossible . . . irrelevant and immaterial to the loss calculation." Esherick Mem. at 5. The government is simply wrong in its interpretation. A belief by the defendant that loss to the

alleged victim would be impossible is highly relevant to the intended loss calculation and in fact precludes a finding of intended loss.

As the term "intended loss" suggests, to apply an enhancement for intended loss the possibility of loss "must exist at least in the defendant's mind." United States v. Fearman, 297 F.3d 660, 662 (7th Cir. 2002). The commentary upon which the government relies is intended to cover situations where the defendant intends a loss to his victim, but for reasons unknown to the defendant such a loss would have been impossible. For example, the Guidelines commentary states that an enhancement for intended loss could be applied in "a government sting operation, or an insurance fraud in which the claim exceeded the insured value." U.S.S.G. § 2B1.1 (App. Note. 2(A)(ii)). However, the "goal" in the intended loss analysis is always "to capture the defendant's intent . . . ." Staples, 410 F.3d at 490. The government's claim that a purely theoretical loss that never crossed a defendant's mind could serve as a basis for enhancing a sentence for "intended loss" is incorrect.

Indeed, the government's argument ignores the rationale that courts have used to reduce intended loss in fraudulent loan cases by the amount of any collateral used to secure the loan. In such cases, "the size of the maximum loss that a fraud could have caused is circumstantial evidence of the intended loss . . . [and] the maximum possible loss is the maximum loss that a reasonable person in the defendant's position could have intended." Id. at 490. "If a reasonable person intends for the collateral to revert to the defrauded party (or understands that it will), then he or she does not intend to obtain the value of that collateral." Id. This and the other cases cited above demonstrate that the value of collateral is reduced from intended loss in a loan fraud case precisely because a defendant who fraudulently obtains a loan

secured by collateral could not possibly intend to cause a loss of the full loan amount where the lender could always mitigate its loss by foreclosing on the collateral.

      Finally, even if the Court were to somehow accept the government's intended loss argument, the Court would still be required to give Defendants a full credit against that intended loss because Defendants effectively replaced the so-called fraudulently obtained funds by subsequently spending more than $430,000 on other tenant improvements at 77 P Street after the tenant improvements reserve was exhausted.  The government argues that intended loss is greater than $400,000 because "the defendant's conduct inherently put Morgan Stanley at risk that the Tenant Improvement Construction Reserve would be short by $430,000 . . . ."  Esherick Mem. at 4.  Even if true (which Mr. Jemal disputes), Mr. Jemal more than made up any shortfall in the tenant improvements reserve by spending more than $3 million on additional tenant improvements at 77 P Street after the tenant improvements reserve was exhausted.  These expenditures also increased the value of Morgan Stanley's collateral and eliminated any "risk" to Morgan Stanley caused by the payment of the MTD invoice.  Because Mr. Jemal made these expenditures long before the government detected the offense, he is entitled to a full credit against loss that renders the intended loss zero.  See U.S.S.G. § 2B1.1 (App. Note 2(E)(i)); Rothwell, 387 F.3d at 585.

### 4.    The Court Should Not Apply Any Enhancement For "Gain"

      The government has urged the Court, in the alternative, to use the amount of "gain" to Defendants as a measure of the loss.  Esherick Mem. at 7.  The Court should decline the government's suggestion because gain may not be used as a substitute for loss where, as here, there is no loss or loss can be reasonably estimated.

The commentary to U.S.S.G. § 2B1.1 states that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 (App. Note 2(B)). "[T]he defendant's gain should only be used when the loss to the victim cannot be reasonably estimated . . . ." United States v. Serpico, 320 F.3d 691, 698 (7th Cir. 2003); see also United States v. Olis, 429 F.3d 540, 548 n.13 (5th Cir. 2005) (gain "need not be considered unless actual loss proves impossible to measure."). Here, the amount of loss is clearly possible to measure. If the Court accepts Defendants' arguments, the amount of loss is zero. If the Court accepts the government's arguments, the amount of loss is approximately $430,000, the amount of the MTD invoice. This case does not involve any complicated analysis of the amount of loss. Therefore, using gain to enhance Mr. Jemal's sentence is unwarranted.

Moreover, "'[g]ain is only an alternative measure of some actual, probable, or intended loss; it is not a proxy for loss when there is none.'" United States v. Robie, 166 F.3d 444, 455 (2d Cir. 1999) (quoting United States v. Chatterji, 46 F.3d 1336, 1340 (4th Cir. 1995)). Here, for the reasons set forth above, there is no actual or intended loss in this case. Accordingly, the Court may not use "gain" as an alternative measure of loss.

IV.     **CONCLUSION**

For the reasons set forth above, the Court should decline to impose any enhancement for "loss" pursuant to U.S.S.G. § 2B1.1(b)(1).

                         Respectfully submitted,


                         _____
                         Reid H. Weingarten (D.C. Bar #365893)
                         Brian M. Heberlig (D.C. Bar #455381)
                         Steptoe & Johnson LLP
                         1330 Connecticut Avenue, N.W.
                         Washington, D.C.  20036-1795
                          (202) 429-3000

                         Michele A. Roberts
                         Jeffrey M. King
                         Akin Gump Strauss Hauer & Feld LLP
                         1333 New Hampshire Avenue, N.W.
                         Washington, D.C.  20036
                         (202) 887-4306

                         Christopher B. Mead
                         London & Mead
                         1225 19th Street, N.W.
                         Suite 320
                         Washington, D.C.  20036
                         (202) 331-3334

                         Counsel for Douglas Jemal


Dated:  February 21, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 21, 2007, a copy of the foregoing Defendant Douglas Jemal's Memorandum Regarding Intended Loss Enhancement was served on the government by the ECF filing system, and to Probation Officer Renee Moses-Gregory by email at: Renee_Moses-Gregory@dcp.uscourts.gov.

_____

Brian M. Heberlig