Don Schaaf & Friends, Inc.
Branding / Marketing / Advertising
1313 F Street, NW
Washington, DC 20004

T 202.965.2600
866.965.1313
F 202.965.2669

www.dsfriends.com



January 12, 2007

The Honorable Ricardo M. Urbina
United States District Court
for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Judge Urbina:

On paper, Douglas Jemal is my landlord -- but I consider him to be more than that. He's been a mentor and positive example at times, and my friend always. During the period Douglas and I have known each other, I've had numerous occasions to witness his interaction with his close-knit family, his industry peers, coworkers, friends and the community. He's a man of principal, of strong character, of generosity, and an inspiration to me professionally and personally.

I understand Douglas has an upcoming sentencing hearing. And while my personal thoughts on last year's trial have no relevance, I can honestly say that Mr. Jemal is one of the finest people I have met since moving my business downtown. I trust him completely in a professional capacity, and I'm happy to call him my friend. Please do not hesitate to contact me directly if you would like to discuss further.

Kind regards,

Donald M. Schaaf
President and CEO

DMS/to

Exhibit 111

An Inc. 500 Company

# MID-ATLANTIC℠
### C O M P A N I E S
*Building Relationships*

*Personal and Confidential*

January 15, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

      Re: Douglas Jemal Sentencing

Dear Judge Urbina,

I first met Mr. Jemal about five years ago when I was looking for new office space in the North Bethesda area of Montgomery County. I have now been a commercial tenant of Douglas Jemal's since commencing a Lease Agreement with him for my company in November of 2002, and had the pleasure of getting to know him since the beginning of that same year. Our relationship is mostly business related, but I am likewise aware of his many philanthropic endeavors around town which occasionally intersect with my own.

I closely followed his case as it played out in the Court of Public Opinion (otherwise known as *The Washington Post*) and was frankly disappointed in the verdict, as Mr. Jemal's conduct with me personally over the past five years has been beyond reproach and I would like to share with you one short vignette demonstrating one of Mr. Jemal's core values that we share, which is 'building relationships.'

Prior to making a deal with Douglas Development, I was not familiar with him or his company. However, shortly after the Tenant Improvements on our space were completed and we moved in to occupy the space, Douglas came over to inspect the newly renovated premises and declared them "beautiful!" Recognizing him as quite a large landlord with enormous holdings and a very busy schedule and obligations way beyond my own, I really didn't expect to see or hear from him again, as my obligations were virtually over other than to pay the rent on time every month and I certainly wasn't going to call him over property management issues.

However, shortly thereafter, I received a phone call inviting me to go out to dinner after work to a very fancy and expensive restaurant as Mr. Jemal's guest. I not only hesitated since I thought the relationship was strictly business, I declined the invitation. I told him that it was unexpected and unnecessary. I was blunt and reiterated that I expected nothing more than to have the space taken care of per the terms of the Lease. He persisted, and insisted -- and not wanting to be rude (he is after all, my Landlord), I finally relented and agreed to meet him, his son Norman, and his right hand man Blake Esherick for dinner. I found the whole invitation to be so odd, that prior to the dinner, I called Blake and asked why do 'they' want to take their valuable time to have dinner

Exhibit 112




The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
January 17, 2007                          Page 2 of 2



MID-ATLANTIC
C O M P A N I E S
*Building Relationships*

with me? My company is a small and insignificant tenant, one of a thousand of their tenants and of little or no consequence to his company. Surely I thought, they can't take every tenant out to a fancy dinner? And furthermore, we made a business deal, it was fairly and fully negotiated in writing by me and my attorney, and Douglas Development and their attorney. There were no promises made outside of the agreement and none were expected, either by them or by me. I suppose I was a little uncomfortable and perhaps even a little suspicious, as I am a skeptic by nature, but Blake laughed and told me, "Oh, that's just Douglas!" and so I went.

Blake assured me there was no hidden agenda and in fact, there wasn't. It was just a nice dinner to welcome Mid-Atlantic to their stable of tenants and thank me for my business. I still find it remarkable to this day and unusual in this DC market of typical real estate executives who run around in a panic, make deals, and then you never see them again.

He showed up in a T shirt, blue jeans, cowboy boots and was driving a big pick-up truck. And no, I am not kidding. The four star restaurant didn't seem to mind though and I believe the maitre d' knew him. In any event, the evening was unusual and endearing to say the least. Douglas made a big impression on me and he remains to this day, a man who calls me back within 24 hours and knows me on a first name basis. It took a while, but I finally became convinced there was no ulterior motive. He just did it to be nice and say thank you – nothing more, nothing less.

As it turns out, as I've gotten to know him a little better over the years, I now know that the behavior I originally found to be a little unusual, is simply put, 'just Douglas'. Our relationship has remained one that I am proud of, and have found Douglas, his executives, and the company to stick to their word as well as the letter and the intent of the Lease. I couldn't ask for anything more, nor do I expect more, but I have frankly always gotten everything I bargained for.

In conclusion, I recognize that Mr. Jemal was convicted of a serious offense. I feel bad about that for too many reasons to articulate here, but knowing him, I feel certain he is remorseful over the mistakes he made in the banking transaction that got him into hot water with the Court. Nevertheless, I would hope that your Honor would be lenient with him in the sentence handed down, as I believe that Douglas is basically an old fashioned man who, on occasion, may do things in a way others find odd.

Respectfully submitted,
Mid-Atlantic Companies, Inc.

Roger M. Lebbin, President

January 25, 2007


The Honorable Ricardo M. Urbina
United States District Court for the
 District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001


Reference: Letter of support for Douglas Jemal


Dear Judge Urbina:


I am writing this letter on behalf of Douglas (Doug) Jemal regarding the sentencing
resulting from his conviction in the criminal case against Douglas Jemal, Norman Jemal
and Blake Eshrick. I was asked to write this letter by Mr. Jemal's legal counsel and
gladly do so for this important friend, business partner and civic leader.

By way of background, I have known Doug for over twenty years on both a professional
and personal basis. I first met Doug when I was a lending officer at American Security
Bank (predecessor of Bank of America); working specifically in the banks community
development lending area focusing on urban revitalization in the District of Columbia's
distressed communities. Doug, at that time, was in the process of redeveloping the
Wonder Bread factory on Georgia Avenue, adjoining Howard University, an area that the
bank had targeted for investment in rebuilding the community. Doug instantly impressed
me with his passion for the City along with his determination to make a difference in this
community. Without all of the inducements and support of Municipal and Federal
subsidies, tax abatements and the like, Doug personally invested significant capital into
this emerging neighborhood and drew the respect of the community, including Howard
University which is, as you are aware, an anchor in the LeDroit Park community. This
was a very pioneering development at a time when many developers were fleeing the
City. The transaction had its share of obstacles along the way but Doug persevered and
completed the project honoring all of his commitments.

Subsequently, I had worked with Doug and his team on several high impact
redevelopments throughout the City. He has always shown good character, judgment,
fairness and honesty in all of dealings. I have come to know Doug personally and
consider him a reliable and good friend. He is always responsive and ready to lend a
helping hand. I had left my senior position at Bank of America and took a senior position
with Fannie Mae, from 1996 through 2006. In early fall, I left Fannie Mae to start a
private enterprise that will focus on providing affordable housing across the country.

Exhibit 113

January 25, 2007
Page 2

As we went about setting up this business, I called on Doug to see if he could help our mission based company by assisting us with our office space needs in the Washington, DC metropolitan area.  Doug and his team quickly responded and provided us with suitable offices in close proximity to our homes at market terms, saving our team a considerable amount of time and energy.  Within 45 days, we have set up operations and begun focusing on our business development and expansion thanks to Douglas Jemal, Norman Jemal, Blake Eshrick and the Douglas Development Team.

I certainly could go on at length about Doug's good deeds but I think you understand my perspective.  Douglas Jemal is a thoughtful, honest and decent person that has done more for this City than anyone I can recall from the private sector.  Douglas has an endearing term for me, "Officer", due to my background as a Police Officer in Long Beach Township, New Jersey.  Although I am also from New Jersey, I do not let that bias my opinions of Douglas Jemal in the slightest bit.  I do hope that you take all of his positive attributes into consideration at the sentencing; it would be a great loss if Douglas were unable to continue to contribute significantly to and provide his leadership in this community.

Respectfully,

Richard K. Devaney
3211 Beech Street, NW
Washington, DC 20015

**Annapolis Volvo**
**Authorized Volvo Cars Retailer**

January 24, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Re:    Douglas Jemal, President
       Douglas Development Corporation

Dear Judge Urbina:

I was disappointed to learn that Douglas Jemal was found guilty by a federal jury of wire fraud.  As a business person who has known Douglas for more than eight years, I am compelled to voice my support for him.

As the principal of automobile dealerships in Annapolis, I came to know Douglas when I needed to temporarily lease property to enable expansion of my businesses. Mr. Jemal's company owns real estate nearby one of my business locations. Since that time, I have entered into multiple real estate leasing agreements with Mr. Jemal. Additionally, I assisted him with the acquisition of an automobile from one of my dealerships. Throughout the negotiation and execution of these transactions, I have found Mr. Jemal to be ethical, forthright, and true to his word.

Over the more than fifteen years that I have been a member of the Annapolis and Anne Arundel County business community, I have witnessed Mr. Jemal's contributions to our community and his commitment to the businesses and homeowners in the area neighboring his properties.  I believe the crime which Mr. Jemal was found guilty of in October is inconsistent with the character of the man with whom I have done business.

Judge, I appreciate the opportunity to express to you my support for Mr. Jemal as you consider his sentence.

Sincerely,

ANNAPOLIS VOLVO



Frank Ferrogine
President

**VOLVO**

333 Busch's Frontage Road, Annapolis, MD 21409   410-349-8800 • Annapolis   410-974-4800 • Baltimore   301-858-7766 • Washington
www.annapolisvolvo.com

Exhibit 114

venturehouse group

January 25, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Colombia
333 Constitution Avenue, N.W.
Washington, D.C. 200001

Dear Judge Urbina,

I am writing to you in support of Douglas Jemal who I have known for eight years.
Simply put, Douglas is one of the most honorable and trustworthy people that I have ever
met and done business with. He is a pillar of the community and a man, without whose
vision and concern about the District of Columbia, our city would not be the same.

Douglas and I first met in the course of our negotiation for my firm to take all of the
office space in one of his buildings, 509 7th Street NW. Douglas had acquired the
building in 1994 – long before anyone thought that the neighborhood would attract the
kind of tenants and residents that it has. During our first meeting, it was clear that, in
addition to wanting a fair economic deal, Douglas cared mostly about bringing in the
right kind of tenant for his vision of the neighborhood. In the course of this lengthy and
complex negotiation, I could always count 100% on Douglas's word and on his fairness.
As the result of our need to study the use of the space appropriately, the discussions took
so long that the market actually improved materially during this nine month period. Yet,
Douglas never used this to his advantage nor tried to extract any additional consideration
as a result. He was committed to getting us, a new investment firm focused on start-up
companies, into the space and into his neighborhood. Most importantly, he was
committed to keeping his word and to our deal, sealed only by a handshake.

Since that time, we have remained a tenant, but Douglas and I have built a broader
business relationship. As a tenant, it would be impossible to ask for a better landlord.
Douglas's organization is first class and exceptionally responsive, and, the several times
that I have reached out to Douglas personally about an issue, he always commits to
immediately addressing the problem and then follows through. As Douglas and I have
discussed working together on certain real estate projects, it is clear that his motivation is
completely driven by his desire to make our city a better place. He has a vision for taking
neighborhoods that have been forsaken by others and turning them into thriving
communities. The shining example is the 7th Street corridor where I and thousands of
others come to work, live, eat and to get entertained. But his work is not done and he has
planted the seed in several other neighborhoods that need his time and focus so that tens
of thousands more people can benefit from his extraordinary talents.

**Exhibit 115**



Finally, in the course of building our business relationship, Douglas and I have also become friends. Once you know Douglas, you want to be his friend. He is a special man that deeply cares about others. He is supportive with his encouragement and generous with his wisdom and advice. He is also a fun person to be around with his big smile, quick hug and constant energy. As a result, people are drawn to Douglas, and he is a rare person who is a magnet for people from all walks of life. I feel very lucky to have him as part of my life.

In the recent trial, I know that Douglas was acquitted on all but one of the charges brought against him and that you may have to consider a sentence for that charge. I think this a great shame and the conviction is completely inconsistent with the man that I know. Douglas is an exceptional individual whose time, effort and focus is desperately needed by so many people. There is so much tangible evidence of the impact that he has made on our city, our community and on so many individual lives, but there is so much more that we need him to do. I would implore you to not take away even a moment of this precious resource.

If there is anything else that I can do to provide additional insight about Douglas, his character or his contribution to our community, please do not hesitate to contact me.

Respectfully,

Mark D. Ein
Chief Executive Officer

Yama Jewayni
400 Mass. Ave. NW
Washington D.C 20001

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Ave. NW Washington D.C 20001

Your Honor,

I am writing to you so that I may share a little of my experience with Mr. Douglas Jemal or as I call him Mr. J over the last twelve years.

As a young 23 year old budding entrepreneur my two friends and I wanted to open our own business. We had the idea to open a restaurant/lounge that you would be on par with any lounge you would find in an international city. Being that young with very little money and no experience except for a few parties we had hosted, you can imagine it was very difficult. For seven months we had approached many building owners and companies only to have to door slammed in our faces. One day we stumbled onto a property owned by Douglas Development. After a few meetings with an associate we managed to get in front of Mr. J for a meeting. We were happy to get that far but we knew what was coming. He asked the usual questions, what is your experience, do you have financial statements etc... As we presented our case that while we host a weekly party and "have some money", we have never owned a business. He thought for a second looked hard at us and said "so you're doing it for someone else and now you want to do it for yourself, alright you can have the space." We were elated and could not believe someone would give us a shot.

That was just the beginning of how Mr. J treated us. As the true amateurs that we were we ate up the free three months rent for construction and were now in our eight month trying to get the place open. The bills piled on, we ran out of money twice having to bring investors. As we got close to opening our main concern was how to pay the seven months of back rent we owed. Mr. J had always periodically dropped in to see how we were doing, he saw we were working hard and struggling. When we approached about the back rent he said " Forget the back rent, and I'll give one more months' free rent so you get on your feet, good luck." The back rent amounted to about $35,000.

We now have four business in the District and are working on two more. Without that first shot I don't know where I would be. Graduated in Finance I guess I would be in a job I wouldn't like and be unhappy. As the years went by I can count many more instances where we needed help and guidance and he unselfishly gave his time and effort. I have also talked to many of his tenants and we all have Douglas stories illustrating his kindness and genuine concern for the welfare of others.

Your honor, I spent several days at the courthouse and while it broke my heart to see Mr. J up there, at the end of the trial I was awed by our justice system, how it works, and how fair it really is. I must admit I do not fully understand this conviction fully as the

Exhibit 116

most serious charges were dropped.  I just hope that all the good that Mr. J has done to others will somehow find its way back to help him with his sentencing.


Sincerely,

Yama Jewayni



To : The Honorable Ricardo M. Urbina
U.S. District Court for the District of Columbia
333 Constitution Avenue N.W.
Washington, DC 20001

Your Honor,

     I'd like to let you know how Douglas Jemal has assisted our small business, and helped us to survive and keep 18 people employed.

     In 2003 as our former employers were in liquidation and closing down 15 DC area music stores, I decided to form a new company and remain in the retail music business. My partners and I had a history with Douglas as fierce competitors in the music business, and found ourselves looking at two locations owned by Douglas Development. I spoke briefly with Douglas in Oct of 2003, and he was open to the prospect of music retail in his locations, but skeptical about us.

     I delivered a business plan to Douglas Development for his review. Douglas called me a few days later and requested a meeting. At that meeting, after some discussion and little more than a handshake, Mr. Jemal agreed to support our new business in two of his locations. What I found out in our meeting was that Douglas Jemal is a smart, savvy, kind and compassionate person. Of course he wanted his vacant stores occupied, but he also embraced us as entrepreneurs, wanting to support our efforts to have a successful, locally owned small business.

     It has been 3 years since that first meeting; during that time I have seen Douglas on several occasions. He has offered advice, support, and was instrumental in helping us find a new location. I find Mr. Jemal to be totally accessible. Even though we are a very small business, and client of Douglas Development, Douglas has always responded to phone calls, emails, and messages in an immediate manner.

     I look forward to growing my business, and having Douglas Jemal as a resource and participant in its success. The inventiveness, tenacity, vision, character, and concern he has imparted to me through his business is a model that I am happy to aspire to.

Sincerely,

Sam Lloyd
President

Kemp Mill Music
8908 Admiral Drive
Laurel, MD 20708

Exhibit 117



# Comfort Management Corporation

Post Office Box 472 • Manassas, Virginia 20108 • 703-330-9955 • Fax 703-361-2990

Maurice Breton
President

*Selling*

*the*

*world's*

*most*

*comfortable*

*shoes*

*throughout*

*Virginia,*

*Maryland*

*&*

*Washington*

*D.C.*

January 25, 2007

Judge Ricardo M. Urbina

Dear Judge Urbina:

I have known Douglas Jemal for over ten years. We have twenty three store locations in the Washington, DC, Maryland and Virginia region and have dealt with several developers in the process of procuring our store locations. Of all of the developers, I can truly say that Douglas Development Corporation is one, if not the most, professional firms we deal with.

We are always treated fairly, and quite frankly, we are always looking for additional store locations that he owns, as we always make a profit in those locations. In all of our dealings with Douglas, we have found him to be honest, trustworthy, capable, and of course, colorful.

It is our belief that Douglas Jemal is a visionary and has proven; time and time again that he can make something out of nothing. Douglas has the ability to create the inspirations and locations where many have followed. Actually, the city and region should be presenting Mr. Jemal awards for all he has accomplished to further improve the city than looking for ways to punish him.

Let's not punish Douglas for being "colorful". After all, where would the city be without charismatic entrepreneurs like Douglas Jemal?

Thank you,

Maurice Breton
President
Comfort One Shoes

www.comfortoneshoes.com

Exhibit 118



**COWGIRL CREAMERY**

ARTISAN &
FARMSTEAD CHEESES

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C.   20001

February 1, 2007

Dear Judge Urbina,

I have known our landlord, Douglas Jemal, for two years and find him to be an honest, straightforward and fair businessman.  His style is not button-down conservative.  He wears cowboy boots, not wingtips; a reflection of his big, bold personality.

As a native Washingtonian, I salute Douglas Jemal for being a leader in the re-development of downtown D.C.  While more conventional, conservative developers were hesitant to invest in the District, Douglas Jemal moved ahead aggressively to put down stakes in the downtown core.  He took the early risks and it paid off.

We have benefited from Jemal's vision by leasing a beautiful store in a refurbished building at 919 F Street, between the old Woodies and the newly renovated American Art Gallery/National Portrait Gallery. Douglas Jemal and his sons are frequent visitors to our cheese shop and are committed to bringing more customers and more businesses to the neighborhood.

I am aware of the criminal proceedings against Mr. Jemal and hope that the court will allow him turn his attention and energy back where it belongs, on rebuilding downtown D.C.

Sincerely,

Sue Conley
Co-owner
Cowgirl Creamery
919 F Street
Washington, D.C.  20004
202 393 6880

Exhibit 119



**F · E · N · N**

**communications group**

February 9, 2007

The Honorable Richard M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC   20001

Dear Judge:

I have lived and worked in the District of Colombia for 35 years.  For 25 of those years, I have run my own business and run a non-profit.  I care about Washington, its neighborhoods, its politics and its people.

Like so many others who live and work here, I have watched this city change and, I believe, for the better.  I have watched with pride as the downtown began to flourish.  My wife has worked for many years at the Smithsonian's Museum of American Art, once an oasis in the midst of a run-down neighborhood, now a jewel surrounded by a revival of sparkling restaurants, businesses and places to live.  The contribution that Douglas Jemal has made to that area and many others across this city is hard to describe in words.  You have to feel it and you have to live it.  The risks he took, the care with which he built and rehabilitated striking structures, the contributions he has made to our neighborhoods is truly extraordinary.  This has taken great energy, innovative ideas and serious thought. I truly believe he has made a difference

On a personal level, I have known the Jemals as a tenant for the past eight years.  I have watched as they took pride in fixing up the property, at a serious cost to them, and never failed to have my calls returned or treated with anything other than the utmost respect. Douglas and Norman have paid attention to detail, devoted personal time at all hours, and been totally supportive.

I write this letter not as a close personal friend or as a business associate, just a tenant who has been treated fairly and a person who admires what Douglas Jemal has done for our city and its people.  I hope that he is allowed to continue to do what he does so well, for I know it will benefit those of us who call Washington, D.C. home.

Sincerely,

Peter Fenn

Exhibit 120



## Greta Perry
Construction Management

January 15, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

RE: Douglas Jemal

Dear Honorable Judge Urbina:

It is my pleasure to write to you regarding Douglas Jemal, I have worked with and for Douglas and his firm, Douglas Development Corp., for almost ten years.

When I first met Douglas I was serving as the construction manager representing the law firm of Arnold & Porter. Douglas and his team met us at Arnold & Porters office, in undeniably one of the cities most prestigious and elegant conference rooms. The Arnold & Porter team dressed in suits and ties and Douglas and his team dressed in jeans and cowboy boots. Douglas was there to close the deal for leasing their building at 4001 Brandywine Street, NW. This leasing meeting of the principals of the Arnold & Porter and Douglas and his team was a classic encounter of two of the most dramatically different business cultures ever envisioned. Yet Arnold & Porter signed the lease, we worked successfully with Douglas and his firm during the construction and his team lived up to every promise made in the meeting held that day. Arnold & Porter and Douglas Jemal continue that successful relationship today.

Despite Douglas' non-traditional business approach he continues to win deals and establish relationships with most of the cities most prominent and elite business professionals.

As an employee of Douglas Development Corp. for almost four years it was my responsibility to oversee the renovation of the historic Woodies building at 1025 F Street, NW. The Woodies building may be Douglas' most favorite building in his extensive real estate portfolio, it is a true Washington icon property and it was my challenge to insure the renovation brought this icon back to life and lived up to Douglas' expectations. I continue to work with Douglas Development today as a construction consultant supporting the office and retail tenants as they move into the historic building.

During my work at Woodies, for over a year, I worked with the design and construction team of *Ross Dress for Less* as they negotiated a lease to establish a retail store at Woodies. After an enormous outlay of architectural and engineering fees by Douglas he

Exhibit 121

21 Dupont Circle, NW, Suite 200   Washington, DC 20036   phone 202.721.0728   fax 202.689.1223   www.gperrycm.com

killed the deal. He did so because the quality of this retailer was not what was best for downtown Washington retail. *Ross Dress for Less* was a financial win for the economics of the project, but Douglas based his decision on what was best for Washington and the future of the downtown retail not what the lender for the building might like to see. The area of Woodies that *Ross* was to lease continues to sit vacant today while he waits for the right retail tenant.

Douglas has changed to face of downtown Washington; he has turned around the F Street corridor and 7th Street. The economic success of downtown DC can be linked directly to Douglas. The quality in Douglas of basing his decisions on what is right for the city over what is financially of benefit to him is a quality that cannot be denied.

Douglas is a true Washington hero and a patriot.

Please accept this as my heartfelt support of Douglas Jemal as you review his pending sentencing before you and your court.

Sincerely,


Greta Perry
Principal



**GTM**ARCHITECTS

January 15, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re: Douglas Jemal

Dear Judge Urbina,

Being aware of Douglas Jemal's recent conviction and of his pending sentencing this spring, I wanted to write you this letter to advise you of my experiences with the man and to express my opinion of his character.

When my brother George started our architecture firm as a one-man shop out of his basement about 17 years ago, there weren't very many developers lining up to give him a chance to show what he could do. Before George met Douglas, his work consisted primarily of small residential renovations for friends of our parents. I don't know why Douglas gave George a chance, and I wasn't there when they met, but I can honestly say that we would never be where we are now, a 60+ person multi-industry design firm, were it not for Douglas. For the better part of 16 years, Douglas has been far and away our very best client.

I came on board full-time to help my brother grow this firm back in 1995. My role has always been to manage the firm from a business perspective. In architecture, that means, first and foremost, that I get to worry about collecting the bills. In this role as the firm's "bad guy", I end up at odds with most of our big clients on a regular basis. Most developers, you see, pay architects in particular slowly. So, please understand that when I speak highly of Douglas, I do so coming from the one position in this firm who is least likely to compliment our clients. My brother has a friendship with Douglas. I know him mostly from business dealings.

I feel I should also clarify what I mean when I refer to Douglas as far and away our very best client bar none, as I do not mean this in purely dollars and cents terms (although a significant portion, if not the great majority of our staff may very well have him to thank for their livelihood). In fifteen plus years, Douglas has never let us down. When he says something, you can take his word to the bank that it will happen. In all my time working here, he may be the only client we've ever had that genuinely seemed concerned with whether or not we would be successful. Please trust me when I say that in this business, that is a rarity indeed.

Douglas Jemal is an honorable man. I am proud to have had the chance to work with him.

Exhibit 122

Thank you for your time.

Sincerely,

James C. Myers
Managing Principal



JAMES G. DAVIS CONSTRUCTION CORPORATION

12530 Parklawn Drive
Rockville, MD 20852
301/881-2990
301/468-3918 FAX
www.davisconstruction.com

16 January 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Urbina:

I write to you in support of my friend and business associate Douglas Jemal. I have known Douglas for 10 years now. We originally became acquainted when my firm was hired to perform general contracting services for a development project. The project was a success and we felt proud to have made significant improvements to a neglected Washington, DC property. Since then, our firms have worked together on over 50 projects, large and small. Through the years, we became friends. Douglas is someone that I trust, admire, and have developed huge respect for. The entire time I have known him, I have enjoyed our working relationship but it's our friendship that I value most. We have three significant characteristics in common – a love for our city; devotion to our large families; and a passion for doing community service and helping those around us in need. He is a man of integrity who keeps his word and follows through on his commitments.

Nobody loves The District more than Douglas. He's been doing business here for over 30 years and has garnered tremendous respect for his work, values, ethics, and his unique style. When all the big developers abandoned The District in the late sixties and early seventies, Douglas bought property with the hopes to one day restore The District to its former glory. It took three decades, but his dream became a reality and I am proud to have been a part of it through historic renovation projects such as 800 F Street, The Atlantic Building, The Woodies Building and 912 F Street, to name a few. He cares so much and wants to be remembered in this town as someone who worked hard to make Washington, DC a better place to live and to do business. He has been instrumental in transforming unsafe, rundown areas of the city into thriving, bustling neighborhoods that bring new residents, businesses, and economic prosperity. He did this without being motivated by money or personal gain, he did it for his vision of what Washington, DC should be and he did it for the people who can now safely enjoy our city again.

I am most proud to call Douglas Jemal my friend.

Respectfully and most sincerely,

Dennis J. Cotter
Executive Vice President

Exhibit 123

# MAIZEL
## CONSTRUCTION INC.
Since 1976

**MAIZEL CONSTRUCTION, INC.**
4250 Kenilworth Avenue
Bladensburg, MD 20710
301 779 6800 • *Fax 301 779 7117*
WWW.MAIZELCONSTRUCTION.COM

January 16, 2007

Re:    Douglas Jemal

To Whom It May Concern:

Maizel Construction has been doing business with Douglas for over 5 years. Our experience has been nothing but pleasant.

We have had the opportunity to work with him on many projects in communities that are not the most desirable. But Douglas works with the history of the building and the community to preserve as much of the original history as possible. This shows how much he cares about the people and these communities. He is fair and has always paid us what is due us.

It is my utmost belief that Douglas is an asset, without his long range plan and thoughtfulness for these communities and for DC itself, none of these projects would have happened and future projects would be held up.

Maizel Construction will do any work that Douglas Jemal asked us to perform. We stand behind him 200%.

If you have any questions or would like more information, please do not hesitate to call me at (240) 375-5915.

Sincerely,

Michael D. Maizel
President

Cc:    file

Exhibit 124

3224 Cleveland Avenue, NW
Washington, DC 20008
January 19, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Urbina:

I have known Douglas Jemal, both personally and in my professional capacity as
Director of Business Development for BBG-BBGM Architects and Interiors for the past
four years. Douglas and his company are clients of our firm, having worked together on
numerous projects.

I am aware of Douglas's recent conviction on a fraud charge related to a business
transaction. While many like myself in the business community were relieved about his
acquittal on the other charges, we still understand the seriousness of the single
conviction and its possible consequences for Douglas.

In my experience, both personally and professionally, Douglas Jemal has the kind of
character that makes Washington a great place to live and do business. I know him to be
a kind and devoted friend, always concerned first for the welfare of his colleagues,
employees, family and the community at large before himself.

Douglas is one of our most generous local business people.  When many developers
focus only on "for profit" ventures, Douglas has supported projects such as saving the
shuttered Avalon Theater and restoring the Sixth and I Streets Synagogue, lending his
personal resources and professional abilities. The Washington business community has
been the continual recipient of his largess, much of which has been done privately.

When Douglas is sentenced soon, I hope the court will take into account all of the many
and significant contributions he has made to Washington and its citizens, and convey a
lenient punishment.

Sincerely,

Ronda S. McCrea

Exhibit 125

# Red Coats, Inc.

4401 East-West Highway • Bethesda, Maryland 20814 • 301/654-4360

January 22, 2007

The Honorable Ricardo M. Urbina
US District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Your Honor,

I am writing this letter as a friend and business colleague of Douglas Jemal. I have known Douglas for 20 plus years and have been very aware of his recent court proceedings. His one conviction out of the entire trial is what concerns me greatly. In my years of doing business with Douglas I have found him to be extremely honest and forthright; a man of his word.

Our business is the second largest expense Douglas has in owning and operating commercial office buildings and over the years Douglas would occasionally fall behind in his monthly payments. With one phone call, we would meet and payment would be received on the exact date promised. Honesty and trust is something that is earned and over the years Douglas has never inferred or suggested anything in our business transactions that was not above board.

Because of this, I find it hard to believe Douglas' conviction of fraud in a private business transaction. In fact it is completely inconsistent with his character. Our family of businesses has done millions of dollars in contracts with Douglas Development and I sincerely hope that the courts consider Douglas' sentencing with extreme leniency.

As a lifelong Washington Metropolitan area resident, I think we owe Douglas Jemal a debt of gratitude. His vision in the revitalization of a part of Washington (7thStreet Corridor) was one that changed the entire area for the better. It was both risky and expensive and now he is poised to do the same thing in another part of Washington on the Annocostia River. It would be a shame for everyone to see his next vision interrupted in any way.

Sincerely

W. Mack Wells

W. Mack Wells
Executive Vice President



Member of:
BUILDING OWNERS & MANAGERS ASSOCIATION OF TAMPA FLORIDA
BUILDING OWNERS & MANAGERS ASSOCIATION OF BALTIMORE MARYLAND
APARTMENT & OFFICE BUILDING ASSOCIATION OF METROPOLITAN WASHINGTON
CAPITAL ASSOCIATION OF BUILDING SERVICE CONTRACTORS
PROPERTY MANAGEMENT ASSOCIATION

Exhibit 126



**CAFFES-STEELE**

*Windows and Doors*

Caffes-Steele Richmond Inc.
1010 N Boulevard      Tel: (804)213-9730
Richmond VA 23230    Fax:(804)213-9731

The Honorable Ricardo M. Urbina,
 United States District Court for the District of Columbia,
333 Constitution Avenue, N.W., Washington, D.C. 20001

Your Honor,

I am writing to you to ask for your consideration in the case of Douglas Jemal.
Mr. Jemal is a business associate of mine here in Richmond. As a property owner, he is
making a positive impact on our community with his redevelopement efforts here. Mr.
Jemal has purchased a number of properties here that he is in the process of renovating
and improving. His work here in Richmond has had and continues to have a pivotal role
in the restoration of some previously run down areas.  I, as well as Caffes- Steele would
ask your consideration of Mr Jemal's contribution to our community in this sentencing
phase of his trial, as his continued participation in the economic development of our city
is desirable.

Joel E Cotten
Manager
Caffes-Steele of Richmond, Inc.

Exhibit 127



January 21, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:    Douglas Jemal

Dear Judge Urbina;

I am writing to you on behalf of Douglas Jemal. It is my sincere hope that you will consider reference letters such as mine upon such time as determining his sentence. Please note that I take no issue with the verdict. As inconsistent as these findings are with my own feelings toward Douglas Jemal, the law is the law when a man is given a fair trial.

First and foremost, one has to acknowledge that Douglas is both charismatic and unconventional. He is certainly a high-profile type guy and, as such, one that is pretty easy to pre-judge from a variety of button down perspectives. I should know because I used to be averse to doing business with him – simply because of what I had "heard". What I initially saw in Douglas and his operation didn't exactly provide me with a lot of comfort either. Fortunately, things are not always what they seem and I have gotten to know Douglas pretty well over the years.

My firm is a commercial general contractor and we have worked in many of his properties. I first met Douglas in the late 90's while working for one of his tenants in a building in Bethesda, MD. He liked the work we did and the professionalism we displayed to his tenants in challenging situations. To him, I was more of a "suit" as a general contractor and he generally hired the trades direct. But I think we grew to have a mutual respect and ultimately, we had to interface with his firm directly to complete our projects. Through this forced relationship, I found that his negative reputation was more urban myth than anything else. The construction business is not a product. It is a service - and every project presents the opportunity to demonstrate your integrity as a businessperson through change orders, hidden conditions, tight deadlines, permit delays and quality control issues. On top of all of those challenges is the simple factor of human error. Yet, I have never once had an argument with anyone from Douglas Development despite ample opportunity to dispute or otherwise contest claims for which we sought compensation while constructing some awfully complex renovations. I believe that kind of reasonable and cool disposition comes from the top – Douglas Jemal.

Corporate Office
9600 Blackwell Road, Suite 120
Rockville, Maryland 20850
Phone    (301) 610-9500
Facsimile    (301) 610-9590

Baltimore Regional Office
5457 Twin Knolls Road, Suite 101
Columbia, Maryland 21045
Phone (410) 837-6200
Facsimile (410) 837-1990

Exhibit 128

Doing business with him as I have for the last eight years has been a thrilling experience – even if sometimes frustrating from a payment consistency standpoint. If I didn't admit that, you would have good reason to question the validity of this entire letter. The office has never been particularly well managed and it can take a while to get paid. Patience is probably a requisite virtue when working for his firm. But he always comes through. Process and policy are the backbone of many successful organizations. Just not this one. Douglas personally searches for the win-win situation and never backs down from his word. It became very clear to me early on in working for Douglas as a contractor, that the paper for which we would seek signatures really meant nothing. His word was far more valuable. I honestly cannot tell you how many contracts that he authorized for signature without reading the first word – and we did about $15M worth of work for him over 40 projects. He was going to treat you fairly and pay you – so why bother reading a document that only articulates what will happen when or if he doesn't? I have to tell you – I learned a lot from that as a business person. If only more people could figure out how to do business on a handshake again, the courts would be freed up to focus on the real problems. When Douglas Development was a smaller suburban developer, he didn't have much time for the formalities of an accounting staff. He knew what he owed you and he saw that you were paid. As his holdings expanded, his firm grew tremendously internally and managing it almost certainly became more difficult than he could have imagined – or kept up with. He is great with real estate and people. But, probably not so much so with paper. In a real estate financing environment that for him evolved from cult of personality to Wall Street backed mortgages, I would bet there was a significant learning curve for Douglas and his team to comprehend. All the while, he remained a guy who went out of his way to stop and talk to the carpenter or electrician working on his jobs – even if they were working under a general contractor. And he did this while trailblazing into parts of the city nobody else wanted – creating economic development opportunities and jobs for residents in those areas.

My firm has not had any dealings with Douglas Development in over three years, so I don't write to you out of concerns for my own economic interest. What I am concerned about is the sentencing imposed on Douglas. From what I understand, the verdict delivered results in at least the possibility of some form of incarceration upon sentencing. However, I honestly believe that removing Douglas from day to day control of his real estate operation is not something that would be good for our city, his family, vendors, tenants and employees. I know that may not sound like a good reason to many to keep someone convicted of a crime out of jail. But if it means that hundreds of good people lose their jobs as a result of the challenges his small organization will have to endure without him, then perhaps you can at least see the cause for concern. This is not a corporate pin-stripe issue. The big money real estate professionals will live another day no matter what happens to Douglas Development Corp. In fact, they will probably benefit from the ultimate demise of his firm. The ripple effect here will most certainly disproportionately affect the many minority and small businesses Douglas employs throughout the region. They are the one's who have taken his word over paper for many years. They are the one's who will get the form letter from an attorney handling the certain bankruptcy proceeding wherein their lien rights are voided. Many small trade-providing firms are owned by first generation Americans. They will watch as the

buildings in which they have labored to participate in the American dream by taking a man at his word are sold of to major developers – who have no intention of settling up with them. At best, their payments for materials and wages expended will be discounted and tied up for so long in the litigation and auction process enacted by the pin stripes that they are effectively put out of business. Please don't let this happen.

Judge Urbina, you have a duty here and I certainly cannot tell you what to do. I am sure it is a difficult job. All that I hope to convey to you is that Douglas Jemal really is a very decent man. He has already paid dearly for his mistakes in terms of added stress, litigation costs, and impairment to his reputation and just plain public gossip. I have read many of the accounts of the trial and the accusations. I know enough about this industry and this man to simply say – other than his over the top public persona – he is not very different from most every other developer when it comes to some of the accusations levied against him. What is different is that this man cares about his community and the people that live in it.

Regardless, it would appear that there is going to be some form of penalty as a result of the conviction for Douglas. That is up to you to decide. In doing so, I would humbly ask that you please consider any sentence which serves to destabilize his firm will effectively pass a more severe sentence on to the innocent folks who have worked for him for many years as janitors, secretaries, carpenters, painters and electricians. I trust that you carefully take a big picture view of this situation and apply justice in such a manner so as not to unfairly burden those who can least afford the fallout.

Thank you for your time.

Respectfully,

Dennis O. Kane
President and CEO

shalom baranes associates | architects

January 29, 2007

The Honorable Richard M. Urbina
United States District Court for the
  District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re: Mr. Douglas Jemal

Your Honor:

Having learned of Mr. Jemal's conviction on a fraud charge related to his business activities and the impending sentencing hearing, I'd like to take this opportunity to relay a few observations about Mr. Jemal that I hope you will consider as you deliberate the conviction.

I have practiced architecture in the District of Columbia for the past thirty years and have known and worked with Mr. Jemal for approximately the past eight years. My projects and clients have been varied and included such buildings as the Federal Courthouse in Pittsburgh, 101 Constitution Avenue (next door to your courthouse) and the renovation of the Warner Theatre, the John Wilson Building and Wedges Two thru Five of the Pentagon. I mention these projects not to establish my credentials, but to suggest the wide range of individuals I have encountered as clients in my practice. I can say with absolute conviction that amongst all my clients, I consider Mr. Jemal to be among the most trustworthy, ethical, committed, responsible and forgiving individuals I have ever worked with.

Mr. Jemal has commissioned me to design about a dozen projects over the past eight years. Among these are The Spy Museum, the old Woodward and Lothrop Building, the Ventana and, directly adjacent to Ford's Theatre, the Atlantic Building project. We have begun every single project we have undertaken with Mr. Jemal on a handshake with no written agreement. On most of his projects, we completed the majority of our services (often worth millions of dollars on an individual project) before executing any written agreements. Mr. Jemal would have signed an agreement at any point in the project, but such was my trust in him, that I never felt the need to document any verbal agreement we reached.

Perhaps more noteworthy than any of my business arrangements with Mr. Jemal are some of the unorthodox project decisions I have watched him make over the years. Unlike many other real estate developers active in downtown development, Mr. Jemal is driven by a very deep seated passion and love for the artifacts of history. Over and over I have seen Mr. Jemal make decisions that were going to cost him money and yield no business advantage whatsoever in order to salvage some element of a building that appealed to his sense of historic significance. In the end we and all of the public benefit from these idiosyncratic decisions, as our day-to-day lives are enriched by the objects that are identified and adopted by Mr. Jemal's sensibilities.

The most memorable and meaningful project I have worked on with Mr. Jemal is one about which he called me one day and told me to drop whatever I was doing and to meet him at the corner of Sixth and Eye Streets near Chinatown. When I arrived I saw a man that was happier than any adult I have ever seen at any wedding, Bar Mitzvah or childbirth. Mr. Jemal, along with two friends, had just acquired the First Baptist Church building and was going to restore it to its original use as a synagogue. We spent the afternoon walking the building together and

Exhibit 129

shalom baranes associates | architects

The Honorable Ricardo M. Urbina
January 29, 2007
Page Two

discussing the work that would ensue, and to this day, I remember that day as one of the most memorable of my entire professional career. I hadn't known until that day that Mr. Jemal was a deeply religious man. He talked to me about his childhood, his family and his father in particular. He talked to me about the importance of providing a place in our modern downtown that would offer others the same opportunity to be introspective that he had growing up near a synagogue in New York. And he talked to me about the importance of honoring the memory of loved ones with acts of good deeds, or as we commonly refer to them in Judaism, *mitzvahs*. Not then nor at any other time did Mr. Jemal ever ask me to contribute my services for this project. But I felt so inspired and privileged to be involved in this undertaking that the project became the most significant pro bono commitment I had ever made.

In conclusion, your Honor, I would like to suggest that you consider the following: as a free man, Mr. Jemal will continue to envision, initiate and execute development projects that no one else in this city will. The city will be a better place for it and the public at large will benefit. Incarcerate Mr. Jemal, and we will all suffer a loss. I understand that for our society to function, a conviction must be followed by an assertion of justice. I would urge you, however, to assert justice here in a manner that recognizes both our need to have Mr. Jemal continue as an active participant in the on-going rebirth of our city as well as what I know must be a full and painful personal acknowledgement by Mr. Jemal of the consequences of his acts.

Please accept my appreciation for this opportunity to express my views about this very important matter.


Respectfully yours,

Shalom Baranes, FAIA

 **Dewberry**

203 Perry Parkway
Suite 1
Gaithersburg, Maryland 20877-2169

301 948 8300
301 258 7607 fax
www.dewberry.com

January 29, 2007

The Honorable Ricardo M. Urbina
United States District Court of
The District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Urbina:

In the matter of Douglas Jemal, I met Mr. Jemal through work. The company I am employed with, Dewberry and Davis, a National engineering firm headquartered in Fairfax, VA, has several jobs with Douglas Development.

I have followed with great interest the proceedings of Mr. Jemal's trial, and was happy to find him acquitted of most of the charges. I was surprised and sorry to hear that he was convicted of the one charge of fraud related to a private business.

The times that I have dealt with Mr. Jemal, I have found him to be attentive, open, gregarious and generous with his friends, colleagues and the communities in which he is involved.

In the projects I have personally been involved with, Mr. Jemal has shown an interest in providing the communities in which they are located with benefits above and beyond those that would be required by regulatory agencies. He makes sure that they are involved from the beginning of the process.

In short, I have found Mr. Jemal to be of admirable qualities; along with his business acumen, he has shown himself to have a great deal of caring for the people and communities in which his developments will have an impact.

Respectfully Yours
DEWBERRY & DAVIS, LLC

Silvia D. Silverman, AICP
Associate

Dewberry & Davis LLC

Exhibit 130



### EHT TRACERIES INC

1121 FIFTH STREET, NW, WASHINGTON, DC 20001-3605  TEL (202) 393-1199  FAX (202) 393-1056  E-MAIL EHT@TRACERIES.COM

January 22, 2007

The Honorable Ricardo M. Urbina,
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001.

Re:    Douglas Jemal

To The Honorable Ricardo M. Urbina:

As architectural historians and preservation consultants we have worked with Douglas Jemal for the past fifteen years on projects involving historic buildings throughout Washington, D.C. We have followed Mr Jemal's trial through the local press and are aware of the proceedings as well as his acquittal on six of the seven charges he was facing. We understand that Mr. Jemal was convicted of a single, fraud charge, and it is with reference to the sentencing in this proceeding that we present our views regarding his character and accomplishments.

In the years that we have worked with Mr. Jemal, we have celebrated his tenacious spirit and determination in purchasing and developing historic buildings in parts of the city many in his field had rejected as "too historic" or not financially sound investments.  For preservationists, these projects were the ones desperately needed to jump start our downtown revitalization. Mr. Jemal sought out locations and sites **with** historic buildings, and based his development plans on research and documentation that provided an understanding of each historic structure.  He did not approach each project, as so many developers do, with the intention of demolition; the resulting rehabilitations along 7th Street as well as the International Spy Museum, and the important Woodward & Lothrop Department Store have restored many of Washington's important downtown landmarks.

With origins in retail, Mr. Jemal is a champion of retail in the city. He has demanded design excellence in both old and new structures at the retail or street level.  His commitment to bringing shopping back to the city has resulted in a renaissance along 7th and F Streets and continues with the signing of major retailers and destination establishments such as H&M, Zara, West Elm, and Madame Tussauds on F Street.  The glimpses of a bustling F Street that are seen in late 19th and early 20th century historic photographs may not be that far off. Douglas Development's newly completed retail space in the Atlantic-Pacific Building on F Street will do much to enhance this emerging shopping district.

Exhibit 131

The Honorable Ricardo M. Urbina,
United States District Court for the District of Columbia
January 22, 2007/Page 2

Mr. Jemal presents an enthusiastic personality, a "can do" attitude, and an ability to envision a future where others see nothing. He has always treated our firm fairly and with integrity, and has been honest and forthright in our contractual relations. We believe this is because he has a strong understanding of history, and the value it holds for modern life. Mr. Jemal embraces the documentation we provide and ensures that the documentation is used to guide the building rehabilitation, even though this might result in additional costs to a project because missing components are cast to complete a design detail, or storefronts are accurately replicated based on the documentation. Few developers actually examine our building documentation, but Mr. Jemal takes the time to look at the historic photographs and architectural drawings to better understand the project. He puts many of the historic photographs in the lobbies of his projects such as the Atlantic Building, Woodward & Lothrop lobby, the apartments in the Warder Building on 9th Street, and the People's Drug Store on New York Avenue. These are wonderful images that are now out of the archives and being experienced by the building occupants and general public.

Douglas Jemal is an asset to the preservation and development community in Washington, and we feel confident that his continued developments combined with his commitment to the city will augment his already impressive accomplishments.

Sincerely,

Emily Hotaling Eig
President

Laura Harris Hughes
Senior Architectural Historian

ICORLTD

January 29, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Urbina:

After hearing of the jury verdict which found Douglas Jemal guilty of a fraud related charge, I felt compelled to write this quick note expressing my personal and professional experiences with Mr. Jemal. Ten years ago, I started a small environmental consulting business in the Washington, metropolitan area. To make a long story short, my company specializes in re development and re vitalization of environmental impaired and neglected properties. I first met Mr. Jemal at a property that he was considering purchasing in the District in 1996. Mr. Jemal pulled up to the property in an old Volkswagon Beetle, with his dog, dressed blue jeans and cowboy boots. He stepped out of the car, looked me strait in the eyes, shook my hand, and introduced himself as "Doug". I quickly felt at ease with him, and he treated me with a genuine sense of respect. We walked the property together, I explained to him what needed to be done, he told me to take care of it, and our lasting relationship was off the ground. A week later, I was informed that "Doug" was in fact Douglas Jemal. The reason that I bring this up is that my first impression of Douglas Jemal is the same as my last impression of Douglas Jemal. He has always been a man of genuine, unpretentious character. Douglas has since re developed numerous properties in the District of Columbia, many of which required extensive environmental clean up. In some cases these clean ups proved to be expensive and time consuming, but Douglas has always instructed to me do whatever it takes to meet regulatory compliance. Douglas has always wanted to leave his project sites cleaner (environmentally) than they were before he touched them.

As a client, Douglas has not only helped me grow my business, but he has always done what has been asked of him (by me and by Regulators). As a friend, Douglas has always offered me lasting and positive personal advice when asked, emotional support when needed, and an open door (and ear) when I needed one. In my mind, Douglas Jemal is a man of sound personal character, a forward thinking visionary with a genuine sense of interest in people – all people, from the worker bee to the corporate executive. I consider myself lucky to call Douglas Jemal my friend. I ask that you please consider my thoughts and sentiments when sentencing Mr. Douglas Jemal.

Sincerely,

Ike L. Singh
Icor Ltd.

P.O. Box 406 • Middleburg, Virginia 20118 • Telephone (703) 257-1225 •Telefax (703) 257-1226

Exhibit 132



January 29, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

**Re: Douglas Jemal**

Dear Sir:

After following the events of the trial, I feel compelled to write to the court with the hope you will consider the following comments regarding Douglas Jemal.

I have known Doug Jemal for several years. I, as many others will attest, know Doug and his company to be a valuable asset to the Washington D.C. business community.

On a personal level, I would characterize Doug as a warm, charitable, and affable person.

In the business community, Doug is well respected and his company's investment in the District is unparalleled. He has maintained a balance of respecting the city's architectural history while enabling its economic future.

Doug Jemal's commitment to the District with his development projects has changed the cityscape for the better.

I hope you will consider the above comments on April 16th.

Sincerely,

Christopher J. Donatelli
President & CEO
Donatelli Development

Exhibit 133

*Edward Aaronson*
*5603 Whitney Mill Way*
*Rockville, Maryland 20852*

January 23, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

re:    Douglas Jemal

Dear Judge Urbina:

I am writing on behalf of Douglas Jemal. I have known Douglas personally for over 25 years and have been conducting business with Douglas for the past 18 years. I can tell you first hand Douglas is a visionary and operates with integrity and compassion in all aspects of this life.

As a native Washingtonian, I have watched Douglas redevelop many deteriorating areas that others wouldn't even consider. Douglas believes in growth and has created opportunities for countless people - he is most likely one of the most influential and dynamic developers in this area. With his expertise and creativity he has helped beautify downtown Washington.

In the late 1990's I unfortunately had a reversal of financial affairs and was forced to close my business after over 40 years in business. Douglas was one of the few friends and business associates I had that called out of care and concern. His interest in my and my families well being was sincere and unconditional. For that I will never forget him.

In 1999, I restarted my business. Douglas Jemal helped me on many levels, including being available as a great sounding board and advisor. My new found success can be partially attributable to Douglas' involvement with me, during my down days and again when all was good.

In all the years I have conducted business with Douglas, he has been highly respected, exceedingly charitable and a fine and honest person to do business with. His word and handshake are his bond. I am proud to call Douglas jemal my friend.

Respectfully,

Eddie Aaronson
President
Eddie Aaronson Custom Flooring, Inc.

Exhibit 134



January 30, 2007

The Honorable Ricardo M. Urbina

I have had the honor and privilege of knowing Douglas for almost seventeen years. My association with Douglas has been very similar to a roller coaster ride, very fast moving, many more ups than downs and at the end of the day I was thrilled to be part of the ride.

My relationship started years ago when Douglas needed a special paint finish for a job that needed to be completed that weekend for a tenant. The problem was, it was already Friday afternoon, I had never heard of Douglas Development and I didn't have much interest in starting doing work for Mr. Big. As memory serves I think he almost dared me into doing the job. The end result was we got it done and on time and the bill was paid. It started a

Exhibit 135

business relationship that for the most part has been wonderful.
I must admit that there were times when payments were slow, but
as with all companies we got through it.

It is almost impossible not to know of the difficulties that
surround Douglas and the conviction. Those are issues that
shocked me to no end. I can only trust that the court will do the
right thing.

As a contractor that has worked in the D.C. Metro area for more
than thirty years, and dealt with all the big owners, none of them
have the vision and guts of Douglas Jemal. His ability and money
have resurrected many areas of this city.

A few years ago we were raising money for a group called
Destination Imagination which is a school sponsored science
club. Our team made it to the World Finals in Arizona and
Douglas donated the use of his luxury suite at the Verizon Center
as a auction item that raised $ 3,000.00 for the kids. Without it, 8
seventh graders would not have had the experience of there life,
and a 3rd place finish.

Douglas Jemal has done far more for this city than most people will ever realize, without him there would still be areas downtown that you would not visit.  The Synagogue that he donated untold time and money to.  Any guilty verdict is totally inconsistent and out of Douglas' character.  He is far to good of a person.


Sincerely

Brian R. Smith
President



2105 West Laburnum Avenue
Richmond, Virginia 23230
Telephone: 804/ 355-3212
FAX: 804/355-3588

January 29, 2007

The Honorable Ricardo M. Urbina
United States District Court
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001


Attn: Honorable Ricardo M. Urbina


This letter is being written as a character reference for a long established friend and trusted business colleague, Mr. Douglas Jemal. I was first introduced to Douglas during a construction project in Richmond Virginia and during the course of this project realized Douglas as a man of character and uncommon commitment to his friends and business associates.

I personally have dealt with in excess of 235 Commercial Developers and have been afforded the luxury of being able to choose the Developers we provide services for. As in life there are disparate types of Developers, some are fly by night and others are interested in preserving their businesses andenhancing the built environment. The Douglas Development portfolio and organization is the latter. Douglas has earned the privilege of being one of my top customers due to his drive, tenacity of purpose and integrity in business dealings. I am very comfortable performing any job for Douglas on a handshake– he is man of his word and has been since my first meeting with him in 2000.

Success rarely happens by accident; it leaves clues. Rooted in success is always honesty, integrity, tenacity of purpose and the ability to motivate a team. Douglas possesses all these qualities and this is the only way to create a sustainable business model. The History of Douglas Development exemplifies my thoughts.

In closing Douglas Jemal is a trusted friend and business associate, I run several businesses with gross revenues in excess of $15,000,000.00 and consider Douglas to be a person of uncommon leadership ability and wish to emulate his business success.

Thank you for this opportunity to provide my thoughts and I can be reached via Cell Phone @ 804 640 6497.

Sincerely,


Michael Scelzi  B.E.- M.B.A
President ETI Group


## *ETI Group*

*2105 West Laburnum Avenue*
*Richmond, Virginia 23227*

Exhibit 136

# SCHWARTZ ENGINEERING, INC.

**4600 North Park Avenue - Lower Plaza**
**Chevy Chase, Maryland  20815**

**Telephone: 301-215-7740**
**Fax:        301-215-6478**
**www.schwartzpe.com**

January 29, 2007

The Honorable Ricardo M. Urbina
United States District Court for the
 District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

The Honorable Judge Urbina:

     I am writing this correspondence in support of Mr. Douglas Jemal.  I am aware of
Mr. Jemal's conviction and am desirous of outlining for you the inconsistency which this
conviction reflects.

     I have known Mr. Jemal since 1991, both professionally and personally.  As a
mechanical engineer, I have had numerous opportunities to interact with Mr. Jemal on
projects which involve the renovation of and revitalization of buildings in the
Washington, D.C. metropolitan area.  Throughout the course of my relationship with Mr.
Jemal, I have repeatedly seen that he is a caring, generous and intelligent individual who
has a vision for the revitalization of the downtown area of the District of Columbia.

     When I first met Mr. Jemal in the early 1990's,  the area in and around the
Seventh Street, N.W. area was blighted and in a depressed condition.  Through Mr.
Jemal's vision and insight has this area of the District of Columbia become a vital
economic zone which reflects positively upon his activities.  Mr. Jemal's efforts have
resulted in jobs being created, a decrepit area in the District of Columbia has been
revitalized and a once blighted area is now an elegant economic district.  This is just one
example of an area where Mr. Jemal has had a vision.  I worked with Mr. Jemal in
several other areas in the District of Columbia and in the Washington, D.C. metropolitan
area and to each project Mr. Jemal supplies boundless energy, positive thinking and an
approach which can only be described as visionary.

Exhibit 137

January 29, 2007                                                                        Page Two

The conviction for which I am writing is an aberration of Mr. Jemal's personality. I have found him to be of the highest integrity in business and in his personal life, a man of exemplary moral character. Mr. Jemal has supplied to numerous charitable endeavors. His boundless energy, support and the giving of his economic resources without reservation and in many cases without the publicity for which other individuals would demand. One example of these characteristics was the time when he learned that a local religious school was in need of a Torah and he immediately provided the funds. Mr. Jemal has an overwhelming generosity not only in his personal matters but in business matters providing many individuals with time and energies for which no remuneration was anticipated.

My interactions with Mr. Jemal on a personal level have included being made a part of numerous family events where I have had an opportunity to observe Mr. Jemal's interaction with his children and grandchildren noting that the energies which he has provided to his business endeavors, he provides to his family.

I commend you to consider the whole of Mr. Jemal's actions in your determination of an appropriate sentence for his conviction. I remain available to communicate with you in these regards. Thank you for your time and attention to this correspondence.

Cordially,

Andrew T. Schwartz, P.E.

ATS/dah

# E STANLEY ASHPALT PAVING
## 1121 Annapolis Rd #212
## Odenton, MD 21113
## 410-519-3667

January 30, 2007

United States District Court of Columbia
Attn: Ricardo M. Urbina
333 Constitution Ave N.W.
Washington, D.C. 20001

Dear Honorable Ricardo M. Urbina,

Upon learning of the situation of Mr. Douglas Jemal I'm writing this letter. Mr. Douglas has been doing business with our company on and off for 30 years. He has not only worked with me he also has worked with my father and uncle. Our family business was just starting in the 70's when Mr. Douglas gave us an opportunity to help with a construction project. At that time Mr. Douglas didn't know my father from Adam let alone our company but he gave us an opportunity to show our selves. Since that day we have been doing business with him. Mr. Jemal showed my father the up most respect not only as a small business but as a person and that means a lot. Mr. Douglas always did us right when it comes to business. Now as a prosperous business and a well established company we still have a good relationship not only as a business associates but a friend of the family. In this day of contracts and emails Mr. Douglas in our terms is considered a handshake man, man of his word, and someone you could do business with just a hand shake.

Mr. Douglas Jemal doesn't think of himself when it comes to work he thinks of his community and fellow workers. He is out to only do the best for both parties involved in a work situation. He is not out just for money he is out for the community.

We hope that you keep this letter in mind when it comes time for you to make your decision. Mr. Douglas is a hard, honest and reliable working man. We have been grateful for him to trust in us as we have trusted in him.

Sincerely,

Ernest Stanley Jr.
Owner

Exhibit 138



*Office Movers, Inc. • Office Archives, LLC • Office Installers, Inc. • Kane 3PL, LLC*

January 22, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Urbina:

I am writing to you on behalf of Douglas Jemal. Please consider my reference letter when you are determining his sentence.

Douglas is certainly both charismatic and unconventional. Because of his personality and his high profile he is easily judged. However, I have found that he is a man true to his word- a very important attribute in today's business environment.

Through his development company, Douglas has provided many small business owners and trades persons opportunities in the Washington, D.C. area. Douglas Development has certainly boosted the economy in the District.

Judge Urbina, please consider the overall effect of your sentencing decision. Because Douglas Jemal is a very hands-on owner, it is vital that he is available to be at the helm of his company. If his company fails because he is not able to run the day-to-day operation, it will not only affect his current office staff, but it will impact many small business owners as well as the trades persons that work for them. The ripple effect will be great.

Thank you for your attention to this matter.

Sincerely,

John M. Kane
President and CEO

*6500 Kane Way • Elkridge, Maryland 21075*
*Washington: 301.621.2100 • Baltimore: 410.799.3200 • Fax: 410.799.3208 • www.kanecompany.com*
**ISO 9001 Certified**

Exhibit 139

# WILSON-EPES PRINTING CO., INC.

★ ★ ★ *LEGAL AND COMMERCIAL PRINTING SINCE 1941* ★ ★ ★

707 SIXTH STREET N.W.

TEL: 202-789-0096
FAX: 202-842-4896

WASHINGTON, D.C. 20001
www.wilsonepes.com

ROBERT F. DORSEY
*President*

January 30, 2007

The Honorable Ricardo M. Urbina
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Urbina:

I first became acquainted with Douglas Jemal five years ago when,
as a Director of Gifts for the Homeless (a charitable 501(C)3)
which represents the entire legal community of Washington), I had
the pleasure to meet Mr. Jemal and as a Member of the Board, accept
his gracious loan of the former Woodward & Lothrop Department Store
for our annual clothing event.  This was an incredible gift to our
organization because we distribute over 4,000 bags of used clothing
each December and require a building large enough to sort, bag and
distribute to more than 150 client shelters and agencies.  Mr. Jemal
not only lent the space, but paid for repairs and maintenance to be
sure it met our requirements.  This is the same selfless person who
is due back in Federal Court for sentencing.  I find it incredulous
that a man who has done so much GOOD for the District of Columbia
can be treated in this manner.

I am the President of an old-line legal printing company who comes
into daily contact with the District's movers and shakers.  I truly
believe that I reflect the feelings of many of my peers that Mr.
Jemal is one of the most positive influences in the District of
Columbia.  I beleive his business dealings first-rate and his
charitable contributions to this community of great impact.

It has been my pleasure to know Douglas Jemal and I look forward
to witnessing his continued "world-class" contributions to the
District of Columbia, my home and business environment.

Sincerely,

Robert F. Dorsey

RFD/1

Exhibit 140

JAMES G. DAVIS CONSTRUCTION CORPORATION



**DAVIS**

12530 Parklawn Drive
Rockville, MD 20852
301/881-2990
301/468-3918 FAX
www.davisconstruction.com

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

January 31, 2007

Dear Sir;

I am writing to you as a character witness for Mr. Douglas Jemal.

I have known Douglas for seven years and have worked with him on a variety of re-vitalization projects in Washington. Without a doubt, my time working with him has been a defining experience and the highlight of my 13 year career in commercial construction.

Douglas is a passionate visionary who has put his heart and soul into the rebuilding of this city's long neglected neighborhoods. Long before it became fashionable and profitable to invest and live in these neighborhoods, I can remember Douglas explaining the greatness of these areas in decades past, pouring over old photographs, and expressing his vision of preserving the old buildings and seeing them filled with business, people, and life. Having grown up locally and attended high school in D.C. during the 1980's, I have a great appreciation of the things he has done. Working in the commercial construction business with a wide cross section of clients, I have great respect for the personal financial risks Douglas undertook to make things happen, at a time when most corporate developers and out of town investors would not consider it.

My business dealings with Douglas and his company have been a true partnership and revealed that he brings a candor and honesty to situations and challenges that unfortunately is only matched by few people in our business. Douglas takes a strong personal interest in his work and would frequently visit the jobsites to express his gratitude and appreciation to tradesmen performing backbreaking tasks.

Outside of his business dealings, Douglas is a charitable and pious gentleman. Douglas consistently contributes to several local charities. He lovingly looks after his children, and religiously ends his work week on Friday afternoon in order to be home with his family prior to sundown.

I certainly hope that you will consider the overall character of Douglas Jemal and his contributions to our community and Washington D.C., and take this into account in your sentencing next April on the charge he has been convicted of.

Sincerely,

Thomas Gnecco
Project Executive

Exhibit 141



**G T M A R C H I T E C T S**

January 31,2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue NW
Washington, D.C. 20001
Re: Douglas Jemal

Dear Judge Urbina,

I am writing this letter on behalf of Douglas Jemal. I am president of GTM Architects, an architectural firm in Bethesda, Maryland, and have been working with Douglas since 1989. I am aware of his recent trial, and was disappointed by the verdict. In my opinion, no one has done more for the city in the last fifteen years.

Having worked with Douglas on hundreds of projects throughout the Washington DC area, I can personally attest to his character, his numerous accomplishments, and most of all his dedication to the community. He is truly unique among developers in that he has consistently done what he thought was best for each neighborhood regardless of the financial consequences. Time after time, he has disregarded the conventional wisdom, gone into long ignored neighborhoods that were need of investment, and brought dilapidated old structures and streets back to life. While other developers would insist a project would only work if all the old buildings were destroyed, Douglas would insist it was the wrong thing to do, and find a way to make it work. Wonder Plaza at Howard University, The Park & Shop at Cleveland Park, the Seventh Street Corridor opposite the MCI Center, The Woodies Building, The Avalon Theater, etc., etc.- the list of projects is too numerous to describe. It goes without saying that the restoration of these buildings has had a profound and positive effect on thousands of people in the community.

I consider Douglas a good friend, someone who I know to be loyal to a fault, who cares about people, and treats everyone around him- from the bankers to the laborers on his projects- with the same courtesy and respect. I admire him and what he has done for the city. We have talked many times about how developers have a unique ability to affect the quality of people's lives, in both good and bad ways, and how important it is to make good decisions for the long term benefit of your community. More so than any other developer in the city, he has done this, even when it was not in his personal interest.  I am proud to have been part of his team, and I sincerely hope he has the opportunity to continue his efforts.

Sincerely,

George Myers

Exhibit 142

7735 old georgetown road, suite 700  bethesda, maryland 20814  fax 240.333.2001  phone 240.333.2000
w w w . g t m a r c h i t e c t s . c o m



**JAMES G. DAVIS CONSTRUCTION CORPORATION**

12530 Parklawn Drive
Rockville, MD 20852
301/ 881-2990
301/ 468-3918 FAX

1 February 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Subject: Letter of Endorsement for Douglas Jemal

Dear Judge Urbina:

For the past 10 years, James G. Davis Construction Corporation (DAVIS) has had Douglas Development as one of our largest and best clients. In that period of time, our firm has constructed 37 projects valued at over $228 Million.

This is a significant business relationship that has involved substantial construction risk!

Judge Urbina, Douglas Jemal is and has been one of our most honorable clients. He tells us the risks of the project, works beside us to solve the issues during construction, and reaches a resolution of all issues at the end of each job. We have started numerous projects on a handshake and we will continue to follow that practice in the future, because Douglas Jemal is a man that we trust.

Douglas Jemal is an individual that we need actively engaged in the redevelopment of our City. Douglas has been a friend to all minorities during his entire career in Washington, D.C. by leasing space, extending credit, and solving business problems for start up businesses.

I consider Douglas Jemal a close friend. I have enormous personal respect for him, as a businessman, entrepreneur, and individual.

I ask that you give careful consideration to the past accomplishments and outstanding personal character of Douglas Jemal.

Sincerely,
JAMES G. DAVIS CONSTRUCTION CORPORATION

James G. Davis
President and CEO

Exhibit 143

January 31, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

**RE:  Douglas Jemal**

Dear Judge Urbina:

I have been a resident and business owner in this city for more than thirty (30) years.  I am proud of this city and a strong advocate for the economic development of our nation's capital.

For more than twenty (20) years, I have known Douglas Jemal as a personal friend and as a client. We share the same philosophy in that we want 'what is best for this city' and are willing to work to achieve it.

Mr. Jemal is a pioneer and an adventurer in the area of real estate development.  His visionary efforts have been the catalyst for the revitalization of areas like the 7th Street corridor.  He has been willing to go into areas (that were shunned by others) and make a difference for the residents and business owners of this city.

Douglas Jemal is a man of integrity.  He is sincere in his commitments as a business owner to his employees, partners and the community.  He is also a family man and a dedicated friend.

I strongly support Douglas Jemal and hope that his lifetime accomplishments and his continued commitment to this city will be  major factors in these proceedings.

Sincerely,

Paul S. Devrouax, FAIA
President

Exhibit 144

devrouax & purnell architects • planners, p.c.  717 d street, n.w.  washington, d.c. 20004  (202) 483-2876  fax (202) 347-5829

211 South Oak Street
Falls Church, Virginia 22046
(703) 241-2862

February 1, 2007

**Judge Ricardo M. Urbina**
**United States District Court for the District of Columbia**

Re: Douglas Jemal

Dear Judge Urbina:

I would like to appeal to you on behalf of a long time friend and colleague, Douglas Jemal. I have know Doug for over 15 years and find that he has always been a fine businessman and gentleman in all of our dealings. He has been forthcoming and has never conducted himself in anyway other than honorable in all of our dealings. I can only hope that you will take into consideration all of the good that Doug has done for our community and city. It would be a sham if he were not giving the opportunity to continue to do the things that he does in making Washington a better place to live and to do business in. My hope is that you will take all of his good accomplishments in to consideration on his day of reckoning.

Thank you for your consideration.

/s/

H. Alan Brangman, AIA

Exhibit 145

Dear, Honorable Ricardo M Urbini

I am writing this this letter on behalf of a man that I met in or about 19995 .Douglas Jemal. I was not solicited to write this letter or asked . But offered to do so out of my desire to help a man that I respect and admire.

My name is John Fowler and I have been the owner operator of Fowlers Glass since 1985 when I started it. Outside of being a business man and an employer I am the father of two boys 12 and 15 . I coach their basketball teams and football teams , I have probably coached about 20 different  teams at the youth level. I feel that the most important aspects of these efforts are to build self esteem and to promote honesty , reward for hard work and to help create good citizens that are well mannered and compassionate.

These are the qualities that I admire in Douglas Jemal. In the past years I have noticed a lot if good qualities in Douglas that seem to be non existent in some other contractors that I have worked for. One being the genuine caring of the well being and success of others . If problems arise you can always talk to Douglas personally. Unlike a lot of other Developers that screen your calls and run you around for months.

I have never seen Douglas act in an un gentlemanly manner He always takes time to say hello and engage in some friendly conversation.

In my many years of business I have been asked many times to do and to partake in underhanded behavior. Such as inflating invoices on damaged glass so that someone could be cheated. I refused. Also just recently I was asked by a respected developer in my area to write a letter saying some work performed on his shopping center was sub standard . After careful inspection by both of us we determined that the work was acceptable . He still wanted the letter so that he could attempt to avoid paying the last $20,000 of a $60,000 job I refused. When I asked him what the final result was he explained to me that he told the sub contractor that if he didn't like him he would have screwed the hell out of him. I feel that people like this are bad for the community. If this man ever needed a character reference I would not oblige him.

These are the things that Douglas would never do. Douglas Development has owed me thousands of dollars through the years and I have always been paid and treated fairly. I think that Douglas has done a lot for the Wash D.C area and a lot of people seen and unseen.

Respectfully John A Fowler 2560 Flag Marsh Rd Mt Airy MD. 21771
Phone 301-748-5570 Fax301-831-0289 E Mail JhnZch@msn.com

Exhibit 146



The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

January 30, 2007

Dear Judge Urbina:

I first met Doug Jemal 8 or 9 years ago when we worked together as "celebrity" waiters at a dinner to benefit My Sister's Place, a Washington, DC based women's shelter. In the years since, I have continued to see the generosity and commitment to helping that immediately attracted me to him that night. A past president of Leadership Washington and former Washingtonian of the Year, I am involved in numerous community initiatives. Invariably, I can count on Doug for support. We have no business or other relationship, and he declines recognition either for himself or his company; so I truly believe his motivation is solely to make a difference.

Doug is a pioneering real estate developer who frequently blazes the trail into areas of the District and our larger region that are most neglected. His leadership is often the catalyst for much needed economic development. He once told me his motivation was to have been part of the resurgence of the city of Washington. Although I assume he also makes a profit, the greater return is to our community.

While I know Doug has been convicted of a criminal charge that carries the potential of time in prison, I do not see a benefit to society or our city in incarcerating him. I would very much rather see him free to continue his philanthropy and the work that benefits the city and its people.

Sincerely,

Lyles Carr

Exhibit 147



**Akridge**
REAL ESTATE SERVICES

January 15, 2007

The Honorable Ricardo M. Urbina
United States District Court for
 The District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Honorable Judge Urbina:

I have known Douglas Jemal for over ten years and have worked with him on many downtown committees and organizations. I am aware that Douglas was convicted of one of the charges made against him at his recent trial. In your deliberations on sentencing Douglas on this charge, I would appreciate your taking this letter into serious consideration.

Douglas is a very strong individual who practices his business in a unique manner. While he must take actions that make economic sense for his company and his partners, he also makes business decisions with his gut and his heart. A good example of this was Douglas's cooperation with my Chevy Chase, DC neighbors in leasing the old Avalon Theater to a non-profit group for use as an independent neighborhood theater. Douglas could have leased it for other, probably more economical uses, but he held the space off the market for several months while this neighborhood group raised funds for the effort. Since Douglas has no other projects in the area, the goodwill he built with the neighbors will likely have no benefit to him in future business dealings.

Douglas's business acumen and his belief in the City have allowed him to invest in neighborhoods where other developers and investors will not go. In that sense, he has been a strong contributor to the economic development in many underserved areas of the District of Columbia.

While Douglas is a strong competitor of my firm, he has been a great collaborator with us and other DC developers in many worthy efforts including the forming of Business Improvement Districts and supporting retail and residential development. His presence in the District's renaissance over the past 10-15 years has been significant. His departure from his work would be a loss for the City.

Sincerely,

Thomas W. Wilbur
Senior Vice President

Exhibit 148



January 12, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Urbina:

Headquartered in Washington, DC since its founding in 1974, Akridge is a local real estate development and services company.  As such, we have had the opportunity to have frequent interaction and experience with Douglas Jemal.  I am aware of the recent conviction of Douglas and, given our experience and knowledge of Douglas, I thought it would be helpful to provide some additional context for your consideration as you approach the sentencing segment of this trial.

As both a competitor and through numerous civic activities, I have known Douglas for close to eight years.  Throughout this time, I have found Douglas to be an effective and important force for the good of Washington, DC.  Many of his projects have been crucial catalysts for economic improvement in parts of Washington where, at the time, others showed little to no interest.  From his participation and support of non-profits to active involvement in various civic organizations, Douglas has been a valuable and engaged civic contributor.  In all of these experiences, the passion for the Washington community that Douglas brings to the table is undisputable.

Throughout our experiences with Douglas, we have found him to be a constructive civic force and an admirable competitor.  His leadership and commitment to Washington has been omnipresent and his contributions to the community are numerous and well documented.  The Washington, DC area is better off when Douglas Jemal is an engaged and productive member of the business community.  As you consider an appropriate course for the next phase of this trial, I hope you will take this context into consideration.

Respectfully,

Matthew J. Klein
President

Exhibit 149



# SIMAN

## REALTY

**Real Estate Services**

January 13th, 2007

The Honorable Ricardo M. Urbina
United States District of Columbia
333 Constitution Avenue, NW
Washington
DC 20001

Dear Honorable Urbina,

I am writing this letter to you, for the court to be aware of the respect I have for Douglas Jemal. I have known Douglas for the past twenty seven (27) years.

Douglas was a long time good personal friend and business partner of my late employer Mr. Jack Black.
Over the past 27 years Douglas has devoted enormous amount of time, energy, and his talents to his family, friends, the community and active in many charitable institutions. Douglas Jemal was instrumental and donated the major portion to purchase the building and renovate the property for the DC jewish community of the old synagogue on 6th Street, Washington, DC.

I have had business dealings with Douglas for many years, when he was in the retail business.
In the past sixteen (16) years have had the pleasure to do real estate business, leases with Douglas Development. Douglas has always honored his word and value his no nonsense business style.
He is a wonderful person and respected visionary real estate developer.

I am well aware of the conviction that Douglas Jemal faces. It would be appreciated to see Douglas exonerated and treated fairly.

The world would be a better place if there were more people like Douglas Jemal. We wish him well.

Sincerely,

Woolf Siman
SIMAN Realty
(President)

Exhibit 150

312 Main Street, Suite # 300, Gaithersburg, Maryland 20878. * P.O. Box 2153, Rockville, MD 20847.
. Phone 301/ 869-3010.  Fax 301/ 869-3011.  email: woolf@simanusa.com



January 11, 2007

The Honorable Ricardo M. Urbina
United States District Court for the
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

*Re: Douglas Jemal*

Dear Honorable Ricardo M. Urbina,

Over the past five years I have had the good fortune to know Douglas Jemal both professionally and personally and have considered it an honor. I am writing to you because I am aware of his conviction and wanted to share a few thoughts about Douglas.

Professionally, I have negotiated with Douglas and his company on various real estate transactions. These transactions have always been handled with the utmost fairness and integrity. He is a straightforward, smart and above board businessman. In his early years he invested in areas of Washington, DC that no one would even consider. His vision turned around entire submarkets - Chinatown for one. He purchased buildings like the old Woodward & Lothrop department store because he wanted to make sure it was brought back to its glory days after many years of neglect and decay. He has done a lot for our fine city.

Personally, he is one of the most family oriented people I know. His commitment to his family, the real estate industry and the well being of so many is remarkable. His family bond with his business Douglas Development (his two sons work with him) and his family interaction have a closeness that would make most people envious.

On the charity front, there has never been a time that he has not generously supported various charities like Make-A-Wish Foundation and the Juvenile Diabetes Research Foundation which I am past Chapter President. He supports not only the commercial real estate industry and its many affiliated charities, but dozens of other charities that are important to him and his family.

I thank you for your time in allowing me to share some sincere thoughts about Douglas Jemal.

Respectfully,

Sherry A. Cushman
Senior Vice President

Exhibit 151



1499 CHAIN BRIDGE ROAD, SUITE 201 ● McLEAN, VA 22101 ● 703-760-8990 ● FAX 703-790-0057

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

RE: Douglas Jemal

January 16, 2007

Dear Judge Urbina,

I am a small private real estate developer working within the metropolitan Washington community since 1980. I have known Douglas Jemal since 1985. He has been active in the International Council of Shopping Centers ( ICSC) which is the trade organization for the shopping center industry. It is through the ICSC that I met Douglas.

I have taken leadership roles over the years as a member of the ICSC and have had the responsibility of putting panels and discussion groups together for its local programs. Getting responsible industry leaders to speak at and participate in various forums is very difficult. Over the years Douglas has always responded to my call for help. He has shown himself to be a responsible community and industry leader. He has been generous in his time and knowledgeable in the field of shopping center development.

Douglas Jemal has shown genuine humanity and good character throughout the years I have known him. I give my vote of confidence to a gentleman who has been willing to be of service to the community when called upon.

Sincerely yours,
The Winfield Group

*Beverly*

Beverly Mayo Dietz
Senior Vice President

Exhibit 152



January 16, 2007


The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001


Re: Douglas Jemal

Dear Honorable Urbina:

I have been a licensed Real Estate Broker/Agent since January 1973 and I currently own Jackson Prentice Real Estate Services, a full service brokerage firm and Jackson Prentice Management, Inc., managing seventeen buildings and three shopping centers in the Washington, D.C. Metropolitan area.     I am a native Washingtonian and my grandparents, Harvey and Ruth Prentice, were for forty years Superintendents of the Gospel Mission located on 810 5th Street, N.W., in the shadows of your court room.

I have known Douglas Jemal for over twenty five years and have been fortunate enough to have sold Douglas Development, Inc. several pieces of land and/or buildings in the Mt. Vernon Square area of northwest Washington. In my opinion, the most significant piece is the property located on 6th and I Street, N.W. currently known as the Addis Israel Synagogue, originally built in the early 1900's as the Addis Israel Synagogue and then sold to the A.M.E. Turner Memorial Baptist Church, who occupied the building for many years. The following story is one of many in which Douglas Jemal's true character was shown to me:

> The Church was listed for sale for many months. After several offers and many meetings with the Church's broker and minister, a final "meeting of the minds" with the principals and a purchase agreement was completed. Under the contract, all chattels, personal property and equipment were to convey to the purchaser, except for office equipment owned by the church. The purchase price was set at a premium. The settlement was scheduled and several weeks went by, when one day, I received a phone call from Rev. Brown, the minister for Turner Memorial. Rev. Brown explained to me that the Church had recently purchased and installed a new organ, organ pipes and all related accessories for the Church's main sanctuary and asked if Mr. Jemal would consider letting the Church take this organ to their new home. I explained to him this request may be rejected because of the following: 1) it was not outlined as part of the sale's agreement, 2) the extraordinary purchase price being paid and 3) the fact this would leave the church

Exhibit 153

Page 2
January 16, 2007

with no organ (a very expensive piece of equipment); however, I would relay this request to Mr. Jemal.

Upon receipt, Mr. Jemal requested a meeting in which Rev. Brown, the Church's real estate broker, Mr. Jemal and I attended. The meeting took place in the Church's sanctuary. Rev. Brown with great trepidation asked Mr. Jemal if he would consider giving Turner Memorial the organ. There was a moment of silence and then with no hesitation, Mr. Jemal looked at Rev. Brown and said "anything in this Church is yours and you may have it." Rev. Brown began to cry with tears of joy and all followed. It was truly a spiritual experience for me and one I shall always cherish.

I am aware of Mr. Jemal's single, stand-alone fraud charge related to a private transaction. This conviction is totally and completely inconsistent with Douglas Jemal's character. My experience over the many years I have known him; is that Mr. Jemal is a man of great character and principle. Never once, at any time, has he ever expressed to me anything that would touch on being unlawful or illegal in any business transaction or otherwise.

I pray this letter will help you learn the true Douglas Jemal. Please feel free to call, 202-841-8700, with any questions you may have. Thank you.

With kind regards,

Jackson Prentice



## Ratcliffe, Cali, Duffy, Hughes & Company
*Real Estate Appraising & Consulting*

Dennis Duffy, MAI
Daniel J. Hanlon III, MAI
Rusty Rich

Albert R. Hughes III, MAI
of Counsel

Jan 16, 2007

The Honorable Ricardo M. Urbina
U.S. District Court for the District of Columbia
333 Constitution Ave, NW
Wash, DC 20001

     Re: Douglas Jemal

Dear Justice Urbina:

Please be advised that I wish to request that you consider the most lenient possible sentence in the upcoming sentencing for Mr. Douglas Jemal.

While I am aware of the recent verdict, and have been watching the trial via news reports, it seems to me that some flexibility in sentencing should be considered for the following reasons:

1. I have known Mr. Jemal for more than 10 years. We first met when I asked him to be a speaker at one of our (small) company breakfast seminars. Without hesitation, he agreed…..even though he had never heard of us, or knew us in any way, nor did he ask if we were a large or small group, etc. He simply said yes. The topic was the then pending re-vitalization of the 7 St corridor. He could have very easily said "no" due to his busy schedule, we were too small an audience (actually, we never had more people come than to his meeting!), too short a time period, etc.
2. Without his entrepreneurial effort, we would be less of a City today. This has been well documented elsewhere on multiple fronts. It would seem to me just that some offsetting benefit be considered here.
3. Since then, RCDH has worked on a number of his projects via has lenders (as appraisers, we are typically hired by the lenders).
4. In all cases, he has been helpful, prompt and straightforward in all of our dealings. Be advised this is **not** a universal situation in our business.
5. Last, as a "Board Member" at DeMatha High School, he has offered to help us in any number of ways (donations; land swaps; etc) that would **materially** benefit the school. Very simply, he said either of 2 things: A) What can I do? Or B) OK, I'll do it. Most people calibrate their own benefit first. Again, there has been **zero hesitation** when asked how to accomplish something, he has spent his own time and money trying to help, etc. The answer was always immediate.

Please advise if there is anything further you may need for your opinion.

Dennis Duffy, MAI

1012 14ᵗʰ Street, N.W.
Suite 800
Washington, D.C. 20005
Phone (202) 783-7300
Fax (202) 783-8010

Exhibit 154



**STAUBACH**

*A World of Real Estate Knowledge*

January 17, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re: Douglas Jemal

Judge Urbina:

I have known Douglas Jemal for nearly 10 years.

As a tenant representation broker working in Washington, DC I have represented numerous tenants who have considered or leased properties owned by Douglas Jemal's real estate company.

During that time I have come to know Mr. Jemal's business ethic and have gotten to know his commitment to his family and the community.  Mr. Jemal is a generous and fair man.  Many of his acts go unnoticed and unrecognized by even those close to him.

I find the guilty verdict for the single count of fraud to be completely inconsistent with Mr. Jemal's character and ask that you minimize his sentence for this conviction.

Thank you for your consideration.


Sincerely,

Ellen Herman

Ellen Herman
Vice President
The Staubach Company

Exhibit 155

# Boston Properties

RAYMOND A. RITCHEY
*Executive Vice President*

January 16, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

BOSTON, MA

NEW YORK, NY

PRINCETON, NJ

SAN FRANCISCO, CA

WASHINGTON, D.C.

Re:    **Douglas Jemal**

Dear Judge Urbina:

I have been asked to provide a letter attesting to my relationship and knowledge regarding the character of Douglas Jemal, who will be appearing before you for sentencing on April 16, 2007. This is a request I am honored to accommodate, and consider it a privilege to comment on my experiences with someone I have been very fortunate to call both a professional colleague and personal friend for about 15 years.

Before I begin my comments on the requested topic, I would like to note that while certainly aware of the trial and the outcome, I have no specific insight into the validity of the charges, or the fairness of the verdict. The purpose of this letter is strictly to attest to the character of the man in question, the impact that he has had on me personally, and the city of Washington.

By way of introduction, I am Ray Ritchey, Executive Vice President of Boston Properties, the second largest publicly traded office real estate investment trust in the United States, and a resident of the Washington area for 31 years. I founded the Washington office of my company after graduating from the U.S. Naval Academy, and serving five years of active duty. I have been very involved in the development industry in downtown Washington, and I have actively participated in numerous charitable and civic organizations in our City. For better or worse, I am sometimes viewed as a "senior statesman," in both the real estate and business communities. It is from this perspective that I provide comments regarding the man in question.

While not precise in the date, I would estimate my first contact with Douglas Jemal must have been more than 15 years ago, as Douglas was becoming a leading force in the redevelopment of the "East End" office and retail market. He was clearly regarded as an aggressive businessman, with an extraordinary vision, and a willingness to take on challenges that other less insightful, and less courageous, owners would avoid. What all of us in the development business quickly learned, however, is that Doug possessed exactly the type of personality and skill set necessary to transform this previous urban wasteland into one of the most remarkable redevelopment zones in the United States, the envy of other major metropolitan regions, and the "poster child" for interactive mixed-use development.

Exhibit 156

901 NEW YORK AVENUE, NW • SUITE 400 • WASHINGTON, DC 20001 • TEL 202.585.0830 • FAX 202.783.6480
E-MAIL: RRITCHEY@BOSTONPROPERTIES.COM • WWW.BOSTONPROPERTIES.COM • BOSTON PROPERTIES, INC. (NYSE: BXP)

IIᗡ Boston Properties

As I have stated on many occasions, both in speeches and to the press, Douglas Jemal, through his selfless devotion of time, resources, and creative energies, has virtually single-handedly transformed this vitally important area of our City, creating thousands of jobs for our economically challenged citizens. This redevelopment effort has generated literally millions of dollars in tax revenues for the coffers of Washington, the proceeds of which have also provided the funding necessary to enrich the lives of thousands of other less fortunate Washingtonians. And while certainly Douglas has benefited financially, as well he should, for the capital he risked in this transformation, it is always clearly evident that he is never motivate by the "love of the dollar" but always, almost exclusively, for the "love" of his adopted hometown, Washington, D.C.

But beyond the jobs created, and taxes generated, Douglas' contributions to the "social fabric" of Washington are also evident in the "giving back" that is his hallmark. Throughout this city, Douglas has made charitable contributions to organizations and causes too numerous to mention, with the knowledge that while others may not know of his largess, that "He knows," and that is sufficient reward for our humble and generous friend.

During this time, I also had several opportunities to engage in business transactions directly with Douglas Jemal. True to his reputation, he is a smart, sophisticated businessman, striving to uphold his fiduciary duties to his investors to achieve their financial objectives. But in every deal I have with Douglas, I know that he is attempting to achieve a final outcome that is beneficial for both parties, and is based on the principle of fairness. Perhaps the best statement to his honesty and integrity is I know that, after making a deal with Douglas, shaking his hand and looking into his eyes, his "word" means much more than any of the thousands of contracts I have ever signed.

Lastly, in both professional and in social circles, I have come to know Douglas' family, including his sons who now join him in their real estate endeavors. I have witnessed in them the same commitment to community, to fair business dealings, to enriching the lives of others that is so evident in their dad. As Douglas Jemal reflects upon his contributions to our city of Washington, D.C., certainly the buildings he has developed and the businesses he has created will be a critical part of his legacy. But much more important will be the wonderful children he has raised to be active, contributing members of our community. After all, this is perhaps the best testament to a life well lived.

Hopefully this letter will provide some insight into the wonderful – and unique - person that is Douglas Jemal. As I look back on my professional life in Washington, regardless of the outcome of your hearing in April, Douglas will always stand for the best that our industry and our community has to offer. I have been privileged to earn the right to call him friend, and know that we will continue to have this most important relationship for many, many years to come.

Thank you for the opportunity to provide this letter, and may God direct you in the proper path as you make this most difficult determination.

Sincerely,

Raymond A. Ritchey
Executive Vice President

# JSA COMMERCIAL REALTY, LLC

### *Commercial • Industrial • Subdivisions*

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

January 17, 2007

Your Honor,

      I have known Douglas Jemal since the spring of 2003. I am a commercial real estate Broker, and represent Douglas in the Frederick Maryland area. We just have a verbal commitment on representation, and commission. Douglas has either purchased or has under lease/contract six commercial properties in the City of Frederick.
Two of the properties have been purchased from the City of Frederick. The first property to be completely renovated is still vacant, because Douglas made a commitment to a prior mayor of the city, to bring a grocery store downtown. It has been vacant for about two years now. When Douglas makes a commitment, he keeps it.

      I have been aware of the charges against Douglas, and the conviction. The local newspaper called me for a comment at the initial charges, and again at the conclusion of the trial. I spoke of Douglas character, and I was sure that he would not be convicted, since I know him. I also addressed Douglas's commitment to Washington D.C., and the City of Frederick.

I have been to Douglas's office many times. I know many of his staff and the respect each has for each other. For all of the properties purchased, and being under construction, I have never seen any conflict or strife. I know of one situation where a staff person, was living in a dangerous environment, and Douglas put her up in an apartment for her safety.

      I have been to the Verizon Center several times. And I do not think that Douglas is even aware of it. I just call a staff member, and she tells me what dates are available, and she gives me the tickets to them. And I have done this for several other people. Douglas is very generous person, not only with the tickets, but helping out those in need.

      I think that anyone who has ever met Douglas, would just be impressed his naturalness, his warmth, and his desire to hug people. I have never met a person who is just so real, and there is not a phony bone in his body. And he does so many things for others, without bragging or tooting his own horn.

Sincerely,

*John Smariga*

John Smariga

6508 Jefferson Boulevard ● Frederick, Maryland 21703
Office: 301-471-9950 ● Fax: 301-371-8919
e-mail: john@smariga.com

Exhibit 157



# NATION'S CAPITAL REALTY

*Advisors*

January 18, 2007

Honorable Ricardo M. Urbina
United States District for the District of Columbia
333 Constitution Avenue NW
Washington D.C. 20001

RE: Douglas Jemal

Dear Honorable Ricardo M. Urbina,

I am taking the time to write this letter with regard to the recent verdict handed down to Douglas Jemal. Thank you in advance for your time, sir.

I am a commercial real estate broker and have been specializing in the sale and leasing of commercial properties for over 15 years, here in the metropolitan area. I first met Douglas in 1993, while presenting him a tenant for one of his shopping centers in Prince William County. The way he did business was totally different from what I had been use to in such a competitive, greedy marketplace. His word was as good as his handshake as I learned as this transaction unfolded. Allow me to explain, please.

This particular shopping center was in need of a grocery store anchor. At that time I was working with Food Lion in their expansion into this region. I set up a meeting with Douglas and Food Lion and in that meeting they verbally agreed to a deal. At the end of the meeting Douglas asked me what my fee was and I told him. We never even executed a commission agreement. As you can imagine, these large tenant leases take months to ratify. As negotiations went on, I basically stepped out as the Broker, and Douglas said it would probably be best to work with Food Lion direct, and that he would pay me if the deal got done. At the time I felt like this is a guy that is as good as his word. That being said, the proof would be in the pudding, as the saying goes.

I moved on doing other business and the months flew by fast. Fourteen months later, I got a call from Douglas saying that the deal had been completed and asked me where he should mail me my check. I had no idea that the deal had gotten done. I will never forget the feeling I had when I hung up the phone. I was blown away. I thought to myself, "my God we never even signed an agreement and he called me to make sure I got paid". I guarantee you sir that no other developer would have called me to make sure I got paid. I assure you that it would have been a case where I called them and they would say that we never had a signed agreement, and "what are you talking about". I called him back and expressed my appreciation. I was truly touched. You know what his response was? He said, "I am a man of my word, as you will learn".

Exhibit 158



**NATION'S CAPITAL REALTY**

*Advisors*

From that point on, he was right about his word as I learned over and over again. Our personal and professional relationship has grown with the years. His generosity and heart felt concern for others are traits that to this day, I try to immolate.

One more sharing thought that says it all as far as his "heart" is concerned. My Father was murdered in 1984. Our family has a foundation to help victims of violent crimes. All I have had to do is call him on the phone about the same time every year, when we are having our fund raising event, and when he picks up the phone he says to me "What can I do, and how much money do you need". At the end of the conversation it is always, "I love you Pal".

I could go on about how he is there for any person in need; his door is always open for advice as a friend etc. I know you are a busy man. I am not the best writer, as you can see, but I do ask you to try and understand the true character of Douglas Jemal. I am proud to call him a friend, as I am sure hundreds of others are as well.


Kindest Regards,

Stephen C. Gerdon
President


**115 Park Street, Suite 206, Vienna, VA 22180**
Direct: 703.589.8636  Fax: 703.620.2602  sg@nationscapitalrealty.com



James Connelly
Vice President
Lincoln Property Company
101 Constitution Avenue
Suite 600 East
Washington, DC 20001


The Honorable Ricardo M Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001


Dear Honorable Mr. Urbina,

This letter is written to acknowledge the good character of Mr. Douglas Jemal. As a
Commercial Real Estate executive with Charles E. Smith Company for eighteen years,
and now with Lincoln Property, I can say that Mr. Jemal exemplifies the spirit and
goodness not always seen in today's world. His concern for groups like the Police
Officer's Widows, the Children's Fund and countless other community service groups, he
has helped here in Washington, D.C. and should surely count for examples of his good
character. We support him and the city of Washington. The Federal Government will
hopefully be mindful of his good works and jobs that have been created due to his
concern for the Community and Country. If further testimonials are needed, I can be
reached at (202) 491-5300.

Sincerely,

*James M. Connelly*

Mr. James Connelly
Vice President
Lincoln Property Company

LINCOLN PROPERTY COMPANY
101 CONSTITUTION AVENUE, NW
SUITE 600 EAST
WASHINGTON, DC 20001
(202) 513-6700
(202) 898-2001 FACSIMILE

Exhibit 159

**GREENHILL**

January 22, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Urbina:

I am writing to share with you my admiration and deep respect for Douglas Jemal, and thank you for taking time to consider what I can tell you about him in connection with your decision regarding his conviction. In short, the City should erect a statue in his honor!

I have known Douglas personally and professionally for more than 15 years. During that period, he and I have worked together on transactions and sometimes competed with one another. No matter what the circumstance, however, my experience is that Doug is a man of his word. We have transacted business on a handshake in many instances, and I have never been disappointed. He has always honored his commitments, whether they were written or unwritten. He is honorable and trustworthy.

He has profoundly benefited the community in numerous ways. He is not only gracious and enormously charitable, but he also has been a pioneer, a risk-taker in acquiring properties in run down neighborhoods and turning them into thriving communities. That is truly an important contribution to the City, because his work has rejuvenated blighted neighborhoods, provided countless jobs, increased tax base revenues, and created beautiful and harmonious environments, where we work and play. Literally, thousands of people have benefited in the enhancement of the quality of their lives, economically and culturally.

When you're so busy and successful, it's easy to lose sight of individuals. Not Douglas. He has a warm feeling and respect for common working men and women. Once, while I visited with him at one of his construction sites, he picked up an old discarded item that was going to be trashed. He turned to me and said, "Lenny, we're going to preserve this. Ya know, think about it, a man got up every day to produce this, to earn a living and feed his family. I want to preserve it to honor that man's work."

In my book, Douglas should be honored, not punished. He is a man of great integrity, business savvy and sensitivity to other human beings. He has a wonderful ability to connect with his fellow human beings. He has made our city a better place to live. I, along with a large chorus of well wishers, hope you release him.

Sincerely,

Leonard A. Greenberg

Exhibit 160

4901 FAIRMONT AVENUE • SUITE 200 • BETHESDA, MD 20814 • TEL 301.657.2525 • FAX 301.657.2555
WWW.GREENHILLCOMPANIES.COM



January 23, 2007

The Honorable Ricardo M. Urbina
United States District Court for
  The District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Re:  Letter of Support for Mr. Douglas Jemal

Dear Judge Urbina:

Over the course of Douglas Jemal's trial, I have sat quietly in support of a fine man that has shown great interest and enthusiasm in the revitalization of Washington DC.  I am aware that you will be sentencing Douglas in the near future for his conviction on one count of fraud.  This letter is to appeal to your Honor to consider Douglas' character and commitment to our city in your sentencing.

I met Douglas eight years ago, upon accepting the oversight responsibility for commercial properties for a local University.  Douglas Development Corporation, under the leadership of Douglas Jemal, was the property management firm for the University for a key commercial property on the campus.  He was instrumental in showing me the requirements for managing such a property and helped to ensure a high quality environment.  As a new comer, he was an outstanding mentor on how to best identify and maintain top quality tenants.

His ebullience tends to captivate those who have the pleasure of knowing him.  He is quick to make friends of people that he meets.  I consider our friendship highly.

He has demonstrated a true commitment in the redevelopment of areas within the District that were once red zones for most developers.  His investment has helped to spur the growth of several dilapidated areas.  Douglas is a rain maker in the development business.

The recent conviction seems to contradict the man that I have come to know.  Douglas is a top business person with the vision and fore sight to make a positive difference.  It is my sincere hope that your sentencing will take into consideration his positive attributes and that he may be allowed to continue to support the District and other areas for redevelopment.

Sincerely,

Margo D. Smith
Chief Financial Officer

Exhibit 161

606 Pebble Beach Drive, Suite 100
Silver Spring, MD 20904

Phone: (202) 409-7156
EASDEVELOPMENT@GMAIL.COM



January 22, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

*Re:    Douglas Jemal*

Dear Judge Urbina:

On behalf of our friend Mr. Douglas Jemal, we would like to register our complete and unwavering support for Mr. Jemal. We have closely followed the court proceedings from the very beginning to the present. As owners of Woodmark Commercial Services, LLC, a commercial real estate firm located in Washington, D.C., we have known Douglas on a personal and professional level for about 15 years. Since we engage in commercial real estate activities, we have been involved in several transactions with Mr. Jemal - leasing on his behalf and selling buildings to Mr. Jemal. In all of our dealings with Mr. Jemal, he has always exhibited the utmost professionalism and integrity, and conversely he expects the same virtues from us.

We have both worked in Washington, D.C. for over 23 years each and have witnessed many real estate cycles, individuals coming and going. And, it is no secret that Mr. Jemal, with his entrance onto the D.C. scene, has transformed many areas, most importantly the 7th Street corridor, into a lively vibrant area of the city. His vision and creativity are difficult to match. He has brought excitement to our city and will continue to do so in other areas of the city in need of assistance.

We hope that you will take all of Mr. Jemal's accomplishments into account, but also his future ones which will undoubtedly materialize for the benefit of this wonderful city.

Thank you for your time.

S. Alexander Green
Principal

Roy L. Ayers
Principal

1025 Thomas Jefferson Street, NW
Suite 145
Washington, D.C. 20007

t. 202 342 8100    f. 202 298 6445
www.woodmarkre.com

Exhibit 162



709 G STREET NW, SUITE 300
WASHINGTON, DC 20001

202/481-1300
Fax: 202/481-1291
www.faison.com

January 25, 2007

The Honorable Ricardo M. Urbina
United States District court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Sir:

I am writing to express my support of Douglas Jemal in advance of the sentencing hearing on April 16, 2007. I recognize that the fact that there is a sentencing hearing implies a finding of guilt on one of the charges against Douglas, but I think that it is important for the Court to know the Doug Jemal that I have come to know over the past 6 years prior to the sentencing hearing.

My name is Don Deutsch and I am the Senior Managing Director of Faison & Associates, a development firm that specializes in large residential projects in the District. I am relatively new to the District, having started my career in Charlotte, North Carolina, but I have been quite active in the District over the past 6 years. Douglas Jemal was one of the first individuals that I introduced myself to as I was contemplating investing and developing in the District. I was immediately struck by Douglas' enthusiasm for the city and for his genuine desire to welcome people into the market that shared his passion for the District. Many developers saw me as a potential competitor and were nice, but not necessarily helpful. Douglas was both, as he saw someone that really wanted to do great projects in a city that he cared so much about.

Many people talk about doing good, Douglas actually does it. His office is a continuous stream of people and organizations asking for his help with one cause or another. They always get a reception. Given that any organization to which Faison has contributed generally has Douglas as a major contributor, I know that these organizations receive significant funding from Douglas. There are churches, Synagogues, theaters etc., throughout the District that owe their existence to Douglas' funding and support. In addition to the charitable work, one needs only to walk down 7th Street by the Verizon Center to understand his genuine commitment to this community. Only Douglas saw the potential for these neighborhoods that we now take for granted. He invested long before anyone else saw the potential, and while one could argue that these were just commercial investments and that Douglas expected a return for these investments – I believe that this misses the difference between Douglas and other developers and investors. While Douglas does expect to make a return on his investments, there is a reason that a Douglas Development building looks nicer than their counterparts in any neighborhood in the District. Douglas seeks to build neighborhoods and improve communities and the way to do that is to build projects that are superior and will stand the test of time. Unlike so many other developers he does not seek to squeeze every dime out of a project at the expense of the long term benefit of the surrounding community. He truly exemplifies the notion of "doing well by doing good".

Exhibit 163

– 2 –



Finally, I would like to speak to the manner in which Douglas conducts business, as I think that it might go to some of the issues before the court. My first business dealing with Douglas was on the purchase of a land parcel on which I developed my first apartment project in the District, 400 Massachusetts Ave. Douglas and I executed a purchase contract and the purchase price was based upon the size of building that I could build. This was a mistake on my part that was the result of my inexperience in the District, as the size of a building does not necessarily correlate to the usable area of a building, particularly in the District. Without going into too much detail the formula in the contract created a $500,000 problem for my development and my $1million deposit was non-refundable. I spent a week rehearsing the issue prior to my meeting with Douglas, as I was extremely worried about this meeting. Douglas had no incentive to help and my project was at risk with this additional cost. When I finally met with Douglas and explained the problem, he simply said that the increase in land cost, based upon an unusable increase in the size of my building, "was not the intent of the deal", and immediately allowed me to adjust the contract. It was as simple as that, no negotiating, no trading – he just knew that it was the fair thing to do; yet, I know of no other developer that would have done the same thing in his position. I mention this incident because it demonstrates that Douglas doesn't do business like most people – it is all about trust with Douglas. He did the right thing for me, because he trusts people and expects to be treated in the same manner that he treats others. There is an enormous amount of trust in the way that he runs his business and how he treats people. While that can be a risky way to run a business, it is just who he is, and he is a throwback to the days when business was conducted on a handshake.

I do appreciate your affording me the opportunity to express my support of Douglas. I hope that I have conveyed a little of the uniqueness of Doug Jemal and the many ways in which he contributes to this community. It is very difficult to imagine the District without Douglas and I know that it would be a much diminished community were he not a part of it.

Sincerely,

Don Deutsch Jr.
Senior Managing Director



COMMERCIAL REAL ESTATE SERVICES, WORLDWIDE

January 25, 2007


The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Honorable Ricardo M. Urbina:

We understand that Douglas Jemal will be appearing before you on April 16, 2007 for possible sentencing of a charge resulting from a recent United States District Court hearing.

On behalf of my sons, Gary and David Michael, and the other 100 employees of The Michael Companies, we respectfully and sincerely request your leniency in sentencing Douglas Jemal. Everyone here at The Michael Companies and numerous charitable organizations in Prince George's County know of Douglas Jemal, and the good deeds that he has accomplished here in Prince George's County, Maryland.  We are certainly aware of how he pioneered and I am certain that others will praise him and his organization for the efforts in bringing back Washington, DC.  However, not too many know of the numerous accomplishments in Prince George's County, our home base.

He has taken over empty buildings in blighted areas and reconstructed same, and as a result, others soon followed suit, which resulted in numerous areas here in Prince George's County being revitalized.  He does this primarily for the satisfaction in turning around blighted areas for the benefit of the residents of those communities.

We have known Douglas Jemal and his family for over 30 years.  Our relationship through the company has been one of the most cherished, professional and businesslike of any client having ever dealt with The Michael Companies.  I personally know Douglas and his family, as well as my sons and many employees.

I could not vouch any more for his character and commitment to his family, friends and his employees, as well as the overall communities in which he develops.  In addition, he is the strong willed, loyal and committed type that I would want in a foxhole with me!

Accordingly, we would sincerely appreciate your leniency when he comes before you.  Thank you very much for allowing us the opportunity to submit this letter of support on behalf of Douglas Jemal.

With kindest regards,


Kenneth H. Michael


KHM7877/ad

Exhibit 164



# ASSET STRATEGIES

January 24, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Urbina:

Please allow me to introduce myself and express support for Douglas Jemal in connection with his pending sentencing in April. My name is Susan Arrowsmith and I have been active in Washington, DC commercial real estate for 21 years. I am an interested and independent observer of the proceedings to date and I have no stake in the outcome of your sentencing decision.

Douglas Jemal has been a client, professional colleague and friend since 1995, and he is an individual for whom I have a high level of personal and professional regard. Douglas has significant contributions to make to the real estate industry, the local community, and among his friends and family – all of which would be severely impaired by incarceration.

I have worked with Douglas as a client, to harness the potential of his operating and development real estate portfolio. I have also represented owners on the opposite side of the table from him in acquisition negotiations. Douglas has a natural genius for real estate, however it is underpinned by a less than conventional, and non-institutional, approach to investment analysis.

On the positive side, he has infused the sometimes-stodgy real estate community with new ideas and energy. On the downside, his accounting and business practices are haphazard as a result of too much to do and too few employees with whom to do it. His portfolio does not generate as much net operating income as it could, given the benefit of more attention to detail.

As I read about Douglas' case and the verdict in the newspaper, it occurred to me that the issues surrounding the case were tied more directly to Douglas' lack of structure and convention in his business practices, than with his character or intent. It was easy for me to see how the circumstances could be misconstrued, particularly by someone with intent to do so.

Amidst buttoned-down executives and complicated cash flow models, Douglas has made notes on the back of napkins and trusted people to keep commitments based on their word – and he has done that consistently over the ten years I have known him. While he can be abrupt and abrasive, he is also essentially a very generous man who has given much of his own time and money to the community.

---

16510 SUGARLAND ROAD • BOYDS, MARYLAND 20841
TELEPHONE (240) 631-1603 • FACSIMILE (240) 631-1604
EMAIL: assetstrategies@earthlink.net

Exhibit 165

The Honorable Ricardo M. Urbina
January 24, 2007
Page Two

I can relate a specific example of the way Douglas has done business during the time I have known him. In 1995, I was employed by Barnes, Morris, Pardoe & Foster. As a third party manager, we bought, sold, leased and operated properties for institutional clients. One of my accounts was a subsidiary of the large Florida homebuilder Lennar, a company with a Wall Street orientation. The client requested that an investment package be prepared for two properties – The Shoppes of Chevy Chase and the Gaithersburg Auto Mall.

Several bidders looked at the properties, conducted due diligence, asked questions, and requested additional information. Douglas made a verbal offer after a site inspection, without any request s for supporting detail. The client was perplexed and disinclined to accept the offer. The property team was comprised of various professionals who had prior experience with Douglas and would vouch for his ability to close on the deal, however unconventional. The client trusted our assessment of Douglas' character, and ultimately Douglas was the successful buyer.

At the core of Douglas Jemal is a willingness, and an ability (and in fact a practice) to live without lavish trappings in order to conduct his business without distraction. It is important to him to be known as a person who keeps his word. Douglas is very much his own man. He is not driven by pursuit of material things and he is not (to his personal financial detriment) subject to the sway, much less expert advice, of others as to how to enhance the value of his real estate portfolio, and corresponding net worth. I know this first hand, because I have been paid to provide advice that he has elected not to follow.

Please consider my request for leniency. Your confidence in Douglas Jemal would be well placed, and his ability to positively impact the community is tremendous.

Sincerely,

Susan Arrowsmith

January 27, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.,
Washington, D. C. 20001

Dear Judge Urbina,

I am writing this letter to you in connection with the recent conviction of Douglas Jemal. I have known Douglas for over 20 years and know him as one of the most honest and giving individuals I have ever come in contact with. Douglas and I met while both of us were getting started in the real estate business. We would meet weekly and over a cup of coffee would discuss how the east end of the city needed to be revitalized. Most of the buildings during the 1970's and 1980's had been left decaying by owners who had given up on the once vibrant old section of the city to move west or out to the suburbs. Douglas wanted to restore this area of the city and bring the people back downtown. He never talked in terms of making money his pleasure and passion was in making great places. He along with others has shaped the cities new vitality and luster and along the way given not only money but inspiration and support to causes where others have been able to reach their goals and visions. A few examples of his efforts is the rebuilding of a Synagogue on 6th street or the giving of free space to the Salvation Army during the holidays. The list of individuals and groups he has helped stretches across all socio economic boundaries.  His foundation is set in the belief that the greatest gift of all is in giving people hope. In closing, the District is a better place because of Douglas. I only hope is that he is given a chance to remain in the community to continue to make it a better place to live and work. Thank you for taking the time to listen to my thoughts.

Sincerely,

William M. Collins

Exhibit 166

The Honorable Judge Ricardo M. Urbana
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: Douglas Jemal

Dear Judge Urbana-

As a long-time friend, business associate and colleague of Douglas Jemal, I feel
compelled to express the profound impact he has had on me and the entire Washington,
DC community over the 20 years I have known him. My dealings with Douglas began
long before the local media become enamored with him personally and professionally. As
a commercial real estate professional, I have represented Douglas Development in leasing
property Douglas owns, tenants who have leased space in buildings which he owns and
sold him property for future development. He has been a man of incredible integrity and
character.

In a time when virtually every business dealing, whether transactional or not, requires
multiple lawyers representing every conceivable party, Douglas Jemal has been a man
whose word has been his bond. He has built a now formidable real estate empire through
handshakes and honor. In turn, Douglas has pledged his time, money and reputation to
the one thing more dear to him than his family and friends- bettering the District of
Columbia. In doing so, Douglas has changed countless lives by creating jobs,
transforming downtrodden areas and generally transforming Washington into the position
of respect the city currently holds both nationally and internationally.

As a friend, I can say with complete confidence that Douglas Jemal would do anything
for those he knows, and more importantly, also for those who are in need-whether he
knows them or not. He has pledged the majority of his life to this city and will continue
to do so. It seems unjust to me that a man who has given so much to Washington, its
citizens and those less fortunate has been forced to defend his honor and name. He should
be honored for his lifelong accomplishments, not asked to defend himself.

Douglas Jemal still has so much good to give to this community. I hope the court sees fit
to allow him the opportunity to build upon his accomplishments rather than punish him.
The real punishment would be inflicted on the Washington community if he was not
allowed to do so.

Respectfully,

Brian R. Raher
Executive Vice President
Cushman & Wakefield of Washington, DC, Inc.

Exhibit 167

# CG INVESTMENTS
### REAL ESTATE INVESTMENTS & DEVELOPMENT

January 27, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Urbina:

I am a real estate developer in the downtown and a friend of Douglas Jemal. I attended many days of your court's proceedings motivated to show my support for my friend Douglas. This was my first significant experience with our judicial court system.

Although the circumstances of having a friend accused before the court is not an experience we seek, I felt that you and your court were a fine example of American decorum and fairness that all courts should emulate. Thank you for that.

I am appealing to you to grant leniency to Douglas. He and I met through the business of real estate development some eight or nine years ago. I was struck by his candor and desire to always try to do the right thing. His desire to leave the development site, building renovation or street a better place was often at his expense. The City and his neighbors were frequently the fortunate recipients of his vision of creating a better place.

Douglas does not seek to expand his wealth at the expense of others. His spirit is competitive and fair. His goals are to continue to make the downtown a revitalized place to live, work and shop. He is the "rock" of his family and provides in ways that many men should but don't. His company is like an extended family, and as a result many jobs and families entrust their futures to his day-to-day leadership.

Douglas has often made his deal with prospective tenants, sellers, lenders, and civic groups with a handshake. People I have talked with have told me that his word was good enough for them. Douglas's family, company and the City need him to continue his daily stewardship. If allowed, I know that Douglas and all those that I have mentioned above will be the better for it.

Thank you for your consideration.

Respectfully,

Greg Fazakerley

CG Investments, Inc.
1808 Eye Street, N.W. / Suite 200 / Washington, D.C. 20006
(202) 466-4141 / FAX (202) 393-3664

Exhibit 168

Susan Boren
5801 Nicholson Lane, Apt. 608
Rockville, MD 20852


January 29, 2007


The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001


RE:   Douglas Jemal


Dear Judge Urbina:

I have been made aware of Douglas Jemal's conviction.  I am the Vice President of Real Estate for a publicly-traded nationwide company, and I have negotiated commercial leases with Douglas Jemal in behalf of my company since 1999.  In each of these transactions, Mr. Jemal demonstrated integrity and commitment.  In particular, in 2000, during penultimate negotiations with his representative, Mr. Jemal discovered that our business use was inconsistent with the company's plans for the building.  Although the lease was not yet binding, he upheld his representative's offer.

As a native Washingtonian, I consistently hear of the good reputation that follows the Jemal name.  Through my personal dealings, I too, am able to attest.

Sincerely,



Susan Boren


Exhibit 169

January 12, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

            Re:    Douglas Jemal

Dear Judge Urbina:

        I understand you will be sentencing Douglas Jemal on April 16, 2007 as a result of the conviction announced on October 26, 2006. I am writing to offer my experience of Mr. Jemal as part of your overall evaluation.

        I have known Mr. Jemal for approximately 5 years. My involvement with him has been of a professional nature. I have been counsel to two different clients who each had a series of major real estate transactions with him. In the course of this work, I have been with him personally on a number of occasions and have had many opportunities to see how he deals with people personally, and how he treats people with whom he does business.

        The thread that goes through all of the interactions I observed is that Mr. Jemal loves his work, and gets great pleasure from the "win-win" subtext underlying the typical real estate transaction. A significant portion of Mr. Jemal's pleasure is the personal and human element of the work. He was always candid and direct with everyone, and seemed to feel genuine affection for people, even under circumstances when disagreements had to be managed. One particular occasion, when he went out of his way to demonstrate genuine caring for a client of mine who had a painful back condition that made it difficult for him to sit through a long negotiation session, made a big impression on me.

        Possibly, the most significant thing I can say about my involvement with Mr. Jemal is that, without exception, the clients I have represented would be anxious to do further transactions with him.

        Lastly, let me add that the work I have done with Mr. Jemal has allowed me to observe how he interacts with his employees and with his two sons who are in business with him. He is genuinely dedicated to his sons and shows real warmth and loyalty to his employees.

        I hope these observations are helpful to you.

                        Very truly yours,


                        Robert N. Weinstock

600239665v1                                                            Exhibit 170



**D E V E L O P M E N T**

January 29, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:  Douglas Jemal

Judge Urbina:

We are writing as developers and retail leasing agents who have worked with Doug Jemal for over 20 years. In that time, he has been known as a tough but fair negotiator. A handshake and a hug are his word. We are aware of the jury's recent conviction of Mr. Jemal on one fraud charge related to a private business transaction, and are writing to you to support the most lenient sentence possible for Mr. Jemal with respect to this conviction, in light of his extraordinary commitment to the DC community.

Mr. Jemal has been a trailblazer in the District of Columbia – investing in neighborhoods where only disinvestment had occurred. While he is recognized for revitalizing Downtown, he is doing the same work on Georgia Avenue and in Anacostia. And, not all his development has been for-profit. When the 6th and I Street synagogue was slated to become a nightclub, Doug rallied a group of like-minded developers and bought the building and restored it to its original use as a synagogue for the Jewish community.

In light of Mr. Jemal's considerable commitment to a broad spectrum of the Washington D.C. community and his tireless work with many community based organizations, we would urge you to consider the most lenient possible sentence for Mr. Jemal. Thank you for considering our views of Mr. Jemal in connection with your sentencing.

Sincerely,

Armond Spikell
Member

Richard S. Lake
Member

Exhibit 171

# McDONNELL & COMPANY

### COMMERCIAL REAL ESTATE SERVICES IN MARYLAND, VIRGINIA AND DISTRICT OF COLUMBIA

P.O. BOX 59
McLEAN, VA 22101
TELEPHONE (202) 659-1661
FAX (703) 734-5626

January 30, 2007

Honorable Ricardo M. Urbina
United States District Court
for the District of Columbia
333 Constitution Ave.N.W,
Washington, D.C. 2001

Dear Sir:

Not too long ago I was involved, as an independent broker, in the sale of a Washington Post-owned property to Douglas Jemal. Before this, and after working for several years on an open basis and producing a number of offers that were declined, their attorneys gave a listing to Trammell Crow, a firm which had not been involved to this point. When I then came up with an acceptable offer from Douglas, and unfortuneately went to the hospital at this critical time, the Post and their attorneys decided not to involve me in this transaction and to solely pay Trammell, who had nothing to do with the sale. While in the hospital Douglas, whom I had yet to meet face to face, called and told me what was happening and stated that he would pay me a commission, which he did. In this, he showed character and a sense of fair play that is uniquely rare in my forty-plus years as a broker.

I write this letter at the request of no one to do so.

Sincerely,

Donald A. Mc Donnell

Exhibit 172

January 30, 2007

The Honorable Ricardo M. Urbina
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, D.C.  20001

Re:   Douglas Jemal

Dear Judge Urbina:

# Hines

I offer this letter in support of Doug Jemal for your consideration as you prepare to sentence him on the fraud conviction recently handed down by the jury in his trial.

I first became acquainted with Doug more than 20 years ago when I assumed responsibility for the Hines Washington development office.  At that time, the Washington commercial real estate community was very small and everyone knew and worked with everyone else.

Doug has proven to be a visionary and has contributed significantly to the economic revitalization of the East End of downtown Washington's Central Business District.

I believe that Doug's true character is demonstrated by his unconditional commitment to friends, business associates, civic organizations and charitable activities.

Sincerely,

William B. Alsup, III
Senior Vice President

Exhibit 173



different by design

January 31, 2007

The Honorable Ricardo M. Urbina
US District Court for the District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

Dear Judge Urbina:

For the past 17 years Douglas Jemal has been a good friend, business colleague and supporter both in my current capacity as a real estate developer and in my former capacity as the Deputy Mayor for Economic Development for the District of Columbia. We share an unbridled and unabashed commitment to making the District a world class city that values diversity and inclusion.

Douglas was instrumental and worked closely with our administration to transform 7th Street NW into Gallery Place blowing breath and life into a desolate area of the City when it was neither fashionable nor popular.  But this is not why I am writing this letter.

It is not Douglas' extraordinary business acumen that really defines him for me. It is his commitment to his family, his demonstrated loyalty to his friends and of great importance to me as an African American; he is committed to the revitalization of underserved neighborhoods. Through his community service activities and his charitable contributions for activities ranging from health care to education and training, Douglas consistently works towards the empowerment of the least served in our communities.  The welfare of people matters to him. He is compassionate, candid and generous beyond a fault.

While I find the circumstances under which I am sending this letter of support to be unfortunate, I wanted to express that our city and many charitable organizations, underserved communities and underemployed residents are much improved and better thanks to the selflessness and compassion of Douglas Jemal.

Sincerely,

Merrick T. Malone, Esq.
Principal and Executive Vice President

Exhibit 174

*mail:* mid-city station 243 • po box 12040 • washington dc 20005-0940

*office:* 1327 14th street, nw • suite 300 • fax: 202.588.1977 • www.metropolis-dc.com



Advantis Real Estate Services Company
707 East Main Street, Suite 1400
Richmond, VA 23219
Tel 804.644.4066
Fax 804.783.1920
www.gvaadvantis.com

January 31, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Urbina:

On behalf of the entire organization at GVA Advantis, we would like to take this opportunity to convey our thoughts regarding our relationship with Douglas Jemal and his associates at Douglas Development Corporation over the last five years. In 2002, we began to work closely with Douglas Jemal and Douglas Development Corporation in connection with the leasing and management of commercial office buildings located in Richmond, Virginia. We have been involved with numerous transactions and situations involving many decisions being made on a daily basis concerning the real estate assets of Douglas Development Corporation in Richmond. We have assisted Douglas Jemal and Blake Esherick during many transactions and have found them to be extremely forthright, honorable and upfront in all situations. The best thing that you can say about someone, and which is certainly true about Douglas Jemal and Blake Esherick, is that they are truly men of their word. Very often we would go forward on business decisions based solely upon Douglas' word and a handshake and never had a worry in the world about doing so. When Douglas or Blake said that they were going to do something, they have always done so, exactly like they said they would.

Working with Douglas, Blake and the entire Douglas Development organization has been one of the best relationships we have ever had in our 30 years of being a business. We certainly look forward to working with them for the next 30 years, if we are so fortunate, as we consider our relationship to be as much a friendship as it is a business relationship.

Sincerely,

**GVA ADVANTIS REAL ESTATE SERVICES COMPANY**
*A GVA Worldwide Partner*

Edward P. Roberts
Executive Director

James L. Thomas, Jr.
Senior Director

Timothy D. Allison
Regional Director, Management Services

Exhibit 175

## Lewis Real Estate Services

718 7th Street, NW Suite 300 Washington, DC  20001 • Office: 202.585.1143 • Fax: 202.662.7101

January 31, 2007

The Honorable Ricardo M. Urbina
U. S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

**RE:    Mr. Douglas Jemal**

Dear Sir:

Twelve years ago, I moved to the Washington, DC area and worked for a commercial real estate firm known then as Smithy Braedon. Douglas Jemal was a client of the firm and a broker's reception was being held at one of his Bethesda development sites. That event marked the beginning of a long professional relationship that I treasure to this day. Douglas took the time to talk to me that evening, and at many future real estate industry events, he expressed genuine interest in my business growth, never missing an opportunity to introduce me to his development peers and colleagues. As one of a limited number of women and often the only woman of color, I was grateful not because of the people I met, but because of the personal integrity demonstrated by a man who saw my worth as someone trying to forge a new path in a business that historically had been less than generous to people who look like me.

Six years ago, when I decided to take a "leap of faith" and start my own firm, Douglas was one of many well wishers; however, his kind words became a tangible deed when he leased office space to my firm and two other minority startups at less than market rate for space in Chinatown. Whether it was donating resources for our trade association community clean up day or restoring the historic Jewish temple in downtown DC, the Douglas Jemal I know and have known over the years has again and again demonstrated a commitment to his community, a heart for service and a champion for those striving to achieve success.

It saddened me to hear the guilty verdict issued against Douglas Jemal, for it in no way reflects the character of the Douglas I know and respect. Judge Urbina, as you contemplate your sentence, I trust that you remember that the District of Columbia is a better place today because of Douglas Jemal, for the urban renaissance which began with his vision of what 7th Street could become has resulted in a brush fire that now glows in every quadrant and Ward of this city.

Sincerely,

Freddie Lewis Archer
Principal

Exhibit 176

# Studley

**Wendy Feldman Block**
*Managing Director*

555 13th Street, NW
Suite 420 East
Washington, DC 20004

t 202.628.6000
d 202.624.8503
f 202.624.8555

wfeldman@studley.com

January 31, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Urbina,

I am writing to you on behalf of Douglas Jemal. I have been actively engaged in the commercial real estate industry in Washington, D.C. for over 20 years. I am a leasing agent and work on behalf of tenants, the users of office space. In my efforts to assist my clients, I consider a wide array of properties. Given the large portfolio that Douglas Development controls, I often considered their properties and on several occasions, my clients leased space in one of their buildings.

I have come to know Douglas fairly well over the years and consider him to be an honorable person with whom to conduct business. It is rare in the business world and the commercial real estate industry in particular to find folks who will stand behind their word, where a handshake means they will do what they say. It is refreshing and one of the reasons I never have hesitated to seek out Douglas when looking to find space for a client.

His role in the revitalization of downtown Washington is enormous. He had a vision to reshape downtrodden parts of downtown and was the first to see its potential. The area surrounding the Verizon Center at the Gallery Place Metro would not be the vibrant district that it is now without his commitment to this area. He is presently working on other neglected parts of the city and shows no signs of stopping or abandoning his cause. No one cares more about this city and making it a better place to live and work than Douglas Jemal.

I am well aware of the legal proceedings for Douglas during the past few years. I am surprised by the charges and feel that they are not reflective of him or his character. While there is no question that he has been successful, Douglas has never forgotten his roots, the community he helped shaped and those in need. He is one of the first who is willing to step up and support non-profit organizations that are in need of help.

I do hope you will take all of this and the other letters of support into consideration. Douglas Jemal is a hard working, honorable man. He is kind, generous and wonderful human being.

Thank you for your consideration.
Sincerely,

*Wendy Feldman Block*

WENDY FELDMAN BLOCK

Exhibit 177



**CASSIDY & PINKARD**

February 1, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.
20001

Dear Judge Urbina:

I am writing you today in support of my friend Douglas Jemal. I know he will be standing before you in short order to receive his sentence for his recent conviction.

I have known Douglas personally since 2001 but have known him by reputation for far longer. My father, Patrick Cassidy founded our firm, Cassidy & Pinkard, over twenty five years ago and had numerous business dealings with Douglas. I lost my father in 2001 to brain cancer. Subsequently, Cassidy & Pinkard became the title sponsor for the Brain Tumor Society's Race for Hope in support of brain tumor research. Douglas was one of the first people to donate to the cause and he did so generously. In fact, his participation in this event was how we actually met. As time has passed he has continued to give to this cause in my father's name. Since that introduction, Douglas has always treated me as an equal in spite of our difference in age. He has consistently been willing to take the time to visit with me and provide encouragement or advice as I further my career in real estate. Personally I have found him to be an incredibly generous and thoughtful friend.

As a native Washingtonian and lifelong follower of the real estate market I have often marveled at what Douglas has been able to accomplish. His vision and determination have reshaped the East end of the city where he has crafted a vibrant new downtown where people live, work, and play. Douglas has become one of the founding fathers of the rebirth of the District. All one has to do is stand outside of the Verizon Center any evening and watch as countless Washingtonians enjoy the atmosphere that Douglas created. Washington is a far better place because of Douglas Jemal and it is my sincere hope that he is allowed to continue his work and that I and others can continue to enjoy the fruits of his labor. I appreciate your time and consideration.

Sincerely,

James P. Cassidy
Vice President

**Exhibit 178**

*Real Results In Real Estate*®

**Commercial Real Estate**   2001 Pennsylvania Avenue, NW   Suite 800   Washington, DC 20006   Tel: 202.463.2100   Fax: 202.223.2989
www.cassidypinkard.com



February 6, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re: Douglas Jemal

Dear Judge Urbina:

Over the past 10 years we have had the opportunity, through both public and private entities, to work with Douglas Jemal in the revitalization of the District of Columbia.

As a business leader he has been at the fore-front of the District's economic revitalization. His real estate investments, often in areas of the City that have suffered years of neglect, have been a catalyst for future economic investment and through his civic activities he has shown what it means to be a "corporate citizen" by committing his time, and resources, to worthwhile projects throughout the city.

In our individual capacities, as well as that of our company, we have found Douglas Jemal to be a man committed to his work and his community and respect him as both a business partner and a friend.

Signed,

Jim Abdo
President and CEO
Abdo Development

Eric Price
Senior Vice President
Abdo Development

Toby Millman
VP of Project Development
Abdo Development

JJA/cp

**abdo.com**
1404 14th Street, NW | Second Floor | Washington DC | 20005 | Tel 202.265.9393 | Fax 202.265.7072

Exhibit 179

# LARSEN COMMERCIAL
### Real Estate Services, Inc.



January 23, 2007

Mr. Brian Heberlig
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W
Washington, DC 20036

RE: Douglas Jemal

Dear Mr. Heberlig:

I am a commercial investment sales broker. I have been in the business for 22 years in the Washington area and before that I had my own construction company.

I first met Douglas Jemal in about 1995 when I sold him a building in Laurel, Maryland. At that time I was with CB Richard Ellis representing MetLife in the sale of their building in Laurel. Throughout the sales process Doug did everything he said he would do. During the negotiation of the contract there were no "games" played. Douglas is a "straight shooter". He does what he says he will do.

Doug is well recognized as a visionary in the Washington real estate market. He has been a very successful contrarian. I consider him a friend and client. He is sincere and personable.

I am aware of the conviction that is hanging over Doug Jemal's head. It is my hope that the court looks favorably upon him and lets him continue the business of making Washington, DC a better place to live and work.

Thanking you in advance for taking the time to read this letter.

Sincerely,

Margaret E. Hirl, CCIM
Managing Director, Investment Sales

Exhibit 180



PN HOFFMAN

**Corporate Office**

4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016

tel 202.686.0010
fax 202.686.0089
www.pnhoffman.com

January 31, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Urbina:

Douglas Jemal will come before you on April 16, 2007, for sentencing in the fraud charge related to a private business transaction, for which he was convicted on October 26, 2006. As a longtime friend and business colleague of Douglas Jemal, I write to you on his behalf and respectfully request leniency when you impose your sentence.

Douglas Jemal is long-time resident of the Washington DC area. With only a limited formal education, he has accomplished more in his career through hard work and dedication, than many others could ever possibly hope to do. I feel fortunate to know Douglas, first as a business colleague, and then as a close friend for over a decade. He is a man with strong values and character, someone who has accomplished and done more than anyone, to enrich the quality of life in this city. In 1998, his company, Douglas Development was selected by the General Services Administration for the acquisition, renovation, and redevelopment of the 800 F Street Historic Row. This project was a catalyst in redeveloping the retail corridor of the District's Chinatown. Additional examples of his projects include the Avalon Theater and the old "Woodies" building. Douglas has gone into areas nobody else would and the District of Columbia has greatly benefited through his efforts. He is very much respected, liked and appreciated, and I personally, cannot believe that he would do anything to hurt a city in which he has invested so much of himself.

Undoubtedly you will receive many letters of support for Douglas and I thank you in advance for taking the time to read them. While I recognize the seriousness of the offence; I also thank you for taking into consideration what I and so many others like me have said in support of Douglas, when deciding his sentencing.

Sincerely,

Lamont H. Hoffman
Chief Executive Officer

Exhibit 181

Development . Construction . Realty . Property Management . Quality Assurance

Fine Urban Living™



## RANDALL HAGNER

*Celebrating 102 Years*

February 1, 2007

The Honorable Ricardo M. Urbina
United States District Court for the
District of Columbia
333 Constitution Avenue, N.W.,
Washington, DC 20001

Dear Honorable Urbina:

I am writing this letter in support of a lenient sentence for Douglas Jemal. While the jury has found Douglas guilty of one charge of fraud out of the seven counts against him, I find this completely out of his character and contradictory to what I have observed over the years.

I have known and worked with Douglas in the real estate industry for years I have always found him to be honest, forthright and of the highest integrity. Douglas is a man who speaks his mind and lets you know exactly where he stands in his business deals. While some may find that to be rough or arrogant, I found it to be refreshing, as it is rare that people say exactly what they mean and mean exactly what they say. Furthermore, Douglas has always stood by his word and not relied on paperwork to keep it.

In working with Douglas, I have never found him to have any hidden agendas or fraudulent intentions. Personally and professionally, Douglas has represented himself to be a class act from start to finish. He has been a visionary developer in the District of Columbia, revitalizing areas such as Historic 7th Street, which sparked the redevelopment of Chinatown and 64 New York Avenue, NE, which has sparked the revitalization of the North of Massachusetts Avenue (NoMa) area.

These are only two examples of Douglas' vision of turning dilapidated old streets back into safe, clean neighborhoods, where people work, live and play. Douglas has become a valued active member of each community he serves and his presence is vital to keeping those communities and the District thriving.

It is for these and many other reasons, I respect Douglas and would welcome the opportunity to work with him in the future. Moreover, it is for these reasons, I write in support of lenient sentencing for Douglas Jemal.

Respectfully,

Bruce Baschuk
President

Exhibit 182

**KLNBRetail**
Commercial Real Estate Services

8027 Leesburg Pike, Suite 300, Vienna, Virginia 22182-2735 / (703) 288-4000 / Fax (703) 288-2999 / www.klnb.com

A division of KLNB, founded in 1968.

Maryland / Washington D.C. / Virginia

February 1, 2007

The Honorable Ricardo M. Urbina
United States District Court
District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

**RE: Douglas Jemal**

Dear Judge Urbina:

I am writing to you today because of the fraud conviction of Douglas Jemal.

I am a native Washingtonian and have been working as a Retail Real Estate broker in Washington DC for the past 11 years. My goal as a commercial broker has been to bring retail tenants to the District of Columbia and to create a Washington DC where all people want to live and work. I have been through many real estate negotiations with Douglas over the past 11 years and I assure you that all of them have been very fair.

Douglas has always had a strong belief in Washington DC. One of the things that is important to point out is that Douglas is one of the few people who has taken huge risks in buying properties in neighborhoods where other developers would not. He took these risks because he believed in Washington, DC and started creating vibrant retail areas that other developers would eventually come to and benefit from. We have all benefited from Douglas' risk, vision and hard work.

I hope that you take these things into consideration when sentencing Mr. Jemal. The city that we live in would not be the same without him.

If you have any questions please do not hesitate to contact me at 202-255-7100.

Sincerely,

**KLNB RETAIL**

Stephen C. Combs
Managing Director

Exhibit 183

# William C. Smith & Co.

1100 New Jersey Avenue SE
Suite 1000
Washington, DC 20003

**W. Christopher Smith, Jr.**
**Chairman and Chief Executive Officer**

p 202/465.7065
f 202/371.1407
www.wcsmith.com

January 18, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue NW
Washington, DC 20001

Re: Douglas Jemal

Dear Judge Urbina:

We write to ask you to consider the many contributions Douglas Jemal has made to the District of Columbia as you prepare to hand down a sentence in his conviction on a charge related to a business transaction.

As a real estate development firm based in the District of Columbia for four decades, we acknowledge and appreciate the vision Mr. Jemal has for making ours a world class city. His entrepreneurial spirit and willingness to tackle the toughest projects have set the standard for those of us who strive to heal a city torn by violence and strife and return it to a condition befitting a nation's capital.

Because our company is committed to community service, we often discover charitable contributions Douglas Jemal has made quietly, without fanfare, for the benefit of the residents of Washington. This is a more livable city because of his work, both public and private.

We hope you will bear in mind the positive impact Mr. Jemal has had on our city as you render your decision.

Respectfully,

W. Christopher Smith, Jr

Exhibit 184

# *Wilkes Artis*

Stuart A. Turow
202.457.7821
sturow@wilkesartis.com

*Chartered*
*Attorneys at Law*

Suite 400
*1150 18th Street, NW*
*Washington, DC 20036-3841*
*Fax: 202.457.7814*

January 12, 2007

The Honorable Ricardo M. Urbina
US District Court Judge
United States District Court For the District of Columbia
333 Constitution Avenue, NW
Washington, DC, 20001

Re:    *Douglas Jemal*

Dear Judge Urbina:

This letter serves to present my impression of the character of Douglas Jemal over the 16-year period that I have known him.

I am a partner with the law firm of Wilkes Artis. I have been with my firm since 1994. Prior to that time, I was associated with another law firm that had an office both in the District of Columbia and Montgomery County. The real estate recession of the early 1990's forced the closure of that firm's D.C. office where I had been working, and I was relocated to the firm's Montgomery County office.

I first met Douglas Jemal in 1992. I was working on a tax appeal matter for him, along with a senior lawyer in the firm. After first meeting him, I immediately felt that Douglas was someone that I could talk to and feel comfortable being around. During this time period I was becoming very disenchanted with the law firm and possibly legal work in general. Although not knowing him very well at the time, I called Douglas and asked him if he would meet with me about a personal matter. He obliged without any hesitation and asked that I meet him at his "office", which at the time was a picnic bench located out front of the Park & Shop strip center located along Connecticut Avenue. Douglas was in the midst of renovating the center that he recently purchased. We met for approximately one hour, at which time I explained my uncertainty in pursuing my legal career and my consideration of going into a business (i.e. retail or otherwise). Throughout the discussion, Douglas could not have been any nicer or more fatherly in his comments to me. In essence, after reviewing his retail background and experiences with me, Douglas recommended that I continue to pursue my legal career. However, he stated that, if I opted not to do so, that he would help set me up in a retail business in one of his properties located near Howard University. Douglas made this offer to me without first knowing me for a period of time. He told me to think about the decision and get back to him when I was ready.

Exhibit 185

*Wilkes Artis*

Hon. Ricardo M. Urbina
January 12, 2007
Page 2


Following our meeting, Douglas took me out to lunch, along with his son Matthew, who must have been around four years old at the time. I remember Douglas lifting Matthew on to his shoulders and walking across Connecticut Avenue with me to a restaurant. After seeing how lovingly he treated his young son at lunch, my fondness for Douglas grew.

I eventually opted to continue my legal career. However, to this day, I will never forget the kindness and compassion that Douglas showed me at our "picnic bench" meeting. From that day on, I have considered Douglas a special friend.

I have been pleased to watch as Douglas has grown his real estate company over the years. He has single-handedly upgraded various parts of the City that no other developer was willing to consider. I am proud to tell people that I handle the D.C. property tax work for Douglas Development (Douglas' company). However, I am even more proud to say that Douglas is a friend of mine. His counseling at our "picnic bench" meeting will never be forgotten.

I hope that this letter provides you with a sense of the kind of individual that Douglas Jemal is. Based upon my experiences and impression of Douglas over the past 16 years, I believe that the single guilty verdict, found upon a private fraud, is clearly inconsistent with the character of the man that I have described above.


Sincerely,

WILKES ARTIS, CHARTERED

By: _____
    Stuart A. Turow


SAT:ef
#292411

# Holland+Knight

Tel   202 955 3000
Fax  202 955 5564

Holland & Knight LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C.  20006-6801
www.hklaw.com

January 12, 2007

NORMAN M. GLASGOW, JR.
202.419.2460
norman.glasgowjr@hklaw.com

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Dear Judge Urbina:

I am submitting this letter to the Court as I am aware that Douglas Jemal was acquitted of six of the seven charges he was facing, but there is one charge for which he was convicted that remains outstanding.  I hope that this letter helps to make you aware of the type of person, friend and client that Douglas is and assist you in the sentencing phase of these proceedings.

I have known Douglas for at least 20 years, and my father knew him for a significant period of time prior to that time.  I first knew and worked with Douglas as his zoning and land use attorney in a professional business capacity.  Over the years that I have worked with Douglas, that relationship has grown and matured; I consider him a friend and he has always treated me as a friend.

Douglas has had many accomplishments through a long and impressive career as a businessman and a real estate developer.  He has always been able to see opportunities and work successfully in neighborhoods where others did not dare to go. He is able to see in communities, and the people in them, their potential and not their deficiencies.  He has worked tirelessly in many underserved communities in the District of Columbia, working with community groups, securing community support for development projects which inured to the benefit of the District and the communities in which they are located, and which have been successful business ventures.

I have seen that same commitment to his business associates and friends and to, essentially, everyone and anyone Douglas meets.  He is well-respected and admired in the business community and in areas where his projects are being developed.  He has an outstanding reputation of his word being his bond.

Exhibit 186

For all of these reasons, I would hope that in your consideration of an appropriate sentence in this case, that Douglas's long-term record of honesty, integrity and credibility be recognized by the Court.

Very truly yours,

Norman M. Glasgow, Jr.

# 4296733_v1

LAW OFFICES

# MEYERS, RODBELL
# & ROSENBAUM, P.A.

*Please Respond to the Riverdale Address*

| | |
|---|---|
| WILLIAM V. MEYERS | FREDERICK STICHNOTH |
| ROBERT H ROSENBAUM* | M. EVAN MEYERS* |
| RUSSELL E. WARFEL | DOUGLAS C. MEISTER+✪ |
| LINDA C. CARTER | DAVID J. MARTIN* |
| JOSEPH B. CHAZEN | MICHAEL R. ACKER*◇✪ |
| MICHELE LA ROCCA* | ELISE M. BALKIN±*+ |
| PAUL A. TURKHEIMER* | MELANIE JOUSTRA*± |
| DAVID A. CARTER* | CHANTELLE CUSTODIO |
| EDWARD S. MARIN *# | JENNIFER L. BANACH |
| GINA M. SMITH* | NINETTE PONTON |
| BRETT C. BEEHLER*+ | |

6801 KENILWORTH AVENUE, SUITE 400
RIVERDALE PARK, MARYLAND 20737-1385
(301) 699-5800    FAX (301) 779-5746
EMAIL: bmeyers@mrrlaw.net

10 EAST BALTIMORE STREET, SUITE 1405
BALTIMORE, MARYLAND 21202
(410) 244-5800    FAX (410) 244-5810
EMAIL: admin@mrrlaw.net

+  *Also Admitted in Virginia*
*  *Also Admitted in D.C.*
◇  *Also Admitted in Pennsylvania*
#  *Also Admitted in New York*
✪  *Also Admitted in West Virginia*
±  *Also Admitted in New Jersey*

1445 RESEARCH BLVD, SUITE 301
ROCKVILLE, MARYLAND 20850
(301) 738-7061    FAX (301) 738-7065
EMAIL: admin@mrrlaw.net

PAUL B. RODBELL
(1947-2001)

January 12, 2007

The Honorable Ricardo M. Urbina
U.S. District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:    Douglas Jemal

Dear Judge Urbina:

When I first met Douglas Jemal our offices in Riverdale were flooded due to a badly leaking roof and he was the new owner of our building and, I believe, new to being a real estate investor. As the water dripped on my desk and my patience dissipated, Douglas assured me he would expeditiously resolve the problem and asked me to trust him and not vacate the premises. With some skepticism I agreed. That was over 12 years ago and in that span of time we have negotiated several lease renewals and a lease of additional space and I have never had any reason to doubt Douglas' word or not to trust him. I have also called on him from time to time to help with local philanthropic endeavors and he has responded with great generosity.

During the years we have interacted as landlord and tenant, I have found Douglas Jemal to be an honest, straight forward and reasonable businessman. He is also a very public-spirited individual.

I am aware that Douglas was convicted of a single charge of fraud related to a private business transaction and, while I know nothing of the facts of the case and would be disingenuous to suggest the jury which acquitted him of six charges and convicted him of only one was in error, I can state unequivocally that it has been my experience in dealing with him for many years that such actions are not characteristic of the individual that I know and respect.

I feel it relevant to note that neither I nor my firm represent or have any relationship with Douglas Jemal except that of landlord and tenant. Based on that relationship I express my wholehearted support for Douglas and urge you to treat him with the utmost leniency which your discretion will allow.

Very truly yours,

William V. Meyers

Exhibit 187



**THE FISHER LAW GROUP** PLLC

JEFFREY B. FISHER (MD & DC)
MARTIN S. GOLDBERG (MD & DC)
IBIRONKE SOBANDE (MD)
MICHELLE E. STAWINSKI (MD & DC)

January 15, 2007

The Honorable Ricardo M. Urbina
United States District Judge
333 Constitution Avenue, NW
Washington, DC 20001

Re: Douglas Jemal

Dear Judge Urbina:

I have known Douglas Jemal for over seven years. He is my landlord. I first met Mr. Jemal in the spring of 1999. I was interested in leasing space in the building that, coincidentally, Mr. Jemal had just acquired in Upper Marlboro, Maryland. I was told that I would be meeting Mr. Jemal personally. When I arrived I saw this confident baldheaded guy wearing jeans and boots and carrying a tape measure. He was a larger-than-life type guy, very personable but very businesslike and direct. He had a firm handshake and aura that you could not only trust what he said but that he would work with you if you had a problem. I have known successful people in my life that have put the letter of their contracts above all else and I did not feel that Mr. Jemal was that rigid.

His company delivered on its commitments to me and I have delivered on my commitments to it. I have gotten to know Mr. Jemal over the seven years and have seen, as I am sure the court is aware, a great deal of civic involvement at a high level that is important to the community and beneficial. If I went to Mr. Jemal's Christmas party, I needed to bring along my checkbook because money was going to be raised for charity and for good purposes.

Exhibit 188

The Honorable Ricardo M. Urbina
January 15, 2007
Page 2

I was distressed to learn of his indictment, his trial and, of course, his conviction. Notwithstanding his conviction, I want it to be said that for me, personally, a lawyer for more than 30 years and AV rated by Martindale Hubbell, I would today feel comfortable entering into a handshake agreement with Mr. Jemal and not have the least bit of concern as to whether my agreement would be honored.

I hope the court will find my comments helpful in connection with Mr. Jemal's sentencing.

Sincerely,

JEFFREY B. FISHER

JBF/idm

THE LAW OFFICES OF

# EDWARD V. GREGOROWICZ, JR.

SUITE 102

10565 LEE HIGHWAY

FAIRFAX, VIRGINIA 22030

(703) 934-6645

FAX: (703) 934-6649

EDWARD V. GREGOROWICZ, JR.*

\* ADMITTED IN VIRGINIA &
THE DISTRICT OF COLUMBIA

January 17, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Urbina:

Please consider this letter on behalf of Douglas Jemal, who will be sentenced by the Court on April 16, 2007, for his 2006 conviction on wire fraud.

I am pleased to have the opportunity to provide the Court with my statement on behalf of a man that I have known for over ten (10) years as a client and friend. Douglas Jemal is well known publicly from the many accountings he's received in the press as a successful real estate developer and businessman. I have had the privilege to also know Douglas in private and personally as a gentleman.

Douglas has always conducted his dealings with me with forthrightness and integrity. I have had the pleasure of assisting Douglas in leasing over 750,000 square feet of office and related space to the federal government in the Washington D.C. Metropolitan Area. Each of these deals stands on its own, exemplifying a quality product at a fair price, and all were delivered in accordance with the agreements signed by Douglas. We have competed fairly and honestly, and we have won and lost our share of procurements over the years by playing within the rules. But, in every case, we have put forth an honest effort and gained the respect of the government personnel with whom we have been involved. In my opinion Douglas has been successful because he can relate to people on a common level, and because he understands that his reputation for delivering what he promises is paramount. He has always treated the people with whom we have conducted business with respect and candor, and I have never had occasion to witness any conduct that supports in any way the serious charges from which he was acquitted.

It is with great conviction that I make this statement, and I have no hesitation in standing behind Douglas as an upstanding citizen and community leader, as well as my friend. I hope that the Court can appreciate the many great things Douglas has accomplished, and give great weight to the many positive contributions he has made to the City, the government and to his friends and associates. Thank you for your consideration of these words on Douglas' behalf.

Sincerely,

Edward V. Gregorowicz, Jr.

Exhibit 189

LAW OFFICES

# GREENSTEIN DeLORME & LUCHS, P.C.

WILLIAM H. HARRIS, JR.
RICHARD G. WISE
ABRAHAM J. GREENSTEIN
GILBERT E. DeLORME
VINCENT MARK J. POLICY
RICHARD W. LUCHS
JUDITH R. GOLDMAN
JACQUES B. DePUY
JEFFREY H. GELMAN
ALAN S. WEITZ
WILLIAM C. CASANO
JOHN PATRICK BROWN, JR.
LEWIS F. MORSE
ROGER D. LUCHS
JAMES D. SADOWSKI
DONALD F. HOLMES, JR.

1620 L STREET, N.W., SUITE 900

WASHINGTON, D.C. 20036-5605

————

TELEPHONE (202) 452-1400

FACSIMILE (202) 452-1410

www.gdllaw.com

ABRIELLE B. ANDERSON
STEPHANIE A. BALDWIN
LYLE M. BLANCHARD
GREGORY T. DuMONT
ALFRED M. GOLDBERG
JOSHUA M. GREENBERG
JARED S. GREENSTEIN*
MONIC Y. HALSEY
GUY R. JEFFRESS
M. RYAN JENNESS
DAVID J. WALKER

————

*ADMITTED IN MD ONLY

January 18, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Dear Judge Urbina:

I am writing to you with respect to Douglas Jemal, who is scheduled to go before you for sentencing in April.  I do not have any personal knowledge of the particular trial and his subsequent conviction on one of several charges, other than what little I have read in the newspapers.  My remarks below are made personally and not on behalf of my law firm.

I have been practicing real estate finance and development law in the District of Columbia for the past 21 years, with a heavy emphasis on low-income housing and neighborhood revitalization.  I have known Douglas Jemal in two capacities.  The first is through serving on the Board of Directors of the District of Columbia Building Industry Association with Mr. Jemal.  In this role, Mr. Jemal has exhibited a compassion and concern for the welfare of this City.  He has repeatedly expressed in his remarks and shown through his actions his love for the welfare of this City. Much of his career has been dedicated to the redevelopment of various blighted commercial and residential areas and buildings of this City.  The second manner in which I know Mr. Jemal is through my firm's representation of a joint venture in which his company participated in the restoration of an older deteriorated building into a quality residential and commercial building.  I have also recently represented a party purchasing a property from Mr. Jemal which will result in the development of a large residential and commercial project that will help revitalize a community in the 14th Street corridor.  In these matters, Mr. Jemal has been forthright and performed in accordance with his obligations and agreements.

Thank you for the opportunity to provide these observations of Mr. Jemal.

Sincerely,

Jeffrey H. Gelman

305542v1

Exhibit 190

LAW OFFICES

GROSSBERG, YOCHELSON, FOX & BEYDA, LLP

2000 L STREET, NW

SUITE 675

WASHINGTON, D.C. 20036-4907

C. RICHARD BEYDA
LAWRENCE A. MILLER
GERALD P. GROSSBERG
STEVEN G. FRIEDMAN
RICHARD F. LEVIN
LINTON W. HENGERER
BRETT D. ORLOVE
MICHAEL D. RAVITCH
CAL N. KAUFMAN
BARBARA L. PORTMAN
EVAN D. HARMS

TELEPHONE
202 296-9696
FACSIMILE
202 296-7777
WEBSITE
www.gyfb.com

SOLOMON GROSSBERG (1905-1994)
IRVING B. YOCHELSON (1906-1983)

January 12, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C, 20001

Re:        Douglas Jemal

Dear Judge Urbina:

Having known Douglas Jemal for almost twenty (20) years, I followed with close attention the trial over which you presided last fall and the resulting acquittal of Douglas on six of the seven charges that were made against him. I am aware that you are presently considering the sentencing of Douglas Jemal on the remaining count for which he was convicted. I write to personally advise you of my thoughts regarding Mr. Jemal and request that you consider in your decision his significant contributions to both civic and charitable institutions, together with his forthright character.

Please note that for many of those twenty years, I represented clients in transactions involving Douglas wherein Douglas was represented by other counsel. Consequently, I, along with my clients, have been able to view Douglas from the "other side" of a transaction. In more recent years I have also had the opportunity to represent enterprises in which Douglas was the managing or general partner and the pleasure to experience first hand his various business accomplishments, including the transformation of various areas and neighborhoods into thriving communities, and have watched and admired his zeal, commitment and pride.

I can personally attest to his good and fine character, and his love of both his family and the City of Washington, D.C.  Please consider these factors in your sentencing decision.

Sincerely,

Richard F. Levin

RFL/sp

Exhibit 191

LAW OFFICES

## GROSSBERG, YOCHELSON, FOX & BEYDA, LLP

2000 L STREET, NW

SUITE 675

WASHINGTON, D.C. 20036-4907

January 25, 2007

C. RICHARD BEYDA
LAWRENCE A. MILLER
GERALD P. GROSSBERG
STEVEN G. FRIEDMAN
RICHARD F. LEVIN
LINTON W. HENGERER
BRETT D. ORLOVE
MICHAEL D. RAVITCH
GAL N. KAUFMAN
BARBARA L. PORTMAN
EVAN D. HARMS

TELEPHONE
202 296-9696
FACSIMILE
202 296-7777
WEBSITE
www.gyfb.com

SOLOMON GROSSBERG (1905-1994)
IRVING B. YOCHELSON (1906-1983)

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

                    Re:     Douglas Jemal

Dear Judge Urbina:

I am writing to inform you of my long relationship with and high regard for Douglas Jemal.

I have known Mr. Jemal for more than 40 years and have observed his many extraordinary business accomplishments and charitable endeavors throughout the years. It is my view that Mr. Jemal is a very kind, caring, thoughtful and generous person and has at all times conducted his affairs in a most fair and equitable manner with much concern for all involved.

Mr. Jemal has devoted much time and resources to generously support many civic and non-profit matters including organizations devoted to the betterment of the City and particularly his leadership in the acquisition, restoration and continued operations of the Sixth & I Historic Synagogue in the City.

I greatly appreciate and thank you for your consideration of my thoughts and that you consider my experiences and views in the sentencing of Mr. Jemal. I would be pleased to furnish such other and further information as you may request.

Very truly yours,

C. Richard Beyda

CRB:mbv

Exhibit 192

LAW OFFICES
# MALLIOS & O'BRIEN
Suite 1112
2600 VIRGINIA AVENUE, N.W.
WASHINGTON, D.C. 20037

———

(202) 625-7700

DIMITRI P. MALLIOS+
STEPHEN J. O'BRIEN
STUART J. LONG
MICHAEL D. FONSECA
CANDACE M. FITCH*

FACSIMILE
(202) 625-7706

+Also Admitted in Maryland
*Admitted in Virginia only

January 25, 2007

The Honorable Ricardo M. Urbina
United States District Court
for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C.  20001

        Re:   Douglas Jemal

Dear Judge Urbina:

        My name is Dimitri P. Mallios.  I have been a resident of the District of
Columbia since 1940, have been a practicing attorney since 1960, and
received all my schooling in the District of Columbia including college and
law school.

        I have known Douglas Jemal for approximately 25 or 30 years.  I first
knew him when he was the proprietor of the Wiz, which as you probably
recall, was a downtown store selling electronics.  My practice in the past
years has been primarily in connection with representing tenants in leasing
and obtaining liquor licenses for their establishments.  I represented Douglas
several times before the Alcohol Beverage Control Board.  I still recall when
as my witness, I asked his name and I asked, "Are you known by any other
name?", and when he said "The Wiz", and indicated he owned those stores;
everybody in the hearing room knew him as the store owner and perked up to

Exhibit 193

The Honorable Ricardo M. Urbina
January 25, 2007
Page 2

listen to his testimony which resulted in the ABC Board granting a license which, however, he did not finalize. I also represent many, many tenants in buildings in which he has an ownership interest in connection with their lease negotiations and liquor license applications.

When I read about the charges and the conviction, I was surprised because these charges were contrary to everything I knew about Douglas and I followed his case in the newspapers regularly.

Ten or twelve years ago, I was a director of a bank. Douglas applied for a loan. His character and finances were carefully scrutinized by the bank and the directors of that bank and a Virginia bank, together, went on a tour of Douglas' properties. Everything we unearthed during those bank studies showed that he, personally, and his companies were first class and above reproach.

I also recall when he bought a shopping center on Connecticut Avenue close to my house which was owned previously by a friend of mine who was unable to remodel the center to the satisfaction of the neighbors. Douglas met with the neighbors, discussed their concerns and received their permission to completely remodel the shopping center (it is still called Jems Center) at Connecticut and Ordway to the complete satisfaction of the neighbors who wanted this mall to remain historical in keeping with its past. I had never seen anyone able to deal with the neighbors and their concerns in such a way that everyone in the community was consulted, listened to, and concerns were addressed and met. His negotiations with the neighbors, with my fellow bank directors, my clients and his tenance has always been exemplary.

The Honorable Ricardo M. Urbina
January 25, 2007
Page 3

    I know of Douglas' commitments to his family, friends and employees over the years and I have marveled and understood how successful he could be because of his personality and character.

    I read about his purchase of the Synagogue in downtown D.C., along with Abe Pollin, so it would not be sold to a nightclub (which, incidentally, I was representing) shows of his great respect and interest in community service and charitable activities.

    I am very hopeful that you would consider Douglas' character, accomplishments, relationship with everyone with whom he has dealt with, and his community services at his sentencing hearing on April 16, 2007.

    I am hopeful that you will take that into consideration at that time.

Sincerely yours,

Dimitri P. Mallios

DPM/mr

M/ltr/Urbina.wpd

FREDERICK L. KLEIN
1200 NINETEENTH STREET, N.W.
WASHINGTON, D.C. 20036

January 29, 2007

Hon. Ricardo M. Urbina
United States District Judge
United States District Court for
the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Re:      **Douglas Jemal**

Dear Judge Urbina:

I am writing this letter to you in connection with your consideration of the sentence for Douglas Jemal's conviction on a fraud charge.  I am a real estate partner with the DLA Piper law firm in Washington, and I have been practicing commercial real estate law in this city since 1980.  I have never served as Douglas' attorney, but I do know him quite well.

I first met Douglas on a real estate transaction in 1986, at the beginning of his real estate career.  I represented the seller of an office building in Rockville that Douglas was acquiring.  Since that time, I have worked on more than a dozen different transactions in which Douglas was intimately involved.  I always represented the party who was adverse to him – whether a seller, lender, purchaser or neighbor – and in each case, he was represented by his own counsel.  In some of these instances, Douglas held the upper hand in terms of relative bargaining power; and in others, Douglas was the underdog.  Some transactions were large and others were small, based on their dollar value and relative importance.

Exhibit 194

Real estate can be a rough and tumble business, and during my 26 years of practice, I have come across all kinds of people with many different approaches. Douglas certainly has a unique style, and he can drive a hard bargain when he needs to. I know you will receive a lot of letters from folks who will extol Douglas's accomplishments and how he has played a major role in re-shaping our city, so I need not comment on that.

But let me give you one very clear observation, based on my many dealings with Douglas Jemal for a variety of clients: there is absolutely nothing dishonest, deceptive or in any way disreputable about this man. Douglas is a man of his word and when Douglas tells you he is going to do something, you can consider it done. I have never, over the course of more than 20 years, on a variety of business deals, seen even the slightest hint of anything besides honest business dealings by Douglas Jemal. This is the case even when Douglas has little or no leverage in a particular case. I have witnessed first-hand the ups and downs of commercial real estate, and have seen how developers and investors cope with adversity. Yet Douglas Jemal, who has certainly faced his share of difficulties, and has done some deals that didn't meet his expectations, remains constant in his integrity, honesty and sense of fair dealing.

In August 2003, I was representing Wachovia Bank in connection with a $10 million loan to Douglas, when a dispute arose between Douglas and the District of Columbia Government that had nothing to do with the matter that was the subject of my representation of the Bank. The city had made some serious allegations, some of which may have been the subject of the case over which you have been presiding. We considered the city's claims and had several serious discussions with John Dowd, who was then representing Douglas. Once we felt comfortable that we understood the situation, Wachovia proceeded to advance the loan to Douglas, without any special "bells and whistles" in the loan documents that would specifically address the claims that had been made, and notwithstanding the fact that the City Council was then investigating his business dealings. The bottom line was that Wachovia Bank, which is a highly-regulated and very prominent financial institution, was willing, based on its own judgment and my advice, to proceed with a business transaction in reliance upon

WASH1\4868338.1                        - 2 -

Douglas' character and the strength of the real estate he had developed. That loan is still on the books today, without default, and I know that Wachovia has favorably considered other requests from Douglas to provide mortgage loans on other projects.

Based on my personal experience, I would vouch for Douglas' character under oath, and in any forum, without reservation. A number of my clients do business regularly with Douglas, and I therefore represent interests that are adverse to his in a business context, so I have nothing to gain by attesting to his integrity. I would advise my clients, based on my personal experience over 20 years, that Douglas is an honest man who can be trusted to make good on his promises.

I appreciate the opportunity to provide these comments to you, and hope you will consider them favorably as you make your decision in April.

Respectfully submitted,

Frederick L. Klein

# RIFKIN, LIVINGSTON, LEVITAN & SILVER, LLC

ATTORNEYS AT LAW

ALAN M. RIFKIN
SCOTT A. LIVINGSTON (MD, DC)
LAURENCE LEVITAN
EDGAR P. SILVER†
MICHAEL V. JOHANSEN
JOEL D. ROZNER (MD, DC)
RICHARD K. REED
NORMAN D. RIVERA
M. CELESTE BRUCE (MD, DC)
JAMIE B. EISENBERG (MD, DC, NY)
CHARLES S. FAX (MD, DC, NY) ††
CAROLYN JACOBS††
PATRICK H. RODDY
ELLEN B. FLYNN (MD, DC, CT)
ERIC LEE BRYANT
MELVIN A. STEINBERG†
KEVIN O'KEEFFE
LANCE W. BILLINGSLEY†
MICHAEL S. NAGY (MD, VA)
MEGAN M. BRAMBLE
GERALDINE VALENTINO†
ELIZABETH K. MILLER†
LYDIA B. HOOVER†
LEWIS S. GOODMAN†
TIMOTHY K. HOGAN†

DERRICK L. GREEN
(NONLAWYER/CONSULTANT)
†   OF COUNSEL
††  COUNSEL

6305 IVY LANE • SUITE 500
GREENBELT, MARYLAND 20770
(301) 345-7700 • FAX (301) 345-1294
E-MAIL: RLLS@RLLS.COM

600 WASHINGTON AVENUE • SUITE 305
TOWSON, MARYLAND 21204
(410) 583-9433 • FAX (410) 583-9439

225 DUKE OF GLOUCESTER STREET
ANNAPOLIS, MARYLAND 21401
(410) 269-5066 • FAX (410) 269-1235

1133 21ST STREET, NW
WASHINGTON, DC 20007
(202) 639-0349

January 30, 2007

The Honorable Ricardo M. Urbina
Unites States District Court
     for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Urbina:

Please accept this letter of support for Douglas Jemal who I understand faces sentencing in your court soon.  Mr. Jemal has been a friend and colleague for many years and I, too, know him to be a fair, honest, and generous man.  In my dealings with him, he has always exhibited excellent judgment and I believe his good character is a primary factor in his success in business.  He is pioneering in his real estate revitalization efforts and, in this way, a true entrepreneur.

I also know Douglas to be a person who is considerate of his neighbors and cares about the affect his projects may have on the greater community.  In efforts which I have been associated with, there has always been a tremendous outreach to the community in an effort to integrate a development proposal as seamlessly into the fabric of the existing neighborhood as possible.  The object is always to attempt to leave an area in a superior condition, and to raise the bar in terms of quality of life, creation of jobs, and revitalization of neighborhoods.

Exhibit 195

The Honorable Ricardo M. Urbina
January 30, 2007
Page 2


     Your consideration of these thoughts and perspectives as you
contemplate your decision is greatly appreciated.

                   Very truly yours,

                   Richard K. Reed

PRISCILLA LABOVITZ
ATTORNEY AT LAW
6856 EASTERN AVENUE, N.W., SUITE 354
WASHINGTON, DC   20021
(202) 291.9648  PHONE
(202) 291.1676  FAX
LABOVITZ@EARTHLINK.NET

January 29, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC  20001

Re: Douglas Jemal

Your Honor:

I am an immigration lawyer and long-time tenant of Douglas Jemal at
Takoma Metro Center in Washington, DC.  I know Mr. Jemal (not
personally, however) as a member of the community.

I was moved and impressed by his purchase and renovation (with Abe
Pollin, I believe) of the beautiful and historic downtown Synagogue at 6th
and I Streets, Northwest. The building has been beautifully, accurately
and lovingly restored,
opened to the public and, my favorite part, made available for religious
observance to a diversity of groups, without sectarianism.

Mr. Jemal has saved other historic buildings from the wrecker's ball.
And in our (unrenovated) building, made room, fabulous room, for the
Washington Opera, definitely raising the tone of the neighborhood,
literally and figuratively.

Our building is obviously family-run, which is not always the most
efficient, but it is human in scale and reminiscent of an earlier time.  I am
not surprised Mr. Jemal's bookkeeping was not the best; when I hadn't
realized I owed a rent increase, I was not informed of the delinquency for
many months.

Exhibit 196

To my mind, despite some apparent rough edges, Mr. Jemal is a gentleman, a generous and fine human being.

Sincerely yours,

Priscilla Labovitz



# NIXON PEABODY LLP

ATTORNEYS AT LAW

401 9th Street N.W.
Suite 900
Washington, DC 20004-2128
(202) 585-8000
Fax: (202) 585-8080

Debra D. Yogodzinski
Direct Dial: (202) 585-8746
E-Mail: dyogodzinski@nixonpeabody.com

January 30, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

RE:    <u>Douglas Jemal</u>

Dear Judge Urbina:

I am a senior partner in the Washington, D.C. office of Nixon Peabody LLP and have practiced in the area of real estate development and finance for more than twenty-five (25) years. I am aware of the jury's recent conviction of Doug Jemal on one fraud charge related to a private business transaction, and am writing to urge your consideration of the most lenient sentence possible for Mr. Jemal with respect to this conviction, in light of his extraordinary commitment to the Washington, D.C. community.

I have known Mr. Jemal personally since for almost five (5) years, though given my longstanding practice in DC real estate, I've known Mr. Jemal by reputation for many more years. Mr. Jemal is not a client of mine. I have been on the other side of a transaction with Mr. Jemal, in my representation of the Avalon Theater Project, Inc., the non-profit corporation that owns and operates the Avalon Theater, in connection with its negotiations with Mr. Jemal to lease and the purchase the building in which the theater is located.

Everything that I was ever told about Mr. Jemal before I met him: that his word and handshake are his bond; that while he was a tough negotiator, he was also honest and straightforward in all of his dealings; and that he loved DC and particularly its old, neglected properties and neighborhoods, have been proven true time and again in my personal experience. Doug's commitment to Washington, D.C. is extraordinary, and his vision is legendary in the real estate community. He is willing to purchase old properties like the Woodies building, the properties on 7th St., NW and the Atlantic Building at 10th and F Streets, hold onto them for a significant period of time, and then renovate them into beautiful re-creations of themselves. His vision for where the market will move next in DC, and for the sort of retail tenants that downtown

Exhibit 197

ALBANY, NY • BOSTON, MA • BUFFALO, NY • HARTFORD, CT • LONG ISLAND, NY • LOS ANGELES, CA • MANCHESTER, NH • McLEAN, VA • NEW YORK, NY
ORANGE COUNTY, CA • PALM BEACH GARDENS, FL • PHILADELPHIA, PA • PROVIDENCE, RI • ROCHESTER, NY • SAN FRANCISCO, CA • WASHINGTON, DC

NIXON PEABODY LLP

The Honorable Ricardo M. Urbina
January 30, 2007
Page 2

Washington D.C. needs and deserves is also extraordinary. And his charitable works, including his partnership with two other DC developers to purchase and renovate the old synagogue at Sixth & I Streets, NW and his assistance to the Avalon Theater Project, Inc., exceeds even his reputation in this regard.

In light of Mr. Jemal's considerable commitment to a broad spectrum of the Washington D.C. community, I urge you to consider the most lenient possible sentence for Mr. Jemal. Thank you for considering my views of Mr. Jemal in connection with your sentencing.

Sincerely,

Debra D. Yogodzinski

10271664.1

# RIFKIN, LIVINGSTON, LEVITAN & SILVER, LLC
### ATTORNEYS AT LAW

ALAN M. RIFKIN
SCOTT A. LIVINGSTON (MD, DC)
LAURENCE LEVITAN
EDGAR P. SILVER†
MICHAEL V. JOHANSEN
JOEL D. ROZNER (MD, DC)
RICHARD K. REED
NORMAN D. RIVERA
M. CELESTE BRUCE (MD, DC)
JAMIE B. EISENBERG (MD, DC, NY)
CHARLES S. FAX (MD, DC, NY) ††
CAROLYN JACOBS††
PATRICK H. RODDY
ELLEN B. FLYNN (MD, DC, CT)
ERIC LEE BRYANT
MELVIN A. STEINBERG†
KEVIN O'KEEFFE
LANCE W. BILLINGSLEY†
MICHAEL S. NAGY (MD, VA)
MEGAN M. BRAMBLE
GERALDINE VALENTINO†
ELIZABETH K. MILLER†
LYDIA B. HOOVER†
LEWIS S. GOODMAN†
TIMOTHY K. HOGAN†

DERRICK L. GREEN
(NONLAWYER/CONSULTANT)

† OF COUNSEL
†† COUNSEL

6305 IVY LANE • SUITE 500
GREENBELT, MARYLAND 20770
(301) 345-7700 • FAX (301) 345-1294
E-MAIL: RLLS@RLLS.COM

600 WASHINGTON AVENUE • SUITE 305
TOWSON, MARYLAND 21204
(410) 583-9433 • FAX (410) 583-9439

225 DUKE OF GLOUCESTER STREET
ANNAPOLIS, MARYLAND 21401
(410) 269-5066 • FAX (410) 269-1235

1133 21ST STREET, NW
WASHINGTON, DC 20007
(202) 639-0349

January 29, 2007

The Honorable Ricardo M Urbina
Unites states District Court
    for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Urbina:

    I wanted to echo the support of many for Douglas Jemal who faces sentencing in your court soon. Mr. Jemal has been a friend and colleague for many years and his reputation precedes him in a favorable light. While he may be perceived as a shrewd businessman, I also know him to be a fair, honest, and straightforward man. In my dealings with him, he is fair, pragmatic and to the point, hence his success in business. I have been a practicing land use attorney for fifteen years and I represent his company, Douglas Development, in Prince George's County on various infill/revitalization projects and as such, I am keenly aware of his reputation and am proud to be part of theses efforts.

    In projects I have been involved in, there has always been a tremendous outreach to the community so as to integrate a development as seamlessly into the neighborhood as possible. We strive to leave an area better off than when we started and the projects we do will raise the bar, create jobs, and revitalize neighborhoods.

    Your consideration of this request is greatly appreciated.

            Sincerely,

            Norman D. Rivera                    Exhibit 198

# Holland+Knight

Tel  202 955 3000
Fax  202 955 5564

Holland & Knight LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C.  20006
www.hklaw.com

Dennis M. Horn
202 457 7122
dennis.horn@hklaw.com

January 30, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

      Re:    Douglas Jemal

Dear Judge Urbina:

    I have known Doug Jemal for several years in my capacity as a member of the Board of Directors of the DC Building Industry Association and in various other civic capacities. Mr. Jemal has been active in the District of Columbia community in a number of positive ways. When developers threatened to tear down the Avalon Theatre, he organized a neighborhood committee to in Northwest Washington to save the theatre. He has been equally active in preserving historical landmarks which are important to the Jewish community in Washington, D.C.

    Mr. Jemal is a very good corporate citizen of our community. I would urge you to take that into account when you sentence him for his recent conviction.

                Sincerely yours,

                Dennis M. Horn

# 4328462_v1

Exhibit 199

GERALD E. WEDREN

ATTORNEY AT LAW
2301 E STREET, N.W.
WASHINGTON, DC 20037-2813
———
(202) 296-5095
FAX (202) 833-7095

LICENSED IN OHIO

February 2, 2007

The Honorable Ricardo Urbina
US District Court
333 Constitution Avenue, NW
Washington, DC 20001

Re:    Douglas Jemal

Dear Judge Urbina:

I am writing this to you on behalf of Douglas Jemal, who I have known for several years. Approximately eight (8) years ago I was the trustee in a bankruptcy case in which I negotiated and sold to Mr. Jemal the property located at 16th Street and Kalorama. My dealings, negotiations, etc. with Mr. Jemal were only of the highest and most honorable, Mr. Jemal never asking for anything to which he was not entitled, and fulfilling all of the terms and conditions of his agreement to purchase. Obviously, both before, during, and after the transaction we had many discussions, and I can only tell you that he is a man of honor and dignity.

I would also add that his contributions to the DC area, both philanthropically and investment wise have helped many others.

I hope that you will take this into account during the sentencing hearing.

Sincerely yours,

Gerald E. Wedren

GEW/jm

Exhibit 200

# Oldaker, Biden & Belair, LLP

Attorneys At Law

818 Connecticut Avenue, NW
Suite 1100
Washington, D.C. 20006

(202) 728-1010
fax: (202) 728-4044

February 6, 2007

The Honorable Ricardo M. Urbina
United States District Court for the
    District of Columbia
333 Constitution Avenue, NW
Washington, DC 20036

Dear Judge Urbina:

    I am writing in regards to Douglas Jemal whom I understand will be sentenced by you on April 6, 2007.

    I am very aware of the case against Mr. Jemal, as I also gave a written affidavit for him detailing some of the parking lot background when I was Deputy Mayor in 1999 under the Mayor William's administration.

    I have known Mr. Jemal since 1998 and I consider him a very good friend. What is endearing about him is his ever and generous treatment of all individuals, regardless of their station in life. When he considers you a friend he is loyal to the end.

    He has also been generous to a fault for helping people or organizations in the District who are in need. He probably, more than any other individual or entity, helped revitalized the east end of downtown Washington, DC in terms of development.

    He is a true public-spirited person. Thank you for your time and attention.

Sincerely,

Douglas J. Patton

Exhibit 201

# LAW OFFICES OF HAROLD BRAZIL & ASSOCIATES, P.C.

February 14, 2007

Honorable Ricardo M. Urbina
United States District Court
          For the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:    Douglas Jemal Sentencing, April 16, 2007

Dear Judge Urbina;

I write this letter in of support my friend and colleague, Douglas Jemal. I ask that you show leniency toward Douglas consistent with the discharge of your duties as a judge of this Honorable Court.

I came to know Douglas, or Doug, during my 14 year tenure on the Council of the District of Columbia. I know him as a tough but honest man, a man of his word, a straight shooter—if you will. I know him as a businessman and a friend, and someone I can trust.

I took office at a low point for the District government. I call it the dark days. We were headed toward financial collapse and though insolvent avoided bankruptcy (or its equivalent in the pubic sector) only because the federal government stepped in. This was a lugubrious time of disinvestment in our city. There were no new buildings and condominiums or bright lights. Many businesses abandoned us and even the disadvantaged were scrambling to get off of a sinking ship of state.

I admire Doug because he believed in this city, he kept his head while all, it seemed, were losing theirs. While others were in retreat, Doug invested in the city, with his time, his money, his know-how, his family, and his livelihood. Gallery Place, F Street, N.W. and Woody's, for example, would not have been what they are today if it were not for Doug's investment. I believe that Doug is a brave man and one that we all should admire and thank for what he did for our city.

I respect this Honorable Court and particularly your fine ability as a judge and one who has presided over Doug's trial. I do not seek to interfere in any way. As one who knows and admires what Doug has done for Washington, I want only to say that Doug is a man deserving of the leniency of this court. Thank you.

Sincerely

Harold Brazil

---

1776 K STREET N.W. SUITE 200    WASHINGTON, D.C. 20006
202.429.1727 PHONE    202.429.1728 FAX
brazillaw@msn.com

Exhibit 202

# 9-43.000
# MAIL FRAUD AND WIRE FRAUD

9-43.100 Prosecution Policy Relating to Mail Fraud and Wire Fraud
9-43.300 Statement of Policy concerning Venue in Mail Fraud Prosecutions

## 9-43.100 Prosecution Policy Relating to Mail Fraud and Wire Fraud

Prosecutions of fraud ordinarily should not be undertaken if the scheme employed consists of some isolated transactions between individuals, involving minor loss to the victims, in which case the parties should be left to settle their differences by civil or criminal litigation in the state courts. Serious consideration, however, should be given to the prosecution of any scheme which in its nature is directed to defrauding a class of persons, or the general public, with a substantial pattern of conduct.

*See also* USAM 9-85.210 (requires prior consultation with the Public Integrity Section to use the mail or wire fraud statutes in the prosecution of election fraud cases).

Further guidance and legal analysis of issues surrounding the investigation and prosecution of frauds involving use of the mail or wire, in violation of Title 18, United States Code, Sections 1341 and 1343 can be found in the Criminal Resource Manual:

| | |
|---|---|
| Investigative Authority | Criminal Resource Manual at 939 |
| 18 U.S.C. Section 1341 -- Elements of Mail Fraud | Criminal Resource Manual at 940 |
| 18 U.S.C. 1343 -- Elements of Wire Fraud | Criminal Resource Manual at 941 |
| The Scheme and Artifice to Defraud | Criminal Resource Manual at 942 |
| No Loss or Gullible Victims | Criminal Resource Manual at 943 |
| Proof of Scheme and Artifice to Defraud | Criminal Resource Manual at 944 |
| McNally and Intangible Rights | Criminal Resource Manual at 945 |
| Tangible Versus Intangible Property Rights | Criminal Resource Manual at 946 |
| Fiduciary Duty | Criminal Resource Manual at 947 |
| Intent to Defraud | Criminal Resource Manual at 948 |
| Proof of Fraudulent Intent | Criminal Resource Manual at 949 |
| Use of Mailings and Wires in Furtherance of the Execution of the Scheme | Criminal Resource Manual at 950 |

Exhibit 203

## GUARANTY

THIS GUARANTY is made as of November ___, 2005, by DOUGLAS JEMAL and JOYCE JEMAL (individually or collectively, the "**Guarantor**") to and for the benefit of WASHINGTONFIRST BANK (the "**Bank**").

## RECITALS

WHEREAS, Jemal's Columbia National L.L.C. (the "**Borrower**") desires to obtain loans or borrow money or obtain credit or other financial accommodations from the Bank from time to time, and has so requested of the Bank; and

WHEREAS, the Bank has agreed to make a loan to the Borrower in the principal amount of Two Million and No/100 Dollars ($2,000,000.00) (the "**Loan**"); and

WHEREAS, the Loan is evidenced by a promissory note (the "**Note**", which term shall include any and all amendments, restatements and modifications thereto) made by the Borrower and payable to the order of the Bank dated of even date herewith; and

WHEREAS, the Bank requires additional assurances and guarantees by the Guarantor as one of the conditions for making loans or advances or otherwise extending credit or making financial accommodations to or for the benefit of the Borrower; and

WHEREAS, the Guarantor has a direct or indirect financial interest in the Borrower and will benefit directly from the making of the Loan to the Borrower.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Guarantor hereby agrees as follows:

## ARTICLE 1
## GUARANTY

**Section 1.1.**     **Guaranty of Payment**.

The Guarantor hereby unconditionally, irrevocably, absolutely and directly guarantees to the Bank the punctual payment when due of any and all indebtedness, obligations and liabilities of the

## IMPORTANT NOTICE

**THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.**

553239v1

Exhibit 204

Borrower or any guarantor to the Bank arising under the Loan, including, but not limited to, liability under the Note, the Loan Documents (as such term is defined herein) or any Swap Agreement (as such term is defined herein), as such Loan Documents, promissory notes or Swap Agreement may be amended, restated, substituted, renewed, extended, supplemented or modified from time to time, and the performance of all of the Borrower's obligations under all such promissory notes and all other agreements of the Borrower with the Bank, including any extensions and renewals of any of the foregoing, and liability for overdrafts of the Borrower and advances by the Bank to the Borrower in excess of the amount of the Loan ("**administrative overlines**") and as indorser, guarantor or surety plus all costs, expenses, advances and attorneys' fees which may be made or incurred by the Bank in the collection or the enforcement of any of the Bank's rights and remedies hereunder (hereinafter referred to as "**Indebtedness**") regardless of whether recovery on the Indebtedness is, or in the future may become, barred by any statute of limitations, and regardless of whether the Indebtedness may otherwise be or become unenforceable or whether the Bank fails to perfect any security interest or any act or omission by the Bank which impairs collateral for the Indebtedness, with all or any of such Indebtedness deemed to have been incurred on the faith hereof.

**Section 1.2.    <u>Nature of Guaranty</u>**.

This Guaranty is an agreement of suretyship as well as a guaranty of payment and performance and not of collection. This Guaranty shall be a continuing one, and shall include any and all existing, new, or increased Indebtedness, whether or not presently contemplated by the Guarantor or the Bank, and whether or not the same shall be incurred after satisfaction, payment or reduction of any previous Indebtedness.

**Section 1.3.    <u>Security Interest</u>**.

As security for the payment of all obligations under this Guaranty, the Guarantor hereby pledges and grants to the Bank a lien on and security interest in, and authorizes the Bank to offset such obligations of the Guarantor to the Bank against, all real property, goods, instruments, documents, securities, chattel paper, accounts, contract rights and other intangibles or any other property now owned or hereafter acquired by the Guarantor which are now or hereafter in the possession of, in transit to, under the control of, or on deposit with the Bank in any capacity whatsoever, including, without limitation, any balance of any deposit account and any credits with the Bank.

2

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

**Section 2.1.     Representations and Warranties**.

The Guarantor represents and warrants that:

(a) the Guarantor has either examined the Loan Documents evidencing the existing Indebtedness or has had an opportunity to examine the Loan Documents and has waived the right to examine them;

(b) the Guarantor has the full power, authority, capacity and legal right to enter into, execute and deliver this Guaranty;

(c) this Guaranty is a valid and binding legal obligation of the Guarantor and is fully enforceable against the Guarantor in accordance with its terms;

(d) the execution, delivery and performance by the Guarantor of this Guaranty will not violate or constitute a default under any indenture, note, loan or credit agreement or any other agreement or instrument to which the Guarantor is a party or is bound;

(e) the Guarantor has a direct financial interest in the Borrower and/or the Borrower's principals; and

(f) if the Guarantor or the Borrower has delivered to the Bank financial statements of the Guarantor, such financial statements were true and correct as of the date prepared and there has been no material adverse change in the financial condition of the Guarantor from the financial condition of the Guarantor shown on such financial statements delivered to the Bank.

**Section 2.2.     Independent Investigation**.

The Guarantor is fully aware of the financial condition of the Borrower and is executing and delivering this Guaranty based solely upon the Guarantor's own independent investigation of all matters pertinent hereto and is not relying in any manner upon any representation or statement of the Bank.  The Guarantor represents and warrants that the Guarantor is in a position to obtain, and the Guarantor hereby assumes full responsibility for obtaining, any additional information concerning the Borrower's financial condition and any other matter pertinent hereto as the Guarantor may desire, and the Guarantor is not relying upon or expecting the Bank to furnish to the Guarantor any information now or hereafter in the Bank's possession concerning the same or any other matter.  By executing this Guaranty, the Guarantor knowingly accepts the full range of risks encompassed within a contract of this type, which risks the Guarantor acknowledges.  The Guarantor shall have no right to require the Bank to obtain or disclose any information with respect to the Indebtedness, the financial condition or the character of the Borrower or the Borrower's ability to pay the Indebtedness, the existence of any collateral or security of any or all of the Indebtedness, the existence or non-existence of any other guaranties of all or any part

of the Indebtedness, any action or non-action on the part of the Bank, the Borrower, or any other person, or any other matter, fact or occurrence whatsoever.

## ARTICLE 3
## FINANCIAL STATEMENTS; REPORTING REQUIREMENTS

**Section 3.1.    Financial Statements; Tax Returns**.

The Guarantor shall furnish to the Bank:

(a)    at the request of the Bank, the personal financial statements of the Guarantor in form and substance satisfactory to the Bank in its sole discretion.

(b)    as soon as available but in no event more than one hundred twenty (120) days after the last day of each calendar year or at the request of the Bank, whichever is earlier, copies of the Guarantor's most recent state and federal tax returns.

## ARTICLE 4
## EVENTS OF DEFAULT AND REMEDIES

**Section 4.1.    Events of Default**.

For purposes of this Guaranty, "**Event of Default**" means:

(a)    the Borrower or the Guarantor defaults in the payment or performance of any of its obligations with respect to the Indebtedness which default continues beyond any applicable grace or cure period; or

(b)    the Guarantor defaults in the observance, performance or compliance with any of the provisions of this Guaranty; or

(c)    the occurrence of an Event of Default (as described or defined therein) under any loan agreement, deed of trust, indemnity deed of trust, guaranty or other agreement executed by the Borrower, the Guarantor or any other guarantor relating to the Loan (the "**Loan Documents**"), and the expiration of any applicable cure period; or

(d)    any representation or warranty contained in this Guaranty or any portion of any report, opinion, schedule or certificate herewith or hereafter submitted to the Bank by or on behalf of the Borrower, the Guarantor, or any other person or entity in connection with the Loan or this Guaranty is untrue, inaccurate, or incomplete in any material respect or is misleading in any material respect; or

(e)    the Borrower or the Guarantor is generally unable to pay its debts as such debts mature; or

4

(f)    the voluntary or involuntary dissolution or termination of the Borrower; or

(g)    the death of any Guarantor; or

(h)    the filing of any insolvency proceeding against the Borrower or the Guarantor pursuant to any federal or state law, which filing is not unconditionally dismissed within sixty (60) days after the filing thereof; or

(i)    the appointment of a receiver with respect to the Borrower or the Guarantor or with respect to the assets of the Borrower or the Guarantor; or

(j)    the filing of formal charges against the Borrower or the Guarantor under any federal or state law for which forfeiture is a potential penalty; or

(k)    the issuance of any attachment or garnishment against the Borrower or the Guarantor, if such Borrower or Guarantor is the debtor; or

(l)    a material adverse change in the condition or affairs (financial or otherwise) of the Borrower or the Guarantor, as determined by the Bank in its sole discretion.

**Section 4.2.    Remedies**.

(a)    Upon the occurrence of any Event of Default:

(1) the Bank may declare the Indebtedness and all obligations of the Guarantor hereunder to be due and payable in full;

(2) the Guarantor hereby authorizes and empowers any Clerk of any Court of Record in Maryland or elsewhere to enter judgment by confession against the Guarantor in favor of the Bank, for the full amount of the Indebtedness (including, without limitation, principal, interest and costs, including attorneys' fees of 15% of the outstanding Indebtedness, and disbursements), expressly waiving summons and other process, and does further consent to the immediate execution of said judgment, expressly waiving the benefit of any and all exemption laws; and

(3) if judgment is to be entered in the Commonwealth of Virginia, the Guarantor hereby duly constitutes and appoints Arthur F. Lafionatis and Cindi E. Cohen, the Guarantor's true and lawful attorney-in-fact, for the Guarantor, in the Guarantor's name, place and stead and upon default of payment hereof as set forth herein, to confess judgment against the Guarantor in the Circuit Court for Arlington County, Virginia, or in any other Court of Record in the Commonwealth of Virginia, for the full amount of the Indebtedness (including, without limitation, principal, interest and costs, including attorneys' fees of 15% of the outstanding Indebtedness, and disbursements) hereby ratifying and confirming the acts of said attorney-in-fact as fully as if done by the Guarantor, expressly waiving the benefit of any homestead or other exemption laws.

(b)    Upon the occurrence and during the continuance of any Event of Default, the

5

Bank is hereby authorized at any time and from time to time, without notice to the Guarantor (any such notice being expressly waived by the Guarantor) and to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final and whether for safekeeping, custody, pledge, transmission or otherwise) at any time held and other indebtedness at any time owing by the Bank (including any of its branches or offices) to or for the credit or the account of the Guarantor, and in any currency, against any or all of the obligations of the Guarantor now or hereafter existing under the Loan Documents, irrespective of whether or not the Bank shall have made any demand under the Loan Documents and although such obligations may be unmatured. The Bank agrees promptly to notify the Guarantor, as appropriate, after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Bank under this paragraph are in addition to other rights and remedies (including, without limitation, other rights of set off) which the Bank may have.

(c)     Each right, power and remedy of the Bank which arises or which shall arise under any Loan Document or under any promissory note or other agreement or instrument signed by the Borrower or the Guarantor, or under any applicable law, shall be cumulative and concurrent, and the exercise of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by the Bank of any or all such other rights, powers, or remedies. No failure or delay by the Bank to insist upon the strict performance of any one or more of its rights, powers, or remedies consequent upon a breach thereof or default hereunder shall constitute a waiver thereof, nor shall it preclude the Bank from exercising any such right, power or remedy. In the event that the Bank shall at any time accept partial payment of this Guaranty, the Bank shall not be deemed thereby to have waived the right either to require prompt payment when due and payable of all other amounts payable under this Guaranty or to exercise any rights and remedies available to it in order to collect all such other amounts. All of the alternative remedies set forth above and/or provided by the Loan Documents by applicable or law or in equity shall be equally available to the Bank and the choice by the Bank of one alternative over another shall not be subject to question or challenge by the Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff or failure to mitigate damages in any action, proceeding or counteraction by the Bank to recover damages or seeking any other remedy under this Guaranty. The parties have agreed to the alternative remedies specified herein in part because they recognize that the choice of remedies in the Event of a Default hereunder will necessarily be and should properly be a matter of business judgment, which the passage of time and events may or may not prove to have been the best choice to maximize recovery by the Bank at the lowest cost to the Borrower and/or to the Guarantor. It is the intention of the parties that such choice by the Bank be given conclusive effect, regardless of subsequent developments or the apparent correctness or incorrectness of such choice.

**Section 4.3.**     **Application of Proceeds**.

The proceeds of any sale of collateral now or hereafter granted to the Bank in connection with any Indebtedness may be applied by the Bank to the Indebtedness in such manner as the Bank, in its sole discretion, may deem fit. Any payments made to the Bank by the Borrower or by any trustee, receiver, assignee, personal representative or any other person for or on behalf of the

Borrower or of his estate or any part thereof, also may be applied by the Bank in such manner as the Bank, in its sole discretion, may deem fit.

**Section 4.4.    Continuing Obligation**.

(a)    The Guarantor agrees that the obligations of the Guarantor hereunder shall not be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of liability of the Borrower or its estate by reason of the commencement of any case, proceeding or other action seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization, relief of debtors or the seeking of the appointment of a receiver, trustee, custodian or similar official for it or for all or part of its property.

(b)    The Guarantor further agrees that, if at any time all or any part of any payment theretofore applied by the Bank to any of the Indebtedness is or must be rescinded or returned by the Bank for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of the Borrower), such Indebtedness shall, for the purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Bank, and this Guaranty shall continue to be effective or reinstated, as the case may be, as to such Indebtedness, all as though such application by the Bank had not been made.

**ARTICLE 5**
**MISCELLANEOUS**

**Section 5.1**.    **Waivers**.

(a)    The Guarantor hereby waives diligence, demand, presentment for payment, protest, notice of dishonor and indulgences and notices of every kind, and agrees that at any time and from time to time, and with or without consideration, the Bank may, without notice to or further consent of the Guarantor, and without in any manner releasing, lessening or affecting the obligations of the Guarantor hereunder: (1) alter, compromise, modify, accelerate, extend or change the time or manner for payment of the Indebtedness or the performance of any of the Indebtedness; (2) increase or reduce the rate of interest or amount of principal payable on the Indebtedness; (3) release or discharge the Borrower, by acceptance of a deed or assignment in lieu of foreclosure or otherwise, as to all or any portion of the Indebtedness; (4) release, substitute or add any one or more guarantors or endorsers, accept additional or substituted security for payment of the Indebtedness, or release or subordinate any security therefor; and (5) resort to the Guarantor for payment of all or any portion of the Indebtedness, whether or not the Bank shall have resorted to any property securing the Indebtedness or shall have proceeded against the Borrower or any party primarily or secondarily liable for the Indebtedness.  No exercise, delay in exercise or non-exercise by the Bank of any right hereby given it, no dealing by the Bank with the Borrower, the Guarantor or any other guarantor, endorser or other person, no change, impairment or suspension of any right or remedy of the Bank, and no act or thing which but for this provision could act as a release or exoneration of the liabilities of the Guarantor hereunder, shall in any way affect,

decrease, diminish or impair any of the obligations of the Guarantor hereunder or give the Guarantor or any other person or entity any recourse or defense against the Bank. It is the intention hereof that the Guarantor shall remain liable as a principal until all Indebtedness has been fully paid and performed, notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of the Guarantor. The Guarantor shall be responsible for obtaining for itself information regarding the Borrower, including, but not limited to, any changes in the business or financial condition of the Borrower, and the Guarantor acknowledges and agrees that the Bank shall have no duty to notify the Guarantor of any information which the Bank may have concerning the Borrower.

(b)     To the extent permitted by law or equity, the Guarantor hereby waives and agrees not to assert or take advantage of (1) any right to require the Bank to proceed against or exhaust its resources against the Borrower or any security or collateral held by the Bank at any time or to pursue any other remedy in its power before being entitled to performance by the Guarantor on or before proceeding against the Guarantor; (2) the defense of the statute of limitations in any action hereunder; (3) any defense that may arise by reason of (i) the incapacity, lack of authority, death or disability of the Borrower, the Guarantor or any other or others, (ii) the revocation or repudiation hereof by the Guarantor or the revocation or repudiation of the Loan executed by the Borrower or any other or others, (iii) the failure of the Bank to file or enforce a claim against the estate (either in administration, bankruptcy or any other proceeding) of the Borrower or any other or others, (iv) the unenforceability in whole or in part of the Loan executed by the Borrower or any other instrument, document or agreement referred to herein, (v) the Bank's election, in any proceeding instituted under the Federal Bankruptcy Code, of the application or Section 1111(b)(2) of the Federal Bankruptcy Code, or (vi) any borrowing or grant of a security interest under Section 364 of the Federal Bankruptcy Code; (4) presentment, demand for payment, protest, notice of discharge, notice of acceptance of this Guaranty, and indulgence and notices of any other kind whatsoever; (5) defense based upon an election of remedies (including, if available, an election to proceed by non-judicial foreclosure) by the Bank which destroys or otherwise impairs the subrogation rights of the Guarantor or the rights of the Guarantor to proceed against the Borrower for reimbursement, or both; (6) any rights or defenses created by the anti-deficiency statutes; (7) any defense based upon taking, modification or release of any collateral or guaranties for any indebtedness of the Borrower to the Bank, or any failure to perfect any security interest in, or the taking of or failure to take any other action with respect to any collateral securing payment of the Indebtedness; or (8) any rights or defenses based upon an offset by the Guarantor against any obligation now or hereafter owed to the Guarantor by the Borrower; it being the intention hereof that the Guarantor shall remain liable as principal, to the extent set forth herein, until the earlier of full payment of the Indebtedness notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of the Guarantor.

(c)     The Guarantor hereby waives any and all claims, set-offs or defenses it may have against the Bank as of the date of this Guaranty.

(d)     The Guarantor also waives the benefits of any provision of law requiring that the Bank exhaust any right or remedy, or take any action, against the Borrower, the Guarantor, any

8

other person and/or property including but not limited to the provisions of Virginia Code §49-25 and Virginia Code §49-26, as amended, or otherwise.

(e)     No modification, change, waiver or amendment of this Guaranty shall be deemed to be made by the Bank unless made in writing and signed by a Vice President (or more senior officer) of the Bank, and each such waiver, if any, shall apply only with respect to the specific instance involved, and then only to the extent expressly provided for therein.

**Section 5.2.    Indemnification of Bank**.

The Guarantor further agrees that should any litigation, action or dispute ensue to the Bank with respect to the enforcement of this Guaranty or regarding the Indebtedness or the holding or sale of any collateral or any part thereof now or hereafter granted to the Bank, the Guarantor shall indemnify the Bank from and against any and all losses, costs, damages and expenses (including, without limitation, attorneys' fees and disbursements) which it may suffer, incur or be put to by reason or in consequence of any of the Indebtedness made or undertaken on the faith hereof and shall reimburse the Bank for any such costs and expenses as the Bank may incur in connection therewith, including, without limitation, attorneys'f ees and disbursements.  Any sum shall also be secured by any collateral now or hereafter granted to the Bank, and such sum shall be payable on demand, in default of payment of which any collateral may be sold as hereinbefore provided.

**Section 5.3.    Subordination**.

The Guarantor agrees that all of the present and future indebtedness of the Borrower to the Guarantor shall be and hereby is subordinated to, assigned and transferred to the Bank, and pledged and made security for the payment of the indebtedness.

**Section 5.4    Subrogation**.

The Guarantor shall have no right of subrogation whatsoever with respect to any of the Indebtedness, nor any right to any collateral now or hereafter granted to secure the same, unless and until all such Indebtedness has been fully paid and performed.  Any claim of the Guarantor against the Borrower or any other guarantor arising from any payment made or any obligation performed by the Guarantor pursuant hereto shall be in all respects subordinate to the full and timely payment, performance and discharge of the indebtedness guaranteed hereby.

**Section 5.5.    Authority of the Bank**.

The Guarantor agrees that the Guarantor, contemporaneously herewith and from time to time hereafter, shall on request execute such further endorsements, assignments, or other transfers as the Bank may request to further evidence the guaranty hereby agreed to and made.

**Section 5.6.    Joint and Several Obligations**.

The obligations of the Guarantor hereunder are joint and several with the obligations of any other guarantor of the Indebtedness and are irrevocable and are independent of the Indebtedness and

9

a separate action or actions may be brought and prosecuted against the Guarantor, regardless of whether any action is brought against the Borrower (or against any other guarantor), and regardless of whether the Borrower (or any other guarantor) is joined in any such action or actions. If this Guaranty is signed by more than one person or entity, their obligations hereunder are joint and several.

**Section 5.7.    Bank Disclosures.**

The Guarantor authorizes the Bank to disclose the financial record of the Guarantor to any subsidiary or affiliate of the Bank, or any of its subsidiaries or affiliates, or to any other fiduciary institution.

**Section 5.8.    Severability.**

If any provision of this Guaranty is held to be invalid or unenforceable by a court of competent jurisdiction, the other provisions of this Guaranty shall remain in full force and effect and shall be liberally construed in favor of the Bank in order to effectuate the provisions of this Guaranty.

**Section 5.9.    Entire Agreement.**

This Guaranty contains the entire understanding between the Bank and the Guarantor with respect to the Guarantor's obligations in connection with the Loan Documents, and supersedes all prior or contemporaneous agreements, understandings, inducements, conditions, express or implied, oral or written, except as herein contained.

**Section 5.10.    Notices.**

All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto shall be in writing, personally delivered or sent by postage prepaid first class certified mail, return receipt requested, overnight courier or by facsimile machine, if such facsimile is followed by a hard copy of the facsimile communication sent promptly thereafter by postage prepaid first class certified mail, return receipt requested, or by overnight delivery service. All such notices shall be deemed to be given on the day such notice is received if sent by personal delivery or sent by facsimile machine or one (1) business day after such notice is sent by overnight courier or three (3) business days after such notice is sent by certified mail. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this paragraph, notices, demands, instructions and other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses indicated for such party below:

      (i)    If to the Guarantor:  _____

                                           _____

                                         _____

                                     Fax No: _____

     (ii)    If to the Bank:    1500 K Street, NW
Washington, D.C. 20005
Attention: Bruce J. Wilmarth, Senior Vice
President
Fax No: (202) 296-5236

or at such other address as the parties may have furnished to each other in writing.

**Section 5.11.** <u>**Waiver of Jury Trial**</u>.

**THE GUARANTOR AND THE BANK HEREBY VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREIN. THE GUARANTOR ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE BANK THAT THE PROVISIONS OF THIS PARAGRAPH CONSTITUTE A MATERIAL INDUCEMENT UPON WHICH THE BANK HAS RELIED, IS RELYING AND WILL RELY IN MAKING THE LOAN. THE GUARANTOR HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF THE BANK (INCLUDING ITS COUNSEL) HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BANK WOULD NOT, IN THE EVENT OF LITIGATION, ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL. THE GUARANTOR ACKNOWLEDGES THAT IT HAS CONSULTED WITH AN ATTORNEY AND FULLY UNDERSTANDS THE LEGAL EFFECT OF THE PROVISIONS OF THIS PARAGRAPH.**

**Section 5.12.** <u>**Continuation of Prior Guaranties**</u>.

This Guaranty shall not supersede or terminate any other or prior guarantees given by the Guarantor to the Bank.

**Section 5.13.** <u>**Successors and Assigns**</u>.

This Guaranty shall bind the successors or assigns of the Guarantor and shall inure to the benefit of the Bank, its successors and assigns. All words used herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the identity of the person or entity may require.

**Section 5.14.** <u>**Applicable Law**</u>.

This Guaranty shall be governed by the laws of the District of Columbia (but not including the choice of law rules thereof).

**Section 5.15.** <u>**Recitals**</u>.

The Recitals set forth at the beginning of this Guaranty are incorporated herein by reference as an integral part of this Guaranty.

**Section 5.16.  Headings**.

The section headings of this Guaranty are for convenience only and shall not limit or otherwise affect any of the terms hereof.

IN WITNESS WHEREOF, the undersigned have duly executed this Guaranty under seal as of the date and year first hereinabove set forth.


WITNESS:


_____     _____(SEAL)
                                    Douglas Jemal


_____     _____(SEAL)
                                    Joyce Jemal




DISTRICT OF COLUMBIA          :
                              :     ss:
COUNTY OF _____   :

I HEREBY CERTIFY THAT on this ____ day of November, 2005, before the undersigned, a Notary Public of the District of Columbia, personally appeared Douglas Jemal, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(SEAL)                              _____
                                    Notary Public

My Commission Expires:

12

DISTRICT OF COLUMBIA      :
                              :    ss:
COUNTY OF _____ :

       I HEREBY CERTIFY THAT on this ____ day of November, 2005, before the undersigned, a Notary Public of the District of Columbia, personally appeared Joyce Jemal, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that she executed the same for the purposes therein contained.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.

(SEAL)                 _____
                             Notary Public

My Commission Expires:

STEPTOE & JOHNSON LLP



1330 Connecticut Avenue, NW
Washington, DC 20036
TEL: 202.429.8022
FAX: 202.429.3902
jmcfadden@steptoe.com

**AREAS OF PRACTICE**
Corporate Governance

Litigation

Mass Tort

Securities &
Directors/Officers
Litigation

White-Collar Criminal
Defense

**EDUCATION**
Georgetown University
Law Center, J.D., *magna
cum laude*, 1990

United States Naval
Academy, B.S., with
distinction, 1979

**JUDICIAL CLERKSHIPS**
Law Clerk to the
Honorable Francis D.
Murnaghan, Jr., US Court
of Appeals, Fourth Circuit,
Baltimore, MD, 1990–1991

**BAR & COURT
ADMISSIONS**
District of Columbia

Maryland

Florida

US Court of Appeals for
Veterans' Claims

### Jeffrey E. McFadden

Jeffrey E. McFadden is a partner in the Washington office of Steptoe & Johnson LLP, where he is a member of the Litigation Department. Mr. McFadden focuses his representation on mass tort and complex commercial litigation, securities litigation and enforcement, white-collar crime and corporate internal investigations. His experience includes civil, administrative, and criminal first-chair trial and appellate litigation of federal and state cases in mass tort, bank fraud, securities fraud, commodities fraud, private and commercial contracts, broker-dealer, investment adviser, and exchange regulation, and mergers and acquisitions.

Bringing his extensive briefing and oral advocacy experience to bear, Mr. McFadden is a senior supervisory partner for the firm's service as national coordinating counsel for a major client's asbestos litigation, and heads that team's motions practice, briefing and arguing dispositive motions and appeals across the country. In 2006, he received a Burton Award for an article he co-authored on mass tort liability.

Mr. McFadden has extensive securities class action and shareholder derivative suit experience, along with wide-ranging SEC, NASD, and NYSE enforcement and arbitration defense experience in proxy disclosure, insider trading, sales practice, touting, internet fraud, and accounting fraud cases.

Additionally, Mr. McFadden's practice includes a wealth of corporate internal investigation experience, including service to the Special Investigative Committee of the Board of Directors of Enron Corp. He also represented a former senior government official before the Iran-Contra prosecutor and served as counsel to the Honor Review Committee of the US Naval Academy Board of Visitors, drafting the final report submitted to the Secretary of the Navy. He also has a long history of representing veterans pro bono before the Department of Veterans Affairs and the US Court of Appeals for Veterans' Claims.

Prior to joining Steptoe, Mr. McFadden practiced at a large Washington, DC, law firm. He previously served as a lecturer in English at the US Naval Academy at Annapolis, MD; as a Special Assistant and Speechwriter for the Secretary of the Navy; as a systems engineer at General Electric Co.; and as a nuclear engineer in the US Navy.

### NOTEWORTHY

- Burton Award for Legal Achievement (2006)

Exhibit 205

STEPTOE & JOHNSON LLP

Jeffrey E. McFadden

## SPEAKING ENGAGEMENTS

"Agent Orange and the Derivative Morality of the Political-Military Decision Maker." Paper presented at the Joint Academy Conference on the Constitutional Responsibilities of Military Officers, National Defense University (1/11/1989)

## PUBLICATIONS

"Mass Tort Cases: Debunking the Expansion of Defendants Theory," Defense Research Institute
October 2005, *For the Defense*

"When 'No Comment' is Not Enough," Global Counsel, Vol. VI, No. 4, with Andrew Parnell, David Lynn, David Taylor, and Phillip von Hoyenberg (May 2001)

"A Second Opportunity to Set the Appropriate Discretionary Standard in Cease-and-Desist Proceedings," PLI/32nd Annual Institute on Securities Regulation (with William R. McLucas) (2000)
January 2000

"Recent Developments in Criminal Money Laundering Law," ABA/ABA Money Laundering Enforcement Seminar, Washington, DC
October 27, 1994

"We Need Leaders, Not Technocrats"
January 1990, *United States Naval Institute Proceedings*

## PROFESSIONAL AFFILIATIONS
District of Columbia Bar

Maryland Bar

Member, Judicial Conference of the US Court of Appeals for the Fourth Circuit

Florida Bar

PROSPECTUS SUPPLEMENT
(To Prospectus dated November 22, 2002)

# $834,596,000 (Approximate)
## Morgan Stanley Dean Witter Capital I Trust 2002-IQ3
### as Issuer
## Morgan Stanley Dean Witter Capital I Inc.
### as Depositor

## Morgan Stanley Dean Witter Mortgage Capital Inc.
## The Union Central Life Insurance Company
## Prudential Mortgage Capital Funding, LLC
## National Consumer Cooperative Bank
## NCB, FSB
## Principal Commercial Funding, LLC
## Teachers Insurance and Annuity Association of America
## Nationwide Life Insurance Company

### as Mortgage Loan Sellers

### COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2002-IQ3

Morgan Stanley Dean Witter Capital I Inc. is offering selected classes of its Series 2002-IQ3 Commercial Mortgage Pass-Through Certificates, which represent beneficial ownership interests in a trust. The trust's assets will primarily be 239 seasoned and newly originated mortgage loans secured by first mortgage liens on commercial and multifamily properties. The Series 2002-IQ3 Certificates are not obligations of Morgan Stanley Dean Witter Capital I Inc., the sellers of the mortgage loans or any of their affiliates, and neither the certificates nor the underlying mortgage loans are insured or guaranteed by any governmental agency or private insurer.

"IQ" is a service mark of Morgan Stanley representing financial investment in the field of commercial mortgage-backed securities collateralized by "institutional quality" whole loans.

Investing in the certificates offered to you involves risks. See "Risk Factors" beginning on page S-29 of this prospectus supplement and page 9 of the prospectus.

Characteristics of the certificates offered to you include:

| Class | Approximate Initial Certificate Balance | Initial Pass-Through Rate | Pass-Through Rate Description | Ratings (Moody's/S&P) |
|---|---|---|---|---|
| Class A-1 | $ 81,000,000 | 3.48% | Fixed | Aaa/AAA |
| Class A-2 | $125,000,000 | 4.39% | Fixed | Aaa/AAA |
| Class A-3 | $ 90,019,000 | 4.80% | Fixed | Aaa/AAA |
| Class A-4 | $482,862,000 | 5.08% | Fixed | Aaa/AAA |
| Class B | $ 26,152,000 | 5.24% | Fixed | Aa2/AA |
| Class C | $ 27,289,000 | 5.41% | Fixed | A2/A |
| Class D | $ 2,274,000 | 5.55% | Fixed | A3/A– |

The certificate balances are approximate and may vary by up to 5%.

The Securities and Exchange Commission and state securities regulators have not approved or disapproved the certificates offered to you or determined if this prospectus supplement or the accompanying prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

Morgan Stanley & Co. Incorporated will act as sole lead manager and sole bookrunner and Merrill Lynch & Co. and Lehman Brothers Inc. will act as co-managers with respect to the offered certificates. Morgan Stanley & Co. Incorporated, Merrill Lynch & Co. and Lehman Brothers Inc., the underwriters, will purchase the certificates offered to you from Morgan Stanley Dean Witter Capital I Inc. and will offer them to the public at negotiated prices determined at the time of sale. The underwriters expect to deliver the certificates to purchasers on or about December 17, 2002. Morgan Stanley Dean Witter Capital I Inc. expects to receive from this offering approximately $838,465,840, plus accrued interest from the cut-off date, before deducting expenses payable by Morgan Stanley Dean Witter Capital I Inc.

## MORGAN STANLEY

### MERRILL LYNCH & CO.                    LEHMAN BROTHERS

December 5, 2002

Exhibit 206



MORGAN STANLEY DEAN WITTER CAPITAL I INC.

Commercial Mortgage Pass-Through Certificates, Series 2002-IQ3
Geographic Overview of Mortgage Pool

Maine
1 property
$1,084,473
0.1% of total

Massachusetts
4 properties
$43,062,582
4.7% of total

Connecticut
1 property
$2,978,987
0.3% of total

Maryland
5 properties
$29,938,871
3.3% of total

New Jersey
1 property
$19,910,528
2.2% of total

New Hampshire
2 properties
$1,589,245
0.2% of total

Virginia
2 properties
$1,347,335
0.1% of total

District of Columbia
4 properties
$70,176,777
7.7% of total

New York
45 properties
$193,550,536
21.3% of total

North Carolina
5 properties
$3,795,166
0.4% of total

South Carolina
2 properties
$17,970,399
2.0% of total

Pennsylvania
2 properties
$9,878,394
1.1% of total

Florida
12 properties
$29,983,697
3.3% of total

Ohio
7 properties
$23,406,403
2.6% of total

Georgia
3 properties
$5,885,983
0.6% of total

Michigan
11 properties
$38,228,364
4.2% of total

Alabama
2 properties
$4,867,846
0.5% of total

Indiana
3 properties
$3,883,144
0.4% of total

Tennessee
3 properties
$3,821,088
0.4% of total

Illinois
2 properties
$15,162,763
1.7% of total

Kentucky
2 properties
$1,739,851
0.2% of total

Minnesota
10 properties
$13,841,567
1.5% of total

Louisiana
1 property
$9,890,768
1.1% of total

Iowa
6 properties
$16,772,513
1.8% of total

Missouri
1 property
$4,690,162
0.5% of total

Oklahoma
1 property
$29,905,326
3.3% of total

Nebraska
2 properties
$1,731,061
0.2% of total

Kansas
1 property
$3,389,678
0.4% of total

Idaho
5 properties
$4,908,998
0.5% of total

Texas
22 properties
$57,093,984
6.3% of total

Washington
5 properties
$33,544,283
3.7% of total

Utah
5 properties
$9,023,034
1.0% of total

Oregon
8 properties
$29,535,561
3.2% of total

Nevada
2 properties
$3,900,643
0.4% of total

New Mexico
12 properties
$18,442,053
2.0% of total

Colorado
2 properties
$2,846,726
0.3% of total

Arizona
7 properties
$12,497,431
1.4% of total

Northern California
7 properties
$40,211,980
4.4% of total

Southern California
31 properties
$92,851,380
10.2% of total

Alaska
1 property
$2,225,739
0.2% of total

< 1.0% of Cut-Off Date Balance
1.0% - 5.0% of Cut-Off Date Balance
5.1% - 10.0% of Cut-Off Date Balance
> 10.0% of Cut-Off Date Balance



**77 P Street Office,** Washington, D.C.



**One Seaport Plaza,** New York, NY

**The Richards Building,** Cambridge, MA



**Tulsa Distribution Center,** Tulsa, OK



Northwestern Corporate Center, Southfield, MI



2731 San Tomas Expressway, Santa Clara, CA



125 Delawanna Avenue, Clifton, NJ



Evergreen Plaza, Staten Island, NY



Plantation Villa Apartments, Frisco, TX



Riverland Woods Apartments, Charleston, SC

## EXECUTIVE SUMMARY

This Executive Summary highlights selected information regarding the certificates. It does not contain all of the information you need to consider in making your investment decision. **To understand all of the terms of this offering and the underlying mortgage loans, you should read this entire prospectus supplement and the accompanying prospectus carefully.**

### Certificate Structure

| Approximate Credit Support | Class | Approximate Initial Certificate Balance | Approximate Initial Pass-Through Rate | Ratings (Moody's/S&P) | Approximate Percent of Total Certificates | Weighted Average Life (Yrs.) | Principal Window (months) |
|---|---|---|---|---|---|---|---|
| 14.375% | Class A-1 | $81,000,000 | 3.48% | Aaa/AAA | 8.9% | 3.41 | 1-73 |
| 14.375% | Class A-2 | $125,000,000 | 4.39% | Aaa/AAA | 13.7% | 5.70 | 73-110 |
| 14.375% | Class A-3 | $90,019,000 | 4.80% | Aaa/AAA | 9.9% | 7.76 | 73-110 |
| 14.375% | Class A-4 | $482,862,000 | 5.08% | Aaa/AAA | 53.1% | 9.65 | 110-120 |
| 11.500% | Class B | $26,152,000 | 5.24% | Aa2/AA | 2.9% | 9.99 | 120-120 |
| 8.500% | Class C | $27,289,000 | 5.41% | A2/A | 3.0% | 10.17 | 120-128 |
| 8.250% | Class D | $2,274,000 | 5.55% | A3/A- | 0.3% | 10.73 | 128-129 |
| 6.750% | Class E | $13,645,000 | 5.98% | Baa1/BBB+ | 1.5% | 10.87 | 129-135 |
| 5.625% | Class F | $10,233,000 | 6.08% | Baa2/BBB | 1.1% | 11.63 | 135-142 |
| 4.875% | Class G | $6,823,000 | 6.51% | Baa3/BBB- | 0.8% | 12.14 | 142-150 |
| ---- | Classes H-O | $44,345,278 | ---- | ---- | ---- | ---- | ---- |
| ---- | Class X-1 | ---- | ---- | Aaa/AAA | ---- | ---- | ---- |
| ---- | Class X-2 | ---- | ---- | ---- | ---- | ---- | ---- |
| ---- | Class X-Y | ---- | ---- | Aaa/AAA | ---- | ---- | ---- |

- The notional amount of the Class X-1 Certificates initially will be $909,642,278, the notional amount of the Class X-2 Certificates initially will be $824,775,000 and the notional amount of the Class X-Y Certificates initially will be $87,981,643.

- The percentages indicated under the column "Approximate Credit Support" with respect to the Class A-1, Class A-2, Class A-3 and Class A-4 Certificates represent the approximate credit support for the Class A-1, Class A-2, Class A-3 and Class A-4 Certificates in the aggregate.

- The initial certificate balance may vary by up to 5%.

- The Class X-1 Certificates, the Class X-2 Certificates and the Class X–Y Certificates (together, the "Class X Certificates") and the Class E, Class F, Class G, Class H, Class J, Class K, Class L, Class M, Class N and Class O Certificates are not offered pursuant to this prospectus supplement.

- The pass-through rates for the Class A-1, Class A-2, Class A-3, Class A-4, Class B, Class C and Class D Certificates presented in the table are fixed at their respective per annum rates set forth above.

- The principal window is expressed in months following the closing date and reflects the period during which distributions of principal would be received under the assumptions set forth in the following sentence. The Weighted Average Life and principal window figures set forth above are based on the following assumptions, among others: (i) no losses on the underlying mortgage loans; (ii) no extensions of the maturity dates of the underlying mortgage loans that do not have anticipated repayment dates and (iii) payment in full on the "anticipated repayment date" or stated maturity date of each underlying mortgage loan. See the assumptions set forth under "Yield, Prepayment and Maturity Considerations" in this prospectus supplement.

- Each Class X-1 and Class X-2 Certificate is an investment unit consisting of multiple REMIC regular interests.

- Each Class EI Certificate represents beneficial ownership of certain excess interest in respect of mortgage loans having a hyper-amortization feature.

- The Class R-I, R-II and R-III Certificates also represent ownership interests in the trust. These certificates are not represented in this table and are not offered pursuant to this prospectus supplement.

| | |
|---|---|
| ☐ | Offered certificates. |
| ▨ | Certificates not offered pursuant to this prospectus supplement. |

## RISK FACTORS

You should carefully consider the risks involved in owning a certificate before purchasing a certificate. Among other risks, the timing of payments and payments you receive on your certificates will depend on payments received on and other recoveries with respect to the mortgage loans. Therefore, you should carefully consider both the risk factors relating to the mortgage loans and the mortgaged properties and the other risks relating to the certificates.

The risks and uncertainties described in this section, together with those risks described in the prospectus under "Risk Factors," summarize the material risks relating to your certificates. Your investment could be materially and adversely affected by the actual and potential circumstances that we describe in those sections.

**Your Investment Is Not Insured Or Guaranteed And Your Source For Repayments Is Limited To Payments Under The Mortgage Loans**

The certificates are not insured or guaranteed by any governmental entity or insurer. Accordingly, the sources for repayment of your certificates are limited to amounts due with respect to the mortgage loans. Payments under the mortgage loans are not insured or guaranteed by any governmental entity or mortgage insurer.

You should consider all of the mortgage loans to be nonrecourse loans. Even in those cases where recourse to a borrower or guarantor is permitted under the related mortgage loan documents, we have not necessarily undertaken an evaluation of the financial condition of any of these persons. If a default occurs, the lender's remedies generally are limited to foreclosing against the specific properties and other assets that have been pledged to secure the mortgage loan. Such remedies may be insufficient to provide a full return on your investment. Payment of amounts due under a mortgage loan prior to its maturity or anticipated repayment date is primarily dependent on the sufficiency of the net operating income of the related mortgaged property. Payment of the balloon payment of a mortgage loan that is a balloon loan at its maturity, or on its anticipated repayment date, is primarily dependent upon the borrower's ability to sell or refinance the mortgaged property for an amount sufficient to repay the mortgage loan.

In limited circumstances, Morgan Stanley Dean Witter Mortgage Capital Inc., The Union Central Life Insurance Company, Prudential Mortgage Capital Funding, LLC, National Consumer Cooperative Bank, NCB, FSB, Principal Commercial Funding, LLC, Teachers Insurance and Annuity Association of America and Nationwide Life Insurance Company, each as a seller, may be obligated to repurchase or replace a mortgage loan that it sold to us if its representations and warranties concerning that mortgage loan are materially breached or if there are material defects in the documentation for that mortgage loan. However, there can be no assurance that any of these entities will be in a financial position to effect a repurchase or substitution. The representations and warranties address certain characteristics of the mortgage loans and mortgaged properties as of the date of issuance of the certificates. They do not relieve you or the trust of the risk of defaults and losses on the mortgage loans.

insurance. Any losses incurred with respect to mortgage loans due to uninsured risks, including earthquakes, mudflows and floods, or insufficient hazard insurance proceeds may adversely affect payments to Certificateholders. The special servicers will have the right, but not the obligation, at the expense of the trust, to obtain earthquake insurance on any mortgaged property securing a Specially Serviced Mortgage Loan and/or any REO Property for which it is acting as special servicer so long as such insurance is available at commercially reasonable rates. See "Risk Factors—The Absence Of Or Inadequacy Of Insurance Coverage On The Property May Adversely Affect Payments On Your Certificates" and "—Certain Other Risks Related to Casualty and Casualty Insurance" in this prospectus supplement.

## The Sellers

### Morgan Stanley Dean Witter Mortgage Capital Inc.

MSDWMC, a subsidiary of Morgan Stanley and an affiliate of Morgan Stanley & Co. Incorporated, one of the underwriters, was formed as a New York corporation to originate and acquire loans secured by mortgages on commercial and multifamily real estate. Each of the MSDWMC Loans was originated or purchased by MSDWMC, and all of the MSDWMC Loans were underwritten by MSDWMC underwriters. The principal offices of MSDWMC are located at 1585 Broadway, New York, New York 10036. MSDWMC's telephone number is (212) 761-4700.

### The Union Central Life Insurance Company

Founded in 1867 in Cincinnati, Ohio, The Union Central Life Insurance Company was the first domestic life insurance company licensed in the state of Ohio. The Union Central Life Insurance Company has become one of the 15 largest mutual insurance companies in the nation with over $5.5 billion in assets and licenses to conduct business in all 50 states and the District of Columbia. The Union Central Life Insurance Company wholly owns Summit Investment Partners, Inc., the Primary Servicer with respect to the loans transferred to the trust by The Union Central Life Insurance Company. The principal offices of The Union Central Life Insurance Company are located at 1876 Waycross Road, P.O. Box 40888, Cincinnati, Ohio 45240. The Union Central Life Insurance Company's telephone number is (800) 825-1551. The pooled mortgage loans for which The Union Central Life Insurance Company is the applicable mortgage loan seller were originated or acquired by The Union Central Life Insurance Company.

### Prudential Mortgage Capital Funding, LLC

Prudential Mortgage Capital Funding, LLC is a limited liability company organized under the laws of the State of Delaware. Prudential Mortgage Capital Funding, LLC is a wholly owned, limited purpose, subsidiary of Prudential Mortgage Capital Company, LLC. Prudential Mortgage Capital Company, LLC is a real estate financial services company which originates commercial and multifamily real estate loans throughout the United States. Prudential Mortgage Capital Funding, LLC was organized for the purpose of acquiring loans originated by Prudential Mortgage Capital Company, LLC and holding them pending securitization or other disposition. Prudential Mortgage Capital Company, LLC has primary offices in Atlanta, Chicago, San Francisco and Newark. The principal offices of Prudential Mortgage Capital Company, LLC are located at 4 Gateway Center, 8th Floor, 100 Mulberry Street, Newark, New Jersey 07102. The pooled mortgage loans for which Prudential Mortgage Capital Funding, LLC is the applicable mortgage loan seller were originated by Prudential Mortgage Capital Company, LLC (or a wholly-owned subsidiary of Prudential Mortgage Capital Company, LLC) or, in 1 case, acquired by Prudential Mortgage Capital Funding, LLC from a third party.

### National Consumer Cooperative Bank

National Consumer Cooperative Bank was chartered by an act of Congress in 1978 for the purpose of providing loans and other financial services to cooperatively owned and organized entities throughout the United States. By Congressional amendments in 1981, NCB was converted to a private institution owned by its member cooperative customers, including certain of the borrowers. It is one of the special servicers and wholly owns NCB, FSB, one of the master servicers and one of the mortgage loan sellers. National Consumer Cooperative Bank and its

Nationwide's Real Estate Investment Department originated $2.1 billion in commercial mortgage loans in 2001 and has averaged over $1.2 billion in originations per year over the past 5 years. The Real Estate Investment Department originated all of the Nationwide Life mortgage loans in this transaction and currently manages over $9.6 billion of mortgage loans for Nationwide Life, its affiliates, and third party participants.

Nationwide Life's headquarters are in Columbus, Ohio, where the company was founded in 1929. Nationwide Life has financial strength ratings from A.M. Best "A+," Moody's "Aa3," and S&P "AA-." Nationwide's main telephone number is (614) 249-7111.

### Sale of the Mortgage Loans

On the Closing Date, each seller will sell its mortgage loans, without recourse, to Morgan Stanley Dean Witter Capital I Inc., and Morgan Stanley Dean Witter Capital I Inc., in turn, will sell all of the mortgage loans, without recourse and will assign the representations and warranties made by each seller in respect of the mortgage loans and the related remedies for breach thereof, to the trustee for the benefit of the Certificateholders. In connection with such assignments, each seller is required in accordance with the related Mortgage Loan Purchase Agreement to deliver the Mortgage File, with respect to each mortgage loan so assigned by it, to the trustee or its designee.

The trustee will be required to review the documents delivered by each seller with respect to its mortgage loans within 120 days following the Closing Date, and the trustee will hold the related documents in trust. Within 60 days following the Closing Date, the assignments with respect to each mortgage loan and any related assignment of rents and leases, as described in the "Glossary of Terms" under the term "Mortgage File," are to be completed in the name of the trustee, if delivered in blank.

### Representations and Warranties

In each Mortgage Loan Purchase Agreement, the related seller has represented and warranted with respect to each of its mortgage loans, subject to certain specified exceptions set forth therein, as of the Closing Date or as of such other date specifically provided in the representation and warranty, among other things, generally to the effect that:

(1)    the information presented in the schedule of the mortgage loans attached to the related Mortgage Loan Purchase Agreement is complete, true and correct in all material respects;

(2)    such seller owns the mortgage loan free and clear of any and all pledges, liens and/or other encumbrances;

(3)    no scheduled payment of principal and interest under the mortgage loan was 30 days or more past due as of the Cut-off Date, and the mortgage loan has not been 30 days or more delinquent in the 12-month period immediately preceding the Cut-off Date;

(4)    the related mortgage constitutes a valid and, subject to certain creditors' rights exceptions, enforceable first priority mortgage lien, subject to certain permitted encumbrances, upon the related mortgaged property;

(5)    the assignment of the related mortgage in favor of the trustee constitutes a legal, valid and binding assignment;

(6)    the related assignment of leases establishes and creates a valid and, subject to certain creditor's rights exceptions, enforceable first priority lien in or assignment of the related borrower's interest in all leases of the mortgaged property;

(7)    the mortgage has not been satisfied, cancelled, rescinded or subordinated in whole or in part, and the related mortgaged property has not been released from the lien of such mortgage, in whole or in part in any manner that materially and adversely affects the value thereof;

# APPENDIX III
## SIGNIFICANT LOAN SUMMARIES

### Mortgage Loan No. 1 – 77 P Street Office

| Loan Information | |
|---|---|
| Original Balance: | $67,000,000 |
| Cut-off Date Balance: | $67,000,000 |
| First Payment Date: | 01/01/2003 |
| Interest Rate: | 6.100% |
| Amortization: | 360 months |
| ARD: | NAP |
| Hyperamortization: | NAP |
| Maturity Date: | 12/01/2012 |
| Expected Maturity Balance: | $57,108,699 |
| Sponsor(s): | Douglas Jemal and Joseph Cayre |
| Interest Calculation: | Actual/360 |
| Call Protection: | Lockout until the earlier of the 5th anniversary of the closing date or 2 years after the REMIC startup date, with US Treasury defeasance thereafter. The loan is prepayable without premium within three months prior to the maturity date. |
| Loan per SF: | $196.08 |
| Up-front Reserves: | Insurance: $15,596 |
| | Completion Holdback[1]: $19,000,000 |
| | Rollover Holdback[2]: $6,505,193 |
| | Debt Service[3]: $345,417 |
| Ongoing Reserves: | RE Tax: $73,988 |
| | Insurance: $7,798 |
| | Replacements: $5,695 |
| | Rollover Costs[4]: $49,831 |
| Lockbox[5]: | Hard |

| Property Information | |
|---|---|
| Single Asset/Portfolio: | Single Asset |
| Property Type: | Office |
| Property Sub-type: | Urban |
| Location: | Washington, DC |
| Year Built/Renovated: | 2000-2002/NAP |
| Occupancy[6]: | 96.5% |
| Square Footage: | 341,701 |
| The Collateral: | Six story office building |
| Ownership Interest[7]: | Fee |

| Major Tenants | %NSF | Rent PSF | Lease Expiration |
|---|---|---|---|
| Department of Employment Services | 30.9% | $33.66 | 06/30/2011 |
| Department of Mental Health Services | 19.9% | $36.07 | 06/30/2011 |
| Department of Human Services | 15.5% | $34.00 | 06/30/2011 |

| | |
|---|---|
| Property Management: | Douglas Development Corporation |
| U/W Net Op. Income: | $7,738,866 |
| U/W Net Cash Flow: | $6,963,205 |
| Appraised Value: | $96,000,000 |
| Cut-off Date LTV: | 69.8% |
| Maturity Date LTV: | 59.5% |
| DSCR: | 1.43x |
| DSCR @8% Constant: | 1.30x |

(1) $19,000,000 of the loan was held back and deposited with the lender in an interest bearing escrow account. The borrower has the right to receive funds from this account at any time prior to May 31, 2004, subject to the satisfaction of the following conditions: (i) delivery of an estoppel letter from one or more of the Department of Human Services, the Department of Health, the Department of Transportation, N. Capital Hospitality and/or the New Economy Art Agency stating that such party has taken occupancy of its premises; (ii) the borrower has provided certain financial reports; (iii) the debt service coverage ratio of the entire loan is not less than 1.43x; (iv) the lender has received an endorsement to the title policy indicating that the property is free from all liens, claims and other encumbrances other than those permitted by the loan documents, (v) the occupancy of the property and the financial condition of the borrower, its principals, the property, any tenant and any guarantor of any lease of space at the property shall not have suffered any material adverse change and no bankruptcy has been filed by or against any such person, (vi) no tenant of the property has ceased business operations or provided notice of its intent to discontinue or possibly discontinue operations at the property and (vii) no event of default or event which, with notice, the passage of time, or both, would constitute an event of default under the loan documents has occurred. If the above conditions are not satisfied by May 31, 2004, the lender may apply any funds remaining to payment of the outstanding principal balance of the loan. In addition, within 5 days after demand by the lender, the borrower must pay the yield maintenance premium attributable to such prepayment.

(2) $6,505,193 of the loan was held back in connection with certain tenant improvements. Subject to certain conditions contained in the loan documents, the funds are to be disbursed by the lender directly to third party vendors and/or contractors that provide invoices, receipts and other similar written documents which evidence that such tenant improvements have been completed.

(3) $345,417 of the loan was held back and deposited with the lender in an interest bearing escrow account. The lender has the right to apply any of the funds in such account for any monthly payment of principal and interest due under the loan. If the lender uses such funds to pay for any monthly payment of principal and interest due under the loan, the borrower is obligated to deposit with the lender an amount sufficient to restore the funds in the account to its original amount with 5 days of the lender's demand. The borrower does not have the right to receive any of the funds in such account until all of the funds in the Completion Holdback have been disbursed to the borrower.

(4) In addition to the monthly rollover escrow collections, the lender will sweep all free cash flow beginning October 1, 2010, if the tenant has not renewed by that date.

(5) Revenue from the related mortgaged property is paid directly by the tenants and other payees to an account controlled by the applicable master servicer on behalf of the trust fund. The revenue from the related mortgaged property is applied by the master servicer on behalf of the trust fund to sums payable under the related mortgage loan and, in certain transactions, to pay expenses at the related mortgaged property.

(6) As of an October 29, 2002 rent roll.

(7) The collateral is subject to a ground lease; however, the fee owner is affiliated with the borrower and has pledged its fee interest as additional collateral for the loan. Upon foreclosure, the ground lease is extinguished. As such, the loan is disclosed as a fee loan.

## The 77 P Street Loan

**The Loan.** The largest loan (the "77 P Street Loan") as evidenced by the promissory note (the "77 P Street Note") is secured by a first priority Mortgage (the "77 P Street Mortgage") encumbering an office building containing 341,701 square feet of space in Washington, DC (the "77 P Street Property"). The 77 P Street Loan was originated on November 19, 2002 by Morgan Stanley Dean Witter Mortgage Capital Inc., or an affiliate thereof.

**The Borrower.** The borrower is Cayre Jemal's Gateway Holdings LLC (the "77 P Street Borrower") that owns no material asset other than the 77 P Street Property and related interests. The 77 P Street Borrower is a single purpose entity. The 77 P Street Borrower is controlled by Douglas Jemal and Joseph Cayre.

**The Property.** The 77 P Street Property, located in Washington, DC, was originally constructed in 1906, but underwent a complete reconstruction in 2000 – 2002, and is essentially a new physical plant. The 77 P Street Property consists of an office building containing 341,701 square feet of space, primarily occupied by five separate agencies of the District of Columbia government. The District of Columbia has general obligation credit ratings of BBB+ (S&P) and Baa1 (Moody's), as of November 19, 2002. The property is located within the Capitol Hill office sub-market and is across the street from the future ATF headquarters campus and a District of Columbia Metro Station scheduled to open in 2005. The property has 350 on-site parking spaces, which are primarily leased to property tenants.

| | | | Lease Rollover Schedule | | | | |
|---|---|---|---|---|---|---|---|
| Year | # of Leases Rolling | Average Base Rent per SF Rolling | % of Total Square Feet Rolling | Cumulative % of SF Rolling | % of Total Base Rental Revenues Rolling | Cumulative % of Total Base Rental Revenues Rolling |
| Vacant | 1 | $20.00 | 4% | 4% | 2% | 2% |
| 2002 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2003 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2004 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2005 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2006 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2007 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2008 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2009 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2010 | 0 | $0.00 | 0% | 4% | 0% | 2% |
| 2011 & Beyond | 10 | $33.08 | 96% | 100% | 98% | 100% |

**Property Management.** Douglas Development Corporation

**Mezzanine Loan and Preferred Equity Interest.** Not allowed.

**Additional Indebtedness.** Not allowed.

**Release of Parcels.** Not allowed.

Certain additional information regarding the 77 P Street Loan and the 77 P Street Property is set forth on Appendix II hereto.

Douglas Development Corp.                            Transaction Report                                    Page 1
                                                                                          System Date: 01/08/07
                                                                                          System Time:  3:48 pm

01/01/2003 to 12/31/2003

| Accounting Date | Ref1 | Job | Invoice | Description | Beginning Balance | Debit | Credit | End Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | **080-00-17300 Tenant Lease Costs - Constrctn** | | | | |
| 01/01/2003 DAVIS | | | | Record TI Draw #1 | | 2,917,297.00 | | |
| 01/01/2003 FOX | | | | Record TI Draw #1 | | 93,789.54 | | |
| 01/01/2003 DDC | | | | Record TI Draw #1 | | 140,600.00 | | |
| 01/03/2003 | | 080-01-002 | | PR Post checks summary | | 616.43 | | |
| 01/14/2003 DAVIS | | | | Record TI Draw #2 | | 1,745,075.00 | | |
| 01/14/2003 CORE GRP | | | | Record TI Draw #2 | | 92,469.43 | | |
| 01/14/2003 FOX | | | | Record TI Draw #2 | | 46,018.51 | | |
| 01/14/2003 GRP GOETZ | | | | Record TI Draw #2 | | 3,167.78 | | |
| 01/14/2003 INTL BLDRS | | | | Record TI Draw #2 | | 803,902.00 | | |
| 01/14/2003 | | | | Record 1/14 reserve draw | | 12,145.45 | | |
| 01/16/2003 | | 080-01-002 | 02-12151 | 77 P ST | | 1,076.00 | | |
| 01/17/2003 | | 080-01-004 | 3100-01-01b | 77 P ST REIMB R. REA | | 34,000.00 | | |
| 01/17/2003 | | 080-01-004 | 3100-01-01b | (Rev)77 P ST REIMB R. REA | | 34,000.00- | | |
| 01/17/2003 | | 080-01-004 | 3100-01-01 | 77 P Street - D.Dot | | 34,000.00 | | |
| 01/17/2003 | | 080-01-002 | | PR Post checks summary | | 1,103.46 | | |
| 01/21/2003 | | | 165994 | 77 P ST | | 68,897.08 | | |
| 01/22/2003 | | 080-01-005 | 112894 | 5711 Sarvis Ave-Crestwood | | 58.80 | | |
| 01/22/2003 | | 080-01-005 | 112906 | 77 P - New Economy | | 43.57 | | |
| 01/22/2003 | | 080-01-005 | 113762 | 77 P - 1st & 5th Floors | | 58.80- | | |
| 01/22/2003 | | 080-01-005 | 112894 | (Rev)Doc Imaging.Com Inc | | | | |
| 01/23/2003 | | 080-01-002 | 910919 | 920 RHODE ISLAND | | 419.91 | | |
| 01/23/2003 | | 080-01-002 | 1879525-00 | Cafe X - 77 P Street | | 2,889.35 | | |
| 01/23/2003 | | 080-01-002 | 1887090-00 | Cafe X - 77 P Street | | 2,369.16 | | |
| 01/24/2003 | | 080-01-002 | 1855 | 77 P ST | | 12,490.00 | | |
| 01/24/2003 | | 080-01-005 | 111858 | | | 23.27 | | |
| 01/24/2003 | | 080-01-005 | 111858 | (Rev) | | 23.27- | | |
| 01/24/2003 | | 080-01-002 | | PR Post checks summary | | 27.37 | | |
| 01/28/2003 | | 080-01-002 | 287495 | 12/31-1/27/0 DOUGLAS DEVELOPMENT | | 220.00 | | |
| 01/28/2003 | | 080-01-002 | 287495 | 77 P ST | | 684.20 | | |
| 01/31/2003 | | 080-01-002 | 9574075-00 | 77 P ST | | 211.17 | | |
| 02/04/2003 | | 080-01-002 | 157311 | 77 P ST | | 326.47 | | |
| 02/05/2003 | | 080-01-002 | 1884387-00 | 77 P ST | | 654.65 | | |
| 02/05/2003 | | 080-01-002 | 1884514-00 | 77 P ST | | 106.29 | | |
| 02/05/2003 | | 080-01-002 | 1887090-01 | 77 P ST | | 183.93 | | |
| 02/05/2003 | | 080-01-002 | 1888246-00 | 77 P ST | | 232.08 | | |
| 02/05/2003 | | 080-01-002 | 1888692-00 | 77 P ST | | 212.68 | | |
| 02/05/2003 | | 080-01-002 | 1888741-00 | 77 P ST | | 63.58 | | |
| 02/05/2003 | | 080-01-002 | 1889867-00 | 77 P ST | | 870.47 | | |
| 02/05/2003 | | 080-01-002 | 1889881-00 | 77 P ST | | 116.80 | | |
| 02/05/2003 | | 080-01-002 | 1890484-00 | 77 P ST | | 1,542.25 | | |
| 02/05/2003 | | 080-01-002 | 1890577-00 | 77 P ST | | 124.24 | | |
| 02/06/2003 | | 080-01-003 | 030102 | 77 P Street | | 510.00 | | |
| 02/06/2003 | | 080-01-006 | 030102 | 77 P Street | | 505.00 | | |
| 02/06/2003 | | 080-01-004 | 030102 | 77 P Street | | 426.00 | | |
| 02/06/2003 | | 080-01-005 | 030102 | 77 P Street | | 387.00 | | |
| 02/07/2003 105540 | | | | To correct Accrual To Cash | | 2,750.00 | | |
| 02/07/2003 105540 | | | | To correct Accrual To Cash | | 2,750.00 | | |
| 02/07/2003 105540 | | | | To correct Accrual To Cash | | 150.00 | | |
| 02/07/2003 105540 | | | | To correct Accrual To Cash | | 150.00 | | |
| 02/07/2003 | | | | To correct accrual books | | | 5,800.00- | |
| 02/11/2003 | | | | To correct accrual to cash | | 326.47 | | |
| 02/14/2003 | | 080-01-002 | | PR Post checks summary | | 91.65 | | |
| 02/15/2003 | | | | To correct accrual ledger | | 1,380.00 | | |
| 02/15/2003 | | | | To correct accrual ledger | | 5,800.00 | | |
| 02/15/2003 | | | | To correct accrual ledger | | 5,800.00 | | |
| 02/15/2003 | | | | To correct accrual ledger | | 513.15 | | |
| 02/15/2003 | | | | To correct accrual ledger | | 23.27 | | |
| 02/15/2003 | | | | To correct accrual ledger | | 656.56 | | |
| 02/15/2003 | | | | To correct accrual ledger | | 243.10 | | |
| 02/15/2003 | | | | | | | 326.47- | |
| 02/15/2003 | | | | | | | 5,800.00- | |
| 02/20/2003 | | 080-01-003 | 114015 | 77 P Street | | 153.71 | | |
| 02/21/2003 | | 080-01-003 | | PR Post checks summary | | 1,372.46 | | |
| 02/24/2003 | | 080-01-002 | 1898284-00 | 77 P ST | | 1,163.27 | | |
| 02/24/2003 | | 080-01-002 | 1898442-01 | 77 P ST | | 569.76 | | |
| 02/24/2003 | | 080-01-002 | 1899270-00 | 77 P ST | | 418.19 | | |
| 02/26/2003 | | 080-01-002 | 908596 | 77 P ST | | 402.57 | | |
| 02/27/2003 | | 080-01-002 | 09668-01240 | 377 P ST | | 3,750.00 | | |
| 02/27/2003 | | 080-01-002 | 09668-02110 | 377 P ST | | 1,624.00 | | |
| 02/27/2003 | | | | BL  summary | | | 964,740.10 | |
| 02/27/2003 | | | | AR Adjust receivables summary | | | 964,740.10 | |
| 02/28/2003 | | | | BL  summary | | | 357,913.03- | |
| 02/28/2003 | | | | AR Adjust receivables summary | | | 357,913.03 | |
| 02/28/2003 | | 080-01-002 | | PR Post checks summary | | 195.79 | | |

Exhibit 207

Douglas Development Corp.

Transaction Report

01/01/2003 to 12/31/2003

| Accounting Date | Ref1 | Job | Invoice | Description | Beginning Balance | Debit | Credit | End Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | 080-00-17300 Tenant Lease Costs - Constrctn | | | | |
| 03/03/2003 | 080-01-004 | | 113624 | 77 P Street - DDOT | | 58.69 | | |
| 03/03/2003 | 080-01-004 | | 113641 | 77 P Street - DDOT | | 43.62 | | |
| 03/03/2003 | 080-01-005 | | 113968 | 77 P Street - | | 41.03 | | |
| 03/03/2003 | 080-01-005 | | 114007 | 77 P Street - New Eco. | | 76.93 | | |
| 03/03/2003 | 080-01-004 | | 114021 | 77 P Street - DDOT | | 74.87 | | |
| 03/03/2003 | 080-01-004 | | 114032 | 77 P Street | | 41.24 | | |
| 03/03/2003 | 080-01-005 | | 114061 | 77 P Street | | 93.75 | | |
| 03/03/2003 | 080-01-005 | | 114062 | 77 P Street | | 98.35 | | |
| 03/03/2003 | 080-01-005 | | 114157 | 77 P St - New Economy | | 35.96 | | |
| 03/03/2003 | 080-01-004 | | 030303-080 | PERMIT-DDOT | | 4,300.00 | | |
| 03/05/2003 | 080-01-004 | | 03/102 | 77 P St | | 66,511.00 | | |
| 03/10/2003 | | | 01166917 | 77 P ST | | 38,707.56 | | |
| 03/10/2003 | 080-01-002 | | 1889881-01 | 77 P ST | | 1,355.58 | | |
| 03/10/2003 | 080-01-002 | | 1889881-50 | 77 P ST | | 22.24 | | |
| 03/10/2003 | 080-01-002 | | 1896269-00 | 1817 M ST | | 34.11 | | |
| 03/10/2003 | 080-01-002 | | 1897222-00 | 77 P ST | | 299.42 | | |
| 03/10/2003 | 080-01-002 | | 1897222-01 | 77 P ST | | 104.98 | | |
| 03/10/2003 | 080-01-002 | | 1898442-00 | 77 P ST | | 22.73 | | |
| 03/10/2003 | 080-01-002 | | 1896269-00 | (Rev)1817 M ST | | 34.11- | | |
| 03/13/2003 | 080-01-004 | | 3/10/03OVR | E. Lopez - 77 P OVR | | 580.00 | | |
| 03/13/2003 | 080-01-004 | | 3/10/03OVR | S. Perez - 77 P OVR | | 348.00 | | |
| 03/13/2003 | 080-01-004 | | 3/10/03OVR | D. Vasquez - 77 P OVR | | 348.00 | | |
| 03/13/2003 | 080-01-004 | | 3/10/03OVR | V. Gomez - 77 P OVR | | 348.00 | | |
| 03/13/2003 | 080-01-004 | | 3/10/03OVR | M. Perez - 77 P OVR | | 348.00 | | |
| 03/13/2003 | 080-01-004 | | 3/10/03OVR | A. Sajche - 77 P OVR | | 348.00 | | |
| 03/13/2003 | 080-01-004 | | 3/3-3/9/03 | Miguel Vasquez 3/3-9/03 | | 402.00 | | |
| 03/13/2003 | 080-01-004 | | 3/3-9/03 | Juan Gomez - 77 P St 3/3-9/03 | | 756.00 | | |
| 03/13/2003 | 080-01-004 | | 3/3-9/03b | 77 P St - Samuel Lopez Perez | | 498.00 | | |
| 03/13/2003 | 080-01-004 | | 3/3-9/03c | 77 P Street - German Cabrera | | 144.00 | | |
| 03/14/2003 | 080-01-004 | | | PR Post checks summary | | 1,721.84 | | |
| 03/14/2003 | 080-01-002 | | | PR Post checks summary | | 115.66 | | |
| 03/18/2003 | 080-01-002 | | 9578889-00 | 77 P ST | | 337.89 | | |
| 03/21/2003 | 080-01-004 | | | PR Post checks summary | | 3,887.48 | | |
| 03/21/2003 | 080-01-002 | | | PR Post checks summary | | 169.57 | | |
| 03/24/2003 | 080-01-004 | | 2/11-3/8/03 | 77 P ST | | 235.23 | | |
| 03/26/2003 | 080-01-004 | | 1-1149841 | 77 P ST | | 1,410.09 | | |
| 03/26/2003 | 080-01-004 | | 1-1149842 | 77 P ST | | 1,194.37 | | |
| 03/26/2003 | 080-01-002 | | 1897222-50 | 77 P ST | | 35.58 | | |
| 03/26/2003 | 080-01-002 | | 1898442-02 | 77 P ST | | 269.99 | | |
| 03/26/2003 | 080-01-002 | | 1898442-50 | 77 P ST | | 22.24 | | |
| 03/26/2003 | 080-01-002 | | 1901618-00 | 77 P ST | | 121.37 | | |
| 03/26/2003 | 080-01-002 | | 1901725-00 | 77 P ST | | 35.56 | | |
| 03/26/2003 | 080-01-002 | | CAFE X-PRESS | 77 P ST | | 13,050.00 | | |
| 03/26/2003 | 080-01-004 | | 291565 | 77 P ST | | 201.33 | | |
| 03/27/2003 | 080-01-002 | | | PR Post checks summary | | 756.94 | | |
| 03/31/2003 | 080-01-004 | | 9578986-00 | 77 P ST | | 389.13 | | |
| 04/02/2003 | 080-01-004 | | 15549 | 77 P Street - DOT | | 39,099.33 | | |
| 04/02/2003 | 080-01-004 | | 15561 | 77 P Street - DOT | | 26,508.70 | | |
| 04/02/2003 | 080-01-004 | | 15602 | 77 P Street - DOT | | 8,797.05 | | |
| 04/03/2003 | 080-01-004 | | 0000139782 | Northrop Grumman Cop. | | 159,935.25 | | |
| 04/03/2003 | 080-01-004 | | 3100-01-02 | R. Rea Corporation | | 58,845.00 | | |
| 04/03/2003 | 080-01-004 | | 3100-01-03 | R. Rea Corporation | | 37,033.88 | | |
| 04/07/2003 | 080-01-002 | | 160361 | Ernest Maier Block Co., Inc. | | 40.08 | | |
| 04/07/2003 | 080-01-002 | | 160367 | Ernest Maier Block Co., Inc. | | 44.80 | | |
| 04/07/2003 | 080-01-002 | | 1909969-00 | Maurice Electrical Sply Co Inc | | 91.76 | | |
| 04/09/2003 | 080-01-003 | | 202-00012-1 | Global Furniture Resources LLC | | 318,078.35 | | |
| 04/09/2003 | 080-01-003 | | 202-00012-2 | Global Furniture Resources LLC | | 190,847.01 | | |
| 04/09/2003 | 080-01-003 | | 202-00012-3 | Global Furniture Resources LLC | | 127,231.34 | | |
| 04/09/2003 | 080-01-003 | | S0307-75B | James G. Davis Construction | | 66,125.00 | | |
| 04/09/2003 | 080-01-003 | | S0307-75C | James G. Davis Construction | | 909,600.00 | | |
| 04/09/2003 | 080-01-004 | | S0307-75F | James G. Davis Construction | | 76,000.00 | | |
| 04/09/2003 | 080-01-004 | | S0307-75H | James G. Davis Construction | | 225,000.00 | | |
| 04/09/2003 | 080-01-003 | | S0307-75B | (Rev)James G. Davis Constructi | | | 66,125.00- | |
| 04/09/2003 | 080-01-003 | | 61-2040-2B | James G. Davis Construction | | 66,125.00 | | |
| 04/09/2003 | 080-01-003 | | S0307-75C | (Rev)James G. Davis Constructi | | | 909,600.00- | |
| 04/09/2003 | 080-01-003 | | 61-2040-2C | James G. Davis Construction | | 909,600.00 | | |
| 04/09/2003 | 080-01-004 | | S0307-75F | (Rev)James G. Davis Constructi | | | 76,000.00- | |
| 04/09/2003 | 080-01-004 | | 61-2040-2F | James G. Davis Construction | | 76,000.00 | | |
| 04/09/2003 | 080-01-004 | | S0307-75H | (Rev)James G. Davis Constructi | | | 225,000.00- | |
| 04/09/2003 | 080-01-004 | | 61-2040-2-H | James G. Davis Construction | | 225,000.00 | | |
| 04/09/2003 | 080-01-004 | | 61-2040-2-H | James G. Davis Construction | | | 225,000.00- | |
| 04/09/2003 | 080-01-004 | | 61-2040-2H | James G. Davis Construction | | 225,000.00 | | |
| 04/09/2003 | | | 01267950 | American Office | | 71,921.99 | | |
| 04/09/2003 | | | 01267998 | American Office | | 8,838.77 | | |

Douglas Development Corp.

Page 3
System Date: 01/08/07
System Time:  3:48 pm

Transaction Report

01/01/2003 to 12/31/2003

| Accounting Date | Ref1 | Job | Invoice | Description | Beginning Balance | Debit | Credit | End Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | 080-00-17300 Tenant Lease Costs - Constrctn | | | | |
| 04/09/2003 | | | 01268033 | American Office | | 4,837.43 | | |
| 04/09/2003 | | | 01268158 | American Office | | 27,743.94 | | |
| 04/09/2003 | | | 01268159 | American Office | | 33,877.11 | | |
| 04/09/2003 | | | 01268300 | American Office | | 10,410.00 | | |
| 04/09/2003 | | | 01268309 | American Office | | 6,443.80 | | |
| 04/09/2003 | | | 01268368 | American Office | | 28,824.86 | | |
| 04/09/2003 | | | 01268485 | American Office | | 29,470.88 | | |
| 04/09/2003 | | | 01268486 | American Office | | 5,488.86 | | |
| 04/09/2003 | | | 01268508 | American Office | | 20,646.84 | | |
| 04/09/2003 | | | 01268609 | American Office | | 662.31 | | |
| 04/09/2003 | | | 01268627 | American Office | | 2,137.50 | | |
| 04/09/2003 | | | 01268680 | American Office | | 48,968.84 | | |
| 04/09/2003 | | | 01269124 | American Office | | 62,495.59 | | |
| 04/09/2003 | | | 2630 | Schwartz Engineering, Inc. | | 34,923.00 | | |
| 04/09/2003 | | | 2639 | Schwartz Engineering, Inc. | | 27,649.75 | | |
| 04/09/2003 | | 080-01-005 | 2211040 | Group Goetz Architects, Pc | | 5,893.23 | | |
| 04/09/2003 | | 080-01-003 | 202-00012-2 | (Rev)Global Furniture Resource | | 190,847.01- | | |
| 04/09/2003 | | 080-01-003 | 202-00012-3 | (Rev)Global Furniture Resource | | 127,231.34- | | |
| 04/10/2003 | | 080-01-005 | 113761 | Doc Imaging.Com Inc | | 26.65 | | |
| 04/11/2003 | | 080-01-002 | 3/3-9/03 | Ruben Lopez | | 2,437.50 | | |
| 04/11/2003 | | 080-01-002 | 5313-REIMB | Douglas Development | | 4,425.00 | | |
| 04/11/2003 | | 080-01-002 | 5313 | William Dorsey & Associates | | 4,425.00 | | |
| 04/11/2003 | | 080-01-002 | 5313-REIMB | (Rev)Douglas Development | | 4,425.00- | | |
| 04/14/2003 | | 080-01-004 | 3/10-16/03 | Ruben Lopez | | 975.00 | | |
| 04/18/2003 | | 080-01-002 | | PR Post checks summary | | 298.21 | | |
| 04/24/2003 | | 080-01-006 | 948660 | Federal Network Services, Inc. | | 1,300.00 | | |
| 04/24/2003 | | 080-01-006 | 948676 | Federal Network Services, Inc. | | 3,200.00 | | |
| 04/24/2003 | | 080-01-006 | 948692 | Federal Network Services, Inc. | | 148,774.50 | | |
| 04/24/2003 | | 080-01-006 | 948713 | Federal Network Services, Inc. | | 13,710.80 | | |
| 04/24/2003 | | 080-01-006 | 948893 | Federal Network Services, Inc. | | 6,000.00 | | |
| 04/25/2003 | | 080-01-004 | 5 | Core Group | | 4,968.04 | | |
| 04/25/2003 | | 080-01-002 | | PR Post checks summary | | 229.93 | | |
| 04/28/2003 | | 080-01-002 | 03-03315 | Ace Corporation | | 1,720.00 | | |
| 04/28/2003 | | 080-01-002 | 913022 | Builders Hardware Corp. | | 215.50 | | |
| 04/29/2003 | | | | BL  summary | | | 2,681.97- | |
| 05/01/2003 | | 080-01-004 | 3100-01-04 | R. Rea Corporation | | 3,692.00 | | |
| 05/01/2003 | | 080-01-004 | 02040.00-5 | Core Group | | 559.12 | | |
| 05/01/2003 | | 080-01-004 | 02040.50-1 | Core Group | | 812.50 | | |
| 05/01/2003 | | 080-01-004 | 02040.50-3 | Core Group | | 10,804.80 | | |
| 05/01/2003 | | 080-01-004 | 02040.50-4 | Core Group | | 7,226.87 | | |
| 05/01/2003 | | 080-01-004 | 02040.60-1 | Core Group | | 16,773.91 | | |
| 05/05/2003 | | 080-01-002 | 1911112-00 | Maurice Electrical Sply Co Inc | | 317.08 | | |
| 05/05/2003 | | 080-01-002 | 1911477-00 | Maurice Electrical Sply Co Inc | | 153.69 | | |
| 05/05/2003 | | 080-01-002 | 1911579-00 | Maurice Electrical Sply Co Inc | | 393.02 | | |
| 05/05/2003 | | 080-01-002 | 725721-00 | Maurice Electrical Sply Co Inc | | 311.50- | | |
| 05/05/2003 | | 080-01-004 | 0000141056 | Logicon FDC/DPC | | 20,612.79 | | |
| 05/05/2003 | | 080-01-004 | 0000141550 | Logicon FDC/DPC | | 2,745.27 | | |
| 05/05/2003 | | 080-01-004 | 0000141056 | (Rev)Logicon FDC/DPC | | 20,612.79- | | |
| 05/06/2003 | | | 2666 | Schwartz Engineering, Inc. | | 10.50 | | |
| 05/06/2003 | | | 2692 | Schwartz Engineering, Inc. | | 20.50 | | |
| 05/06/2003 | | | 2716 | Schwartz Engineering, Inc. | | 34,648.00 | | |
| 05/06/2003 | | | 2717 | Schwartz Engineering, Inc. | | 12,845.00 | | |
| 05/07/2003 | | 080-01-002 | 1995 | Three Way Mechanical Corp. | | 2,195.00 | | |
| 05/07/2003 | | | 2792 | Schwartz Engineering, Inc. | | 9,500.00 | | |
| 05/07/2003 | | | 2793 | Schwartz Engineering, Inc. | | 16,900.00 | | |
| 05/07/2003 | | | 2794 | Schwartz Engineering, Inc. | | 14,000.00 | | |
| 05/07/2003 | | | 2795 | Schwartz Engineering, Inc. | | 21,300.00 | | |
| 05/07/2003 | | | 2796 | Schwartz Engineering, Inc. | | 9,500.00 | | |
| 05/07/2003 | | 080-01-005 | J3656-4/5 | American Mechanical Services | | 58,408.56 | | |
| 05/07/2003 | | 080-01-005 | J3657-4/5 | American Mechanical Services | | 23,069.12 | | |
| 05/09/2003 | | 080-01-004 | 0000140292 | Logicon FDC/DPC | | 16,153.32 | | |
| 05/09/2003 | | 080-01-006 | PSI0837085 | Daly Computers | | 53,478.65 | | |
| 05/09/2003 | | 080-01-004 | 0000140188 | Logicon FDC/DPC | | 16,480.08 | | |
| 05/09/2003 | | 080-01-004 | 0000140811 | Logicon FDC/DPC | | 10,998.00 | | |
| 05/15/2003 | | 080-01-006 | CI-4173 | Stultz Air Technology Systems | | 12,120.00 | | |
| 05/15/2003 | | 080-01-006 | CI-4175 | Stultz Air Technology Systems | | 12,764.00 | | |
| 05/15/2003 | | 080-01-006 | CI-4182 | Stultz Air Technology Systems | | 9,721.00 | | |
| 05/22/2003 | | 080-01-004 | 40980 | Remco Business Systems | | 3,824.38 | | |
| 05/30/2003 | | | | BL  summary | | | 317,467.00- | |
| 05/30/2003 | | | | BL  summary | | | 317,467.00- | |
| 05/30/2003 | | | | AR Adjust receivables summary | | | | 317,467.00 |
| 06/06/2003 | | 080-01-006 | 00020723 | Lee Technologies Group | | 29,455.61 | | |
| 06/06/2003 | | 080-01-006 | 00020724 | Lee Technologies Group | | 14,276.25 | | |
| 06/06/2003 | | 080-01-006 | 00020725 | Lee Technologies Group | | 3,965.63 | | |

Douglas Development Corp.

Transaction Report

Page 4
System Date: 01/08/07
System Time:  3:48 pm

01/01/2003 to 12/31/2003

| Accounting Date | Ref1 | Job | Invoice | Description | Beginning Balance | Debit | Credit | End Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | 080-00-17300 Tenant Lease Costs - Constrctn | | | | |
| 06/06/2003 | | 080-01-002 | S1003542.001 | Maurice Electrical Sply Co Inc | | 285.57 | | |
| 06/16/2003 | | | | BL  summary | | | 3,696,863.38- | |
| 06/17/2003 | | | 01269121 | American Office | | 51,797.38 | | |
| 06/17/2003 | | | 01269122 | American Office | | 12,973.36 | | |
| 06/17/2003 | | | 01269201 | American Office | | 720.00 | | |
| 06/17/2003 | | | 01269213 | American Office | | 253.62 | | |
| 06/17/2003 | | | 01269298 | American Office | | 5,781.12 | | |
| 06/17/2003 | | | 01269325 | American Office | | 71,595.66 | | |
| 06/17/2003 | | | 061703-080 | American Office | | 93.37- | | |
| 06/18/2003 | | 080-01-004 | 1187027 | Cort Furniture | | 616.45 | | |
| 06/19/2003 | | | | BL  summary | | | 345,426.71- | |
| 06/26/2003 | | 080-01-006 | 200073 | Doc Imaging.Com Inc | | 33.31 | | |
| 06/26/2003 | | 080-01-004 | 200265 | Doc Imaging.Com Inc | | 171.16 | | |
| 06/30/2003 | | | 02041.02-001 | Hickok Warner Fox Archtects | | 1,750.00 | | |
| 06/30/2003 | | | 02041.03-01 | Hickok Warner Fox Archtects | | 397.00 | | |
| 06/30/2003 | | | 02041.05-01 | Hickok Warner Fox Archtects | | 7,880.00 | | |
| 06/30/2003 | | | 02041.05-02 | Hickok Warner Fox Archtects | | 1,020.00 | | |
| 06/30/2003 | | | 02041.00-04 | Hickok Warner Fox Archtects | | 3,425.99 | | |
| 06/30/2003 | | | 02041.00-03 | Hickok Warner Fox Archtects | | 10,981.72 | | |
| 06/30/2003 | | | 02041.00-05 | Hickok Warner Fox Archtects | | 551.21 | | |
| 06/30/2003 | | | 02041.00-06 | Hickok Warner Fox Archtects | | 133.60 | | |
| 06/30/2003 | | | 02041.04-01 | Hickok Warner Fox Archtects | | 7,800.00 | | |
| 06/30/2003 | | | 02066.00-03 | Hickok Warner Cole Archtects | | 4,398.27 | | |
| 06/30/2003 | | | 02066.00-03 | (Rev)Hickok Warner Cole Archte | | 4,398.27- | | |
| 06/30/2003 | | | | AR Adjust receivables summary | | | 396,368.61 | |
| 06/30/2003 | | | | AR Adjust receivables summary | | | 3,645,921.48 | |
| 07/02/2003 | | 080-01-002 | 1910119-00 | Maurice Electrical Sply Co Inc | | 230.41 | | |
| 07/02/2003 | | 080-01-002 | 0105F28 | Natelco Corporation | | 753.00 | | |
| 07/15/2003 | | 080-01-002 | 1911120-00 | Maurice Electrical Sply Co Inc | | 212.13 | | |
| 07/21/2003 | | | S0310-37 | James G. Davis Construction | | 365,428.00 | | |
| 07/21/2003 | | | S0310-38 | James G. Davis Construction | | 578,223.00 | | |
| 07/21/2003 | | | S0310-39 | James G. Davis Construction | | 184,657.00 | | |
| 07/21/2003 | | | S0402-37 | James G. Davis Construction | | 85,304.00 | | |
| 07/21/2003 | | | 28102 | Hellmuth, Obata & Kassabaum | | 9,199.40 | | |
| 08/27/2003 | | | | BL  summary | | | 50,941.90- | |
| 08/27/2003 | | | | BL  summary | | | 3,991,348.19- | |
| 08/27/2003 | | | | AR Adjust receivables summary | | | 4,042,290.09 | |
| 09/03/2003 | | 080-01-003 | 02037.00-04 | Hickok Warner Fox Archtects | | 36.94 | | |
| 09/03/2003 | | 080-01-003 | 02037.00-05 | Hickok Warner Fox Archtects | | 153.01 | | |
| 09/03/2003 | | 080-01-003 | 02037.00-06 | Hickok Warner Fox Archtects | | 366.33 | | |
| 09/03/2003 | | 080-01-003 | 02037.00-07 | Hickok Warner Fox Archtects | | 31.45 | | |
| 09/03/2003 | | 080-01-003 | 02037.00-08 | Hickok Warner Fox Archtects | | 53.10 | | |
| 09/15/2003 | | 080-01-002 | 10 | Quality Services, Inc | | 2,300.00 | | |
| 10/17/2003 | | 080-01-006 | 00020723 | (Rev)Lee Technologies Group | | 29,455.61- | | |
| 10/17/2003 | | 080-01-006 | 00020724 | (Rev)Lee Technologies Group | | 14,276.25- | | |
| 10/17/2003 | | 080-01-006 | 00020725 | (Rev)Lee Technologies Group | | 3,965.63- | | |
| 10/17/2003 | | 080-01-006 | CI-4173 | (Rev)Stultz Air Technology Sys | | 12,120.00- | | |
| 10/17/2003 | | 080-01-006 | CI-4175 | (Rev)Stultz Air Technology Sys | | 12,764.00- | | |
| 10/17/2003 | | 080-01-006 | CI-4182 | (Rev)Stultz Air Technology Sys | | 9,721.00- | | |
| 10/17/2003 | | 080-01-004 | 40980 | (Rev)Remco Business Systems | | 3,824.38- | | |
| 10/21/2003 | | | | void ck#2849 | | | 1,549.52- | |
| 10/31/2003 | | | | Void Ck #2552 | | | 97,161.50- | |
| 10/31/2003 | | | | Void Ck #2553 | | | 97,203.74- | |
| 12/18/2003 | | | | AR Adjust receivables summary | | | 317,467.00 | |
| | | | | Account Totals for Tenant Lease Costs - Construction | .00 | 10,448,459.91* | 210,523.20-* | 10,237,936.71 |

Report Totals:                                                                .00*   10,448,459.91*   210,523.20-* 10,237,936.71*

Douglas Development Corp.                                        Transaction Report                                        Page 22
System Date: 01/09/07
System Time: 3:43 pm

01/01/2003 to 12/31/2003

| Accounting Date | Ref1 | Ref2 | Job | Description | Beginning Balance | Debit | Credit | End Balance |
|---|---|---|---|---|---|---|---|---|
| | | | | 080-00-17300 Tenant Lease Costs - Constrctn | | | | |
| 10/08/2003 | 3296 | 200265 | 080-01-004 | Doc Imaging.Com Inc | | 171.16 | | |
| 10/17/2003 | 3230 | 00020723 | 080-01-006 | (Rev)Lee Technologies Group | | 29,455.61- | | |
| 10/17/2003 | 3230 | 00020724 | 080-01-006 | (Rev)Lee Technologies Group | | 14,276.25- | | |
| 10/17/2003 | 3219 | 00020725 | 080-01-006 | (Rev)Lee Technologies Group | | 3,965.63- | | |
| 10/17/2003 | 3116 | CI-4173 | 080-01-006 | (Rev)Stultz Air Technology Sys | | 12,120.00- | | |
| 10/17/2003 | 3116 | CI-4175 | 080-01-006 | (Rev)Stultz Air Technology Sys | | 12,764.00- | | |
| 10/17/2003 | 3116 | CI-4182 | 080-01-006 | (Rev)Stultz Air Technology Sys | | 9,721.00- | | |
| 10/17/2003 | 3154 | 40980 | 080-01-004 | (Rev)Remco Business Systems | | 3,824.38- | | |
| 10/21/2003 | | | | void ck#2849 | | | 1,549.52- | |
| 10/31/2003 | | | | Void Ck #2552 | | | 97,161.50- | |
| 10/31/2003 | | | | Void Ck #2553 | | | 97,203.74- | |
| 11/06/2003 | 3323 | 10 | 080-01-002 | Quality Services, Inc | | 2,300.00 | | |
| 11/06/2003 | 3323 | | 080-01-002 | (Rev)Quality Services, Inc | | 2,300.00- | | |
| 11/06/2003 | 9993323 | | 080-01-002 | Quality Services, Inc | | 2,300.00 | | |
| 11/20/2003 | 3339 | 113761 | 080-01-005 | Doc Imaging.Com Inc | | 26.65 | | |
| | | | | Account Totals for 0800017300  Tenant Lease Costs - Construction | .00 | 10,436,290.34* | 195,914.76-* | 10,240,375.58 |
| | | | | **080-00-17350 Tenant Lease Costs - Commissn** | | | | |
| 01/01/2003 | STAUBACH | | | Record TI Draw #1 | | 221,776.00 | | |
| 01/01/2003 | MTD | | | Record TI Draw #1 | | 430,039.08 | | |
| 04/30/2003 | 3077 | GSA LS#GS- | | Boland Smart Associates, Inc. | | 19,990.58 | | |
| 04/30/2003 | 3077 | GSA LS#GS- | | (Rev)Boland Smart Associates, | | 19,990.58- | | |
| | | | | Account Totals for 0800017350  Tenant Lease Costs - Commission | 5,189,760.06 | 651,815.08* | .00* | 5,841,575.14 |
| | | | | **080-00-17399 Accum Depreciation - TLC** | | | | |
| 12/31/2003 | | | | Record yr 2003 l/h amort expen | | | 471,798.00- | |
| | | | | Account Totals for 0800017399  Accum Depreciation - TLC | 425,695.34- | .00* | 471,798.00-* | 897,493.34- |
| | | | | **080-00-17400 Loan Fees** | | | | |
| 01/01/2003 | | | | Record escrow/reserve activity | | 6,729.00 | | |
| 04/25/2003 | | | | Midtown Equities | | 670,000.00 | | |
| | | | | Account Totals for 0800017400  Loan Fees | 384,413.00 | 676,729.00* | .00* | 1,061,142.00 |
| | | | | **080-00-17499 Accum Amortization - Loan Fees** | | | | |
| 12/31/2003 | | | | Record yr 2003 loan fee amort | | | 106,683.00- | |
| | | | | Account Totals for 0800017499  Accum Amortization - Loan Fees | 4,805.00- | .00* | 106,683.00-* | 111,488.00- |
| | | | | **080-00-17600 Equipment** | | | | |
| 03/14/2003 | 2967 | 2/17/03 | | 77 P ST | | 1,981.09 | | |
| 10/21/2003 | 2967 | 2/17/03 | | (Rev)Paul Millstein | | 1,981.09- | | |
| | | | | Account Totals for 0800017600  Equipment | 5,980,640.92 | .00* | .00* | 5,980,640.92 |
| | | | | **080-00-17699 Accum Depreciation - Equipment** | | | | |
| 12/31/2003 | | | | Record yr 2003 depreciation | | | 2,465,580.00- | |
| | | | | Account Totals for 0800017699  Accum Depreciation - Equipment | 2,107,885.00- | .00* | 2,465,580.00-* | 4,573,465.00- |
| | | | | **080-00-19550 Utility Deposit** | | | | |
| | | | | Account Totals for 0800019550  Utility Deposit | .00 | .00* | .00* | .00 |
| | | | | **080-00-19900 Settlement Funds Clearng Accnt** | | | | |
| 01/01/2003 | | | | Reclass 11/02 settlmt diff | | 14,591.33 | | |
| | | | | Account Totals for 0800019900  Settlement Funds Clearing Account | .00 | 14,591.33* | .00* | 14,591.33 |
| | | | | **080-00-21100 Tenant Deposit - Security** | | | | |
| | | | | Account Totals for 0800021100  Tenant Deposit - Security | 3,266.00- | .00* | .00* | 3,266.00- |
| | | | | **080-00-21200 Tenant Deposit - Advance Rent** | | | | |
| 08/01/2003 | 080-01 | | | North Capitol Hospitality | | 3,266.00 | | |
| | | | | Account Totals for 0800021200  Tenant Deposit - Advance Rent | .00 | 3,266.00* | .00* | 3,266.00 |

Exhibit 208

77 P Street - Application 1 - Tenant Improvements Commissions

| TENANT IMPROVEMENTS | Invoice # | Inv Date | Amount | Total |
|---|---|---|---|---|
| **Department of Transportation - 1st Floor** | | | | |
| James G. Davis Construction | S030711G | 11/20/02 | $240,000.00 | |
| James G. Davis Construction | S030711H | 11/20/02 | $75,000.00 | |
| Douglas Development | 80001-02 | 11/21/02 | $30,000.00 | |
| | | | | |
| **Department of Mental Health - 1st Floor** | | | | |
| James G. Davis Construction | S030711E | 11/20/02 | $76,000.00 | |
| James G. Davis Construction | S030711F | 11/20/02 | $19,000.00 | |
| Douglas Development | 80001-02 | 11/21/02 | $9,500.00 | |
| | | | | |
| **Department of Mental Health - 5th Floor** | | | | |
| James G. Davis Construction | S030711C | 11/20/02 | $303,200.00 | |
| James G. Davis Construction | S030711D | 11/20/02 | $47,375.00 | |
| James G. Davis Construction | S03069 | 10/31/02 | $471,321.00 | |
| James G. Davis Construction | S030416 | 08/31/02 | $140,176.00 | |
| Douglas Development | 80001-02 | 11/21/02 | $37,900.00 | |
| | | | | |
| **Department of Human Services - 6th Floor** | | | | |
| James G. Davis Construction | S030711A | 11/20/02 | $1,269.600.00 | |
| James G. Davis Construction | S030711B | 11/20/02 | $198,375.00 | |
| Hickok Warner Fox | 02037.00-01 | 09/13/02 | $23,273.14 | |
| Hickok Warner Fox | 02037.00-02 | 10/03/02 | $70,816.40 | |
| Douglas Development | 80001-02 | 11/21/02 | $52,900.00 | |
| | | | | |
| **Department of Transportation - Basement** | | | | |
| James G. Davis Construction | S030711I | 11/20/02 | $51,500.00 | |
| James G. Davis Construction | S030711J | 11/20/02 | $25,750.00 | |
| Douglas Development | 80001-02 | 11/21/02 | $10,300.00 | |
| | | | | |
| **Total Tenant Improvements** | | | | $3,151,986.54 |

**COMMISSIONS**

| | | | | |
|---|---|---|---|---|
| **Department of Mental Health, 1st and 5th floors** | | | | |
| Staubach | 7114-1860-25101 | 09/04/02 | $221,776.00 | |
| | | | | |
| **Department of Transportation, 1st and Basement** | | | | |
| MTD Real Estate Services | 100089 | 11/01/02 | $430,039.08 | |
| | | | | |
| **Total Commissions** | | | | 651,815.08 |
| | | | | |
| **Total Request** | | | | 3,803,801.62 |

*Deposit Account Status*
*Beginning Deposit Balance* — 6,505,192.83
*Current Draw* — (3,803,801.62)
*Ending Deposit Balance* — 2,701,391.21

MORGAN STANLEY
CONFIDENTIAL

MS 01133

Exhibit 209     411-0002

*Cayre Jemal's Peoples LLC*

| | | | James G. Davis Construction |
|---|---|---|---|
| DATE | INVOICE NO | DESCRIPTION | INVOICE AMOUNT |
| 12-09-02 | 61-2040-2B 77 P ST | 080-00-17300 | 66125.00 |

| | | | |
|---|---|---|---|
| CHECK DATE | 4-09-03 | CHECK NUMBER | 3024 |

TOTAL > 661 25.00

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

*Cayre Jemal's Peoples LLC*

C/O Douglas Development Corp
702 H Street, NW Suite 400
Washington, DC 20001
202-638-6300

HSBC Bank USA

DATE
April 9, 2003

CHECK NO.
3024

1-108
210

AMOUNT
$*****66,125.00

Accounting Copy

** VOID * VOID * VOID **

**** NOT NEGOTIABLE ****

Pay: *********Sixty-six thousand one hundred twenty-five dollars and no cents

PAY
TO THE
ORDER OF

James G. Davis Construction
12500 Parklawn Drive
Rockville, MD 20852

Exhibit 210

| JAMES G DAVIS CONSTRUCTION CORP |
|---|

77 P STREET - DEPT OF HUMAN SERVICES - 6TH FLOOR - OWNER ITEMS
52,900sf @ 5.00/sf
080-01-003

| | | |
|---|---|---:|
| Original Contract Amount | $ | 264,500.00 |
| Change Orders | | 0.00 |
| Total Contract | | 264,500.00 |

Payment History:

| Check# | Invoice # | DATE | Amount |
|---|---|---|---|
| WIRE | S030711B | Oct-02 | (198,375.00) |
| 3024 | S0307-75B | 4/9/2003 | (66,125.00) |

| | | |
|---|---|---:|
| Total | | (264,500.00) |
| | | |
| Balance Remaining | | 0.00 |

4/9/03

# APPLICATION AND CERTIFICATE FOR PAYMENT

INVOICE # S0307-75B

JOB # 61-2040

AIA DOCUMENT G702    (Instructions on reverse)

PAGE ONE OF THREE PAGES

TO:
Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

PROJECT: 6th Floor- Owner Furnished Items
77 "P" Street NE
Washington DC

APPLICATION NO: TWO

PERIOD TO: 9-Dec-02

Distribution to:

X  ARCHITECT (1) copy
X  CONTRACTOR
X  OWNER (5) copies

FROM: JAMES G. DAVIS CONST. CORPORATION    VIA (ARCHITECT):
12500 Parklawn Drive
Rockville, Maryland 20852

PROJECT NO: 61-2040
CONTRACT DATE: 1-Oct-02

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | | |
| | $0.00 | |
| | | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | $0.00 | |

1. ORIGINAL CONTRACT SUM                                         $  264,500
2. Net change by Change Orders                                    $
3. CONTRACT SUM TO DATE(Line 1+2)                                 $  264,500
4. TOTAL COMPLETED & STORED TO DATE                               $  264,500
   (Column G on G703)
5. RETAINAGE:
   a. 10% of Completed Work              $            0
      (Column D + E on G703)
   b. 10% of Stored Material             $            0
      (Column F on G703)
   Total Retainage (Line 5a + 5b or
   Total in Column I on G703)
6. TOTAL EARNED LESS RETAINAGE                                    $  264,500
   (Line 4 less Line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR                                 $  198,375
   PAYMENT (Line 6 from prior Certificate)
8. CURRENT PAYMENT DUE                                            $  66,125
9. BALANCE TO FINISH, PLUS RETAINAGE                              $
   (Line 3 less line 6)

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been
paid by the Contractor for Work for which previous Certificates for Payment were
issued and payments received from the Owner, and that current payment shown
herein is now due.

CONTRACTOR:    JAMES G. DAVIS CONSTRUCTION CORPORATION
               Dominic Machion, Assistant Project Manager

By: _____    Date: December 09, 2002

DOUGLAS DEVELOPMENT

PROOF OF WK JOB #  080-01 - 003
DATE APPROVED 6th   04-01-09
WORK TOTAL   66,125 00
DATE         INIT.
AMT

State of: VA
County of:
Subscribed and sworn to before me this ___ ODF APPROVED 6th 9 day of December 2002
Notary Public:
My Commission expires:

AMOUNT CERTIFIED                                                  $
(Attach explanation if amount certified differs from amount applied for.)
ARCHITECT:

By: _____    Date: _____

This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the
Contractor named herein. Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the
data comprising the above application, the Architect certifies to the Owner that to the
best of the Architect's knowledge, information and belief the Work has progressed as
indicated, the quality of the Work is in accordance with the Contract Documents, and
the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**SUMMARY SHEET, TOTAL**  *AIA DOCUMENT G703*  (Instructions on reverse)    PAGE TWO OF TWO PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: TEO
APPLICATION DATE: 9-Dec-02
PERIOD TO: 9-Dec-02
DAVIS PROJECT NO: 61-2040

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 09250 | Tricon- Perimeter Drywall | $16,200 | $16,200 | $0 | $0 | $16,200 | 100% | $0 | $0 |
| 09250 | Tricon- Interior Corridor | $19,800 | $19,800 | | $0 | $19,800 | 100% | $0 | $0 |
| 12,500 | All Blinds Inc. | $3,500 | $0 | $3,500 | $0 | $3,500 | 100% | $0 | $0 |
| 08800 | Herson Glass | $1,200 | $1,200 | $0 | $0 | $1,200 | 100% | $0 | $0 |
| 15300 | Fire Watch- Interior Corridor | $3,950 | $3,950 | $0 | $0 | $3,950 | 100% | $0 | $0 |
| 16000 | Natelco- VAV Power | $2,899 | $2,725 | $174 | $0 | $2,899 | 100% | $0 | $0 |
| 16000 | Natelco- Interior Corridor | $11,951 | $11,951 | $0 | $0 | $11,951 | 100% | $0 | $0 |
| 15,000 | American Mechanical Services | $180,000 | $133,000 | $47,000 | $0 | $180,000 | 100% | $0 | $0 |
| | General Conditions | $10,000 | $4,000 | $6,000 | $0 | $10,000 | 100% | $0 | $0 |
| | Fee | $15,000 | $5,549 | $9,451 | $0 | $15,000 | 100% | $0 | $0 |
| | **SUBTOTAL** | $264,500 | $198,375 | $66,125 | $0 | $264,500 | 100% | $0 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# APPLICATION AND CERTIFICATE FOR PAYMENT

AIA DOCUMENT G702

JOB # 61-2040

PAGE ONE OF THREE PAGES

INVOICE # S0307-11B

**TO :** Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

**PROJECT:** 6th Floor- Owner Furnished Items
77 "P" Street NE
Washington DC

**FROM :** JAMES G. DAVIS CONST. CORPORATION    VIA (ARCHITECT) :
12500 Parklawn Drive
Rockville, Maryland 20852

| | |
|---|---|
| APPLICATION NO: | ONE |
| PERIOD TO: | 20-Nov-02 |
| PROJECT NO: | 61-2040 |
| CONTRACT DATE: | 1-Oct-02 |

Distribution to:
x ARCHITECT (1) copy
x CONTRACTOR
x OWNER (5) copies

## CONTRACTOR'S APPLICATION FOR PAYMENT

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | | |
| | $0.00 | |
| | | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | $0.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:    JAMES G. DAVIS CONSTRUCTION CORPORATION

Kevin Clark,  Project Manager

By: _____    Date: November 20, 2002

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | | $ 264,500 |
| 2. Net change by Change Orders | | $ 0 |
| 3. CONTRACT SUM TO DATE(Line 1+2) | | $ 264,500 |
| 4. TOTAL COMPLETED & STORED TO DATE | | $ 198,375 |
| (Column G on G703) | | |
| 5. RETAINAGE: | | |
| a. 10% of Completed Work | $ 0 | |
| (Column D + E on G703) | | |
| b. 10% of Stored Material | $ 0 | |
| (Column F on G703) | | |
| Total Retainage (Line 5a + 5b or | | |
| Total in Column I og G703) | | |
| 6. TOTAL EARNED LESS RETAINAGE | | $ 198,37 |
| (Line 4 less Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR | | |
| PAYMENT (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE | | $ 198,37 |
| 9. BALANCE TO FINISH, PLUS RETAINAGE | | $ 66,12 |
| (Line 3 less Line 6) | | |

State of:  VA    County of:  FAIRFAX

Subscribed and sworn to before me this    20th    day of November 2002

Notary Public:  _____

My Commission expires:  6/30/06

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ............................ $ _____

(Attach explanation if amount certified differs from amount applied for.)
ARCHITECT:

By: _____    Date: _____

This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the Contractor named herein.  Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT- MAY 1983 EDITION - AIA - 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

# SUMMARY SHEET, TOTAL

*AIA DOCUMENT G703*   (Instructions on reverse)

PAGE TWO OF TWO PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: ONE
APPLICATION DATE: 20-Nov-02
PERIOD TO: 20-Nov-02
DAVIS PROJECT NO: 61-2040

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D-E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 09250 | Tricon- Perimeter Drywall | $16,200 | $0 | $16,200 | $0 | $16,200 | 100% | $0 | $0 |
| 09250 | Tricon- Interior Corridor | $19,800 | $0 | $19,800 | $0 | $19,800 | 100% | $0 | $0 |
| 12,500 | All Blinds Inc. | $3,500 | $0 | | $0 | $0 | 0% | $3,500 | $0 |
| 08800 | Herson Glass | $1,200 | $0 | $1,200 | $0 | $1,200 | 100% | $0 | $0 |
| 15300 | Fire Watch- Interior Corridor | $3,950 | $0 | $3,950 | $0 | $3,950 | 100% | $0 | $0 |
| 16000 | Natelco- VAV Power | $2,899 | $0 | $2,725 | $0 | $2,725 | 94% | $174 | $0 |
| 16000 | Natelco- Interior Corridor | $11,951 | $0 | $11,951 | $0 | $11,951 | 100% | $0 | $0 |
| 15,000 | American Mechanical Services | $180,000 | $0 | $133,000 | $0 | $133,000 | 74% | $47,000 | $0 |
| | General Conditions | $10,000 | $0 | $4,000 | $0 | $4,000 | 40% | $6,000 | $0 |
| | Fee | $15,000 | $0 | $5,549 | $0 | $5,549 | 37% | $9,451 | $0 |
| | SUBTOTAL | $264,500 | $0 | $198,375 | $0 | $198,375 | 75% | $66,125 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YOUK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

*Cayre Jemal's Peoples LLC*

James G. Davis Construction

| CHECK DATE | INVOICE NO | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|
| 12-09-02 | 61-2040-2C 77 P ST | 080-00-17300 | 909600.00 |

| CHECK DATE | CHECK NUMBER | | |
|---|---|---|---|
| 4-09-03 | 3025 | TOTAL > | 909600.00 |

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

*Cayre Jemal's Peoples LLC*

C/O Douglas Development Corp
702 H Street, NW Suite 400
Washington, DC 20001
202-638-6300

HSBC Bank USA

1-108
210

DATE          CHECK NO.
April 9, 2003      3025

AMOUNT
$*****909,600.00

Accounting Copy

** VOID * VOID * VOID **

**** NOT NEGOTIABLE ****

Pay: *************Nine hundred nine thousand six hundred dollars and no cents

PAY TO THE ORDER OF

James G. Davis Construction
12500 Parklawn Drive
Rockville, MD 20852

| JAMES G DAVIS CONSTRUCTION CORP |
|---|

77 P STREET - DEPT OF MENTAL HEALTH 5TH FL  - TENANT CONSTRUCTION
37,900sf @ 32.00/sf
080-01-003

| | | |
|---|---|---|
| Original Contract Amount | $ | 1,212,800.00 |
| Change Orders | | 0.00 |
| Total Contract | | 1,212,800.00 |

Payment History:

| Check# | Invoice # | DATE | Amount |
|---|---|---|---|
| WIRE | S030711C | Oct-02 | (303,200.00) |
| 3025 | S0307-75C | 4/9/2003 | (909,600.00) |

| | | |
|---|---|---|
| Total | | (1,212,800.00) |
| Balance Remaining | | 0.00 |

JOB # 61-2040

PAGE ONE OF THREE PAGES

# APPLICATION AND CERTIFICATE FOR PAYMENT

INVOICE  # S0307-75 C

AIA DOCUMENT G702

Distribution to:

X  ARCHITECT (1) copy
X  CONTRACTOR
X  OWNER (5) copies

TO :  Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

PROJECT: DOH 5th Floor- Tenant Construction
77 "P" Street NE
Washington DC

APPLICATION NO:  TWO

PERIOD TO:  9-Dec-02

FROM :  JAMES G. DAVIS CONST. CORPORATION
12500 Parklawn Drive
Rockville, Maryland 20852

VIA (ARCHITECT) :  Hickok Warner Fox
1023 31st Street, NW
Washington, DC 20007

PROJECT NO:  61-2040
CONTRACT DATE:  1-Oct-01

CONTRACT FOR: 3rd Floor Tenant Construction

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | | |
| | $0.00 | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | | $0.00 |

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 1,212,800 |
| 2. Net change by Change Orders | $ | 1,212,800 |
| 3. CONTRACT SUM TO DATE(Line 1+2) | $ | 1,212,800 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 1,212,800 |
| 5. RETAINAGE: | | |
| a. 10% of Completed Work (Column D + E on G703) | $ | 0 |
| b. 10% of Stored Material (Column F on G703) | $ | 0 |
| Total Retainage (Line 5a + 5b or Total in Column I log G703) | | |
| 6. TOTAL EARNED LESS RETAINAGE (Line 4 less Line 5 Total) | $ | 1,212,800 |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior Certificate) | $ | 303,200 |
| 8. CURRENT PAYMENT DUE | $ | 909,600 |
| 9. BALANCE TO FINISH, PLUS RETAINAGE (Line 3 less Line 6) | $ | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been
paid by the Contractor for Work for which previous Certificates for Payment were
issued and payments received from the Owner, and that current payment shown
herein is now due.

CONTRACTOR:  JAMES G. DAVIS CONSTRUCTION CORPORATION
Dominic Machion, Assistant Project Manager
By: _____  Date: December 09th, 2002

State of:  VA  County of: _____
Subscribed and sworn to before me this _____ day _____
Notary Public: _____
My Commission expires: _____

DOUGLAS DEVELOPMENT

080-01-003

909,600 00

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the
data comprising the above application, the Architect certifies to the Owner that to the
best of the Architect's knowledge, information and belief the Work has progressed as
indicated, the quality of the Work is in accordance with the Contract Documents, and
the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ............................ $
(Attach explanation if amount certified differs from amount applied for.)
ARCHITECT:

By: _____  Date: _____
This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the
Contractor named herein.  Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA -1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

# SUMMARY SHEET, TOTAL

AIA DOCUMENT G703    (Instructions on reverse)

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

PAGE TWO OF TWO PAGES

APPLICATION NO: ONE
APPLICATION DATE: 20-Nov-02
PERIOD TO: 20-Nov-02
DAVIS PROJECT NO: 61-2040

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETE | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D + E + F) | % (G / C) | BALANCE TO FINISH (C–G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 01700 | Final Cleaning | $15,050 | $0 | $15,050 | $0 | $15,050 | 100% | | $0 |
| 01712 | Dumpsters | $11,250 | $5,625 | $5,625 | $0 | $11,250 | 100% | | $0 |
| 03300 | Concrete | $14,000 | $14,000 | $0 | $0 | $14,000 | 100% | | $0 |
| 06001 | Rough Carpentry | $35,000 | $35,000 | $0 | $0 | $35,000 | 100% | | $0 |
| 06400 | Millwork | $22,000 | $14,200 | $7,800 | $0 | $22,000 | 100% | | $0 |
| 08110 | Doors/Frames/Hardware | $75,000 | $0 | $75,000 | $0 | $75,000 | 100% | | $0 |
| 08114 | Doors/Frames/Hardware-installation | $10,000 | $0 | $10,000 | $0 | $10,000 | 100% | | $0 |
| 08800 | Glass & Glazing | $5,000 | $0 | $5,000 | $0 | $5,000 | 100% | | $0 |
| 09250 | Drywall | $220,000 | $89,200 | $130,800 | $0 | $220,000 | 100% | | $0 |
| 09250 | Ceiling Removal & Replacement | $5,000 | $0 | $5,000 | $0 | $5,000 | 100% | | $0 |
| 09680 | Carpet/VCT | $170,000 | $0 | $170,000 | $0 | $170,000 | 100% | | $0 |
| 09900 | Painting/Wall Covering | $50,000 | $0 | $50,000 | $0 | $50,000 | 100% | | $0 |
| 15000 | Mechanical/HVAC/ Plumbing | $165,000 | $18,000 | $147,000 | $0 | $165,000 | 100% | | $0 |
| 15300 | Fire Protection | $46,500 | $12,000 | $34,500 | $0 | $46,500 | 100% | | $0 |
| 16000 | Electrical | $255,000 | $85,000 | $170,000 | $0 | $255,000 | 100% | | $0 |
| | Overtime Allowance | $30,000 | $9,175 | $20,825 | $0 | $30,000 | 100% | | $0 |
| | General Conditions | $42,000 | $10,500 | $31,500 | $0 | $42,000 | 100% | | $0 |
| | Fee | $42,000 | $10,500 | $31,500 | $0 | $42,000 | 100% | | $0 |
| | **SUBTOTAL** | $1,212,800 | $303,200 | $909,600 | $0 | $1,212,800 | 100% | | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# APPLICATION AND CERTIFICATE FOR PAYMENT

AIA DOCUMENT G702

INVOICE # S0307-11 ©

JOB # 61-2040

PAGE ONE OF THREE PAGES

Distribution to:
- X ARCHITECT (1) copy
- X CONTRACTOR
- X OWNER (5) copies

**TO:**
Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

**PROJECT:** DOH 5th Floor- Tenant Construction
77 "P" Street NE
Washington DC

**APPLICATION NO:** ONE

**PERIOD TO:** 20-Nov-02

**FROM:** JAMES G. DAVIS CONST. CORPORATION
12500 Parklawn Drive
Rockville, Maryland 20852

**VIA (ARCHITECT):** Hickok Warner Fox
1023 31st Street, NW
Washington, DC 20007

**PROJECT NO:** 61-2040
**CONTRACT DATE:** 1-Oct-01

**CONTRACT FOR:** 3rd Floor Tenant Construction

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | | |
|---|---|---|---|
| 1. ORIGINAL CONTRACT SUM | | $ | 1,212,856 |
| 2. Net change by Change Orders | | $ | |
| 3. CONTRACT SUM TO DATE(Line 1+2) | | $ | 1,212,856 |
| 4. TOTAL COMPLETED & STORED TO DATE | | $ | 303,200 |
| (Column G on G703) | | | |
| 5. RETAINAGE: | | | |
| a. 10% of Completed Work | $ | 0 | |
| (Column D + E on G703) | | | |
| b. 10% of Stored Material | $ | 0 | |
| (Column F on G703) | | | |
| Total Retainage (Line 5a + 5b or | | | |
| Total in Column I og G703) | | | |
| 6. TOTAL EARNED LESS RETAINAGE | | $ | 303,200 |
| (Line 4 less Line 5 Total) | | | |
| 7. LESS PREVIOUS CERTIFICATES FOR | | | |
| PAYMENT (Line 6 from prior Certificate) | | $ | 303,200 |
| 8. CURRENT PAYMENT DUE | | $ | |
| 9. BALANCE TO FINISH, PLUS RETAINAGE | | $ | 909,656 |
| (Line 3 less Line 6) | | | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | | |
| | $0.00 | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | $0.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: JAMES G. DAVIS CONSTRUCTION CORPORATION

Kevin Clark, Project Manager

By: Date: November 20th, 2002

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

State of: Maryland  County of: Montgomery County
Subscribed and sworn to before me this  20th  day of November 2002
Notary Public:
My Commission expires:

FRANK FOX
6/30/06

AMOUNT CERTIFIED ......................................... $
*(Attach explanation if amount certified differs from amount applied for.)*
ARCHITECT:

By: Date:

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA - 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

# SUMMARY SHEET, TOTAL

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

*AIA DOCUMENT G703* (Instructions on reverse)

PAGE TWO OF TWO PAGES
APPLICATION NO: ONE
APPLICATION DATE: 20-Nov-02
PERIOD TO: 20-Nov-02
DAVIS PROJECT NO: 61-2040

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 01700 | Final Cleaning | $15,050 | $0 | | $0 | $0 | 0% | $15,050 | $0 |
| 01712 | Dumpsters | $11,250 | $0 | $5,625 | $0 | $5,625 | 100% | $5,625 | $0 |
| 03300 | Concrete | $14,000 | $0 | $14,000 | $0 | $14,000 | 100% | $0 | $0 |
| 06001 | Rough Carpentry | $35,000 | $0 | $35,000 | $0 | $35,000 | 100% | $0 | $0 |
| 06400 | Millwork | $22,000 | $0 | $14,200 | $0 | $14,200 | 65% | $7,800 | $0 |
| 08110 | Doors/Frames/Hardware | $75,000 | $0 | $0 | $0 | $0 | 0% | $75,000 | $0 |
| 08114 | Doors/Frames/Hardware-installation | $10,000 | $0 | $0 | $0 | $0 | 0% | $10,000 | $0 |
| 08800 | Glass & Glazing | $5,000 | $0 | $0 | $0 | $0 | 0% | $5,000 | $0 |
| 09250 | Drywall | $220,000 | $0 | $89,200 | $0 | $89,200 | 41% | $130,800 | $0 |
| 09250 | Ceiling Removal & Replacement | $5,000 | $0 | $0 | $0 | $0 | 0% | $5,000 | $0 |
| 09680 | Carpet/VCT | $170,000 | $0 | $0 | $0 | $0 | 0% | $170,000 | $0 |
| 09900 | Painting/Wall Covering | $50,000 | $0 | $0 | $0 | $0 | 0% | $50,000 | $0 |
| 15000 | Mechanical/HVAC/ Plumbing | $165,000 | $0 | $18,000 | $0 | $18,000 | 11% | $147,000 | $0 |
| 15300 | Fire Protection | $46,500 | $0 | $12,000 | $0 | $12,000 | 26% | $34,500 | $0 |
| 16000 | Electrical | $255,000 | $0 | $85,000 | $0 | $85,000 | 33% | $170,000 | $0 |
| | Overtime Allowance | $30,000 | $0 | $9,175 | $0 | $9,175 | 31% | $20,825 | $0 |
| | General Conditions | $42,000 | $0 | $10,500 | $0 | $10,500 | 25% | $31,500 | $0 |
| | Fee | $42,000 | $0 | $10,500 | $0 | $10,500 | 25% | $31,500 | $0 |
| | SUBTOTAL | $1,212,800 | $0 | $303,200 | $0 | $303,200 | 25% | $909,600 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YOUK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

James G. Davis Construction

**Cayre Jemal's Peoples LLC**

| CHECK DATE | INVOICE NO | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|
| 12-09-02 | 61-2040-2F 77 P ST | 080-00-17300 | 76000.00 |
| | | TOTAL > | 76000.00 |

| CHECK DATE | CHECK NUMBER |
|---|---|
| 4-09-03 | 3026 |

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

HSBC Bank USA

**Cayre Jemal's Peoples LLC**
C/O Douglas Development Corp
702 H Street, NW Suite 400
Washington, DC 20001
202-638-6300

DATE
April 9, 2003

CHECK NO.
3026

1-108
210

AMOUNT
$*****76,000.00

Accounting Copy

** VOID * VOID * VOID **

**** NOT NEGOTIABLE ****

Pay: ****************************Seventy-six thousand dollars and no cents

PAY
TO THE
ORDER OF
James G. Davis Construction
12500 Parklawn Drive
Rockville, MD 20852

| JAMES G DAVIS CONSTRUCTION CORP |
|---|

77 P STREET - DEPT OF ~~MENTAL~~ HEALTH 1ST FL - OWNER ITEMS
9500 sf @ $10.00/SF
080-01-004

| | | | |
|---|---|---|---|
| Original Contract Amount | | $ | **95,000.00** |
| Change Orders | | | **0.00** |
| Total Contract | | | **95,000.00** |

Payment History:

| Check# | Invoice # | DATE | Amount |
|---|---|---|---|
| WIRE | S030711F | Oct-02 | (19,000.00) |
| 3026 | S0307-75F | 4/9/2003 | (76,000.00) |

| Total | | (95,000.00) |
|---|---|---|

| Balance Remaining | 0.00 |
|---|---|

# APPLICATION AND CERTIFICATE FOR PAYMENT

INVOICE  # S0307-75F   (Instructions on reverse)

AIA DOCUMENT G702

JOB # 61-2040

PAGE ONE OF THREE PAGES

| TO: | Douglas Development Corporation<br>702 "H" Street, NW<br>Washington DC 20001<br>Paul Millstein | PROJECT: 1st DOH Floor- Owner Furnished Items<br>77 "P" Street NE<br>Washington DC | APPLICATION NO: | TWO |
|---|---|---|---|---|

PERIOD TO:     9-Dec-02

| FROM : | JAMES G. DAVIS CONST. CORPORATION       VIA (ARCHITECT) :<br>12500 Parklawn Drive<br>Rockville, Maryland 20852 |
|---|---|

PROJECT NO:     61-2040

CONTRACT DATE:     20-Nov-02

Distribution to:

X   ARCHITECT (1) copy
X   CONTRACTOR
X   OWNER (5) copies

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

### CHANGE ORDER SUMMARY

| | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in<br>previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | $0.00 | |
| | | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | $0.00 | |

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 95,000 |
| 2. Net change by Change Orders | $ | |
| 3. CONTRACT SUM TO DATE(Line 1+2) | $ | 95,000 |
| 4. TOTAL COMPLETED & STORED TO DATE | $ | 95,000 |
| (Column G on G703) | | |
| 5. RETAINAGE: | | |
| a. 10% of Completed Work | $               0 | |
| (Column D + E on G703) | | |
| b. 10% of Stored Material | $               0 | |
| (Column F on G703) | | |
| Total Retainage (Line 5a + 5b or | | |
| Total in Column I og G703) | | |
| 6. TOTAL EARNED LESS RETAINAGE | $ | 95,000 |
| (Line 4 less Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR | $ | 19,000 |
| PAYMENT (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE | $ | 76,000 |
| 9. BALANCE TO FINISH, PLUS RETAINAGE | $ | |
| (Line 3 less Line 6) | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been
paid by the Contractor for Work for which previous Certificates of Payment were
issued and payments received from the Owner, and that current payment shown
herein is now due.

CONTRACTOR:     JAMES G. DAVIS CONSTRUCTION CORPORATION
Dominic Machion, Assistant Project Manager

By:  _____     Date: December 09, 2002

State of:  _VA_     County of  _Arlington_

Subscribed and sworn to before me this  ___  09th  ___

Notary Public:  _____

My Commission expires:  _____

080-01-004

04-01-004      PF

76,000

DATE        AMT        INIT.

APPROVED

CODE APPROVED

ENTERED BY

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the
data comprising the above application, the Architect certifies to the Owner that to the
best of the Architect's knowledge, information and belief the Work has progressed as
indicated, the quality of the Work is in accordance with the Contract Documents, and
the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ..........................................  $
(Attach explanation if amount certified differs from amount applied for.)
ARCHITECT:

By:  _____     Date:  _____

This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the
Contractor named herein.  Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

DOUGLAS DEVELOPMENT

$/9176000

4/04/02

#3026

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA-1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

## SUMMARY SHEET, TOTAL — AIA DOCUMENT G703

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

(Instructions on reverse)

PAGE TWO OF TWO PAGES

APPLICATION NO: TWO
APPLICATION DATE: 9-Dec-02
PERIOD TO: 9-Dec-02
DAVIS PROJECT NO: 61-2040

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 09250 | Tricon- Perimeter Drywall | $12,000 | $6,500 | $5,500 | $0 | $12,000 | 100% | $0 | $0 |
| 12,500 | All Blinds Inc. | $2,500 | $0 | $2,500 | $0 | $2,500 | 100% | $0 | $0 |
| 08800 | Herson Glass | $1,200 | $1,000 | $200 | $0 | $1,200 | 100% | $0 | $0 |
| 15300 | Fire Watch- Interior Corridor | $3,650 | $0 | $3,650 | $0 | $3,650 | 100% | $0 | $0 |
| 16000 | Natelco- VAV Power | $2,650 | $1,500 | $1,150 | $0 | $2,650 | 100% | $0 | $0 |
| 15,000 | American Mechanical Services | $65,000 | $10,000 | $55,000 | $0 | $65,000 | 100% | $0 | $0 |
| | General Conditions | $4,000 | $0 | $4,000 | $0 | $4,000 | 100% | $0 | $0 |
| | Fee | $4,000 | $0 | $4,000 | $0 | $4,000 | 100% | $0 | $0 |
| | SUBTOTAL | $95,000 | $19,000 | $76,000 | $0 | $95,000 | 100% | $0 | $0 |

AIA DOCUMENT G702- CONTINUATION SHEET • MAY 1983 EDITION • AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# APPLICATION AND CERTIFICATE FOR PAYMENT

INVOICE  # S0307-11  (Instructions on reverse)

AIA DOCUMENT G702

JOB # 61-2040

PAGE ONE OF THREE PAGES

TO :
Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

PROJECT: 1st DOH Floor- Owner Furnished Items
77 "P" Street NE
Washington DC

APPLICATION NO:   ONE

PERIOD TO:   20-Nov-02

Distribution to:
X   ARCHITECT (1) copy
X   CONTRACTOR
X   OWNER (5) copies

FROM :
JAMES G. DAVIS CONST. CORPORATION   VIA (ARCHITECT) :
12500 Parklawn Drive
Rockville, Maryland 20852

PROJECT NO:   61-2040
CONTRACT DATE:   20-Nov-02

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
| --- | --- | --- |
| Change Orders approved in | $0 | $0 |
| previous months by Owner | $0 | $0 |
| TOTAL | | |
| Approved this month | | |
| Number | | |
| | | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | $0.00 | |

| | |
| --- | --- |
| 1. ORIGINAL CONTRACT SUM | $   95,000 |
| 2. Net change by Change Orders | $ |
| 3. CONTRACT SUM TO DATE(Line 1+2) | $   95,000 |
| 4. TOTAL COMPLETED & STORED TO DATE | $   19,000 |
|    (Column G on G703) | |
| 5. RETAINAGE: | |
|    a. 10% of Completed Work   $          0 | |
|       (Column D + E on G703) | |
|    b. 10% of Stored Material   $          0 | |
|       (Column F on G703) | |
|    Total Retainage (Line 5a + 5b or | |
|    Total in Column I og G703) | |
| 6. TOTAL EARNED LESS RETAINAGE | $   19,000 |
|    (Line 4 less Line 5 Total) | |
| 7. LESS PREVIOUS CERTIFICATES FOR | |
|    PAYMENT (Line 6 from prior Certificate) | $   19,000 |
| 8. CURRENT PAYMENT DUE | $   19,000 |
| 9. BALANCE TO FINISH, PLUS RETAINAGE | $   76,000 |
|    (Line 3 less Line 6) | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:   JAMES G. DAVIS CONSTRUCTION CORPORATION

By:   Kevin Clark, Project Manager   Date: November 20, 2002

State of:   VA   County of:   FAIRFAX
Subscribed and sworn to before me this   20th   day of November 2002
Notary Public:
My Commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

AMOUNT CERTIFIED ................................. $
(Attach explanation if amount certified differs from amount applied for.)
ARCHITECT:

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

By:   Date:
This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the Contractor named herein.  Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA- 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**SUMMARY SHEET, TOTAL**    AIA DOCUMENT G703    (Instructions on reverse)    PAGE TWO OF TWO PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: ONE
APPLICATION DATE: 20-Nov-02
PERIOD TO: 20-Nov-02
DAVIS PROJECT NO: 61-2040

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 09250 | Tricon· Perimeter Drywall | $12,000 | $0 | $6,500 | $0 | $6,500 | 100% | $5,500 | $0 |
| 12,500 | All Blinds Inc. | $2,500 | $0 | $0 | $0 | $0 | 0% | $2,500 | $0 |
| 08800 | Herson Glass | $1,200 | $0 | $1,000 | $0 | $1,000 | 83% | $200 | $0 |
| 15300 | Fire Watch· Interior Corridor | $3,650 | $0 | $0 | $0 | $0 | 0% | $3,650 | $0 |
| 16000 | Natelco· VAV Power | $2,650 | $0 | $1,500 | $0 | $1,500 | 57% | $1,150 | $0 |
| 15,000 | American Mechanical Services | $65,000 | $0 | $10,000 | $0 | $10,000 | 15% | $55,000 | $0 |
| | General Conditions | $4,000 | $0 | $0 | $0 | $0 | 0% | $4,000 | $0 |
| | Fee | $4,000 | $0 | $0 | $0 | $0 | 0% | $4,000 | $0 |
| | SUBTOTAL | $95,000 | $0 | $19,000 | $0 | $19,000 | 20% | $76,000 | $0 |

AIA DOCUMENT G702 · CONTINUATION SHEET · MAY 1983 EDITION · AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

*Cayre Jemal's Peoples LLC*

James G. Davis Construction

| DATE | INVOICE NO | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|
| 12-09-02 | 61-2040-2H 77 P ST | 080-00-17300 | 225000.00 |

| CHECK DATE | 4-09-03 | CHECK NUMBER | 3027 | TOTAL > | 225000.00 |

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

*Cayre Jemal's Peoples LLC*
C/O Douglas Development Corp
702 H Street, NW Suite 400
Washington, DC 20001
202-638-6300

HSBC Bank USA

DATE
April 9, 2003

CHECK NO.
3027

Accounting Copy

** VOID * VOID * VOID **

**** NOT NEGOTIABLE ****

Pay: ***************Two hundred twenty-five thousand dollars and no cents

1-108
210

AMOUNT
$****225,000.00

PAY
TO THE
ORDER OF

James G. Davis Construction
12500 Parklawn Drive
Rockville, MD 20852

| JAMES G DAVIS CONSTRUCTION CORP |
|---|

77 P STREET - D.DOT 1ST FL - OWNER ITEMS
30,000 sf @ $10.00/SF
080-01-004

| | | |
|---|---|---|
| Original Contract Amount | $ | 300,000.00 |
| Change Orders | | 0.00 |
| Total Contract | | 300,000.00 |

Payment History:

| Check# | Invoice # | DATE | Amount |
|---|---|---|---|
| WIRE | S030711H | Oct-02 | (75,000.00) |
| 3027 | S0307,75H | 4/9/2003 | (225,000.00) |

| | | |
|---|---|---|
| Total | | (300,000.00) |
| Balance Remaining | | 0.00 |

4/9/03

# APPLICATION AND CERTIFICATE FOR PAYMENT

INVOICE  # S0307-75H

AIA DOCUMENT G702    (Instructions on reverse)

JOB # 61-2040

PAGE ONE OF THREE PAGES

TO:
Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

PROJECT: 1st D.DOT Floor- Owner Furnished Items
77 "P" Street NE
Washington DC

APPLICATION NO:    TWO

PERIOD TO:    9-Dec-02

Distribution to:

X  ARCHITECT (1) copy
X  CONTRACTOR
X  OWNER (5) copies

FROM :
JAMES G. DAVIS CONST. CORPORATION    VIA (ARCHITECT) :
12500 Parklawn Drive
Rockville, Maryland 20852

PROJECT NO:    61-2040
CONTRACT DATE:    20-Nov-02

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $0 | $0 |
| TOTAL | | $0 |
| Approved this month | | |
| Number | | |
| | | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | $0.00 | |

$0.00

1. ORIGINAL CONTRACT SUM                                      $ 300,000
2. Net change by Change Orders                               $
3. CONTRACT SUM TO DATE(Line 1+2)                            $ 300,000
4. TOTAL COMPLETED & STORED TO DATE                          $ 300,000
   (Column G on G703)
5. RETAINAGE:
   a. 10% of Completed Work           $         0
      (Column D + E on G703)
   b. 10% of Stored Material          $         0
      (Column F on G703)
   Total Retainage (Line 5a + 5b or
   Total in Column I on G703)
6. TOTAL EARNED LESS RETAINAGE                               $ 300,000
   (Line 4 less Line 5 Total)
7. LESS PREVIOUS CERTIFICATES FOR                            $ 75,000
   PAYMENT (Line 6 from prior Certificate)
8. CURRENT PAYMENT DUE                                       $ 225,000
9. BALANCE TO FINISH, PLUS RETAINAGE
   (Line 3 less Line 6)

State of:  VA    County of
Subscribed and sworn to before me this
Notary Public:
My Commission expires:

DOUGLAS DEVELOPMENT
PROJECT DEV. JOB #  080-01-008
G.L. CODE  04-01-00
INVOICE TOTAL  225,500
DATE  AMT
APPROVED
CODE APPROVED    check number  2000
ENTERED BY

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been
paid by the Contractor for Work for which previous Certificates for Payment were
issued and payments received from the Owner, and that current payment shown
herein is now due.

CONTRACTOR:    JAMES G. DAVIS CONSTRUCTION CORPORATION
               Dominic Machion, Assistant Project Manager
BY:                              Date: December 09, 2002

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the
data comprising the above application, the Architect certifies to the Owner that to the
best of the Architect's knowledge, information and belief the Work has progressed as
indicated, the quality of the Work is in accordance with the Contract Documents, and
the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED .........................................
(Attach explanation if amount certified differs from amount applied for.
ARCHITECT:

By:                                        Date:
This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the
Contractor named herein.  Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA - 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

**SUMMARY SHEET, TOTAL**　　AIA DOCUMENT G703　　(Instructions on reverse)　　PAGE TWO OF TWO PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

APPLICATION NO: TWO
APPLICATION DATE: 9-Dec-02
PERIOD TO: 9-Dec-02
DAVIS PROJECT NO: 61-2040

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | WORK COMPLETE THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D + E + F) | % (G / C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| 09250 | Tricon· Perimete· Drywall | $18,000 | $12,000 | $6,000 | $0 | $18,000 | 100% | $0 | $0 |
| 12,500 | All Blinds Inc. | $2,500 | $0 | $2,500 | $0 | $2,500 | 100% | $0 | $0 |
| 08800 | Herson Glass | $1,200 | $1,000 | $200 | $0 | $1,200 | 100% | $0 | $0 |
| 15300 | Fire Watch· Interior Corridor | $3,650 | $0 | $3,650 | $0 | $3,650 | 100% | $0 | $0 |
| 16000 | Natelco· VAV Power | $2,650 | $1,500 | $1,150 | $0 | $2,650 | 100% | $0 | $0 |
| 15,000 | American Mechanical Services | $252,000 | $55,000 | $197,000 | $0 | $252,000 | 100% | $0 | $0 |
| | General Conditions | $10,000 | $3,000 | $7,000 | $0 | $10,000 | 100% | $0 | $0 |
| | Fee | $10,000 | $2,500 | $7,500 | $0 | $10,000 | 100% | $0 | $0 |
| | **SUBTOTAL** | $300,000 | $75,000 | $225,000 | $0 | $300,000 | 100% | $0 | $0 |

AIA DOCUMENT G702 · CONTINUATION SHEET · MAY 1983 EDITION · AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YOLK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# APPLICATION AND CERTIFICATE FOR PAYMENT

AIA DOCUMENT G702

JOB # 61-2040

PAGE ONE OF THREE PAGES

INVOICE # S0307-11H  (Instructions on reverse)

TO: Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

PROJECT: 1st D.DOT Floor- Owner Furnished Items
77 "P" Street NE
Washington DC

APPLICATION NO: ONE

PERIOD TO: 20-Nov-02

FROM: JAMES G. DAVIS CONST. CORPORATION
12500 Parklawn Drive
Rockville, Maryland 20852

VIA (ARCHITECT):

PROJECT NO: 61-2040
CONTRACT DATE: 20-Nov-02

Distribution to:
X ARCHITECT (1) copy
X CONTRACTOR
X OWNER (5) copies

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 300,000 |
| 2. Net change by Change Orders | $ | 300,000 |
| 3. CONTRACT SUM TO DATE(Line 1+2) | $ | 300,000 |
| 4. TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ | 75,000 |
| 5. RETAINAGE: | | |
| a. 10% of Completed Work (Column D + E on G703) $ 0 | | |
| b. 10% of Stored Material (Column F on G703) $ 0 | | |
| Total Retainage (Line 5a + 5b or Total in Column I og G703) | $ | 0 |
| 6. TOTAL EARNED LESS RETAINAGE (Line 4 less Line 5 Total) | $ | 75,000 |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE | $ | 75,000 |
| 9. BALANCE TO FINISH, PLUS RETAINAGE (Line 3 less Line 6) | $ | 225,000 |

### CHANGE ORDER SUMMARY

| | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | | |
| | $0.00 | |
| TOTALS | $0.00 | $0.00 |
| Net change by Change Orders | $0.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: JAMES G. DAVIS CONSTRUCTION CORPORATION

Kevin Clark,  Project Manager

By: _____  Date: November 20, 2002

State of: VA    County of: FAIRFAX

Subscribed and sworn to before me this   20th   day of November 2002

Notary Public: _____

My Commission expires:   6/30/06

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ............................. $ _____
(Attach explanation if amount certified differs from amount applied for.)
ARCHITECT:

By: _____    Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA- 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

# SUMMARY SHEET, TOTAL

*AIA DOCUMENT G703*    (Instructions on reverse)

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

PAGE TWO OF TWO PAGES

APPLICATION NO: ONE
APPLICATION DATE: 20-Nov-02
PERIOD TO: 20-Nov-02
DAVIS PROJECT NO: 61-2040

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETE | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D + E + F) | % (G / C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| 09250 | Tricon- Perimeter Drywall | $18,000 | $0 | $12,000 | $0 | $12,000 | 100% | $6,000 | $0 |
| 12,500 | All Blinds Inc. | $2,500 | $0 | $0 | $0 | $0 | 0% | $2,500 | $0 |
| 08800 | Herson Glass | $1,200 | $0 | $1,000 | $0 | $1,000 | 83% | $200 | $0 |
| 15300 | Fire Watch- Interior Corridor | $3,650 | $0 | $0 | $0 | $0 | 0% | $3,650 | $0 |
| 16000 | Natelco- VAV Power | $2,650 | $0 | $1,500 | $0 | $1,500 | 57% | $1,150 | $0 |
| 15,000 | American Mechanical Services | $252,000 | $0 | $55,000 | $0 | $55,000 | 22% | $197,000 | $0 |
| | General Conditions | $10,000 | $0 | $3,000 | $0 | $3,000 | 30% | $7,000 | $0 |
| | Fee | $10,000 | $0 | $2,500 | $0 | $2,500 | 25% | $7,500 | $0 |
| | SUBTOTAL | $300,000 | $0 | $75,000 | $0 | $75,000 | 25% | $225,000 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YOUK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

*Cayre Jemal's Peoples LLC*

James G. Davis Construction

| CHECK DATE | INVOICE NO | DESCRIPTION | | INVOICE AMOUNT |
|---|---|---|---|---|
| 2-28-03 | S0310-37 | 77 P ST (61-2040-4) | 080-00-17300 | 365428.00 |
| CHECK DATE | 7-21-03 | CHECK NUMBER | 3222 | TOTAL > | 365428.00 |

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

HSBC Bank USA

*Cayre Jemal's Peoples LLC*
C/O Douglas Development Corp
702 H Street, NW Suite 400 ·.
Washington, DC 20001
202-638-6300

| | DATE | CHECK NO. |
| | July 21, 2003 | 3222 |

Accounting Copy

1-108
210

AMOUNT
$****365,428.00

Pay: *****Three hundred sixty-five thousand four hundred twenty-eight dollars
*************************************************and no cents

** VOID * VOID * VOID **

PAY
TO THE
ORDER OF
James G. Davis Construction
12500 Parklawn Drive
Rockville, MD 20852

**** NOT NEGOTIABLE ****

# APPLICATION AND CERTIFICATE FOR PAYMENT

INVOICE # S0310-37

AIA DOCUMENT G702

PAGE ONE OF THREE PAGES

# 61-2051

**TO :**
Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

**PROJECT:** D.DOT 1st Floor- Tenant Construction
77 "P" Street NE
Washington DC

**APPLICATION NO:** FOUR

**PERIOD TO:** 28-Feb-03

Distribution to:
X ARCHITECT (1) copy
X CONTRACTOR
X OWNER (5) copies

**FROM :**
JAMES G. DAVIS CONST. CORPORATION
12500 Parklawn Drive
Rockville, Maryland 20852

**VIA (ARCHITECT) :** Hickok Warner Fox
1023 31st Street, NW
Washington, DC 20007

**PROJECT NO:** 61-2051
**CONTRACT DATE:** 1-Oct-01

**CONTRACT FOR:** 3rd Floor Tenant Construction

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

## CONTRACTOR'S APPLICATION FOR PAYMENT

| 1. ORIGINAL CONTRACT SUM | $ | 1,671,499 |
|---|---|---|
| 2. Net change by Change Orders | $ | 262,929 |
| 3. CONTRACT SUM TO DATE(Line 1+2) | $ | 1,934,428 |
| 4. TOTAL COMPLETED & STORED TO DATE | $ | 1,934,428 |

(Column G on G703)

5. RETAINAGE:
  a. 10% of Completed Work    $    0
     (Column D + E on G703)
  b. 10% of Stored Material
     (Column F on G703)
  Total Retainage (Line 5a + 5b or
  Total in Column I og G703)

| 6. TOTAL EARNED LESS RETAINAGE | $ | 1,934,428 |
|---|---|---|

(Line 4 less Line 5 Total)

| 7. LESS TENANT IMPROVEMENT ALLOWANCE | | 0 |
|---|---|---|
| 8. CURRENT PAYMENT DUE | $ | 1,569,000 |
| 9.BALANCE TO FINISH, PLUS RETAINAGE | $ | 365,428 |

(Line 3 less Line 6)

### CHANGE ORDER SUMMARY

| Number | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| 3, 05, 08, 10, 11, 12 | $223,126.00 | |
| #20, 21, 28 | $39,803.00 | |
| | | |
| TOTALS | $262,929.00 | $0.00 |
| Net change by Change Orders | $262,929.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been
paid by the Contractor for Work for which previous Certificates for Payment were
issued and payments received from the Owner, and that current payment shown
herein is now due.

**CONTRACTOR:** JAMES G. DAVIS CONSTRUCTION CORPORATION
Kevin Clark, Project Manager

By:                    Date: February 28, 2003

DOUGLAS DEVELOPMENT

APPLICATION FUNDING

Funded By DDC

AMOUNT APPROVED    10/31/2006

State of: Virginia    County of: Alexandria
Subscribed and sworn to before me this    28th    day of February 2003
Notary Public: Susan Peery
My commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the
data comprising the above application, the Architect certifies to the Owner that to the
best of the Architect's knowledge, information and belief the Work has progressed as
indicated, the quality of the Work is in accordance with the Contract Documents, and
the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ..................... $

(Attach explanation if amount certified differs from amount applied for.)

ARCHITECT:

By:                    Date:    7/16/03

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the
Contractor named herein. Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA-1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

# SUMMARY SHEET, TOTAL

AIA DOCUMENT G703 (Instructions on reverse)

PAGE TWO OF TWO PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: FOUR
APPLICATION DATE: 28-Feb-03
PERIOD TO: 28-Feb-03
DAVIS PROJECT NO: 61-2051

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETE FROM PREVIOUS APPLICATION (D-E) | WORK COMPLETE THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| 01700 | Final Cleaning | $15,050 | $0 | $15,050 | $0 | $15,050 | 100% | $0 | $0 |
| 01712 | Dumpsters | $11,250 | $0 | $11,250 | $0 | $11,250 | 100% | $0 | $0 |
| 03300 | Concrete repair | $14,000 | $0 | $14,000 | $0 | $14,000 | 100% | $0 | $0 |
| 02700 | Concrete cutting | $15,000 | $0 | $15,000 | $0 | $15,000 | 100% | $0 | $0 |
| | Structural Steel & Misc. Metals | $95,000 | $0 | $95,000 | $0 | $95,000 | 100% | $0 | $0 |
| 06001 | Rough Carpentry | $35,000 | $0 | $35,000 | $0 | $35,000 | 100% | $0 | $0 |
| 06400 | Millwork | $72,147 | $0 | $72,147 | $0 | $72,147 | 100% | $0 | $0 |
| 08110 | Doors/Frames/Hardware | $19,442 | $0 | $19,442 | $0 | $19,442 | 100% | $0 | $0 |
| 08114 | Doors/Frames/Hardware-installation | $6,500 | $0 | $6,500 | $0 | $6,500 | 100% | $0 | $0 |
| 08800 | Glass & Glazing | $28,900 | $0 | $28,900 | $0 | $28,900 | 100% | $0 | $0 |
| 09250 | Drywall | $151,500 | $0 | $151,500 | $0 | $151,500 | 100% | $0 | $0 |
| 09680 | Carpet/VCT | $145,211 | $0 | $145,211 | $0 | $145,211 | 100% | $0 | $0 |
| 09900 | Painting/Wall Covering | $44,600 | $0 | $44,600 | $0 | $44,600 | 100% | $0 | $0 |
| | Appliances | $5,000 | $0 | $5,000 | $0 | $5,000 | 100% | $0 | $0 |
| 15000 | Ductwork | $167,980 | $0 | $167,980 | $0 | $167,980 | 100% | $0 | $0 |
| | HVAC | $30,000 | $0 | $30,000 | $0 | $30,000 | 100% | $0 | $0 |
| 15000 | Plumbing | $16,972 | $0 | $16,972 | $0 | $16,972 | 100% | $0 | $0 |
| 15500 | Controls & VAV's | $150,603 | $0 | $150,603 | $0 | $150,603 | 100% | $0 | $0 |
| 15300 | Fire Protection | $44,837 | $0 | $44,837 | $0 | $44,837 | 100% | $0 | $0 |
| 16000 | Electrical | $435,000 | $0 | $435,000 | $0 | $435,000 | 100% | $0 | $0 |
| | | | | | | | | | |
| | Acceleration | $15,000 | $0 | $15,000 | $0 | $15,000 | 100% | $0 | $0 |
| | General Conditions | $75,950 | $0 | $75,950 | $0 | $75,950 | 100% | $0 | $0 |
| | Fee | $76,557 | $0 | $76,557 | $0 | $76,557 | 100% | $0 | $0 |
| | SUBTOTAL | $1,671,499 | $0 | $1,671,499 | $0 | $1,671,499 | 100% | $0 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# CHANGE ORDER, SHEET 1

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

AIA DOCUMENT G703    (Instructions on reverse)

PAGE THREE OF THREE PAGES

| | | APPLICATION NO: | FOUR |
| | | APPLICATION DATE: | 28-Feb-03 |
| | | PERIOD TO: | 28-Feb-03 |
| | | DAVIS PROJECT NO: | 61-2051 |

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETE | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D + E + F) | % (G / C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| | Carried From Page Two | $1,671,499 | $0 | $1,671,499 | $0 | $1,671,499 | 1 | | $0 |
| | | | | | | | | | |
| | APPROVED CHANGE ORDERS | | | | | | | | |
| | Change Order No.3 | $50,131 | $0 | $50,131 | $0 | $50,131 | 100% | | $0 |
| | Change Order No.5 | $103,474 | $0 | $103,474 | $0 | $103,474 | 100% | | $0 |
| | Change Order No.8 | $37,794 | $0 | $37,794 | $0 | $37,794 | 100% | | $0 |
| | Change Order No.10 | $11,098 | $0 | $11,098 | $0 | $11,098 | 100% | | $0 |
| | Change Order No.11 | $5,464 | $0 | $5,464 | $0 | $5,464 | 100% | | $0 |
| | Change Order No.12 | $15,165 | $0 | $15,165 | $0 | $15,165 | 100% | | $0 |
| | Change Order No.20 | $29,665 | $0 | $29,665 | $0 | $29,665 | 100% | | $0 |
| | Change Order No.21 | $6,470 | $0 | $6,470 | $0 | $6,470 | 100% | | $0 |
| | Change Order No.28 | $3,668 | $0 | $3,668 | $0 | $3,668 | 100% | | $0 |
| | | | | | | | | | |
| | TOTAL | $1,934,428 | $0 | $1,934,428 | $0 | $1,934,428 | 100% | | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YOUK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

**Cayre Jemal's Peoples LLC**                                           James G. Davis Construction

| DATE | INVOICE NO | DESCRIPTION | INVOICE AMOUNT |
|------|------------|-------------|----------------|
| 2-28-03 | S0310-38 77 P ST (61-2040-4) | 080-00-17300 | 578223.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| CHECK DATE | 7-21-03 | CHECK NUMBER | 3223 | TOTAL > | 578223.00 |

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

**Cayre Jemal's Peoples LLC**

C/O Douglas Development Corp
702 H Street, NW Suite 400
Washington, DC 20001
202-638-6300

HSBC Bank USA

1-108
210

DATE                    CHECK NO.        AMOUNT
July 21, 2003             3223        $****578,223.00

Accounting Copy

Pay: ****Five hundred seventy-eight thousand two hundred twenty-three dollars
**********************************************************and no cents

** VOID * VOID * VOID **

**** NOT NEGOTIABLE ****

PAY
TO THE        James G. Davis Construction
ORDER OF      12500 Parklawn Drive
              Rockville, MD 20852

# APPLICATION AND CERTIFICATE FOR PAYMENT

INVOICE # S0310-38

# 61-2040

PAGE ONE OF THREE PAGES

AIA DOCUMENT G702

| | | | |
|---|---|---|---|
| TO: | Douglas Development Corporation | PROJECT: DHS 6th Floor- Tenant Construction | APPLICATION NO: |
| | 702 "H" Street, NW | 77 "P" Street NE | FOUR |
| | Washington DC 20001 | Washington DC | |
| | Paul Millstein | | PERIOD TO: |
| | | | 28-Feb-03 |
| FROM : | JAMES G. DAVIS CONST. CORPORATION | VIA (ARCHITECT) : Hickok Warner Fox | |
| | 12500 Parklawn Drive | 1023 31st Street, NW | PROJECT NO: |
| | Rockville, Maryland 20852 | Washington, D.C. 20007 | 61-2040 |
| | | | CONTRACT DATE: |
| CONTRACT FOR: 3rd Floor Tenant Construction | | | 1-Oct-01 |

Distribution to:
X ARCHITECT (1) copy
X CONTRACTOR
X OWNER (5) copies

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

## CONTRACTOR'S APPLICATION FOR PAYMENT

### CHANGE ORDER SUMMARY

| | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | | |
| 12, 04, 09, 15, 17, 18 | $343,980.00 | |
| #19, 22 | $15,641.00 | |
| TOTALS | $359,621.00 | $0.00 |
| Net change by Change Orders | $359,621.00 | |

1. ORIGINAL CONTRACT SUM ............ $ 2,175,000
2. Net change by Change Orders ......... $ 359,621
3. CONTRACT SUM TO DATE(Line 1+2) ... $ 2,535,523
4. TOTAL COMPLETED & STORED TO DATE $ 2,535,523
   (Column G on G703)
5. RETAINAGE:
   a. 10% of Completed Work ....... $ 0
      (Column D + E on G703)
   b. 10% of Stored Material ....... $ 0
      (Column F on G703)
   Total Retainage (Line 5a + 5b)or
   Total in Column I og G703)
6. TOTAL EARNED LESS RETAINAGE ..... $ 2,535,523
   (Line 4 less Line 5 Total)
7. LESS TENANT IMPROVEMENT ALLOWANCE $ 1,957,300
   Funded By DDC
8. CURRENT PAYMENT DUE ................ $ 578,223
9. BALANCE TO FINISH, PLUS RETAINAGE
   (Line 3 less Line 6)

The undersigned Contractor certifies that to the best of the Contractor's knowledge, Information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that the current payment shown herein is now due.

CONTRACTOR: JAMES G. DAVIS CONSTRUCTION CORPORATION

By: Kevin Balter, Project Manager     Date: February 28, 2003

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ................ $
(Attach explanation if amount certified differs from amount applied for.)
ARCHITECT:

By: _____ Date: 7/1/03

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

State of:    Virginia    County of: DDI : Alexandria
Subscribed and sworn to before me this 28th
Notary Public:  Susan Peery
My commission expires:    10/31/2006

DOUGLAS DEVELOPMENT    JOB # 080-01

INVOICE TOTAL    579,227
ENTERED BY 28th    7/21
DATE        INIT    AMT
ENTERED BY 28th   $78229
4th February 2003

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA - 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

# SUMMARY SHEET, TOTAL

*AIA DOCUMENT G703*    (Instructions on reverse)

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

PAGE TWO OF TWO PAGES

APPLICATION NO:    FOUR
APPLICATION DATE:    28-Feb-03
PERIOD TO:    28-Feb-03
DAVIS PROJECT NO:    61-2040

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETE | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 01700 | Final Cleaning | $15,050 | $0 | $15,050 | $0 | $15,050 | 100% | $0 | $0 |
| 01712 | Dumpsters | $11,250 | $0 | $11,250 | $0 | $11,250 | 100% | $0 | $0 |
| 03300 | Concrete repair | $14,000 | $0 | $14,000 | $0 | $14,000 | 100% | $0 | $0 |
| 06001 | Rough Carpentry | $35,000 | $0 | $35,000 | $0 | $35,000 | 100% | $0 | $0 |
| 06400 | Millwork | $45,650 | $0 | $45,650 | $0 | $45,650 | 100% | $0 | $0 |
| 08110 | Doors/Frames/Hardware | $89,887 | $0 | $89,887 | $0 | $89,887 | 100% | $0 | $0 |
| 08114 | Doors/Frames/Hardware-installation | $21,500 | $0 | $21,500 | $0 | $21,500 | 100% | $0 | $0 |
| 08800 | Glass & Glazing | $88,300 | $0 | $88,300 | $0 | $88,300 | 100% | $0 | $0 |
| 08800 | Remove Window for stocking material | $5,000 | $0 | $5,000 | $0 | $5,000 | 100% | $0 | $0 |
| 09250 | Drywall | $321,200 | $0 | $321,200 | $0 | $321,200 | 100% | $0 | $0 |
| 09250 | Ceiling Removal & Replacement | $5,000 | $0 | $5,000 | $0 | $5,000 | 100% | $0 | $0 |
| 09680 | Carpet/VCT | $210,922 | $0 | $210,922 | $0 | $210,922 | 100% | $0 | $0 |
| 09900 | Painting/Wall Covering | $70,800 | $0 | $70,800 | $0 | $70,800 | 100% | $0 | $0 |
| | Spray Fire Proofing | $10,000 | $0 | $10,000 | $0 | $10,000 | 100% | $0 | $0 |
| | Appliances | $3,500 | $0 | $3,500 | $0 | $3,500 | 100% | $0 | $0 |
| | Window Blinds | $8,560 | $0 | $8,560 | $0 | $8,560 | 100% | $0 | $0 |
| 15000 | HVAC | $480,474 | $0 | $480,474 | $0 | $480,474 | 100% | $0 | $0 |
| 15300 | Fire Protection | $63,480 | $0 | $63,480 | $0 | $63,480 | 100% | $0 | $0 |
| 16000 | Electrical | $477,800 | $0 | $477,800 | $0 | $477,800 | 100% | $0 | $0 |
| | General Conditions | $98,869 | $0 | $98,869 | $0 | $98,869 | 100% | $0 | $0 |
| | Fee | $99,660 | $0 | $99,660 | $0 | $99,660 | 100% | $0 | $0 |
| | **SUBTOTAL** | $2,175,902 | $0 | $2,175,902 | $0 | $2,175,902 | 100% | $0 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# CHANGE ORDER, SHEET 1

*AIA DOCUMENT G703*

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column 1 on Contracts where variable retainage for line items may apply.

(Instructions on reverse)

PAGE THREE OF THREE PAGES
APPLICATION NO: FOUR
APPLICATION DATE: 28-Feb-03
PERIOD TO: 28-Feb-03
DAVIS PROJECT NO: 61-2040

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | WORK COMPLETE THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | RETAINAGE |
| | Carried From Page Two | $2,175,902 | $0 | $2,175,902 | $0 | $2,175,902 | 1 | $0 | $0 |
| | APPROVED CHANGE ORDERS | | | | | | | | |
| | Change Order No.2 | $134,034 | $0 | $134,034 | $0 | $134,034 | 100% | | $0 |
| | Change Order No.4 | $74,067 | $0 | $74,067 | $0 | $74,067 | 100% | | $0 |
| | Change Order No.9 | $103,777 | $0 | $103,777 | $0 | $103,777 | 100% | | $0 |
| | Change Order No.15 | $8,975 | $0 | $8,975 | $0 | $8,975 | 100% | | $0 |
| | Change Order No.17 | $10,079 | $0 | $10,079 | $0 | $10,079 | 100% | | $0 |
| | Change Order No.18 | $13,048 | $0 | $13,048 | $0 | $13,048 | 100% | | $0 |
| | Change Order No.19 | $10,475 | $0 | $10,475 | $0 | $10,475 | 100% | | $0 |
| | Change Order No.22 | $5,166 | $0 | $5,166 | $0 | $5,166 | 100% | | $0 |
| | TOTAL | $2,535,523 | $0 | $2,535,523 | $0 | $2,535,523 | 100% | $0 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)



*Cayre Jemal's Peoples LLC*

James G. Davis Construction

| CHECK DATE | INVOICE NO | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|
| 6-15-03 | S0402-37  77 P ST (61-2051-5) | 080-00-17300 | 85304.00 |

| CHECK DATE | CHECK NUMBER | | |
|---|---|---|---|
| 7-21-03 | 3225 | TOTAL > | 85304.00 |

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

*Cayre Jemal's Peoples LLC*
C/O Douglas Development Corp
702 H Street, NW Suite 400
Washington, DC 20001
202-638-6300

HSBC Bank USA

CHECK NO.
3225

DATE
July 21, 2003

Accounting Copy

** VOID * VOID * VOID **

**** NOT NEGOTIABLE ****

1-108
210

AMOUNT
$*****85,304.00

Pay: *********Eighty-five thousand three hundred four dollars and no cents

PAY
TO THE
ORDER OF

James G. Davis Construction
12500 Parklawn Drive
Rockville, MD 20852

# APPLICATION AND CERTIFICATE FOR PAYMENT

|  |  |
|---|---|
| | INVOICE # S0402-37 |
| | *AIA DOCUMENT G702* |

JOB # 61-2051

PAGE ONE OF THREE PAGES

TO:
Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

PROJECT: D.DOT 1st Floor- Tenant Construction
77 "P" Street NE
Washington DC

| APPLICATION NO: | FIVE |
|---|---|
| PERIOD TO: | 15-Jun-03 |

FROM:
JAMES G. DAVIS CONST. CORPORATION
12500 Parklawn Drive
Rockville, Maryland 20852

VIA (ARCHITECT) : Hickok Warner Fox
1023 31st Street, NW
Washington, DC 20007

| PROJECT NO: | 61-2051 |
|---|---|
| CONTRACT DATE: | 31-Dec-02 |

Distribution to:

| | |
|---|---|
| X | ARCHITECT (1) copy |
| X | CONTRACTOR |
| X | OWNER (5) copies |

CONTRACT FOR: 3rd Floor Tenant Construction

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in | | |
| previous months by Owner | $262,929 | $0 |
| TOTAL | $262,929 | $0 |
| Approved this month | | |
| Number | | |
| Error in CO No.20 | | ($32,766.00) |
| Change Order No.30 | $88,070.00 | |
| | | |
| TOTALS | $88,070.00 | ($32,766.00) |
| Net change by Change Orders | $348,233.00 | |

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 1,671,499 |
| 2. Net change by Change Orders | $ | 348,233 |
| 3. CONTRACT SUM TO DATE(Line 1+2) | $ | 2,019,732 |
| 4. TOTAL COMPLETED & STORED TO DATE | $ | 2,019,732 |
| (Column G on G703) | | |
| 5. RETAINAGE: | | |
| a. 10% of Completed Work | $ | 0 |
| (Column D + E on G703) | | |
| b. 10% of Stored Material | $ | 0 |
| (Column F on G703) | | |
| Total Retainage (Line 5a + 5b or | | |
| Total in Column I og G703) | | |
| 6. TOTAL EARNED LESS RETAINAGE | $ | 2,019,732 |
| (Line 4 less Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR | | |
| PAYMENT (Line 6 from prior Certificate) | $ | 1,934,429 |
| 8. CURRENT PAYMENT DUE | $ | 85,303 |
| 9. BALANCE TO FINISH, PLUS RETAINAGE | $ | |
| (Line 3 less Line 6) | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been
paid by the Contractor for Work for which previous Certificates for Payment were
issued and payments received from the Owner, and that current payment shown
herein is now due.

$ 3223

CONTRACTOR  JAMES G. DAVIS CONSTRUCTION CORPORATION
Kevin Clark, Senior Project Manager
By:                                    Date: June 15, 2003

State of:  Virginia    County of:  Alexandria
Subscribed and sworn to before me this    16th    day of June 2003
Notary Public: Susan Peery
My Commision expires:    10/31/2006

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the
data comprising the above application, the Architect certifies to the Owner that to the
best of the Architect's knowledge, information and belief the Work has progressed as
indicated, the quality of the Work is in accordance with the Contract Documents, and
the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ......................................  $
*(Attach explanation if amount certified differs from amount applied for.)*
ARCHITECT:

By:                                    Date:
This Certificate is not negotiable.  The AMOUNT CERTIFIED is payable only to the
Contractor named herein.  Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

**SUMMARY SHEET, TOTAL**   *AIA DOCUMENT G703*   (Instructions on reverse)

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

PAGE TWO OF TWO PAGES

APPLICATION NO: Five
APPLICATION DATE: 15-Jun-03
PERIOD TO: 15-Jun-03
DAVIS PROJECT NO: 61-2051

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 01700 | Final Cleaning | $15,050 | $15,050 | $0 | $0 | $15,050 | 100% | $0 | $0 |
| 01712 | Dumpsters | $11,250 | $11,250 | $0 | $0 | $11,250 | 100% | $0 | $0 |
| 03300 | Concrete repair | $14,000 | $14,000 | $0 | $0 | $14,000 | 100% | $0 | $0 |
| 02700 | Concrete cutting | $15,000 | $15,000 | $0 | $0 | $15,000 | 100% | $0 | $0 |
|  | Structural Steel & Misc. Metals | $95,000 | $95,000 | $0 | $0 | $95,000 | 100% | $0 | $0 |
| 06001 | Rough Carpentry | $35,000 | $35,000 | $0 | $0 | $35,000 | 100% | $0 | $0 |
| 06400 | Millwork | $72,147 | $72,147 | $0 | $0 | $72,147 | 100% | $0 | $0 |
| 08110 | Doors/Frames/Hardware | $19,442 | $19,442 | $0 | $0 | $19,442 | 100% | $0 | $0 |
| 08114 | Doors/Frames/Hardware-installation | $6,500 | $6,500 | $0 | $0 | $6,500 | 100% | $0 | $0 |
| 08800 | Glass & Glazing | $28,900 | $28,900 | $0 | $0 | $28,900 | 100% | $0 | $0 |
| 09250 | Drywall | $151,500 | $151,500 | $0 | $0 | $151,500 | 100% | $0 | $0 |
| 09680 | Carpet/VCT | $145,211 | $145,211 | $0 | $0 | $145,211 | 100% | $0 | $0 |
| 09900 | Painting/Wall Covering | $44,600 | $44,600 | $0 | $0 | $44,600 | 100% | $0 | $0 |
|  | Appliances | $5,000 | $5,000 | $0 | $0 | $5,000 | 100% | $0 | $0 |
| 15000 | Ductwork | $167,980 | $167,980 | $0 | $0 | $167,980 | 100% | $0 | $0 |
|  | HVAC | $30,000 | $30,000 | $0 | $0 | $30,000 | 100% | $0 | $0 |
| 15000 | Plumbing | $16,972 | $16,972 | $0 | $0 | $16,972 | 100% | $0 | $0 |
| 15500 | Controls & VAV's | $150,603 | $150,603 | $0 | $0 | $150,603 | 100% | $0 | $0 |
| 15300 | Fire Protection | $44,837 | $44,837 | $0 | $0 | $44,837 | 100% | $0 | $0 |
| 16000 | Electrical | $435,000 | $435,000 | $0 | $0 | $435,000 | 100% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |
|  | Accelleration | $15,000 | $15,000 | $0 | $0 | $15,000 | 100% | $0 | $0 |
|  | General Conditions | $75,950 | $75,950 | $0 | $0 | $75,950 | 100% | $0 | $0 |
|  | Fee | $76,557 | $76,557 | $0 | $0 | $76,557 | 100% | $0 | $0 |
|  | **SUBTOTAL** | $1,671,499 | $1,671,499 | $0 | $0 | $1,671,499 | 100% | $0 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YOUK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# CHANGE ORDER, SHEET 1

AIA DOCUMENT G703

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

(Instructions on reverse)

PAGE THREE OF THREE PAGES

APPLICATION NO:      FIVE
APPLICATION DATE:    15-Jun-03
PERIOD TO:           15-Jun-03
DAVIS PROJECT NO:    61-2051

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | Carried From Page Two | $1,671,499 | $1,671,499 | | $0 | $1,671,499 | 1 | $0 | $0 |
| | | | | | | | | | |
| | APPROVED CHANGE ORDERS | | | | | | | | |
| | Change Order No.3 | $50,131 | $50,131 | $0 | $0 | $50,131 | 100% | $0 | $0 |
| | Change Order No.5 | $103,474 | $103,474 | $0 | $0 | $103,474 | 100% | $0 | $0 |
| | Change Order No.8 | $37,794 | $37,794 | $0 | $0 | $37,794 | 100% | $0 | $0 |
| | Change Order No.10 | $11,098 | $11,098 | $0 | $0 | $11,098 | 100% | $0 | $0 |
| | Change Order No.11 | $5,464 | $5,464 | $0 | $0 | $5,464 | 100% | $0 | $0 |
| | Change Order No.12 | $15,165 | $15,165 | $0 | $0 | $15,165 | 100% | $0 | $0 |
| | Change Order No.20 | $29,665 | $29,665 | $0 | $0 | $29,665 | 100% | $0 | $0 |
| | Change Order No.21 | $6,470 | $6,470 | $0 | $0 | $6,470 | 100% | $0 | $0 |
| | Change Order No.28 | $3,668 | $3,668 | $0 | $0 | $3,668 | 100% | $0 | $0 |
| | Error in CO No.20 | -$2,766 | $0 | -$2,766 | $0 | -$2,766 | 100% | $0 | $0 |
| | Change Order No.30 | $88,070 | $0 | $88,070 | $0 | $88,070 | 100% | $0 | $0 |
| | TOTAL | $2,019,732 | $1,934,428 | $85,304 | $0 | $2,019,732 | 100% | $0 | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

*Cayre Jemal's Peoples LLC*

James G. Davis Construction

| CHECK DATE | INVOICE NO | DESCRIPTION | INVOICE AMOUNT |
|---|---|---|---|
| 2-28-03 | S0310-39 . 77 P ST (61-2040-4). | 080-00-17300. | 184657.00 |
| | | TOTAL > | 184657.00 |

| CHECK DATE | CHECK NUMBER |
|---|---|
| 7-21-03 | 3224 |

PLEASE DETACH AND RETAIN FOR YOUR RECORDS

*Cayre Jemal's Peoples LLC*
C/O Douglas Development Corp
702 H Street, NW Suite 400
Washington, DC 20001
202-638-6300

HSBC Bank USA

DATE
July 21, 2003

CHECK NO.
3224

$\frac{1-108}{210}$

AMOUNT
$*****184,657.00

Accounting Copy

** VOID * VOID * VOID **

**** NOT NEGOTIABLE ****

Pay: ********One hundred eighty-four thousand six hundred fifty-seven dollars
*******************************************************and no cents

PAY
TO THE
ORDER OF

James G. Davis Construction
12500 Parklawn Drive
Rockville, MD 20852

OB # 61-2040

INVOICE # S0310-39

PAGE ONE OF THREE PAGES

# APPLICATION AND CERTIFICATE FOR PAYMENT

AIA DOCUMENT G702

TO:
Douglas Development Corporation
702 "H" Street, NW
Washington DC 20001
Paul Millstein

PROJECT: DOH 5th Floor- Tenant Construction
77 "P" Street NE
Washington DC

APPLICATION NO: FOUR
PERIOD TO: 28-Feb-03

Distribution to:
× ARCHITECT (1) copy
× CONTRACTOR
× OWNER (5) copies

FROM: JAMES G. DAVIS CONST. CORPORATION
12500 Parklawn Drive
Rockville, Maryland 20852

VIA (ARCHITECT): Hickok Warner Fox
1023 31st Street, NW
Washington, DC 20007

PROJECT NO: 61-2040
CONTRACT DATE: 1-Oct-01

CONTRACT FOR: 3rd Floor Tenant Construction

Application is made for Payment, as shown below, in accordance with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 1,833,537 |
| 2. Net change by Change Orders | $ | 152,420 |
| 3. CONTRACT SUM TO DATE(Line 1+2) | $ | 1,985,957 |
| 4. TOTAL COMPLETED & STORED TO DATE | $ | 1,985,957 |
| (Column G on G703) | | |
| 5. RETAINAGE: | | |
| a. 10% of Completed Work | $ | 0 |
| (Column D + E on G703) | | |
| b. 10% of Stored Material | $ | 0 |
| (Column F on G703) | | |
| Total Retainage (Line 5a + 5b or | | |
| Total in Column I og G703) | | |
| 6. TOTAL EARNED LESS RETAINAGE | $ | 1,985,957 |
| (Line 4 less Line 5 Total) | | |
| 7. LESS TENANT IMPROVEMENT ALLOWANCE | | 1,801,300 |
| Funded By DDC | | 184,655 |
| 8. CURRENT PAYMENT DUE | | |
| 9. BALANCE TO FINISH, PLUS RETAINAGE | | |
| (Line 3 less Line 6) | $ | |

DOUGLAS DEVELOPMENT
INVOICE # 080-00
INVOICE TOTAL 1733
197,637
CHK 184663 90
AMT

Funded By DDC

INIT

State of Virginia  County of Alexandria
Subscribed and sworn to me before me this 28th day of February 2003
Notary Public: Susan Peery    10/31/2006
My Commission expires:

## CONTRACTOR'S APPLICATION FOR PAYMENT

CHANGE ORDER SUMMARY

| | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Change Orders approved in previous months by Owner | $0 | $0 |
| TOTAL | $0 | $0 |
| Approved this month | | |
| Number | | |
| 11, 06, 07, 13, 14, 16 #23 | $151,025.00 | $1,399.00 |
| TOTALS | $152,424.00 | $0.00 |
| Net change by Change Orders | $152,424.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: JAMES G. DAVIS CONSTRUCTION CORPORATION
By: Kevin Clark, Project Manager
Date: February, 28 2003

# 3224
7/21/03

## ARCHITECT'S CERTIFICATE FOR PAYMENT

AMOUNT CERTIFIED $ .......
(Attach explanation if amount certified differs from amount applied for.)

In accordance with the Contract Documents based on on-site observations and the data comprising the above application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

ARCHITECT:
By: ...........................  Date: 7/1/03
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATE FOR PAYMENT - MAY 1983 EDITION - AIA- 1983
THE AMERICAN INSTITUTE OF ARCHITECT, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006

# SUMMARY SHEET, TOTAL    AIA DOCUMENT G703    (Instructions on reverse)    PAGE TWO OF TWO PAGES

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: FOUR
APPLICATION DATE: 28-Feb-03
PERIOD TO: 28-Feb-03
DAVIS PROJECT NO: 61-2040

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| 01700 | Final Cleaning | $15,050 | $0 | $15,050 | $0 | $15,050 | 100% | | $0 |
| 01712 | Dumpsters | $11,250 | $0 | $11,250 | $0 | $11,250 | 100% | | $0 |
| 03300 | Concrete repair | $14,000 | $0 | $14,000 | $0 | $14,000 | 100% | | $0 |
| 06001 | Rough Carpentry | $35,000 | $0 | $35,000 | $0 | $35,000 | 100% | | $0 |
| 06400 | Millwork | $45,650 | $0 | $45,650 | $0 | $45,650 | 100% | | $0 |
| 08110 | Doors/Frames/Hardware | $74,000 | $0 | $74,000 | $0 | $74,000 | 100% | | $0 |
| 08114 | Doors/Frames/Hardware-installation | $21,500 | $0 | $21,500 | $0 | $21,500 | 100% | | $0 |
| 08800 | Glass & Glazing | $56,600 | $0 | $56,600 | $0 | $56,600 | 100% | | $0 |
| 08800 | Remove Window for stocking material | $5,000 | $0 | $5,000 | $0 | $5,000 | 100% | | $0 |
| 09250 | Drywall | $302,900 | $0 | $302,900 | $0 | $302,900 | 100% | | $0 |
| 09250 | Ceiling Removal & Replacement | $12,500 | $0 | $12,500 | $0 | $12,500 | 100% | | $0 |
| 09680 | Carpet/VCT | $165,419 | $0 | $165,419 | $0 | $165,419 | 100% | | $0 |
| 09900 | Painting/Wall Covering | $46,500 | $0 | $46,500 | $0 | $46,500 | 100% | | $0 |
| 09900 | Raised Access Flooring | $40,000 | $0 | $40,000 | $0 | $40,000 | 100% | | $0 |
| | Appliances | $3,500 | $0 | $3,500 | $0 | $3,500 | 100% | | $0 |
| | Window Blinds | $39,164 | $0 | $39,164 | $0 | $39,164 | 100% | | $0 |
| 15000 | Ductwork | $150,000 | $0 | $150,000 | $0 | $150,000 | 100% | | $0 |
| 15000 | Plumbing | $65,000 | $0 | $65,000 | $0 | $65,000 | 100% | | $0 |
| 15000 | HVAC Controls & VAV's | $125,300 | $0 | $125,300 | $0 | $125,300 | 100% | | $0 |
| 15300 | Fire Protection | $58,109 | $0 | $58,109 | $0 | $58,109 | 100% | | $0 |
| 16000 | Electrical | $329,800 | $0 | $329,800 | $0 | $329,800 | 100% | | $0 |
| | Overtime | $50,000 | $0 | $50,000 | $0 | $50,000 | 100% | | $0 |
| | General Conditions | $83,312 | $0 | $83,312 | $0 | $83,312 | 100% | | $0 |
| | Fee | $83,979 | $0 | $83,979 | $0 | $83,979 | 100% | | $0 |
| | SUBTOTAL | $1,833,533 | $0 | $1,833,533 | $0 | $1,833,533 | 100% | | $0 |

AIA DOCUMENT G702 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)

# CHANGE ORDER, SHEET 1

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT, containing
Contractor's signed Certification is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

*AIA DOCUMENT G703*   (Instructions on reverse)

PAGE THREE OF THREE PAGES

APPLICATION NO:      FOUR
APPLICATION DATE:    28-Feb-03
PERIOD TO:           28-Feb-03
DAVIS PROJECT NO:    61-2040

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETE FROM PREVIOUS APPLICATION (D+E) | E WORK COMPLETE THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED AND STORED TO DATE (D + E + F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE |
|---|---|---|---|---|---|---|---|---|---|
| | Carried From Page Two | $1,833,533 | $0 | $1,833,533 | $0 | $1,833,533 | 1 | $0 | $0 |
| | | | | | | | | | |
| | APPROVED CHANGE ORDERS | | | | | | | | |
| | Change Order No.1 | $74,859 | $0 | $74,859 | $0 | $74,859 | 100% | $0 | $0 |
| | Change Order No.6 | $10,919 | $0 | $10,919 | $0 | $10,919 | 100% | $0 | $0 |
| | Change Order No.7 | $21,294 | $0 | $21,294 | $0 | $21,294 | 100% | $0 | $0 |
| | Change Order No.13 | $21,398 | $0 | $21,398 | $0 | $21,398 | 100% | $0 | $0 |
| | Change Order No.14 | $7,726 | $0 | $7,726 | $0 | $7,726 | 100% | $0 | $0 |
| | Change Order No.16 | $14,829 | $0 | $14,829 | $0 | $14,829 | 100% | $0 | $0 |
| | Change Order No.23 | $1,399 | $0 | $1,399 | $0 | $1,399 | 100% | $0 | $0 |
| | TOTAL | $1,985,957 | $0 | $1,985,957 | $0 | $1,985,957 | 100% | $0 | $0 |

AIA DOCUMENT G703 - CONTINUATION SHEET - MAY 1983 EDITION - AIA 1983
THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YOUK AVENUE, N.W., WASHINGTON D.C. 20006 (Reproduced by permission of the Copyright Holder)



619 H Street
N.W. Washington, D.C. 20001
(202) 371-TONY

February 5, 2007


The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, D.C. 20001


Dear Honorable Urbina:

I am writing on behalf of my dear friend, Mr. Douglas Jemal. I am well aware of his
fraud conviction and the upcoming sentencing to take place in April. I feel it is my duty
and obligation as Douglas' friend and fellow community leader to convey to you his kind
and supportive nature. Hopefully, my message to you will compel you to show leniency
towards Douglas at the time of sentencing.

I am a long-time restaurant owner and community leader in the District's Chinatown
neighborhood. Having been in the area for over 30 years, I have witnessed the waves of
change; from a neglected and frequently unsafe community to a bustling attraction for
locals and tourists alike. Douglas was the first developer to enter into our Chinatown
community and not only did he single-handedly revitalized Chinatown by building up an
entire block of the 7th Street corridor, the same block where he maintains his main offices
today, but he has been different from other businessmen in that he has showed
compassion and concern for the welfare of the neighborhood. He took the lengthy
process of preserving the historic buildings in Chinatown. As a result, he has created
more jobs and brought businesses into our community and turned the economy around,
thus making Chinatown a real attraction for the District.

Furthermore, Douglas was instrumental in the creation and implementation of the Asian
Liason Unit of the Metropolitan Police Department. He was concerned with Chinatown's
increasing crime rates and homeless population and assisted in spearheading the
campaign for a local police unit to patrol Chinatown. Since the establishment of the
Asian Liason Unit, Chinatown has become a much safer place when compared with the
unsafe condition of the streets over ten years ago.

In addition to being a caring and generous community activist and businessman, Douglas
has also recognized the cultural significance in the area by purchasing and restoring the

Exhibit 211



619 H Street
N.W. Washington, D.C. 20001
(202) 371-TONY

historic Synagogue at the corner of 6th and I Streets. He displayed his deep involvement in the preservation of the neighborhood's cultural relics when he personally helped install the lights for the Chinatown Arch, a duty that has since been assigned to the District government. Moreover, Douglas has ensured that Chinatown has a voice by actively speaking up for our small community. He assisted in Downtown BID and made sure that Chinatown was properly maintained and cleaned up. Today, you can still see the presence of those efforts he has made.

For sake of brevity, I will leave you with these thoughts. Douglas is a true gentleman who cares about the community and we, the Chinatown community, are forever grateful for his generosity and friendship. Chinatown was not like this 10 years ago and we can really attribute the development and success to Douglas Jemal. Douglas should be proud of his efforts and active philanthropy that have left an indelible legacy that Chinatown will not forget.

Sincerely yours,

Tony Cheng
Owner
Tony Cheng's Restaurants



**G.S.Proctor**
**& ASSOCIATES, INC.**
*Lobbying & Consulting*

Annapolis ▪ La Plata ▪ Upper Marlboro ▪ Washington, DC

February 20, 2007

The Honorable Ricardo M. Urbina
United States District Court for the District of Columbia
333 Constitution Avenue, N.W.
Washington, DC 20001

**Re**: Douglas Jemal

Dear Judge Urbina:

Words cannot adequately express the depth of our gratitude to Mr. Douglas
Jemal for his support of our young people and his vote of confidence in the Kiamsha Youth
Empowerment Organization, Inc. Our young leaders have been notified of Mr. Douglas Jemal's
generosity and have responded in kind with numerous assurances that they appreciate and honor
his faith in the good work that they have done and will continue to do. Goals will be reached and
dreams realized, because people such as Douglas Jemal have decided to believe in them and
provide them with this new opportunity.

Douglas Jemal's corporate decision to provide Kiamsha with office space in-kind for a
year is a phenomenal blessing! This will give these young people an opportunity to raise funds
towards financial independence, and move them closer to their ultimate goal of owning property
elsewhere in fee.

Rest assured that Kiamsha already has a business and sustainability plan in place to assist the
organization in achieving fiscal autonomy. The organization's goal of doing so would be
impossible without this major and substantial show of support from Douglas Development.
Plans for a public display of the organization's gratitude toward Douglas Development are
already underway.

Again, thank you, and we wish you much success in all of your future endeavors.

Sincerely,

Karen Williams Gooden, Esquire
on behalf of the Kiamsha Youth Empowerment Organization, Inc.

14408 Old Mill Road ▪ Suite 201 ▪ Upper Marlboro, MD 20772
Phone: (301) 952-8885 ▪ Fax: (301) 952-0290 ▪ Email: gsproctor@aol.com ▪ Website: www.gsproctor.com

Exhibit 212