**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Crim. No.  05-0359-1 (RMU)** |
| | ) | |
| **DOUGLAS JEMAL, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**DEFENDANT DOUGLAS JEMAL'S RESPONSE TO**
**THE GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

Reid H. Weingarten
Brian M. Heberlig
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
 (202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334

Counsel for Douglas Jemal

Dated:  February 26, 2007

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..........................................................................................................1

II.   ARGUMENT ...............................................................................................................2

    A.    The Court Should Not Consider Acquitted And Uncharged Conduct....................2

        1.    The Court Should Not Consider Acquitted Conduct Relating To
             The Public Corruption Charges ...................................................................5

        2.    The Court Should Not Consider Acquitted And Uncharged
             Conduct Regarding Purported Tax Evasion .................................................8

        3.    The Court Should Not Consider Purported Bad Business Practices..........10

        4.    The "Lifestyle" Issues Raised By The Government Are Not A
             Basis To Enhance Mr. Jemal's Sentence ...................................................14

        5.    Mr. Jemal's Regrettable And Isolated Comment To A Reporter Is
             Not A Basis To Enhance His Sentence.......................................................16

    B.    The Government's Guidelines Calculation Is Incorrect ........................................18

        1.    The "Intended Loss" Enhancement Does Not Apply ................................18

        2.    The "Sophisticated Means" Enhancement Does Not Apply.....................26

        3.    The "Vulnerable Victim" Enhancement Does Not Apply.........................31

        4.    The "Role In The Offense" Enhancement Does Not Apply .....................35

    C.    The Court Should Reject The Government's Analysis Of The Sentencing
        Factors Under 18 U.S.C. § 3553(a).......................................................................36

    D.    The Court Should Not Depart Upward From The Guidelines Fine Range
        To Impose A Fine Under The Alternative Fine Statute .........................................37

    E.    The Court Should Not Preclude Mr. Jemal From Associating With Blake
        Esherick And John Brownell As A Condition Of Supervised Release ................39

III.  CONCLUSION...........................................................................................................43

## I.    INTRODUCTION

The government complains that Douglas Jemal has been unjustly "lionized" by his supporters and attempts to construct an alternate view of reality in which Mr. Jemal is a career criminal and a scofflaw who believes the rules do not apply to him.  Nothing could be further from the truth.  Mr. Jemal readily admits that he has made some mistakes and has undertaken major efforts to prevent them from ever happening again.  Nonetheless, Mr. Jemal is fundamentally an honest businessman and a charitable, family man for whom the offense conduct was completely out of character.  The more than 200 letters of support submitted to the Court speak for themselves and reveal Mr. Jemal's true nature.  These are not the words of, as the government complains, Mr. Jemal's "paid attorneys"; they are real people from all segments of the community.

The reality is that the government has unfairly attempted to demonize Mr. Jemal throughout this case.  As is obvious from the tone of the government's response, the lead prosecutor has taken this case personally and lost all perspective on the true events at issue.  The lead prosecutor tipped his hand when he referred to Mr. Jemal in his opening statement as "no more than a common thief."  Tr. 370-71.  That inflammatory allegation was not even remotely proved at trial.  Instead, Mr. Jemal was acquitted of six of the seven charges he faced, including all allegations that he engaged in public corruption, defrauded the District of Columbia, or assisted Mr. Esherick in tax evasion.  Now, the government ignores these verdicts and persists in arguing that "the evidence at trial fully exposed the defendant as an ordinary criminal." Government's Memorandum In Aid Of Sentencing at 2 ("Gov't Mem."), who deserves to be incarcerated for five years, even though the single charge of which he was convicted involved no loss to any victim and the advisory Sentencing Guidelines call for a sentence of zero to six

months, authorizing a sentence of probation.  In support of its request for this extreme

punishment, the government relies almost exclusively on acquitted conduct and even more

dubious uncharged conduct regarding vendor lawsuits (which were so remote that the Court

barred them from evidence at trial), bounced checks and purported tax evasion involving

Douglas Development employees that the government did not even attempt to prove at trial.

This is a sad, desperate attempt by the lead prosecutor to somehow justify his virtually full-time

investigation and prosecution of Douglas Jemal for the last three years after the jury

resoundingly rejected the vast majority of the government's theory of prosecution.

      The Court should fashion a sentence that provides "just punishment" for the

offense of conviction in this case, not the acquitted conduct that the government attempts to re-

litigate.  That offense involved a private business transaction that caused no loss to any victim.

A proper calculation of the advisory Sentencing Guidelines results in a total offense level of six,

rendering Mr. Jemal eligible for probation.  Even if the Guidelines calculation did not justify

probation, Mr. Jemal is entitled to a downward departure on several grounds and deserves a

lenient sentence based on an analysis of the sentencing factors in 18 U.S.C. § 3553(a).  We urge

the Court to decline the government's sinister attempt to portray Mr. Jemal in a manner

inconsistent with his true character.  In reality, Mr. Jemal is a good man who deserves an

opportunity to continue being a productive member of society.

## II.    ARGUMENT

### A.    The Court Should Not Consider Acquitted And Uncharged Conduct

      The government devotes a mere three paragraphs to describing the offense of

conviction and the remainder of the first 15 pages of its sentencing memorandum to attempting

to demonstrate that Mr. Jemal deserves "meaningful punishment" because of (1) the conduct for

which he was acquitted, including the alleged bribery of Mr. Lorusso, the alleged defrauding of

the District of Columbia, and the alleged tax evasion involving Douglas Development

employees, and (2) even more remote uncharged conduct relating to bounced checks,

purportedly bad business practices, and a supposed failure to pay contractors.  See Gov't Mem.

at 1-16.  The Court should exercise its substantial discretion to decline to consider this conduct

when fashioning an appropriate sentence for Mr. Jemal.  Notwithstanding the government's

ranting that treats this conduct as fact, the jury acquitted Mr. Jemal of the conduct upon which

the government relies after hearing six weeks of the government's evidence.  The government

had the opportunity to prove this conduct and failed completely.  Moreover, the uncharged

conduct upon which the government also relies is so remote and irrelevant that either the Court

declared it inadmissible or the government itself chose not to introduce evidence about it at trial.

It would pervert justice to rely upon such acquitted and uncharged conduct to enhance

Mr. Jemal's sentence.

        The D.C. Circuit has held that it is constitutionally permissible for a sentencing

court to consider acquitted conduct when determining the advisory Guidelines range.  United

States v. Dorcely, 454 F.3d 366, 371 (D.C. Cir.), cert. denied, 127 S. Ct. 691 (2006).  As a court

in this District has recognized, "[t]he holding in Dorcely, however, does not mandate

consideration of acquitted conduct under the Guidelines . . . ."  United States v. Safavian, 461 F.

Supp. 2d 76, 83 (D.D.C. 2006) (emphasis added).  In Safavian, Judge Friedman held:  "This

Court declines to exercise its discretion under the advisory Guidelines to consider such conduct,

because it has long believed that consideration of acquitted conduct trivializes legal guilt or legal

innocence, which is what a jury decides."  Id. (quotation marks and citation omitted).

Judge Friedman's views have been echoed by sentencing judges around the country who have refused to exercise their discretion to consider acquitted conduct when determining the post-Booker advisory Guidelines range.  For instance, in United States v. Ibanga, 454 F. Supp. 2d 532 (E.D. Va. 2006), the court held that punishing the defendant for acquitted conduct "would have contravened the statutory goal of furthering respect for the law and would have resulted in unjust punishment for the offense for which he was convicted. . . ." Id. at 539 (citing 18 U.S.C. § 3553(a)(2)(A)).  The court further noted that "[s]entencing a defendant to time in prison for a crime that the jury found he did not commit is a Kafka-esque result," id. at 536, and that "[i]t would only confirm the public's darkest suspicions to sentence a man to an extra ten years in prison for a crime that a jury found he did not commit."  Id. at 543.

Another court that declined to consider acquitted conduct stated that "[i]n the eyes of this court, such a result is an abomination of the Guidelines and merely an attempt by the Government to relitigate and perfect its previously lost cases."  United States v. Wendelsdorf, 423 F. Supp. 2d 927, 938 (N.D. Iowa 2006).  Yet another court concluded "that considering acquitted conduct would disregard completely the jury's role in determining guilt and innocence," because "[t]he legal innocence associated with acquittal would be summarily eviscerated" if such acquitted conduct was used to enhance the defendant's sentence.  United States v. Coleman, 370 F. Supp. 2d 661, 672 (S.D. Ohio 2005); see also United States v. Pimental, 367 F. Supp. 2d 143, 152-53 (D. Mass. 2005) (declining to consider acquitted conduct); United States v. Carvajal, No. 04 CR 222AKH, 2005 WL 476125, at *4 (S.D.N.Y. Feb. 22, 2005) (same).

Similarly, for the reasons set forth below, the Court should exercise its discretion to decline to enhance Mr. Jemal's sentence on the basis of the acquitted and uncharged conduct

relied upon by the government.  Throughout its brief, the government argues that the Court should respect the jury's verdict of conviction on the wire fraud count.  See, e.g., Gov't Mem. at 2 (arguing that the jury's verdict is "a righteous one").  Yet the government repeatedly urges the Court to ignore completely the verdicts acquitting Mr. Jemal of six of the seven charges he faced. The Court should respect all of the verdicts and focus its analysis on fashioning "just punishment" for the offense of conviction, without regard to the government's inflammatory allegations regarding acquitted and irrelevant uncharged conduct.

> **1.      The Court Should Not Consider Acquitted Conduct Relating To The Public Corruption Charges**

Although the government claims that it "does not reargue the bribery conviction facts here," Gov't Mem. at 13 -- an apparent Freudian slip given the lack of <u>any</u> bribery conviction in this case -- it proceeds to relitigate the public corruption charges in an effort to enhance Mr. Jemal's sentence.  The Court should decline the government's invitation to consider this acquitted conduct.

The government rehashes the allegations that Mr. Jemal gave Mr. Lorusso things of value in return for Mr. Lorusso signing leases for D.C. tenants at 77 P Street, and claims that the "undisputed" evidence established that Mr. Jemal obtained the D.C. government's lease of Addison Road at "four or five times the going rate" for such a property after hosting Mr. Lorusso as a guest in Las Vegas.  Gov't Mem. at 13-15.  While the government begrudgingly acknowledges that "the jury may have concluded these items were not bribes," <u>id.</u> at 13, it persists in arguing that the Court should impose an upward departure based on "the defendant's <u>proven dishonesty</u> . . . vis-à-vis the D.C. Government (both dealings with Lorusso and the various invoices). . . ."  <u>Id.</u> at 17 n.15 (emphasis added); <u>see also id.</u> at 29 (characterizing Mr. Jemal's "conduct vis-à-vis the D.C. Government and Lorusso" as "certainly dishonest").

The government's argument flatly ignores the jury's verdicts.  The jury not only concluded that the things of value provided to Mr. Lorusso were not bribes, it rejected the government's claim that they amounted to the lesser offense of illegal gratuities.  The jury also acquitted all Defendants of the mail fraud charge alleging that Defendants defrauded the District of Columbia by submitting false invoices and overcharging for leases (Count Three).  Thus, there has been no "proven dishonesty" regarding Mr. Jemal's interaction with the District of Columbia government.  Quite the contrary, the jury flatly rejected the government's theory of the case by acquitting all Defendants of all of the public corruption and fraud charges related to the District of Columbia.

The government also claims that Mr. Jemal has wrongly characterized himself as "a great friend of the city and its government," when in fact, according to the government, "the relationship between Jemal and the D.C. government should not be understood as anything other than one stemming from Jemal's business needs and his desire to maximize profits."  Gov't Mem. at 14.  In addition to its attempt to relitigate the allegations regarding 77 P Street and Addison Road, the government even goes so far as to raise questions about Mr. Jemal's efforts to rezone the Woodies building and seems to suggest that the acceptance of tax subsidies by tenants that Mr. Jemal attracted to the Woodies building was somehow an act of profiteering on Mr. Jemal's part.  Id. at 13-14.  In reality, Mr. Jemal committed substantial resources to developing the Woodies building and holding out for an anchor retail tenant that would attract consumers to downtown D.C. with nothing more than an informal verbal commitment from D.C. government officials that tax subsidies would be available in the future.  The government's

attempt to twist this transaction to support its theory of Mr. Jemal as a greedy developer is baseless.[1]

Mr. Jemal has never disputed that he is a businessman.  However, the claim that Mr. Jemal has been motivated in his dealings with the D.C. government solely by a desire to "maximize profits" is demonstrably false.  Gov't Mem. at 14.  As dozens of letters to the Court reflect, Mr. Jemal is a good corporate citizen who regularly takes actions to benefit the City that are not always in the interest of maximizing profits.  For instance, Michael D. Wallach, COO of the Anacostia Economic Development Corporation, notes that Mr. Jemal passed up several opportunities to sell property in Anacostia at a profit:

> [Mr. Jemal] proved he was not looking for the quick profit and has
> continued to work with AEDC to see our project to fruition.
> Mr. Jemal was not and is not in this business for the quick buck.
> His history and commitment to this city is apparent by his deeds.

Heberlig Decl. ¶ 91 (Ex. 89).  Similarly, Councilmember Jack Evans writes that "Doug has also been very focused on historic preservation and making sure the retailers and others using his property are appropriate for our city.  His commitment to the civic good of Washington has greatly benefited all of us who live and work here."  Id. ¶ 70 (Ex. 68).  OPM official Aimee Ochetti writes that "Douglas has contributed significantly to real estate development in the District," and "attribute[s] much of the development downtown and in this city to him."  Id. ¶ 69 (Ex. 67).  Former-Deputy Mayor of Economic Development Eric Price and his colleagues write

---

[1] The government now concedes that the zoning change at the Woodies building in 2001 was "worth tens if not hundreds of millions of dollars" to Mr. Jemal.  Gov't Mem. at 14.  Yet at trial, the government devoted a substantial portion of its case to attempting to prove that Mr. Jemal had a motive to bribe Mr. Lorusso because he was in desperate financial condition during the exact same time period in 2001, and even fought Mr. Jemal's attempt to introduce evidence regarding the Woodies rezoning decision during the cross-examination of the head of OPM, Carol Mitten.  Tr. 0154-56.  The government is apparently willing to acknowledge objective facts only when they suit its arguments.

that Mr. Jemal has "shown what it means to be a 'corporate citizen' by committing his time, and resources, to worthwhile projects throughout this city." Id. ¶ 181 (Ex. 179); see also id. ¶ 81 (Ex. 79) (Alexander M. Padro, Advisory Neighborhood Commissioner for the Shaw neighborhood, notes that Mr. Jemal could have abandoned redevelopment efforts in Shaw that lagged behind schedule, but "Mr. Jemal had made a promise to us that he would see the project through.  Any other developer would have walked away, but Mr. Jemal is a man of his word."); id. ¶ 204 (Ex. 202) (Former-D.C. Councilmember Harold Brazil writes, "I believe that Doug is a brave man and one that we all should admire and thank for what he did for our city.").

    In sum, the relevant City officials who have actually dealt with Mr. Jemal in a professional capacity believe he has done good things for the city of Washington, D.C. and have written to the Court seeking leniency for Mr. Jemal.  The Court should decline to consider acquitted conduct relating to public corruption and the D.C. government and instead take into account Mr. Jemal's good corporate citizenship when fashioning an appropriate sentencing in this case.

### 2.    The Court Should Not Consider Acquitted And Uncharged Conduct Regarding Purported Tax Evasion

    The Court should similarly decline to enhance Mr. Jemal's sentence on the basis of his purported efforts to assist Douglas Development employees in evading income taxes.  The government relies upon both the charged conduct related to Mr. Esherick of which Mr. Jemal was acquitted and the uncharged conduct related to Douglas Development CFO John Brownell that the government did not even attempt to prove at trial.

    As the Court is aware, re-numbered Counts Five through Seven of the Indictment charged Mr. Jemal and Mr. Esherick with tax evasion based on Douglas Development allegedly compensating Mr. Esherick in ways that were not reported to the IRS, including loans, and the

payment of certain housing, automobile and other personal expenses.  The jury acquitted

Mr. Jemal of all of these tax evasion charges, acquitted Mr. Esherick of Count Seven related to

calendar year 2003, and convicted Mr. Esherick of Counts Five and Six related to calendar years

2001 and 2002 -- the years in which Mr. Esherick claimed improper deductions for mortgage

interest and property tax he did not pay.  Mr. Esherick did not contest his guilt relating to these

deductions and his counsel accepted responsibility on Mr. Esherick's behalf during closing

argument.  It is clear from these verdicts that the jury resoundingly rejected the government's

theory that Mr. Jemal paid Mr. Esherick "disguised compensation" and instead convicted

Mr. Esherick solely based on his personal issues unrelated to Mr. Jemal.[2]

As the Court is also aware, the government indicted Mr. Brownell a few months

before Mr. Jemal's trial on tax evasion charges related to the manner in which Mr. Brownell was

compensated by Douglas Development.  This action was an unsuccessful attempt to pressure

Mr. Brownell and/or Mr. Jemal into pleading guilty.  Not surprisingly, when this tactic failed, the

government retreated significantly from the indictment on the eve of Mr. Brownell's trial by

permitting Mr. Brownell to plead guilty to a single charge of tax evasion based on

Mr. Brownell's admission that he should have declared as income a $10,000 check he received

in 1999.  Mr. Brownell did not admit to receiving any disguised income from Mr. Jemal in the

form of loans, and, we submit, the government completely failed to prove at the recent

sentencing hearing before the Court that Mr. Brownell intentionally failed to declare any other

income.

---

[2] Although the Court granted the government's pretrial motion to introduce 404(b)
evidence relating to the manner in which Mr. Jemal compensated Mr. Brownell, the government
deliberately elected not to attempt to prove such conduct at trial.  The government's attempt to
enhance Mr. Jemal's sentence on the basis of conduct it declined to prove at trial is truly
disingenuous under these circumstances.

Despite Mr. Jemal's acquittals on the tax counts and the lack of any finding that Mr. Jemal improperly compensated his employees, the government asserts as fact that the loans Douglas Development provided senior employees were "nonsense," "fictional and meaningless." Gov't Mem. at 11. The government further claims that its investigation "uncovered the criminality at the core of [Mr. Jemal's] compensation practices," id., and that Mr. Jemal's generous act of providing places for Mr. Esherick to live while going through a tough divorce and getting back on his feet was "just a way of permitting Esherick and Jemal to dodge taxes . . . ." Id. at 12. The jury rejected the very same arguments by acquitting Mr. Jemal completely and acquitting Mr. Esherick of Count Seven, which included the identical allegation about disguised income in the form of housing.

Inexplicably, despite the fact that the jury acquitted Mr. Jemal of every charge that he evaded taxes by providing Mr. Esherick with disguised income, the government claims that "[t]here is really no dispute" that Mr. Esherick's salary "was deliberately kept low and that Jemal provided Esherick was provided [sic] income in other forms." Id. The government refuses to accept reality. The jury's verdicts resoundingly rejected the government's entire theory of prosecution regarding the so-called "disguised income" to Mr. Esherick. There is even less evidence that Mr. Jemal aided and abetted Mr. Brownell in tax evasion. The Court should decline to enhance Mr. Jemal's sentence on the basis on any tax-related acquitted or uncharged conduct.

### 3.    The Court Should Not Consider Purported Bad Business Practices

The lead prosecutor's lack of perspective is best exemplified by his efforts to enhance Mr. Jemal's sentence based on the dubious proposition that Mr. Jemal is a dishonest businessman who bounces checks and fails to pay vendors. Incredibly, the government devotes

five pages of its brief to describing lawsuits that disgruntled vendors and contractors have filed against Douglas Development over the span of a 15-year period. Gov't Mem. at 4-9. The government claims that these lawsuits demonstrate that Mr. Jemal has a "routine practice of failing to honor business debts . . . ." Id. at 9. This is the same evidence that the Court precluded the government from admitting at trial in support of its motive theory. Tr. 31-32 (Aug. 24, 2006).

Enough is enough. The government's reliance on these lawsuits is silly and certainly not a basis to enhance Mr. Jemal's sentence. It is a fact of life in the real estate development and construction industries that disputes often arise between developers, contractors and subcontractors. It is also common for parties to settle litigation without admitting liability to save litigation expenses. The lawsuits against Douglas Development and Mr. Jemal prove nothing about his business practices notwithstanding the government's sinister spin to the contrary.

Moreover, the lawsuits identified by the government are trivial when compared to Douglas Development's overall operations. The government identifies 46 total lawsuits, involving total claims of $1,615,365, filed between 1991 and 2006.[3] This total averages to between two and three lawsuits per year. The lawsuits cited for calendar year 2006 involve two plaintiffs who sought damages totaling $34,627. In 2006, Douglas Development contracted the services of more than 680 different contractors and vendors and paid approximately $65 million for those services. Thus, the total claims of unpaid business debts cited by the government in 2006 amount to a mere .05% of the total that Douglas Development paid to contractors that year.

---

[3] This total excludes the lawsuit by Stephen and Marvin Jemal against Douglas Jemal, which involved a family dispute relating to Mr. Jemal's interest in "The Wiz" and was completely unrelated to any business dealings of Douglas Development.

Similarly, the government cites two lawsuits against Douglas Development in 2002 involving claims totaling $78,935. Those two claims amount to .1% of the roughly $64 million that Douglas Development paid to more than 1,000 different contractors and vendors in 2002. In 2005, Douglas Development paid approximately $97 million to more than 730 contractors and vendors, and the government fails to cite a single lawsuit against the Company in that year.

In sum, there is simply no factual basis for the government's claim that Mr. Jemal routinely fails to honor his business debts. If anything, it is a testament to Mr. Jemal's business integrity that an operation as large as Douglas Development, in the litigation-heavy real estate development and construction industries, has been targeted by so few lawsuits over the years.

The government's claim that Mr. Jemal is a dishonest businessman who routinely fails to pay his debts is further contradicted by dozens of letters of support written to the Court. According to Kate Walsh Carr, President of Cardinal Bank/Washington:

> For more than twenty-five years, I have had a professional relationship with Douglas Jemal, primarily providing financing for his business and real estate investments. He has always been honest, hardworking and responsible. There have been periods of difficult economic times in this market and there are businessmen and real estate developers, on our streets today, who took advantage of banks and others during them. During those periods of difficulty, not once did Doug Jemal try to manipulate, discount, or walk away from an obligation with anyone or any institution. He sacrificed in order to keep the reputation he earned.

Heberlig Decl. ¶ 63 (Ex. 61). Many area vendors, bankers and business associates have had similar experiences with Mr. Jemal. See, e.g., id. ¶ 196 (Ex. 194) (DLA Piper real estate partner Frederick L. Klein: "A number of my clients do business regularly with Douglas, and I therefore represent interests that are adverse to his in a business context, so I have nothing to gain by attesting to his integrity. I would advise my clients, based on my personal experience over 20 years, that Douglas is an honest man who can be trusted to make good on his promises."); id.

¶ 62 (Ex. 60) (United Bank Executive Vice President Kurtis J. Marx:  "Mr. Jemal has demonstrated excellent creditworthiness and we trust his character as a borrower and as loan guarantor."); id. ¶ 184 (Ex. 182) (Bruce Baschuk, President of Randall Hagner, a local real estate management and commercial leasing company:  "I have known and worked with Douglas in the real estate industry for years.  I have always found him to be honest, forthright and of the highest integrity.").

      Finally, there is no merit to the government's claim that Mr. Jemal pays only large businesses and preys upon the "little guy."  Gov't Mem. at 9-10.  On the contrary, many smaller vendors and contractors throughout the metropolitan area have come to rely on Mr. Jemal as a man of his word and are eager to continue doing business with him.  According to Kane Construction President and CEO Dennis O. Kane:

> I have never once had an argument with anyone from Douglas
> Development despite ample opportunity to dispute or otherwise
> contest claims for which we sought compensation while
> constructing some awfully complex renovations. . . .  The office
> has never been particularly well managed and it can take a while to
> get paid.  Patience is probably a requisite virtue when working for
> his firm, . . . But he always comes through.

Id. ¶ 130 (Ex. 128); see also id. ¶ 124 (Ex. 122) (GTM Architects Managing Principal James C. Myers:  "In fifteen plus years, Douglas has never let us down.  When he says something, you can take his word to the bank that it will happen.  In all my time working here, he may be the only client we've ever had that genuinely seemed concerned with whether or not we would be successful."); id. ¶ 126 (Ex. 124) (Maizel Construction, Inc. President Michael D. Maizel:  "Maizel Construction has been doing business with Douglas for over 5 years.  Our experience has been nothing but pleasant."); id. ¶ 134 (Ex. 132) (Icor Ltd. owner and operator Ike L. Singh:  "As a client, Douglas has not only helped me grow my business, but he has always done what

has been asked of him (by me and by Regulators).”); id. ¶ 127 (Ex. 125) (BBG-BBGM

Architects and Interiors Director of Business Development Ronda S. McCrea:  “Douglas and his

company are clients of our firm, having worked together on numerous projects. . . . I know him

to be a kind and devoted friend, always concerned first for the welfare of his colleagues,

employees, family and the community at large before himself.”); id. ¶ 136 (Ex. 134) (Eddie

Aaronson Custom Flooring, Inc. President Eddie Aaronson:  “I have known Douglas personally

for over 25 years and have been conducting business with Douglas for the past 18 years.  I can

tell you first hand Douglas is a visionary and operates with integrity and compassion in all

aspects of this life.”).

       In sum, the Court should decline to enhance Mr. Jemal’s sentence on the basis of

the government’s claims regarding purported bad business practices because they are both

irrelevant and patently false.

      **4.**    **The “Lifestyle” Issues Raised By The Government Are Not A Basis To Enhance Mr. Jemal’s Sentence**

       Throughout its brief, the government attempts to portray Mr. Jemal as a man who

believes he is both above the law and better than ordinary people.  The government also suggests

that Mr. Jemal has lived his life motivated by greed and the desire to fuel an opulent lifestyle at

the expense of the “little guy.”  The government has crafted these propositions out of whole cloth

in an offensive effort to prejudice Mr. Jemal in the eyes of the Court.  Neither proposition has

any foundation in fact, as the letters submitted to the Court reveal.

       Mr. Jemal has never contended, as the government claims, that he is “too rich, too

powerful, too successful, and too entitled to do things [his] way” to be held accountable for the

offense of conviction.  Gov’t Mem. at 2.  In an obvious attempt to pander to class and lifestyle

issues, the government fills its sentencing memorandum with claims that Mr. Jemal seeks special

treatment because he is successful or mistreats the "little guy" to get ahead.  See Gov't Mem. at 3

(Mr. Jemal is supposedly "motivated by greed"); id. at 4 (Mr. Jemal purportedly uses his

business "to support the lifestyle of the defendant (numerous houses and, for example, a rare car

collection)"); id. (Mr. Jemal has an alleged practice of harming "small businesses"); id. at 9

(Mr. Jemal purportedly routinely fails to honor business debts to "support his lifestyle" by

"[taking] out millions of dollars a year from his company for personal purposes."); id. at 9-10

(claiming that "it is typically the little guy . . . who go unpaid and are forced to sue."); id. at 29

(arguing that extending leniency to Mr. Jemal would "suggest that there is a different standard

for punishing the crimes that are committed by the wealthiest in society . . . .").

        In reality, as the letters of support submitted to the Court attest, Mr. Jemal treats

all individuals with equal respect and carries himself in the same manner professionally whether

he is dealing with a global financial institution or a small, disadvantaged local business or tenant.

Eric S. Kassoff, one of Mr. Jemal's tax attorneys, describes an example of how Mr. Jemal treated

two complete strangers during a site tour on a cold winter day:

> On our way in to the property, two homeless women could be seen
> bundled up in an alcove nearby.  Douglas excused himself from
> our conversation and walked directly over to the women and
> handed them what had to be, based on their reaction, a sizeable
> amount of cash. . . . His loyalty and commitment to friends is
> laudable, but his compassion for two destitute strangers is
> extraordinary.

Heberlig Decl. ¶ 67 (Ex. 65).  Similarly, people throughout the community describe Mr. Jemal's

"generous treatment of all individuals, regardless of their station in life," id. ¶ 230 (Ex. 201)

(Oldaker, Biden & Belair, LLP attorney Douglas J. Patton), and the respect Mr. Jemal has for all

individuals regardless of their class or social status.  See, e.g., id. ¶ 45 (Ex. 43) (Douglas

Development employee Darlene Brown:  "Douglas is a friendly casual man who treats all

individuals in a fair and respectable manner, he will hire the less advantaged person or a person who has taken a wrong turn in life and give them a chance to work towards a new way of life."); id. ¶ 119 (Ex. 117) (Kemp Mill Music President Sam Lloyd: "I find Mr. Jemal to be totally accessible. Even though we are a very small business, and client of Douglas Development, Douglas has always responded to phone calls, emails, and messages in an immediate manner."); id. ¶ 113 (Ex. 111) (Don Schaaf & Friends, Inc. President and CEO Donald M. Schaaf: "On paper, Douglas Jemal is my landlord -- but I consider him to be more than that. He's been a mentor and positive example at times, and my friend always.").

        In sum, the government has been obsessed with its view that Mr. Jemal has sought special treatment because of his success and wealth throughout this case. Indeed, the government even descends so far as to deride Mr. Jemal for relying on "paid attorneys" to defend him. Gov't Mem. at 1. Mr. Jemal certainly defended himself vigorously and stood up to the power of the federal government. But he has never sought special treatment or held himself out as above the law. Mr. Jemal seeks a lenient sentence in this case not because he is wealthy or above reproach, but rather because (1) an analysis of the applicable legal issues and Sentencing Guidelines fully supports a sentence of probation for this no-loss offense of conviction, and (2) the offense conduct is out of character from the honest businessman, generous and charitable member of the community, and devoted family man who comes before the Court for sentencing. The class and lifestyle issues raised by the government are pure fiction.

**5.    Mr. Jemal's Regrettable And Isolated Comment To A Reporter Is Not A Basis To Enhance His Sentence**

        The government places heavy emphasis on Mr. Jemal's comments to a reporter following the verdict in this case in which Mr. Jemal minimized the impact of the wire fraud conviction. Gov't Mem. at 1-2. Mr. Jemal regrets deeply that he made this inappropriate

comment in the aftermath of the trial.  As Mr. Jemal wrote in a letter of apology to the Court, he let the emotions that he felt upon being acquitted of the corruption charges get the best of him when talking to the reporter.  He has acknowledged that his comments were out of line and unacceptable.  Mr. Jemal's contrition is sincere.  We respectfully submit that the Court should not enhance Mr. Jemal's sentence on the basis of the comments.

Nonetheless, we take serious issue with the government's claim that it was improper for Mr. Jemal's attorneys to contend that Mr. Jemal was vindicated following the verdicts, and that such comments require the Court to impose "meaningful incarceration."  Gov't Mem. at 17.  Mr. Jemal's attorneys made clear at all times that the jury's verdicts indicated that Mr. Jemal had been vindicated with respect to the majority and most serious charges that he faced alleging public corruption and fraud against the District of Columbia.  The government had vigorously attacked virtually every aspect of Mr. Jemal's professional life, even going so far as to brand him a "common thief" before the jury in its opening statement.  Tr. 370-71.  Through its verdicts, the jury resoundingly rejected the vast majority of the government's case.  It was completely appropriate to observe that Mr. Jemal had been vindicated on the public corruption charges that had dominated the investigation and trial, and that ran directly contrary to the manner in which Mr. Jemal believed he has carried himself in his dealings with the District of Columbia.

Moreover, in asking the Court to incarcerate Mr. Jemal on the basis of his counsel's comments to the media, the government ignores the public statements that the U.S. Attorney for the District of Columbia made to the media following the verdicts.  Among other things, U.S. Attorney Jeffrey Taylor was quoted as saying that the verdicts "were a 'vindication of the majority of our case.'"  Carol D. Leonig & Dana Hedgpeth, D.C. Jury Acquits Jemal of

Bribery; Leading Developer is Found Guilty Of Lesser Count, Wash. Post, Oct. 27, 2006, at A1.

Mr. Taylor also stated that Mr. Jemal was convicted of "'the most serious of the charges . . .

because it has the highest statutory maximum of prison time . . . .'"  Dana Hedgpeth, Jemal

Jumps Right Back In; It's Business As Usual For Developer After Bribery Trial, Wash. Post,

Oct. 30, 2006, at D1.  The Court can draw its own conclusions as to whether Mr. Taylor's

comments accurately reflect the outcome of the trial.[4]

### B.    The Government's Guidelines Calculation Is Incorrect

####   1.    The "Intended Loss" Enhancement Does Not Apply

The Court should not apply any enhancement for "intended loss" to Morgan

Stanley in this case.[5]  It is important to clarify the precise issue before the Court regarding the

loss enhancement.  The government does not dispute that there was no actual loss to Joseph

Cayre or Morgan Stanley, and that there was no intended loss with respect to Mr. Cayre.

---

[4] It is also noteworthy that the U.S. Attorney's Office issued a press release following Mr. Brownell's guilty plea in which it set forth "facts" amounting to a tax loss of between $80,000 and $150,000 without disclosing that the government had permitted Mr. Brownell to plead guilty on the basis of a single undisclosed check for $10,000 in 1999.  See Press Release (Feb. 9, 2007), available at http://www.usdoj.gov/usao/dc/Press_Releases/2007%20Archives/Feb_2007/07051.html.

[5] The government's legal argument in support of the loss enhancement is identical in substance to its argument in the Esherick Sentencing Memorandum.  Gov't Mem. at 17 n.16.  Mr. Jemal has already demonstrated why those arguments have no merit.  See Defendant Douglas Jemal's Memorandum Of Law Regarding Intended Loss Enhancement at 21-26 ("Loss Memorandum").  On February 21, 2007, the government filed a response to Mr. Esherick's sentencing memorandum in which it addressed Mr. Esherick's argument that the intended loss enhancement does not apply.  Government's Response To Memorandum On Sentencing On Behalf Of Defendant Blake Esherick at 4-11 ("Esherick Response").  Mr. Esherick's loss argument is identical in substance to Mr. Jemal's argument in the Loss Memorandum, and their collective argument will be referred to herein as "Defendants' loss argument."  Accordingly, Mr. Jemal will focus his analysis here on why the government's response to Defendants' loss argument is unpersuasive.

Therefore, the only issue before the Court is whether Defendants intended any loss to Morgan Stanley. Under applicable Guidelines commentary and well-established precedent, the answer is clearly no.

The government does not respond directly to Defendants' argument that all of the evidence at trial pointed solely to a finding that the MTD transaction was directed at Mr. Cayre to avoid the historic fighting between Mr. Jemal and Mr. Cayre over fees to which Douglas Development was entitled, and that Defendants did not intend to impact Morgan Stanley whatsoever by the MTD transaction. Mr. Jemal maintains that an objective review of the evidence establishes that Defendants did not intend to inflict any harm or loss upon Morgan Stanley. In any event, however, even if Defendants could be deemed to have intended a loss to Morgan Stanley in the amount of the MTD invoice, the Guidelines commentary and applicable case law demonstrates that any such intended loss must be reduced to zero because (1) the Morgan Stanley loan was fully secured by collateral that prevented Morgan Stanley from suffering any loss, and (2) Defendants effectively returned the full value of the MTD invoice to Morgan Stanley by spending far more than $430,000 in additional tenant improvements at 77 P Street after the tenant improvements reserve was exhausted. See Loss Memorandum at 13-21. The government's attempt to rebut these arguments is wholly unpersuasive.

With respect to the collateral argument, the government attempts to sidestep the issue altogether by claiming that the cases cited by Defendants are irrelevant because they all involved collateral provided to secure an initial loan, whereas the MTD invoice did not reflect a loan to MTD. Gov't Mem. at 5-6. This is truly a distinction without a difference. The factual scenario here is no different than in United States v. Weidner, 437 F.3d 1023 (10th Cir. 2006), where the defendant was convicted of fraudulently increasing an existing line of credit by $1.5

million.  At sentencing, the district court refused to consider the value of the collateral that the

defendant had pledged to secure the original line of credit, reasoning that the defendant had

pledged no new collateral for the credit line increase.  Id. at 1048.  The Court of Appeals

reversed, holding that the failure to pledge new collateral did not "justify a disregard of *all* of the

collateral pledged by [the defendant] in calculating the amount of intended loss."  Id.  In a

subsequent appeal, the Court of Appeals concluded that the defendant's collateral pledged to

secure the original loan fully offset any intended loss, resulting in no loss enhancement.  United

States v. Wittig, No. 06-3166, 2006 WL 3378451, at *6 (10th Cir. Nov. 22, 2006).

       Here, the MTD invoice may not have resulted in a loan to MTD, but it became

part of the loan to the Cayre-Jemal Gateway partnership once it was paid by Morgan Stanley.

The government has always contended that Mr. Jemal and MTD were alter egos.  Thus, by

submitting an allegedly fraudulent invoice, Mr. Jemal effectively obtained the $430,000 as a loan

from Morgan Stanley.  Therefore, the Court must consider the collateral that Mr. Jemal and the

Cayre-Jemal Gateway pledged to Morgan Stanley to obtain the loan when determining intended

loss.  The amount of that collateral was $30 million in equity, plus the personal guaranties of

Messrs. Cayre and Jemal.  This collateral fully offsets any intended loss to Morgan Stanley and

reduces the intended loss amount for purposes of the Guidelines to zero.

       Other than this meaningless "distinction," the government offers no substantive

response to Defendants' argument that the collateral held by Morgan Stanley reduces any

intended loss to zero.  A simple hypothetical reveals why Defendants' interpretation is correct.

Assume that an individual (1) has no credit or ability to obtain a loan but possesses a valuable

piece of property that could serve as collateral, and (2) obtains a $430,000 loan using a false

identity but gives the bank a perfected security interest in that property, which is worth $30

million, as collateral for the loan.  The individual could well be convicted of bank fraud under these facts.  But in determining the amount of intended loss for purposes of the Guidelines, the sentencing court would be required to reduce the amount of the intended loss ($430,000) by the fair market value of the collateral at the time of sentencing ($30 million) to arrive at an intended loss of zero.  <u>See</u> U.S.S.G. § 2B1.1 (App. Note 2(E)(ii)).  The same result applies in this case.

    Equally without merit is the government's attempt to demonstrate that Defendants are not entitled to a credit against loss for the amount of the tenant improvements incurred at 77 P Street after the Morgan Stanley tenant improvements reserve was exhausted.  Guidelines commentary specifically provides that a defendant's loss should be reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant . . . to the victim before the offense was detected."  U.S.S.G. § 2B1.1 (Application Note 2(E)(i)).  In a case directly on point, the Sixth Circuit applied this commentary to reduce a defendant's intended loss to zero where the Defendant had fraudulently obtained a loan draw by misrepresenting that the funds would be spent to construct a specific building, but later effectively replaced the funds that had been drawn prematurely by spending in excess of those funds, prior to detection of the offense, on construction costs at the building.  <u>United States v. Rothwell</u>, 387 F.3d 579, 582-85 (6th Cir. 2004).  Similarly, even if the $430,000 obtained by the MTD invoice should have been spent on tenant improvements, Defendants effectively replaced those funds prior to detection of the offense by spending more than $3.7 million on additional tenant improvements at 77 P Street after the tenant improvements reserve was exhausted.

    Given the obvious impact of Application Note 2(E)(i) as applied to these facts, the government constructs its own rule that the Application Note applies only when a defendant reaches a "moral realization" that "he has done wrong" and attempts to return the proceeds of a

crime to his victim before he is caught. Esherick Response at 6. Of course, the government cites

no authority in support of this proposition. Nor is it supported by any language in the Guidelines

commentary itself. See U.S.S.G. § 2B1.1 (Application Note 2(E)(i)). The government claims

merely that Rothwell is "consistent with this point" because the court in that case applied the

commentary to a defendant who had pled guilty. Esherick Response at 6-7 n.5. If the

government's unsupported contention was correct, courts would consider application of

Application Note 2(E)(i) only in cases where the defendant pled guilty. However, the

government ignores the fact that in another case upon which it relies, United States v. Radtke,

415 F.3d 826, 842 (8th Cir. 2005), the court engaged in a careful analysis of whether the

defendants were entitled to a credit against loss under this Guidelines commentary even though

the defendants had been convicted at trial. There would have been no need to do so if the

commentary applied only to defendants who acknowledge their guilt.

   The government also claims that Defendants are not entitled to a credit against

loss because they did not "write a check" to Morgan Stanley in the amount of the MTD invoice.

Esherick Response at 4. The government's interpretation of the Guidelines commentary is

plainly incorrect. Most obviously, the government ignores the fact that the commentary permits

a credit against loss not only for money returned to the victim, but for the "fair market value of

the property returned and the services rendered . . . to the victim before the offense is detected."

U.S.S.G. § 2B1.1 (Application Note 2(E)(i)).[6] The government's analysis also ignores Rothwell,

where the defendant did not write a check to the lender but nonetheless received a credit against

---

[6] Notably, in the Esherick Response, the government omits this portion of the
commentary from its quotation. Esherick Response at 6 n.4.

loss for the full amount of the construction costs that he spent on a building to effectively replace

the funds that he had improperly borrowed.  387 F.3d at 585.[7]

        The government further contends that the excess $3.7 million that the Cayre-

Jemal Gateway partnership spent in tenant improvements at the 77 P Street building after the

tenant improvements reserve was exhausted was not actually returned to Morgan Stanley

because, the government speculates, the funds could have been spent by the Cayre-Jemal

Gateway partnership on items that did not benefit the lender.  Esherick Response at 7-8.  As

examples, the government claims the money could have been spent on a fancy lobby or

expensive energy saving windows and lighting.  Id. at 8.  The government's claims might have

merit if the expenses at issue were for base building.  However, all of the $3.7 in excess tenant

improvement costs were spent on *tenant improvements* -- precisely the sort of items covered by

the Morgan Stanley tenant improvements reserve.  Morgan Stanley had no discretion to pick and

choose among the tenant improvement expenditures when reimbursing them out of the tenant

improvements reserve.  If the $430,000 at issue had not been spent on the MTD invoice, it would

have been spent to cover the first $430,000 of the $3.7 in tenant improvement expenses incurred

by the Cayre-Jemal Gateway partnership after the reserve was exhausted.  Just as in Rothwell,

---

[7] With no meaningful response to Rothwell, the government resorts to arguing in a
footnote that it is a "non-binding, light-on-any-meaningful-analysis opinion."  Esherick
Response at 9 n.6.  Ironically, the only case that the government cites in its own sentencing
memorandum in support of the loss enhancement is United States v. Younes, 194 Fed. Appx.
302 (6th Cir. Sept. 5, 2006), available at, 2006 WL 2567481, cert. denied, 127 S. Ct. 699 (2006),
an unpublished decision from the same Court of Appeals that issued the published opinion in
Rothwell.

this is precisely a scenario in which a defendant is entitled to a credit against loss for replacing

loan proceeds before detection of an offense.[8]

    To compensate for its lack of a substantive response to Defendants' loss

argument, the government persists in its offensive focus on class and lifestyle issues.  Among

other odious claims, the government contends that Defendants seek "a 'wealthy defendant'

exception in applying the Guidelines to fraud prosecutions," Esherick Response at 4 n.3, believe

they "should be allowed to engage in fraud" because Mr. Jemal has "so many assets in collateral

[and] personal guarantees," id. at 4, and deserve "more favorable treatment because they had vast

resources at their disposal." Id. at 5.  The government's attempt to twist Mr. Jemal's

straightforward legal arguments into a plea for special treatment based on his wealth is baseless.

Mr. Jemal is not seeking a "wealthy man's exception," he urges the Court to apply the

Guidelines consistent with their commentary and well-established precedent demonstrating that

an enhancement for intended loss would be contrary to law in this case.  The government's

renewed attempt to play class politics is nothing but an ineffective smokescreen designed to

distract the Court from its lack of any substantive response to Mr. Jemal's legal analysis.

    The government also suggests that Mr. Jemal is seeking to avoid punishment

altogether by arguing that the intended loss amount is zero.  The government apparently forgets

---

   [8] The Court should reject the government's argument that the Court should use
Defendants' gain as an alternative to loss because it is purportedly too complicated to determine
which of the $3.7 million in tenant improvements actually benefited Morgan Stanley.  Esherick
Mem. at 9.  Gain may not be used as an alternative measure of loss if there is no loss or loss may
be reasonably calculated.  See Loss Memorandum at 25-26.  Here, there is no loss because of the
collateral held by Morgan Stanley.  In any event, the Court "need only make a reasonable
estimate of the loss."  U.S.S.G. § 2B1.1 (App. Note 2(C)).  The Court can easily and reasonably
conclude that at least $430,000 of the additional $3.7 million that the Cayre-Jemal Gateway
partnership spent on tenant improvements benefited Morgan Stanley, and therefore that
Defendants are entitled to a full credit against loss without any consideration of "gain."

that the Sentencing Guideline for fraud provides for a base offense of six, reflecting a judgment

by the drafters of the Guidelines that such a level is an appropriate punishment for a basic fraud

offense involving no loss.  The government further expresses indignation that under "defendants'

logic, . . . a bank teller who embezzles $5,001" would receive greater punishment than

Defendants.  Gov't Mem. at 4 n.3.  That result is mandated by a proper interpretation of the

Guidelines, not any "logic" of Defendants.  In the government's hypothetical, the bank would

have actually lost money due to the defendant's conduct, whereas here neither the bank nor

anyone else lost anything as a result of the offense.  The Guidelines call for greater punishment

when an offense actually causes a loss to an identifiable victim.  Where there is no actual loss

and any intended loss is fully offset by collateral and the value of property returned to the victim

prior to detection of the offense, the Guidelines require the sentencing court to impose

punishment based on the base offense level of six with no loss enhancement.  There is nothing

complicated or unfair about this analysis.

Finally, the government urges the Court to depart upward under the Guidelines if

it concludes that no loss enhancement applies.  Gov't Mem. at 9.  The government cites

Application Note 15(A) to § 2B1.1 in support of this argument, which provides that an upward

departure may be warranted if the offense level determined under this guideline "substantially

understates the seriousness of the offense."  However, the government fails to analyze any of the

factors set forth in the commentary indicating when an upward departure may be warranted,

none of which even remotely support an upward departure in this case.  Specifically, the offense

did not (1) have "an aggravating, non-monetary objective" such as "to inflict emotional harm,"

(2) "cause[] or risk[] substantial non-monetary harm," (3) "involve[] a substantial amount of

interest," (4) "create[] a risk of substantial loss beyond the loss determined for purposes of

subsection (b)(1)," or (5) "endanger[] the solvency or financial security of one or more victims." U.S.S.G. § 2B1.1 (App. Note 15(A)(i)-(v)).  There is absolutely no basis to impose an upward departure in this case.  If anything, to the extent the Court somehow concludes that there was an intended loss of $430,000, the Court would be well within its discretion to depart downward because such an elevated offense level, in a case where neither victim lost any money whatsoever, would "substantially overstate the seriousness of the offense."  Id. (App. Note 15(B)).

### 2.    The "Sophisticated Means" Enhancement Does Not Apply

The Court should reject the government's claim that the "sophisticated means" enhancement applies and instead conclude, as the Probation Office has, that the "sophisticated means" enhancement is not warranted in this case.  See PSIR (Addendum at p. 20).

Under U.S.S.G. § 2B1.1(b)(8), a defendant's base offense level may be increased by two levels, "[i]f (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of the fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means. . . ."  U.S.S.G. § 2B1.1(b)(8).  Sections 2B1.1(b)(8)(A)&(B) clearly do not apply in this case because the offense does not involve relocating a scheme to another jurisdiction to avoid detection or any activities outside the United States.  Similarly, the offense in this case did not involve "sophisticated means" and §2B1.1(b)(8)(C) does not apply.

Application note 6(B) to § 2B1.1 provides that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1 (App. Note 6(B)).  "The guidelines do not permit

an enhancement for any and all offense conduct that conceals an offense." United States v. Hart, 324 F.3d 575, 579 (8th Cir. 2003). "Thus, this enhancement should be reserved for those defendants who employ more complex or intricate means than those typically used in an ordinary . . . fraud scheme." United States v. Cooper, No. 02-40069-01/02/03-SAC, 2006 U.S. Dist. LEXIS 2582, at *57 (D. Kan. Jan. 24, 2006) (sophisticated means enhancement not applied to "means used in ordinary Medicare fraud cases."); see also United States v. Utecht, 238 F.3d 882, 889 (7th Cir. 2001) (regarding the identical "sophisticated means" enhancement in the tax evasion Guideline, court stated: "the enhancement should not be applied where the concealment is no more intricate or complex than the routine tax evasion case."). Unlike the especially complex and intricate cases in which courts in this District have applied the sophisticated means enhancement,[9] this case involves the submission of a single misleading invoice, and "the submission of false claims, in and of itself, cannot be said to be complex or intricate offensive conduct." United States v. Sriram, No. 00 CR 0894, 2003 U.S. Dist. LEXIS 20055, at *24 (N.D. Ill. Nov. 5, 2003).

The evidence at trial established that Defendants created MTD in anticipation of starting a legitimate real estate consulting company in August 2002, several months before the MTD invoice was submitted to Morgan Stanley on November 21, 2002. See DX 682 (IRS Form SS-4 (Application for Employer Identification Number) sent to IRS on August 27, 2002, and

---

[9] See, e.g., United States v. Gutierrez, Cr. No. 06-0006 (JGP), 2006 U.S. Dist. LEXIS 36518, at *5 (D.D.C. May 24, 2006) (sophisticated means enhancement applied to defendant who, among other things, adapted his techniques to "permit fraud and avoid detection for ten years"); United States v. McCants, Cr. No. 02-0130 (JGP), 2006 U.S. Dist. LEXIS 78409, at *37-40 (D.D.C. Oct. 27, 2006) (sophisticated means enhancement applied to defendant convicted of manufacturing false documents because he "located offices in multiple jurisdictions, and hid his equipment and operations through the use of false identities and seemingly legitimate companies.").

listing August 1, 2002 as date of MTD incorporation);[10] Tr. 864 (Medding: "Douglas

Development was setting up a LLC that would be for a specific purpose for leasing, for handling

leasing transactions"); Tr. 3369-70 (Lorusso and Esherick discussed "whether or not it would be

wise for DDC people to have a stand-alone operation to fill that role [like that of Staubach or

Cushman & Wakefield] for the city").  Therefore, this is not a case that involves "hiding . . .

transactions . . . through the use of fictitious entities, or corporate shells," U.S.S.G. § 2B1.1

(App. Note 6(B)), because MTD was not a fictitious entity, but was created to perform legitimate

services independent of Douglas Development.  At most, this case involves a single transaction

in which an existing affiliate of Douglas Development was used to issue one misleading invoice

and accompanying documents to obtain a single commission payment to which Mr. Jemal was

entitled, and does not involve the multi-faceted, especially complex or intricate conduct that

constitutes "sophisticated means."

        In addition, Mr. Jemal's limited participation in the execution of the scheme does

not warrant the enhancement because "the sophisticated means enhancement requires the

sentencing court to look at the actions taken by the individual."  United States v. Kraig, 99 F.3d

1361, 1371 (6th Cir. 1996) (Court questioned lower court's finding that sophisticated means

enhancement applied and noted that "[a] defendant involved in a complex or repetitive tax

conspiracy is not automatically given a sophisticated means enhancement if his or her personal

involvement did not constitute sophisticated means"); see also United States v. Butler, 297 F.3d

505, 517 (6th Cir. 2002) (evaluating defendant's individual conduct to determine whether

sophisticated means enhancement applied).

---

    [10] See also DX 681 (Entity Classification Election Form for MTD Real Estate Services,
LLC signed on August 29, 2002).

The government cites eight specific acts that it contends "[t]he defendant" committed that warrant application of the sophisticated means enhancement. Gov't Mem. at 22-23. Although Mr. Jemal disputes that any of these acts constitute sophisticated means, when the Court looks at the specific acts taken by Mr. Jemal, as it must, it is obvious that the enhancement is not warranted. Mr. Jemal was involved in only one of the acts cited by the government: opening an MTD bank account. The government failed to prove that Mr. Jemal was involved in any other aspect of the creation of the MTD invoice or the submission of the paperwork to Morgan Stanley. Even if Mr. Jemal knew of the existence of the invoice and related documentation, mere knowledge of events is insufficient to trigger application of the sophisticated means enhancement if the defendant's "personal involvement with them was minimal." Kraig, 99 F.3d at 1371. Mr. Jemal's minimal involvement in the alleged scheme does not rise to the level of "sophisticated" conduct that warrants the enhancement.

The government's argument in favor of the sophisticated means enhancement -- and indeed its overall argument that the offense of conviction warrants significant punishment -- is based on the mistaken premise that the use of the MTD invoice was a carefully planned plot to obtain money to be used to purchase the building at 111 Massachusetts Avenue. However, the government's arguments are inherently contradictory. On the one hand, the government contends that Mr. Jemal "needed $400,000 immediately" to purchase the building at 111 Massachusetts Avenue -- a loan set to close on December 12, 2002 -- because Douglas Development's bank accounts were overdrawn by $100,000. Gov't Mem. at 19. On the other, it argues that the MTD invoice "reflected weeks of dishonest planning," including "numerous steps, [and] careful coordination." Id. at 28.

The Court heard the evidence regarding Douglas Development's lack of accounting sophistication and haphazard cash management practices. The evidence established that Douglas Development paid its bills with whatever cash was available whenever it came in, and that the Company was constantly struggling with a shortage of cash. Viewed in light of this context, the government's theory that the MTD transaction was a calculated, long-planned effort to obtain money from Morgan Stanley to use as a down payment for the 111 Massachusetts property makes no sense. To accept the government's theory, the Court would need to conclude that Mr. Jemal (1) knew the exact amount of the $400,000 down payment for the 111 Massachusetts Avenue property (which involved a loan of $52 million and a total purchase price of $62 million) when MTD was formed in August 2002, before an agreement to purchase the property was even reached (on September 6, 2002), and nearly three months prior to the closing of the loan, and (2) went about carefully constructing the MTD invoice to ensure that he would have funds for the closing. The Court would also need to conclude that Mr. Jemal knew, months in advance, that the Morgan Stanley loan would close before the 111 Massachusetts Avenue loan, and that Morgan Stanley would authorize payment of the MTD invoice in the nick of time to permit the funds to be used as a down payment.

In reality, the picture is far more simple. The MTD transaction was a completely separate transaction focused on Joe Cayre and designed to obtain a commission to which Douglas Development was entitled without enduring the hassling and difficulties that Mr. Cayre always gave Mr. Jemal over legitimate fees and commissions. The 111 Massachusetts Avenue loan transaction proceeded on a completely separate track. A few days before that loan closed on December 12, 2002, the settlement company advised Douglas Development for the first time that it needed approximately $400,000 to close on the property. It just so happened that the

MTD invoice was paid at this time and represented an available source of cash that was used to make the down payment. Had Douglas Development been better organized, the accounting staff could have just as easily recalled that Mr. Jemal was due a credit from the seller of 111 Massachusetts Avenue, which they had learned over two months earlier, that could have fully funded the down payment. Tr. 4191-94 (Jan Peterson); DX 1203. There was simply no linkage between the MTD transaction and the purchase of 111 Massachusetts Avenue.

In sum, the sophisticated means enhancement does not apply and Mr. Jemal's base offense level should remain at level six.

### 3.    The "Vulnerable Victim" Enhancement Does Not Apply

The Court should also reject the government's claim that the "vulnerable victim" enhancement applies because Mr. Jemal used Michael Rowe to "facilitate the crime of conviction." Gov't Mem. at 25. The government claims that the enhancement can apply to third-party individuals who facilitate the crime of conviction but are not themselves the victim of any crime, and that Mr. Rowe had a diminished mental capacity sufficient to render him a "vulnerable victim." Id. at 25-26. Neither proposition is correct.

The government first claims that the "vulnerable victim" need not "be the named victim of the offense of conviction." Gov't Mem. at 25 n.18. While that statement is technically correct, the government fails to acknowledge that the "vulnerable victim" must at least be the victim of *some crime* for which the defendant is accountable as relevant conduct. Here, Mr. Rowe was not the victim of any crime and the enhancement does not apply.

The commentary to U.S.S.G. § 3A1.1 defines "vulnerable victim," in part, as any person "who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct) . . . ." U.S.S.G. § 3A1.1 (App. Note 2). Cases

interpreting this Guideline make clear that a third party who is not the victim of the offense of conviction may be a "vulnerable victim" for purposes of the Guidelines *only if he was a victim of some other crime* for which the defendant is accountable as relevant conduct. For instance, in United States v. Yount, 960 F.2d 955 (11th Cir. 1992), cited by the government, the offense of conviction was money laundering and a bank was technically the victim, but the defendant received the "vulnerable victim" enhancement because he embezzled the funds at issue from elderly account holders and thereby engaged in criminal conduct directed at those victims. Id. at 958. Similarly, in United States v. Firment, 296 F.3d 118 (2d Cir. 2002), the defendant pleaded guilty to a tax evasion conspiracy based on the failure to report income from a telemarketing scheme, and the court applied the vulnerable victim enhancement based on the victims of the telemarketing scheme because they were victims of relevant criminal conduct even though it was not the offense of conviction. Id. at 120-21.

The government does not contend that Mr. Rowe was a victim of the wire fraud offense of conviction in this case. The alleged victims of that offense were Joseph Cayre and Morgan Stanley. Moreover, Mr. Rowe was not the "victim" of any criminal conduct for which Mr. Jemal is accountable as relevant conduct. The government fails to identify any crime that Mr. Jemal committed in which he targeted Mr. Rowe. Therefore, the "vulnerable victim" enhancement is not applicable.

The government also erroneously contends that the "vulnerable victim" enhancement can apply to any person the defendant uses "to facilitate the crime of conviction." Gov't Mem. at 25. The government cites no authority to support this sweeping proposition. On the contrary, in United States v. Madden, 403 F.3d 347 (6th Cir. 2005), the court held that the "vulnerable victim" enhancement did not apply in a case involving a violation of the vote-buying

statute where the defendant paid mentally ill individuals for their votes. Although the

individuals were clearly vulnerable and certainly helped facilitate the crime of conviction, the

court held that they were not "victims" for Guidelines purposes. Id. at 349-50.

   In any event, Mr. Rowe is not "vulnerable" for purposes of the Guideline

enhancement. The commentary to Section 3A1.1 defines "vulnerable victim," in relevant part,

as a person "who is unusually vulnerable due to age, physical or mental condition, or who is

otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 (App. Note 2). As

the Tenth Circuit has aptly stated:

> The concept of "vulnerability" under the Guidelines is potentially
> confusing. Success of all fraudulent schemes depends in some
> measure on a victim's vulnerability, and perpetrators of fraud
> routinely target vulnerable individuals. The Guidelines'
> enhancement, however, is reserved for exceptional cases in which
> the victim is *unusually* vulnerable or *particularly susceptible* to the
> crime committed. . . . "Vulnerable victims" are individuals unable
> to protect themselves who therefore require greater societal
> protection.

United States v. Proffit, 304 F.3d 1001, 1006-07 (10th Cir. 2002) (citations omitted) (reversing

decision to impose vulnerable victim enhancement based on victim's illness). Similarly,

"'[s]usceptibility to the defendant's scheme *alone* is not enough to qualify victims as unusually

vulnerable. The victims must also be vulnerable members of society and fall in the same

category as the elderly, the young, or the sick.'" United States v. Medina-Argueta, 454 F.3d 479,

482 (5th Cir. 2006) (reversing decision to impose vulnerable victim enhancement based on

victims' status as illegal aliens) (citation omitted) (alteration in original).

   Consistent with these principles, courts in the District of Columbia have

concluded that individuals who qualify as "vulnerable victims" for purposes of the Guidelines

include (1) clients of the District of Columbia's Mental Retardation and Developmentally

Disabled Administration, United States v. Smith, 374 F.3d 1240, 1248-49 (D.C. Cir. 2004);

(2) "an emotionally troubled special education student," United States v. Long, 185 F. Supp. 2d

30, 40 (D.D.C. 2001); (3) an elderly "widow, who had never before managed her own finances,

and who had recently suffered a minor stroke," United States v. Fox, 159 F.3d 637 (Table),

reported in full at 1998 WL 388801, at *2 (D.C. Cir. May 6, 1998); and (4) foreign nationals

"unfamiliar with the English language and tax enforcement in the United States," United States

v. Shyllon, 10 F.3d 1, 6 (D.C. Cir. 1993). Other courts have reached similar conclusions. See

United States v. Wise, 158 Fed. Appx. 173, 179 (11th Cir. 2005) (enhancement applied in a case

involving an elderly victim with Parkinson's disease who lived in a retirement home and

required assistance with her finances); United States v. Gonzales, 436 F.3d 560, 585 (5th Cir.)

(quadriplegic was vulnerable victim in deprivation of civil rights case involving excessive force

by law enforcement), cert. denied, 127 S. Ct. 1026 (2007).

       Here, the government asks the Court to apply the "vulnerable victim"

enhancement because Mr. Rowe was a "very decent, simple, gullible, trusting individual." Gov't

Mem. at 26. Even if true, those characteristics do not make Mr. Rowe a "vulnerable victim" for

purposes of the Guidelines. Indeed, the Second Circuit recently rejected the imposition of the

"vulnerable victim" enhancement based on the victims' "gullibility," holding that fraud schemes

"inevitably attract the gullible." United States v. Dupre, 462 F.3d 131, 145 (2d Cir. 2006).

Gullible individuals do not fall into a class of individuals who are unable to defend themselves

and in need of societal protection. In fact, virtually every victim of a fraudulent scheme could be

deemed gullible. Such characteristics are insufficient to trigger the vulnerable victim

enhancement.

       Finally, the government suggests that Mr. Rowe has a diminished mental capacity

that justifies the enhancement. Gov't Mem. at 26. The government's suggestion is baseless.

The Court heard Mr. Rowe testify and he clearly does not have any diminished mental capacity sufficient to trigger the enhancement. Lest there be any doubt, we intend to ask Mr. Rowe to be present at sentencing. The government cannot obtain the enhancement by tossing around accusations of mental infirmity without any foundation. The government should withdraw its request or be prepared to question Mr. Rowe to prove his purportedly diminished mental capacity.[11]

### 4.    The "Role In The Offense" Enhancement Does Not Apply

The government does not establish that the two-level role in the offense enhancement applies in this case, instead stating in a footnote: "It is clear Jemal supervised Esherick, Brownell and Millstein, and that the scheme required numerous coordinated steps." Gov't Mem. at 27 n.20. The government's conclusory assertions are an insufficient basis to impose the enhancement and include no more analysis than the conclusory statements in the PSIR. See PSIR at 7 (¶¶ 19-22). For the reasons set forth in Mr. Jemal's Sentencing Memorandum, the Court should decline to impose any enhancement for role in the offense. See Sentencing Memorandum of Douglas Jemal at 20-22.

---

[11] The only "evidence" the government cites for this proposition regarding Mr. Rowe's mental capacity is a snippet from defense counsel's closing argument. Gov't Mem. at 26. The government fails to acknowledge that this portion of the closing argument was delivered with a heavy dose of sarcasm. Defense counsel did not treat *Mr. Rowe* as "an object of scorn if not derision," id. at 26, but rather treated *the government's* preposterous suggestion that Mr. Rowe was victimized by Defendants with scorn and derision -- a view we wholeheartedly continue to embrace. The government's out-of-context reliance on counsel's argument reveals the weakness of its argument.

C.    **The Court Should Reject The Government's Analysis Of The Sentencing Factors Under 18 U.S.C. § 3553(a)**

The Court should reject the government's claims that the sentencing factors under 18 U.S.C. § 3553(a) support a harsh sentence of between 41 and 60 months of incarceration.  In reality, as set forth in Mr. Jemal's Sentencing Memorandum (pp. 36-51), the Section 3553(a) factors fully support a Guidelines sentence of probation (based on Mr. Jemal's total offense level of six) or, to the extent the Court calculates the Guidelines differently, a lenient non-Guidelines sentence of probation.

First, the government contends that "the nature and circumstances of the offense" warrant a severe sentence.  Gov't Mem. at 28.  The government claims that the offense resulted in "a $430,000 fraud and annual tax crimes."  Id.  Unbelievably, the government appears to be urging stern punishment based on MTD's failure to file a tax return -- a portion of the case that was so flimsy that the Court granted Defendants' Rule 29 motion for judgment of acquittal with respect to the portion of the charge alleging that Defendants defrauded the IRS through the MTD transaction.  Such conduct is certainly not a basis for a substantial sentence.  Moreover, the government's argument about a "$430,000 fraud" misleadingly suggests that a victim lost that sum, when in fact the government has conceded that no victim lost any money as a result of the offense.  The "nature and circumstances of the offense" -- a no-loss fraud involving an isolated private business transaction in which neither "victim" ever complained or sought recourse against Defendants -- is a factor weighing in favor of leniency, not severity.

Second, the government contends that "the history and characteristics of the defendant" demand a harsh sentence.  Gov't Mem. at 28-29.  Here, the government rehashes its arguments, based entirely on acquitted and uncharged conduct, that Mr. Jemal is a "dishonest" individual and a career criminal "who has finally been prosecuted."  Id. at 29.  The government's

claims have no merit whatsoever, as the more than 200 letters of support submitted to the Court

demonstrate. Mr. Jemal's "history and characteristics," including a lifetime of fair dealing,

honest business integrity, family ties, and substantial charitable and community service, warrant

leniency, not severity.

Finally, the government contends that a harsh sentence would promote respect for

the law and provide just punishment. Gov't Mem. at 29. Yet it is the harsh sentence requested

by the government, based largely on acquitted and uncharged conduct, which would

"contravene[] the statutory goal of furthering respect for the law and . . . result[] in unjust

punishment for the offense for which [the defendant] was convicted. . . ." United States v.

Ibanga, 454 F. Supp. 2d 532, 539 (E.D. Va. 2006). Such a result would pervert justice and

belittle the jury's acquittal of Mr. Jemal on the majority of the charges he faced. With no

substance to its arguments, the government again plays the class and lifestyle card, claiming that

imposing a lenient sentence called for by the Guidelines would "suggest that there is a different

standard for punishing the crimes that are committed by the wealthiest in society." Gov't Mem.

at 29. On the contrary, respect for the law will be furthered by a sentence that honors the jury's

verdicts and reflects the fact that Mr. Jemal was convicted only of a no-loss fraud involving a

private business transaction, and exonerated of the myriad "crimes" that the government attempts

to relitigate in the face of a resounding defeat.

**D.    The Court Should Not Depart Upward From The Guidelines Fine Range
To Impose A Fine Under The Alternative Fine Statute**

The government requests that the Court impose a fine of $860,000 in this case

pursuant to 18 U.S.C. § 3571(d) (2000). The government, however, offers no rationale for the

request, which requires a significant upward departure from the Guidelines fine range of $500-

$5,000 based on an offense level 6, or even from the Guidelines fine range of $7,500-$75,000

based on the offense level 22 proposed in the PSIR.  PSIR at 19 (¶ 85).  The government's

request is unwarranted.

Section 3571(d) is inapplicable in this case because the offense of conviction

resulted in no loss to any victim and no "pecuniary gain" to Mr. Jemal.  The Court may impose a

fine of up to twice the amount of pecuniary gain resulting from an offense or pecuniary loss

suffered by a victim pursuant to 18 U.S.C. § 3571(d), which provides:

> If any person derives pecuniary gain from the offense, or if the
> offense results in pecuniary loss to a person other than the
> defendant, the defendant may be fined not more than the greater of
> twice the gross gain or twice the gross loss, unless imposition of a
> fine under this subsection would unduly complicate or prolong the
> sentencing process.

18 U.S.C. § 3571(d).  The government does not dispute that there was no pecuniary loss to any

person as a result of the offense.  In addition, Mr. Jemal derived no pecuniary gain as a result of

the MTD transaction because the funds at issue were borrowed from Morgan Stanley, Mr. Jemal

never defaulted on the loan, and Morgan Stanley was fully repaid when it sold the loan into a

loan securitization pool shortly after the closing.  Thus, because there was no gain to Mr. Jemal

or loss incurred by another party as a result of the offense, 18 U.S.C. § 3571(d) is inapplicable

and the $860,000 fine proposed by the government is unwarranted.

For these reasons, there is no basis to impose the significant upward departure

from the Guidelines fine range sought by the government in this case.  "There is no reason to

draw a distinction between departures from Guidelines fine ranges and departures from

Guidelines imprisonment ranges for analytical purposes."  United States v. Seale, 20 F.3d 1279,

1287 (3d Cir. 1994).  An upward departure is an extraordinary event requiring significant

justification.  Yet the government offers no reason why an upward departure is warranted.  Gov't

Mem. at 33.  The Court should reject the government's request and impose a fine within the applicable Sentencing Guidelines range.[12]

       **E.**       **The Court Should Not Preclude Mr. Jemal From Associating With Blake Esherick And John Brownell As A Condition Of Supervised Release**

       The Court should reject the government's request that it impose a condition of supervised release that "the defendant shall not associate with any person . . . convicted of a felony unless granted permission to do so by the probation officer," with the modification that such permission be obtained from the Court.  Gov't Mem. at 31 (citing U.S.S.G. § 5D1.3(c)(9)).  The government made the same request immediately after the verdicts in this case and the Court correctly denied it.  See Tr. 4882-83 (The Court:  "I don't see any interest to be served by, certainly none that the government has articulated persuasively that would serve the public's interest by requiring that Mr. Esherick should not associate further with Mr. [Douglas] Jemal. . . . [N]othing has been said that persuades me that taking that step would be in the public interest or the interest of the community.").  The government offers no new justification that would warrant separating Mr. Jemal from his trusted key employees Blake Esherick and John Brownell.

       The Court has substantial discretion to determine the appropriate special conditions of supervised release.  See United States v. Segura-Lara, No. 04-20631 (Summary Calendar), 2006 U.S. App. LEXIS 5919, at *4 (5th Cir. Mar. 8, 2006) (per curiam).  However:

---

       [12] The government falsely claims that Mr. Jemal disclosed only his personal assets to the Probation Office.  Gov't Mem. at 4 n.3.  Mr. Jemal cooperated completely in the PSIR process and provided a detailed financial statement to the Probation Officer.  In the first draft of the PSIR, the Probation Officer mistakenly omitted Mr. Jemal's business assets in the net worth calculation.  In his letter objecting to portions of the PSIR, a copy of which Mr. Jemal sent to the prosecutor, Mr. Jemal noted this error and pointed the Probation Officer to the section of his financial statement containing his business assets and his total net worth.  The Probation Officer corrected this information in the final PSIR, noting Mr. Jemal's total net worth, including business assets, in paragraph 61.

> At the same time, the court's discretion is limited by 18 U.S.C.
> § 3583(d).  Special conditions of supervised release must be
> "reasonably related" to "(1) 'the nature and circumstances of the
> offense and the history and characteristics of the defendant,'
> (2) the need 'to afford adequate deterrence to criminal conduct,'
> (3) the need 'to protect the public from further crimes of the
> defendant,' and (4) the need 'to provide the defendant with needed
> [training], medical care, or other correctional treatment in the most
> effective manner.'"

Id. (quoting United States v. Paul, 274 F.3d 155, 164 (5th Cir. 2001) (quoting 18 U.S.C.

§ 3553(a)(1)-(2))).  "Further, the conditions may involve no greater deprivation of liberty than is

reasonably necessary to achieve the latter three statutory goals."  Id. at *5 (citation omitted).

    The condition of release sought by the government is not mandatory.  See 18

U.S.C. § 3583(d); U.S.S.G. § 5D1.3(a).  Rather, such a condition "may" be imposed by the Court

if the condition is reasonably related to the sentencing factors set forth above and involves no

greater deprivation of liberty than necessary to accomplish the goals of federal sentencing.

U.S.S.G. § 5D1.3(b).  Thus, although U.S.S.G. § 5D1.3(c)(9) recommends prohibiting a

defendant from associating with any person convicted of a felony as a "standard" condition of

supervised release, the Court has substantial discretion not to impose such a condition if it is not

reasonably necessary to deter Mr. Jemal from committing future criminal acts and to protect the

public from further crimes by Mr. Jemal.

    Despite the government's repeated attempts to malign Mr. Jemal's character by

reference to acquitted and uncharged conduct, the factors set forth in 18 U.S.C. § 3553(a) do not

warrant precluding Mr. Jemal from associating with two of his key employees who have worked

hard to make Douglas Development what it is today.  The nature and circumstances of the

offense of conviction -- involving a private business transaction that caused no loss to any victim

-- do not warrant severing the ties between Mr. Jemal and Messrs. Esherick and Brownell.

The government's entire argument is premised on acquitted conduct relating to tax evasion. Yet the government again refuses to accept reality. Mr. Jemal was acquitted of all tax evasion charges. Mr. Esherick was convicted only of improperly taking mortgage interest and property tax deductions on his personal tax returns -- conduct completely unrelated to Mr. Jemal or Douglas Development. Mr. Brownell pled guilty to failing to declare a single $10,000 check in 1999. The government has never proved that Mr. Jemal knowingly assisted Mr. Brownell in tax evasion related to this single check or even had any idea how Mr. Brownell handled his personal tax affairs.[13] Yet according to the government's alternate view of reality, "when Esherick and Brownell operate under the influence of Jemal, they lose judgment, perspective and the ability to distinguish right from wrong." Gov't Mem. at 31. There is simply no basis for his assertion.

There is similarly no merit to the government's contention that severing ties between Messrs. Jemal, Esherick and Brownell "is essential to protect the community at large." Id. The government ignores the fact that all of these individuals have been under regular supervision by the Pretrial Services office since they were indicted -- more than 18 months ago in the case of Messrs. Jemal and Esherick -- and have been in close contact with each other at Douglas Development and in social settings throughout that period. None of these individuals have committed any crimes during this period of supervision and have certainly not menaced the community through their association with each other. The notion that these three men must be

---

[13] In any event, the government fails to acknowledge that Douglas Development conservatively changed its compensation practices after the government investigation began and its employees filed amended tax returns in a good faith effort to give the government the benefit of the doubt and conservatively pay taxes on items in dispute. Thus, even if the prior Douglas Development compensation practices were improper -- a proposition we vehemently dispute and one soundly rejected by the jury -- those practices have been changed and there is no possibility that they will be repeated in the future.

separated to protect the community is just as preposterous now as it was when the Court denied

the government's first attempt to separate them following the verdicts.  If any incidents arise

during the course of their supervised probation, the Court could revisit this issue at that time.

However, given their exemplary behavior during the past 18 months, there is absolutely no

reason to think that will be necessary.

    Indeed, the government appears to be the only party who believes that

Washington, D.C. is in need of protection from Mr. Jemal and his key employees.  Actual

citizens of this community believe that Mr. Jemal and his team have "virtually single-handedly

transformed this vitally important area of our City, creating thousands of jobs for our

economically challenged citizens," Heberlig Decl. ¶ 158 (Ex. 156 -- Boston Properties Executive

Vice President Raymond A. Ritchey), "provide[d] members of his staff to serve on the boards of

neighborhood nonprofits so that their leadership can be strengthened and to ensure that every

possible form of assistance that he can provide will benefit the community," id. ¶ 81 (Ex. 79 --

Commissioner, ANC 2C01 Alexander M. Padro), "been crucial catalysts for economic

improvement in parts of Washington where, at the time, others showed little to no interest," id.

¶ 151 (Ex. 149 -- Akridge President Matthew J. Klein), "based his decision[s] on what was best

for Washington and the future of the downtown retail," id. ¶ 123 (Ex. 121 -- Greta Perry

Construction Management Principal Greta Perry), and "reinvested in projects which reflected the

city's historic character and value and therefore helped to preserve our past," id. ¶ 75 (Ex. 73 --

Downtown DC Business Improvement District Executive Director Richard H. Bradley).  Even

D.C. Councilmember Jim Graham, the individual responsible for spearheading the initial

investigation into Douglas Development, "'hope[s] [Mr. Jemal is] able to reconstruct his life and

continue to serve all the interests he works for.  He's done a lot of good things for the city.'"

Dana Hedgpeth, <u>Jemal Jumps Right Back In; It's Business As Usual For Developer After Bribery Trial</u>, Wash. Post, Oct. 30, 2006, at D1.  Only the prosecutor is intent on destroying Douglas Development through needless terms of supervised release that would cause significant harm to the business.

Moreover, Messrs. Esherick and Brownell are more than Mr. Jemal's business associates at Douglas Development, they have long been treated as part of his extended family.  Thus, imposing a condition of probation precluding Messrs. Jemal, Esherick and Brownell from continuing to work together to benefit the District and its many residents, and breaking up the Douglas Development "family," would impose a greater deprivation of liberty than is reasonably necessary to achieve the goals of 18 U.S.C. § 3553(a).  In sum, the Court should deny the government's request to sever ties between these individuals.

## III.     CONCLUSION

For the reasons set forth above, and in the Sentencing Memorandum of Douglas Jemal and Defendant Douglas Jemal's Memorandum Of Law Regarding Intended Loss Enhancement, the Court should sentence Mr. Jemal to a term of probation with a special condition requiring Mr. Jemal to adopt and implement a comprehensive corporate compliance program for Douglas Development.

Respectfully submitted,

_____
Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

- 43 -

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334

Counsel for Douglas Jemal

Dated:  February 26, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2007, a copy of the foregoing motion was served on the government by the ECF filing system, and to Probation Officer Renee Moses-Gregory by email at:  Renee_Moses-Gregory@dcp.uscourts.gov.

_____
Brian M. Heberlig