## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No.  05-359-01 (RMU) |
| | : | |
| DOUGLAS JEMAL | : | |

### GOVERNMENT'S 1) RESPONSE TO SENTENCING MEMORANDUM OF DOUGLAS JEMAL, AND 2) REQUEST FOR UPWARD DEPARTURE

The United States of America, through its attorney, respectfully submits this Response to the Defendant's Memorandum in Aid of Sentencing.

## I. INTRODUCTION

There is but one decision for the Court:  the appropriate sentence for the defendant based on his wire fraud conviction in this case.  The Court must take into account as a starting point the Sentencing Guidelines but ultimately render a sentence that satisfies the need for punishment, deterrence, and the requirement of fairness under the law.  This Court may properly take into account evidence that it saw and heard – evidence that exposed the private workings of Douglas Jemal and his closest confederates – even if such evidence was not known to the letter writers in this case.  The Court is not required to turn its head and disregard evidence that was presented in open Court for the world to see.

The defendant's attack on the prosecutor, like the ones throughout Mr. Esherick's memorandum, is little more a distraction and has absolutely nothing to do with any issue before the Court.  The government is not responsible for the criminal conduct of Mr. Jemal and Mr. Esherick.  The government presented the evidence, the Court permitted nearly all the charges to go to the jury, and it was the jury that found each of the defendants guilty.  Further, it was Congress that enacted the Sentencing Guidelines – to ensure that the wealthy were treated just

like everyone else at sentencing and could not insulate themselves by their privileged positions when they commit $400,000 frauds.

The defendant finds it inconceivable that the Government seeks to hold him to the same sentence that anyone would receive convicted by a jury of a $400,000 offense and lashes out at those who do not see the crime or conviction as a petty offense but instead seek to hold him accountable just like any other convicted defendant facing sentencing. Thus, the defendant maintains he is entitled to an exemption from <u>standard</u> conditions of supervised release that are routinely applied to all criminal defendants. From the defendant's perspective, the Government's failure to make allowances when he and his confederates commit crimes reflects the irrational decisions of the Government in not bending to the defendant's world view.

Indeed, the attacks on the prosecution are relevant only in one aspect: to the extent they truly reflect the defendant's view of where responsibility lies, such attacks only highlight his truly unrepentant defiance, his sense of entitlement, and his decision to blame others as he faces consequences of his criminal misconduct.

Thus, as of now, three of the four highest-ranking officials from Douglas Development – the defendant, Mr. Esherick and Mr. Brownell – have been found guilty of felonies involving fraud and tax evasion, and Mr. Brownell, in pleading guilty to tax evasion, acknowledged facts that implicated Mr. Jemal. These crimes would not have occurred but for Douglas Jemal's leadership of his company.

## II. THE SENTENCING ISSUES

### A. Introduction

In the face of a jury verdict finding the defendant guilty of wire fraud, the defense seeks as punishment even less than a slap on the wrist.

For reasons discussed in greater detail, the defendant's factual arguments for leniency are, at bottom, rooted in claims that the defendant's privileged status should exempt him from punishment. These arguments should be soundly rejected. The defendant's procedural arguments – that the Court should look at only what the defendant wishes the Court to look at but ignore what the Court has seen with its own eyes in trial – are contrary to law. And, as far as the Guidelines are concerned, some of the defendant's contentions, such as that the defendant was not a "supervisor" within the meaning of the Guidelines, are simply untenable. The proposed sentence – probation and a "corporate compliance" program – is wholly inadequate and fails to do justice to the verdict in this case.

At the outset, several comments are in order. First, in his pleading, the defendant equates his pursuit of upscale investment opportunities in the "Penn Quarter" section of the District of Columbia with charity work, implying – though not stating – that his pursuit of profits by building office and commercial space is a virtue for which he deserves leniency. The most fundamental reason to reject these arguments is that they were the precise arguments that were raised by the defendant to avoid being held culpable and were rejected by the jury. Moreover, these are the sorts of arguments that are the uniquely available to wealthy white-collar businessmen. They should be rejected out of hand.

Defendant has submitted letters from high-level officials in the business community –

people in whose circles he travels and with whom it is necessary for him to deal in pursuit of business interests.[1]  The jury heard that there are businessmen who hold the defendant in high regard.  However, the defendant has all but conceded that the MTD invoice was a false and fraudulent document and that he used it to obtain money.  The letter writers are clearly unaware of or unwilling to accept these facts and defendant's willingness to resort to dishonest means to obtain money.  They just don't know what the jury knew and found beyond a reasonable doubt.

Third, the defendant goes so far as to suggest that the real problem of his company was the lack of better management, implying that some third party forces outside his control were somehow involved in committing the crime of conviction and thus a "corporate compliance" must be installed to keep him from committing further crimes.  Of course, it was the <u>defendant,</u> and no one but the defendant, who was fully responsible for the dishonest practices revealed at trial.

Moreover, if the defendant were serious about cleaning up his company, he would have immediately fired Blake Esherick and John Brownell, thereby ridding himself of the convicted felons he selected to occupy the highest levels of his company's management.  The defendant sat through the trial of Mr. Esherick (and knows him well) and is well aware of the facts surrounding the plea and sentencing proceedings of Mr. Brownell (and knows him well).  The defendant's proposal is so profoundly inadequate, so obviously an act undertaken in anticipation of sentencing, and his demonstrated efforts toward remedial measures so truly inconsequential that, rather than serving as a viable alternative to incarceration, the defendant's proposal simply

---

[1]     Numerous letters refer to the defendant's conviction on a single fraud charge related to a private business transaction, or similar words to the same effect.

underscores the need for incarceration as the <u>only</u> appropriate sentence in this case.

### B.  Outline of this Pleading

Thus, Government first addresses the legal landscape in terms of the § 3553 factors, the Guidelines and <u>Booker</u>.  Thereafter, the Government argues:

1.   There is no need for a downward departure;

2.   If the Court finds the loss is in excess of $400,000 as argued by the government, but concludes a downward departure is appropriate, the downward departure should be minimal;

3.   If the Court finds the loss is zero as argued by the defendant: a) the Court should find, at a bare minimum, the Guidelines level is 14, and b) the Court should depart upward to reflect the seriousness of the offense and the remaining § 3553 criteria.

### C.  Legal Landscape as to the Application of the Sentencing Guidelines in Light of Booker

The defendant argues in essence that under <u>Booker</u> the Court should not be bound by the Guidelines, but to the extent the Guidelines are considered as a factor in sentencing, the Court should depart downward.

The government does not disagree with the essential premise of the defendant's contention:  certainly, post-<u>Booker</u>, the Court must consult the Guidelines but is not bound by them.[2]  However, the Court must provide specific reasons capable of appellate review if it does

---

[2]    The defense argues that the Guidelines are just one factor under 18 U.S.C. § 3553.  The Government submits this understates the weight to be provided the Guidelines.  The Guidelines have been arrived at by the United States Sentencing Commission, and the degree of departure or compliance with the Guidelines sentence provides a basis for appellate review.

not impose a Guidelines sentence.[3]  And, for purposes or appellate review, a sentence within the Guidelines is presumptively reasonable.  Thus, it is necessary that the Court make Guidelines findings and consider them in imposing sentence.  Thereafter, as the defense and Government both recognize, the Court is not bound by such findings.

## D.  The Parties' Contentions

As a starting point, the parties have advocated diametrically different Guidelines interpretations.  The Government has argued that under the Guidelines this is a $400,000 crime and should be treated as such, that the scheme was sophisticated, that the defendant supervised two or more participants, and that it involved the exploitation of a vulnerable third party.  The government thus requests as a starting point "level 22" (as found by Ms. Moses-Gregory) and the presumption of meaningful incarceration.

The defense argues that this offense should be treated as "no loss" offense, that it was not sophisticated, and that the defendant was not a supervisor – and thus requests as a starting point "level 6" and the presumption of probation.

The defense, in its recent pleading, has argued, in essence, that even if the Court were to interpret the Guidelines as urged by the Government, the facts of the crime of conviction are not those of the "heartland" fraud case, and, in consideration of the crime and the personal qualities

---

[3]    18 U.S.C. § 3553(c) provides:

> "The Court at the time of sentencing shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence — *** (2) [is not within the Sentencing Guidelines] the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in the written order of judgment and commitment, ***."

of the defendant, the Court should depart downward to probation plus a corporate compliance program.

For reasons set forth in prior pleadings, the government argues precisely the opposite: that even if the Court were to find the Guidelines as set forth by the defendant (particularly in regard to a "no loss" finding), the Court should conclude this is far from the "heartland" of a "no loss" case, and should depart underlined_upward. In this regard, the reasons why this Court should not "depart downward" (or should do so only to a minimal degree) are, to a great extent, the same reasons that compel an upward departure and compel a sentence that includes incarceration.

### E. The Guidelines are Appropriately Set at a Loss of More Than $400,000. No Departure is Necessary

For reasons argued in other contexts, including the companion pleading addressing just the loss issue, a finding of a loss in excess of $400,000 for Guidelines purposes is appropriate. At bottom, the facts demonstrate the defendant received $400,000 by fraud and thus threatened a potential pecuniary harm to Morgan Stanley. In contrast, the defendant equates the crime of conviction as being no more serious, no more "sophisticated" and having no more "supervisory" components, than, for example, the impulsive one-time act of a bank teller, who, on the first day on the job, acting alone and supervising no one, steals $100 from her cash drawer. On the law, therefore, the government urges that the Court find the "$400,000 loss" urged by the Government, find that "sophisticated means" were used, and find that the defendant was a "supervisor."

### F.  Even if the Court Concludes that a Downward Departure is Appropriate, <u>Such a Departure Should be Minimal</u>

Even if the Court concludes that a departure is therefore in order, the Government urges that it be minimal.

The defendant's primary arguments for less than a slap on the wrist are those typically urged by privileged defendants after conviction to avoid going to jail, and involve his community and business relationships. These arguments are expressly discouraged by Congress and the Guidelines; they should be given little weight by this Court.[4]  As one Circuit noted, for example, in connection with the sentencing of a corporate executive for violating the Sherman Act: "It would appear that high-level business executives, those who are in a position to commit Sherman Act violations, also enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities." <u>United States v. Haversat</u>, 22 F.3d 790, 796 (8th Cir. 1994).  That the defendant has many bankers and businessmen in his

---

[4]     Defendant's alleged community contributions – nearly all of which stem from his business activities – are entitled to little weight in determining the sentence. <u>See</u>, <u>e.g.</u>, Guidelines (2002 ed.) § 5H1.6:

> **<u>Family Ties and Responsibilities, and Community Ties</u> (Policy Statement)**
>
> Family ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.

See also, Guidelines (2002 ed.) § 5H1.1:

> **<u>Military, Civic, Charitable, or Public Service;  Employment-related</u> <u>Contributions; Record of Prior Good Works</u> (Policy Statement)**
>
> Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.

corner means little.   The defendant himself, through his counsel, has basically admitted to

dishonesty in obtaining money by means of the MTD invoice.  Moreover, at a broader level, an

individual of the defendant's means and stature would naturally be expected to be able to

generate letters from high-level businessmen of the sort that would not be possible, for example,

by the above-mentioned bank teller who stole $100 from her cash drawer.[5]  In enacting the

Guidelines, Congress specifically commanded that the Guidelines be "entirely neutral as to ***

socioeconomic status." 28 U.S.C. § 994(d).  That command is a powerful one in ensuring

respect for and equal justice under the law, and speaks to the necessity of holding the defendant

fully accountable for his conduct.

Though the letters reference that the defendant has occasionally displayed a generous or

charitable impulse, the simple facts are as follows: in 2002, for example, the defendant received

about $2.9 million from Douglas Development for personal purposes,[6] and refinanced properties

and obtained loans in excess of $200 million.  He claimed personal charitable contributions on

his 2002 tax return of $17,611.[7]  Many of the "good deeds" of the defendant, such as the

---

[5]     As one Court of Appeals aptly noted: "Ownership of a business, however, much like ownership of a home or of a car, represents an indicator of socioeconomic status, and, as such, is irrelevant for sentencing purposes." United States v. Mogel, 956 F.2d 1555, 1564 (11th Cir. 1992).

[6]     The defendant took out all his distributions – that is, the $2.9 million – from Douglas Development in the form of "loans" from the company to him: he took no salary, paid no social security taxes, and paid no income taxes on these amounts.

[7]     Assuming the defendant's net worth could be in excess of $100 million, this would be the equivalent of someone with $100,000 in assets donating $17.60.  There were also about $50,000 in contributions by Douglas Development listed on the company's General Ledger for 2002, including such items as an "Abe Pollin dinner," a D.C. Chamber of Commerce Luncheon, campaign contributions, and donations in the range of $500 or so to local charities.

occasional donations to local charities, are good business for him. And, in the case of the true

loans to employees – where the employee actually was required to pay him back – such acts of

generosity cost him little and generate employee loyalty.[8]

The defendant discusses his "love" for the District of Columbia. However, the people of

the District of Columbia, through its government, have been good to the defendant. The

D.C. Government has leased buildings the defendant could not otherwise lease, provided him a

sure profit on what could have been a disastrous investment in 77 P Street, and provided millions

of dollars in subsidies for the Woodies Building. Even the defendant's investment in the Avalon

Theater – trumpeted by the defendant in his pleading and at trial – involved the D.C.

Government (that is, the people of the city) giving grant money (believed to be $1.5 million) to

the Avalon Theater Project so that it could <u>purchase</u> the property from the defendant.[9]

The defendant has explicitly sought to hide behind the protective cloak of third parties to

avoid his just punishment. He thus dares the Court: if you hurt me, you hurt them as well. This

argument is not only overtly manipulative, but it is flawed in several ways. First, if innocent

third parties were to be affected by the defendant's punishment – a prospect the Government

disputes – it will be because of conduct of the <u>defendant</u>, not actions of the Court.

---

[8]     Without knowing the circumstances of the occasional free rent – whether the particular
building was otherwise occupied, whether there was a demand for the space at that location by
potential paying tenants, and similar details – the isolated "free-rent" or "forgiving back rent"
episodes mean little.

[9]     It appears that the D.C. City Council passed legislation July 14, 2005, that authorized
$1.5 million as a grant for the "Avalon Theatre Project" for its use in purchasing the property.
See Exhibit 1. The defendant attaches a letter that indicates that he left $50,000 on the table in
negotiations as to the sale price of the property to the Avalon Theatre Project. It is unknown
what additional tax credits or tax benefits the defendant received or claimed in connection with
this property.

Second, there is no reason to credit the threats that the defendant's incarceration will harm his company. The defendant has tried this line before: when seeking to reschedule the trial date in early 2006 the defendant threatened disaster for his company and his employees (and the District of Columbia metropolitan area) if he could not get to trial prior to September 2006. To obtain the requested relief, defendant specifically represented: "(1) the pending charges have severely restricted Defendants' ability to obtain real estate financing and threaten to cause irreparable damage to Defendants' business interests if trial does not take place until September 2006 ***."[10] This proved to be untrue.[11] There is no reason to credit counsel's cry of wolf this time.[12] With all the defendant's contacts in the real estate community, including those through Mr. Cayre, with the defendant's savvy people skills and ability to recognize competent leadership, it is simply not feasible to conclude that there is <u>no one</u> who he can find to run his company during the period of incarceration.[13] The defendant's loans are secured by properties, and, there is again no reason to conclude that the banks – especially in light of the numerous letters they have written to the Court on behalf of the defendant – will turn their backs on the

---

[10]  <u>Memorandum in Support of Defendants' Motion to Reschedule Trial Date</u> at 1. The accompany Declaration of the defendant stated: "My business will be severely damaged if the trial in this matter does not take place until September 2006, ***. In addition, the current situation affectus numerous current and ongoing projects, which impacts hundreds of jobs and the revitalization of the D.C. metropolitan area." <u>Declaration of Douglas Jemal in Support of Defendants' Motion to Reschedule Trial Date</u> at 6.

[11]  Attached as Exhibit 2 are some news accounts of the defendant's real estate dealings in 2006, including a real estate deal that occurred during trial. In the defendant's pleading, he cites to one banker who made loans to the defendant in 2006.

[12]  Defendant's pleading does not actually suggest that the company will go bankrupt. It simply says that there is a "substantial possibility" of that result.

[13]  The government will not object to self-surrender to permit an orderly transition..

defendant and against their own business interests by calling their loans.

Third, on policy grounds, the implications of defendant's argument are profound and cannot be countenanced. Defendant's argument would effectively immunize and insulate business owners from the consequences of crimes committed in the course of business. This cannot be the case, and, fortunately, it is not. The Guidelines and the principles of sentencing have routinely been understood as making sure that a business owner is not immune from punishment because of potential harm to his company. See, e.g., United States v. Pool, 474 F.3d 1127 (8th Cir. 2007) (post-Booker sentence reversed, where sentencing court reduced presumptive Guideline sentence of 33-41 months to 5 years probation based on potential impact to employees):

> "Notwithstanding, it is not extraordinary that in the area of white collar crime, a principal's business and employees may suffer if he is incarcerated. ***. And Pool's generosity, while certainly notable, does not support such a variance as that chosen by the district court here. While these are appropriate considerations, the court gave too much weight to the effect of any potential incarceration on Pool's employees, Pool's charitable record, and his medical condition."

(citation omitted). See also, United States v. Rutana, 932 F.2d 1155, 1158 (6th Cir., 1991) (harm to the business rejected as a basis for departure: "The very nature of the crime dictates that many defendants will likely be employers, whose imprisonment may potentially impose hardship upon their employees and families."); United States v. Sharapan, 13 F.3d 781, 785 (3rd Cir. 1994) (Alito, J.) ("[W]e see nothing extraordinary in the fact that the imprisonment of Ralph's principal for mail fraud and filing false corporate tax returns may cause harm to the business and its employees. The same is presumably true in a great many cases in which the principal of a small business is jailed for comparable offenses, and accordingly, we doubt whether these

-12-

consequences are sufficiently unusual to provide a proper basis for a sentencing departure." (citing Rutana, supra)); United States v. Reilly, 33 F.3d 1396, 1424 (3d Cir.1994) (potentially harmful consequences of defendant's incarceration on family and family businesses were not sufficient basis for departure). As one Court noted: "Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration." United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992). The impact on employees cannot be used to shield persons fortunate enough to be business owners from the criminal liability that would befall any defendant who participated in fraud of the nature and scope proved in this case. The few cases cited by the defendant represent a minority view on this matter.

Turning finally to family issues, it is apparent there is less reason to factor in the impact on the defendant's family in imposing sentence than in most of the other cases that come before the Court for sentencing. This Court is called upon to sentence single parents with children on a day in, day out basis: these are often individuals with few resources and the effect of incarceration is to separate a young child from the custodial parent. To the contrary, the defendant does not have custody of minor children and there are no other financial concerns that would affect his family.

The reasons for leniency are truly insubstantial and are rooted in the defendant's wealth. In consideration of all the facts and circumstances, including those argued in the Government's initial sentencing Memorandum, any downward departure, if granted, should be minimal.

G. Even if the Court were to find the Guidelines as Urged by the Defendant
An Upward Departure is In Order

1. The Bare Minimum Guidelines Level – Even Finding No Loss --
Should be at Level 14 (15 to 21 Months)

Even if the Court were to find "no loss" – a finding with which the government disagrees – the Guidelines should be set at level 14 (15 to 21 months) at a bare minimum. This would be the level if the Court were to find "no loss" but find, as urged by the Government, that "sophisticated means" were used and the defendant was a two-level "supervisor."

The defense argues that there is insufficient evidence for the supervisor enhancement and suggests that all the defendant did was sign a bank account for MTD. However, the defendant admitted his ownership of the scheme in his conversation with Joseph Cayre, in which he explained he used MTD because Cayre was always "break[ing] his balls" over commissions. It was the defendant who had the motive – he needed the money for settlement on 110 Massachusetts Avenue – and it was the defendant who had the critical relationships with Cayre and Michael Rowe that were implicated by the fraud scheme. Finally, it was the defendant who actually went to the bank and opened the MTD account. In light of the defendant's dominating leadership and control over the company and his subordinates, it is inconceivable that he was not a "supervisor" of Mr. Esherick and Mr. Brownell within the meaning of the Guidelines. Thus, the two level enhancement for "supervisor" – as recommended by Ms. Moses-Gregory – is well-supported.

The Government has argued and provided ample cases authority to support the finding that "sophisticated means" were used. Under § 2B1.1(b)(8), if "sophisticated means" were used: "[i]f the resulting offense level is less than level **12**, increase to level **12**" (bold in original).

Thus, even with "no loss," the defendant would start at level 12 with a sophisticated means finding. The two level adjustment for role in the offense – supervisor – would increase the Guidelines to **level 14**, yielding, even under the defendant's "no loss" contentions, the following:

Sentence for Wire Fraud - (If No Loss Found)

| 2B1.1 | Fraud | | |
|---|---|---|---|
| | (a)(2)Base Offense Level | 6 | |
| | (b)(1)(H) "No loss" | 0 | |
| | (b)(8)(C) Sophisticated Means | 2 | |
| | (but if otherwise less than 12, | | |
| | increase to 12) | | 12 |
| | OFFENSE LEVEL | | 12 |
| | 3B1.1(c)   Role in the Offense | | 2 |
| | TOTAL | | 14 |

The sentence at level 14 would be 15 - 21 months.[14]    This is the minimum Guidelines level, with no other adjustments or departures. Thus, even if the Court were to make a "no loss" finding, the Court should properly find a guidelines level of no less than level 14. The Court should not hesitate, under such a finding, to sentence the defendant to 21 months incarceration and to impose a five year term of supervised release.[15]

### 2. If the Court Were to Make the "No Loss" Finding Urged by the Defendant, the Court Should "Depart Upward"

Moreover, assuming that the Court were to find there was "no loss" as a result of its interpretation of the Guidelines, the Government submits that the facts of this case are far removed from the "heartland" of "no loss" cases. This is not a case where the defendant

---

[14]    In the prior pleading, the government mistakenly referred to the statutory maximum as 5 years. It is 20 years. The penalty increased from 5 to 20 years in June 2002, and it is correctly stated in the pre-sentence report, and has been correctly noted elsewhere.

[15]    The supervised release should include all standard terms of supervised release, including those requiring no contact with convicted felons, as well as a requirement of annual audited financial statements.

attempted to obtain $400,000 but was unsuccessful, or where the defendant obtained less than $5,000, or where the defendant actually made a good faith repayment of purloined funds before the crime was discovered. Rather, this case was a calculated fraud, perpetrated by a series of dishonest acts, designed to deceive both Morgan Stanley and Cayre and take advantage of Michael Rowe. The dollar value of the funds at issue – over $400,000 – is of a magnitude far in excess of the trivial "no loss" offense suggested by the defendants. Even if, therefore, the Court finds this is not a "pure" $400,000 loss, this Court should likewise treat it as far more serious than a "no loss" in assessing the criminal conduct that propelled it. Thus, even at "no loss," an upward departure would be in order.

Moreover, in considering the extent of the upward departure (or, if the Court were to find that $400,000 overstates the loss, in considering the extent of any downward departure), the Court should appropriately consider all the criteria of § 3553 and everything it knows of the defendant. This Court should consider evidence that it saw and heard that the defendant gave things of value to city officials, that he chose as his representatives and close associates Mr. Esherick and Mr. Brownell who committed crimes for his benefit or in his name, and that he continues to embrace them.

III. THIS COURT SHOULD CONSIDER INFORMATION WITHOUT LIMITATION

The first ten pages of the defendant's pleading discuss information the defense contends the Court should not consider. It appears the defendant takes the position that the Court should only consider his representations as to his "good" business practices but not the government's representations (bolstered by trial testimony) as to unflattering practices, such as the routine practice of bouncing checks or slow-paying and "no paying" small vendors.

Of course, this proposition is meritless. At sentencing, the Court should properly consider, without limitation, as much information about a convicted defendant as it deems relevant to the sentencing decision. As to this, the law cannot be more clear:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3661. Thus, the Court should consider matters that the Court determines to have been proven at trial, in other hearings and submissions – including, for example, what the Court knows from the Brownell proceedings, reliable evidence that Court excluded from the Jemal trial, and, most importantly, evidence from the Jemal trial that the Court has heard and seen.[16]

The defendant's comments about "acquitted conduct" miss the mark. There are numerous cases where information that has not been the subject of a jury verdict is profoundly relevant to a proper sentence and properly considered by the sentencing Court. Thus, for example, "other crimes" evidence may be excluded at trial; statements and physical evidence may be suppressed; evidence in codefendant cases may be excluded against one defendant because it unfairly prejudices another; evidence may exist of related crimes in other jurisdictions that are never prosecuted; evidence may be discovered subsequent to conviction.[17]

---

[16]    For example, the Court excluded evidence of the civil suits, largely because the defendant claimed that he had substantial defenses that would prolong the trial. The Court also drew a line subsequent to 2003 tax conduct for numerous reasons having nothing to do with the reliability of the evidence.

[17]    In this case, for example, the Government located in December 2006 the Brownell-Jemal memo of 1993, that revealed that as far back as 1993, the defendant was on notice of Brownell's actions, for his benefit, to make income "non-traceable." It is unlikely the Court would have permitted the memo to be introduced in evidence at the Jemal trial even though it was profoundly relevant to the prosecution of Mr. Brownell. The Court is not required to pretend that the memo

-17-

However, criminal prosecutions are not a sport where the evidentiary rules that keep evidence from a jury operate to keep that same evidence from being appropriately considered by the Court at sentencing.

The same reasoning supports the Court's proper consideration of what the defense refers to as "acquitted conduct." First, the requirement that the Court consider, without limitation, all conduct of the defendant has <u>always</u> been understood – pre-Guidelines, Guidelines, and post-<u>Booker</u> – as permitting the Court to consider any evidence, including so-called "acquitted conduct," so long as it has been proved by a preponderance of the evidence. This is now settled post-<u>Booker</u> law: "[A] sentencing court may base a sentence on acquitted conduct without offending the defendant's Sixth Amendment right to trial by jury. In so holding, we agree with every circuit that has considered the question post-<u>Booker</u>." <u>United States v. Dorcely</u>, 454 F.3d at 371 (D.C. Cir. 2006) (citing cases).

The contention that considering such conduct is somehow unfair or involves punishment for the acquitted offense is simply not accurate, notwithstanding the efforts of the defense to suggest unfairness: "'[C]onsideration of information about the defendant's character and conduct at sentencing does not result in "punishment" for any offense other than the one of which the defendant was convicted.' *** Rather, the defendant is 'punished only for the fact that the present offense was carried out in a manner that warrants increased punishment ***.'" <u>United States v. Watts</u>, 519 U.S. 148, 155 (1997) (quoting <u>Witte v. United States</u>, 515 U.S. 389, 401, 403 (1995)). Simply put, an acquittal does not necessarily represent a jury rejection of any particular facts and does not prove innocence. "[A]n acquittal is not a finding of fact. ***

does not exist.

-18-

Without specific jury findings, no one can logically draw any factual finding inferences." United States v. Watts, 519 U.S. at 155 (quoting United States v. Putra, 78 F.3d 1386, 1394 (9th Cir. 1996) (C.J. Wallace, dissenting)).

The consideration of such conduct in the post-Booker sentencing is particularly appropriate. As noted by one Judge of this Court:

> Booker itself provides strong support for enhancement of sentences based on acquitted conduct. See, e.g., United States v. Booker, [543 U.S. 220, 233 (2005)] ("when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant"). * * * The majority remedial opinion of Justice Breyer confirms that judges retain the authority, in an advisory Guidelines regime, to determine facts and relevant conduct for purposes of the traditional judicial role in sentencing.

United States v. Edwards, 427 F. Supp. 2d 17 (D.D.C. 2006) (Bates, J.).

Thus, for purposes of sentencing, the defense has made assertions far afield from the limited trial record. For example, the defendant asks the Court to accept as true letters from well-wishers and asks the Court to accept his representations as to his good points. None of these are set forth in "evidence" to which the Court is required to make findings; none of those representations have been proved or tested or been subject to cross-examination. Similarly, the government has brought forth some relevant information, and has taken care to make sure there is record evidence to support its contentions as to its sentencing recommendations.

Thus, the government does not otherwise rely on the "acquitted conduct" but for a single point, albeit an important one. The government does ask the Court to conclude that the trial record – by at least a preponderance of the record – demonstrates that Mr. Esherick engaged in numerous significant acts of dishonesty on behalf of Mr. Jemal. The Court can appropriately

consider the entirety of the trial record, including the evidence on the corruption and tax counts

in assessing the various sentencing factors, such as "the nature and circumstances of the offense

and the reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense," and readily conclude that in consideration of all the factors and all

the evidence, Mr. Jemal deserves meaningful incarceration.

## IV. CONCLUSION

In conclusion:

1.    The loss is and remains more than $400,000 (and sophisticated

means were used and the defendant was a supervisor);[18]

2.    If the Court finds the loss is more than $400,000 as argued by the

government but concludes a downward departure is appropriate, the downward

departure should be minimal in light of all the facts and circumstances of this

case;

3.    If the Court finds the loss is zero as argued by the defendant: a) the

Court should find, at a bare minimum, the Guidelines level is 14 – because the

crime was characterized by sophisticated means and the defendant was a

supervisor; and, b) the Court should grant the government's request for an upward

departure to reflect the seriousness of the offense, the remaining § 3553 criteria,

and all the facts and circumstances of this case.

---

[18]    And, Mr. Rowe was a vulnerable victim. The Government does not set forth here every
possible variation of factual findings the Court can make. These were covered in the initial
Sentencing Memorandum. The additional possibility, that the Court find "no loss" but find
"sophisticated means" and "supervisor," was covered in this pleading.

As to the ultimate sentence, the government requests a sentence of real and meaningful incarceration and the maximum fine, to be followed by the maximum term of supervised release. The Government, as noted, seeks standard terms of supervised release requiring that the defendant not associate with known felons. Defendant's contentions to the contrary, these terms are standard and they have particular applicability in this case.

WHEREFORE, the Government requests the Court consider this Memorandum in sentencing the defendant

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

By:

Mark H. Dubester, D.C. Bar No. 339655
Timothy G. Lynch, D.C. Bar No. 456506
Assistant United States Attorneys
555 4th Street, NW,
Washington, D.C.  20530
(202) 514-7986