UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 05-359-01 (RMU) |
| | : | |
| DOUGLAS JEMAL | : | |

GOVERNMENT'S RESPONSE TO
DEFENDANT DOUGLAS JEMAL'S MEMORANDUM
OF LAW REGARDING INTENDED LOSS ENHANCEMENT

The United States of America, through its attorney, the United States Attorney for the

District of Columbia, respectfully submits this Response to Defendant Jemal's Memorandum of

Law Regarding Intended Loss Enhancement.[1]

I. DEFENDANT'S GUIDELINE LOSS WAS $430,000.

The defendant, through myriad and necessarily complicated arguments, tries to get away

from the simple facts in this case:  the defendants intended to deprive others of $430,000 that

defendants were not entitled to by obtaining that money through a fraudulent MTD invoice

hiding the relationship between MTD and Douglas Jemal and Douglas Development and falsely

claiming entitlement to a lease commission for representing the District of Columbia.

Defendants were not entitled to receive $430,000 from Morgan Stanley for (not) representing the

District of Columbia; they wanted that money immediately to purchase another building (on

Massachusetts Avenue); they obtained that money through a fraudulent invoice; and they never

wrote a check to Morgan Stanley returning the money.

Defendants' arguments to the contrary all boil down to one overarching theme:  we have

---

[1]    This pleading tracks nearly verbatim Section II of the Government's Response to
Memorandum on Sentencing on Behalf of Defendant Blake Esherick.  Section IV of this
pleading is new.

so many assets in collateral, personal guarantees, and tenant improvement expenditures (even if

Douglas Development was overdrawn by more than $100,000 at the time of the MTD-400 Mass.

Ave. transaction), that we should be allowed to engage in fraud to obtain several hundred

thousand dollars in the short run because we (ultimately) probably could have covered the fraud

loss (unless the market went into a downturn).[2]  The Court should soundly reject such arguments.

Fraud is fraud; and Douglas Jemal and Blake Esherick had other, more legitimate ways to finance

the purchase of 400 Massachusetts Avenue (such as by obtaining a loan backed by their other

assets) than the vast majority of other people who are tempted to commit fraud because of

pressing financial need but who lack the resources and advantages of these defendants.  To

"promote respect for the law," see 18 U.S.C. § 3553(a)(2)(A), in particular the principle that we

are all equal under the law—high and low, rich and poor, rough and plain—defendants should

not be given more favorable treatment because they had vast resources at their disposal but chose

the easy, criminal way instead to obtain $430,000.

## II. DEFENDANT IS NOT ENTITLED TO A CREDIT AGAINST LOSS.

### A. There Is No Credit Based On Collateral Here.

Defendants are not entitled to a credit under Application Note 2(E)(ii) based on the

---

[2]        According to the defendants' logic, their conduct in obtaining $430,000 was less
serious than that of a bank teller who embezzles $5,001. Indeed, taken to its logical conclusion,
defendants are really arguing that it would not matter if the amount obtained by fraud was
$430,000, $1 million, or $10 million because it is nearly impossible for Douglas Jemal to ever
commit bank fraud in connection with a loan, because the bank can always sue to recover
fraudulently obtained funds.  Indeed, the defendants' interpretation of the Guidelines would carve
out a "wealthy defendant" exception in applying the Guidelines to fraud prosecutions – the
wealthier the defendant, the greater the amount of funds that could be obtained by fraud without
"intending loss" as the defendants would interpret those terms.  This is the precise opposite of the
purposes of the Sentencing Guidelines, and would distort the purposes of sentencing.

collateral pledged to obtain the Morgan Stanley loan in the first place. The fraudulent $430,000

MTD invoice was not a fraud to obtain the $67 million Morgan Stanley loan <u>ab</u> <u>initio</u>; it was a

fraud to obtain money (from the Tenant Improvement fund) to which the defendants were not

entitled, but which defendants needed immediately to purchase another building (not to renovate

77 P Street). Thus, all the cases on which defendants rely on are wholly inapposite. In those

cases, the <u>initial</u> <u>loan</u> was obtained under false pretenses or through a false application, and the

defendant's collateral backing up the loan was used as a credit against loss. Here, however, <u>the</u>

<u>$430,000 invoice paid to MTD was not a loan to MTD</u> obtained under false pretenses; it was

reimbursement for MTD's  purported representation of the District of Columbia's Department of

Transportation. MTD, unlike the defendants in the cases on which defendants rely, was not

obtaining a loan and it was never planning on paying Morgan Stanley back on such a non-loan.

Thus, defendants' lengthy discussion of these cases has no bearing whatsoever on the analysis of

the application of the Guidelines in this case.

### B. Defendants Did Not Return Money To the Victim.

Nor are defendants entitled to a credit for amounts spent on renovating 77 P Street under

Application Note 2(E)(i).[3] First, the Application Note presumes a consciousness of guilt on the

part of a defendant. That is, it is based on the notion that a defendant, realizing that he has done

wrong, decides—before he has been caught—that he should attempt to make his victim whole by

returning his unlawful proceeds. When a defendant reaches such a moral realization, and acts

---

[3]     Application Note 2(E)(i) provides, in part:

"The money returned * * * by the defendant or other persons acting jointly with
the defendant[ ] to the victim before the offense was detected."

accordingly (even before he is being prosecuted), it is typically right and fitting that the loss amount—and therefore the presumptive sentence—be reduced.

Understood in those terms, Application Note 2(E)(i) has no bearing whatsoever here. The defendants have argued repeatedly—at trial, in the post-trial motions, and in their sentencing letters and memoranda—that they never intended to harm Morgan Stanley or Joseph Cayre, and, more generally, that no loss was inflicted or intended. If, as they have consistently argued, they did no wrong, they could not have knowingly and intentionally "returned" money to Morgan Stanley or Joseph Cayre; for they would have had no reason to have done so.[4] In other words, if they were truly blameless, as they have maintained, they would not, as rational and sophisticated businessmen, have "returned" money to an entity they never intended to harm.

Second, and even more importantly, Application Note 2(E)(i) has no bearing here because there is no proof the $430,000 was actually returned to the victim. Defendants conspicuously do not argue that they cut a check in the amount of $430,000 and sent it to Morgan Stanley before the MTD fraud was discovered. But that is the only way defendants would have been entitled to a credit under Application Note 2(E)(i). See United States v. Radtke, 415 F.3d 826, 842 (8th Cir. 2005) ("The commentary to the guidelines provides that the court should apply a credit where the defendant returns the very money or property taken as part of the fraud."). Money the defendants chose to spend on tenant improvements thereafter does not count as "money * * * returned to the

_____

[4]    United States v. Rothwell, 387 F.3d 579 (6th Cir. 2004), a non-binding opinion, is consistent with this point. In Rothwell, the defendant pleading guilty for having made a false, fictitious, and fraudulent material statement in connection with a loan from the Small Business Administration. In other words, that defendant admitted that his conduct was improper, and that there thus was a victim. Under the circumstances there, but not here, it could make sense that he would repay a victim, because he was actually admitting there was a victim.

victim," because it is impossible to determine whether expenditures not approved by Morgan

Stanley benefitted Morgan Stanley or primarily benefitted the Cayre-Jemal partnership.

Morgan Stanley had a right to review and approve draws from the Tenant Improvement

fund. Morgan Stanley in fact exercised this review thoroughly, going so far as to challenge

Douglas Development's request for a commission. Thus, assuming defendant is correct that the

Cayre-Jemal partnership spent money on renovating 77 P Street above and beyond the entire

amount set aside in the Tenant Improvement fund allocated under the loan agreement, that does

not mean that the excess funds were returned to the victim.

To take an example of how the interests of property owners and lenders are not

necessarily the same, if the Cayre-Jemal partnership determined that, over the long term, the

value of the property to the partnership would be increased if $1 million was spent on the lobby

of 77 P Street, but Morgan Stanley's interests in the loan would have been sufficiently protected

by a lobby that cost $250,000, it cannot be fairly stated that the defendants "returned" $750,000

to Morgan Stanley by spending $1 million.

Likewise, if the Cayre-Jemal partnership determined that it could save money over the

long term by installing windows and lighting fixtures that saved energy, even though such

features were more expensive to purchase initially, should the additional expenditures be counted

as having been returned to Morgan Stanley if they are included in tenant improvement costs?

More generally, an owner of a building could decide to make certain tenant improvements

that were so costly that they placed other, more important but less visible, improvements in

jeopardy for lack of funding. Under such circumstances, the lender would not be seen to have

benefitted or having received the return of money with respect to such expenditures.

Put simply, the defendants obtained the $430,000 from Morgan Stanley at the end of

2002, and they never specifically and unequivocally returned that money to the victim so that

Morgan Stanley (not Blake Esherick, Douglas Jemal, or John Brownell) could decide what was

best to do with it.  Without Morgan Stanley's seal of approval on an excess expenditure—such as

the approval Morgan Stanley gave to the MTD commission because it relied on the fraudulent

invoice—there is no reasonable way to determine whether amounts the Cayre-Jemal partnership

spent on renovating 77 P Street should count as having been "returned" to Morgan Stanley.[5]

In sum, either there is no credit—because the funds were not truly returned to the

victim—or the calculations necessary to separate out expenditures that primarily benefitted the

Cayre-Jemal partnership from those which benefitted Morgan Stanley are so complicated that

the loss "reasonably cannot be determined," and the Court should look instead to the defendants'

gain.  See U.S.S.G. § 2B1.1, App. Note 2(B).[6]

Finally, to the extent the Court determines that the funds the Cayre-Jemal partnership

spent renovating 77 P Street were actually "returned" to Morgan Stanley, the sentence that would

result from a zero loss calculation "would substantially understate[] the seriousness of the

offense." See U.S.S.G. § 2B.1.1, App. Note 15(A).  Under such circumstances, the Court should

depart upward under the Guidelines to reflect the seriousness of the offense—an offense

---

[5]    To the extent Rothwell simply assumes that all moneys spent renovating a building are "returned" to a lender, without differentiating between moneys spent to further the owner's interests from funds spent to further the lender's interests, and without requiring that the money actually be given to the lender so the lender can decide whether it should go back to the owner, that non-binding, light-on-any-meaningful-analysis opinion is inconsistent with Application Note 2(E)(i) and should be disregarded.

[6]    The gain here is the value of the invoice, or $430,000.

involving defendants' sophisticated fraud scheme to obtain $430,000 by duping Michael Rowe and by using a false MTD invoice printed on fifth generation-or-more MTD letterhead designed to conceal Douglas Development's ownership and control over that entity.

III.  THE LOSS NEED ONLY BE PROVED BY A PREPONDERANCE OF THE EVIDENCE

The defendant seeks to avoid the obvious amount of loss due and owing from a fraudulent invoice in the amount of $430,000, which is understandable but unavailing.  But defendant is incorrect in contending that the Court must hear proof of the loss amount above and beyond a preponderance of the evidence.  The D.C. Circuit has made absolutely clear that a preponderance of the evidence standard is appropriate in this jurisdiction even for acquitted conduct, not just relevant conduct or conduct inherent to the convicted crime itself (as is the case here).  See United States v. Dorcely, 454 F.3d 366, 373 (D.C. Cir. 2006) ("[B]efore Booker, we rejected the argument that facts at sentencing must be proved by a more stringent standard than preponderance of the evidence * * * including findings that the defendant engaged in conduct of which he was acquitted * * *.  Nothing in Booker suggests a contrary result.").  Moreover, the sentence defendant would receive if he is quite reasonably held to account for the full value of the $430,000 MTD invoice is not so extraordinary that it could ever require more than a preponderance of the evidence.  In any event, the Court heard evidence at trial that establishes proof far beyond a preponderance of the evidence that the defendant intended a loss of $430,000 by submitting a fraudulent invoice to deprive Morgan Stanley of that amount—an amount to which defendants were not entitled and had to resort to fraud to obtain.[7]

---

[7]    Defendant's citation to a district court case from Massachusetts, United States v. Pimental, 367 F. Supp. 2d 143 (D. Mass. 2005), is wholly unavailing inasmuch as it takes the position that a sentence enhancement may not, post-Booker, be based on acquitted conduct—a

Moreover, the defendant specifically declined to seek a special verdict on this Count or any other Count, to permit such a finding to be made by the jury:

> THE COURT: * * * [T]here was some discussion as well about the possibility of a special verdict form, but I understand that that request has been withdrawn.

> MR. WEINGARTEN: Yes.

Tr. at 4648. The defense, having specifically declined to have the jury make this finding (beyond a reasonable doubt), cannot now claim that the jury should have done so.

## IV.    FINALLY, ANY AMBIGUITY IN DETERMINING THE LOSS MAY BE RESOLVED BY RELYING ON THE $430,000 GAIN TO THE DEFENDANT

The loss issue has been heavily litigated in this case and in United States v. Esherick; each side has a different view of how the loss should be determined under the Guidelines.

However, the Guidelines provide a basis to resolve this highly contested legal dispute as to loss and explicitly provide that if the loss cannot reasonably be determined, "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss." Guidelines, App. Note 2(B).

In this case, there is no question that the $430,000 gain is an appropriate "alternative measure of loss."

---

position that has been explicitly rejected by the D.C. Circuit. See Dorecly, 454 F.3d at 374; see also United States v. Edwards, 417 F. Supp. 2d 17, 25-26 (D.D.C. 2006) (rejecting Pimental).

WHEREFORE, the government requests this Court consider this Memorandum in imposing sentence.

                                        Respectfully submitted,

                                        JEFFREY A. TAYLOR
                                        UNITED STATES ATTORNEY

By:     _____
                                        Mark H. Dubester, D.C. Bar No. 339655
                                        Timothy G. Lynch, D.C. Bar No. 456506
                                        Assistant United States Attorneys
                                        555 4th Street, NW,
                                        Washington, D.C. 20530
                                        (202) 514-7986