# EXHIBIT A

# REPORT TO
# DOUGLAS DEVELOPMENT CORPORATION
# REGARDING RECOMMENDATIONS FOR
# ORGANIZATIONAL CONTROLS

## PREPARED BY

## KPMG FORENSIC[SM]
## KPMG LLP
## 2001 M STREET, N.W.
## WASHINGTON, D.C. 20036
## (202) 533-3000
## WWW.KPMG.COM

## APRIL 11, 2007

# Table of Contents

Table of Contents ……………………………………………………………..ii

Executive Summary ……………………………………………………..…….....iii

Introduction ……………………………………………………….................1

   I.  Recommendations Regarding Internal Accounting Controls ………………........3

      A.  Definitions …………………………………………………..…3

      B.  Key Business Processes and Recommendations for Internal
          Accounting Controls ……………………………………………4

  II.  Recommendations Regarding Antifraud Programs and Controls ………….....16

      A.  Types of Fraud and Misconduct ………………………………….16

      B.  Key Authoritative Frameworks for Antifraud Programs and
          Controls …………………………………………………………16

      C.  Recommendations for Antifraud Programs and Controls for DDC …..20

 III.  Recommendations Regarding Personnel and Processes to Support the
      Aforementioned Internal Accounting Controls and Antifraud Programs and
      Controls ………………………………………………………………...27

      A.  Recommendations Regarding Personnel ………………………..…27

      B.  Recommendations Regarding Processes ……………………….. 30

Conclusion …………………………………………………………………32



Report to Douglas Development Corporation
Regarding Recommendations for Organizational Controls
April 11, 2007

ii

# REPORT TO
## DOUGLAS DEVELOPMENT CORPORATION
## REGARDING RECOMMENDATIONS FOR
## ORGANIZATIONAL CONTROLS

### Executive Summary

In this report, KPMG LLP (KPMG) provides a series of recommendations regarding internal accounting controls, antifraud programs and controls, and personnel and processes to support these controls for Douglas Development Corporation (DDC).

## I. Internal Accounting Controls

*Control categories* relate to the mode for effecting controls, and *business processes* relate to the underlying operations subject to these controls.

The principal *control categories* are *reconciliation controls, management review controls, authorization controls, system access controls,* and *segregation-of-duties controls,* as well as *entity-wide controls,* which involve the control environment for an entire organization.

*Business processes* include the *cash and treasury function, lease administration and accounts receivable, construction accounts payable and cash disbursements, purchases and accounts payable, payroll, general accounting,* and *entity-wide processes and controls.*

Effective internal accounting controls relate to each of these business processes according to various control categories and the relevant frequency for practicing or applying them, e.g., daily, monthly, or quarterly.

## II. Antifraud Programs and Controls

Fraud involves aspects of *accounting* (misappropriation of assets and misstatements in financial reporting), *law* (deception that induces material detrimental reliance by another), and/or *general misconduct* (behavior that transgresses articulable and applicable organizational, business, professional, or community standards).

Numerous regulatory frameworks exert binding or influential authority over businesses and other organizations with regard to fraud risk management, including the *federal sentencing guidelines for organizations,* the *Sarbanes-Oxley Act of 2002,* the *Seaboard Report,* and the *law of fiduciary duties of care and loyalty.* These frameworks have been converging to support a set



of leading practices for organizations to adopt to *prevent, detect,* and *respond* to incidents of fraud and misconduct.

Among the most common and salient practices that DDC can use on an ongoing basis are fraud risk assessments; the appointment of a director of corporate compliance; due diligence in hiring, retaining, and promoting employees, vendors, and others; the promulgation and enforcement of a code of conduct (including a nonretaliation policy); training; a hotline for employees and others to seek guidance and report allegations of fraud and misconduct; auditing and monitoring; proactive forensic data analysis; internal investigations; internal discipline and enforcement; and corrective action that attempts to remedy the harm and examine the root causes for the breakdowns in controls.

### III. Personnel and Processes

In *designating, defining,* and *filling key personnel positions* at several levels, including professional positions for treasury, accounting, human resources, construction, and lease administration services, DDC can support internal accounting controls and antifraud programs and controls on an ongoing basis. Structural processes involving document management policies and procedures, provisions for business continuity, and a strict separation of corporate financial matters from the financial matters of the Jemal family and other individuals also can provide useful ongoing support for such controls.



**REPORT TO**
**DOUGLAS DEVELOPMENT CORPORATION**
**REGARDING RECOMMENDATIONS FOR**
**ORGANIZATIONAL CONTROLS**

**Introduction**

In this report, KPMG LLP (KPMG) provides a series of recommendations regarding organizational controls for Douglas Development Corporation (DDC), a private real estate development and management company with headquarters in Washington, D.C. It consists of three sections.

Section I consists of recommendations for a *system of internal accounting controls.* It distinguishes and defines the key concepts of *control categories,* which relate to the mode for effecting controls, and *business processes,* which relate to the underlying operational activities that are subject to these controls. It enumerates and defines the *principal control categories* of *reconciliation controls, management review controls, authorization controls, system access controls,* and *segregation-of-duties controls,* as well as *entity-wide controls,* which involve the control environment for an entire organization. Finally, it enumerates and recommends controls for the following business processes: the *cash and treasury function, lease administration and accounts receivable, construction accounts payable and cash disbursements, purchases and accounts payable, payroll, general accounting,* and *entity-wide processes and controls.*

Section II consists of recommendations for *antifraud programs and controls.* It distinguishes and defines the key types of fraud and misconduct as they relate to *accounting* aspects of *misappropriation of assets* and *misstatements in financial reporting,* the *legal* aspect of *deception* that *induces material detrimental reliance by another,* and *general misconduct* that transgresses *articulable* and *applicable organizational, business, professional, or community standards.* It then summarizes key elements of *converging regulatory frameworks* that exert either *binding* or *influential authority* over privately held organizations such as DDC with regard to fraud risk management: the *federal sentencing guidelines for organizations,* the *Sarbanes-Oxley Act of 2002,* the *Seaboard Report,* and the *law of fiduciary duties of care and loyalty* on the part of corporate leadership. Finally, it draws on this convergence of regulatory frameworks to distill and enumerate leading practices in the form of antifraud programs and controls that could help DDC to *prevent, detect,* and *respond* to fraud and misconduct.

Section III consists of recommendations regarding *personnel and processes to support the aforementioned internal accounting controls and antifraud programs and controls.* It recommends that DDC *designate, define,* and *fill key personnel positions* at several levels of the organization to support these controls. It also recommends that DDC design, implement, and evaluate on an ongoing basis structural processes involving document management policies and procedures, provisions for business continuity, and a strict separation of corporate financial matters from the financial matters of the Jemal family and other individuals.

*This report provides a general prospective plan for DDC to design, implement, and evaluate on an ongoing basis systems for internal accounting controls and fraud risk management, in*



Report to Douglas Development Corporation                                                          2
Regarding Recommendations for Organizational Controls
April 11, 2007

conformity with applicable laws, regulations, and leading practices. It addresses what KPMG understands to be the principal business processes at DDC, but KPMG does not warrant that its enumeration of these processes or its recommendations for internal accounting controls and antifraud programs and controls are exhaustive. In addition, the scope for KPMG's work in preparing this report did not include implementation of these or other recommendations, and KPMG disclaims any responsibility regarding whether DDC or others implement these recommendations.

This engagement did not include an audit, review, examination, attestation, or agreed-upon procedures engagement as the American Institute of Certified Public Accountants (AICPA) defines these terms. In performing its analysis, KPMG relied on assertions by management and its employees and legal counsel, and undertook no procedures to validate those assertions. KPMG's work was more limited than would be necessary to express an opinion on the internal control structure or the financial statements of DDC and, furthermore, it neither evaluated nor reported on material weaknesses in DDC's internal control structure. Accordingly, KPMG is not expressing an opinion on the internal control structure or the financial statements of DDC.

While information in this report may address legal concepts, no one should construe KPMG's analysis as legal advice, and no one should rely on it in lieu of legal advice.



Report to Douglas Development Corporation                                      3
Regarding Recommendations for Organizational Controls
April 11, 2007

# I. Recommendations Regarding
# Internal Accounting Controls

## A. Definitions

An essential initial step for developing internal accounting controls consists of distinguishing between the concepts of *control categories* and *business processes*. *Control categories* relate to the mode for effecting controls, while *business processes* relate to the underlying operational activities that are subject to these controls.

The principal *control categories* consist of the following:

- *reconciliation controls,* the design for which supports a demonstrable determination that two items, such as computer systems, are consistent;

- *management review controls,* through which a person analyzes and exercises oversight over activities of others;

- *authorization controls,* which demonstrate approval for the execution of transactions as in accordance with management's general or specific policies, procedures, and practices; this includes access—other than *system access (see next item)*—to assets and records in conformity with organizational policies;

- *system access controls,* which reflect the ability of an individual or group to gain entrance into a computer information system processing environment, according to access rights in the system configuration; the access rights in the system agree to the access in practice; and

- *segregation-of-duties controls,* which reflect the separation of duties and responsibilities for authorizing transactions, recording transactions, and maintaining custody of assets, to prevent individuals from both perpetrating and concealing an error or irregularity.

In addition to these control categories, *entity-wide controls,* or controls that involve the *control environment* for an entire organization, are key to an effective control framework. Entity-wide controls reflect the following seven organizational features:

- *integrity and principled leadership*, by which management demonstrates and effectively communicates to employees and other stakeholders (e.g., contractors, tenants, and lenders) a steadfast commitment to *high ethical standards* through words, actions, and the promotion of an *organizational culture* that supports *openness, dialogue, ethical decision making,* and *resolute action;*



Report to Douglas Development Corporation                                                                          4
Regarding Recommendations for Organizational Controls
April 11, 2007

- *a commitment to competence,* by which management translates the levels of competence that it desires into requisite knowledge and skills, and specifies the respective levels of competence for particular jobs;

- *an engaged and concerned senior management team,* which, through active and conspicuous oversight, plays an important role in ensuring effective internal controls;

- *management's philosophy and operating style* for identifying and assessing inherent market, regulatory, litigation, reputational, and ethical risks, and balancing these risks to effect the organization's objectives within the context of the interests of stakeholders to whom it remains responsible;

- *organizational structure,* through which members of senior management demonstrate understanding of their control responsibilities and possession of the requisite experience and knowledge commensurate with their positions;

- *authority and responsibility,* by which management provides a basis for accountability through methods for assigning responsibility, delegating authority, and establishing related policies; management uses these methods to set forth individual employees' respective roles; and

- *human resources policies and procedures,* which are central to recruiting, compensating, retaining, developing, and evaluating on an ongoing basis the people who are key to helping the organization achieve its goals and objectives.

B.  Key Business Processes and Recommendations for Internal Accounting Controls

KPMG recommends that DDC implement internal accounting controls within the following seven *business processes:* (1) the cash and treasury function, (2) lease administration and accounts receivable, (3) construction accounts payable and cash disbursements, (4) purchases and accounts payable, (5) payroll, (6) general accounting, and (7) entity-wide processes and controls.

The following subsections list the principal recommended controls for each type of *business process.*

1.  The Cash and Treasury Function

- The accounting staff *reconcile* all general ledger *cash* account balances to the *bank statements* monthly. They investigate and resolve in a timely fashion *reconciling* differences and outstanding items. The controller *reviews* cash *reconciliations* monthly (monthly *reconciliation* and *management review* controls).

- The accounting staff prepare and enter all *cash journal entries* into the MRI accounting system (MRI) and the controller *reviews* the supporting documentation (if applicable)



Report to Douglas Development Corporation                                                    5
Regarding Recommendations for Organizational Controls
April 11, 2007

daily to ensure the entries are accurate and appropriate (a daily *management review* control).

- The company uses a *cash lockbox* for the majority of payments or deposits it receives. It uses separate lockboxes when mortgage terms require this (a daily *authorization* control).

- *Someone other than* the accounting manager, controller, or chief financial officer (CFO) prepares all *checks* that arrive directly at the office, and *records* them into a daily log or *cash cover sheet* (listing). This individual endorses the checks via a stamp, "For Deposit Only," and provides the daily log or *cash cover sheet* with the checks to an administrative assistant or someone in the treasury function. The administrative assistant or person in the treasury function completes a deposit slip and personally deposits the checks to the bank. The controller or CFO *reviews* and *compares* the daily log or *cash cover sheet* to the daily deposit (daily *reconciliation, management review,* and *segregation-of-duties* controls).

- The CFO *reviews* a copy of the daily *cash receipts packages*, which contain the *cash cover sheet,* deposit slip, and copies of all checks that the company received at the *lockbox* and office (a daily *management review* control).

- The accounting manager (*someone other than* the person entering cash receipts into MRI) *reviews* and *compares* the *cash receipts batch edit report* detail and totals printout from MRI to the daily *cash receipts package* before posting the amounts to accounts receivable (daily *reconciliation, management review,* and *segregation-of-duties* controls).

- The administrative assistant *verifies* the previous day's *cash balances* for all DDC bank accounts in the treasury cash spreadsheet to the Wachovia (and other) bank reports daily (a daily *reconciliation* control).

- The administrative assistant *compares* the current-day *cash receipts, wire,* and *bank transfer activity* posted to the treasury cash spreadsheet to the current-day reports for Wachovia (and other banks) daily to verify that the banks have effected all transactions (a daily *reconciliation* control).

- *Only* the controller, CFO, or president can *initiate cash transfers* through *bank accounts.* A *second individual* is *required* to execute and complete each transfer (daily *authorization* and *segregation-of-duties* controls).

- All *wire* transfers over $25,000 require two *approvals. Only* the controller, CFO, and president have *authorization* to *approve* a *wire* transfer (a daily *authorization* control).

- A staff accountant maintains a *check log* to ensure proper *accounting* for all issued, voided, and remaining checks. The accounting manager or controller *compares* the check number sequence on the bank statement to the *check log* monthly. The accounting



Report to Douglas Development Corporation                                                                6
Regarding Recommendations for Organizational Controls
April 11, 2007

manager *reviews* the check stock monthly to ensure that no checks are missing. This review accounts for all used, voided, and unused checks (monthly *reconciliation* and *management review* controls).

- The CFO *approves* all *financing decisions* for *real property investments* and the company, and the president signs the financing agreements. The president and CFO *review* all significant financing arrangements and activity with the senior management team monthly (daily and monthly *management review* and *authorization* controls).

- The accounting staff update the *debt amortization schedules* for *borrowing* and *mortgage* activity (i.e., draws or requisitions and payments). The accounting staff *agree* or *reconcile* the general ledger balance for each of the debts to each respective amortization schedule, and the controller *reviews* the related borrowing and mortgage activity monthly for appropriateness (monthly *reconciliation* and *management review* controls).

- The accounting staff prepare all *debt* and *borrowing journal entries,* along with supporting documentation (i.e., mortgage agreements and amortization schedules), and the controller *reviews* them monthly to ensure that the entries are accurate and appropriate (a monthly *management review* control).

- The controller performs a quarterly *borrowing compliance assessment,* including a review of all *debt covenants.* The documentation for the assessment appears in the form of a checklist or memorandum and the CFO *reviews* and *approves* its supporting or required bank documentation (i.e., profit and loss statements for real estate investment properties and certifications) (quarterly *management review* and *authorization* controls).

2. Lease Administration and Accounts Receivable

- Prior to executing a lease with a new tenant or material lease renewals, the leasing department performs a *tenant evaluation* and *reviews* the prospective tenant's creditworthiness and financial position. The department will not execute a lease if the tenant's creditworthiness does not meet established *standards.* The department performs a credit check and *reviews* the entity's financial statements, tax returns, Dun & Bradstreet credit report, and bank references, as well as a summary of the tenant and lease information relating to the proposed transaction. The director of leasing and controller *review* and *approve* the results of the *tenant evaluation* to confirm the propriety of security deposits or credit decisions (daily *management review* and *authorization* controls).

- All *new leases* require the *signature* of the director of leasing. If the periodic rent payment exceeds $5,000, the lease requires *signed approval* by the CFO. If the periodic rent payment exceeds $10,000, the lease requires *signed approval* by the president (a daily *authorization* control).



Report to Douglas Development Corporation
Regarding Recommendations for Organizational Controls
April 11, 2007

7

- Lease accounting staff prepare all *lease summaries* and supporting documentation (e.g., new leases, amendments, assignments, and lease terminations). The director of leasing *reviews* daily the lease summaries and ensures the summary or extract is complete and accurate (a daily *management review* control).

- The accounting manager or controller *reviews* all *lease profiles* and *compares* the lease profiles to the lease summary and supporting documentation for accuracy. The lease accounting staff check the *lease profile* or setup printout from MRI after entry of the new lease summary information into the system (daily *reconciliation* and *management review* controls).

- The administrative assistant issues an *internal communication of new leasing activity notification* to property management personnel and the senior management team after the signing and execution of all leases (and new leases, amendments, etc.) (a daily *management review* control).

- The director of leasing and the controller must *approve* by *signature* a *lease action form* for the lease administration group to change lease account or invoicing data. The substantiation for the lease action form consists of documentation indicating tenant acceptance of the change(s) in terms, such as a lease amendment or a letter (a daily *authorization* control).

- *Access* to the lease and tenant billing information in MRI is *restricted* to user profiles within the lease administration group, and is available to individuals who require access and meet *segregation-of-duties* requirements (daily *system access* and *segregation-of-duties* controls).

- The controller *reviews* monthly the *total aged receivables* from the *accounts receivable aged delinquency report* that the lease accounting staff *reconcile* or *agree* to the general ledger balance (monthly *reconciliation* and *management review* controls).

- The director of leasing *reviews* monthly the *accounts receivable aged delinquency report* and discusses assignments with the lease accounting staff (a monthly *management review* control).

- The lease accounting staff perform a *tenant account review* for accounts with amounts outstanding for a threshold number of days on the *accounts receivable aged delinquency report*. The staff *reconcile* the tenant account information to the original lease agreement and billing documentation. Tenant service representatives contact tenants, make collection calls, and make payment arrangements or correct account information (a monthly *reconciliation* control).



Report to Douglas Development Corporation                                                    8
Regarding Recommendations for Organizational Controls
April 11, 2007

- The accounting staff prepare all *journal entries* for *accounts receivable* and the controller *reviews* the supporting documentation daily to ensure the entries are accurate and appropriate (a daily *management review* control).

- The customer service staff field calls and the director of leasing receives mail regarding *tenant complaints* about incorrect or disputed billings or questionable services. Property management *reviews* and acts on service requests and implements resolution instructions daily (a daily *management review* control).

- The lease accounting staff document all tenant account adjustments on a *tenant adjustment form* (i.e., correcting accounts and billing errors, waiving late fees, and writing off balances or amounts), and the director of leasing and controller *review* and *approve* the supporting documentation daily to understand why there are such adjustments and whether they are appropriate (daily *management review* and *authorization* controls).

- The controller *reviews* the tenant account *adjustments report* or listing from MRI monthly to ensure adjustments to receivables and tenant accounts are appropriate and that they received prior review and approval (a monthly *management review* control).

- The leasing department, with assistance from general accounting staff, develops an *asset management plan* for each real property investment that includes revenue criteria (e.g., rental rates, concessions, incentives, and other terms), expense criteria (e.g., facilities maintenance, insurance, property taxes, payroll, and other expense obligations) and return methods and expectations (e.g., internal rate of return, net present value, or net payback). The director of leasing, director of property management, and CFO annually *review* and *approve* the asset management plan (annual *management review* and *authorization* controls).

- The director of leasing and controller conduct and document *quarterly asset management plan review* meetings to monitor asset performance and changes within the portfolio. They submit changes to the asset management plan to the director of property management and CFO for *review* and *approval* (quarterly *management review* and *authorization* controls).

3.  Construction Accounts Payable and Cash Disbursements

- The controller *approves* all *additions of vendors* to the accounts payable system by initialing the new vendor form prior to data entry into MRI and ensures that the additions are appropriate and the new vendor account information is complete (e.g., address, phone number[s], and employer identification number) (a daily *authorization* control).

- The appropriate project manager *approves* all *construction invoices* by initialing or signing them before staff attach them to the monthly bank draw package/requisition for



payment by accounts payable. *Supporting documentation,* such as contracts, bid sheets, purchase orders, and check requests, is attached to *all* construction invoices for *review, approval,* and payment. The director of construction *reviews* and *approves* the draw package/requisition (monthly *management review* and *authorization* controls).

- An appropriate manager and/or director *approves* all *invoices* prior to accounts payable presenting the checks to the president for signature. The president *reviews* all *checks* and attached supporting documentation daily and signs the checks. The president *compares* the amount and payee for each check to *approved* invoices and/or check requests (supporting documentation) (daily *reconciliation, management review,* and *authorization* controls).

- The controller *reviews* daily the general ledger *account classifications* (including all asset and expense categories) and *project codings* that accounts payable and project managers have provided to ensure that the coding is appropriate. The controller performs and evidences this review while reviewing the check package (a daily *management review* control).

- All *checks* over $25,000 require two *signatures. Only* the president, CFO, and director of leasing have *authority* to sign checks (a daily *authorization* control).

- Treasury staff use Wachovia's *positive pay service* to *authorize* and clear accounts payable checks within the bank system. Positive pay is a bank control that *matches* a check's sequential number and its corresponding dollar amount at the time of printing to the sequential number and amount of a check that someone submits to the bank for payment (daily *reconciliation* and *authorization* controls).

4. Purchases and Accounts Payable

- The accounting staff *reconcile* or *agree* the total on *aged payables from the subsidiary ledger* to the *general ledger* balance at the end of month. The controller *reviews* the accounts payable reconciliation and open items lists monthly (monthly *reconciliation* and *management review* controls).

- Accounts payable staff *agree invoices* to a check request or purchase order. The appropriate manager or director *approves* all invoices prior to accounts payable staff entering the information into the accounts payable module in MRI for payment (daily *reconciliation* and *authorization* controls).

- The accounting staff prepare all *journal entries* monthly for accounts payable. The controller *reviews* the supporting documentation monthly to ensure each entry is accurate and appropriate (a monthly *management review* control).



- The controller or CFO *reviews* all *checks* that the accounts payable staff generate from MRI and the attached supporting documentation daily. *No* one *prepares manual checks* outside the accounts payable system (a daily *management review* control).

- The controller ensures that the configuration of MRI prevents the posting of *duplicate invoices,* i.e., that the interface *prohibits* the duplication of key combinations during accounts payable entry and processing (a daily *authorization* control).

- The controller *reviews* the *new vendor listing* from MRI monthly to ensure that additions to the vendor master file are appropriate and that they received prior review and approval (a daily *management review* control).

- Supervisors *review* the *expense reports* of subordinates monthly, verify that the receipts that subordinates submit *agree* to the total reimbursement request or expenses they submit, and *approve* the expense reports (monthly *reconciliation, management review,* and *authorization* controls).

- The accounts payable staff *reconcile vendor statements* to accounts payable detail or the aged payables from the subsidiary ledger monthly (a monthly *reconciliation* control).

- The receptionist fields calls and the director of leasing receives mail regarding *vendor complaints* about overdue invoices or questionable business practices. The controller *reviews* and *acts upon* instructions to resolve the matters (a daily *management review* control).

5. Payroll

- The payroll administrator prepares all *payroll journal entries.* The controller *reviews* supporting documentation for these entries weekly to ensure the entries are accurate and appropriate. Such documentation includes payroll summary reports and weekly property spreadsheets that reflect actual labor hours for charging to properties (a weekly *management review* control).

- The administrative assistant for the construction function applies *codes* to time sheets for construction employees for each construction *job account;* the construction supervisor *approves* the codes; and the director of construction *reviews* and *approves* all *time sheets* for construction employees (weekly *management review* and *authorization* controls).

- The administrative assistants for remaining service functions apply project or property *codes* to time sheets for remaining (i.e., nonconstruction) employees; the respective supervisors *approve* the codes; and the director of property management or leasing *reviews* and *approves* all *time sheets* for these remaining employees (weekly *management review* and *authorization* controls).



Report to Douglas Development Corporation                                                    11
Regarding Recommendations for Organizational Controls
April 11, 2007

- *Only* the payroll administrator and, as a back up, an office administrative assistant, have *access* to information in the *payroll system,* including the number of hours employees have worked, dates of birth, home addresses, social security numbers, marital status, benefits elections, garnishments, and other personal information in ADP. Access to this information is through only one computer and password (a daily *system access* control).

- The payroll administrator weekly *reconciles* or *agrees* weekly the *quick-view payroll edit report* from ADP to actual time sheet hours and totals to ensure the accuracy of data entries into the system (a weekly *reconciliation* control).

- The company's primary and preferred method for remitting weekly payroll payments to employees is by electronic *direct deposit* to employee-authorized bank accounts (a weekly *authorization* control).

- The payroll administrator *reconciles* or *agrees* the weekly *payroll summary reports* from ADP that list all employee hours and gross and net pay amounts to the respective *payroll deposits,* and attaches these to the respective deposits. The payroll administrator presents weekly the payroll summary reports, with the related bank deposits attached, and all non-direct-deposit payroll checks to employees to the president for *review, approval,* and signatures (weekly *reconciliation, management review,* and *authorization* controls).

6.  General Accounting

- The general accounting staff prepare all *account analyses* and *reconciliations* (e.g., for property taxes, insurance, and common area maintenance charges [CAM]) and the accounting manager or controller *reviews* monthly all account analyses and reconciliations. The staff *reconcile* or *agree* the subledger, trial balance, or account detail for each account to the general ledger balance monthly (monthly *reconciliation* and *management review* controls).

- The accounting staff prepare all *journal entries* for each real property investment and company asset and liability accounts (including asset dispositions, disposals, and write-offs or write-downs) and the controller *reviews* the journal entries and supporting documentation daily to ensure that the entries are accurate and appropriate (a daily *management review* control).

- The accounting staff update monthly the *amortization schedules* and the controller *reviews* them to ensure that the cost and amortization amounts are accurate (a monthly *management review* control).

- The leasing department and general accounting staff prepare *budgets* and *forecasts* for each real property investment (asset management, detailed operating, and capital improvement plans) and for the company as a whole. With the senior management team,



Report to Douglas Development Corporation                                            12
Regarding Recommendations for Organizational Controls
April 11, 2007

they *review* the budgets and forecasts for *approval* (annual *management review* and *authorization* controls).

- The property managers and property accountants generate *rent rolls* from MRI monthly and *analyze* them before the director of property management and the controller *review* them. The property accountant performs monthly *reconciliations* to confirm rental and other revenues, CAM charges, straight-line rents, and tenant billing adjustments (monthly *reconciliation* and *management review* controls).

- The accounting manager *analyzes* monthly the *revenue, operating expenses,* and data for each real property investment and the company as a whole, and the controller *reviews* these analyses (monthly *reconciliation* and *management review* controls).

- The accounting manager prepares from MRI monthly *profit and loss statements* for each real property investment and the controller and the senior management team *review* these statements and compare the results to the respective *budgets* and *forecasts* (a monthly *management review* control).

- The property managers prepare detailed *operating and capital improvement plans* annually for each real property investment in the portfolio. The director of property management and the controller *review* supporting documentation for revenue and expense assumptions and submit plans to the director of leasing and CFO for *approval* (annual *management review* and *authorization* controls).

- The property accountant completes a *financial close checklist* for each real property investment monthly. The accounting manager *reviews* and *approves* the completed checklist and supporting documentation to validate the completeness and accuracy of the accounting for each property. These review checklists may address various *reconciliations* (e.g., *rent rolls*, payroll, balance sheet), monthly reviews of normalized (straight-line) rent, CAM/escalation adjustments, and budgeted versus actual results (monthly *reconciliation, management review,* and *authorization* controls).

- The accounting manager maintains a month-end *closing checklist* and *reviews* the checklist with the controller. The checklist identifies all required monthly accounting activities and journal entries and indicates the completion status for each (a monthly *management review* control).

- At the end of each year, the property accountant performs a *CAM reconciliation* by *reconciling* the expenses for each real property investment in the portfolio (e.g., an expenses "true-up"). On a tenant-by-tenant basis, the property accountant prepares final *CAM/escalation allocations* for *review* and *approval* by the controller and director of leasing, and then prepares final billings for each tenant (annual *reconciliation, management review,* and *authorization* controls).



- *Only* the controller has *authorization* for *access* to set up new general ledger accounts in MRI (a daily *system access* control).

- *Only* those who require *access* to MRI and meet *segregation* requirements receive user profiles for the system, and only those with user profiles for the system have access to it (daily *system access* and *segregation-of-duties* controls).

7.  Entity-wide Processes and Controls

The internal accounting controls in this subsection address the structure, organizational culture, and managerial processes of DDC. While many of these controls do not relate directly to recording and reporting of financial information, they affect the ability of DDC's employees to implement and comply with the aforementioned internal accounting controls.

Some of these entity-wide controls coincide with leading practices for managing risks of *fraud* in *financial reporting; misappropriation of assets; deceptive practices* that induce *material detrimental reliance* by others; and *other misconduct* that violates relevant and articulable *organizational, professional, business,* and *community standards.*

Where there is such convergence between the *internal accounting controls* that section I.B.7 recommends and *antifraud program* and *control recommendations* in section II.C below, the former section recites brief information to frame the importance of each control, while the latter section provides more detailed guidance regarding these items in the context of the public and private regulatory frameworks that shape leading practices for *fraud risk management.*

The following *entity-wide processes* and *controls* provide essential support for the internal accounting controls in sections I.B.1 through I.B.6 above:

- The president and senior management team lead a process for validating the organizational *vision* of DDC as "an entrepreneurial real estate development company with a record of creating value in the DC metropolitan area," and foster an ongoing dialogue with relevant stakeholder constituencies to formulate an organizational *mission statement* that is consistent with this vision.

- The president and senior management team develop and issue a *statement of ethical principles* for the operation of DDC that is *consistent* with the vision and mission for the organization, and that reflects *substantive dialogue* with relevant *stakeholders.*

- The president and senior management team formulate an *organizational strategy* for the development of the business that is *consistent* with its vision, mission, and statement of ethical principles, with attention to current and prospective markets, services, partners, competitors, sources of talent and capital, and regulatory frameworks.



Report to Douglas Development Corporation                                              14
Regarding Recommendations for Organizational Controls
April 11, 2007

- The president and senior management team develop articulable and measurable *goals* to realize this organizational strategy—in conformity with DDC's statement of ethical principles—over relevant time horizons, including annual performance goals for the organization, and annual performance goals for key responsibility portfolios, personnel, and functions that are consistent with the organization's strategy and goals.

- The president *communicates* these goals to direct reports, who communicate them to their respective staffs, and the achievement of these goals through means that demonstrably conform with DDC's statement of ethical principles is integral to the annual *performance-evaluation process* for all employees.

- The president and senior management team conduct *regular meetings* to review *organizational performance,* assess progress in achieving annual performance *goals,* identify and respond to *events and trends* that affect the achievement of these goals, and, if necessary, modify these goals in light of organizational performance and these events and trends.

- The president and senior management team use several *key reports* for these meetings, including monthly *profit and loss statements* per section I.B.6 above, *priority project reports,* and weekly and quarterly *cash-flow schedules.*

- In addition to the monthly closing checklist in section I.B.6 above, the accounting manager prepares an *annual closing schedule* and *checklist* to assist the controller, CFO, and senior management in managing the financial closing and reporting for each fiscal year.

- The company uses an outside *insurance broker* to help assess the risks it faces and to propose for senior management's review and approval appropriate *insurance coverage.* See section III.B.2 below.

- The president and senior management team compile, document, circulate, and conspicuously promote a formal *code of conduct* for employees, agents, partners, vendors, and other relevant persons and entities that work for or with the company, and whose actions others plausibly may impute to the company. The company secures *signed acknowledgment* that those who fall under the code's jurisdiction have received it, understood its content, and agreed to abide by its terms. The code includes *standards* and other *guidance* regarding issues and processes such as the following: business practices relating to real estate construction and financing; tenant relations; fiduciary duties of care and loyalty; the use of company assets; conflicts of interest; the management and protection of confidential information regarding the company, its people, and others; fair financial reporting; competitive practices; lobbying, political activities, campaign contributions, gifts and gratuities, and relations with regulators and other government officials; employment practices; workplace safety; environmental protection and sustainable business practices; compliance with legal and regulatory obligations;



Report to Douglas Development Corporation                                                    15
Regarding Recommendations for Organizational Controls
April 11, 2007

channels for employees and others to seek guidance or report violations, with provisions to protect them from retaliation; cooperation with company inquiries and investigations; and universal applicability of the code as to requirements and disciplinary consequences, regardless of rank, tenure, relationship, or function. See section II.C.1 below for a framework that charts the general structural and procedural features of the code.

- The company follows a systematic process for designing and discharging key *human resources responsibilities,* including the designation and assignment of meaningful *job titles* that appear on business cards, correspondence, directories, forms, and in other professional communications inside and outside the company; the formulation of corresponding meaningful *position descriptions* that clearly recite the scale and scope for each position's responsibilities and the requisite *qualifications,* including education, professional credentials, and experience to discharge those responsibilities; the design of *reporting relationships* to apply these qualifications to organizational needs consistently, efficiently, and effectively; the internal publication of accurate *organization charts* for all departments and functions that list complete names, titles, and relationships of incumbents; the design, implementation, and ongoing evaluation of compensation and benefits policies and plans to maintain competitiveness in the market and internal equity, and to align incentives for performance consistently with the company's vision, mission, statement of ethical principles, strategy, and goals; and the design, implementation, and ongoing evaluation of policies and procedures for recruitment, orientation, retention, employee relations, professional development, performance evaluation, and terminations that are consistent with the company's vision, mission, statement of ethical principles, strategy, and goals. See section III.A.13 below.

The aforementioned internal accounting controls can assist DDC in sustaining a control environment that safeguards its underlying business processes effectively—including real estate construction, development, and management—and thus be capable of achieving its annual and long-term goals, effecting its strategy, and realizing its organizational mission.

The following section of this report deals with the related but distinct topic of fraud risk mismanagement, and includes recommendations for DDC to assess its risks of fraud and misconduct and to optimize antifraud programs and controls to lessen the likelihood that it will suffer financial, reputational, and other forms of damage as a result of fraud and misconduct by employees, agents, and partners.



Report to Douglas Development Corporation                                      16
Regarding Recommendations for Organizational Controls
April 11, 2007

## II. Recommendations Regarding
## Antifraud Programs and Controls

This section of the report outlines recommendations to DDC for antifraud programs and controls in three subsections.

First, it classifies types of fraud and misconduct as they relate to aspects of accounting, law, and general forms of misconduct that transgress applicable organizational, business, professional, or community standards for behavior.

Second, it summarizes the convergence of key regulatory frameworks in the United States that govern how organizations monitor and manage risks of fraud and misconduct. Some of these frameworks are binding on DDC as a private corporation, and some are not, but even the latter set have influenced the development of leading practices that organizations such as DDC follow as a matter of prudent business judgment.

Third, it draws upon the classification of types of fraud and misconduct and the convergence of key regulatory frameworks to recommend that DDC perform an assessment of the scale and scope of the risks of fraud and misconduct that it faces, and that it design, implement, and evaluate on an ongoing basis antifraud programs and controls that will help it to prevent, detect, and respond to such incidents, and thereby minimize the likelihood that they will occur.

A. Types of Fraud and Misconduct

The scope for fraud and misconduct in an organization typically includes three possible aspects: accounting fraud, legal fraud, and general misconduct.

- *Accounting fraud* includes *misappropriation of assets* and *misstatements in financial reporting*.

- *Legal fraud* involves *deception* that *induces reliance* by another to that person's *material detriment*.

- *General misconduct* refers to *actions* and *practices* that *transgress* applicable organizational, business, professional, and community *standards* for behavior.

While an organization's antifraud programs and controls normally focus on actions of *employees*, it is prudent for them to include as well the actions of *agents, partners,* and *other parties* whose behavior others plausibly *might impute* to the organization.

B. Key Authoritative Frameworks for Antifraud Programs and Controls

It is prudent managerial practice for leaders of an organization to assess the entity's risks of fraud and misconduct and to develop, implement, and evaluate practices and procedures on an



ongoing basis to prevent, detect, and respond to instances of such behavior. Such a discipline helps to safeguard the integrity, reputation, strategic coherence, and operational viability of the entity. It makes substantive business sense to attempt to discern, prioritize, and manage such risks as part of a continuous, dynamic process.

In addition, a host of domestic and international frameworks in recent years have imposed public- and private-sector requirements on many types of organizations to implement such antifraud programs and controls. The growing scope and the multi-jurisdictional nature of such frameworks have complicated the regulatory and strategic environment for organizations and the corresponding responsibilities of organizational leadership. At the same time, the convergence of these frameworks has made it possible for organizational leaders incrementally to recognize common themes in these regimes, such as accountability, integrity, and transparency, and to develop leading practices to guide organizations in deploying antifraud programs and controls.

The following subsections summarize some of these frameworks that are relevant to DDC, either as binding guidelines or as influential authorities: the federal sentencing guidelines for organizations, the Sarbanes-Oxley Act of 2002, the Seaboard Report, and the law of fiduciary duties of care and loyalty. These frameworks form the thematic background and context for this report's recommendations in section II.C below regarding antifraud programs and controls for DDC.

## 1.  The Federal Sentencing Guidelines for Organizations

The *federal sentencing guidelines* are rules that set out a uniform sentencing policy for convicted defendants in the United States federal court system. The guidelines are the product of the United States Sentencing Commission and are part of an overall federal sentencing reform package, the foundation for which is the Sentencing Reform Act of 1984, as amended. *Penalties* under the guidelines include restitution, remedial orders, community service, and substantial fines on the basis of a *point system* for determining the severity of an offense.

Chapter 8 of the *Guidelines Manual of the United States Sentencing Commission* recites policies, standards, and procedures for the sentencing of organizational defendants. The guidelines encourage organizations to develop *effective ethics and compliance programs to prevent and detect violations of law.* For a program to qualify as effective, the organization must exercise *due diligence* to prevent and detect criminal conduct and otherwise *promote an organizational culture that encourages ethical conduct* and a *commitment to compliance with the law.*

The organization *reasonably* must *design, implement,* and *enforce* such a compliance and ethics program so that the program is *generally effective* in preventing and detecting criminal conduct. *The failure to prevent or detect the instant offense does not necessarily mean that the program is not generally effective* in preventing and detecting criminal conduct.



Report to Douglas Development Corporation
Regarding Recommendations for Organizational Controls
April 11, 2007

18

## 2. The Sarbanes-Oxley Act of 2002

The *Sarbanes-Oxley Act* became law on July 30, 2002, in response to major corporate and accounting scandals. The purpose for this legislation was to promote efficient and effective capital formation by protecting and reassuring investors through *accurate and reliable corporate financial reporting and disclosure* and *improving the effectiveness and accountability of corporate governance*. The Sarbanes-Oxley Act principally governs corporations whose securities trade in public capital markets (issuers). It prescribes duties for boards, management teams, and public accounting firms that audit these issuers. In particular, it enumerates responsibilities of corporate management and auditors with regard to managing the risks of fraud.

Since the enactment of the Sarbanes-Oxley Act, most companies in the United States have looked to the combined internal control framework of the *Committee of Sponsoring Organizations of the Treadway Commission (COSO)* to provide substantive content for principal provisions of the legislation regarding management's assessment and reporting on the system of internal accounting controls. The COSO framework addresses *entity-level ethics* and *compliance program elements* that have a pervasive influence on organizational behavior, such as the control environment. Examples of such entity-level control considerations include the following:

- establishment of the *tone at the top* by the board and management;

- *codes of conduct* and other policies regarding acceptable business practices;

- the extent to which *management makes employees aware of its expectations;*

- pressure to meet *unrealistic or short-term performance targets;*

- management's propensity to *override* established controls;

- the extent to which *adherence* to the code of conduct is a *criterion in performance appraisals;*

- the extent to which *management monitors* whether *internal control systems* are working;

- establishment of *channels for people to report* suspected improprieties; and

- *appropriateness of remedial action* that the organization takes in response to violations of the code of conduct.

Because DDC does not qualify as an issuer, it does not have to comply with the principal provisions of the Sarbanes-Oxley Act. Numerous other for-profit and exempt organizations, however, voluntarily have adopted disclosure and governance standards that are the same or substantially the same as Sarbanes-Oxley standards, and these guidelines have become leading practices for organizations in general.



3.  The Seaboard Report

The Securities and Exchange Commission's (SEC) *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions (Seaboard Report)* appears in Securities Exchange Act Release No. 44969 of October 23, 2001. This report recites thirteen factors that influence the SEC's decision to "credit self-policing, self-reporting, remediation and cooperation" by issuers in securities enforcement actions.

While only factor two refers expressly to compliance programs, the other factors include elements that bear on the effectiveness of such programs, including organizational culture, tone at the top, auditing and monitoring, investigations, and remedial action, including modifications to the compliance program. Moreover, the sentencing guidelines' aforementioned criteria of due diligence and promotion of an organizational culture that encourages ethical conduct and compliance with the law provide collateral support for the practical effect of the SEC's guidelines.

Because DDC is not an issuer under securities laws, and is thus not subject to the SEC's enforcement powers under the Securities Exchange Act of 1934, these thirteen factors are guidelines rather than mandates for its apparatus of antifraud programs and controls. The thematic message of these factors is that organizations should adopt proactive measures to prevent, detect, and respond to instances of fraud and misconduct, and this affirms the guidance in the federal sentencing guidelines, the Sarbanes-Oxley Act, and other principal regulatory frameworks. The Seaboard Report thus corroborates the proposition that vigilance through such a proactive corporate compliance program is a leading practice for organizations to manage risks of fraud and misconduct.

4.  The Law of Fiduciary Duties of Care and Loyalty

Under the laws of the District of Columbia and other jurisdictions, corporate officers and directors owe the organization fiduciary duties of care and loyalty; i.e., they must act *in good faith*, in a manner that they *reasonably believe* is in the *best interest* of the corporation, and with the *care* that an *ordinarily prudent person* in a similar position would use in similar circumstances. At a minimum, this means that they may not usurp corporate opportunities, engage in self-dealing, or realize secret profits from their activities in service to the corporation.

Although these are statutory legal duties, the policy basis for them is a special ethical bond of trust and accountability that one assumes when he or she commits to discharging affairs for another. In the case of DDC, these legal duties bind the officers of the company by virtue of the entrustment of corporate assets and affairs to their care. One of the principal means for management to fulfill these duties is to manage the risks of fraud and misconduct diligently and effectively.



The Delaware Chancery Court in *In re Caremark Int'l Inc. Derivative Lit.*, 698 A.2d 959 (Del. Ch. 1996) held that boards of directors that exercise reasonable oversight over a compliance program may be eligible for protection from personal liability in shareholder civil suits resulting from employee misconduct. A director's fiduciary duty goes beyond ensuring that a compliance program *exists,* but also includes a good-faith duty to help ensure that the organization's compliance program is *adequate.*

In 2006, the Delaware Supreme Court affirmed the *Caremark* standard for director oversight liability in *Stone v. Ritter*, C.A. No. 1570-N, 2006 WL 3169168 (Del. Nov. 6, 2006), stating that "*Caremark* articulates the necessary conditions for assessing director oversight liability." The Court opined that the standard is whether there is a "sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists...." This case also clarified that "the obligation to act in good faith" is not a stand-alone fiduciary duty, and that the failure of a director to exercise his or her responsibilities in good faith is a breach of the duty of loyalty.

The thematic guidance from the law of fiduciary duty and the *Caremark* and *Stone v. Ritter* decisions is that corporate leadership has an articulable legal duty to help ensure the adequacy of an organization's compliance program. Merely designing a program on paper or mechanically completing pro forma checklists is not sufficient. Rather, it is essential as well for management to implement a compliance program meaningfully and to demonstrate through its actions that the program functions in response to the routine questions, challenges, and risks of fraud and misconduct that inevitably arise in the course of doing business.

C. Recommendations for Antifraud Programs and Controls for DDC

The regulatory frameworks in section II.B above variously emphasize the importance for organizations to *prevent, detect,* and *report* (or *respond to*) incidents of fraud and misconduct. As the introduction to section II.B indicates, for an organization to safeguard its integrity, reputation, and other interests, and for it to be able to demonstrate that its compliance program and other antifraud programs and controls are effective, such measures should reflect all three structural and procedural elements—prevention, detection, and response—and management and employees at all levels of an organization should have meaningful roles in implementing such controls.

Moreover, the process for developing, implementing, and evaluating these antifraud programs and controls is ongoing, reiterative, and dynamic, with management and other key participants gaining information from repeating over time the discipline of assessing the risks of fraud and misconduct facing an organization and evaluating the antifraud programs and controls it deploys to manage these risks.

The following recommendations for antifraud programs and controls assume and rely upon the efficacy of the *system of internal accounting controls* that this report recommends for DDC to adopt in section I.B above.



Report to Douglas Development Corporation                                                    21
Regarding Recommendations for Organizational Controls
April 11, 2007

In addition, these recommendations assume that DDC will have made the structural and procedural modifications to its organization and systems that this report recommends in sections I.B.7 and III, including the hiring of a sufficient number of qualified staff.

With these assumptions in mind, and in light of the aforementioned convergence of regulatory frameworks for managing risks of fraud and misconduct that bind or influence DDC, KPMG recommends the following measures to prevent, detect, and respond to incidents of such behavior.

1.  Preventive Controls

*The most important thematic measure that senior leaders of DDC can take to prevent incidents of fraud and misconduct is to model in their words and actions principled leadership that sets an appropriate "tone at the top" by promoting an organizational culture that encourages ethical conduct and a commitment to compliance with the law; and by enabling, encouraging, and rewarding open communication among members of the company, ethically conscientious behavior, and independent professional judgment.*

The following controls will support and reinforce the efforts of DDC's leadership to prevent incidents of fraud and misconduct.

- Conduct a *fraud risk assessment* to ascertain in a *systematic way* the *scale* and *scope* of the distinctive risks of fraud and misconduct that DDC faces as a real estate development and management company. This involves *identifying* relevant units, locations, or processes to assess; *compiling* an inventory of possible fraud and misconduct (e.g., the improper disbursement of construction financing); *classifying* the possible fraud and misconduct by meaningful categories; *rating* and *prioritizing* the risks on the basis of their *likelihood* and the *significance* that they will occur; and *remediating* those risks through *optimizing* the controls in sections I.B and below (e.g., matching each construction invoice to a vendor contract in MRI). *This fraud risk assessment process is the essential first step for DDC to design, implement, and evaluate antifraud programs and controls that are meaningful and appropriate for its sector, location, operations, and the stakeholders it serves. It must complete this step before proceeding substantively with the antifraud programs and controls that appear below.* Moreover, it is a good discipline for DDC to conduct such a fraud risk assessment on a *recurring basis,* e.g., every two years.

- Designate a *senior member* of management with responsibility to develop, implement, and oversee *ethics* and *compliance initiatives* and *related antifraud programs* and *controls* within DDC (a "director of corporate compliance"). Although it would be ideal if this were a dedicated, standalone position, the small size of DDC may preclude this, and a senior member of management with another portfolio of responsibilities may have to assume this role as well. Nevertheless, the incumbent should possess *systematic training, experience, credentials,* and/or *other qualifications* in a *compliance-related*



Report to Douglas Development Corporation                                          22
Regarding Recommendations for Organizational Controls
April 11, 2007

*field,* e.g., *law, public accounting,* or *law enforcement,* and should be capable of serving with *credible detachment* and *autonomy* from the Jemal family and previous decisions, actions, and initiatives of DDC. Creative means for preserving this detachment and autonomy on an ongoing basis may include a term appointment, possibly renewable one time, and special contractual limitations on the ability of DDC to dismiss the director of corporate compliance under default standards of employment at will (except for for-cause grounds). See also section III.A.2 below.

- Practice *due diligence* in *hiring, retaining,* and *promoting employees, vendors, financial services firms, consultants,* and *other third-party service providers.* To minimize the risk that employees or others will commit fraudulent acts or other forms of misconduct that others would seek to impute to DDC under theories of vicarious liability or negligent hiring, DDC should investigate the backgrounds of those who fill these roles, e.g., through *reference checks* of previous employers, *criminal background checks,* and *credit checks.*

- Develop and issue a *code of conduct* and *related standards* that is *consistent* with DDC's vision, mission, statement of ethical principles, strategy, and goals. A code of conduct is a key means for management to communicate to stakeholders the standards that define acceptable business conduct. It helps to set the tone for the organization's overall culture of integrity, compliance, and professionalism and it raises awareness among employees and other stakeholders regarding management's commitment to principled leadership, compliance with the law, and the dedication of resources to help those under the jurisdiction of the code achieve management's compliance goals.

  *The following material provides a general prospective plan, or framework, for DDC to design a code of conduct, and does not constitute a set of specific or exhaustive recommendations regarding such a code for DDC.*

  *As section I.B.7 and the introduction to this preventive control indicate above, a code of conduct must be consistent with and supportive of an organization's vision, mission, statement of ethical principles, strategy, and performance goals. In addition, the company's performance-evaluation process and performance incentives must align with these key frameworks. Each of these features reflects a substantive process that DDC must execute to inform a meaningful profile and furnish content for its code of conduct.*

  *Moreover, as the aforementioned guidance for preventive controls indicates, prior to designing a comprehensive and operational code of conduct, DDC must conduct a fraud risk assessment. Only in this way can it promulgate a code that meaningfully addresses the risks specific to itself, its stakeholders, its sector, and its overall environment.*

  With DDC's articulation or validation of a vision, mission, statement of ethical principles, strategy, and performance goals, and its completion of a systematic fraud risk assessment process, it ordinarily would include in its code of conduct *entity-level*



Report to Douglas Development Corporation                                                23
Regarding Recommendations for Organizational Controls
April 11, 2007

*activities* such as those that appear in the recommendations in section I.B.7 above, with the following content and features:

– high-level *endorsement* from DDC's *president* and the *senior management team* for the code itself and for the ethics and compliance program as a whole, to underscore the *commitment* of *leadership* to *integrity;*

– *simple, concise,* and *positive language* that *integrates* with the vision, mission, statement of ethical principles, strategy, and performance goals for the company*;*

– a *visually inviting* format that encourages *readership, usage,* and *understanding;*

– ready *accessibility* to authorized users, e.g., via DDC's Web site;

– *topical guidance* that mirrors major DDC policies or areas with broad applicability as to risks of fraud and misconduct, e.g., business practices relating to real estate construction and financing; tenant relations; fiduciary duties of care and loyalty; the use of company assets; recognition of and responses to conflicts of interest; the management and protection of confidential information regarding the company, its people, and others; fair financial reporting; competitive practices; lobbying, political activities, campaign contributions, gifts and gratuities, and relations with regulators and other government officials; employment practices; workplace safety; environmental protection and sustainable business practices; compliance with legal and regulatory obligations; cooperation with company inquiries and investigations (see below); and universal applicability of the code as to requirements and disciplinary consequences, regardless of rank, tenure, relationship, or function (see below);

– *practical guidance* for users regarding how to respond to risks of fraud and misconduct, with recognizable *scenarios* or *hypothetical examples* relating to DDC's business processes at a practicable level of detail, e.g., *construction management* and *contracting* (vendor relations), *lease administration* and *tenant relations* (dispute resolution), *property management* (prohibitions against fraudulent real property insurance claims), and *relations* with *government officials* and *regulators* (prohibitions against bribery and other forms of improper influence);

– *systematic decision-making tools* to help implement the guidelines in the code;

– information regarding an *ethics and compliance telephone hotline,* a *Web site,* and/or other channels and resources for people to seek *guidance* or *advice,* or to *report allegations* of misconduct (see below);

– a *nonretaliation policy* for those who seek guidance or advice, or report allegations of misconduct; and



    – a means for those who fall under the jurisdiction of the code of conduct to indicate at the *time of hire,* and *at least annually,* that *they have read it,* that *they understand it,* and that *they agree to abide* by its terms, e.g., a *signature* on a paper form, or the electronic equivalent; in addition to verifying these facts and recording this assent, this ritual will communicate to signors the seriousness that management attaches to the code.

As this list of features indicates, the code will be most effective in preventing incidents of fraud and misconduct when it *educates* as well as *enforces.* A mixture of precept, systematic decision-making tools, and recognizable scenarios will help the code to serve these parallel roles.

- Offer employees, contractors, vendors, and others who work closely with DDC *information* and *training* regarding the code of conduct and other antifraud programs and controls that is *comprehensive* and *related to job functions* and *risk areas; integrated* with other *training* efforts; *effective* in a variety of settings, using multiple methods and techniques; and *regular* and *frequent,* covering the relevant population of employees and others.

- *Highlight* through training and communications to employees and others the role of the *process-specific internal accounting controls* in sections I.B.1 through I.B.6 of this report in preventing *fraud* and *misconduct.*

2. Detective Controls

The following controls can help DDC to uncover incidents of fraud and misconduct.

- Establish a telephone hotline (or helpline), a Web site, and/or other channels or resources for employees, contractors, vendors, and other applicable persons to seek guidance or report allegations of fraud or misconduct. The apparatus for providing this control should include the following features:

    – *confidentiality,* with intake operators notifying callers of relevant safeguards in place to keep the matter confidential (subject to legal limitations), including sharing of data on a strict need-to-know basis;

    – *anonymity* to encourage open communication in submitting information and resolving matters, with case numbers for identification and deactivation of the ability to trace telephone numbers and Internet Protocol addresses;

    – *organization-wide availability,* with reasonable accommodations as to accessibility, particularly away from DDC locations, and the language for receiving the inquiry;



Report to Douglas Development Corporation                                   25
Regarding Recommendations for Organizational Controls
April 11, 2007

  – *real-time assistance* from *trained* operators who are capable of giving *basic advice, 24 hours per day, 365 days per year;*

  – *systematic data management procedures* to ensure a consistent approach to gathering and recording data and securing custody of the information;

  – *classification* of each case by *relevant topic* or *issue,* with protocols for reviews of intake information by qualified specialists to determine whether an allegation could trigger *acute risks,* e.g., imminent danger to life, health, or property;

  – *protocols* for *investigating* and *reporting* to *senior management* regarding incidents, concerns, and resolutions of matters, with provisions for automatic referrals to outside independent counsel for matters rising to an articulable threshold of seriousness;

  – *follow-up on nonretaliation,* whereby the hotline administrator inquires periodically to ensure that the person who has contacted the hotline has not experienced retaliation; and

  – *prominent communications,* whereby DDC publicizes the existence, purpose, and methods for using the hotline in multiple places and formats, e.g., in the code of conduct, and on posters, calendars, identification cards, screen savers, and the company Web site.

*N.B.:* Given the small size of DDC and its need to set up the hotline in a cost-effective manner that preserves the integrity of this detective control as an open, professional, and nonthreatening channel for communication and assistance, KPMG recommends that DDC retain an independent vendor that offers this service on a dedicated basis.

- Institute a basic process for *auditing* or *analytically reviewing* past operations and *monitoring* present operations in real time to include *entity-level* and *process-level* activities, with a focus on the risks that DDC discerns as a result of the fraud risk assessment process in section II.C.1 above.

- Perform *proactive forensic data analysis* through computer-based *data mining* and *data analysis* of key data sets in their entirety to *discern patterns* in transactions and operations that may signal the potential for fraud and misconduct, e.g., in construction expense draws, adjustments to tenant accounts, reimbursements for CAM and other charges, and lease profile data points.

3. Responsive Controls

  The company should institute the following controls to help it take corrective action and to mitigate and remedy the harm from fraud or misconduct.



Report to Douglas Development Corporation                                                        26
Regarding Recommendations for Organizational Controls
April 11, 2007

- Institute *internal investigation protocols* to provide management with the opportunity to address potentially troublesome situations by retaining *independent counsel,* i.e., counsel that has not provided legal representation to DDC or the Jemal family in a civil or criminal matter for at least five years.

- Establish a *consistent* and *credible disciplinary system* that mandates *meaningful* and *proportionate sanctions* for *all* who violate the code of conduct, *regardless of rank, tenure, or relationship,* to demonstrate to those inside and outside DDC that the company takes fraud and misconduct *seriously,* and that its antifraud programs and controls are *substantive* and *operational* (a requirement for regulatory frameworks that appear in section II.B above).

- Establish procedures to hold those with *management authority responsible* for the misconduct of those who report to them, when they knew, or should have known, of the misconduct. The sanctions should be *proportionate* to the manager's role in overlooking, acquiescing, or inciting the misconduct, e.g., *directing or pressuring others* to violate DDC standards to meet business objectives or setting unrealistic performance goals that have the same effect, *failing to ensure* that employees have *adequate training or resources, failing to set a positive example* of acting with integrity or exhibiting a history of missing or permitting violations, *enforcing DDC standards inconsistently,* or *retaliating* against those who report concerns.

- Take *corrective action,* including *disclosing* the results of an *independent investigation* to authorities, *remedying the harm,* examining the *root causes* for the *breakdowns* in controls to ensure the mitigation of risk and the strengthening of controls, *administering discipline* to those who violated the code of conduct and possibly to those who failed to prevent or detect the misconduct, and *communicating* in a proportionate and decorous manner to the broader employee population that the company has taken disciplinary action.



Report to Douglas Development Corporation                                              27
Regarding Recommendations for Organizational Controls
April 11, 2007

## III. Recommendations Regarding
## Personnel and Processes to
## Support the Aforementioned
## Internal Accounting Controls and
## Antifraud Programs and Controls

This section summarizes recommendations regarding the personnel and processes necessary for DDC to support the recommendations in sections I and II above on an ongoing basis. KPMG offers these as salient, though not exhaustive, recommendations.

A.  Recommendations Regarding Personnel

As section I.B.7 above indicates, systematic human resources policies and procedures, including the designation of titles and practicably detailed position descriptions for employees, are essential. Section III.A.13 discusses this below as well. DDC should consider *designating, defining* (i.e., developing descriptions for), and *filling* the following positions and roles:

1.  A *chief operating officer* (COO) to whom the president can delegate day-to-day administrative responsibilities for the company; this person will mediate between the entrepreneurial culture and activities of senior company leaders who execute real estate development deals and the systematic administrative culture of professional managers and staff who safeguard the company's assets, financial reporting, integrity, and reputation through effective systems for internal accounting controls, fraud risk management, lease administration, and other key processes. While the current complement of approximately 85 employees may appear too modest to support the creation of this position in the short term, it would be advisable for senior leadership to keep this as an option, particularly if the company continues to grow in the scale of its operations and its personnel.

2.  A *director of corporate compliance* (possibly in combination with another senior leadership position, per section II.C.1 above); the director's responsibilities include the following:

    •   coordinating DDC's efforts to promulgate a code of conduct and related standards;

    •   overseeing the design and implementation of antifraud programs and controls for entity-level and process-level activities;

    •   overseeing the firm's ethics and compliance communication and training initiatives; and

    •   coordinating with regular legal counsel and special outside investigative counsel for independent investigations when there are actionable allegations of fraud or misconduct.

3.  A *chief financial officer and treasurer* who manages the treasury function in a systematic and professional manner by safeguarding assets, reporting on DDC's financial position and results of operations, and advising the senior management team regarding the development,



Report to Douglas Development Corporation                                          28
Regarding Recommendations for Organizational Controls
April 11, 2007

implementation, and evaluation on an ongoing basis of strategies to procure and apply capital in ways that will enable DDC to earn rates of return in excess of its weighted-average cost of capital, within the company's financial risk tolerances.

4.  A *controller* who manages the internal accounting control and financial reporting functions according to the recommendations in this report, including the production for managerial use of monthly financial statements for each real property investment and for DDC as a whole.

5.  A *manager of general accounting* who manages the chart of accounts, the general ledger, routine control functions, and the preparation of financial statements and other reports.

6.  A *development/construction accountant* who records, analyzes, applies controls, and reports systematically on financial activity involving the construction business processes of DDC, including job costing, construction in process, and project completion reports.

7.  An *accounts payable supervisor* who supervises the work of the accounts payable accountants for construction and for general obligations of DDC, in conformity with internal accounting controls, antifraud programs and controls, and other relevant guidelines and laws.

8.  *Accounts payable specialist(s)* who receive, review, and process payment requests for construction and general expenses of DDC in conformity with internal accounting controls, antifraud programs and controls, and other relevant guidelines and laws.

9.  A *payroll administrator* who records, processes, reports, and coordinates with ADP regarding the reporting and remission of DDC's payroll, including tax reporting garnishment of wages in response to court orders, in conformity with internal accounting controls, antifraud programs and controls, and other relevant guidelines and laws.

10. A *property/lease accountant* who records, processes, and reports financial activity surrounding lease administration, including rent payments, deposits, and reimbursements and adjustments for repairs, maintenance, improvements, and CAM charges, in conformity with internal accounting controls, antifraud programs and controls, and other relevant guidelines and laws. Because of the specialized nature of this work, the incumbent should have special qualifications, not just in accounting, but in *lease accounting,* and this can result in a market premium to secure such talent, which is in limited supply; the property/lease accountant should report to the manager of general accounting.

11. *Lease administrators* who manage the recording, summarization, reporting, and ongoing maintenance of the leases and associated relationships with 150 to 200 tenants each; because DDC currently has at least 800 commercial, government, and residential tenants, it should have *at least four lease administrators,* each of whom should have special training and qualifications to record, code, summarize, report on, and manage the complex and highly variable leases that DDC executes with its tenants; the lease administrators should report to the manager of general accounting.



12. A *professional office manager* who supervises a wide array of core administrative processes in the company, including procurement of supplies, equipment, furniture, vendor services, and, if necessary, temporary employment assistance; administrative support personnel report to this manager.

13. A *professional human resources manager* who develops, implements, and periodically evaluates systematic policies and procedures for human resources management in a manner consistent with the organization's vision, mission, statement of ethical principles, strategy, and goals; and in compliance with applicable federal, state, and local laws and regulations. These policies and procedures will parallel the recommendations in section I.B.7 above, including the following:

- *recruiting* for positions with formal job titles and descriptions;

- *compensation* to remain competitive with comparable organizations in the Washington, D.C. area; to sustain a reasonable range of internal equity; and to align performance incentives with internal accounting controls, antifraud programs and controls, and the ethics and compliance objectives for the organization;

- *employee benefits,* including the publication and ongoing revision of an employee benefits handbook, to remain competitive with comparable organizations in the Washington, D.C. area; to sustain a reasonable range of internal equity; and to align performance incentives with the ethics and compliance objectives for the organization;

- *training and development* commensurate with the scale and scope of employees' authority and responsibilities, including internal accounting controls and the code of conduct and other antifraud programs and controls;

- *employee relations*, including the publication and ongoing revision of an employee handbook;

- *performance assessment*;

- *terminations;*

- *succession planning;*

- *coordination* with leadership and staff in *financial* and *accounting roles* to support and reinforce the system of internal accounting controls; and

- *coordination* with the director of corporate compliance regarding the development, implementation, and ongoing evaluation of the code of conduct and other antifraud programs and controls, including communications and training and monitoring for the effectiveness of nonretaliation policies.



*N.B.:* Because the integrity, effectiveness, and systematic approach of the human resources function is an essential condition for the success of the business, these recommendations are particularly important. All employees must have a clear understanding of their job titles, their reporting relationships, and the scale and scope for their responsibilities. In addition to the necessity of this information and understanding for the efficient management and operation of the business, such clarity regarding rank, authority, and responsibility itself constitutes an essential internal accounting control and antifraud control, because it reduces the likelihood that an employee inadvertently or intentionally will represent his or her authority incorrectly to those outside DDC in ways that could create liability or constitute legal violations, e.g., by pretending to have—or accidentally assuming—authority to enter into contracts on behalf of the company, committing illegal acts with the appearance or effect of benefiting the company, or otherwise acting in an apparently official capacity that is beyond the true scope for his or her authority.

B.  Recommendations Regarding Processes

In addition to the internal accounting controls in section I, the antifraud programs and controls in section II, and the recommendations for personnel in section III.A above, the following process recommendations are prudent for DDC: (1) document management policies and procedures, (2) general planning for business continuity, and (3) strict separation of DDC's business matters from the personal financial matters of the Jemal family.

1.  Document Management Policies and Procedures

The company develops, implements, and periodically evaluates *document management policies* and *procedures* regarding the following:

- the optimal scale and scope for securely recording, storing, accessing, sharing, and recovering documentary information;

- the optimal media alternatives for securely recording, storing, accessing, sharing, and recovering documentary information;

- the retention and destruction of documentary information; and

- the special legal and other requirements governing the custody of confidential information about tenants, vendors, employees, and others.

2.  General Planning for Business Continuity

The company develops, implements, and periodically evaluates plans to respond to threats to *business interruption,* including contingency plans for business *continuity* and *recovery* of staffing capability, assets, records, and information in the wake of a disaster. In addition to traditional risks such as fire, water damage, and theft of personal property and



fixtures, DDC faces risks by virtue of the location of its headquarters and significant holdings of its real property in Washington, D.C., a jurisdiction that many consider to be at heightened risk for terrorist activity since September 11, 2001. See recommendation regarding insurance risk assessment in section I.B.7 above.

3.  Separation of Corporate and Family Financial Matters

The company maintains strict separation of corporate financial matters from private matters of the Jemal family and other private individuals, to minimize commingling of funds and custody of assets, to promote clear and meaningful financial reporting, and to avoid organizational pressures and other risk factors that might compromise the effectiveness of internal accounting controls and antifraud programs and controls.



## Conclusion

This report has recommended internal accounting controls and antifraud programs and controls for DDC in three steps.

First, it has distinguished and defined (1) *control categories* of reconciliation controls, management review controls, authorization controls, system access controls, and segregation-of-duties controls, as well as entity-wide controls; and (2) *business processes* relating to the cash and treasury function; lease administration and accounts receivable; construction accounts payable and cash disbursements; purchases and accounts payable; payroll; general accounting; and entity-wide processes and controls. Section I includes recommendations for internal accounting controls for each of these business processes, with a focus on the distinctive features of real estate development and management.

Second, it has distinguished and defined key types of *fraud* and *misconduct* relating to (1) *accounting* aspects of misappropriation of assets and misstatements in financial reporting, (2) the *legal* aspect of deception that induces material detrimental reliance by another, and (3) *general misconduct* that transgresses articulable and applicable organizational, business, professional, or community standards. It also has summarized the *converging regulatory frameworks* that either bind or influence organizations such as DDC when it comes to leading practices for fraud risk management, including the federal sentencing guidelines for organizations, the Sarbanes-Oxley Act of 2002, the Seaboard Report, and the law of fiduciary duties of care and loyalty as it relates to corporate leadership. Finally, it has drawn on this convergence of regulatory frameworks to recommend leading practices in the form of antifraud programs and controls that could help DDC to *prevent, detect,* and *respond* to forms of fraud and misconduct that may arise in the context of the operations of a real estate development and management company.

Third, it has made recommendations regarding personnel and processes to support these internal accounting controls and antifraud programs and controls. These include the recommendation that DDC designate, define, and fill key personnel positions at several levels of the organization to implement and evaluate these controls on an ongoing basis. In addition, the report has recommended that DDC design, implement, and periodically evaluate structural processes involving document management policies and procedures, provisions for business continuity, and a strict separation of corporate matters from the financial matters of the Jemal family and other private individuals.

As the introduction to this report indicates, these recommendations offer a general prospective plan for DDC to design, implement, and evaluate on an ongoing basis systems for internal accounting controls and fraud risk management, in conformity with applicable laws, regulations, and leading practices. This report addresses what KPMG understands to be the principal business processes at DDC, but KPMG does not warrant that its enumeration of these processes or its recommendations for internal accounting controls and antifraud programs and



controls are exhaustive. In addition, the scope for KPMG's work in preparing this report did not include implementation of these or other recommendations, and KPMG disclaims any responsibility regarding whether DDC or others implement these recommendations.

This engagement did not include an audit, review, examination, attestation, or agreed-upon procedures engagement as the American Institute of Certified Public Accountants (AICPA) defines these terms. In performing its analysis, KPMG relied on assertions by management and its employees and legal counsel, and undertook no procedures to validate those assertions. KPMG's work was more limited than would be necessary to express an opinion on the internal control structure or the financial statements of DDC and, furthermore, it neither evaluated nor reported on material weaknesses in DDC's internal control structure. Accordingly, KPMG is not expressing an opinion on the internal control structure or the financial statements of DDC.

While information in this report may address legal concepts, no one should construe KPMG's analysis as legal advice, and no one should rely on it in lieu of legal advice.