HONORABLE RICARDO M. URBINA, UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FILED**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No.: <u>CR-05-359-01</u> |
| | : | |
| vs. | : | SSN: _____ |
| | : | |
| JEMAL, Douglas | : | Disclosure Date: <u>January 16, 2007</u> |

APR **1 7** 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## RECEIPT AND ACKNOWLEDGMENT OF PRESENTENCE INVESTIGATION REPORT

This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges that:

**For the Government**

(CHECK APPROPRIATE BOX)
- ( )    There are no material/factual inaccuracies therein.
- ( )    There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.

_____          _____
Prosecuting Attorney                                   Date

**For the Defendant**

(CHECK APPROPRIATE BOX)
- ( )    There are no material/factual inaccuracies therein.
- (X)    There are material/factual inaccuracies in the PSI report as set forth in the attachment.

_____ 1/25/07          _____ 1/25/07
Defendant              Date                    Defense Counsel          Date

## NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM

Pursuant to Local Rule 32(f)(2), those executing this form shall first submit any material inaccuracies or disputes in writing by <u>January 30, 2007</u>, to U.S. Probation Officer <u>Renee Moses-Gregory</u>, telephone number <u>(202) 565-1348</u>, fax number <u>(202) 273-0242</u>.

Pursuant to Rule 32(b)(6)(B), effective December 1, 1994, it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are filed with the probation office.

FOR THE COURT

By:    Gennine A. Hagar, Acting Chief
        United States Probation Officer

# STEPTOE & JOHNSON LLP

### ATTORNEYS AT LAW

Brian M. Heberlig
202.429.8134
bheberlig@steptoe.com

1330 Connecticut Avenue. NW
Washington. DC 20036-1795
Tel 202.429.3000
Fax 202.429.3902
steptoe.com

January 26, 2007

**By Electronic Mail**

Renee L. Moses-Gregory
United States Probation Officer
2800 E. Barrett Prettyman,
U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

   Re: <u>United States v. Douglas Jemal</u>, Crim. No. 05-0359-01

Dear Ms. Moses-Gregory:

   Pursuant to Federal Rule of Criminal Procedure 32(f), we are writing to set forth Mr. Jemal's objections to the Presentence Investigation Report ("PSIR") in this case. While we appreciate the time and effort you spent preparing the report, unfortunately we disagree with the Guidelines calculation in the PSIR and believe that the proposed sentence range violates the requirement that Mr. Jemal's sentence be no greater than necessary to provide "just punishment." <u>See</u> 18 U.S.C. § 3553(a)(2)(A). Please be advised that we respectfully object or offer clarifications to the following portions of the PSIR.

## GENERAL OBJECTIONS

   1. <u>Description of the Offense Conduct</u>. Paragraphs 7-18 of the PSIR describe the "offense conduct." Although the PSIR notes that the information in these paragraphs was obtained from documentation provided by the government and defense counsel (¶ 7), the majority of the information appears to have come from the government. We note below our specific objections to certain information in the description of the offense conduct. In general, however, we object to the description of the offense conduct as incomplete. We respectfully request that you include in the PSIR the "Defendant's Version of the Offense," which we submitted to you on December 13, 2006.

.

WASHINGTON • NEW YORK • PHOENIX • LOS ANGELES • LONDON • BRUSSELS

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 2

In addition, as you are aware, Mr. Jemal pled not guilty and disputed the government's allegations at trial. Although Mr. Jemal was acquitted of six of the seven charges he faced, Mr. Jemal was profoundly disappointed by the guilty verdict on Count Four and maintains that he is innocent of that charge. Mr. Jemal has sought a judgment of acquittal, a new trial and, if unsuccessful in those efforts, plans to vigorously pursue an appeal in this case. Accordingly, Mr. Jemal respectfully objects to any and all information contained in the "offense conduct" section of the PSIR that is inconsistent with or otherwise suggests that Mr. Jemal is guilty of the charge of conviction.

      2.    <u>Failure To Address The 18 U.S.C. § 3553(a) Factors</u>. Mr. Jemal objects to the failure of the PSIR to address the sentencing factors contained in 18 U.S.C. § 3553(a). In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory, and that the factors set forth in 18 U.S.C. § 3553(a) will now "guide sentencing," as well as provide appellate courts with a basis to determine whether a sentence is "reasonable." 125 S. Ct. at 764. "Under the new sentencing regime, a sentencing court is required 'to consider Guidelines ranges' applicable to the defendant, but is permitted 'to tailor the sentence in light of other statutory concerns as well.'" <u>United States v. Adewani</u>, 467 F.3d 1340, 1341 (D.C. Cir. 2006). Sentencing courts now have a duty to consider all of the factors in 18 U.S.C. § 3553(a) when fashioning an appropriate sentence, and courts should decide after review of those factors whether "(i) to impose the sentence that would have been imposed under the Guidelines, <u>i.e.</u>, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence." <u>United States v. Crosby</u>, 397 F.3d 103, 113 (2d Cir. 2005); <u>see also</u> <u>United States v. Simpson</u>, 430 F.3d 1177, 1183 (D.C. Cir. 2005) ("A district court's failure to consider the sentencing factors listed in 18 U.S.C. § 3553(a) . . . [is] non-constitutional (statutory) error."). District courts have held that the Sentencing Guidelines calculation is merely one factor for the sentencing judge to consider that should not be given any greater weight than the other applicable Section 3553(a) factors. <u>See, e.g.</u>, <u>United States v. Simon</u>, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005) ("[T]he Guidelines are advisory and entitled to the same weight accorded to each other factor that the Court is instructed to consider by § 3553(a).").

Here, the PSIR mentions only 18 U.S.C. § 3553(a)(1), stating that the Court may find that the nature and circumstances of the offense are such that there was no intended loss, keeping the base offense level at a six. PSIR at 19 (¶ 88). While we agree that there was no intended loss, such a finding relates primarily to the Guidelines calculation. The remainder of the PSIR discusses only the potential Sentencing Guidelines calculation and omits any other reference to the applicable factors under 18 U.S.C. § 3553(a), such as the history and characteristics of the defendant, the seriousness of the offense, deterrence, rehabilitation, and the need to protect the public. As Mr. Jemal will explain in greater detail in his Sentencing Memorandum, virtually every one of these Section 3553(a) factors weighs heavily in favor of a non-Guidelines sentence that is far more lenient than the sentence called for by the Sentencing Guidelines analysis in the PSIR. Accordingly, Mr. Jemal objects to the failure of the PSIR to analyze the applicable sentencing factors set forth in 18 U.S.C. § 3553(a).

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 3

      3.    <u>The Intended Loss Calculation Is Erroneous</u>. Mr. Jemal disputes the conclusion in the PSIR that there was an intended loss in this case of $430,039.08, warranting a 14-level enhancement under U.S.S.G. § 2B1.1(b)(1)(H). PSIR at 8 (¶ 28). Although the PSIR contains no analysis of how this intended loss figure was derived, it appears to be based on the theory that the Defendants intended to cause Morgan Stanley to lose the entire amount of the MTD invoice.[1] For the reasons set forth below, we respectfully submit that there was no intended loss and no enhancement should apply.

      Application Note 2(A) to § 2B1.1 provides that "loss is the greater of actual loss or intended loss." Intended loss is "the pecuniary harm that was intended to result from the offense." <u>Id.</u> (App. Note 2(A)(II)). The application notes further provide that any loss shall be reduced by: "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." <u>Id.</u> (App. Note 2(E)(ii)).

      The evidence at trial failed to establish that Defendants intended to cause Morgan Stanley to suffer any loss. All evidence of intent established solely that Defendants used MTD to avoid their historic disputes with Mr. Cayre over fees and commissions. There was no evidence that the MTD invoice was intended to cause any loss to Morgan Stanley.

      In any event, however, any intended loss to Morgan Stanley in this case is more than fully offset by the collateral that Morgan Stanley had in both the equity of 77 P Street and the personal guarantees of Douglas Jemal and Joseph Cayre. In cases involving fraud against a lender, the value of any collateral given for the loan must be deducted from intended loss when determining a defendant's sentence. <u>See, e.g.</u>, <u>United States v. Weidner</u>, 437 F.3d 1023 (10th Cir. 2006). Here, at worst, Defendants obtained loan proceeds by false pretenses. Defendants did not steal any money outright. The funds were borrowed from Morgan Stanley. There was no evidence that Defendants defaulted on the Morgan Stanley loan, failed to make a payment, or otherwise failed to repay Morgan Stanley. Accordingly, the value of Morgan Stanley's collateral securing the loan at 77 P Street must be taken into account in determining the intended loss. Because Morgan Stanley's collateral in the 77 P Street loan far exceeded the $430,000 MTD invoice, Morgan Stanley could not possibly have lost money on the transaction and Defendants could not have intended any loss to Morgan Stanley.

---

[1] We reach this conclusion because Defendants could not have intended Mr. Cayre to suffer a loss of $430,039.08. Specifically, even if the Defendants intended to cause some loss to Mr. Cayre by the MTD invoice -- a proposition we vehemently dispute -- the maximum loss that Mr. Cayre could have suffered as a result of the invoice is approximately $215,000, or 50% of the total amount of the invoice, because Mr. Jemal and Mr. Cayre were 50-50 partners in the Cayre Jemal Gateway partnership. Therefore, any invoice paid by Cayre Jemal Gateway was a joint obligation, and Mr. Cayre could have only suffered a loss of 50% of the total invoice amount, or approximately $215,000.

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 4

In addition, even if Defendants were prohibited by the loan terms from receiving the MTD commission from the tenant improvements reserve and the $430,000 at issue should have been spent on tenant improvements at 77 P Street (which Defendants dispute), Defendants ultimately spent more than $430,000 in tenant improvements at 77 P Street after the tenant improvements reserve was spent and before the commencement of any investigation into these matters. By so doing, Defendants fully protected Morgan Stanley's interest in the property and the intended loss should be zero.

The PSIR notes these and other issues as potential factors that may warrant a "departure." PSIR at 19 (¶ 88). We respectfully submit, however, that the foregoing analysis demonstrates that the loss enhancement should not apply at all, and there is no need for any "departure" because the total offense level (before any adjustments for role in the offense) should be a level six. We urge you to amend your report in this manner and eliminate the proposed enhancement for intended loss from the Sentencing Guidelines calculation.

4.    The Two-Level Enhancement For Role In The Offense Does Not Apply.
Mr. Jemal disputes the conclusion in the PSIR that a two-level "role in the offense" enhancement under § 3B1.1(c) applies in this case. Mr. Jemal did not organize, lead, manage or supervise any of the participants in the MTD transaction for purposes of the enhancement. It appears that the PSIR erroneously applied the enhancement solely because of Mr. Jemal's leadership position in Douglas Development.

Under U.S.S.G. § 3B1.1, a defendant's offense level may be increased by (a) four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive"; (b) three levels "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive"; or (c) two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. § 3B1.1. In this case, none of these adjustments apply because the government failed to prove that the Mr. Jemal organized, led, managed or supervised any of the activity constituting the offense of conviction and "[t]his adjustment does not apply to a defendant who merely suggests committing the offense." U.S.S.G. § 3B1.1 (App. Note 4).

"To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 (App. Note 2). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 (App. Note 1). The government introduced no evidence establishing that Mr. Jemal exercised any degree of control or supervision over another "criminally responsible" participant. See United States v. Quigley, 373 F.3d 133, 139 (D.C. Cir. 2004) ("As we have recognized, 'all persons receiving an enhancement [under § 3B1.1] must exercise some control over others.'") (citing Graham, 162 F.3d at 1185); United States v. Jobe, 101 F.3d 1046, 1065 (5th Cir. 1996) (court vacated two-point enhancement under § 3B1.1(c) because lower court "incorrectly conclud[ed] that [defendant's] position as director of two of the banks involved . . . demonstrat[ed] that he managed or supervised the criminal activity.").

STEPTOE & JOHNSON ʟʟᴘ

Renee L. Moses-Gregory
January 26, 2007
Page 5

The evidence failed to establish that Mr. Jemal organized or managed any participants in the MTD transaction. The government proved only that Mr. Jemal signed the documents needed to open the MTD bank account at Adams Bank, see GX 54; Tr. 657 (Scott), and had a conversation with Mr. Cayre after the relevant events took place in which he explained that Douglas Development submitted the invoice on MTD letterhead to avoid the fighting that took place between them. Tr. 2150 (Cayre). The government did not prove that Mr. Jemal played any role in the creation of the MTD invoice or related documents.[2] The government also introduced no evidence suggesting that Mr. Jemal directed anyone else as to the preparation of the MTD invoice or managed any other details relating to the alleged offense. Thus, this case bears no resemblance to those cases in which the D.C. Circuit has held that a defendant's involvement in criminal activity qualified him as an organizer, leader, manager or supervisor. See, e.g., United States v. Rhodes, 894 F. Supp. 1, 4 (D.C. Cir. 1995) (adjustment applied to defendant who "was the one who had the checks,[] was the one signing the checks, and [] was directing what was to be done, when and where.") (citation and quotation marks omitted); United States v. Wilson, 240 F.3d 39, 46 (D.C. Cir. 2001) (defendant in bank fraud case was "organizer or leader of criminal activity" because he "'solicited [participant's] involvement' in the criminal conduct, and gave him 'very explicit directions as to exactly the kind of information, and exactly the kind of profile that he wanted [the participant] to get out of the bank's records.'").

In its section regarding the role enhancement, the PSIR notes that Mr. Jemal "is the owner and operator of Douglas Development Corporation," and that he entered into the loan with Morgan Stanley. PSIR at 7 (¶ 19). The PSIR thus suggests that Mr. Jemal's leadership position in Douglas Development is sufficient to trigger the role enhancement under § 3B1.1. On the contrary, the inference that the head of a legitimate company was also an active organizer, leader, manager or supervisor of criminal activity is insufficient to trigger the sentencing enhancement for aggravating role. See United States v. Carter, 449 F.3d 1287, 1299 (D.C. Cir. 2006) ("Absent findings by the district court on [defendant's] degree of control or authority over his associates, the district court could not enhance his sentence under § 3B1.1(a).") (citing United States v. Graham, 162 F.3d 1180, 1185 (D.C. Cir. 1998); United States v. Thomas, 114 F.3d 228, 261 (D.C. Cir. 1996)). The government was required to prove Mr. Jemal's active role in organizing, leading, managing or supervising the offense conduct and failed to do so. In sum, Mr. Jemal should receive no upward adjustment to his offense level based on his role in the offense.

---

[2] Although the government attempted to prove that Mr. Jemal had Mike Rowe sign MTD-related documents, Mr. Rowe testified that he did not know whether the documents Mr. Jemal asked him to sign were related to MTD at all. Tr. 1316-17; 1320-21.

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 6

## SPECIFIC OBJECTIONS / CLARIFICATIONS TO THE PSIR

5.     Page 4 (¶ 1). The PSIR erroneously states that Mr. Jemal was charged with Fraud in the First Degree in Count Four of the original Indictment. In fact, only Blake Esherick was charged in the original Count Four.

6.     Page 4 (¶ 4). The PSIR erroneously states that "[o]n October 26, 2006, defendant Norman Jemal was acquitted by a jury of all Counts charged in the Indictment." Norman Jemal was acquitted by a jury of Counts One through Three only. On October 16, 2006, the Court granted Norman Jemal's Motion for a Judgment of Acquittal on Count Four (originally Count Five). Tr. 4176. Norman Jemal was not charged in the original Counts Six through Eight (the tax evasion charges).

7.     Page 5 (¶ 12). The PSIR erroneously states that "[a]dditionally, CJG owed money to Cayre, and Douglas Jemal personally owed monies, in excess of $19 million, to Cayre related to other personal belongings." As of November 18, 2002, Douglas Jemal owed Joe Cayre $3,071,989 for properties other than 77 P Street (also referred to as Square 669). The approximately $19.2 million that Mr. Cayre was scheduled to receive from the proceeds of the Morgan Stanley loan consisted of primarily repayment of Mr. Cayre's funding of the Cayre Jemal's Gateway partnership and also this approximately $3.1 million that Mr. Jemal owed Mr. Cayre from other projects. See GX 197-0002 (highlighted in yellow) (attached as Exhibit A).

8.     Page 5 (¶ 12). Mr. Jemal objects to the statement in the PSIR that "Morgan Stanley lent CJG $67 million, secured by the 77 P Street property" because it is incomplete. The $67 million that Morgan Stanley lent Cayre Jemal's Gateway LLC was secured by the 77 P Street property and a personal guaranty executed by Douglas Jemal and Joe Cayre. See GX 113-332-46 (attached as Exhibit B).

9.     Page 5 (¶ 12). Mr. Jemal objects to the statement in the PSIR that "[a]t the time of the loan, substantial portions of the building were vacant." In fact, while the rental payments associated with the lease addenda for the first and sixth floors, as well as portions of the basement and fifth floors, had not commenced, those addenda had been executed and only 3.51% of 77 P Street was vacant at the time of the Morgan Stanley loan. See GX 113-229 (Rent Roll included in Morgan Stanley loan documentation) (attached as Exhibit C).

10.     Page 5 (¶ 12). The PSIR erroneously states that "[a]t the time of the loan, Douglas Jemal and Cayre agreed that Cayre would be repaid his capital investment for the property (in excess of $19 million) plus interest . . . ." Mr. Cayre's capital investment in 77 P Street was $12,432,976, including interest. See Ex. A. The remainder of the $19 million that was scheduled to be paid to Mr. Cayre represented repayment of his loan to the partnership for Square 670 (a piece of land adjacent to the 77 P Street property), repayment of Mr. Cayre's loan to Douglas Jemal for the Woodies project they completed together, a financing fee Mr. Jemal agreed to pay to Mr. Cayre for the 77 P Street refinancing, and a distribution of just under $1 million of remaining loan funds.

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 7

11.    Page 5 (¶ 13). Mr. Jemal objects to the statement in the PSIR that "[t]he approximately $7 million balance was also held back and placed in escrow by Morgan Stanley 'to be used exclusively to pay for tenant improvements associated with the buildout of the unoccupied space.'" In fact, the funds in the tenant improvements reserve could also be used to pay leasing commissions and other fees. For example, Morgan Stanley paid a leasing commission for the Staubach Company out of the tenant improvements reserve, Tr. 1224-1226; GX 411-0002, as part of the same draw request that included the MTD leasing commission. In addition, Morgan Stanley representative Ben Black testified that paying commissions out of the tenant improvements reserve did not violate the loan agreement. Tr. 1267-68. The government introduced no evidence to the contrary. In addition, Morgan Stanley paid Douglas Development construction management fees out of the tenant improvements reserve. GX 411-0007; Tr. 1235. Thus, the tenant improvements reserve was by no means used exclusively to pay for tenant improvements associated with the buildout of the tenant space at 77 P Street.

12.    Page 6 (¶ 16). Mr. Jemal objects to the characterization of the MTD invoice as containing "fraudulent information."

13.    Page 6 (¶ 17). Mr. Jemal objects to the statement in the PSIR that "Douglas Jemal and/or Esherick, with others, obtained from Michael Rowe, his signature on a 'lien release' document . . . ." Mr. Rowe testified that he could not recall if the document that Mr. Esherick asked him to sign when he visited the Douglas Development offices was the MTD lien release, Tr. 1296-1298 (direct), or if any of the documents Douglas Jemal asked Mr. Rowe to sign were related to MTD at all. Tr. 1316-17 (cross); Tr. 1320-21 (re-direct).

14.    Page 6 (¶ 17). Mr. Jemal objects to the statement in the PSIR that "defendants and other participants, were involved in creating a memorandum that contained the wiring information for the MTD Adams National Bank account." Dave Medding testified that he created the MTD wiring instructions memorandum at Paul Millstein's instruction and did not implicate Douglas Jemal. Tr. 869. No witness testified that Mr. Jemal was involved in creating this memorandum.

15.    Page 7 (¶ 19). Mr. Jemal objects to the statement in the PSIR that he "submitted fraudulent documents [to Morgan Stanley] and directed his subordinates to engage in similar behavior, for which he received $430,039.08 from that loan." There was simply no testimony or other evidence that Mr. Jemal submitted any documentation to Morgan Stanley or directed others to do so. Consequently, as set forth above, Mr. Jemal also objects to the two-level enhancement for his role in the offense, pursuant to § 3B1.1(c).

16.    Page 7 (¶ 22). The PSIR erroneously states that "[Jack Brownell] has been indicted . . . in the instant offense. However, as his trial is scheduled for February 2007, his role in the instant offense has not yet been determined." Mr. Brownell was not indicted in the instant offense. Mr. Brownell was indicted of one count of conspiracy to commit tax evasion (Count One) and five counts of tax evasion (Counts Two-Six) and is scheduled to go to trial on February 9, 2007. Mr. Brownell's indictment is unrelated to the MTD transaction at issue.

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 8

17.     Page 8 (¶ 28).  For the reasons set forth above and in Mr. Jemal's forthcoming sentencing memorandum, Mr. Jemal disputes the PSIR's conclusion that the intended loss in this case was $430,039.08, triggering a 14-level enhancement under U.S.S.G. § 2B1.1(b)(1)(H).

18.     Page 8 (¶ 30).  For the reasons set forth above and in Mr. Jemal's forthcoming sentencing memorandum, Mr. Jemal disputes the PSIR's conclusion that the two-level role enhancement set forth in U.S.S.G § 3B1.1(c) applies in this case.

19.     Page 8 (¶¶ 32, 35).  Mr. Jemal objects to the PSIR's conclusion that the adjusted offense level (subtotal) and total offense level in this case are level 22.  For the reasons set forth above, the specific offense characteristic and adjustment for role in the offense imposed in the PSIR do not apply in this case.  As a result, Mr. Jemal's adjusted and total offense levels should be a level six.

20.     Page 10 (¶ 44).  The PSIR erroneously states that "[Norman Jemal] was a co-defendant in the instant offense, who was acquitted by a jury."  While Norman Jemal was a co-defendant, the Court granted his Motion for a Judgment of Acquittal on Count Four on October 16, 2006, prior to jury deliberations.  Tr. 4176.

21.     Page 12 (¶ 55).  The PSIR erroneously states that Norman Jemal owns 20% of Douglas Development Corporation.  In fact, Douglas Jemal owns 100% of the business.

22.     Page 12 (¶ 57).  Paragraph 57 summarizes Mr. Jemal's estimated net equity in closely held companies and partnerships.  In order to ensure that the record is clear, Mr. Jemal notes that the information in this paragraph -- as well as the information in much of the rest of the PSIR -- is based on Mr. Jemal's statement of financial condition as of December 31, 2005.  Mr. Jemal's 2006 financial statement had not been prepared as of the date of his interview with the Probation Officer, and has not yet been prepared because it takes a significant amount of time to compile.  While the PSIR correctly states Mr. Jemal's estimated net equity in partnerships as of December 31, 2005, it erroneously states that Mr. Jemal's net equity in closely held companies as of December 31, 2005, was $9,932,420.  In fact, as indicated in the financial statement submitted to the Probation Officer, Mr. Jemal's net equity in closely held companies as of December 31, 2005 was $624,923,675.

23.     Page 13 (Table of Financial Condition).  Mr. Jemal's actual net worth is greater than the net worth identified in this table.  The PSIR does not include Mr. Jemal's equity in business interests (such as partnerships and closely held corporations) in this analysis of net worth.  Mr. Jemal's actual net worth, as indicated in the December 31, 2005 financial statement submitted to the Probation Office, was approximately $734,073,376 as of December 31, 2005.  We submit this information to ensure that the PSIR is accurate.  However, we believe this information is immaterial to the PSIR because Mr. Jemal does not dispute that he has the ability to pay a fine in this case.

24.     Page 13 (Monthly Cash Flow).  Mr. Jemal has additional monthly living expenses that are not reflected in the table in the PSIR.  For instance, Mr. Jemal has expenses for food, clothing

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 9

and support of his wife and family. However, we believe this information is immaterial to the PSIR because Mr. Jemal does not dispute that he has the ability to pay a fine in this case.

25.    Page 17 (¶ 71). Mr. Jemal does not dispute that he has the ability to pay a fine. Again, for purposes of clarification, the net worth calculation in the PSIR omits Mr. Jemal's net equity in business holdings (such as closely held corporations and partnerships), which makes his net worth substantially in excess of $13,230,238.

26.    Page 17 (¶ 73). For the reasons set forth above, Mr. Jemal objects to the total offense level of 22 set forth in the PSIR. Because the specific offense characteristic and adjustment for role in the offense do not apply, Mr. Jemal's total offense level is six, providing for a guidelines range of zero to six months imprisonment. U.S.S.G. Chapter 5, Part A.

27.    Page 17 (¶ 78). The PSIR states that the Court should consider additional conditions of "financial disclosure" and a fine in this case. As set forth above, Mr. Jemal does not dispute that he is eligible to pay a fine in this case. However, Mr. Jemal objects to any suggestion in the PSIR that Mr. Jemal should be required to make some special form of additional financial disclosure. The offense conduct at issue did not relate to concealing Mr. Jemal's financial condition or assets. Mr. Jemal should not be required to make any special financial disclosure simply because he has a high net worth completely unrelated to the offense conduct at issue.

28.    Page 18 (¶ 80). Mr. Jemal objects to the conclusion that he falls within Zone D of the Sentencing Table and is not eligible for probation. On the contrary, at an offense level of six, Mr. Jemal falls within Zone A of the Sentencing Table and is therefore eligible for probation. See U.S.S.G. § 5B1.1(a)(1).

29.    Page 18 (¶ 84). The reference to "Count 1" should be changed to "Count 4" or "the charge of conviction."

30.    Page 18 (¶ 85). Mr. Jemal objects to the conclusion in the PSIR that the fine range is from $7,500 to $75,000, which is based on a total offense level of 22. In fact, because Mr. Jemal's total offense level should be a level six, the applicable fine range is $500 to $5,000.

31.    Page 19 (¶ 88). Mr. Jemal does not dispute that "the Court may find the nature and circumstances of the Wire Fraud offense are such that there was no intended loss" and that the base offense level in this case is level six. However, Mr. Jemal contends, as set forth above, that the factors supporting a finding of no intended loss require an original determination that the intended loss in this case is zero, resulting in a base offense level of six, and consideration of these factors pursuant to 18 U.S.C. § 3553(a)(1) is unnecessary. Mr. Jemal also respectfully submits that there are several additional factors in this case that may warrant a downward departure and/or the imposition of a non-Guidelines sentence far below the proposed sentence range in the PSIR. Mr. Jemal will address those factors in his forthcoming sentencing memorandum.

STEPTOE & JOHNSON LLP

Renee L. Moses-Gregory
January 26, 2007
Page 10


      Thank you for your consideration.  Please do not hesitate to contact us if you have any questions about this letter or need any additional information for the final PSIR.

          Respectfully submitted,

          Reid H. Weingarten (D.C. Bar #365893)
          Brian M. Heberlig (D.C. Bar #455381)
          Steptoe & Johnson LLP
          1330 Connecticut Avenue, N.W.
          Washington, D.C.  20036-1795
          (202) 429-3000

          Michele A. Roberts
          Jeffrey M. King
          Akin Gump Strauss Hauer & Feld LLP
          1333 New Hampshire Avenue, N.W.
          Washington, D.C.  20036
          (202) 887-4306

          Christopher B. Mead
          London & Mead
          1225 19th Street, N.W.
          Suite 320
          Washington, D.C.  20036
          (202) 331-3334

          Counsel for Douglas Jemal

Attachments


cc:    AUSA Mark Dubester

# EXHIBIT A

# 77 P STREET
## FUND DISBURSEMENT SCHEDULE
### AS OF NOVEMBER 18, 2002

| | |
|---|---:|
| FUNDS HELD BACK | 19,345,417 |
| | |
| RELEASE SCHEDULE | |
| OCCUPANCY OF 6TH, 5TH, LL<br> - ESTIMATED RELEASE DATE, 12/21-28/02 | 12,750,000 |
| OCCUPANCY OF FIRST FLOOR<br> - ESTIMATED RELEASE DATE, 1/15/03 | 6,595,417 |

| _ALLOCATION OF FUNDS_ | |
|---|---:|
| FEE TO MIDTOWN EQUITIES | 670,000 |
| PAYOFF LOAN TO PEOPLES FIVE PARTNERS FOR SQUARE 669 | 12,432,976 |
| PAYOFF PEOPLES FIVE PARTNERS LOAN FOR SQUARE 670 | 2,180,122 |
| PAYOFF DOUGLAS JEMAL LOAN FOR SQUARE 670 * | 2,180,122 |
| REMAINING DISTRIBUTION TO CAYRE | 941,099 |
| REMAINING DISTRIBUTION TO JEMAL | 941,098 |
| TOTAL FUNDS | 19,345,417 |

| | |
|---|---:|
| TOTAL FUNDS TO CAYRE | 16,224,197 |
| TOTAL FUNDS TO JEMAL * | 3,121,220 |

| | |
|---|---:|
| * - FUNDS TO JEMAL | 3,121,220 |
| PAYOFF TO CAYRE - SQUARE 670 | (936,321) |
| PAYOFF TO CAYRE - WOODIES | (2,135,668) |
| NET FUNDS TO JEMAL | 49,231 |
| NET FUNDS TO CAYRE | 19,296,186 |

DDC 001920

# EXHIBIT B

MSDWMC Loan No. 02-11797

## GUARANTY

This GUARANTY (this "**Guaranty**") is executed as of November 19, 2002 by **DOUGLAS JEMAL** and **JOSEPH CAYRE**, each an individual (whether one or more collectively referred to as "**Guarantor**"), for the benefit of **MORGAN STANLEY DEAN WITTER MORTGAGE CAPITAL INC.**, a New York corporation ("**Lender**").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Promissory Note, dated of even date herewith, executed by **CAYRE JEMAL'S GATEWAY HOLDINGS LLC**, a District of Columbia limited liability company ("**Borrower**") and payable to the order of Lender in the original principal amount of Sixty Seven Million and No/100 Dollars ($67,000,000) (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan (the "**Loan**") which is made pursuant to that certain Loan Agreement, dated of even date herewith, between Borrower and Lender (the "**Loan Agreement**") and is secured by, among other things, the Security Instrument (as defined in the Loan Agreement);

WHEREAS, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1    Guaranty of Obligation.**  Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**1.2    Definition of Guaranteed Obligations.**  As used herein, the term "**Guaranteed Obligations**" means the obligations or liabilities of Borrower to Lender for any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

50193378v2

00000331

113-0332

(a)   fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan;

(b)   the gross negligence or willful misconduct by Borrower;

(c)   the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity or in the Security Instrument concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in either document;

(d)   the removal or disposal of any portion of the Property after an Event of Default;

(e)   the misapplication or conversion by Borrower of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (ii) any awards or other amounts received in connection with the Condemnation of all or a portion of the Property and (iii) any Rents following an Event of Default;

(f)   failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property;

(g)   any security deposits, advance deposits or other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(h)   the breach by Borrower of Borrower's indemnification obligations set forth in Section 9.2 of the Loan Agreement;

(i)   the breach by Borrower of Borrower's obligations set forth in Sections 6.5.2 and 6.5.3 of the Loan Agreement;

(j)   Borrower's failure to (i) permit on-site inspections of the Property, (ii) provide financial information or (iii) appoint a new property manager upon the request of Lender after an Event of Default, each as required by, and in accordance with the terms and provisions of, the Loan Agreement and the Security Instrument.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents and (ii) Guarantor shall be liable for the full amount of the Debt in the event that (A) the first full monthly payment of principal and interest on the Note is not paid when due; (B) Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of, the Loan Agreement

50193378v2-

.00000332

113-0333

and the Security Instrument; (C) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary lien encumbering the Property; (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Security Instrument, (E) Intentionally Deleted, or (F) if the Property or any part thereof shall become an asset in (1) a voluntary bankruptcy or insolvency proceeding, or (2) an involuntary bankruptcy or insolvency proceeding (a) which is commenced by any party controlling, controlled by or under common control with Borrower or Fee Owner (which shall include, but not be limited to, any creditor or claimant acting in concert with Borrower or Fee Owner or any of the foregoing parties) (the "Borrowing Group") or (b) in which any member of the Borrowing Group objects to a motion by Lender for relief from any stay or injunction from the foreclosure of the Security Instrument or any other remedial action permitted under the Note or the Security Instrument or the other Loan Documents or (iii) if a court of competent jurisdiction holds that the granting, execution or delivery of the Security Instrument or any other Loan Documents is or constitutes a fraudulent conveyance under any bankruptcy, insolvency or fraudulent conveyance law or is otherwise voidable under any such laws.

1.3     **Nature of Guaranty.**   This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

1.4     **Guaranteed Obligations Not Reduced by Offset.**   The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower or any other party against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

1.5     **Payment By Guarantor.**   If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

50193378v2-

-3-

113-0334

**1.6    No Duty To Pursue Others.** It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**1.7    Waivers.** Guarantor agrees to the provisions of the Loan Documents and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Security Instrument, the Loan Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

**1.8    Payment of Expenses.** In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

**1.9    Effect of Bankruptcy.** In the event that pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law or any judgment, order or decision thereunder, Lender must rescind or restore any payment or any part thereof received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

**1.10    Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Lender), to assert any claim against or seek contribution,

50193378v2-

-4-

00000334

113-0335

indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

**1.11    Borrower.** The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), limited liability company joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

## ARTICLE II

### EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

**2.1    Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Security Instrument, the Loan Agreement, the other Loan Documents or any other document, instrument, contract or understanding between Borrower and Lender or any other parties pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

**2.2    Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3    Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4    Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations or any document or agreement executed in connection with the Guaranteed Obligations for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations or any part thereof exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is *ultra vires*, (iii) the officers or representatives executing the Note, the Security Instrument, the Loan Agreement or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery

00000335

113-0336

and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Security Instrument, the Loan Agreement or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

2.5    **Release of Obligors.**  Any full or partial release of the liability of Borrower on the Guaranteed Obligations or any part thereof, or of any co-guarantors, or any other Person now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

2.6    **Other Collateral.**  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

2.7    **Release of Collateral.**  Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

2.8    **Care and Diligence.**  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of any collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

2.9    **Unenforceability.**  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

2.10    **Offset.**  The Note, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or

50193378v2-

00000336

113-0337

by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

**2.11    Merger.**  The reorganization, merger or consolidation of Borrower into or with any other Person.

**2.12    Preference.**  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.13    Other Actions Taken or Omitted.**  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1    Benefit.**  Guarantor is an Affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2    Familiarity and Reliance.**  Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3    No Representation By Lender.**  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

**3.4    Guarantor's Financial Condition.**  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is and will be solvent and has and will have assets which, fairly valued, exceed its obligations, liabilities (including

50193378v2-

-7-

00000337

113-0338

contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not and will not contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or become a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6** **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

### ARTICLE IV

### SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1** **Subordination of All Guarantor Claims.** As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. After the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2** **Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application against the Guaranteed Obligations, any dividend or payment which is otherwise payable to Guarantor and which, as between Borrower and Guarantor, shall constitute a credit against the Guarantor Claims, then, upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which

-8-

50193378v2-

00000338

113-0339

would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3    Payments Held In Trust.**  In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4    Liens Subordinate.**  Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach.  Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V

## MISCELLANEOUS

**5.1    Waiver.**  No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right.  The rights of Lender hereunder shall be in addition to all other rights provided by law.  No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved.  No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2    Notices.**     All notices given hereunder shall be in writing and shall be either hand delivered or mailed, by registered U.S. mail, Return Receipt Requested, first class postage prepaid, to the parties at their respective addresses below or at such other address for any party as such party may designate by notice to the other parties hereto:

S0193378v2-

00000339

113-0340

| If to Lender: | Morgan Stanley Dean Witter Mortgage Capital Inc.<br>1585 Broadway<br>10th Floor<br>New York, New York 10036<br>Attention: Stephen Holmes<br>Facsimile No.: (212) 761-3286 |
| --- | --- |
| with a copy to: | Stroock & Stroock & Lavan LLP<br>2029 Century Park East, Suite 1800<br>Los Angeles, California 90067-3086<br>Attention: Jody M. Heitner, Esq.<br>Facsimile No.: (310) 556-5959 |
| If to Guarantor: | Douglas Jemal<br>Douglas Development Corporation<br>702 H Street, N.W.<br>Washington, D.C. 20001<br><br>Joseph Cayre<br>c/o Midtown Equities LLC<br>417 5th Avenue, 9th Floor<br>New York, New York 10016 |
| with a copy to: | Leibner & Potkin, P.C.<br>4725 Wisconsin Avenue<br>Suite 250<br>Washington, D.C. 20016<br>Attention: Lane H. Potkin, Esq.<br>Facsimile No.: (202) 244-8930 |

5.3    **Governing Law; Submission to Jurisdiction.**  This Guaranty shall be governed by and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America.  Any legal suit, action or proceeding against Lender or Guarantor arising out of or relating to this Guaranty may at Lender's option be instituted in any Federal or State court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding.  Guarantor does hereby designate and appoint:

Cayre Jemal's Gateway Holdings LLC
c/o CT Corporation System
111 8th Avenue
New York, New York 10011

-10-

50193378v2-

00000340

113-0341

as its authorized agent to accept and acknowledge on its behalf service of any and all process which may be served in any such suit, action or proceeding in any Federal or State court in New York, New York, and agrees that service of process upon said agent at said address and written notice of said service mailed or delivered to Guarantor in the manner provided herein shall be deemed in every respect effective service of process upon Guarantor in any such suit, action or proceeding in the State of New York.

**5.4    Invalid Provisions.**  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

**5.5    Amendments.**  This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

**5.6    Parties Bound; Assignment; Joint and Several.**  This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

**5.7    Headings.**  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

**5.8    Recitals.**  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered *prima facie* evidence of the facts and documents referred to therein.

**5.9    Counterparts.**  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

**5.10    Rights and Remedies.**  If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender

00000341

113-0342

hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.11   **Other Defined Terms.**  Any capitalized term utilized herein shall have the meaning as specified in the Loan Agreement, unless such term is otherwise specifically defined herein.

5.12   **Entirety.**  THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF.   THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT.   THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

5.13   **Waiver of Right To Trial By Jury.**  GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, THE LOAN AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.

5.14   **Cooperation.**  Guarantor acknowledges that Lender and its successors and assigns may (i) sell this Guaranty, the Note and other Loan Documents to one or more investors as a whole loan, (ii) participate the Loan secured by this Guaranty to one or more investors, (iii) deposit this Guaranty, the Note and other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the Loan or interest therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as "**Secondary Market Transaction**"). At no material cost or expense to Guarantor, Guarantor shall cooperate with Lender in effecting any such Secondary

-12-

50193378v2-

Market Transaction and shall cooperate to implement all requirements imposed by any Rating involved in any Secondary Market Transaction. Guarantor shall provide such information and documents relating to Guarantor, Borrower, the Property and any tenants of the Improvements as Lender may reasonably request in connection with such Secondary Market Transaction. In addition, Guarantor shall make available to Lender all information concerning its business and operations that Lender may reasonably request. Lender shall be permitted to share all such information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Secondary Market Transaction. It is understood that the information provided by Guarantor to Lender may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors may also see some or all of the information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Guarantor in the form as provided by Guarantor. Lender may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

**5.15    Reinstatement in Certain Circumstances.**  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[NO FURTHER TEXT ON THIS PAGE]

50193378v2-

-13-

00000343

113-0344

EXECUTED as of the day and year first above written.

GUARANTOR:

DOUGLAS JEMAL

JOSEPH CAYRE

50193378v2

00000344

113-0345

EXECUTED as of the day and year first above written.

**GUARANTOR:**

DOUGLAS JEMAL

JOSEPH CAYRE

50193378v2

00000345

113-0346

# EXHIBIT C

113-0229

Dec 02 02 05:44p   Jack Brownell   202 347 6107   p.2

## 77 P STREET
## RENT ROLL
### December 2, 2002

| FLOOR | TENANT | S.F. | RENT PER S.F. | ANNUAL RENT | LEASE COMM | LEASE EXPIR |
|---|---|---|---|---|---|---|
| LL-BASE | VACANT | 12,000 | 20.00 | 240,000 | n/a | n/a |
| LL-BASE | NEW ECONOMY ACT AGENCY | 24,387 | 20.00 | 487,740 | see note below | 6/30/2011 |
| 1st | N. CAPITAL HOSP (Café) | 1,400 | 28.00 | 39,200 | see note below | TBD |
| 1st | DEPT OF TRANSPORTATION | 30,000 | 31.75 | 952,500 | see note below | 6/30/2011 |
| 1st | DEPT OF HEALTH | 9,460 | 31.75 | 300,355 | see note below | 6/30/2011 |
| 2nd - 3rd | DEPT OF EMPLOYMENT SRVS. | 105,754 | 33.66 | 3,559,680 | see note below | 6/30/2011 |
| 4th | DEPT OF MENTAL HEALTH SRV | 52,900 | 36.07 | 1,908,103 | 06/22/01 | 6/30/2011 |
| 5th | DEPT OF MENTAL HEALTH SRV | 15,000 | 36.07 | 541,050 | 12/01/01 | 6/30/2011 |
| 5th | DEPT OF HEALTH | 37,900 | 34.00 | 1,288,600 | 05/01/02 | 6/30/2011 |
| 6th | DEPT OF HUMAN SERVICES | 52,900 | 34.00 | 1,798,600 | see note below | 8/30/2011 |
| ROOF | APC REALTY & EQUIPMENT | 0 | 0.00 | 31,200 | see note below | 6/30/2011 |
| (CURRENT) | LEASED PARKING SPACES | 173 | $80/mo | 166,080 | | 5/31/2012 |
| (FUTURE) | LEASED PARKING SPACES | 154 | $80/mo | 147,840 | | |
| | **TOTALS** | **341,701** | | **11,460,948** | | |

| | | | | | |
|---|---|---|---|---|---|
| VACANT | 12,000 | 3.51% | 240,000 |
| LEASED | 329,701 | 96.49% | 11,220,948 |

CERTIFIED TO BE TRUE
AND CORRECT

JACK BRADWELL, CFO

00000228



## ENTRANCE CLOSING TIMES

Here's a list of stations where one entrance may close early at night and all day on weekends. Other entrances to that station are open.

| STATION | WEEKDAYS | WEEKENDS |
|---|---|---|
| ARLINGTON CEMETERY | | |
| Oct 1 - Apr 1 | 7 p.m. | 7 p.m. |
| Apr 2 - Sep 30 | 10 p.m. | 10 p.m. |
| FARRAGUT NORTH | | |
| Connecticut Avenue and L Street, NW | 10 p.m. | all day |
| FARRAGUT WEST | | |
| 17th Street NW | midnight | all day |
| JUDICIARY SQUARE | | |
| 4th Street NW | midnight | all day |
| L'ENFANT PLAZA | | |
| 7th and D Streets, NW | midnight | all day |
| SMITHSONIAN | | |
| The Mall | 10 p.m. | 10 p.m. |

(0401)

# WEEKDAY MID-DAY
# Train Times



# Metrorail
# Timetable
## Weekday Mid-Day

Schedule 6-26-05



**Washington Metropolitan
Area Transit Authority**

*A District of Columbia, Maryland
and Virginia Transit Partnership*

INFORMATION ANYTIME 202-637-7000

TTY 202-638-3780    MetroOpensDoors.com

Metro opens doors